**E-FILED**
Wednesday, 31 May, 2006  04:41:16 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| GREGORY CHURCHILL, ROBERT DELOACH | ) | |
| JONATHAN RICHARD, SANDRA CREWS | ) | |
| JASON SMITH, KIM LINNEMAN, | ) | |
| CONNIE HEDGES, ELIZABETH BAVERY, | ) | |
| CHARLES ROWSEY, KATIE BABOCK, | ) | |
| ANDREW WREN, CHARLES FURMAN, | ) | |
| YVONNE HAMMOND, TRACY CASSIDAY, | ) | |
| CHRISTOPHER CASSIDAY, KELLY MIZE, | ) | |
| KATHY HILLIER, CONCHETTA BUTLER, | ) | |
| DANIELLE FLORENCE, STACEY BURGESS, | ) | Docket No. 4: 06-CV-4023 |
| KEVIN WINKING and MELISSA MILLER | ) | |
| on behalf of themselves and all other similarly | ) | Hon. Michael M. Mihm |
| situated individuals, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FARMLAND FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF J.P. MORGAN TRUST COMPANY,
NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE OF THE
FI LIQUIDATING TRUST, AND REORGANIZED FLI, INC.
TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FEDERAL
RULES OF CIVIL PROCEDURE 12(b)(1) AND (6)**

J.P. Morgan Trust Company, National Association, in its capacity as trustee (the

"Liquidating Trustee") of the FI Liquidating Trust (the "Liquidating Trust"), and Reorganized

FLI, Inc. ("Reorganized FLI"),[1] submit this memorandum in support of their motion to dismiss

---

[1] Plaintiffs improperly named as a defendant Farmland Foods, Inc. ("Defendant" or "Debtor"), which was merged into Farmland Industries, Inc. as part of the Second Amended Joint Plan of Reorganization (the "Plan") under Chapter 11 of the United States Bankruptcy Code (the "Code") in the case entitled, *In re Farmland Industries, Inc., et al.* No. 02-50557-JWW (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court") (the Plan is attached as Ex. 1). Under the Plan, the

(the "Motion") all counts of the Supplemented Class Action Complaint (the "Complaint") of Plaintiffs Gregory Churchill, et al. (the "Plaintiffs") against Defendant, pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  In support of its Motion, the Liquidating Trustee and Reorganized FLI respectfully state as follows:

## INTRODUCTION

Plaintiffs' Complaint is improperly filed and must be dismissed in its entirety. Most significantly, this Court has no jurisdiction over this matter.  Defendant Farmland Foods, Inc. was a debtor in the Chapter 11 case, *In re Farmland Industries, Inc., et al.* pending in the Bankruptcy Court.  Pursuant to the Plan and the Bankruptcy Court's Confirmation Order ("Confirmation Order," attached as Ex. 2),[2] the Bankruptcy Court  has exclusive jurisdiction over all matters related to the Chapter 11 Case and the Plan, as Plaintiffs' Complaint is.  Because this

---

Liquidating Trustee is vested with the right to pursue any motions arising in connection with the Chapter 11 Case on behalf of the Debtors, certain affiliated debtors, and their estates.  As the Liquidating Trustee and Reorganized FLI detail below, Plaintiffs' failure to name a proper party-defendant is one reason why the Complaint must be dismissed.  However, even assuming that Plaintiffs had avoided or could cure this defect, the Complaint is otherwise fatally flawed and must be dismissed.

[2] For purposes of a motion to dismiss, this Court may take judicial notice over these and the other public documents attached to this Motion that evidence the Liquidating Trustee's and Reorganized FLI's right to dismissal here.  Doing so is proper under a motion to dismiss.  *See In re Johnson*, 238 B.R. 462, 465 (Bankr. W.D. Mo 1999) (Court took judicial notice of the bankruptcy schedules, the Disclosure Statement, the Plan and the Order setting the Bar Date); *see also Pierce v. Ill. Dept. of Human Servs.*, 128 Fed. Appx. 534, 536 note 1 (7th Cir. 2005) (*citing Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) for proposition that district court could take judicial notice of public court documents while considering a 12(b)(6) motion to dismiss and avoid converting to a motion for summary judgment); *Baker v. Potter*, 2006 WL 895904, *3 (7th Cir. 2006) (where the district court relied only on documents attached to the complaint and a decision of which it properly took judicial notice, it was not necessary to consider motion as one for summary judgment).

2

Court has no subject matter jurisdiction here, Plaintiffs' Complaint is improperly filed with this Court and must be dismissed pursuant to F.R.C.P. 12(b)(1).

Separate from the lack of jurisdiction, Plaintiffs' Complaint must independently be dismissed because Plaintiffs failed to file a timely claim against the Debtor, Farmland Foods, Inc., within the deadlines for both pre-petition and administrative claims ordered by the Bankruptcy Court. What Plaintiffs allege in their Complaint should have been set forth as either a pre-petition or administrative claim. Since Plaintiffs filed no claim within either deadline, their claims here are barred. As a result, Plaintiffs will be unable to assert their claims here before any court and their Complaint should be dismissed with prejudice pursuant to F.R.C.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

Finally, the Complaint violates the automatic stay provision under the Code that was extended pursuant to the Plan and Confirmation Order and remains in full force and effect. Accordingly, to the extent Plaintiffs' claims in the Complaint could have been raised prior to the Petition Date, they are barred by the automatic stay. Moreover, to the extent Plaintiff's claims arose post-petition, they are channeled to the Bankruptcy Court based on its exclusive jurisdiction.

## BACKGROUND

### I.     Defendant Is In Chapter 11 Bankruptcy
### Before The Bankruptcy Court

The Chapter 11 Case has been pending for more than four years. On May 31, 2002 (the "Petition Date"), Defendant Farmland Foods, Inc., along with certain affiliated companies – Farmland Industries, Inc., Farmland Transportation, Inc., SFA, Inc., and Farmland Pipeline Company (collectively, the "Debtors") – began their respective reorganization cases by

3

filing voluntary petitions for relief before the Bankruptcy Court under Chapter 11 of the Code .

The Bankruptcy Court consolidated their respective petitions under Case No. 02-50557-JWV .

On October 31, 2003, the Debtors, including Defendant, filed the Plan.   On December 19, 2003, the Bankruptcy Court entered the Confirmation Order confirming the Plan. The Plan became effective, pursuant to the Confirmation Order, on May 1, 2004 (the "Effective Date") (*See* Notice of Effective Date attached as Exhibit 1 to the Affidavit of J.P. Morgan Trust Company, N.A. referred to below and attached as Ex. 6).

## II.     The Bankruptcy Court Appoints The Liquidating Trustee To Effectuate The Plan

Plan Section 5.4 establishes the Liquidating Trust.  (*See* Plan, Ex. 1, § 5.4).  The Liquidating Trustee was approved and appointed as the Liquidating Trustee under the Plan.  The Plan vests the Liquidating Trust and the Liquidating Trustee with all property, rights, interests, and powers of the Debtors.  These include the right to prosecute Litigation Claims[3] on behalf of the Debtors and/or their estates and to file and pursue any other pleading, motion, stipulation or other item in connection with any matter arising in or in connection with the Chapter 11 Case. (*Id*.)  The term "Litigation Claims" means:

> the claims, rights, causes of action, *defense*, counterclaims, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtors, the Estates or the Bankruptcy Committee may hold or assert against any non-Debtor Entity. . . .

(*Id*., § 1.81) (emphasis added)

---

[3] Capitalized terms are terms defined in the Plan.

4

III.    **By Operation Of The Plan, Defendant**
        **No Longer Exists As A Separate Entity**

Pursuant to Plan Section 5.1, enforced through the Confirmation Order, as of the Effective Date, Defendant Farmland Foods, Inc. merged into debtor Farmland Industries, Inc. which continued to exist as Reorganized FLI.[4]  The Plan empowers Reorganized FLI to effectuate the Plan and the transactions contemplated by the Plan.  (*See* Plan, Ex 1, § 5.1; Confirmation Order, Ex. 2).

IV.    **The Bankruptcy Court Retains Exclusive**
        **Jurisdiction Over The Matters At Issue**

Pursuant to Plan Section 10 and the Confirmation Order, the Bankruptcy Court retains *exclusive* jurisdiction over all matters arising out of, and related to the Chapter 11 Case and the Plan, including jurisdiction to, among other things,:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;…

(e)    Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;…

(g)    Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;…

(i)    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by an Entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;…

---

[4] The Plan defined the reorganized entity on and after the Effective Date as Reorganized Industries.  Reorganized Industries is incorporated under the name Reorganized FLI, Inc. which is the name used here.

CHIC_1340136.1

    (l)      Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;…

    (o)      Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code.

(*See* Plan, Ex. 1, § 10; Confirmation Order, Ex. 2). The Plan defines "Claim," in turn, to mean a "claim against the Debtors, or any of them, whether or not asserted, as defined in Section 101 of the Bankruptcy Code." (Plan, Ex. 1, § 1.20).

## V.    <u>The Plan Binds The Plaintiffs</u>

Plan Section 11.10 provides that, as of the Confirmation Date, the Plan's provisions shall bind "all present and former holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Liquidating Trust, the Liquidating Trustee and all other parties-in-interest in this Chapter 11 Case." (Plan, Ex. 1, § 11.10) Accordingly, to the extent the Plaintiffs seek to assert claims against the Debtor, Farmland Foods, Inc., they are bound by the provisions of the Plan.

## VI.    <u>The Bankruptcy Court Set Bar Dates That Preclude Untimely Claims Such As Plaintiffs Raise Here</u>

By Order dated October 24, 2002 (the "Pre-Petition Bar Date Order"), the Bankruptcy Court set January 10, 2003 as the final date for filing proofs of claim against the Debtors (the "Pre-Petition Bar Date") (*See* Pre-Petition Bar Date Order, attached as <u>Ex. 3</u> and Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization (the "Disclosure Statement"), attached as <u>Ex. 4</u>, p. 28.) Therefore, pre-petition claims not filed by January 10, 2003 are barred.

The Pre-Petition Bar Date Order also approved the Debtors' Form of Notice to creditors. (Ex. 3; Ex. 4, p. 28.) On November 20, 2002, the Debtors served and filed Notice of

CHIC_1340136.1

the Chapter 11 Case and Pre-Petition Bar Date to all creditors, including employees of the Defendant and the vast majority of the individual Plaintiffs named in the Complaint. (*See* Declaration of Service dated November 20, 2002, relevant excerpts attached as <u>Ex. 5</u>).[5]  In addition, the Debtors published the Notice in several publications including the Wall Street Journal, the Kansas City Star, Feedstuffs, the Wichita Eagle and the Des Moines Register.

Plan Section 11.2 establishes that the deadline for filing requests for payment of administrative claims incurred after the Petition Date is no later than 30 days after the Plan's Effective Date (the "Administrative Bar Date"). (Plan, Ex. 1, § 11.2).  On May 7, 2004, the Debtors served and filed Notice of Effective Date and Administrative Bar Date to all creditors, including employees of the Defendant and the vast majority of the individual Plaintiffs named in the Complaint. (*See* Affidavit of J.P. Morgan Trust Company, N.A., filed with the Bankruptcy Court dated May 17, 2004, and relevant excerpts from the list of parties receiving Notice of Effective Date and Administrative Bar Date, attached hereto as <u>Ex. 6</u>).[6]  In addition, the Debtors published the Notice in several publications including the Wall Street Journal, the Kansas City Star and Feedstuffs. (*See* Affidavits of publication of Administrative Bar Date attached as Group <u>Ex. 7</u>).  Therefore, administrative claims not filed as of June 6, 2004 are barred.

## VII.    The Plaintiffs Improperly Sue Defendant <u>In This Court, Raising Barred Claims</u>

Despite actual and constructive notice of both the Pre-Petition and Administrative Bar Dates, Plaintiffs did not timely file any claims against the Defendant in the Chapter 11 Case

---

[5] The entire Declaration of Service and list of parties receiving notice of the Prepetition Bar Date runs more than 5000 pages and is not attached hereto.  However, the document can be found on the Bankruptcy Court docket, No. 1573.

[6] A list of the parties receiving Notice of Effective Date and Administrative Bar Date also is extremely voluminous and may be obtained by contacting the Affiant identified on Ex. 6.

CHIC_1340136.1

but instead filed the Complaint years after the established Bar Dates. Moreover, despite notice of the Bankruptcy and Plan, Plaintiffs filed their Complaint in this Court, which has no jurisdiction. Plaintiffs do not allege that they filed any of the claims asserted in the Complaint in the Chapter 11 Case.[7]

On April 18, 2006, Plaintiffs filed with this Court the Complaint against the Defendant (Complaint ¶¶ 4, 30), even though Defendant was a debtor in the Chapter 11 Case and no longer exists as a separate entity, having been legally merged into Farmland Industries, Inc. as of the Effective Date. In addition, the Complaint was filed despite the automatic stay provision under § 362 of the Code which bars such actions against the Debtor. The automatic stay was extended by the Plan and Confirmation Order, barring Plaintiffs' claims to the extent they could have been raised prior to the Petition Date. (Plan, Ex. 1, § 11.15; Confirmation Order, Ex. 2) Moreover, even if the stay does not extend to claims arising post-petition, those claims are channeled to the Bankruptcy Court based on its exclusive jurisdiction and barred here.

Count I of the Complaint seeks alleged lost wages, lost overtime wages, statutory penalties, interest, costs and attorney's fees pursuant to the Illinois Minimum Wage Law. Count II seeks alleged lost wages, lost overtime wages, statutory penalties, interest, costs and attorney's fees pursuant to the Illinois Wage Payment and Collection Act. Count III seeks alleged lost wages, lost overtime wages, statutory penalties, interest, costs and attorney's fees pursuant to the Fair labor Standards Act. Plaintiffs challenge conduct and seek damages from April 18, 2001 to the present. Their Complaint, therefore, raises both pre- and post-petition claims against Defendant that are barred by, the automatic stay and the Pre-Petition and Administrative Bar Dates.

---

[7] A search of the claims register confirms that they failed to do so.

8

<u>**ARGUMENT**</u>

I.     **The Liquidating Trustee Satisfies The**
<u>**Legal Standard For Dismissal of Plaintiffs' Complaint**</u>

      The Liquidating Trustee brings this motion to dismiss under Rules 12(b)(1) and

(6) of the Federal Rules of Civil Procedure. Rule 12(b)(1) allows for dismissal when the court

lacks subject matter jurisdiction, while Rule 12(b)(6) allows for dismissal when the plaintiff fails

to state a claim upon which relief can be granted. *Thomas v. Shehan*, 370 F. Supp. 2d 704, 708

(N.D. Ill. 2005). Dismissal of a claim is proper if the plaintiff can prove no set of facts in

support of its claim that would entitle it to relief. *Id.* This is true here.

II.     **The Complaint Must Be Dismissed**
<u>**Because This Court Has No Jurisdiction**</u>

      The Complaint must be dismissed pursuant to F.R.C.P. 12(b)(1) because this

Court has no subject matter jurisdiction. Plan Section 10 – which binds Plaintiffs – provides that

the Bankruptcy Court "shall retain exclusive jurisdiction over all matter arising out of, and

related to, the Chapter 11 Case and the Plan to the fullest extent possible by law . . . ." (Plan, Ex.

1, § 10). The Seventh Circuit has defined a bankruptcy court's "related to" jurisdiction to

include any dispute affecting the allocation or distribution of a debtor's property including legal

claims against the debtor. *In re Fed Pak Sys., Inc*., 80 F.3d 207, 213-14 (7th Cir. 1996) *quoting*

*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161 (7th Cir. 1994). Accordingly, the Circuit

has dismissed claims for lack of jurisdiction where, as here, the claims should have been brought

in the bankruptcy court. *See Ry. Labor Executives' Associates v. Interstate Commerce Comm'n,*

894 F.2d 915, 918 (7th Cir. 1990) (granting motion to dismiss where bankruptcy court had

exclusive jurisdiction); *In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co.,* 738 F.2d 209, 211

(7th Cir. 1984) (holding that bankruptcy court has exclusive jurisdiction over debtor and its

CHIC_1340136.1

property and may enjoin or stay commencement or continuation of suits against the debtor in another court).

Moreover, Section 10 enumerates a series of specific areas where the Bankruptcy Court retains exclusive jurisdiction that bar Plaintiffs' claims here. This includes exclusive jurisdiction to determine the status of any claim or request for payment of any administrative claim; hear and determine any litigated matters related to the Chapter 11 Case; hear and determine any dispute in connection with enforcement of the Plan; take any action to enforce the Plan or Confirmation Order; enforce all orders and rulings in connection with the Chapter 11 Case; and hear and determine any matter as provided in the Confirmation Order or authorized under the Bankruptcy Code. (Plan Ex. 1, § 10(a), (e), (g), (i), (l), (o)). Again, courts have specifically dismissed suits brought outside a bankruptcy court for lack of jurisdiction where it should have been brought as a claim before the bankruptcy court. *See Ry. Labor,* 894 F.2d at 918; *In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co.,* 738 F.2d at 211; *see also Guardian Mortgage Investors v. Unofficial Noteholders-Debentureholders Creditors Comm.*, 607 F.2d 1020, 1024 (2d Cir. 1979) (affirming order dismissing complaint on ground that exclusive jurisdiction rested in bankruptcy court). Because this Court lacks jurisdiction here, the Complaint must be dismissed pursuant to F.R.C.P. 12(b)(1).

### III.    The Complaint Should Be Dismissed With Prejudice Because Plaintiffs Raise Claims Here That Are Legally Barred

Apart from the lack of jurisdiction, Plaintiffs are barred from asserting their claims against Defendant and its estate because Plaintiffs allowed the Pre-Petition and Administrative Bar Dates each to pass without filing any claims with the Bankruptcy Court, as they were required to do to obtain relief. *See In re Marino*, 1996 WL 691350, *2 (Bankr. N.D.

CHIC_1340136.1

Ill., Nov. 26 1996 at *2) (failure to file a proof of claim before the expiration of the claims bar

date will generally result in discharge of the creditor's claim); *Chicago, Milwaukee, St. Paul and*

*Pac. R.R.*, 878 F.2d 182, 184 (7th Cir. 1989) (same); *R.H. Macy & Co., Inc. v. Federated Dept.*

*Stores, Inc.*, 283 B.R. 140, 146 (S.D.N.Y. 2002) (court properly enjoined party from raising

claims not filed within applicable bar date); *In re Varat Enterprises, Inc.,* 81 F.3d 1310, 1315 (4th

Cir. 1996) (parties may be precluded from raising claims or issues that they could have or should

have raised before confirmation of the bankruptcy plan, but failed to do so).  Because Plaintiffs

are barred from bringing the claims asserted in the Complaint, the Complaint should be

dismissed with prejudice.

       This is especially true because Plaintiffs knew or should have known of the Pre-

Petition and Administrative Claims Bar Dates and received actual notice of these, but filed no

claim.  *See In re Kmart Corp.*, 381 F.3d 709, 714 (7th Cir. 2004) (Court refused to find

excusable neglect and allow late claims even where proof of claim was filed only one day late

and where only 81 days lapsed between original bar date and movant's motion for relief from the

bar date).  One cannot circumvent the requirement of adhering to a claims bar date by simply

ignoring it and filing a complaint raising matters that should have been raised as part of a claim.

*In re Johns-Mansville Corp.*, 97 B.R. 174, 181 (S.D.N.Y. 1989) (Claimants are bound by the

terms of a plan in bankruptcy and must follow the procedures set out in the plan in order to assert

alleged claims).

       Finally, separate from the Prepetition and Administrative Bar Dates, Plaintiffs'

Complaint violates the Code's automatic stay provision under § 362(a)(1) which was extended

by the Plan and Confirmation Order and remains in full force and effect here.  (Plan, Ex. 1, §

11.15; Confirmation Order, Ex. 2)  Accordingly, claims asserted in the Compliant that could

CHIC_1340136.1

have been raised prior to the Petition Date are barred by the automatic stay. *See Aiello v. Providian Financial Corp.*, 239 F.3d 876, 879 (7th Cir. 2001) (upon filing of a petition, the automatic stay under § 362(a) prevents any creditor of the debtor from attempting to collect a debt other than by prosecuting a claim within the bankruptcy proceeding itself).

## <u>CONCLUSION</u>

For the reasons set forth above, the Liquidating Trustee respectfully requests that this Court enter an order dismissing all counts of the Complaint with prejudice and granting such other and further relief as the Court deems just and proper.

Respectfully submitted,


    /s/ Michael J. Small

Dated: May 31, 2006                Michael J. Small (Ill. Bar No. 6225069)
                                   (admission pending)
                                   David B. Goroff (Ill. Bar No. 6190039)
                                   (admission pending)
                                   Derek L. Wright (Ill. Bar No. 6272297)
                                   (admission pending)
                                   FOLEY & LARDNER LLP
                                   321 North Clark Street, Suite 2800
                                   Chicago, IL 60610
                                   (312) 832-4500 Telephone
                                   (312) 832-4700 Facsimile

                                   Attorneys for Plaintiff, J.P. Morgan Trust
                                   Company, National Association, in its capacity
                                   as Liquidating Trustee of the FI Liquidating
                                   Trust and Reorganized FLI, Inc.

CHIC_1340136.1

E-FILED
Wednesday, 31 May, 2006  04:41:41 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| | ) | |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors. | ) | Joint Administration |

## **DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED**

Gregory D. Willard, Esq.
David M. Unseth, Esq.
Cullen K. Kuhn, Esq.
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750

Laurence M. Frazen, Esq.
Cynthia Dillard Parres, Esq.
Robert M. Thompson, Esq.
BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri 64105

Attorneys for Debtors and Debtors-in-Possession


Dated: October 31, 2003

**TABLE OF CONTENTS**                                              **Page**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME
    AND GOVERNING LAW ............................................................................... 1
1.1     "Administrative Claim" ............................................................................. 1
1.2     "Allowed" ................................................................................................. 1
1.3     "Allowed Class . . . Claim" ...................................................................... 2
1.4     "Allowed Class . . . Interest" .................................................................... 2
1.5     "Allowed Interest" .................................................................................... 2
1.6     "Available Cash" ...................................................................................... 2
1.7     "Ballot" ..................................................................................................... 2
1.8     "Bankruptcy Code" ................................................................................... 2
1.9     "Bankruptcy Committees" ........................................................................ 2
1.10    "Bankruptcy Court" .................................................................................. 2
1.11    "Bankruptcy Rules" .................................................................................. 2
1.12    "Bar Date(s)" ............................................................................................ 3
1.13    "Beneficiaries" ......................................................................................... 3
1.14    "Benefited Debtors" ................................................................................. 3
1.15    "Bondholder Transaction Fee" ................................................................. 3
1.16    "Bondholders' Committee" ...................................................................... 3
1.17    "Business Day" ......................................................................................... 3
1.18    "Cash" ....................................................................................................... 3
1.19    "Chapter 11 Case" .................................................................................... 3
1.20    "Claim" ..................................................................................................... 3
1.21    "Class" ...................................................................................................... 3
1.22    "Class 8 Redemption Account" ................................................................ 3
1.23    "Class 11 Distribution Pool" .................................................................... 3
1.24    "Coffeyville Assets" ................................................................................. 3
1.25    "Collateral" ............................................................................................... 3
1.26    "Committee Members" ............................................................................. 3
1.27    "Confirmation" ......................................................................................... 3
1.28    "Confirmation Date" ................................................................................ 3
1.29    "Confirmation Hearing" ........................................................................... 4
1.30    "Confirmation Order" ............................................................................... 4
1.31    "Convenience Claim" ............................................................................... 4
1.32    "Creditor" ................................................................................................. 4
1.33    "Creditor Transaction Fee" ...................................................................... 4
1.34    "Creditors' Committee" ............................................................................ 4
1.35    "Cure" ....................................................................................................... 4
1.36    "Debtor" .................................................................................................... 4
1.37    "Debtors" .................................................................................................. 4
1.38    "Demand Certificates" ............................................................................. 4
1.39    "Demand Certificates Claim" ................................................................... 4
1.40    "DIP Credit Agreement" ........................................................................... 4
1.41    "DIP Loan Claims" ................................................................................... 4

1.42    "Disclosure Statement" ................................................................................................. 5
1.43    "Disputed Claim" ......................................................................................................... 5
1.44    "Disputed Claim Amount" ............................................................................................ 5
1.45    "Disputed Claims Reserve" ......................................................................................... 5
1.46    "Disputed Interest" ...................................................................................................... 5
1.47    "Disputed Interest Amount" ......................................................................................... 5
1.48    "Distribution Record Date" .......................................................................................... 5
1.49    "Effective Date" ........................................................................................................... 6
1.50    "Entity" ........................................................................................................................ 6
1.51    "Ernst & Young" .......................................................................................................... 6
1.52    "Estate(s)" ................................................................................................................... 6
1.53    "Face Amount" ............................................................................................................ 6
1.54    "Final Distribution Date" .............................................................................................. 6
1.55    "Final Order" ................................................................................................................ 6
1.56    "Foods" ........................................................................................................................ 6
1.57    "General Unsecured Claim" ......................................................................................... 6
1.58    "Houlihan Lokey" ......................................................................................................... 6
1.59    "Impaired" .................................................................................................................... 6
1.60    "Indenture Trustees" .................................................................................................... 6
1.61    "Industrial Revenue Bonds" ........................................................................................ 6
1.62    "Industries" .................................................................................................................. 7
1.63    "Industries Common Shares" ...................................................................................... 7
1.64    "Industries Distribution Pool" ...................................................................................... 7
1.65    "Industries Preferred Shares" ..................................................................................... 7
1.66    "Industries Retained Assets" ...................................................................................... 7
1.67    "Initial Distribution Date" ............................................................................................. 7
1.68    "Insurance Claim" ....................................................................................................... 7
1.69    "Intercompany Advances" ........................................................................................... 7
1.70    "Intercompany Claim" .................................................................................................. 7
1.71    "Interest" ...................................................................................................................... 7
1.72    "IRB Indentures" .......................................................................................................... 7
1.73    "KERIT Plan" ............................................................................................................... 8
1.74    "Lender" ....................................................................................................................... 8
1.75    "Lien" ........................................................................................................................... 8
1.76    "Liquidating Trust" ....................................................................................................... 8
1.77    "Liquidating Trust Administrative Reserve" .................................................................. 8
1.78    "Liquidating Trust Agreement" ..................................................................................... 8
1.79    "Liquidating Trust Assets" ........................................................................................... 8
1.80    "Liquidating Trustee" ................................................................................................... 8
1.81    "Litigation Claims" ....................................................................................................... 8
1.82    "Loan Documents" ....................................................................................................... 8
1.83    "Management Agreement" ........................................................................................... 8
1.84    "Minority Foods Shares" .............................................................................................. 8
1.85    "Non-Debtor Subsidiaries" .......................................................................................... 9
1.86    "Objection Deadline" ................................................................................................... 9
1.87    "Old Common Shares" ................................................................................................. 9
1.88    "Old Preferred Shares" ................................................................................................ 9
1.89    "Old Securities" ........................................................................................................... 9

1.90    "Old Stock Options"................................................................................................9
1.91    "Old Warrants"......................................................................................................9
1.92    "Other Priority Claim"..........................................................................................9
1.93    "Other Secured Claim"..........................................................................................9
1.94    "PBGC"..................................................................................................................9
1.95    "PBGC Claims".....................................................................................................9
1.96    "Person".................................................................................................................9
1.97    "Petition Date".......................................................................................................9
1.98    "Pipeline"..............................................................................................................10
1.99    "Plan"....................................................................................................................10
1.100   "Plan Exhibit".......................................................................................................10
1.101   "Plan Rate"............................................................................................................10
1.102   "Pork Business".....................................................................................................10
1.103   "Post-Confirmation Committee"...........................................................................10
1.104   "Pre-Petition Credit Agreement"..........................................................................10
1.105   "Priority Tax Claim".............................................................................................10
1.106   "Pro Rata".............................................................................................................10
1.107   "Professional".......................................................................................................10
1.108   "Professional Fee Claim"......................................................................................10
1.109   "Register"..............................................................................................................10
1.110   "Reimbursement Right".........................................................................................10
1.111   "Reinstated" or "Reinstatement"..........................................................................11
1.112   "Reorganized Industries"......................................................................................11
1.113   "Schedules"...........................................................................................................11
1.114   "Secured Claim"....................................................................................................11
1.115   "Secured Lender Claims".......................................................................................11
1.116   "SF Phosphates Interest".......................................................................................11
1.117   "SFA".....................................................................................................................11
1.118   "Subordinated Certificates"...................................................................................11
1.119   "Subordinated Certificates Claim"........................................................................12
1.120   "Subordinated Claims"..........................................................................................12
1.121   "Subsequent Distribution Date"............................................................................12
1.122   "Subsidiaries"........................................................................................................12
1.123   "Subsidiary Debtors".............................................................................................12
1.124   "Subsidiary Interests"............................................................................................12
1.125   "Substantial Contribution Claim".........................................................................12
1.126   "Tax Distribution".................................................................................................12
1.127   "Transferred Assets"..............................................................................................12
1.128   "Transportation"....................................................................................................13
1.129   "Trust Indentures".................................................................................................13
1.130   "Unimpaired".........................................................................................................13
1.131   "Voting Record Date"............................................................................................13

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS..........................................14
2.1     Class 1 (Other Priority Claims)............................................................................14
2.2     Class 2 (Secured Lender Claims)..........................................................................15
2.3     Class 3 (Other Secured Claims)............................................................................15
2.4     Class 4 (Demand Certificates Claims)..................................................................15

2.5    Class 5 (Subordinated Certificates Claims)................................................................... 15
2.6    Class 6 (Convenience Claims against Industries)........................................................ 15
2.7    Class 7 (General Unsecured Claims against Industries)............................................. 15
2.8    Class 8 (Industries Preferred Shares) ......................................................................... 15
2.9    Class 9 (Industries Common Shares) .......................................................................... 15
2.10   Class 10 (General Unsecured Claims against Foods).................................................. 15
2.11   Class 11 (Old Securities of Foods).............................................................................. 15
2.12   Class 12 (General Unsecured Claims against Transportation).................................... 15
2.13   Class 13 (Old Securities of Transportation)................................................................ 15
2.14   Class 14 (General Unsecured Claims against SFA)..................................................... 16
2.15   Class 15 (Old Securities of SFA)................................................................................ 16
2.16   Class 16 (General Unsecured Claims against Pipeline).............................................. 16
2.17   Class 17 (Old Securities of Pipeline) .......................................................................... 16
2.18   Class 18 (Intercompany Claims) ................................................................................. 16
2.19   Class 19 (Subordinated Claims) .................................................................................. 16

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS.......................................... 16
3.1    Unclassified Claims .................................................................................................... 16
3.2    Class 1 (Other Priority Claims) .................................................................................. 17
3.3    Class 2 (Secured Lender Claims)................................................................................ 18
3.4    Class 3 (Other Secured Claims) .................................................................................. 18
3.5    Class 4 (Demand Certificates Claims) ........................................................................ 18
3.6    Class 5 (Subordinated Certificates Claims)................................................................. 18
3.7    Class 6 (Convenience Claims against Industries)........................................................ 19
3.8    Class 7 (General Unsecured Claims against Industries)............................................. 19
3.9    Class 8 (Industries Preferred Shares) ......................................................................... 19
3.10   Class 9 (Industries Common Shares) .......................................................................... 20
3.11   Class 10 (General Unsecured Claims against Foods).................................................. 21
3.12   Class 11 (Old Securities of Foods).............................................................................. 21
3.13   Class 12 (General Unsecured Claims against Transportation).................................... 21
3.14   Class 13 (Old Securities of Transportation)................................................................ 21
3.15   Class 14 (General Unsecured Claims against SFA)..................................................... 21
3.16   Class 15 (Old Securities of SFA)................................................................................ 22
3.17   Class 16 (General Unsecured Claims against Pipeline).............................................. 22
3.18   Class 17 (Old Securities of Pipeline) .......................................................................... 22
3.19   Class 18 (Intercompany Claims) ................................................................................. 22
3.20   Class 19 (Subordinated Claims) .................................................................................. 22
3.21   Reservation Of Rights Regarding Claims.................................................................... 23

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN....................................... 23
4.1    Impaired Classes Of Claims And Interests Entitled To Vote..................................... 23
4.2    Acceptance By An Impaired Class.............................................................................. 23
4.3    Presumed Acceptances................................................................................................ 23
4.4    Summary of Classes Voting On The Plan................................................................... 23
4.5    Confirmation Pursuant To Section 1129(b) Of The Bankruptcy Code ...................... 23

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN.................................... 24
5.1    Continued Existence Of The Debtors; Vesting Of Assets.......................................... 24

5.2    Funding For The Plan...................................................................................... 25
5.3    Accounts........................................................................................................... 26
5.4    Liquidating Trust; Liquidating Trustee ........................................................... 26
5.5    Post-Confirmation Committee .......................................................................... 27
5.6    Effectuating Documents; Further Transactions................................................ 28
5.7    Exemption From Certain Transfer Taxes.......................................................... 28
5.8    Releases And Related Matters........................................................................... 28
5.9    Closing Of The Chapter 11 Case...................................................................... 29
5.10   Rights of Action................................................................................................ 29
5.11   Retiree Benefits ................................................................................................ 30
5.12   Establishment of Class 11 Distribution Pool................................................... 30

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES30
6.1    Rejected Executory Contracts And Unexpired Leases...................................... 30
6.2    Rejection Damages Bar Date............................................................................ 31
6.3    Assumed Executory Contracts And Unexpired Leases .................................... 31
6.4    Payments Related To Assumed Executory Contracts And Unexpired Leases.................... 31

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 32
7.1    Distributions..................................................................................................... 32
7.2    Interest On Claims............................................................................................ 32
7.3    Means Of Cash Payment................................................................................... 32
7.4    Distributions on the Initial Distribution Date.................................................. 32
7.5    Distributions on a Subsequent Distribution Date............................................ 33
7.6    Distributions on the Final Distribution Date.................................................... 33
7.7    Delivery Of Distributions; Undeliverable Distributions.................................. 34
7.8    Tender Of Securities And Instruments; Cancellation of Trust Indentures ........................... 34
7.9    Withholding And Reporting Requirements....................................................... 36
7.10   Setoffs.............................................................................................................. 36
7.11   No Recourse ..................................................................................................... 36
7.12   Transactions On Business Days ....................................................................... 36
7.13   No Distribution In Excess Of Allowed Amount Of Claim .............................. 36
7.14   Intercompany Advances ................................................................................... 37

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
        UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO .. 37
8.1    Prosecution Of Objections To Claims.............................................................. 37
8.2    Treatment Of Disputed Claims; Disputed Claims Reserves............................. 38
8.3    Estimation......................................................................................................... 38

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
        OF THE PLAN.......................................................................................................... 38
9.1    Conditions To Effective Date ........................................................................... 38
9.2    Waiver Of Conditions....................................................................................... 39
9.3    Notice Of Effective Date.................................................................................. 39

ARTICLE X RETENTION OF JURISDICTION ....................................................................... 40

ARTICLE XI MISCELLANEOUS PROVISIONS..............................................................41
11.1    Deadline For Filing Professional Fee Claims; Objections To Professional Fee Claims ... 41
11.2    Deadline For Filing Administrative Claims; Objections To Administrative Claims......... 41
11.3    Payment Of Statutory Fees.................................................................42
11.4    Modifications And Amendments.............................................................42
11.5    Severability Of Plan Provisions.........................................................42
11.6    Successors And Assigns..................................................................43
11.7    No Discharge............................................................................43
11.8    Release Of Assets......................................................................43
11.9    Exculpation And Limitation Of Liability.................................................43
11.10   Binding Effect.........................................................................44
11.11   Revocation, Withdrawal, Or Non-Consummation............................................44
11.12   Plan Exhibits..........................................................................45
11.13   Notices................................................................................45
11.14   Dissolution Of The Bankruptcy Committees...............................................46
11.15   Term Of Injunctions Or Stays...........................................................47
11.16   Headings...............................................................................47

# INTRODUCTION

Farmland Industries, Inc., Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company (collectively, the "Debtors") hereby propose the following second amended joint plan of reorganization, as modified (as may be further amended or modified, the "Plan") for the resolution of their outstanding creditor Claims (as defined herein) and equity Interests (as defined herein). Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of the Debtors' history, businesses, properties, results of operations, risk factors, a summary and analysis of the Plan, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

All holders of Claims and Interests are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Fed. R. Bankr. P. 3019 and Article XI, including Section 11.4 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## ARTICLE I
## DEFINITIONS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

## A.    Scope Of Definitions; Rules Of Construction

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

## B.    Definitions

**1.1    "Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, commissions, severance payments or other compensation for services rendered after the commencement of the Chapter 11 Case, (b) Professional Fee Claims, (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930 and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

**1.2    "Allowed"** means, with regard to any Claim other than an Administrative Claim, a Claim or any portion thereof (a) that has been allowed by a Final Order, or (b) as to which, on or by the Effective Date, (i) no proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and noncontingent amount of which is listed on the Schedules, other than a Claim that is

listed on the Schedules as zero, in an unknown amount, or as disputed, or (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed by the Objection Deadline or by such other applicable period of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any and all objections to its allowance have been settled or withdrawn or have been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.  With regard to an Administrative Claim, *"Allowed"* means an Administrative Claim, or any portion thereof, (a) incurred or arising after the Petition Date and prior to the Effective Date, (b) as to which a request for payment has been timely filed with the Bankruptcy Court in a liquidated amount, and as to which either (i) no objection to its allowance has been filed by the Objection Deadline or by such other applicable period of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any and all objections to its allowance have been settled or withdrawn or have been denied by a Final Order.

**1.3** **"Allowed Class . . . Claim"** means an Allowed Claim in the particular Class described.

**1.4** **"Allowed Class . . . Interest"** means an Allowed Interest in the particular Class described.

**1.5** **"Allowed Interest"** means an Interest that (a) is registered as of the Distribution Record Date in a stock register maintained by or on behalf of the Debtors and (b) is not a Disputed Interest.

**1.6** **"Available Cash"** means all Cash of each separate Estate (other than the proceeds of Collateral securing any Allowed Secured Claim) from and after the Effective Date that is not subject to any Reimbursement Right, less the amount of Cash deposited or to be deposited, from time to time, into (i) the Liquidating Trust Administrative Reserve, (ii) the Disputed Claims Reserves, and (iii) any other reserves established under the Plan or the Liquidating Trust Agreement, which Cash shall be maintained separately with respect to each Estate.

**1.7** **"Ballot"** means each of the ballot forms distributed with the Disclosure Statement to holders of Impaired Claims entitled to vote as specified in Article IV of the Plan, in connection with the solicitation of acceptances of the Plan.

**1.8** **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

**1.9** **"Bankruptcy Committees"** means, collectively, the Bondholders' Committee and the Creditors' Committee.

**1.10** **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of Missouri or such other court as may have jurisdiction over the Chapter 11 Case.

**1.11** **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.12** **"Bar Date(s)"** means the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of Claim or Interest against the Debtors.

**1.13** **"Beneficiaries"** means the holders of Allowed Claims and Allowed Class 11 Interests that are beneficiaries of the Liquidating Trust.

**1.14** **"Benefited Debtors"** has the meaning set forth in Section 7.14 of the Plan.

**1.15** **"Bondholder Transaction Fee"** means the "completion fee" payable to Ernst & Young pursuant to the agreement between the Bondholders' Committee and Ernst & Young.

**1.16** **"Bondholders' Committee"** means the official committee of bondholders appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Case.

**1.17** **"Business Day"** means any day except for Saturday, Sunday or a "legal holiday" (as defined in Fed. R. Bankr. P. 9006(a)).

**1.18** **"Cash"** means legal tender of the United States or equivalents thereof.

**1.19** **"Chapter 11 Case"** means the jointly administered Chapter 11 cases of the Debtors.

**1.20** **"Claim"** means a "claim" against the Debtors, or any of them, whether or not asserted, as defined in section 101 of the Bankruptcy Code.

**1.21** **"Class"** means a category of holders of Claims or Interests, as described in Article II of the Plan.

**1.22** **"Class 8 Redemption Account"** has the meaning set forth in Section 3.9 of the Plan.

**1.23** **"Class 11 Distribution Pool"** has the meaning set forth in Section 5.12 of the Plan.

**1.24** **"Coffeyville Assets"** means all of the assets associated with the following, including, without limitation, the executory contracts and unexpired leases listed on Plan Exhibit E: (i) a petroleum refinery owned by Industries in Coffeyville, Kansas; (ii) a fertilizer production facility owned by Industries in Coffeyville, Kansas; (iii) a petroleum refinery owned by Industries in Phillipsburg, Kansas; and (iv) a petroleum pipeline system related to Industries' refining operations.

**1.25** **"Collateral"** means any property or interest in the property of an Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.26** **"Committee Members"** has the meaning set forth in Section 5.5 of the Plan.

**1.27** **"Confirmation"** means entry by the Bankruptcy Court of the Confirmation Order.

**1.28** **"Confirmation Date"** means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

**1.29** **"Confirmation Hearing"** means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code.

**1.30** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming the Plan.

**1.31** **"Convenience Claim"** means any Claim that otherwise would be an Allowed Class 7 Claim in an amount equal to or less than $1,000.

**1.32** **"Creditor"** means any Entity who holds a Claim against any of the Debtors.

**1.33** **"Creditor Transaction Fee"** means the "success fee" payable to Houlihan Lokey pursuant to the agreement between the Creditors' Committee and Houlihan Lokey.

**1.34** **"Creditors' Committee"** means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Case.

**1.35** **"Cure"** means the distribution of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable nonbankruptcy law.

**1.36** **"Debtor"** means any of the Debtors.

**1.37** **"Debtors"** means Farmland Industries, Inc., Farmland Foods, Inc., Farmland Transportation, Inc., SFA Inc. and Farmland Pipe Line Company, including in their capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**1.38** **"Demand Certificates"** means: (a) Demand Loan Certificates dated November 20, 1981 with an original authorized principal amount of $500,000,000.00; and (b) Demand Loan Certificates dated December 4, 1997 issuable in Series with an unlimited authorized aggregate principal amount.

**1.39** **"Demand Certificates Claim"** means a Claim arising out of or related to the Demand Certificates.

**1.40** **"DIP Credit Agreement"** means the First Amended and Restated Debtor-In-Possession Credit Agreement and Adequate Protection Stipulation dated as of June 5, 2002, together with any amendments, by and among Industries and Foods, as borrowers, the financial institutions party thereto, as lenders, and Deutsche Bank Trust Company Americas, as administrative agent.

**1.41** **"DIP Loan Claims"** means the Allowed Claims held by those certain financial institutions participating under the DIP Credit Agreement, which Claims constitute superpriority Administrative Claims senior to all other Claims and are secured by Liens on substantially all of the assets of the Debtors.

**1.42** **"Disclosure Statement"** means the written disclosure statement that relates to the Plan, as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017.

**1.43** **"Disputed Claim"** means, with respect to a Claim, such Claim or any portion thereof that is not an Allowed Claim, and includes, without limitation, Claims (other than Allowed Claims) that (a) have not been listed on the Schedules or have been listed on the Schedules at zero, or as contingent, unliquidated or disputed, or (b) are the subject to an objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.44** **"Disputed Claim Amount"** means (a) if a liquidated amount is set forth in a timely filed proof of Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the proof of Claim relating to the Disputed Claim; (ii) an amount agreed to by the Debtors or the Liquidating Trustee, as the case may be, and the holder of such Disputed Claim; or (iii) if a request for estimation is filed by the Debtors or the Liquidating Trustee, as the case may be, the amount at which such Claim is estimated by the Bankruptcy Court; (b) if no liquidated amount is set forth in the proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Debtors or the Liquidating Trustee, as the case may be, and the holder of such Disputed Claim or (ii) the amount estimated by the Bankruptcy Court with respect to such Disputed Claim; (c) if the Claim was listed on the Schedules as unliquidated, contingent or disputed and no proof of Claim was filed, or deemed to have been filed, by the applicable Bar Date and the Claim has not been resolved by written agreement of the parties or an order of the Bankruptcy Court, zero; or (d), with respect to a Disputed Administrative Claim, the liquidated amount set forth in any request for payment relating to the Disputed Administrative Claim.

**1.45** **"Disputed Claims Reserve"** means, in the event there exists any Disputed Claims on or after the Effective Date, Cash reserved by the Liquidating Trustee in separate interest-bearing accounts for the following: (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in each Class for which distributions are contemplated by the Plan; all in accordance with the provisions of the Plan and the Liquidating Trust Agreement and to be maintained under the Plan and the Liquidating Trust Agreement.

**1.46** **"Disputed Interest"** means an Interest, or any portion thereof, that is not an Allowed Interest and includes, without limitation, Interests (other than Allowed Interests) that (a) are not listed in the Schedules or are listed in the Schedules as contingent, unliquidated or disputed, or (b) are the subject of an objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.47** **"Disputed Interest Amount"** means, with respect to a Disputed Interest, the number of shares set forth in a timely filed proof of Interest.

**1.48** **"Distribution Record Date"** means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the Confirmation Date or such other date designated in the Confirmation Order.

**1.49**    **"Effective Date"** means the Business Day on which all conditions to the consummation of the Plan as set forth in Section 9.1 of the Plan have been satisfied or waived as provided in Article IX of the Plan and is the effective date of the Plan.

**1.50**    **"Entity"** has the meaning set forth in section 101 of the Bankruptcy Code and also means, without limitation, a Person, joint venture, trust, estate, unincorporated association or organization, limited liability company, governmental entity or political subdivision, agency or representative thereof, or any other entity.

**1.51**    **"Ernst & Young"** means Ernst & Young Corporate Finance, in their capacity as Professionals for the Bondholders' Committee.

**1.52**    **"Estate(s)"** means, individually, the estate of each Debtor in the Chapter 11 Case, and, collectively, the estates of all Debtors in the Chapter 11 Case, created pursuant to section 541 of the Bankruptcy Code.

**1.53**    **"Face Amount"** means (a) when used in reference to a Disputed Claim, the Disputed Claim Amount, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

**1.54**    **"Final Distribution Date"** has the meaning set forth in Section 7.6 of the Plan.

**1.55**    **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and (unless the Debtors, in compliance with Section 9.2 of the Plan, or the Liquidating Trustee, in its sole discretion, shall have waived the requirement therefor) as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.56**    **"Foods"** means Farmland Foods, Inc.

**1.57**    **"General Unsecured Claim"** means a Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Secured Lender Claim, Other Secured Claim, Convenience Claim, Intercompany Claim or Subordinated Claim, and does not include any Reimbursement Right.

**1.58**    **"Houlihan Lokey"** means Houlihan Lokey Howard and Zukin Financial Advisors, Inc., in their capacity as Professionals for the Creditors' Committee.

**1.59**    **"Impaired"** means, when used with reference to a Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.60**    **"Indenture Trustees"** means each of the trustees under the Trust Indentures and the IRB Indentures.

**1.61**    **"Industrial Revenue Bonds"** means: (a) Taxable Industrial Revenue Bond, Series 1999 of Kansas City, Missouri dated August 1, 1999 in the original principal amount of $40,000,000.00; (b) City of Galveston, Texas, Special Contract Revenue Bonds, Series 1977, in the

original principal amount of $26,000,000; (c) City of Galveston, Texas, Special Contract Refunding Revenue Bonds (Farmland Industries, Inc. Project), Series 1998, in the original principal amount of $8,500,000; (d) City of Coffeyville, Kansas, Taxable Industrial Revenue Bonds, Series A, 1997 (Farmland Industries, Inc.) in the aggregate original principal amount of $255,110,000; and (e) City of Coffeyville, Kansas Subordinated Taxable Industrial Revenue Bonds, Series B, 1997 (Farmland Industries, Inc.) in the aggregate original principal amount of $10,520,000.

**1.62**    **"Industries"** means Farmland Industries, Inc.

**1.63**    **"Industries Common Shares"** means the Old Common Shares of Industries (including, without limitation, common stock, associate member common stock and capital credits of Industries), the Old Stock Options of Industries and the Old Warrants.

**1.64**    **"Industries Distribution Pool"** means all Available Cash in the Estate of Industries after all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 6 Claims and all Intercompany Advances payable by Industries have been (i) Allowed and paid or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) Disputed and sufficient Cash reserved in a Disputed Claims Reserve, (iii) disallowed or (iv) withdrawn.

**1.65**    **"Industries Preferred Shares"** means the Old Preferred Shares of Industries.

**1.66**    **"Industries Retained Assets"** means those assets of Industries and/or Foods identified on Plan Exhibit C, which assets shall be retained by and vested in Reorganized Industries on the Effective Date; provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit C to delete any assets therefrom or add any assets thereto and to provide notice of any such amendments to the Bankruptcy Court.

**1.67**    **"Initial Distribution Date"** has the meaning set forth in Section 7.5 of the Plan.

**1.68**    **"Insurance Claim"** means the insurance claim arising under a $500 million blanket insurance policy that relates to the damage and/or destruction of buildings, equipment and inventory located at Foods' Albert Lea, Minnesota meat processing facility.

**1.69**    **"Intercompany Advances"** has the meaning set forth in Section 7.14 of the Plan.

**1.70**    **"Intercompany Claim"** means any Claim by a Debtor against another Debtor that was incurred or arose prior to the Petition Date.

**1.71**    **"Interest"** means (a) the legal, equitable, contractual and other rights of any Entity (including any 401(k) plan or plan participant) with respect to Old Securities of the Debtors, and (b) the legal, equitable, contractual or other rights of any Entity to acquire or receive any of the foregoing.

**1.72**    **"IRB Indentures"** means the trust indentures for each of the Industrial Revenue Bonds.

**1.73    "KERIT Plan"** means the Key Employee Retention and Incentive Target Plan approved by the Bankruptcy Court by order dated November 4, 2002.

**1.74    "Lender"** means a "Lender" as defined in the Pre-Petition Credit Agreement.

**1.75    "Lien"** means a charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.76    "Liquidating Trust"** means the trust created pursuant to Section 5.4 of the Plan and evidenced by the Liquidating Trust Agreement.

**1.77    "Liquidating Trust Administrative Reserve"** has the meaning set forth in the Liquidating Trust Agreement.

**1.78    "Liquidating Trust Agreement"** means the trust agreement establishing the Liquidating Trust, substantially in the form attached hereto as Plan Exhibit A, which shall be approved in the Confirmation Order and entered into by the Debtors and the Liquidating Trustee on the Effective Date pursuant to the terms of the Plan; provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date with the consent of the Bankruptcy Committees, to amend Plan Exhibit A and to provide notice of any such amendments to the Bankruptcy Court.  All of the terms and conditions of the Liquidating Trust Agreement are incorporated into the Plan and are subject to the terms and provisions of the Plan.

**1.79    "Liquidating Trust Assets"** has the meaning set forth in the Liquidating Trust Agreement.

**1.80    "Liquidating Trustee"** has the meaning set forth in the Liquidating Trust Agreement.

**1.81    "Litigation Claims"** means the claims, rights, causes of action, defenses, counterclaims, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtors, the Estates or the Bankruptcy Committees may hold or assert against any non-Debtor Entity, including, without limitation, all claims, rights of action, suits and proceedings under Chapter 5 of the Bankruptcy Code; provided, however, that *"Litigation Claims"* shall not include any Industries Retained Assets or Transferred Assets.

**1.82    "Loan Documents"** means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

**1.83    "Management Agreement"** means the agreement, if any, entered into by the Liquidating Trustee and Reorganized Industries on the Effective Date pursuant to the terms of the Plan and the Liquidating Trust Agreement, substantially in the form to be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.  All of the terms and conditions of the Management Agreement are subject to the terms and provisions of the Plan.

**1.84    "Minority Foods Shares"** means the Old Securities of Foods held by an Entity other than Industries.

**1.85    "Non-Debtor Subsidiaries"** means, collectively, the direct and indirect subsidiaries of Industries which have not commenced Chapter 11 cases and thus are not Debtors.

**1.86    "Objection Deadline"** means the last day for filing objections to Disputed Claims (other than Disputed Professional Fee Claims) or Disputed Interests, which day shall be 180 days after the Effective Date, unless such date is extended by the Bankruptcy Court upon request by the Liquidating Trustee.

**1.87    "Old Common Shares"** means the common shares of any of the Debtors issued and outstanding as of the Petition Date, including, without limitation, any patronage dividends issued to members, associate members and/or patrons of any Debtor in the form of common stock, associate member common stock or capital credits.

**1.88    "Old Preferred Shares"** means the preferred shares of any of the Debtors issued and outstanding as of the Petition Date.

**1.89    "Old Securities"** means, collectively, the Old Common Shares, the Old Preferred Shares, the Old Warrants and the Old Stock Options of any of the Debtors.

**1.90    "Old Stock Options"** means the outstanding options to purchase Old Common Shares or Old Preferred Shares of any of the Debtors issued and outstanding as of the Petition Date.

**1.91    "Old Warrants"** means the warrants issued to former patrons of SF Services, Inc. in conjunction with the merger of Industries and SF Services, Inc. that entitled the holder to convert such warrants to Old Common Shares of Industries if certain product purchases were made by such patron from Industries during the seven year period following such merger.

**1.92    "Other Priority Claim"** means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

**1.93    "Other Secured Claim"** means a Secured Claim against any of the Debtors, as the case may be, other than the Secured Lender Claims, including, without limitation, (i) Secured Claims arising under or in connection with any Industrial Revenue Bonds and that remain unpaid obligations of the Debtors as of the Effective Date, and (ii) mechanics', materialmans', artisans' and similar type liens that constitute Secured Claims.

**1.94    "PBGC"** means Pension Benefit Guaranty Corporation.

**1.95    "PBGC Claims"** means any and all Claims of the PBGC against the Debtors arising from or related to pension plan termination, unfunded benefit liability and/or unpaid premiums and any and all Claims of the PBGC on behalf of any pension plans administered by the Debtors for due and unpaid minimum funding contributions under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461.

**1.96    "Person"** means a "person" as defined in section 101 of the Bankruptcy Code.

**1.97    "Petition Date"** means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Case.

**1.98**    **"Pipeline"** means Farmland Pipe Line Company.

**1.99**    **"Plan"** means this Chapter 11 reorganization plan and all exhibits and schedules attached hereto or referenced herein, as the same may be amended, modified or supplemented from time to time.

**1.100**    **"Plan Exhibit"** means any exhibit or schedule attached hereto.

**1.101**    **"Plan Rate"** means the federal judgment rate established under 28 U.S.C. § 1961 as of the Petition Date.

**1.102**    **"Pork Business"** means the Debtors' pork processing operations, including, without limitation, substantially all of the assets of Foods.

**1.103**    **"Post-Confirmation Committee"** has the meaning set forth in Section 5.5 of the Plan.

**1.104**    **"Pre-Petition Credit Agreement"** means the Credit Agreement, dated as of February 7, 2002, by and among Industries and Foods, as borrowers, the financial institutions party thereto, as lenders, CoBank ACB and Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., as co-syndication agents, Harris Trust & Savings Bank and U.S. Bank National Association, as co-documentation agents, and Deutsche Bank Trust Company Americas, as administrative agent.

**1.105**    **"Priority Tax Claim"** means a Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.106**    **"Pro Rata"** means, at any time, the proportion that the Face Amount of a Claim (or the number of shares representing an Interest) in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims) in such Class (or the aggregate number of shares (including Disputed Interests) representing such Class of Interests), unless the Plan provides otherwise; <u>provided</u>, <u>however</u>, that with respect to the Industries Distribution Pool, *"Pro Rata"* means with respect to a Claim in Class 4, Class 5 or Class 7, the proportion that the Face Amount of a Claim in Class 4, Class 5 or Class 7 bears to the aggregate Face Amount of all Claims (including Disputed Claims) in Classes 4, 5 and 7.

**1.107**    **"Professional"** means any professional employed in the Chapter 11 Case pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise and any professionals seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.108**    **"Professional Fee Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date.

**1.109**    **"Register"** has the meaning set forth in the Liquidating Trust Agreement.

**1.110**    **"Reimbursement Right"** has the meaning set forth in Section 7.14 of the Plan.

**1.111** **"Reinstated" or "Reinstatement"** means (i) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (c) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

**1.112** **"Reorganized Industries"** means Industries, as reorganized on and after the Effective Date.

**1.113** **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs, if any, filed in the Bankruptcy Court by the Debtors as such schedules or statements may be amended or supplemented from time to time in accordance with Fed. R. Bankr. P. 1009 or orders of the Bankruptcy Court.

**1.114** **"Secured Claim"** means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

**1.115** **"Secured Lender Claims"** means the Claims of the Lenders arising under or as a result of the Pre-Petition Credit Agreement and the Loan Documents.

**1.116** **"SF Phosphates Interest"** means Industries' ownership interest in SF Phosphates, Limited Company.

**1.117** **"SFA"** means SFA, Inc.

**1.118** **"Subordinated Certificates"** means: (a) 5 Year Subordinated Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, with an original authorized principal amount of $500,000,000.00; (b) 10 Year Subordinated Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, with an original authorized principal amount of $500,000,000.00; (c) 20 Year

Subordinated Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, with an original authorized principal amount of $500,000,000.00; (d) 10 Year Subordinated Monthly Income Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, with an original authorized principal amount of $500,000,000.00; (e) 10 Year Subordinated Individual Retirement Account Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, with an original authorized principal amount of $500,000,000.00; (f) 5 Year Subordinated Monthly Income Capital Investment Certificates issued under the Indenture dated November 11, 1985, with an original authorized principal amount of $500,000,000.00; and (g) Series A through Series H Subordinated Debenture Bonds issued under a Subordinated Indenture dated December 4, 1997, with an unlimited authorized aggregate principal amount.

**1.119** **"Subordinated Certificates Claim"** means a Claim arising out of or related to the Subordinated Certificates.

**1.120** **"Subordinated Claims"** means any Claim arising from, related to or on account of any Old Security of Industries that is subordinated pursuant to sections 510(b) or (c) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Old Security of Industries, any Claim for damages arising from the purchase or sale of an Old Security of Industries, any Claim for reimbursement, contribution or indemnification on account of any such Claim, or any Claim arising out of or related to the rejection of Old Warrants.

**1.121** **"Subsequent Distribution Date"** has the meaning set forth in Section 7.5 of the Plan.

**1.122** **"Subsidiaries"** mean, collectively, the Subsidiary Debtors and the Non-Debtor Subsidiaries.

**1.123** **"Subsidiary Debtors"** means, collectively, Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company.

**1.124** **"Subsidiary Interests"** means, collectively, the issued and outstanding shares of common stock of the Subsidiary Debtors directly or indirectly owned by Industries, as of the Petition Date.

**1.125** **"Substantial Contribution Claim"** means a claim for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Case pursuant to section 503(b)(3),(4), or (5) of the Bankruptcy Code.

**1.126** **"Tax Distribution"** has the meaning set forth in Section 1.1 of the Liquidating Trust Agreement.

**1.127** **"Transferred Assets"** means those assets of the Debtors identified on Plan Exhibit D, which assets shall be transferred as provided in Section 5.1(d) of the Plan; provided, however, that the Debtors reserve their right, at any time prior to the Effective Date, upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit D to delete any assets therefrom, add any assets

12

thereto or modify any other information contained thereon and to provide notice of any such amendments to the Bankruptcy Court.

**1.128** **"Transportation"** means Farmland Transportation, Inc.

**1.129** **"Trust Indentures"** means: (a) Indenture dated November 20, 1981, as amended January 4, 1982, providing for the issuance of demand loan certificates; (b) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, providing for the issuance of 5 Year Subordinated Capital Investment Certificates; (c) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, providing for the issuance of 10 Year Subordinated Capital Investment Certificates; (d) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, providing for the issuance of 20 Year Subordinated Monthly Income Capital Investment Certificates; (e) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, providing for the issuance of 10 Year Subordinated Monthly Income Capital Investment Certificates; (f) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, providing for the issuance of 10 Year Subordinated Individual Retirement Account Certificates; (g) Indenture dated November 11, 1985, providing for the issuance of 5 Year Subordinated Monthly Income Capital Investment Certificates; (h) Indenture dated December 4, 1997, providing for the issuance of unsubordinated debt securities, including demand loan certificates; and (i) Subordinated Indenture dated December 4, 1997, providing for the issuance of subordinated debt securities in series.

**1.130** **"Unimpaired"** means, when used with reference to a Claim or Interest, a Claim or Interest that is not Impaired.

**1.131** **"Voting Record Date"** means the voting record date for voting to accept or reject the Plan, as determined by the Bankruptcy Court.

## C.     Rules Of Interpretation

For purposes of the Plan (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (d) the words "herein", "hereof", "hereunder", "hereto" and other words of similar import refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**D.     Computation Of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

**E.     Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (i) the State of Delaware shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.   Nothing contained in this Section I.E is intended to, or shall, affect the substantive law otherwise applicable to the allowance or disallowance of a Claim or Interest or the rights granted to the Liquidating Trustee, including, without limitation, those rights granted pursuant to Section 5.10 of the Plan.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Loan Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Section 3.1 of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class. A Claim or Interest may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

Although the PBGC previously filed the PBGC Claims against certain of the Debtors, all of the PBGC Claims will be resolved by the assumption of the liabilities associated with such Claims in connection with the sale of the Pork Business.  No distributions will be made to the PBGC under the Plan.

The Plan, though proposed jointly, constitutes separate plans proposed by each Debtor. Therefore, the classifications set forth below shall be deemed to apply separately (as appropriate) with respect to each such plan.  Accordingly, each Debtor reserves the right to request confirmation of its separate plan in the event that such separate confirmation is necessary and appropriate for such Debtors and its creditors.

### 2.1     Class 1 (Other Priority Claims)

Class 1 consists of all Other Priority Claims.

**2.2**     **Class 2 (Secured Lender Claims)**

Class 2 consists of all Secured Lender Claims.

**2.3**     **Class 3 (Other Secured Claims)**

Class 3 consists of all Other Secured Claims.

**2.4**     **Class 4 (Demand Certificates Claims)**

Class 4 consists of all Demand Certificates Claims.

**2.5**     **Class 5 (Subordinated Certificates Claims)**

Class 5 consists of all Subordinated Certificates Claims.

**2.6**     **Class 6 (Convenience Claims against Industries)**

Class 6 consists of all Convenience Claims against Industries.

**2.7**     **Class 7 (General Unsecured Claims against Industries)**

Class 7 consists of all General Unsecured Claims against Industries.

**2.8**     **Class 8 (Industries Preferred Shares)**

Class 8 consists of all Industries Preferred Shares.

**2.9**     **Class 9 (Industries Common Shares)**

Class 9 consists of all Industries Common Shares.

**2.10**     **Class 10 (General Unsecured Claims against Foods)**

Class 10 consists of all General Unsecured Claims against Foods.

**2.11**     **Class 11 (Old Securities of Foods)**

Class 11 consists of all Old Securities of Foods.

**2.12**     **Class 12 (General Unsecured Claims against Transportation)**

Class 12 consists of all General Unsecured Claims against Transportation.

**2.13**     **Class 13 (Old Securities of Transportation)**

Class 13 consists of all Old Securities of Transportation.

**2.14    Class 14 (General Unsecured Claims against SFA)**

Class 14 consists of all General Unsecured Claims against SFA.

**2.15    Class 15 (Old Securities of SFA)**

Class 15 consists of all Old Securities of SFA.

**2.16    Class 16 (General Unsecured Claims against Pipeline)**

Class 16 consists of all General Unsecured Claims against Pipeline.

**2.17    Class 17 (Old Securities of Pipeline)**

Class 17 consists of all Old Securities of Pipeline.

**2.18    Class 18 (Intercompany Claims)**

Class 18 consists of all Intercompany Claims.

**2.19    Class 19 (Subordinated Claims)**

Class 19 consists of all Subordinated Claims.

**ARTICLE III**
**TREATMENT OF CLAIMS AND INTERESTS**

**3.1    Unclassified Claims**

    (a)    Administrative Claims

Except as otherwise provided for herein, and subject to the requirements of Sections 11.1-11.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Administrative Claim, each holder of an Allowed Administrative Claim shall receive in full and complete satisfaction of such Allowed Administrative Claim (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case and all liabilities and obligations of the Debtors under the KERIT Plan shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Notwithstanding the foregoing, (i) the Bondholder Transaction Fee shall be payable only from distributions otherwise payable to holders of Allowed Class 5 Claims and shall be paid prior to the payment of any distributions to holders of Allowed Class 5 Claims, and (ii) the Creditor Transaction Fee shall be payable only from

distributions otherwise payable to holders of Allowed Class 7 Claims and shall be paid prior to the payment of any distributions to holders of Allowed Class 7 Claims.

(b)     Priority Tax Claims

Except as otherwise provided for herein, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (iii) the date such Priority Tax Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive in full and complete satisfaction of such Allowed Priority Tax Claim (x) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing.

(c)     DIP Loan Claims

If then outstanding on the Effective Date, the DIP Loan Claims shall be paid in full on the Effective Date according to the terms of the DIP Credit Agreement.  Notwithstanding anything in the Plan to the contrary, the DIP Loan Claims shall have the superpriority status set forth in the orders authorizing and evidencing the DIP Loan Claims.

(d)     Fees and Expenses of the Indenture Trustees

Without further order of the Bankruptcy Court, the Indenture Trustees shall be entitled to payment out of distributions otherwise payable to the holders of the Demand Certificates, the Subordinated Certificates or the Industrial Revenue Bonds (as applicable) of all properly documented unpaid fees and expenses for services rendered under the Trust Indentures and the IRB Indentures, including compensation, disbursements and expenses of agents and legal counsel to the Indenture Trustees in connection with the performance of their duties under the Trust Indentures and the IRB Indentures.  Upon payment in full of such fees and expenses, any liens of the Indenture Trustees on current distributions to holders of Demand Certificates, Subordinated Certificates and Industries Revenue Bonds shall be released and extinguished.

## 3.2     Class 1 (Other Priority Claims)

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Claim becomes an Allowed Class 1 Claim, or (iii) the date such Class 1 Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Class 1 Claim, each holder of an Allowed Class 1 Claim shall receive, in full and complete satisfaction of such Allowed Class 1 Claim (x) Cash equal to the unpaid portion of such Allowed Class 1 Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing.  The legal, equitable and contractual rights of the holders of Allowed Class 1 Claims are Unimpaired by the Plan.

17

### 3.3     Class 2 (Secured Lender Claims)

On the Effective Date, the Allowed Secured Lender Claims, if any, shall be satisfied and paid in full in the amount of said Claims then outstanding. Net cash proceeds from Section 363 asset sales prior to the Confirmation Date shall be remitted for application against the Secured Lender Claims. The Secured Lender Claims, if any, outstanding on the Effective Date shall be paid in full in Cash from net cash proceeds from Section 363 asset sales that occur after the Confirmation Date and prior to the Effective Date. Nothing in the Plan shall alter or affect any intermediate payments made by the Debtors to the Secured Lenders prior to the Effective Date. Class 2 is Unimpaired by the Plan.

### 3.4     Class 3 (Other Secured Claims)

Subject to the provisions of Section 3.1(d) of the Plan, on or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 3 Claim shall receive one of the following distributions: (a) payment of such holder's Allowed Other Secured Claim in full in Cash; (b) the sale or disposition proceeds of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Debtors' interest in such Collateral; (c) the surrender of the Collateral securing such Allowed Other Secured Claim to the holder of such Allowed Other Secured Claim; (d) the Reinstatement of such Allowed Other Secured Claim; or (e) such other distribution or treatment as may be ordered by the Bankruptcy Court or as shall be necessary to satisfy the requirements of the Bankruptcy Code. The manner and treatment of each Allowed Other Secured Claim shall be determined by the Liquidating Trustee in his sole and absolute discretion. Nothing in this Section 3.4 or elsewhere in the Plan shall preclude the Liquidating Trustee from challenging the validity of any alleged Lien on any asset of a Debtor or the value of such Collateral. The legal, equitable and contractual rights of the holders of Allowed Class 3 Claims are Unimpaired by the Plan.

### 3.5     Class 4 (Demand Certificates Claims)

As of the Effective Date, all notes, instruments and other documents evidencing the Demand Certificates shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Demand Certificates evidenced thereby shall be extinguished. Subject to the provisions of Section 3.1(d) of the Plan and Article VII of the Plan and the Liquidating Trust Agreement, until all Allowed Class 4 Claims have been paid in full (including payment of interest through the Effective Date at the rate provided in the Demand Certificates) less any amounts payable to the Indenture Trustee for the Demand Certificates pursuant to Section 3.1(d) of the Plan, each holder of an Allowed Class 4 Claim shall receive, in full and complete satisfaction of such Allowed Class 4 Claim, (i) its Pro Rata share of the Industries Distribution Pool plus (ii) its Pro Rata Share of the funds otherwise payable to holders of Allowed Class 5 Claims pursuant to clause (i) of the second sentence of Section 3.6 of the Plan less (iii) its Pro Rata share of any amounts payable to the Indenture Trustees for the Demand Certificates pursuant to Section 3.1(d) of the Plan. Class 4 is Impaired by the Plan.

### 3.6     Class 5 (Subordinated Certificates Claims)

As of the Effective Date, all notes, instruments and other documents evidencing the Subordinated Certificates shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Subordinated Certificates evidenced

thereby shall be extinguished. Subject to the provisions of Section 3.1(d) of the Plan and Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 5 Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 5 Claim, (i) its Pro Rata share of the Industries Distribution Pool less (ii) its Pro Rata share of those funds required to be paid to holders of Allowed Class 4 Claims in accordance with clause (ii) of the second sentence of Section 3.5 of the Plan plus (iii) after all holders of Allowed Class 4 Claims have received the distributions they are entitled to receive pursuant to Section 3.5 of the Plan, its Pro Rata share of the funds otherwise payable to holders of Allowed Class 4 Claims pursuant to clause (i) of the second sentence of Section 3.5 of the Plan less (iv) its Pro Rata share of the Bondholder Transaction Fee less (v) its Pro Rata share of any amounts payable to the Indenture Trustees for the Subordinated Certificates pursuant to Section 3.1(d) of the Plan. Class 5 is Impaired by the Plan.

### 3.7    Class 6 (Convenience Claims against Industries)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 6 Claim shall receive, in full and complete satisfaction of such Allowed Class 6 Claim, Cash equal to the amount of such Allowed Claim. Class 6 is Unimpaired by the Plan.

### 3.8    Class 7 (General Unsecured Claims against Industries)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 7 Claim shall receive, in full and complete satisfaction of such Allowed Class 7 Claim, its Pro Rata share of the Industries Distribution Pool less the Creditor Transaction Fee. Class 7 is Impaired by the Plan.

### 3.9    Class 8 (Industries Preferred Shares)

The Industries Preferred Shares shall be Reinstated on the Effective Date. Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made on account of the Industries Preferred Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid. Class 8 is Unimpaired by the Plan.

As a voluntary alternative to the treatment set forth in the preceding paragraph, on or before 180 days following the Effective Date, any holder of Industries Preferred Shares may voluntarily elect to tender and assign to the Liquidating Trustee in accordance with Section 7.8(f) of the Plan that holder's Industries Preferred Shares, including any and all causes of action and claims against any person or entity arising from or related to those Industries Preferred Shares and arising since the issuance of the Industries Preferred Shares including without limitation the right to bring such causes of action and claims; provided, however, such causes of action, claims and rights are to be separately held by the Liquidating Trustee and are not causes of action, claims or rights devolving from the Debtors. The Liquidating Trustee shall indemnify, hold harmless and defend each holder of Industries Preferred Shares that tenders its Industry Preferred Shares from and against any and all

claims, liabilities and expenses arising out of or related to the assertion by the Liquidating Trustee of any claims or causes of action based on the Industry Preferred Shares or any rights assigned pursuant to this provision of the Plan. On the Initial Distribution Date, the Liquidating Trustee shall deposit $2.4 million into a separate account that will be established and maintained by the Liquidating Trustee (the "Class 8 Redemption Account"). On the Initial Distribution Date, the Liquidating Trustee shall distribute to holders of Industries Preferred Shares that have tendered their Industries Preferred Shares to the Liquidating Trustee their Pro Rata portion of the $2.4 million. On each Subsequent Distribution Date on which the holders of Allowed Class 5 Claims shall have received distributions equal to or greater than 60% of the amount of their Allowed Class 5 Claims, the Liquidating Trustee shall deposit into the Class 8 Redemption Account simultaneously with the distributions made to holders of Allowed Class 5 Claims an amount of consideration equal to that which would otherwise be distributable on that Subsequent Distribution Date to an equivalent $4 Million Allowed Class 5 Claim, which equivalent Allowed Class 5 Claim amount shall be adjusted, as appropriate, on any Subsequent Distribution Date that occurs later than 180 days after the Effective Date with respect to non-tendering holders of Industries Preferred Shares. In exchange for such tender and assignment of those Industries Preferred Shares and causes of action, claims and rights (and the tender of proceeds and cooperation as provided for herein), said holder shall receive: (i) that holder's Pro Rata share of the funds in the Class 8 Redemption Account; and (ii) a release in favor of such holder and any prior holder of such holder's Industries Preferred Shares of any of the Debtors' and the Liquidating Trustee's causes of action under Chapter 5 of the Bankruptcy Code or any other state or federal law that would give rise to the Liquidating Trustee's or Debtors' rights against such holder (and any predecessors and successors to such holder) relating to the Industries Preferred Shares or any distributions with respect thereto. Any causes of action, claims and rights assigned to the Liquidating Trustee by holders of Industries Preferred Shares shall also be administered by the Liquidating Trustee in accordance with the Plan. One hundred eighty days after the Effective Date, the Liquidating Trustee shall withdraw from the Class 8 Redemption Account any amounts in the Class 8 Redemption Account attributable to holders of Industries Preferred Shares who did not tender and assign their shares in accordance with this paragraph, and such withdrawn amounts shall thereafter be administered in accordance with the Plan. The Professional Fee Claims of the group of holders chaired by John Hancock Life Insurance Company of Industries Preferred Shares that were incurred in connection with this Chapter 11 case in the amount of $110,000 shall be paid from consideration deposited into the Class 8 Redemption Account prior to any distributions to holders of Industries Preferred Shares who tender their shares.

### 3.10    Class 9 (Industries Common Shares)

On the Effective Date (or such later date(s) as may be determined by Reorganized Industries with the consent of the Liquidating Trustee), (i) that amount of Industries Common Shares whose cancellation, in the Debtors' reasonable judgment, can be offset in full against appropriate losses and net operating losses shall be deemed canceled on a Pro Rata basis without further act or action under any applicable agreement, law, regulation, order or rule, and the Industries Common Shares evidenced thereby shall be extinguished, and (ii) any remaining Industries Common Shares shall be deemed Reinstated. Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made (or dividend paid) on account of any remaining Industries Common Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment

of interest at the Plan Rate), or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid.  In accordance with and as provided by the Plan, any remaining Industries Common Shares shall be deemed to continue in effect and shall not be deemed canceled or extinguished under any other law or regulation.  Class 9 is Impaired by the Plan.

### 3.11     Class 10 (General Unsecured Claims against Foods)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 10 Claim shall receive, in full and complete satisfaction of such Allowed Class 10 Claim, Cash equal to the amount of its Allowed Class 10 Claim plus interest at the Plan Rate from the Petition Date through the Effective Date.  Class 10 is Impaired by the Plan; provided, however, that holders of Allowed Class 10 Claims that arise from the rejection of an executory contract or unexpired leases shall receive interest at the Plan Rate only from the date of such rejection through the Effective Date.

### 3.12     Class 11 (Old Securities of Foods)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Foods shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule and the Old Securities of Foods evidenced thereby shall be extinguished.  The holders of Allowed Class 11 Interests that constitute Minority Foods Shares shall receive their Pro Rata share of the Class 11 Distribution Pool.  Class 11 is Impaired by the Plan.

### 3.13     Class 12 (General Unsecured Claims against Transportation)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 12 Claim shall receive, in full and complete satisfaction of such Allowed Class 12 Claim, Cash equal to the amount of its Allowed Class 12 Claim.  Class 12 is Impaired by the Plan.

### 3.14     Class 13 (Old Securities of Transportation)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Transportation shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of Transportation evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of Transportation after all Administrative Claims against Transportation, all Priority Tax Claims against Transportation, all Class 1 Claims against Transportation, all Class 3 Claims against Transportation, all Class 12 Claims and all Class 18 Claims against Transportation have been (i) Allowed and paid (including, with respect to Class 12, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Transportation have been repaid, shall vest in the Liquidating Trust.  Class 13 is Impaired by the Plan.

### 3.15     Class 14 (General Unsecured Claims against SFA)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 14 Claim shall receive, in full and complete satisfaction of such

Allowed Class 14 Claim, Cash equal to the amount of its Allowed Class 14 Claim.  Class 14 is Impaired by the Plan.

### 3.16     Class 15 (Old Securities of SFA)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of SFA shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of SFA evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of SFA after all Administrative Claims against SFA, all Priority Tax Claims against SFA, all Class 1 Claims against SFA, all Class 3 Claims against SFA, all Class 14 Claims and all Class 18 Claims against SFA have been (i) Allowed and paid (including, with respect to Class 14, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by SFA have been repaid, shall vest in the Liquidating Trust.  Class 15 is Impaired by the Plan.

### 3.17     Class 16 (General Unsecured Claims against Pipeline)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 16 Claim shall receive, in full and complete satisfaction of such Allowed Class 16 Claim, Cash equal to the amount of its Allowed Class 16 Claim.  Class 16 is Impaired by the Plan.

### 3.18     Class 17 (Old Securities of Pipeline)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Pipeline shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of Pipeline evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of Pipeline after all Administrative Claims against Pipeline, all Priority Tax Claims against Pipeline, all Class 1 Claims against Pipeline, all Class 3 Claims against Pipeline, all Class 16 Claims and all Class 18 Claims against Pipeline have been (i) Allowed and paid (including, with respect to Class 16, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Pipeline have been repaid, shall vest in the Liquidating Trust.  Class 17 is Impaired by the Plan.

### 3.19     Class 18 (Intercompany Claims)

On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 18 Claim shall receive, in full and complete satisfaction of such Allowed Class 18 Claim, (x) Cash equal to the unpaid portion of such Allowed Class 18 Claim or (y) such other treatment as to which the Debtors or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing.  Class 18 is Impaired by the Plan.

### 3.20     Class 19 (Subordinated Claims)

In accordance with section 510(b) and (c) of the Bankruptcy Code, no distribution shall be made on account of the Subordinated Claims until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against

Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid.  Class 19 is Impaired by the Plan.

### 3.21     Reservation Of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Liquidating Trustee's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

### 4.1     Impaired Classes Of Claims And Interests Entitled To Vote

Subject to Section 4.3 of the Plan, Claim and Interest holders in each Impaired Class of Claims or Interests are entitled to vote as a class to accept or reject the Plan.

### 4.2     Acceptance By An Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 4.3     Presumed Acceptances

Classes 1, 2, 3, 6 and 8 are Unimpaired by the Plan. Under section 1126(f) of the Bankruptcy Code, such Claim and Interest holders are conclusively presumed to accept the Plan, and the votes of such Claim and Interest holders will not be solicited.  Classes 13, 15, 17 and 18 are conclusively presumed to accept the Plan because the Claim and Interest holders in such Classes are the proponents of the Plan.

### 4.4     Summary of Classes Voting On The Plan

As a result of the provisions of Sections 4.1, 4.3 and 4.4 of the Plan, the votes of holders of Claims in Classes 4, 5, 7, 9, 10, 11, 12, 14, 16 and 19 will be solicited with respect to the Plan.

### 4.5     Confirmation Pursuant To Section 1129(b) Of The Bankruptcy Code

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 5.1    Continued Existence Of The Debtors; Vesting Of Assets

(a)    On the Effective Date, all right, title and interest in all of the Debtors' property and assets (excluding the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets), including without limitation, all rights and causes of action, whether arising by contract, under the Bankruptcy Code (including, without limitation pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code), under the Plan or under other applicable law, including, without limitation, all rights the Debtors have under the Plan, shall vest in the Liquidating Trust.

(b)    On the Effective Date, Foods shall be merged into Industries, after which Industries shall continue to exist as Reorganized Industries.  Reorganized Industries shall be governed and managed under and in accordance with the Plan, the Management Agreement and its amended certificate of incorporation and bylaws; provided, however, that all provisions contained in such documents related to the SF Phosphates, Limited Company will not be effective if the SF Phosphates Interest has been disposed of prior to the Effective Date. Reorganized Industries shall be authorized to effectuate the Plan and the transactions contemplated by the Plan and to take any proceedings or actions provided for or contemplated by the Plan (in each case in a manner consistent with the Plan and the Liquidating Trust Agreement), including, without limitation, such proceedings or actions related to the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets as may be necessary and appropriate, all without further action by the stockholders of Reorganized Industries, and with like effect as if such actions had been taken by unanimous action of the stockholders of Reorganized Industries.  All recoveries received by Reorganized Industries on account of the Industries Retained Assets, the Transferred Assets or any other assets of the Debtors shall be remitted to the Liquidating Trust and held by the Liquidating Trustee on account of the Estate to which such recoveries are allocable.  Forms of the Management Agreement and the amended certificate of incorporation and bylaws of Reorganized Industries shall be filed with the Bankruptcy Court at least five Business Days prior to commencement of the Confirmation Hearing.  The identities of the officers and directors of Reorganized Industries shall be disclosed to the Bankruptcy Court no later than five Business Days prior to the commencement of the Confirmation Hearing, together with any additional information required under Section 1129(a)(5) of the Bankruptcy Code.  The Bankruptcy Committees and any creditor or party in interest may object to the identities of the proposed officers and directors of Reorganized Industries (and the proposed compensation to be provided to such persons) no later than one Business Day prior to the commencement of the Confirmation Hearing.  Notwithstanding any other provision hereof, Cash or Cash equivalents in an amount disclosed to the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing shall remain as assets of Reorganized Industries to fund all operations of Reorganized Industries other than those operations, if any, related to the Industries Retained Assets and/or services to be provided to the Liquidating Trust (which shall be funded, if at all, under the Management Agreement).

(c)    In the event that the Debtors own the Coffeyville Assets on the Effective Date, on the Effective Date, (i) all of the Debtors' right, title and interest in the Coffeyville Assets shall be transferred to a Delaware limited liability company (the "Coffeyville LLC") to be

established and wholly owned by the Liquidating Trust, and (ii) the executory contracts and unexpired leases listed on Plan Exhibit E shall be assumed and assigned to the Coffeyville LLC; provided, however, that the Liquidating Trust shall have the option (at its sole discretion in accordance with the Liquidating Trust Agreement) to transfer any of the Coffeyville Assets to the Liquidating Trust. The Coffeyville LLC shall be funded with that amount of capital determined by the Bankruptcy Court at the Confirmation Hearing to constitute sufficient capitalization for the continued maintenance of the Coffeyville LLC and any necessary remediation or other regulatory compliance related to the Coffeyville Assets. Forms of the certificate of organization and operating agreement for the Coffeyville LLC shall be filed with the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing.

(d)      On the Effective Date, (i) all of the Debtors' right, title and interest in each Transferred Asset owned by the Debtors on the Effective Date shall be transferred to a trust (each such trust, a "Transferred Asset Trust"), and (ii) the Liquidating Trust shall fund each Transferred Asset Trust with that amount of capital set forth on Plan Exhibit D or such other amount as determined by the Bankruptcy Court at the Confirmation Hearing (or at such other time prior to the Effective Date), which amount shall constitute sufficient capitalization for the maintenance, remediation (or other regulatory compliance) and/or disposition of each such Transferred Asset. Forms of the trust documents and related documents for each Transferred Asset Trust shall be filed with the Bankruptcy Court no later than five Business Days prior to the commencement of the Confirmation Hearing.

(e)      On the Effective Date, SFA, Transportation and Pipeline shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Debtors shall file with the appropriate public office certificates of dissolution.

(f)      From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, to withdraw their business operation from any state in which the Debtors were previously conducting their business operation.

## 5.2      Funding For The Plan

The Plan shall be funded in accordance with the provisions of the Plan from (a) Available Cash on the Effective Date and (b) Cash available after the Effective Date from, among other things, the liquidation of the Debtors' remaining assets, the prosecution and enforcement of Litigation Claims, and any release of funds from the Disputed Claims Reserve after the Effective Date. All Available Cash realized from the liquidation of the Debtors' remaining assets that is not Collateral for the Secured Lender Claims or DIP Loan Claims, the prosecution and enforcement of Litigation Claims, and the release of funds from the Disputed Claims Reserve (to the extent not otherwise payable to the Pre-Petition Lenders or the DIP Lenders) shall be allocated to the appropriate Estate(s) and shall be maintained by the Liquidating Trustee for distribution to the holders of Allowed Claims as provided in the Plan and the Liquidating Trust Agreement.

**5.3    Accounts**

The Debtors (subject to approval of the Bankruptcy Committees, which approval shall not be unreasonably withheld) and, from and after the Effective Date, the Liquidating Trustee may establish or maintain one or more interest-bearing accounts as they determine may be necessary or appropriate to effectuate the provisions of the Plan consistent with section 345 of the Bankruptcy Code and any orders of the Bankruptcy Court.

**5.4    Liquidating Trust; Liquidating Trustee**

(a)    Prior to the Effective Date, the Debtors shall establish the Liquidating Trust in accordance with Sections 5.1(c) herein and subject to the terms of the Liquidating Trust Agreement and the Plan. The Bankruptcy Committees shall establish the Post-Confirmation Committee and appoint the Committee Members in accordance with the Liquidating Trust Agreement and the Plan. By Confirmation of the Plan, the Bankruptcy Court specifically approves and designates the Liquidating Trust and the Liquidating Trustee as a representative of each Estate and finds that the Liquidating Trust and the Liquidating Trustee are acting on behalf of and for the benefit of the Beneficiaries in accordance with the distribution scheme set forth in the Plan. The establishment of the Liquidating Trust shall not give a holder of a Claim against any Debtor or any Estate any rights as against any other Debtor or any other Estate, except as provided for in Section 7.11 of the Plan. The Liquidating Trust is an intended third-party beneficiary of the Plan to the fullest extent allowable under the laws of the State of Delaware, the laws of the United States or any other applicable law. The identity of the Liquidating Trustee shall be disclosed to the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing. The Bankruptcy Committees and any creditor or party in interest may object to the identity of the proposed Liquidating Trustee (and the proposed compensation to be provided to such person) no later than one Business Day prior to the commencement of the Confirmation Hearing.

(b)    The Liquidating Trust and the Liquidating Trustee, as the representative of each Estate, except as otherwise limited in the Liquidating Trust Agreement, Plan or the Confirmation Order, shall be vested with all property, rights, interests, and powers of the Debtors. Subject to the provisions of the Liquidating Trust Agreement, the Liquidating Trustee's rights and authority include, without limitation, all of the following:

(i)    control, management and disposal of all Liquidating Trust Assets for the benefit of the holders of Allowed Claims and Allowed Class 11 Interests who may receive distributions under the Plan;

(ii)    prosecution of Litigation Claims on behalf of the Debtors and/or the Estates and/or the Liquidating Trust, including preference, fraudulent conveyance, avoidance and other actions whether against insiders or any other third parties;

(iii)    filing of objections to Claims or actions to subordinate Claims or recharacterize debt as equity and the filing and pursuit of any other pleading, motion, stipulation or other item in connection with any matter arising under, in or in connection with the Chapter 11 Case;

      (iv)     filing of tax returns;

      (v)     transfer (subject to Bankruptcy Court approval) of right, title and interest in and to any Liquidating Trust Assets; and

      (vi)     undertake any other action in the best interests of the Trust and/or its beneficiaries and not inconsistent with the provisions of the Liquidating Trust Agreement, the Plan, and the Confirmation Order.

      (c)     The funding of the Liquidating Trust pursuant to Section 5.1(c) hereof shall be treated for all purposes of the Tax Code as a deemed transfer to the Beneficiaries, followed by a deemed transfer by the Beneficiaries to the Liquidating Trust. The Beneficiaries shall be treated as the grantors and deemed owners of the Liquidating Trust. The valuation of the property and assets transferred to the Liquidating Trust shall be consistent and shall be used for all federal income tax purposes.

      (d)     Neither the Liquidating Trust nor the Liquidating Trustee shall have any successor or transferee liability for liabilities of the Debtors or shall be deemed a joint employer, co-employer or successor employer with the Debtors and shall have no obligation to pay wages, severance pay, WARN Act claims, benefits (including, without limitation, benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985) or any other payment to employees of the Debtors, except to the extent that such payments are payable in respect of Allowed Claims against the Debtors.

      (e)     From and after the Effective Date, the Liquidating Trust shall be subject to all terms and conditions contained in the Liquidating Trust Agreement and the Plan.

**5.5    Post-Confirmation Committee**

      (a)     On the Effective Date, there shall be constituted a committee (the "Post-Confirmation Committee") consisting of members (the "Committee Members"), the number and method for selection of which shall be agreed to by the Bankruptcy Committees and disclosed to the Bankruptcy Court at least ten Business Days prior to the commencement of the Confirmation Hearing or as otherwise ordered by the Bankruptcy Court. The identities of the Committee Members shall be disclosed to the Bankruptcy Court on the Confirmation Date. In the event that (a) no one is willing to serve on the Post-Confirmation Committee or (b) there shall have been fewer than one-half of the original number of Committee Members serving for a period of 30 consecutive days, then the Liquidating Trustee may, during such vacancy, ignore any reference in the Plan, the Liquidating Trust Agreement, or the Confirmation Order to a Post-Confirmation Committee, and all references to the Post-Confirmation Committee's ongoing duties and rights in the Plan, the Liquidating Trust Agreement, and the Confirmation Order shall be null and void during such time period.

      (b)     The Post-Confirmation Committee shall have the rights and responsibilities set forth in this Plan and the Liquidating Trust Agreement. The Committee Members shall be entitled to reimbursement of their reasonable expenses. The Committee Members shall receive such compensation as shall be disclosed to the Bankruptcy Court, upon

consent of the Debtors and the Bankruptcy Committees, not less than five Business Days prior to the commencement of the Confirmation Hearing.

(c)     Neither the Post-Confirmation Committee nor any of the Committee Members shall be liable for the acts or omissions of any other member of the Post-Confirmation Committee, nor shall any Committee Member be liable for any act or omission taken in its capacity as a Committee Member, other than acts or omissions resulting from such Committee Member's willful misconduct or gross negligence.

(d)     The Post-Confirmation Committee shall adopt by-laws which shall provide for the governance of the Post-Confirmation Committee, except as may be otherwise set forth in the Liquidating Trust Agreement.

(e)     A Committee Member shall recuse himself or herself from any decisions or deliberations regarding actions taken or proposed to be taken by the Liquidating Trustee or the Estates with respect to the Claims, Interests, or rights of such Committee Member, the entity appointing such Committee Member, or any affiliate of the foregoing.

### 5.6     Effectuating Documents; Further Transactions

Prior to the Effective Date, the chief executive officer, chief financial officer, or any other appropriate officer of Industries or any other applicable Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Industries or any other applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

### 5.7     Exemption From Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers in the United States from a Debtor to the Liquidating Trust or any other Entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.8     Releases And Related Matters

(a)     Releases by Debtors

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Liquidating Trustee, on behalf of the Liquidating Trust, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan (other than the rights of the Debtor, the Liquidating Trust or the

Liquidating Trustee to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan, and that may be asserted by or on behalf of the Debtors or their Estates or the Liquidating Trust against the Lenders, the agents under the Pre-Petition Credit Agreement, the financial institutions party to the DIP Credit Agreement, the agents under the DIP Credit Agreement, and their respective agents and professionals.

(b)     Injunction Related to Releases

The Confirmation Order will enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released by operation of Section 5.8 of the Plan or exculpated by operation of Section 11.9 of the Plan.

## 5.9     Closing Of The Chapter 11 Case

When substantially all remaining assets of the Debtors, Reorganized Industries or the Liquidating Trust (except the Transferred Assets), as the case may be, have been liquidated and converted into Cash (other than those assets abandoned by Debtors or the Liquidating Trust, as the case may be), and such Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## 5.10     Rights of Action

(a)     On and after the Effective Date, except as provided in Section 11.9 of the Plan, the Liquidating Trustee, on behalf of and as a court-appointed representative of each Debtor and for the benefit of each Estate (as vested in the Liquidating Trust pursuant to the Plan), will, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, retain and become the holder of, and have the exclusive right to enforce any and all present or future Litigation Claims and any and all rights of any and all of the Debtors that arose before or after the Commencement Date, including, but not limited to, rights, claims, causes of action, avoiding powers, suits and proceedings arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and all potential rights, claims and causes of action related to payments made by the Debtors prior to the Petition Date and disclosed in the Schedules.  The Liquidating Trustee may pursue, abandon, settle or release any or all such Litigation Claims and rights of action pursuant to the terms of the Plan and the Liquidating Trust Agreement, as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court.

(b)     On and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, Litigation Claim,

debt, right or cause of action of the Debtors for which the Liquidating Trustee retains sole and exclusive authority to pursue in accordance with Section 5.10(a) of the Plan.

(c)     The allowance of any Claim prior to the Effective Date shall not constitute a waiver of any Litigation Claim against the holder of such Claim.

### 5.11    Retiree Benefits

Any "retiree benefits" (as that term is defined in section 1114 of the Bankruptcy Code) of the Debtors not terminated during the Chapter 11 Case shall continue after the Effective Date to the extent required by section 1129(a)(13) of the Bankruptcy Code, without prejudice to the Debtor's right under applicable non-bankruptcy law to modify, amend or terminate such benefits. To the extent that any "retiree benefits" continue after the Effective Date, the Liquidating Trustee and/or Reorganized Industries expressly reserve the right to terminate such benefits in accordance with applicable non-bankruptcy law.

### 5.12    Establishment of Class 11 Distribution Pool

On or prior to the Effective Date, and subject to approval of the Bankruptcy Court, the Debtors, in consultation with the Bankruptcy Committees, shall determine the amount of Cash to be reserved by the Liquidating Trustee in a separate account (the "Class 11 Distribution Pool") for distribution to holders of Allowed Class 11 Interests that constitute Minority Foods Shares in accordance with the Plan and the Liquidating Trust Agreement, which amount shall represent the Available Cash estimated to be available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares as of the Effective Date after all Administrative Claims against Foods, all Priority Tax Claims against Foods, all Class 1 Claims against Foods, all Class 3 Claims against Foods, all Class 10 Claims and all Class 18 Claims against Foods have been (i) Allowed and paid in full (including, with respect to Class 10, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Foods have been repaid; provided, however, that the Liquidating Trustee reserves the right to reduce the Class 11 Distribution Pool in the event that the amount reserved in the Class 11 Distribution Pool is determined to be in excess of the amount actually available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1    Rejected Executory Contracts And Unexpired Leases

Except as otherwise provided in Section 6.3 of the Plan, on the Effective Date, all executory contracts and unexpired leases that exist between a Debtor and any Entity (including, without limitation, the IRB Indentures not Reinstated on or prior to the Effective Date and the Trust Indentures) shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (a) which has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date or pursuant to the Confirmation Order, or (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date (except to the extent that any such motion is

ultimately denied or withdrawn).  Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases pursuant to the Plan.

### 6.2    Rejection Damages Bar Date

If the rejection of an executory contract or unexpired lease during the Chapter 11 Case (including any rejection of an executory contract or unexpired lease pursuant to Section 6.1 of the Plan) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor, the Liquidating Trust, the Liquidating Trustee or the properties of any of them unless a proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors, and counsel to the Bankruptcy Committees, (i) if such rejection is effective on or prior to the Confirmation Date, within 30 days after the Confirmation Date, (ii) if such rejection is effective after the Confirmation Date, within 30 days after service of notice of such rejection, or (iii) if such rejection is pursuant to Section 6.1 of the Plan, within 30 days after the Effective Date.

### 6.3    Assumed Executory Contracts And Unexpired Leases

(a)    On the Effective Date, Reorganized Industries shall be deemed to have assumed or assumed and assigned, as the case may be, each executory contract and unexpired lease listed on Plan Exhibit B, provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date, to amend Plan Exhibit B to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease assumptions or assumptions and assignments, as the case may be, described above, as of the Effective Date.

(b)    In the event that Industries owns the Coffeyville Assets on the Effective Date, on the Effective Date Reorganized Industries shall be deemed to have assumed and assigned to the Coffeyville LLC each executory contract and unexpired lease listed on Plan Exhibit E, provided, however, that the Debtors reserve their right, at any time prior to the Effective Date, to amend Plan Exhibit E to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the conditional assumptions and assignments of the executory contracts and unexpired leases listed on Plan Exhibit E, as of the Effective Date.

### 6.4    Payments Related To Assumed Executory Contracts And Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default are indicated on Plan Exhibit B and Plan Exhibit E and shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor party to the contract or lease or the assignee of such Debtor party assuming such contract or lease, by Cure.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Reorganized Industries or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c)

any other matter pertaining to assumption or assignment (each, a "Cure Dispute") that cannot be resolved consensually among the parties, Reorganized Industries (with the consent of the Liquidating Trustee) shall have the right to reject the contract or lease for a period of five Business Days after entry of a Final Order adjudicating a Cure Dispute in a manner that is not acceptable to Reorganized Industries (with the consent of the Liquidating Trustee).

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1    Distributions

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made by the Liquidating Trustee pursuant to the terms and conditions contained in the Plan and the Liquidating Trust Agreement; provided, however, that no distribution shall be made on behalf of any Claim which may be subject to disallowance under section 502(d) of the Bankruptcy Code.  At the close of business on the Effective Date, the Claims and Interest register shall be closed, and there shall be no further changes in the record holders of any Claims or Interests.  The Liquidating Trustee shall have no obligation to recognize any transfer of any Claims or Interest occurring after the Effective Date. The Liquidating Trustee shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Article 4 of the Plan) with only those record holders stated on the Claims register as of the close of business on the Effective Date.

### 7.2    Interest On Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable law, including section 1129(a) of the Bankruptcy Code, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim; provided, however, that any interest determined to be payable in respect of any Claim shall be calculated at the Plan Rate.  This provision shall not apply to Allowed Secured Lender Claims and DIP Loan Claims.

### 7.3    Means Of Cash Payment

Any payment to be made by the Liquidating Trustee pursuant to the Plan will be in U.S. dollars and may be made, at the sole discretion of the Liquidating Trustee, by draft, check, electronic funds transfer, or as otherwise required or provided in any relevant agreement or applicable law.

### 7.4    Distributions on the Initial Distribution Date

As soon as is practicable after the Effective Date, subject to the reservation of adequate funds in the Liquidating Trust Administrative Reserve, each Disputed Claims Reserve and any other reserves established under the Plan or the Liquidating Trust Agreement as and when appropriate, the Liquidating Trustee shall deliver proceeds of Collateral and/or Available Cash to holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date.  All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

### 7.5 Distributions on a Subsequent Distribution Date

Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the date of making the distributions required by Section 7.4 of the Plan (the "Initial Distribution Date"), the Liquidating Trustee shall, on a subsequent date (each, a "Subsequent Distribution Date"), which date shall be whenever the aggregate amount distributable to holders of Allowed Claims equals or exceeds $1,000,000 (but in no event shall such date be less than three months, or more than one year, after the next previous distribution date), distribute such proceeds of Collateral and/or Available Cash or other reasonably distributable assets to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Subsequent Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Subsequent Distribution Date had been disallowed on the Initial Distribution Date; provided, however, that the Liquidating Trustee shall not be required to make any distribution on a Subsequent Distribution Date on account of an Allowed Claim or Interest in an amount less than $100; provided further, however, that in no event shall the foregoing impair the right of the Liquidating Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the Liquidating Trustee. All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

### 7.6 Distributions on the Final Distribution Date

Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the Initial Distribution Date, any Subsequent Distribution Date and after the liquidation of any and all assets of the Debtors and after all Disputed Claim and Disputed Interests of Beneficiaries have become (in whole or in part) Allowed Claims or Allowed Interests or have been disallowed by Final Order, the Liquidating Trustee shall establish a final distribution date (the "Final Distribution Date") upon which the Liquidating Trustee shall distribute such proceeds of Collateral and/or Available Cash or other assets to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Final Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Final Distribution Date had been disallowed on the Initial Distribution Date, taking into account all previous distributions; provided, however, that in no event shall the foregoing impair the right of the Liquidating Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the Liquidating Trust. Within 20 Business Days prior to making the final distribution, the Liquidating Trustee shall notify the Post-Confirmation Committee that the Liquidating Trustee deems all assets

to be liquidated and all Claims and Interest of Beneficiaries to be resolved and that the Liquidating Trustee intends to establish the Final Distribution Date.

### 7.7 Delivery Of Distributions; Undeliverable Distributions

Distributions to holders of Allowed Claims and Allowed Interests shall be made by the Liquidating Trustee (a) at the addresses set forth on the proofs of Claim or Interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of Claim or Interest, (c) at the addresses reflected in the Schedules if no proof of Claim or Interest has been filed and the Liquidating Trustee has not received a written notice of a change of address, or (d) at the addresses contained in the official records of the Debtors or the applicable Indenture Trustee for the Industrial Revenue Bonds, or (e) at the addresses set forth in a properly completed letter of transmittal accompanying securities properly remitted to the Debtors. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidating Trustee is notified, in accordance with the Liquidating Trust Agreement, of such holder's then current address. Claims or Interests held by holders whose distributions are returned as undeliverable and who fail to notify the Liquidating Trustee of their respective correct addresses within one year after such distributions are returned to the Liquidating Trustee as undeliverable shall be expunged, after which date all unclaimed property (including, without limitation, all unclaimed property held in the Class 11 Distribution Pool and the Class 8 Redemption Account) shall (i) revert to the Liquidating Trust free of any restrictions thereon and the Claims or Interests of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary, or (ii) if the Liquidating Trust has been terminated, be delivered to the clerk of the Bankruptcy Court. All undeliverable distributions that revert to the Liquidating Trust shall be used to satisfy the costs of administering the Plan and the Liquidating Trust and/or distributed to other holders of Allowed Claims or Allowed Interests of the same Class on the Final Distribution Date. Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### 7.8 Tender Of Securities And Instruments; Cancellation of Trust Indentures

(a)      Except as otherwise required by the Liquidating Trustee, as a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, each holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods shall tender the applicable instruments, securities or other documentation evidencing such Claim or Interest to the Liquidating Trustee in accordance with written instructions to be provided to such holders by the Liquidating Trustee as promptly as practicable following the Effective Date. All tendered instruments and documentation relating to Industrial Revenue Bonds, Demand Certificates and Subordinated Certificates shall be marked as cancelled. All tendered securities and documentation relating to Old Securities of Foods shall be held by the Liquidating Trustee.

(b)      In addition to any requirements under the applicable certificate or articles of incorporation or by-laws of the applicable Debtor, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old

Securities of Foods that has been lost, stolen, mutilated or destroyed shall, in lieu of tendering such instrument, security or documentation, deliver to the Liquidating Trustee (i) evidence satisfactory to the Liquidating Trustee or the applicable Indenture Trustee for the Industrial Revenue Bonds of the loss, theft, mutilation or destruction; and (ii) such indemnity or security as may be required by the Liquidating Trustee to hold the Liquidating Trustee and the Liquidating Trust harmless from any damages, liabilities or costs incurred in treating such individual as a holder of Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed. Upon compliance with this Section 7.8(b) by a holder of a Claim or Interest evidenced by Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods, such holder shall, for all purposes under the Plan, be deemed to have tendered its Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods.

(c)     Except as otherwise required by the Liquidating Trustee, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that fails to tender or is deemed to have failed to tender the applicable instruments, securities and documentation required to be tendered hereunder within one year after the Effective Date shall have its Claim or Interest discharged and shall be forever barred from asserting such Claim or Interest against the Liquidating Trust or its property and any distribution to have been made on account of such Claim or Interest shall be treated as an undeliverable distribution in accordance with Section 7.7 of the Plan.

(d)     The notice of the Confirmation Order shall contain a description of the requirements contained in this Section 7.8.

(e)     On the Effective Date, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, each IRB Indenture not Reinstated on or prior to the Effective Date and each Trust Indenture shall be deemed cancelled.

(f)     As a condition precedent to receiving any distribution from the Class 8 Redemption Account, on or before 180 days after the Effective Date, holders of Industries Preferred Shares must tender and assign to the Liquidating Trustee the applicable instruments, securities or other documentation evidencing such Industries Preferred Shares and any causes of action against any person or entity arising from or related to those Industries Preferred Shares, all in accordance with written instructions to be provided to holders of Industries Preferred Shares by the Liquidating Trustee as promptly as practicable following the Effective Date. If for any reason the Liquidating Trustee can not assert the causes of action, claims or rights, then the holder shall assign to the Liquidating Trustee the causes of action and/or claims and agrees to provide to the Liquidating Trustee such reasonable cooperation as may be reasonably necessary for the Liquidating Trustee to prosecute and realize upon the causes of actions and/or claims in the name of such Industries Preferred Shareholders. It shall be a condition precedent to such cooperation that the Liquidating Trustee shall provide indemnification and expense reimbursement reasonably acceptable to such Industries Preferred Shareholders. Any holder of Industries Preferred Shares that fails to tender or is deemed to have failed to tender the applicable instruments, securities, documentation, causes of action, claims and rights required to be tendered and assigned hereunder within 180 days after the Effective Date shall be forever barred from receiving any distribution from the Class 8 Redemption Account and any funds held in the Class 8 Redemption Account on account of such Industries Preferred Shares shall be

withdrawn by the Liquidating Trustee from the Class 8 Redemption Account and administered in accordance with the Plan.

### 7.9     Withholding And Reporting Requirements

In connection with the Plan and all distributions hereunder, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

### 7.10     Setoffs

The Liquidating Trustee may, but shall not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, claims, right and causes of action of any nature whatsoever that the Liquidating Trustee may have against the holder of such Allowed Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trustee of any such claim that the Liquidating Trustee may have against such holder, including, without limitation, any Litigation Claims.  Nothing contained herein is intended or shall be construed to limit or otherwise affect any claims, defenses or rights of any Entity to setoff or recoupment.  The Debtors, the Liquidating Trustee and Reorganized Industries expressly reserve all such claims, defenses and rights with respect to setoff and recoupment.

### 7.11     No Recourse

Notwithstanding that the Allowed amount of any particular Claim may be reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or Allowed in an amount for which there is insufficient Cash in the relevant account to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no such holder shall have recourse to the Estates, the Bankruptcy Committees, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Committee, Reorganized Industries or any of their respective professionals, or their successors or assigns, or the holder of any other Claim, or any of their respective property. Nothing in the Plan, however, shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

### 7.12     Transactions On Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day and shall be deemed to have been completed as of the required date.

### 7.13     No Distribution In Excess Of Allowed Amount Of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim plus interest at the Plan Rate from the Petition Date through the Effective Date plus Tax

36

Distributions.  Notwithstanding the foregoing sentence, to the extent there is any distribution provided to the Industries Preferred Shares (exclusive of the Class 8 Redemption Account), holders of Allowed Claims in Class 5 and Class 7 shall receive a Pro Rata share of any distribution made on account of the Industries Preferred Shares tendered to the Liquidating Trustee in accordance with Section 3.9 of the Plan.

### 7.14    Intercompany Advances

In the event that the Liquidating Trustee determines that there does not exist sufficient Cash in the Estate of any Debtor (a "<u>Benefited Debtor</u>") to make payments to all holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Class 1 Claims asserted against such Benefited Debtor (or to deposit sufficient funds in Disputed Claims Reserves for all Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Class 1 Claims asserted against such Benefited Debtor), then the Liquidating Trustee shall utilize Cash in the one or more of the other Estates to make such payments or deposit such funds on behalf of the Estate of such Benefited Debtor (such payments and deposits, the "<u>Intercompany Advances</u>") and the Estate(s) of such Debtor(s) shall thereupon have a direct right of reimbursement from the Estate of such Benefited Debtor to the extent of the Intercompany Advances extended to such Benefited Debtor (a "<u>Reimbursement Right</u>").  Except as otherwise provided herein, the Liquidating Trustee shall ensure that all Intercompany Advances are repaid prior to making any distributions to holders of Allowed General Unsecured Claims asserted against such Benefited Debtor.

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND**
**UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO**

### 8.1    Prosecution Of Objections To Claims

(a)    Objections to Claims

All objections to Claims (other than Professional Fee Claims) and Interests must be filed and served on the holders of such Claims and Interests by the Objection Deadline.

(b)    Authority to Prosecute Objections

From and after the Effective Date, the Liquidating Trustee shall have the exclusive right to make and file and continue prosecution of objections to the allowance, classification and/or amount of any Claim or Interest with the Bankruptcy Court, and shall serve such objections upon holders of each of the Claims and Interests to which objections are made by the Objection Deadline.  Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee is authorized and empowered, but not required, to resolve consensually any disputes regarding the allowance, classification and/or amount of any Claim or Interest.  All objections by the Liquidating Trustee shall be litigated to a Final Order except to the extent the Liquidating Trustee, in his discretion, elects to withdraw any such objection, or compromise, settle or otherwise resolve any such objection, in which event the Liquidating Trustee may settle, compromise or otherwise resolve any Disputed Claim or Interest without approval of the Bankruptcy Court. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee and the Post-Confirmation Committee shall

establish appropriate protocol for the prosecution, settlement, compromise, withdrawal or litigation to judgment of all objections to Claims and Interests.

**8.2     Treatment Of Disputed Claims; Disputed Claims Reserves**

Subject to the provisions of Section 7.1 of the Plan and notwithstanding any other provisions of the Plan or the Liquidating Trust Agreement to the contrary, no payments or distributions will be made on account of a Disputed Claim or Disputed Interest, or, if less than the entire Claim or Interest is a Disputed Claim or Disputed Interest, the portion of a Claim or Interest that is Disputed, until such Claim or Interest becomes an Allowed Claim or Allowed Interest.  On the Effective Date or as soon as practicable thereafter, the Liquidating Trustee shall reserve Cash in one or more Disputed Claims Reserves in an amount equal to the Face Amount of: (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in Classes 1, 2, 3, 4, 5, 6, 7, 10, 12, 14, 16 and 18; provided, however, that the Liquidating Trustee shall have the right to file a motion with the Bankruptcy Court to estimate, reduce or modify the amount to be reserved with respect to any such Disputed Claims.  Each Disputed Claims Reserve shall be established and maintained in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

**8.3     Estimation**

The Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee, as the case may be, have previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to the extent permitted by law to estimate any contingent or unliquidated Claim at any time, including during litigation concerning any objection to such Claim.  In the event that the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanisms.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

**9.1     Conditions To Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with this Section:

(a)     The Confirmation Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Debtors and the Bankruptcy Committees and shall provide that the Debtors and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate

the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan.

(b)    All Plan Exhibits shall be in form and substance reasonably acceptable to the Debtors and the Bankruptcy Committees and shall have been executed and delivered.

(c)    All actions, documents and agreements necessary to implement the Plan shall have been effected or executed or are ready to be executed.

(d)    The Debtors shall have paid the then outstanding balances of the Secured Lender Claims and the DIP Loan Claims in full.

(e)    The closing of the sales of the Pork Business and the SF Phosphate Interest shall have occurred.

(f)    The closing of the sale of the Coffeyville Assets shall have occurred.

(g)    The Insurance Claim shall have been settled and paid in full.

(h)    In the event that the Debtors own the Coffeyville Assets on the Effective Date, the Bankruptcy Court shall have entered an order determining the amount of capital constituting sufficient capitalization for the maintenance of the Coffeyville LLC and any necessary remediation or other regulatory compliance related to the Coffeyville Assets; provided, however, that this condition shall be deemed waived if the Debtors do not own the Coffeyville Assets on the Effective Date.

(i)    In the event that the Debtors do not own the Coffeyville Assets on the Effective Date, the Bankruptcy Court shall have entered an order determining the amount of capital to be reserved in the Liquidating Trust for the satisfaction of the Debtors' continuing environmental obligations regarding the Coffeyville Assets.

(j)    The Debtors shall have determined, in consultation with the Bankruptcy Committees, that the occurrence of the Effective Date is in the best interest of creditors and parties in interest.

## 9.2    Waiver Of Conditions

The requirement that the Confirmation Order must be a Final Order may be waived by the Debtors, with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld.  The requirement that the closing of the sale of the Coffeyville Assets shall have occurred may be waived by the Debtors, with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld, if the closing of the sale of the Coffeyville Assets shall not have occurred by the closing date established in connection with a Bankruptcy Court-approved sale of the Coffeyville Assets.

## 9.3    Notice Of Effective Date

The Liquidating Trustee shall file and serve an appropriate notice of the Effective Date within seven Business Days of the Effective Date.

# ARTICLE X
## RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Liquidating Trustee shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)     Effectuate performance of and payments under the provisions of the Plan;

(e)     Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

(f)     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(h)     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(l)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(m)     Except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(p)     Enter a final decree closing the Chapter 11 Case.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

### 11.1    Deadline For Filing Professional Fee Claims; Objections To Professional Fee Claims

All final requests for compensation or reimbursement for Professionals pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date and Substantial Contribution Claims under section 503(b)(4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Liquidating Trustee and its counsel no later than 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the Liquidating Trustee and its counsel and the requesting Professional or other Entity no later than 30 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### 11.2    Deadline For Filing Administrative Claims; Objections To Administrative Claims

Other than as set forth in Section 11.1 of the Plan and except with respect to payments payable in connection with post-petition severance obligations of the Debtors and the KERIT Plan, all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trust and, if prior to the Effective Date, counsel for the Debtors and each Bankruptcy Committee no later than 30 days after the Effective Date. In the event that the Debtors or the Liquidating Trustee, as the case may be,

object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

### 11.3     Payment Of Statutory Fees

All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation shall be paid on or before the Effective Date.

### 11.4     Modifications And Amendments

(a)     The Debtors reserve the right (with the consent of the Bankruptcy Committees in the case of material modifications or amendments), and in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan and the Liquidating Trust Agreement at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors (subject to consent of the Bankruptcy Committees and the administrative agent under the Pre-Petition Credit Agreement, which consent shall not be unreasonably withheld) may amend or modify the Plan and the Liquidating Trust Agreement, in accordance with Section 1127 of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim or Allowed Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Interest of such holder.  In addition, the Plan shall be deemed automatically amended and modified to the extent determined necessary by the Bankruptcy Court to comply with the DIP Credit Agreement.

(b)     In the event that any Impaired Class shall not accept the Plan, at the written election of the Debtors (with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld) filed with the Bankruptcy Court with respect to any one or more of said nonaccepting Classes and any Classes junior to such nonaccepting Classes, the Plan shall be modified and amended automatically and without further notice to provide such treatment, as determined necessary by the Bankruptcy Court, sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Classes rejecting the Plan, and, in particular, the treatment necessary to meet the requirements of Sections 1129(a) and (b) of the Bankruptcy Code with respect to (i) the rejecting Classes and (ii) any other Classes adversely affected by such modifications.  In particular, the treatment of any nonaccepting Classes or adversely affected Classes shall be modified and amended from that set forth in Article III, even if less favorable, to the minimum treatment necessary to meet the requirements of sections 1129(a) and (b) of the Bankruptcy Code.

### 11.5     Severability Of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of any Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or

interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 11.6    Successors And Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 11.7    No Discharge

The Confirmation Order shall not discharge any Debtor from any debt or liability that arose before Confirmation, as provided in section 1141(d)(3)(A) of the Bankruptcy Code.

### 11.8    Release Of Assets

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtors, their assets and properties.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Article X of the Plan, and Liquidating Trustee shall perform its duties and obligations pursuant to the Liquidating Trust Agreement and the Plan.

### 11.9    Exculpation And Limitation Of Liability

(a)     Subject to limitations required by applicable ethical rules and standards of conduct, and except as limited in Section 11.9(b) below, none of the Debtors, the Liquidating Trust, the Liquidating Trustee, the Bankruptcy Committees, the Indenture Trustees, the Lenders, the financial institutions party to the DIP Credit Agreement, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission from and after the Petition Date in connection with, relating to, or arising out of, the Chapter 11 Case, the commencement of the Chapter 11 Case, the administration of the Chapter 11 Case, the pursuit of and the approval of the sales of the Debtors' assets (and the related asset purchase agreement), the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct; provided, however, any present or former officer or director of any Debtors shall be liable to any holder of a Claim or Interest, or any other party in interest, or any of their successor or assigns, for: (i) any breach of such person's duty of loyalty to the Debtors, (ii) any act or omission not in subjective good faith or which involves intentional misconduct or a knowing violation of law, and (iii) any transaction for which such person derived an improper benefit, and in all respects such persons shall be entitled to reasonably rely upon the advice of the Debtors' counsel (including in-house counsel) with

43

respect to their duties and responsibilities under the Plan. In addition, the Indenture Trustees under the Demand Certificates and the Subordinated Certificates shall not have or incur any liability to any holder (registered or unregistered) of any Demand Certificate or Subordinated Certificate or any claim based on any Demand Certificate or Subordinated Certificate as a result of any inaccuracy or mistake in the books and records of Industries (in their capacities as paying agents and registrars under the Trust Indentures for the Demand Certificates and the Subordinated Certificates).

(b)     The exculpatory provisions contained in Section 11.9(a) of the Plan (i) shall not limit the claims and rights, if any, of the United States, and (ii) shall apply to any person or entity who was not the beneficiary of a post-petition indemnification obligation of the Debtors only to the extent provided in Section 11.9(c).

(c)     Any claims that would otherwise be subject to the exculpatory provisions contained in Section 11.9(a) but for the provisions of Section 11.9(b)(ii) may only be asserted in the Bankruptcy Court and only if filed on or before ninety days after the Effective Date. In the event that any such claims are not filed timely in the Bankruptcy Court, the exemption contained in Section 11.9(b)(ii) shall be terminated with respect to such claims, and such claims shall be deemed subject to the exculpatory provisions contained in Section 11.9(a).

(d)     Any non-exculpated claims against the parties set forth in Section 11.9(a) arising from or related to the matters set forth in Section 11.9(a) may only be asserted and filed in the Bankruptcy Court.

(e)     The Bankruptcy Court shall retain exclusive jurisdiction to determine all matters arising from or related to claims against the parties set forth in Section 11.9(a) that arise from or relate to the matters set forth in Section 11.9(a).

## 11.10     Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Liquidating Trust, the Liquidating Trustee and all other parties-in-interest in this Chapter 11 Case.

## 11.11     Revocation, Withdrawal, Or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and to file subsequent plans of reorganization; provided, however, that any revocation or withdrawal of the Plan after the Confirmation Date shall be with the consent of the Bankruptcy Committees and the administrative agent under the Pre-Petition Credit Agreement, which consent shall not be unreasonably withheld. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for

consummation of the Plan, shall (x) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Entity, (y) prejudice in any manner the rights of any Debtor or any Entity in any further proceedings involving a Debtor, or (z) constitute an admission of any sort by any Debtor or any other Entity.

### 11.12    Plan Exhibits

Any and all Plan Exhibits, or other lists or schedules not filed with the Plan, shall be filed with the Clerk of the Bankruptcy Court at least five Business Days prior to the date of the commencement of the hearing on the approval of the Disclosure Statement and shall be actually provided to all parties identified in Section 11.13 at the addresses provided in such Section at least five Business Days prior to the date of the commencement of the hearing on the approval of the Disclosure Statement.  Upon such filing, such documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any such document upon written request to the Debtors in accordance with Section 11.13 of the Plan.

### 11.13    Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or the Liquidating Trustee under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (b) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

FARMLAND INDUSTRIES, INC., et al.
12200 North Ambassador Drive
Kansas City, Missouri 64163-1244
Attn: Chief Executive Officer
Telephone: (816) 713-7000
Facsimile:  (816) 713-6397

with a copy to:

BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri 64105
Attn: Laurence M. Frazen
Telephone: (816) 374-3200
Facsimile: (816) 374-3300

and

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Attn: Evan M. Jones, Esq.

Telephone: (213) 430-6236
Facsimile: (213) 430-6407

and

AKIN GUMP STRAUSS HAUER & FELD LLP
1900 Pennzoil Place – South Tower
711 Louisiana
Houston, Texas 77002
Attn: S. Margie Venus, Esq.
Telephone: (713) 220-5800
Facsimile: (713) 236-0822

and

HUSCH & EPPENBERGER
1200 Main Street, Suite 1700
Kansas City, Missouri 64105
Attn: Christopher Redmond, Esq.
Telephone: (816) 421-4800
Facsimile: (816) 421-0596

and

FOLEY & LARDNER
321 North Clark Street
Suite 2800
Chicago, Illinois 60610-4764
Attn: Michael Small, Esq.
Telephone: (312) 832-4500
Facsimile: (312) 832-4700

and

POLSINELLI SHALTON & WELTE
700 W. 47th Street, Suite 1000
Kansas City, Missouri 64112-1808
Attn: Daniel J. Flanigan, Esq.
        James E. Bird, Esq.
Telephone: (816) 753-1000
Facsimile: (816) 753-1536

### 11.14    Dissolution Of The Bankruptcy Committees

On the Effective Date, the Bankruptcy Committees will dissolve and their respective members (only in their capacity as members of the Bankruptcy Committees) will be released and discharged from all further authority, duties, responsibilities and obligations arising from or related to the Chapter 11 Case. The members of the Bankruptcy Committees and the Professionals retained

by the Bankruptcy Committees will not be entitled to compensation or reimbursement of expenses for any services rendered to the Bankruptcy Committees after the Effective Date.

### 11.15    Term Of Injunctions Or Stays

Unless expressly modified or lifted by the Bankruptcy Court, all injunctions or stays provided for in the Chapter 11 Case, including in the Confirmation Order, under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Final Distribution Date.

### 11.16    Headings

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose

[Remainder of Page Blank]

Dated: October 31, 2003

FARMLAND INDUSTRIES, INC.
FARMLAND FOODS, INC.
SFA, INC.
FARMLAND TRANSPORTATION, INC.
FARMLAND PIPE LINE COMPANY


By:  /s/ Robert B. Terry
Name:  Robert B. Terry
Title: Authorized Signatory


Laurence M. Frazen, Esq.
Cynthia Dillard Parres, Esq.
Robert M. Thompson, Esq.
BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri  64105

Gregory D. Willard, Esq.
David M. Unseth, Esq.
Cullen K. Kuhn, Esq.
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750

Attorneys for the Debtors and Debtors-in-Possession

1664371.12

# **PLAN EXHIBIT A**

Liquidating Trust Agreement[1]

---

[1]     The Debtors reserve their right, at any time prior to the Confirmation Date, to amend <u>Plan Exhibit A</u> and to provide notice of any such amendments to the Bankruptcy Court.

1664371.11

## FI LIQUIDATING TRUST AGREEMENT

This FI Liquidating Trust Agreement (the "Agreement"), dated as of _____ 2003 (the "Effective Date"), by and among Farmland Industries, Inc., both in its own capacity and as successor in interest to Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company (collectively, the "Debtors") and _____, as trust administrator (together, with any successor appointed under the terms hereof, the "Trustee"), provides for the establishment of a liquidating trust evidenced hereby (the "FI Liquidating Trust") for the sole benefit of the Beneficiaries (as defined below). This Agreement is being entered into in connection with the Chapter 11 Debtors' First Amended Joint Plan of Liquidation dated July 31, 2003 as may be subsequently amended (the "Plan"), filed in the Debtors' cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court") and the order entered by the Bankruptcy Court confirming the Plan (the "Confirmation Order").

## RECITALS

WHEREAS, the FI Liquidating Trust is established pursuant to section 5.4 of the Plan for the sole purpose of liquidating and distributing the Trust Assets (as defined below) for the benefit of the Beneficiaries (as defined below), as a liquidating trust in accordance with 26 C.F.R. § 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the FI Liquidating Trust; and

WHEREAS, the Confirmation Order having been entered on _____, 2003; and

WHEREAS, the FI Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the Internal Revenue Code of 1986, as amended (the "Code"), with the Beneficiaries (as defined below) treated as the grantors and owners of the Trust Assets; and

WHEREAS, the Trustee has agreed to act as Trustee under this Agreement and to manage the Trust as Trustee upon and subject to the terms and conditions set forth herein, in the Plan, and in the Confirmation Order;

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. The following initially capitalized terms shall have the meanings ascribed to them below for all purposes under this Agreement.  All initially capitalized terms not otherwise defined in this Agreement shall have the meanings given to them in the Plan. All initially capitalized terms not otherwise defined in this Agreement or the Plan shall have the meanings given them in the Bankruptcy Code.

"Avoidance Actions" means any avoidance actions under Chapter 5 of the Bankruptcy Code or any applicable state law.

"Beneficiaries" means holders of Allowed Claims and Allowed Class 11 Interests.

"Business Day" means any day except for Saturday, Sunday or a "legal holiday" (as defined in Fed. R. Bankr. P. 9006(a)).

"Cash" means legal tender of the United States or equivalents thereof.

"Claim" means a Claim (as such term is defined in the Plan) against the Debtors, or any of them, whether or not asserted, as defined in section 101 of the Bankruptcy Code.

"Class 11 Interests" means those Interests of Farmland Foods classified under the Plan as Class 11.

"Code" is defined in the third recital hereof.

"Deemed Tax Amount" means the amount, determined by the Trustee with respect to each Beneficiary on a consistent basis, of the estimated federal income tax obligation which such Beneficiary can be reasonably anticipated to incur with respect to the net taxable income of the FI Liquation Trust, taking into consideration all deductions, credit, or losses otherwise allocable to such Beneficiary.

"Disputed Claim" means, with respect to a Claim, such Claim or any portion thereof that is not an Allowed Claim, and includes, without limitation, Claims (other than Allowed Claims) that (a) have not been listed on the Schedules or have been listed on the Schedules at zero, or as contingent, unliquidated or disputed, or (b) are subject to an objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

"Disputed Claims Reserve" means, in the event there exists any Disputed Claims on or after the Effective Date, Cash, reserved by the Liquidating Trust in separate interest bearing accounts for the following: (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in each Class for which distributions are contemplated by the Plan; all in accordance with the provisions of the Plan and this Agreement and to be maintained under the Plan and this Agreement.

"Distribution" means any distribution made to holders of Allowed Claims or Allowed Class 11 Interests under the Plan or this Agreement.

"IRS" means the United States Internal Revenue Service.

"Liquidating Trust Administrative Reserve" is defined in section 4.2(b).

"Objection Deadline" means the last day for filing Disputed Claims (other than Disputed Professional Fee Claims) or Disputed Interests, which day shall be 180 days after the Effective Date, unless such date is extended by the Bankruptcy Court upon request by the Trustee.

"Permitted Investments" is defined in section 3.4(vi).

"Person" means a "person" as defined in section 101 of the Bankruptcy Code.

"Post Confirmation Committee" means the committee appointed in accordance with the Plan, which shall oversee the operation of the FI Liquidating Trust and have the duties and responsibilities specified in the Plan and in Section 2.4 of this Agreement.

"Priority Claim" means a Claim against the Debtors that is an Administrative Claim, a Priority Tax Claim, a DIP Loan Claim or an Other Priority Claim.

"Remaining Assets" means those Trust Assets remaining in or transferable to the FI Liquidating Trust following the payment of all Allowed Secured Claims and Allowed Priority Claims.

"Tax Distribution" means a Distribution to a Beneficiary made with respect to any net taxable income of the Trust which is allocated to such Beneficiary for United States federal income tax purposes.

"Termination Date" is defined in section 8.1.

"Treasury Regulation" means the United States Treasury regulations, including any temporary regulations from time to time promulgated under the Code.

"Trust Assets" means all property and assets of each Estate and Reorganized Industries as and when required by the Plan to be transferred to the FI Liquidating Trust.

## ARTICLE II
## ESTABLISHMENT OF THE FI LIQUIDATING TRUST

2.1    Transfer of Assets to FI Liquidating Trust.

(a)    The Debtors and the Trustee hereby establish the FI Liquidating Trust on behalf, and for the sole and exclusive benefit, of the Beneficiaries. On the date hereof, the Debtors shall deliver to the FI Liquidating Trust the Trust Assets required to be transferred to the FI Liquidating Trust on the Effective Date, for the benefit and on behalf of the Beneficiaries, pursuant to sections 7.1 and 7.7 of the Plan. The Debtors agree to make, and the Trustee agrees to accept, additional transfers of the Trust Assets to the FI Liquidating Trust consistent with the terms of the Plan. The Trustee hereby agrees to accept and hold the Trust Assets in the FI Liquidating Trust for the sole and exclusive benefit of the Beneficiaries, subject to the terms of this Agreement and the Plan. Following the transfer of the Trust Assets to the FI Liquidating Trust, the Debtors shall have no interest in, or with respect to, the Trust Assets.

(b)    The Trust Assets shall be valued consistently pursuant to section 6.2 of this Agreement, and those valuations shall be used for all U.S. federal income tax purposes.

(c)     Reorganized Industries shall retain only such books and records as are necessary to manage the Industries Retained Assets, the Industries Transferred Assets, any Rejected Assets and its corporate affairs. All other books and records of the Debtors shall be transferred to the FI Liquidating Trust. The FI Liquidating Trust and Reorganized Industries shall provide reasonable access to the books and records in its possession to each other as may be necessary to effectuate the Plan and the transactions contemplated by the Plan. Any attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the FI Liquidating Trust shall vest exclusively in the Trustee and his representatives, and the Trustee is authorized to take all necessary actions to effectuate the transfer of such privileges. After the Effective Date, no person other than the Trustee may assert or waive any privilege of the Debtors or any Estate or to make any admission or statement against interest respecting the Debtors or any Estate.

(d)     The FI Liquidating Trust is irrevocable.

2.2     <u>Intention of Parties</u>. All parties (x) intend to create a liquidating trust in accordance with Treasury Regulation § 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, which shall be treated as a grantor trust for United States federal income tax purposes pursuant to sections 671-677 of the Code, and (y) agree that the transfer of the Trust Assets by the Debtors to the FI Liquidating Trust shall be treated for federal income tax purposes as a taxable sale or exchange of the Trust Assets (other than Cash) by the Debtors to the Beneficiaries and a transfer from the Beneficiaries to the FI Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes. More particularly, for U.S. federal income tax purposes:

(a)     Each Beneficiary holding an Allowed Secured Claim or an Allowed Priority Claim that is not fully paid on the Effective Date shall be deemed to have received from the Debtors on the Effective Date, and immediately contributed to the FI Liquidating Trust, an amount of Cash equal to the amount of such Beneficiary's Claim that was not actually paid on the Effective Date.

(b)     Each Beneficiary holding an Allowed Claim or Allowed Class 11 Interest that is not an Allowed Secured Claim or an Allowed Priority Claim shall be deemed (i) to have received from the Debtors on the Effective Date, and immediately contributed to the FI Liquidating Trust, an interest in Remaining Assets equal to its pro rata interest in the Remaining Assets and (ii) to receive from the Debtors on each subsequent date on which the Debtor makes a transfer to the FI Liquidating Trust and to have immediately contributed to the FI Liquidating Trust its pro rata portion of the assets so transferred by the Debtors.

2.3     <u>Purposes of the FI Liquidating Trust</u>. Subject to section 8.1, the FI Liquidating Trust shall continue in existence so long as necessary for the purpose of liquidating the Trust Assets, in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the FI Liquidating Trust. Consistent with such

objective, the Trustee, in an orderly manner and subject to the provisions of the Plan and this Agreement, shall:

      (a)     make all Distributions under the Plan and this Agreement;

      (b)     satisfy its obligations under the Plan and this Agreement, including, but not limited to, those specifically set forth in sections 5.4(a)-(b) and 7.1 of the Plan;

      (c)     enforce and prosecute the Litigation Claims, and other claims, interests, rights and privileges of the Debtors, including, but not limited to, the prosecution of Avoidance Actions;

      (d)     on a timely basis under the Plan, object to Claims and Class 11 Interests asserted against the Debtors;

      (e)     litigate or resolve Disputed Claims and Disputed Class 11 Interests;

      (f)     administer the Plan; and

      (g)     file appropriate tax returns in accordance with section 6.2.

2.4     <u>The Post Confirmation Committee</u>.

      (a)     The Post Confirmation Committee shall consist of four members. Each Bankruptcy Committee shall appoint two persons to serve on the Post Confirmation Committee. Decisions of the Post Confirmation Committee shall require at least three votes in favor of or against the matter proposed. The Trustee shall report to and consult with, and as determined herein or as otherwise requested by the Post Confirmation Committee, shall follow the instructions of the Post Confirmation Committee with regard to the implementation of the Plan. If three votes cannot be obtained in favor of or against the Trustee's proposal, the Trustee may seek the Court's approval of the proposal without further voting by the Post Confirmation Committee. The Trustee shall render monthly written reports to the Post Confirmation Committee.

      (b)     If a member of the Post Confirmation Committee sells, transfers or assigns its Claim, such member shall be immediately removed.

      (c)     If a member of the Post Confirmation Committee resigns or is removed pursuant to Section 2.4(b) of this Agreement, the remaining members of the Post Confirmation Committee shall elect a replacement member who must be the holder of the same class of claim as the resigning or removed member of the Post Confirmation Committee.

      (d)     The Post Confirmation Committee may retain the services of attorneys, accountants and other agents that, in the discretion of the Post Confirmation Committee, are necessary to assist the Post Confirmation Committee in the performance of its duties. The reasonable fees and expenses of such professionals shall be paid by the FI Liquidating Trust upon the monthly submission of statements to the Trustee and the Post

Confirmation Committee.  The payment of the reasonable fees and expenses of the Post Confirmation Committee's retained professional shall be made in the ordinary course of business from the FI Liquidating Trust and shall not be subject to the approval of the Bankruptcy Court.

(e)    The Post Confirmation Committee shall monitor the performance by the Trustee of its obligations under the Plan and this Agreement. The Post Confirmation Committee shall also review and either approve or reject:

(i)    budgets for the FI Liquidating Trust that the Trustee may be required or requested to prepare and submit to the Post Confirmation Committee;

(ii)    proposals by the Trustee to modify the Plan;

(iii)    proposals by the Trustee to set or postpone the scheduled date of a Distribution to holders of Allowed Claims or Allowed Class 11 Interests;

(iv)    proposals by the Trustee to sell, abandon or otherwise transfer non-cash Trust Assets;

(v)    proposals by the Trustee to retain professionals, employees or agents to assist in the administration of the FI Liquidating Trust;

(vi)    proposals by the Trustee with respect to initiation and prosecution of litigation, including but not limited to, objections to Claims, Class 11 Interests and Litigation Claims; and

(vii)    proposals by the Trustee with respect to disposition and settlement of any Claim, Class 11 Interest or Litigation Claim, including any Avoidance Action, provided, however, that the Post Confirmation Committee may designate parameters within with the Trustee need not seek approval for settlement of Claims, Class 11 Interests or Litigation Claims;

(f)    Except as otherwise specifically provided herein and in the Plan, members of the Post Confirmation Committee shall not be held personally liable for any claim asserted against the FI Liquidating Trust, the Trustee, the Trustee's employees, the Post Confirmation Committee's employees, any of the Trustee's professionals or representatives or any of the Post Confirmation Committee's professionals or representatives. Without limiting the generality of the foregoing, the members of the Post Confirmation Committee shall not be liable for any error of judgment with respect to their oversight of the FI Liquidating Trust and/or the activities of the Trustee made in good faith, or with respect to any action taken or omitted to be taken in good faith, except for actions or omissions to act that are due to gross negligence, willful misconduct or intentional fraud.

(g)    The members of the Post Confirmation Committee shall be and hereby are exculpated by all Persons from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the

members of the Post Confirmation Committee or any of the Post Confirmation Committee members' professionals or representatives by this Agreement or applicable law or otherwise, except for actions or omissions to act that are due to gross negligence, willful misconduct or fraud after the date hereof. The FI Liquidating Trust shall indemnify, defend and hold harmless the members of the Post Confirmation Committee and their professionals or representatives from and against any and all claims, causes of action, liabilities, obligations, losses, damages or reasonable expenses (including reasonable attorneys' fees and expenses) (other than and only to the extent due to such Post Confirmation Committee member's or such professionals' or representatives' gross negligence, willful misconduct or intentional fraud) to the fullest extent permitted by applicable law.

(h)      The duties, responsibilities and powers of the members of the Post Confirmation Committee to oversee the FI Liquidating Trust and/or the activities of the Trustee shall terminate on the date the FI Liquidating Trust is dissolved pursuant to Article VIII of this Agreement and section 7.9 of the Plan, provided that paragraphs (d) and (e) of this section 2.4 shall survive such termination, dissolution and entry.

## ARTICLE III
## TRUSTEE

3.1      <u>Appointment</u>. The Debtors hereby designate _____ to serve as the initial Trustee, and _____ hereby accepts such appointment and agrees to serve in such capacity, effective as of the date hereof.

3.2      <u>Generally</u>. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the FI Liquidating Trust and not otherwise. The Trustee shall have the authority to bind the FI Liquidating Trust, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually. The Trustee shall owe a fiduciary duty to the Beneficiaries.

3.3      <u>Rights and Powers of the Trustee</u>.

(a)      The Trustee shall have all the rights, powers and duties necessary to carry out its responsibilities under the Plan and this Agreement.

(b)      In exercising its rights and powers and carrying out its duties under the Plan and this Agreement, upon the approval of the Post Confirmation Committee, the Trustee shall have the authority to retain such professionals (including, without limitation, disbursing and transfer agents, legal counsel and/or other agents or advisors) on the Trustee's own behalf and on behalf of the Trust, as the Trustee deems appropriate and compensate such professionals from the Trust Assets on customary terms reasonably acceptable to the Trustee and the Post Confirmation Committee, without any requirement of approval by the Bankruptcy Court, subject to the terms of section 3.8 of this Agreement. Professionals so retained are not required to be "disinterested persons" (as such term is defined in the Bankruptcy Code) and may include, without limitation,

counsel or financial advisors to the Debtors, the Bankruptcy Committees, or any member of the Bankruptcy Committees.

3.4     <u>Scope of Trustee's Duties</u>. The duties of the Trustee shall include, but shall not be limited to:

(i)     considering, pursuing and to the extent the Trustee deems advisable, with the approval of the Post Confirmation Committee, settling, abandoning, selling or assigning any of the Litigation Claims, including, but not limited to, the Avoidance Actions.

(ii)     preparing and submitting a proposed budget of expenses and, to the extent feasible, anticipated recoveries of cash, for the nine months following the Effective Date. The Trustee shall present such additional budgets as are requested by the Post Confirmation Committee, which shall be subject to the approval of the Post Confirmation Committee.

(iii)     preparing and submitting to the Post Confirmation Committee such additional budgets as may be required by the Post Confirmation Committee.

(iv)     preparing and submitting to the Post Confirmation Committee a monthly report of Cash held in the FI Liquidating Trust.

(v)     operating within approved budgets as they may be modified with the consent of the Post Confirmation Committee.

(vi)     investing the Cash held in the Liquidating Trust in accordance with the terms of Section 5.3 of the Plan (collectively, the "<u>Permitted Investments</u>"); provided, however, that the scope of the Permitted Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation § 301.7701-4(d), maybe permitted to invest in, pursuant to the Treasury Regulations and Rev. Proc. 94-45, 1994-28 C.B. 124, or any modification in IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(vii)     calculating and paying all Distributions to be made under the Plan and other orders of the Bankruptcy Court to holders of Allowed Claims and Allowed Class 11 Interests.

(viii)     to the extent the Trustee deems advisable, with the approval of the Post Confirmation Committee, litigating and settling (with the approval of the Post Confirmation Committee) all objections to Claims and Class 11 Interests, except that the Trustee has the authority to settle without first consulting the Post Confirmation Committee (a) any Priority Claim if the allowed amount of such Claim is less than $15,000.00 and (b) any unsecured Claim if the allowed amount of such Claim is less than $250,000.00, unless otherwise instructed by the Post Confirmation Committee after a minimum three-fourths vote.

(ix)    taking all other actions necessary or appropriate to implement or consummate the Plan and/or this Agreement, including, without limitation, all actions necessary to fulfill the Debtors' obligations under the KERIT Plan.

(x)    reviewing and objecting to Claims and Class 11 Interests as appropriate, and resolving all Disputed Claims and Disputed Class 11 Interests.

(xi)    filing any and all tax and information returns with respect to the FI Liquidating Trust consistent with the treatment of the FI Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and paying taxes properly payable by the FI Liquidating Trust, if any, and making Distributions, including Tax Distributions, to Beneficiaries net of any such taxes.

(xii)    complying with the provisions of the Plan.

(xiii)    such other responsibilities as may be necessary and proper to carry out the provisions of this Agreement.

3.5    <u>Limitation of Trustee's Authority</u>.

(a)    Except as otherwise provided in the Plan and the Confirmation Order, the Trustee shall not and is not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom or take any action, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the FI Liquidating Trust or as permitted under this Agreement, and shall take such actions consistent with the orderly liquidation of the Trust Assets as is required by applicable law and consistent with the treatment of the FI Liquidating Trust as a liquidating trust under Treasury Regulation §301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, and such actions permitted herein.

(b)    The Trustee shall take specific actions upon the receipt of directions and instructions from the Post Confirmation Committee. The Trustee may rely and act upon the directions and instructions of the Post Confirmation Committee given in accordance with and pursuant to this Agreement, and the Trustee shall not be liable for any action taken or omitted to be taken by it in reliance upon such directions and instructions.

3.6    <u>Liability of Trustee</u>.

(a)    Except as otherwise specifically provided herein, the Trustee, the Trustee's employees and the Trustee's professionals or representatives shall not be held personally liable for any claim asserted against the FI Liquidating Trust, the Trustee, the Trustee's employees, the Post Confirmation Committee's members, any of the Trustee's professionals or representatives or any of the Post Confirmation Committee's professionals or representatives. Without limiting the generality of the foregoing, the Trustee, the Trustee's employees and any of the Trustee's professionals or representatives shall not be liable for any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith, except for actions or omissions to act that are due to gross negligence, willful misconduct or intentional fraud.

(b)    The Trustee shall not be liable for interest or obligated to produce income on any moneys received by the FI Liquidating Trust hereunder and held for Distribution or payment to the Beneficiaries, except as such interest or other income shall actually be received by the Trustee.

(c)    Nothing in this Section 3.6 shall be deemed to protect the Trustee from personal liability with respect to the assessment of fines or penalties against the Trustee which may be assessed by any government agency for failure to comply with applicable law.

3.7    Reliance by Trustee.

(a)    Except as otherwise provided in sections 2.4 and 3.6 hereof (i) the Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties; and (ii) the Trustee may consult with accounting advisors and other professionals to be selected by it, and the Trustee shall not be liable for any action taken or omitted to be taken by it in accordance with the advice thereof.

(b)    If the Trustee is unsure of the application of any provision of this Agreement or any other agreement relating to the transactions contemplated hereby, the Trustee may consult with the Post Confirmation Committee and request and rely upon the instructions of the Post Confirmation Committee; provided, however, that if the Trustee shall not have received instructions from the Post Confirmation Committee within fifteen (15) days after the date of such request, until instructed otherwise, the Trustee may, but shall be under no duty to, take or refrain from taking such action as it shall deem advisable in the best interests of the FI Liquidating Trust and the Beneficiaries.

3.8    Compensation of the Trustee.  Any commission or fees which may be fixed by applicable law for trustees or fiduciaries are hereby waived by the Trustee.  The Trustee shall receive compensation as  has been  approved by Bankruptcy Committees and disclosed to the Bankruptcy Court at the Confirmation Hearing.  Such compensation shall be paid from the Liquidating Trust Administrative Reserve.  In addition, the Trustee shall be entitled to reimbursement from the Liquidating Trust Administrative Reserve of all reasonable expenses and costs to administer the Liquidating Trust, distribute to the Beneficiaries the Available Cash, litigate any Litigation Claims or take other actions contemplated herein.  The Trustee shall provide to the Post Confirmation Committee a written report detailing all such expenditures on such schedule and  by such written documentation as the  Post Confirmation Committee may reasonably require.

3.9    Exculpation; Indemnification.  The Trustee, the Trustee's employees and the Trustee's professionals and representatives shall be and hereby are exculpated by all Persons from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Trustee by this Agreement or applicable law or otherwise, except for actions or omissions to act that are due to gross negligence, willful misconduct, intentional fraud or violations of applicable law of such persons after the date

hereof. The FI Liquidating Trust shall indemnify, defend and hold harmless the Trustee, the Trustee's employees and the Trustee's professionals or representatives from and against any and all claims, causes of action, liabilities, obligations, losses, damages or reasonable expenses (including reasonable attorneys' fees and expenses) (other than and only to the extent due to the Trustee's gross negligence, willful misconduct, fraud or violation of applicable law) to the fullest extent permitted by applicable law.

3.10    Termination. The duties, responsibilities and powers of the Trustee shall terminate on the date the FI Liquidating Trust is dissolved pursuant to Article IX of this Agreement, provided that sections 3.8 and 3.9 above shall survive such termination and dissolution.

## ARTICLE IV
## BOOKS, RECORDS AND DISTRIBUTIONS

4.1    Books and Records. The Trustee shall maintain books and records relating to the assets and income of the FI Liquidating Trust and the payment of expenses of, and liabilities of, the FI Liquidating Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof in accordance with Article VI hereof and to comply with applicable provisions of law. The Post Confirmation Committee shall have the right to inspect the books and records of the FI Liquidating Trust. Except as provided in section 6.1 hereof, nothing in this Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the FI Liquidating Trust, or as a condition for making any payment or Distribution out of the Trust Assets.

4.2    Distributions.

(a)    General Operating Account; Other Accounts. The Trustee shall maintain in a general operating account all Cash received from the Debtors or obtained at any time in the future with respect to the FI Liquidating Trust. The Trustee shall establish and maintain such other accounts as he deems necessary and appropriate to carry forth the terms of the Plan and the FI Liquidating Trust, including, without limitation, the Liquidating Trust Administrative Reserve and the Disputed Claims Reserves.

(b)    Liquidating Trust Administrative Reserve. The Trustee shall establish a separate interest-bearing account (the "Liquidating Trust Administrative Reserve") and deposit funds into such reserve, in an amount to be determined by the Trustee with the approval of the Post Confirmation Committee, as reasonably sufficient to pay the costs, fees, and expenses arising from the administration of the Plan and the FI Liquidating Trust. Furthermore, to the extent the Trustee determines that funding of the Liquidating Trust Administrative Reserve is insufficient, additional funds from the Trust Assets, including, but not limited to any Disputed Claims Reserve, to the extent necessary for such purposes, may be allocated by the Trustee to the Liquidating Trust Administrative Reserve, after notice and approval by to the Post Confirmation Committee. After all costs and expenses associated with the FI Liquidating Trust have been paid, and/or upon the reasonable determination of the Trustee, in consultation with the Post Confirmation Committee that the funds in the Liquidating Trust Administrative Reserve exceed the amounts necessary to pay the expenses for which such fund is established, the remaining

or excess funds, as applicable, in the Liquidating Trust Administrative Reserve shall be distributed, net of any Tax Distribution approved by the Trustee, Pro Rata to holders of Allowed Claims in accordance with this Agreement, the Plan, and the Confirmation Order.

(c)    Distributions on Initial Distribution Date. As soon as is practicable and prudent after the Effective Date, subject to the reservation of adequate funds in the Liquidating Trust Administrative Reserve and each Disputed Claims Reserve, the Trustee shall deliver proceeds of Collateral and/or Available Cash to holders of Claims entitled to Distributions under the Plan that were Allowed as of the Effective Date. All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

(d)    Distributions on a Subsequent Distribution Date. Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the Initial Distribution Date, the Trustee shall, on a Subsequent Distribution Date, which date shall be whenever the aggregate amount distributable to holders of Allowed Claims equals or exceeds $1,000,000 (but in no event shall such date be less than three months, or more than one year, after the next previous distribution date), distribute such proceeds of Collateral and/or Available Cash or other reasonably distributable assets to the holders of Claims entitled to Distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Subsequent Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Subsequent Distribution Date had been disallowed on the Initial Distribution Date; provided, however, that the Liquidating Trustee shall not be required to make any Distribution on a Subsequent Distribution Date on account of an Allowed Claim in an amount less than $100, except in the case of a Distribution on the Final Distribution Date in accordance with Section 7.6 of the Plan; provided further, however, that in no event shall the foregoing impair the right of the Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the FI Liquidating Trust. All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order. The foregoing notwithstanding, at least annually, the Liquidating Trustee shall distribute to the Beneficiaries an amount equal to (A-B), where A is the sum of the net income from investments earned by the Liquidating Trust and the net proceeds from the sale of assets and B is such amount as the Liquidating Trustee deems reasonably necessary to maintain the value of the Liquidating Trust Assets and to satisfy the expenses and contingent liabilities of the Liquidating Trust (including Disputed Claims). In addition to distributions with respect to Allowed Claims, Beneficiaries shall be entitled to receive Tax Distributions with respect to the net taxable income of the Liquidating Trust allocated to them for federal

income tax purposes in such amount as the Liquidating Trustee, in his sole discretion, deems reasonable and appropriate.

(e)    <u>Distributions on the Final Distribution Date</u>. Unless otherwise provided in the Plan, after the liquidation of any and all Trust Assets to the fullest extent reasonably possible, the Trustee shall establish the Final Distribution Date, upon which the Trustee shall distribute such Cash or other assets remaining after satisfaction of all expenses and other obligations of the FI Liquidating Trust to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such Cash or other assets had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Final Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Final Distribution Date had been disallowed on the Initial Distribution Date, taking into account all previous distributions; <u>provided</u>, <u>however</u>, that in no event shall the foregoing impair the right of the Plan Administrator to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the FI Liquidating Trust or to make Tax Distributions which the Trustee deems reasonable and appropriate. Within 20 Business Days prior to making the final distribution, the Trustee shall notify the Post Confirmation Committee that the Trustee deems all assets to be liquidated and that the Trustee intends to establish the Final Distribution Date.

(f)    <u>Setoffs</u>. The Trustee may, but shall not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, claims, right and causes of action of any nature whatsoever that the Trustee, as successor to and assignee from the Allowed Debtors, may have or have had against the holder of such Allowed Claim or any prior holder of such Claim if the Allowed Claim has been transferred; <u>provided</u>, <u>however</u>, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release current or former by the Trustee of any such claim that the Debtors or the Trustee may have against such current or former holder.

(g)    <u>Disputed Payment</u>. If any dispute arises as to the identity of a holder of an Allowed Claim or Allowed Class 11 Interest who is to receive any Distribution, the Trustee may, in lieu of making such Distribution to such person, make such Distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute or otherwise withhold payment until the Bankruptcy Court has determined the identity of the holder upon request by the Trustee.

(h)    <u>No Distribution in Excess of Allowed Amount of Claim</u>. Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of sum of the Allowed amount of such Claim and

the Deemed Tax Amount for all taxable periods, unless such holder is entitled to interest at the Plan Rate pursuant to the Plan.

## ARTICLE V
## SUCCESSOR TRUSTEE

5.1    <u>Resignation</u>. The Trustee may resign by giving not less than sixty (60) days prior written notice thereof to the Post Confirmation Committee.

5.2    <u>Removal</u>. The Trustee may be removed upon a minimum three-fourths vote of the Post Confirmation Committee, with or without cause. If the Trustee is removed for cause, the Post Confirmation Committee or successor Trustee shall have the right to seek disgorgement from the Trustee of all or a portion of the fee paid to such removed Trustee. In the event of the removal of the Trustee without cause, the Trustee shall be entitled to immediate payment of all compensation earned by the Trustee through and including the date of such removal.

5.3    <u>Acceptance of Appointment by Successor Trustee</u>. Any successor Trustee shall be appointed after a minimum three-fourths vote of the Post Confirmation Committee, by an acknowledged written instrument delivered to the successor Trustee. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the FI Liquidating Trust records. Thereupon, such successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the FI Liquidating Trust with like effect as if originally named herein; <u>provided</u>, <u>however</u>, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the FI Liquidating Trust all the estates, properties, rights, powers and trusts of such predecessor Trustee.

## ARTICLE VI
## REPORTING

6.1    <u>Reports</u>

(a)    In addition to the reporting otherwise required by this Agreement, as soon as practicable upon termination of the FI Liquidating Trust, the Trustee shall submit to the Post Confirmation Committee a written report, including: (i) audited financial statements of the FI Liquidating Trust for the period commencing on the date hereof and ending on the Termination Date and the receipts and disbursements of the Trustee for such period; and (ii) a description of any action taken by the Trustee in the performance of its duties which materially affects the FI Liquidating Trust and of which notice has not previously been given to the Post Confirmation Committee. All such reports shall be in form and substance reasonably acceptable to the Post Confirmation Committee.

(b)    Upon the occurrence of any change, circumstance or effect that could reasonably be determined to be materially adverse to the FI Liquidating Trust, the Trustee shall promptly notify the Post Confirmation Committee in writing of such occurrence. The Trustee may, but shall not be required to, consult with, and rely upon the advice of, the Post Confirmation Committee in making a determination that such a change,

14

circumstance or effect has occurred, and the Trustee shall not be liable for any determination made by it in reliance upon the advice thereof.

6.2     United States Federal Income Tax.

(a)     Grantor Trust Status. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall make timely filings of annual federal income tax returns attached to Form 1041 reflecting the items of income, gain or loss, deductions or credits of the FI Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a). The Trustee shall value the Trust Assets on a consistent basis and such valuations shall be used for all federal income tax purposes by the Trustee and the Beneficiaries. Consistent with its status as a grantor trust, the FI Liquidating Trust shall not be, and the Beneficiaries shall be, responsible for the payment of their allocable portion of any federal income tax liability related to the operation of the Liquidating Trust.

(b)     Attributions of FI Liquidating Trust Taxable Income. Subject to the provisions of section 6.2(a) hereof, attribution of taxable income or credits of the FI Liquidating Trust shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the FI Liquidating Trust had distributed all of its other assets (valued for this purpose at their "tax book value") to the Beneficiaries, taking into account all prior and concurrent Distributions from the FI Liquidating Trust. Similarly, taxable losses or deductions of the FI Liquidating Trust shall be attributed by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Trust Assets. The tax book value of the Trust Assets for this purpose shall equal their fair market value on the date hereof or, if later, the date such assets were acquired by the FI Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRS, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

(c)     Compliance. The FI Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority with respect to Distributions.

6.3     Other. The Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the FI Liquidating Trust that, upon the advice of counsel, are identified to the Trustee as required by any governmental authority.

## ARTICLE VII
## BENEFICIARIES' INTERESTS

7.1     <u>Beneficial Interests</u>. The interests of the Beneficiaries in the FI Liquidating Trust shall be uncertificated and shall be reflected only on the records of the FI Liquidating Trust maintained by the Trustee. The proportionate interest of each Beneficiary in the FI Liquidating Trust shall be in the priority and amount of each Beneficiary's Allowed Claim or Allowed Class 11 Interest, and the Trustee shall be fully protected and incur no liability to any Beneficiary or any other Person in making any Distribution in accordance with such proportionate interests.

7.2     <u>Transfer</u>. The interests of the Beneficiaries in the FI Liquidating Trust are not negotiable and shall be transferable after written notice to the Trustee only: (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficiary), or (b) by operation of law. The Trustee shall not be required to record any transfer in favor of any transferee who, in the sole discretion of the Trustee, is or might be construed to be ambiguous, or create uncertainty as to the holder of the interest in the FI Liquidating Trust, and in so doing the Trustee shall be fully protected and incur no liability to any Person pursuant to section 3.6 hereof. Until a transfer is in fact recorded on the books and records maintained by the Trustee for the purpose of identifying the Beneficiaries, the Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make Distributions and send communications to the Beneficiaries, as though it has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other Person pursuant to section 3.6 hereof.

## ARTICLE VIII
## TERMINATION OF FI LIQUIDATING TRUST

8.1     <u>Termination of FI Liquidating Trust</u>. The Trustee shall seek authority from the Bankruptcy Court to dissolve the FI Liquidating Trust as part of the process of closing the Bankruptcy Case, consistent with section 5.9 of the Plan, when each of the following conditions are satisfied (such date being referred to herein as the "<u>Termination Date</u>"):

(a)     all Disputed Claims and Disputed Class 11 Interests have become Allowed Claims and Allowed Class 11 Interests or have been disallowed by Final Order,

(b)     all Litigation Claims, including any Avoidance Actions, have been resolved;

(c)     all other Trust Assets have been liquidated;

(d)     all Cash from the liquidation of the Trust Assets has been distributed in accordance with the Plan and this Agreement; and

(e)     if any Cash remains after the payment in full (including post-petition interest at the Plan Rate) of the Allowed Claims of all Beneficiaries and any other distributions in accordance with the Plan and this Agreement, such remaining Cash has been transferred to Reorganized Industries.

Notwithstanding the foregoing, the FI Liquidating Trust shall not remain in being for more than four (4) years, unless such term is extended pursuant to section 8.2 of this Agreement.

8.2    Extension of Term of FI Liquidating Trust. Any extension of the term of the FI Liquidating Trust set forth in section 8.1 hereof must be (i) for a finite period of time, (ii) preceded by the Trustee's receipt of a favorable ruling from the IRS that the FI Liquidating Trust's continued existence beyond such period would not adversely affect the status of the FI Liquidating Trust as a liquidating trust within the meaning of § 301.7701-4(d) of the Treasury Regulations for U.S. federal income tax purposes, and (iii) approved by the Bankruptcy Court within six (6) months of the beginning of the extended term.

# ARTICLE IX
# AMENDMENT AND WAIVER

Subject to approval of the Bankruptcy Court, any provision of this Agreement may be amended or waived with the approval of the Trustee and a three-fourths vote of the Post Confirmation Committee; provided further that no change shall be made to this Agreement that would (i) adversely affect the Distributions otherwise required to be made to any Beneficiary, (ii) adversely affect the U.S. federal income tax status of the FI Liquidating Trust as a "grantor trust" (in accordance with section 6.2 hereof), if applicable, or (iii) unless agreed to in writing by the affected Trustee, adversely affect the rights of the Trustee. Technical amendments to this Agreement may be made as necessary to cure any ambiguity, defect or inconsistency in this Agreement or enable the FI Liquidating Trust to effectuate the terms of this Agreement, with the consent of the Trustee and a three-fourths vote of the Post Confirmation Committee, provided that such amendment does not adversely affect the rights of the Beneficiaries.

# ARTICLE X
# MISCELLANEOUS PROVISIONS

10.1    Cooperation. Simultaneously with or immediately prior to the effectiveness of this Agreement, the Debtors shall provide the Trustee with copies of such of its books and records and such further information as the Bankruptcy Committees have requested for the purpose of performing its duties and exercising its powers hereunder.

10.2    Laws as to Construction. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law which would require the application of the law of another jurisdiction.

10.3    Actions Taken on Other Than Business Day. If any payment or act is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

10.4    Severability. If any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of

such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

10.5    Notices. All notices and other communications provided for or permitted hereunder shall be made in writing by hand-delivery, certified or registered first-class mail, next-day air courier or telecopier to the following addresses:

If to the Trustee:

**[Insert Trustee contact info]**
Attn:_____
Direct:
Facsimile:
E-Mail:

If to the Post Confirmation Committee:

**[Insert #1 contact info]**
Attention:
Direct:
Facsimile:
E-Mail:

**[Insert #2 contact info]**
Attention:
Direct:
Facsimile:
E-Mail:

**[Insert #3 contact Info]**
Attention:
Direct:
Facsimile:
E-Mail:

**[Insert #4 contact Info]**
Attention:
Direct:
Facsimile:
E-Mail:

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; one (1) Business Day after being timely delivered to a next-day air courier; and when receipt is acknowledged by the addressee, if telecopied.

10.6    <u>Headings</u>. The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

10.7    <u>Conflict with Plan</u>. In the event of a conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

10.8    <u>Retention of Jurisdiction</u>. After the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over (i) the FI Liquidating Trust, including the performance of the duties of the Trustee and the Post Confirmation Committee in overseeing the FI Liquidating Trust and (ii) the interpretation of this Agreement and all issues arising under or related to this Agreement.

10.9    <u>Third Party Beneficiaries</u>. Except for the Beneficiaries, nothing in this Agreement is intended to confer upon any Person that is not a party hereto any rights or remedies hereunder.

10.10    <u>Successors and Assigns</u>. The terms of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

10.11    <u>Counterparts</u>. This Agreement may be signed by the parties hereto in counterparts, which, when taken together, shall constitute one and the same document.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date of the first above written.

**FARMLAND INDUSTRIES, INC.**
**FARMLAND FOODS, INC.**
**SFA, INC.**
**FARMLAND TRANSPORTATION, INC.**
**FARMLAND PIPE LINE COMPANY**

By:    _____
Name:    Robert B. Terry, Authorized
    Signatory


By:    _____
    , as Trustee

## PLAN EXHIBIT B

Assumed Executory Contracts and Unexpired Leases[2/]

| Name | Disposition | Cure Amount |
|------|-------------|-------------|
| Operating Agreement of Agrifarm Industries, LLC, dated as of March 19, 1998 | Assumed by Reorganized Industries | $0.00 |
| Agreement among Wilbur-Ellis Company, Farmland Industries, Inc., Wilfarm, L.L.C., Cenex Harvest States Cooperatives and United Country Brands LLC, dated March 2000 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of Agriliance LLC, dated as of January 4, 2000 | Assumed by Reorganized Industries | $0.00 |
| Management Services Agreement with Agriliance LLC, dated as of January 4, 2000 | Assumed by Reorganized Industries | $0.00 |
| Put Option Agreements with Agriliance LLC, dated January 2000 | Assumed by Reorganized Industries | $0.00 |
| Seed Agreement with Agriliance LLC, dated January 2000 | Assumed by Reorganized Industries | $0.00 |
| Bylaws adopted by Alliance Farms Cooperative Association, dated May 3, 1994 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of Dakota Energy Retail Ventures, L.L.C., dated as of May 2, 1997 | Assumed by Reorganized Industries | $0.00 |
| Limited Liability Company Agreement of Farmland-Harvest States, LLC, dated as of September 10, 1996 | Assumed by Reorganized Industries | $0.00 |
| Limited Liability Company Agreement of Farmland National Beef aLF, LLC, dated as of July 16, 2001 | Assumed by Reorganized Industries | $0.00 |

---

[2/] The Debtors reserve their right to add any unexpired lease or executory contract to, or delete any unexpired lease of executory contract from, this Plan Exhibit in accordance with Section 6.3 of the Plan.

| Operating Agreement of Husky Hogs, L.L.C., dated as of January 26, 1999 | Assumed by Reorganized Industries | $0.00 |
|---|---|---|
| Limited Liability Company Agreement of Land O'Lakes Farmland Feed LLC, dated as of September 1, 2000 | Assumed by Reorganized Industries | $0.00 |
| Fourth Amendment Modifying Economic Interest of Land O'Lakes Farmland Feed LLC, dated as of October 12, 2001 | Assumed by Reorganized Industries | $0.00 |
| Third Amended and Restated Operating Agreement of Resource21, LLC, dated October 1, 1997 | Assumed by Reorganized Industries | $0.00 |
| Bylaws of TruAI, Inc., dated as of March 8, 1995 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of United Bakeries International, Inc., dated as of January 31, 2001 | Assumed by Reorganized Industries | $0.00 |
| Joint Venture Agreement among Farmland Industries, Inc., Cenex Harvest States Cooperatives, United Country Brands LLC and Land O'Lakes, Inc., effective January 1, 2000 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of United Country Brands LLC, effective January 4, 2000 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of United Processors, L.L.C. | Assumed by Reorganized Industries | $0.00 |
| Third Amended and Restated Operating Agreement of Westland Terminal, L.L.C., dated as of January 15, 1997 | Assumed by Reorganized Industries | $0.00 |

## **PLAN EXHIBIT C**

### Industries Retained Assets[3/]

1.    Interest in Agrifarm Industries, LLC

2.    Interest in Agriliance LLC

3.    Interest in Alliance Farms Cooperative Association

4.    Interest in Dakota Energy Retail Ventures, L.L.C.

5.    Interest in Farmland-Harvest States, LLC

6.    Interest in Farmland National Beef aLF, LLC

7.    Interest in Husky Hogs, L.L.C.

8.    Interest in Land O'Lakes Farmland Feed LLC

9.    Interest in Resource21, LLC

10.    Interest in TruAI, Inc.

11.    Interest in United Bakeries International, Inc.

12.    Interest in United Country Brands LLC

13.    Interest in United Processors, L.L.C.

14.    Interest in Westland Terminal, L.L.C.

15.    Interest in Double Circle Farm Supply Company

16.    Interest in Farmers Petroleum, Inc.

17.    Interest in Agronomy Company of Canada.

---

[3/]    The Debtors reserve their right, at any time prior to the Confirmation Date, upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit C to delete any assets therefrom or add any assets thereto and to provide notice of any such amendments to the Bankruptcy Court.

## PLAN EXHIBIT D

Transferred Assets[4/]

| PROPERTY DESCRIPTION | OWNER OF PROPERTY | REGULATORY AGENCIES INVOLVED | PROPOSED FUNDING FOR TRUST |
|---|---|---|---|
| Joplin, MO Gypsum Stack Property | Farmland Industries, Inc. | Missouri Department of Natural Resources | $5,292,119 |
| South Hutchinson, KS Grain Elevator | Farmland Industries, Inc. | Kansas Department of Health and Environment | $916,382 |
| Fertilizer Storage Tank adjacent to former Enid, OK Feed Mill facility | Farmland Industries, Inc. | Oklahoma Department of Environmental Quality | $91,594 |
| Lawrence, KS nitrogen plant | Farmland Industries, Inc. | Kansas Department of Health and Environment; U.S. EPA | $4,894,210 |
| Scottsbluff, NE former refinery site | Farmland Industries, Inc. | Nebraska Department of Environmental Quality | $185,855 |
| Doniphan, NE UAN Pit Release | Farmland Industries, Inc. | Nebraska Department of Environmental Quality | $536,305 |
| North Kansas City, MO Manufacturing Complex | Farmland Industries, Inc. | Missouri Department of Natural Resources | $217,689 |
| Augusta, AK Farm Supply Operation | SFA, Inc. | Arkansas Department of Environmental Quality | $37,171 |
| Topeka, KS Grain Elevator | Farmland Industries, Inc. | Kansas Department of Health and Environment | $425,912 |
| Wichita, KS Grain Elevator | Farmland Industries, Inc. | Kansas Department of Health and Environment | $358,644 |

---

[4/]    The Debtors reserve their right, at any time prior to the Effective Date, upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit D to delete any assets therefrom, add any assets thereto or modify any other information contained thereon and to provide notice of any such amendments to the Bankruptcy Court.

| PROPERTY DESCRIPTION | OWNER OF PROPERTY | REGULATORY AGENCIES INVOLVED | PROPOSED FUNDING FOR TRUST |
|---|---|---|---|
| Wichita, KS North Industrial Corridor | Farmland Industries, Inc. | Kansas Department of Health and Environment | $97,087 |

# **PLAN EXHIBIT E**

Executory Contracts and Unexpired Leases related to Coffeyville Assets[5]

---

[5] The Debtors reserve their right, at any time prior to the Effective Date, to amend <u>Plan Exhibit E</u> to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | MATHWORKS | MATLAB PLS TOOL BOX | Software | | Coffeyville |
| | MICROSOFT CORP | SERVER SOFTWARE | Software | | Coffeyville |
| | MICROSOFT CORP | SERVER CLIENT | Software | | Coffeyville |
| | MICROSOFT CORP | MAIL SERVER | Software | | Coffeyville |
| | MICROSOFT CORP | MAIL CLIENT | Software | | Coffeyville |
| | MICROSOFT CORP | ISA 2000 SERVER | Software | | Coffeyville |
| | MICROSOFT CORP | OFFICE PRO 2000 | Software | | Coffeyville |
| | MICROSOFT CORP | DESKTOP OP. SYSTEM | Software | | Coffeyville |
| | MICROSOFT CORP | VISIO 5.O | Software | | Coffeyville |
| | MICROSOFT CORP | VISIO 2000 | Software | | Coffeyville |
| | MICROSOFT CORP | WIN NT 4.0 SVR | Software | | Coffeyville |
| | ADOBE | ACROBAT 5.0 | Software | | Coffeyville |
| | ALLEN BRADLEY | RSLOGIC 500 | Software | | Coffeyville |
| | ALLEN BRADLEY | AI LADDER | Software | | Coffeyville |
| | Aspen Technology Inc | ADVISOR 7.0 | Software | | Coffeyville |
| | ATR | PRISM | Software | | Coffeyville |
| | Autodesk | AUTOCAD | Software | | Coffeyville |
| | Autodesk | AUTOCAD LT | Software | | Coffeyville |
| | BR&E | Prosim\Tsweet | Software | | Coffeyville |
| | BST | BAPPT | Software | | Coffeyville |
| | COMPUTER ASSOCIATES | ARCSERVE | Software | | Coffeyville |
| | COX BUSINESS SERVICES | COX | Software | | Coffeyville |
| | DTN CORP | FARMDATA | Software | | Coffeyville |
| | ENTEK | ENLINE66 | Software | | Coffeyville |
| | ENTEK | ODYSSEY | Software | | Coffeyville |
| | Epcon International | I : PROCESS | Software | | Coffeyville |
| | ETI | FEMS | Software | | Coffeyville |
| | Flir Systems | Thermacam 2000 | Software | | Coffeyville |
| | GE | CIMPLICITY | Software | | Gathering System |
| | Haverly Systems Inc | GRTMPS | Software | | Coffeyville |
| | Haverly Systems Inc | Template | Software | | Coffeyville |
| | Haverly Systems Inc | iCDM/Flash Assay | Software | | Coffeyville |
| | Haverly Systems Inc | OMNI PC/ASM | Software | | Coffeyville |
| | Haverly Systems Inc | CAL-II | Software | | Coffeyville |
| | HONEYWELL INC | LIMS | Software | | Coffeyville |
| | HONEYWELL INC | SESP | Software | $8,534.72 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | HONEYWELL INC | UNLIMITED PARTS | Software | | Coffeyville |
| | HONEYWELL INC | HI-SPEC | Software | | Coffeyville |
| | HONEYWELL INC | SCAN 3000 | Software | | Coffeyville |
| | INDUSTRIAL AUTOMATION TECHNOLOGY | PEBUILD | Software | | Coffeyville |
| | INDUSTRIAL AUTOMATION TECHNOLOGY | DSMAP | Software | | Coffeyville |
| | ICARUS CORPORATION | QUESTIMATE | Software | | Coffeyville |
| | INFOGRAPHICS | APOGEE 8.11.866 | Software | | Coffeyville |
| | INVENSYS | WONDERWARE | Software | | Gathering System |
| | Isa Press | CLIP SYMBOLS | Software | | Coffeyville |
| | KBC (Profimatics, Inc) | FCC-SIM | Software | | Coffeyville |
| | KENONIC CONTROLS | FLOWELL | Software | | Coffeyville |
| | Kodak Polychrome Graphics LLC | PICTURE EASY | Software | | Coffeyville |
| | KRAUTKRAMER | ULTRAPIPE | Software | | Coffeyville |
| | Kronos Inc | KRONOS | Software | | Coffeyville |
| | MACROSOLVE, INC | | Software | | |
| | MACROSOLVE INC | RFBARCODE | Software | | Coffeyville |
| | MATHWORKS | MATLAB | Software | | Coffeyville |
| | MICROSOFT CORP | NT4.0 CLIENTS | Software | | Coffeyville |
| | MICROSOFT CORP | NT 2000 WKST | Software | | Coffeyville |
| | Mro Software (Formerly Psdi) | MAXIMO | Software | | Coffeyville |
| | Oracle Corp | ORACLE (Enterprise) | Software | | Coffeyville |
| | Oracle Corp | ORACLE (Workgroup) | Software | | Coffeyville |
| | Pdma Corp | MCE MOTOR TESTER | Software | | Coffeyville |
| | Petrometrix Inc | PETRO | Software | | Coffeyville |
| | Primavera Systems Inc | PRIMAVERA-P3 | Software | | Coffeyville |
| | Primavera Systems Inc | PRIMAVERA-P1.3 | Software | | Coffeyville |
| | RICHARDSON ENG | RICHARDSON | Software | | Coffeyville |
| | SYMANTEC CORPORATION | Norton Anti Virus | Software | | Coffeyville |
| | SYMANTEC CORPORATION | Norton Ghost | Software | | Coffeyville |
| | SYMANTEC CORPORATION | PROCOM + | Software | | Coffeyville |
| | Toptech Systems, Inc | TMS5 | Software | | Coffeyville |
| | Toptech Systems, Inc | PHINDOWS | Software | | Coffeyville |
| | Toptech Systems, Inc | T-TALKW | Software | | Coffeyville |
| | Toptech Systems, Inc | FAIRCOM | Software | | Coffeyville |
| | TREMETRICS | OHM | Software | | Coffeyville |
| | TRINITY | BREEZE HAZ | Software | | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | TRISYS | TAPITT 2000 | Software | | Coffeyville |
| | Uop | WKCOMPLY | Software | | Coffeyville |
| | Uop | TRIOS | Software | | Coffeyville |
| | WINESTIMATOR INC | WINEST PRO+ | Software | | Coffeyville |
| | Zytax | ZYTAX | Software | | Coffeyville |
| | HONEYWELL INC | HONEYWELL | Software | | |
| | Bourque Data Systems Inc | RAILTRAC | Software | | |
| | Mid-America Building Maintenance, Inc. | Janitorial Services Agreement | Service Agreement | $0.00 | Coffeyville |
| | American Petroleum Institute ("API") | Petroleum and Allied Industry Agreement | | | Coffeyville |
| | Ammonia Casale S.A. | License Agreement | | | |
| 1022 | ARCO | Lease between ARCO (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1023 | ARCO | Lease between ARCO (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | IIYS, Inc. (now AspenTech) | IIYS Advisor License and Maintenance Agreement | | | Coffeyville |
| | Atchison Topeka and Santa Fe Railroad Company | Contract for Industry Track | Track Agreement | $0.00 | Coffeyville |
| | Atchison Topeka and Santa Fe Railroad Company | License for parking motor vehicles on right of way | License for Parking Motor Vehicles on Right of Way | $0.00 | Coffeyville |
| | Atchison Topeka and Santa Fe Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Atchison, Topeka and Santa Fe Railway Company | Pipe Line License | Lease Agreement | $0.00 | Gathering System |
| | Atchison, Topeka and Santa Fe Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Atchison, Topeka and Santa Fe Railway Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Atchison, Topeka and Santa Fe Railway Company | Power Line License | License Agreement | $0.00 | Gathering System |
| | Atchison, Topeka and Santa Fe Railway Company (apparently assigned to South Kansas and Oklahoma Railroad.) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | The Atchison Topeka and Santa Fe Railroad Company | Agreement for Private or Farm Crossing | License Agreement | $0.00 | Coffeyville |
| | The Atchison Topeka and Santa Fe Railroad Company | Shackle Rod Line License | License Agreement | $0.00 | Coffeyville |
| | Williams Pipe Line Company | Joint Tariff Agreement | Joint Tariff Agreement | $0.00 | Coffeyville |
| 0810 | Williams Pipe Line Company | Petroleum Products Transportation Agreement | Transport Agreement | $0.00 | Coffeyville |
| | AX&P, Inc. | Crude Oil Purchase Agreement | Agreement | $0.00 | Gathering System |
| | Baker Tanks, Inc. | Polymer Tank Rental Agreement | | | Coffeyville |
| 813 | Banc One | Lease Agreement for 98 UAN tank cars. | | $0 | 0 |
| 0257 | Banks Construction Company, Inc. | Coke Handling Agreement | | $237,407.00 | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | Black Hills Energy Resources, Inc. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| | BlackJack Oil Company | Crude Oil Purchase Contract | Purchase Contract | $0.00 | Gathering System |
| | BOC Gases | Rental Agreement of Nitrogen Tank and Vaporizer at Alky | Lease Agreement | $1,300.00 | Coffeyville |
| | BOC Gases | Rental Agreement of Nitrogen Tank and Vaporizer at Area 1 | Lease Agreement | $1,300.00 | Coffeyville |
| | BOC Gases | Rental Agreement of Oxygen Tank and Vaporizer at Sulfur unit | Lease Agreement | $1,300.00 | Coffeyville |
| | BP America Production Co. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| 1028 | Brothers Dairy Incorporated | Surface Lease between Brothers Dairy Incorporated (Lessor) & Farmland Industries, Inc. (Lessee) | Surface Lease | $0.00 | Gathering System |
| | Bruker Analytical X-Ray Systems, Inc. | Service Agreement | | | Coffeyville |
| | Bryan Research and Engineering, Inc. | Software Licensing Agreement | | | Coffeyville |
| | GE Capital Modular Space | CEMS Trailer Lease #822356 | Lease Agreement | $634.00 | Coffeyville |
| 0773 | GE Capital Modular Space | Lease of a 14x70 office trailer | Equipment Lease | $1,130.00 | Coffeyville |
| N31285 | Carolyn Tolson [Lease assignment from Robert & Harriet Labodie] | Lease of Property located in Osage County, OK | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0757 | Cenex Harvest States Cooperatives | Terminal Throughput Agreement | Purchase Agreement | $0.00 | Phillipsburg |
| | Central and South West Services, Inc. and the City of Coffeyville, KS | Payment Security Agreement | | | |
| | Chicago, Burlington & Quincy Railroad Company | Contract for Pipe Line | Lease Agreement | $0.00 | Gathering System |
| 0762 | Citation Oil and Gas Corp. | Crude Oil Purchase Agreement | Purchase Agreement | $0.00 | Gathering System |
| 0761 | Citation Oil and Gas Corp. | Crude Oil Purchase Agreement | Purchase Agreements | $0.00 | Gathering System |
| 1493 | City of Coffeyville, Kansas | Petroleum Coke Gasification to Nitrogen Fertilizer Electric Service Agreement (requires modification) | | $0.00 | |
| | The Coleman Company, Inc. | Agreement | Agreement | $0.00 | Coffeyville |
| N31393 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31265 | Freedom Group Inc. | Membership Agreement | Agreement | $0.00 | Coffeyville |
| | Sinclair Pipe Line Company (assigned from Missouri-Kansas-Texas Railroad Company) | Pipe Line License | Lease Agreement | $0.00 | Gathering System |
| 0793 | Sinclair Oil Corporation | Asphalt Services Agreement for the terminaling of Roll Saturate and Roofing Flux ("Products") | Service Agreement | $0.00 | Phillipsburg |
| 0796 | Terra Resources, Inc. | Agreement for Preferential Right to Purchase Crude Oil | Purchase Agreement | $0.00 | Gathering System |
| N31255 | Mobil Oil Corporation | Sludge Coking Process License Agreement | License Agreement | $42,590.77 | Coffeyville |
| N31258 | Exxon Research and Engineering Company | Flexicracking Process License and Engineering Agreement | License Agreement | $26,996.00 | Coffeyville |
| N31261 | W.R. Grace & Co. – Conn. | Desox Injection Equipment Lease | Equipment Lease | $3,050.00 | Coffeyville |
| | Oxbow Carbon and Minerals LLC | Petroleum Coke Agreement | | $0.00 | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | Black Hills Energy Resources, Inc. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| 0789 | ONEOK NGL Marketing, L.P. | Agreement | Lease Agreement | $0.00 | Coffeyville |
| | Corroon & Black Company of New York | Agreement | Agreement | $0.00 | Coffeyville |
| | Project Software and Development, Inc. (now MRO) | Software License Agreement | | | Coffeyville |
| 1081 | Sun Pipe Line Company | Lease between Sun Pipe Line Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31256 | Union Carbide Corporation | Total Isomerization Process License Agreement | License Agreement | $0.00 | Coffeyville |
| | Corroon & Black Company of New York | Agreement | Agreement | $0.00 | Coffeyville |
| 0800 | TexPar Energy, Inc. | Purchase/Sale Agreement for CBO/Slurry | Purchase Agreement | $0.00 | Coffeyville |
| 1041 | Estate Land Company | Lease between Estate Land Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0808 | Williams Pipe Line Company | Crude Oil Pipeline Agreement (16" Coffeyville line) | Purchase Agreement | $0.00 | Coffeyville |
| 1072 | Octagon Investment  Company (Originally with John M. Kane Land Trust) | Lease between Octagon Investment  Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1493 | City of Coffeyville, Kansas | Petroleum Coke Gasification to Nitrogen Fertilizer Electric Service Agreement (requires modification) | | $0.00 | |
| | Prime Energy | Air Compressor Rental Agreement | | | Coffeyville |
| 1038 | Don W. Steeples and David J. Steeples | Lease between Don W. Steeples and David J. Steeples (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31280 | Donald Adams,Jim Childress, Lonnie Adams, Mary Cochran, Melvin Cochran [Original lease was between Samuel Dix and Prairie Oil & Gas.] | Lease of Property located in Creek County, OK | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Quest Resource Corporation | Base Contract For Sale and Purchase of Natural Gas | Natural Gas Purchase Agreement | | Coffeyville |
| 1040 | Elton Bowman and Una Mae Bowman | Lease between Elton Bowman and Una Mae Bowman (Lessor) & Farmland Industries, Inc. (Lessee) | Surface Lease | $0.00 | Gathering System |
| | Energy Support Providers, LLC | Natural Gas Agency Agreement | | | Coffeyville |
| | Engineered Recovery Systems, Inc. | Service Agreement | | | Coffeyville |
| | Entek IRD Corporation | ESAFE Agreement (Includes Enline 66 and Odyssey) | | | Coffeyville |
| 0768 | EOTT Energy Operating Limited Party | Crude Oil Exchange Contract | Exchange Agreement | $0.00 | Gathering System |
| 0769 | EOTT Energy Operating Limited Party | Crude Oil Exchange Contract | Exchange Agreement | $0.00 | Gathering System |
| 1041 | Estate Land Company | Lease between Estate Land Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31258 | Exxon Research and Engineering Company | Flexicracking Process License and Engineering Agreement | License Agreement | $26,996.00 | Coffeyville |
| 819 | Farm Credit | Lease Agreement for 100 UAN tank cars. | | $114,206.00 | |
| N31248 | Phillips Petroleum Company | Metals Passivation License Agreement | License Agreement | $0.00 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| N31260 | Phillips Petroleum Company | Reforming Technology License Agreement | License Agreement | $0.00 | Coffeyville |
| N31265 | Freedom Group Inc. | Membership Agreement | Agreement | $0.00 | Coffeyville |
| | GE Capital Modular Space | CEMS Trailer Lease #822356 | Lease Agreement | $634.00 | Coffeyville |
| 0773 | GE Capital Modular Space | Lease of a 14x70 office trailer | Equipment Lease | $1,130.00 | Coffeyville |
| 0774 | GE Capital Modular Space | Lease for double wide office | Equipment Lease | $2,046.00 | Coffeyville |
| 842 | GE Capital Railcar Services | Railcar lease | Lease Agreement for 18 tank cars | $18,900.00 | |
| N31435 | GATX | Lease Agreement for 150 Ammonia tank cars | | $428,794.00 | |
| 1044 | Gratia Kemp | Lease between Gratia Kemp (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31273 | Greeley Gas Company (now ATMOS) (Original agreement was in name of United Cities Gas Co. which sold to Greeley and which then sold to Atmos) | Sales and Transportation Service Agreement | Service Agreement | $154,490.00 | Coffeyville |
| | Harbison Walker Refractives | Refractory Purchase Order | | $0.00 | |
| | Harry R. Defler Corp. | Petroleum Coke Purchase Order | | $0.00 | |
| | Harry R. Defler Corp. | Petroleum Coke Purchase Order | | $0.00 | |
| | Haverly Systems, Inc. | CAL II Use Rights License Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | GRTMPS Continuous Maintenance Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | ICDM Software Continuous Maintenance Agreement Renewal | | | Coffeyville |
| | Haverly Systems, Inc. | Template Continuous Maintenance Agreement | | | Coffeyville |
| 0776 | Honeywell Hi-Spec Solutions | Advanced Process Control Technical Service Contract | Service Agreement | $0.00 | Coffeyville |
| | Honeywell International Inc. | Industrial Services Agreement No. 14284 | | $7,608.00 | |
| 0777 | Honeywell International Inc. | Industrial Control Services Agreement | Service Agreement | $8,535.00 | Coffeyville |
| 1028 | Brothers Dairy Incorporated | Surface Lease between Brothers Dairy Incorporated  (Lessor) & Farmland Industries, Inc. (Lessee) | Surface Lease | $0.00 | Gathering System |
| 1046 | James A. Wheeler and Leta Beth Wheeler | Lease between James A. Wheeler and Leta Beth Wheeler  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | TPA, Inc. | License Agreement - TPA Technology (Oxygen Injection) | Technology License Agreement | $0.00 | Coffeyville |
| | TPA, Inc. | License Agreement - TPA Technology (Sulfur Recovery) | Technology License Agreement | $0.00 | Coffeyville |
| 1047 | James R. and Mary E. Conrad | Lease between James R. and Mary E. Conrad  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1048 | Jayhawk Pipeline Corporation | Lease between Jayhawk Pipeline Corporation  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31388 | ATSF & MKT Railroads | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| | Bryan Research and Engineering, Inc. | Software Licensing Agreement | | | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 1050 | Jody Morgan | Lease between Jody Morgan (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31415 | Union Pacific Railroad (Agmt originally w/Midland Valley Railroad Company) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| N31419 | Union Pacific Railroad | Pipe Line License | | $0.00 | Gathering System |
| N31420 | Union Pacific Railroad (Agmt originally w/Missouri Pacific RR Co) | Pipe Line License | | $0.00 | Coffeyville |
| N31421 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| N31422 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| | AX&P, Inc. | Crude Oil Purchase Agreement | Agreement | $0.00 | Gathering System |
| N31262 | Westar Energy (f/k/a Kansas Gas and Electric Co.) | Electric Service Agreement for Coffeyville Refinery | Service Agreement | $946,051.00 | Coffeyville |
| N31522 | Kansas Water Office | Water Purchase Contract (Coffeyville) | | $0.00 | |
| 1052 | Kaw Pipe Line Company | Sublease between Kaw Pipe Line Company  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Sublease | $0.00 | Gathering System |
| 1053 | Kaw Pipe Line Company | Sublease between Kaw Pipe Line Company  (Sublessor) & Farmland Industries, Inc. (Sublessee) | Non-Residential Real Property Sublease | $0.00 | Gathering System |
| | Profimatics, Inc. (now KBC) | FCC-SIMOPT Software Package License Agreement | | | Coffeyville |
| 1054 | Kenneth Bever (Orignally N. C. Spurlock) | Lease between Kenneth Bever (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0782 | Koch Sulfur Products Company, LLC | Purchase Contract for molten sulfur | Purchase Agreement | $3,346.60 | Coffeyville |
| | L&G Petroleum | Crude Oil Purchase Agreement | Agreement | | |
| | Entek IRD Corporation | ESAFE Agreement (Includes Enline 66 and Odyssey) | | | Coffeyville |
| N31262 | Westar Energy (f/k/a Kansas Gas and Electric Co.) | Electric Service Agreement for Coffeyville Refinery | Service Agreement | $946,051.00 | Coffeyville |
| 1061 | Laurence and Lorene Diehl | Lease between Laurence and Lorene Diehl  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Chicago, Rock Island and Pacific Railroad Company (now Kyle R.R.) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Chicago, Rock Island and Pacific Railroad Company (now U.P.) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Chicago, Rock Island and Pacific Railroad Company (now UP) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Kansas Texas Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Kansas Texas Railroad Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Kansas Texas Railroad Company | Pipeline Agreement - Crossing | License Agreement | $0.00 | Coffeyville |
| | Missouri Kansas Texas Railroad Company | Power Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Kansas Texas Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 1062 | Leland H. Schumacher and Augusta Brungardt | Lease between Leland H. Schumacher and Augusta Brungardt (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1063 | Madean Heyen and June Heyen | Lease between Madean Heyen and June Heyen (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1394 | Marguerite Swain | Lease between Marguerite Swain (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31247 | Petrolite Corporation | Petreco Desalting Equipment Agreement | Equipment Lease | $0.00 | Coffeyville |
| N31259 | Merichem Company | Process License Agreement | License Agreement | $4,343.00 | Coffeyville |
|  | MFA Incorporated | Prepay Ammonia Contract No. 400038381 |  |  |  |
|  | MFA Incorporated | Prepay Ammonia Contract No. 40038382 |  |  |  |
|  | Mid-America Building Maintenance, Inc. | Janitorial Services Agreement | Service Agreement | $0.00 | Coffeyville |
| 1067 | Mid-America Pipeline system (now Williams Energy Services) | Pipeline Capacity Lease and Operating Agreement between Mid-America Pipeline system (Lessor) & Farmland Industries, Inc. (Lessee) | Equipment Lease | $0.00 | Coffeyville |
|  | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
|  | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
|  | Missouri Pacific Railroad Company | Supplemental Agreement & Lease | License Agreement | $0.00 | Gathering System |
|  | Missouri Pacific Railroad Company | Wire Line License | License Agreement | $0.00 | Gathering System |
|  | Missouri Pacific Railroad Company (Agmt originally w/Mo-Ks-Tx Railroad) | Pipe Line License | License Agreement | $0.00 | Coffeyville |
|  | Missouri Pacific Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| N31391 | Missouri Pacific Railroad | Agreement for Pipe Line Crossing | Lease Agreement | $0.00 | Coffeyville |
| N31392 | Missouri Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31255 | Mobil Oil Corporation | Sludge Coking Process License Agreement | License Agreement | $42,590.77 | Coffeyville |
| 1043 | Mrs. Faye Taylor and Mrs. Mabel E. Allred | Lease between Floyd Allred, Mrs. Faye Taylor and Mrs. Mabel E. Allred (Lessor) & Farmland Industries, Inc. (Lessee) Mrs. Mabel E. Allred (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1396 | Nancy and Parker Badenhop | Lease between Nancy and Parker Badenhop (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
|  | National Cooperative Refinery Assoc. | Employee Lease Agreement | Agreement |  | Gathering System |
|  | National Cooperative Refinery Association | Equipment Lease Agreement | Equipment Lease | $0.00 | Gathering System |
| 0783 | National Cooperative Refinery Assoc | Accounting Services Agreement | Service Agreement | $18,343.45 | Coffeyville |
| 0786 | National Cooperative Refinery Assoc | Crude Oil Purchase Agreement | Purchase Agreement | $1,486,521.00 | Coffeyville |
| 0785 | National Cooperative Refinery Association | Crude Oil Exchange Contract (#5993) | Exchange Agreement | $72,649.35 | Gathering System |
| 0769 | EOTT Energy Operating Limited Party | Crude Oil Exchange Contract | Exchange Agreement | $0.00 | Gathering System |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 1072 | Octagon Investment Company (Originally with John M. Kane Land Trust) | Lease between Octagon Investment Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0789 | ONEOK NGL Marketing, L.P. | Agreement | Lease Agreement | $0.00 | Coffeyville |
| | Oxbow Carbon and Minerals LLC | Petroleum Coke Agreement | | $0.00 | |
| N31283 | Paulette A Briley and James L. Briley (Contract is in name of Bill Brown & Betty Lowery). | Lease of Property located in Chautauqua County, OK | Non-Residential Real Property Lease | $300.00 | Gathering System |
| | Peter Berick | Water Treatment Agreement | | | Coffeyville |
| N31247 | Petrolite Corporation | Petreco Desalting Equipment Agreement | Equipment Lease | $0.00 | Coffeyville |
| N31245 | Petrolite Corporation, Ltd. | License Agreement | License Agreement for Vertical Desalter | $8,898.00 | Coffeyville |
| N31246 | Petrolite Corporation, Ltd. | Electrical Purification Equipment Loan Agreement | Equipment Lease for Spherical Desalter | $0.00 | Coffeyville |
| N31260 | Phillips Petroleum Company | Reforming Technology License Agreement | License Agreement | $0.00 | Coffeyville |
| N31248 | Phillips Petroleum Company | Metals Passivation License Agreement | License Agreement | $0.00 | Coffeyville |
| 852 | Pitney Bowes | Lease Agreement for 200 UAN tank cars. | | $210,663.00 | |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R370748 | Lease Agreement | $75.00 | Coffeyville |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R412310 replaces #R310475 | Lease Agreement | $75.00 | Coffeyville |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R8055994 | Lease Agreement | $86.00 | Coffeyville |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R8962785 | Lease Agreement | $38.00 | Coffeyville |
| | Prime Energy | Air Compressor Rental Agreement | | | Coffeyville |
| N31266 | Process Industry Practices | Subscription and License Agreement | License Agreement | $0.00 | Coffeyville |
| | Project Software and Development, Inc. (now MRO) | Software License Agreement | | | Coffeyville |
| | Quest Resource Corporation | Base Contract For Sale and Purchase of Natural Gas | Natural Gas Purchase Agreement | $0.00 | Coffeyville |
| 1595 | GE Capital (as assigned by Reliant Energy Solutions) | Master Lease Agreement | Equipment Lease | $0.00 | Coffeyville |
| N31264 | Rexel Nelson | Agreement for Sale on Consignment (electrical motors) | Sale Agreement | $0.00 | Coffeyville |
| 1077 | Robert L. Campbell | Lease between Robert L. Campbell (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Coffeyville |
| | Royster-Clark, Inc. | Prepay Ammonia Contract No. 400038380 | | | |
| 1020 | Running "F", Inc. | Lease between Running "F", Inc. (Lessor) & Farmland Industries, Inc (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31284 | Ruth Spurgeon (Assigned from Edward & Norma Miller). | Lease of Property located in Nowata County, OK | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Saint-Gobain Ceramics and Plastics, Inc. | Refractory Agreement | | $0.00 | |
| 0792 | Seaway Crude Pipeline Company | Division of Rates Agreement | Service Agreement | $196,236.72 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0792 | Seaway Crude Pipeline Company | Division of Rates Agreement | Service Agreement | $196,236.72 | Coffeyville |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Havland Station | | Gathering System |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Susank Station | | Gathering System |
| | Shannahan Crane & Hoist, Inc. | Inspection Agreement | | | Coffeyville |
| 0793 | Sinclair Oil Corporation | Asphalt Services Agreement for the terminaling of Roll Saturate and Roofing Flux ("Products") | Service Agreement | $0.00 | Phillipsburg |
| | Sinclair Pipe Line Company (assigned from Missouri-Kansas-Texas Railroad Company) | Pipe Line License | Lease Agreement | | Gathering System |
| | South Kansas & Oklahoma Railroad | Overhead Utility Bridge Agreement | Agreement | $0.00 | Coffeyville |
| | South Kansas & Oklahoma Railroad | Pipeline Agreement | Agreement | $0.00 | Coffeyville |
| | South Kansas & Oklahoma Railroad | Waterline Agreement | Agreement | $0.00 | Coffeyville |
| | South Kansas and Oklahoma Railroad | License Agreement for Wire, Pipe and Cable Transverse Crossings and Longitudinal Occupations | License Agreement | $0.00 | Coffeyville |
| | South Kansas and Oklahoma Railroad | Pipeline Agreement - Crossing | Lease Agreement | $0.00 | Gathering System |
| | Southeast Kansas Railroad | Industry Track Agreement | Track Agreement | $0.00 | Coffeyville |
| | Southeast Kansas Railroad | Industry Tract Agreement | Railcar Storage | $0.00 | Coffeyville |
| | St. Louis-San Francisco Railway Company | Pipe Line Crossing Contract | Lease Agreement | $0.00 | Gathering System |
| | St. Louis-San Francisco Railway Company | Pipe Line Crossing Contract | License Agreement | $0.00 | Gathering System |
| N31405 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| N31406 | The Staubach Company (Agmt originally w/St. Louis San Francisco Railway Company) | Pipe Line Crossing Contract | | | Gathering System |
| N31408 Extension Rider | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| N31409 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Coffeyville |
| N31410 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Gathering System |
| N31411 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Gathering System |
| N31412 | The Staubach Company (agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Gathering System |
| N31413 | The Staubach Company (Agmt originally w/St Louis-San Francisco RR Co) | Pipe Line Crossing Contract | | $0.00 | Gathering System |
| N31414 | The Staubach Company (Agmt originally w/St. Louis-San Frisco RR Co) | Pipe Line License | | $0.00 | Gathering System |
| N31388 | ATSF & MKT Railroads | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| 0794 | Sun Company, Inc. | Crude Oil Bulk Purchase Agreement | Purchase Agreement. Farmland sells to Sun | $0.00 | Gathering System |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0795 | Sun Company, Inc. | Sale Agreement for Light Cycle Oil | Sale Agreement - Farmland sells to Sun | $0.00 | Gathering System |
| 1081 | Sun Pipe Line Company | Lease between Sun Pipe Line Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0796 | Terra Resources, Inc. | Agreement for Preferential Right to Purchase Crude Oil | Purchase Agreement | $0.00 | Gathering System |
| | Tessenderlo Kerley, Inc. | Ground Lease | Lease Agreement | | Coffeyville |
| 0797 | Tessenderlo Kerley Inc. | Sulfur Processing Agreement | Service Agreement | $796,446.00 | Coffeyville |
| 1495 | Tessenderlo Kerley, Inc. | Phase II Sulfur Processing Agreement (requires modification) | | $331,349.00 | |
| | Texaco Development Corporation | THGP Technical Services Agreement | | | |
| 0290 | Texaco Development Corporation | License Agreement for Use of the Texaco Gasification Process, Texaco Hydrogen Generation Process, and Texaco Gasification Power Systems (requires modification) | | $1,316,244.20 | |
| | Texaco, Inc. | License Agreement - Texaco General Equipment and Materials Specifications (GEMS) | License Agreement | $62,500.00 | Coffeyville |
| 0800 | TexPar Energy, Inc. | Purchase/Sale Agreement for CBO/Slurry | Purchase Agreement | $0.00 | Coffeyville |
| 0259 | The BOC Group, Inc. | On-Site Product Supply Agreement with the BOC Group, Inc. dated 12/3/97 (requires modifications) | | $0.00 | |
| 1067 | Mid-America Pipeline system (now Williams Energy Services) | Pipeline Capacity Lease and Operating Agreement between Mid-America Pipeline system (Lessor) & Farmland Industries, Inc. (Lessee) | Equipment Lease | $0.00 | Coffeyville |
| | American Petroleum Institute ("API") | Petroleum and Allied Industry Agreement | | | Coffeyville |
| | BP America Production Co. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| | The Coleman Company, Inc. | Agreement | Agreement | $0.00 | Coffeyville |
| | Harbison Walker Refractries | Refractory Purchase Order | | $0.00 | |
| | L&G Petroleum | Crude Oil Purchase Agreement | Agreement | | |
| | MFA Incorporated | Prepay Ammonia Contract No. 400038381 | | | |
| | MFA Incorporated | Prepay Ammonia Contract No. 40038382 | | | |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Haviland Station | | Gathering System |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Susank Station | | Gathering System |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038378 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038379 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038386 | | | |
| 0257 | Banks Construction Company, Inc. | Coke Handling Agreement | | $237,407.00 | |
| 0259 | The BOC Group, Inc. | On-Site Product Supply Agreement with the BOC Group, Inc. dated 12/3/97 (requires modifications) | | $0.00 | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0786 | National Cooperative Refinery Assoc | Crude Oil Purchase Agreement | Purchase Agreement | $1,486,521.00 | Coffeyville |
| 0805 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease for RGBs (Contract No. 2003-0001) – Conway Holding | RGB Storage Lease | $0.00 | Coffeyville |
| N31273 | Greeley Gas Company (now ATMOS) (Original agreement was in name of United Cities Gas Co. which sold to Greeley and which then sold to Atmos) | Sales and Transportation Service Agreement | Service Agreement | $154,490.00 | Coffeyville |
| | Baker Tanks, Inc. | Polymer Tank Rental Agreement | | | Coffeyville |
| | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Pacific Railroad Company | Supplemental Agreement & Lease | License Agreement | $0.00 | Gathering System |
| | Missouri Pacific Railroad Company | Wire Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Pacific Railroad Company (Agmt originally w/Mo-Ks-Tx Railroad) | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Pacific Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| N31391 | Missouri Pacific Railroad | Agreement for Pipe Line Crossing | Lease Agreement | $0.00 | Coffeyville |
| N31392 | Missouri Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| | Royster-Clark, Inc. | Prepay Ammonia Contract No. 400038380 | | | |
| | ZyTax, Inc. | Software License Agreement | | | Coffeyville |
| 1048 | Jayhawk Pipeline Corporation | Lease between Jayhawk Pipeline Corporation (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0761 | Citation Oil and Gas Corp. | Crude Oil Purchase Agreement | Purchase Agreements | $0.00 | Gathering System |
| | Honeywell International Inc. | Industrial Services Agreement No. 14284 | | $7,608.00 | |
| 0777 | Honeywell International Inc. | Industrial Control Services Agreement | Service Agreement | $8,535.00 | Coffeyville |
| 0782 | Koch Sulfur Products Company, LLC | Purchase Contract for molten sulfur | Purchase Agreement | $3,346.60 | Coffeyville |
| 0795 | Sun Company, Inc. | Sale Agreement for Light Cycle Oil | Sale Agreement - Farmland sells to Sun | $0.00 | Gathering System |
| | Tessenderlo Kerley, Inc. | Ground Lease | Lease Agreement | | Coffeyville |
| 0797 | Tessenderlo Kerley Inc. | Sulfur Processing Agreement | Service Agreement | $796,446.00 | Coffeyville |
| N31250 | Universal Oil Products Company | UOP Platforming Process License Agreement | License Agreement | $0.00 | Coffeyville |
| | Saint-Gobain Ceramics and Plastics, Inc. | Refractory Agreement | | $0.00 | |
| | The Prairie Oil & Gas Company | Lease | Lease Agreement | $0.00 | Gathering System |
| | The Prairie Oil & Gas Company | Lease | Lease Agreement | $0.00 | Gathering System |
| N31264 | Rexel Nelson | Agreement for Sale on Consignment (electrical motors) | Sale Agreement | $0.00 | Coffeyville |
| | Texaco, Inc. | License Agreement - Texaco General Equipment and Materials Specifications (GEMS) | License Agreement | $62,500.00 | Coffeyville |
| 1053 | Kaw Pipe Line Company | Sublease between Kaw Pipe Line Company (Sublessor) & Farmland Industries, Inc. (Sublessee) | Non-Residential Real Property Sublease | $0.00 | Gathering System |
| | Texaco Development Corporation | THGP Technical Services Agreement | | | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0290 | Texaco Development Corporation | License Agreement for Use of the Texaco Gasification Process, Texaco Hydrogen Generation Process, and Texaco Gasification Power Systems (requires modification) | | $1,316,244.20 | |
| 0805 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease for RGBs (Contract No. 2003-0001) – Conway Holding | RGB Storage Lease | $0.00 | Coffeyville |
| N31259 | Merichem Company | Process License Agreement | License Agreement | $4,343.00 | Coffeyville |
| | Toptech Systems, Inc. | Software Support and Maintenance Agreement | | | Coffeyville |
| | TPA, Inc. | License Agreement - TPA Technology (Oxygen Injection) | Technology License Agreement | $0.00 | Coffeyville |
| | TPA, Inc. | License Agreement - TPA Technology (Sulfur Recovery) | Technology License Agreement | $0.00 | Coffeyville |
| N31256 | Union Carbide Corporation | Total Isomerization Process License Agreement | License Agreement | $0.00 | Coffeyville |
| N31399 | Union Pacific Railroad | Track Lease Agreement - First Amendment | Lease Agreement | $0.00 | Coffeyville |
| N31400 | Union Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31399 | Union Pacific Railroad | Track Lease Agreement - First Amendment | Lease Agreement | $0.00 | Coffeyville |
| N31400 | Union Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31415 | Union Pacific Railroad (Agmt originally w/Midland Valley Railroad Company) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| N31419 | Union Pacific Railroad | Pipe Line License | | $0.00 | Gathering System |
| N31420 | Union Pacific Railroad (Agmt originally w/Missouri Pacific RR Co) | Pipe Line License | | $0.00 | Coffeyville |
| N31421 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| N31422 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| N31393 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31394 | Missouri-Kansas-Texas Railroad | Electric Power Transmission Line Across or Along Railroad Company Property | Lease Agreement | $0.00 | Coffeyville |
| N31395 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31396 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N30877 | Union Pacific Railroad (Agmt originally w/Mo-Ks-Tx Railroad) | Power Line License | License Agreement | $0.00 | Coffeyville |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038378 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038379 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038386 | | | |
| N31249 | Universal Oil Products Company | UOP "HF" Alkylation Process License Agreement | License Agreement | $6,153.00 | Coffeyville |
| N31250 | Universal Oil Products Company | UOP Platforming Process License Agreement | License Agreement | $0.00 | Coffeyville |
| | Universal Oil Products Company | LPG Merox Process Agreement | License Agreement | $0.00 | Coffeyville |
| N31251 | Universal Oil Products Company | UOP Merox Process License Agreement | License Agreement | $0.00 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| N31252 | Universal Oil Products Company | Unifying Process Agreement | Service Agreement | $0.00 | Coffeyville |
| | UOP | Precious Metals Lease | | $15,638.14 | Coffeyville |
| N31257 | UOP Process Division | Hydrobon Process License | License Agreement | $0.00 | Coffeyville |
| N31253 | UOP Process Division, a division of | Service Agreement | Service Agreement | $3,568.00 | Coffeyville |
| N31254 | UOP Process Division, a division of | UOP HC Platforming Process Guarantee Agreement | Service Agreement | $0.00 | Coffeyville |
| | UOP | Selexol Process License Agreement | | | Coffeyville |
| | Profimatics, Inc. (now KBC) | FCC-SIMOPT Software Package License Agreement | | | Coffeyville |
| 1085 | Veva Conness | Lease between Veva Conness (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Haverly Systems, Inc. | CAL II Use Rights License Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | GRTMPS Continuous Maintenance Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | ICDM Software Continuous Maintenance Agreement Renewal | | | Coffeyville |
| | Haverly Systems, Inc. | Template Continuous Maintenance Agreement | | | Coffeyville |
| | Vivian Mayer, Raymond Clark, Lyle Shawler, Faye Clark & Mary Shawler (Original Lessor was W. M. & Maude Clark) | Surface Lease | Agreement | $0.00 | Gathering System |
| 1086 | Wade and Margarte Waldschmidt | Lease between Wade Margarte Waldschmidt (Lessor) & APCO Pipe Line (Lessee) assigned to Farmland on 11/10/71. | Non-Residential Real Property Lease | $12.50 | Gathering System |
| 1087 | Wade S. Waldschmidt | Lease between Wade Waldschmidt (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Shannahan Crane & Hoist, Inc. | Inspection Agreement | | | Coffeyville |
| 0805 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease for RGBs (Contract No. 2003-0001) – Conway Holding | RGB Storage Lease | $0.00 | Coffeyville |
| 0806 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease (Contract No. 2003-0016) – Conway Holding | Isobutane Storage Lease | $0.00 | Coffeyville |
| | Williams Midstream Natural Gas Liquids, Inc. | Product Storage Lease (contract No. 2003-0002) | RGB Storage Lease | $0.00 | Coffeyville |
| 0809 | Williams Pipe Line Company | Agreement of Capacity Lease and Operating Agreement (for portions of 8" and 10" pipelines between Coffeyville and Caney Junction, Kansas, and Coffeyville and Independence, Kansas) | Equipment Lease | $38,750.00 | Coffeyville |
| | Williams Pipe Line Company | Joint Tariff Agreement | Joint Tariff Agreement | $0.00 | Coffeyville |
| 0810 | Williams Pipe Line Company | Petroleum Products Transportation Agreement | Transport Agreement | $0.00 | Coffeyville |
| 0808 | Williams Pipe Line Company | Crude Oil Pipeline Agreement (16" Coffeyville line) | Purchase Agreement | $0.00 | Coffeyville |
| | Wilson Supply, a unit of Smith International, Inc. | Purchasing and Warehouse Services Agreement | Service Agreement | $151,145.77 | Coffeyville |
| N31261 | W.R. Grace & Co. – Conn. | Desox Injection Equipment Lease | Equipment Lease | $3,050.00 | Coffeyville |
| | ZyTax, Inc. | Software License Agreement | | | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
| --- | --- | --- | --- | --- | --- |
| | Adobe | Acrobat 5.0 | Software | 0.00 | Coffeyville |
| | Autodesk | Autocad | Software | 0.00 | Coffeyville |
| | Autodesk | Autocad LT | Software | 0.00 | Coffeyville |
| | Computer Associates Internationsl | AcrServe | Software | 393.00 | Coffeyville |
| | Mathsoft Engineering & Education Inc | Mathcad | Software | 0.00 | Gathering System |
| | Palm Inc | Palm Desktop | Software | 0.00 | Gathering System |
| | Prolink Microsystems Inc | Prolink | Software | 0.00 | Gathering System |
| | Bachelor Controls (BCI) | Automated loadout system | Software | 0.00 | Gathering System |
| | Invensys | Triconex Operating | Software | 0.00 | Gathering System |
| | Invensys | Triconex Recorder | Software | 0.00 | Gathering System |
| | Honeywell Inc | Uniformance | Software | 0.00 | Gathering System |
| | Microsoft | Visio 2000 | Software | 0.00 | Gathering System |
| | Microsoft | Visual Basic | Software | 0.00 | Gathering System |
| | NUS | York DTS Software | Software | 0 | Gathering System |
| | CSI | CSI 8117 Pro-Align | Software | 0 | Gathering System |
| | Modicon | York DTS Software | Software | 0 | Gathering System |
| | Williams | Interactive Maintenance Training | Software | 0 | Gathering system |
| | CSI | CSI Model 2120-2 RBM | Software | 0 | Gathering System |
| | VSI | Ecowatch VSI | Software | 0 | Gathering System |
| | GE | GE Ditronics Software | Software | 0 | Gathering System |
| | Honeywell | Honeywell | Software | 40000 | Gathering System |

E-FILED
Wednesday, 31 May, 2006  04:42:12 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| | ) | |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors. | ) | Joint Administration |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**
**CONFIRMING DEBTORS' SECOND AMENDED**
**<u>JOINT PLAN OF REORGANIZATION, AS MODIFIED</u>**

**INTRODUCTION**

The Debtors[1] having filed their Second Amended Joint Plan of Reorganization, as

modified, dated as of October 31, 2003, (including the Non-Material Amendments (as defined

below), the "Plan"); the Court having entered an order dated October 8, 2003 (the "Disclosure

Statement Order"), approving the Disclosure Statement for the Plan (the "Disclosure Statement")

pursuant to Section 1125(b) of the Bankruptcy Code and setting the date and time of the hearing

pursuant to Section 1129 of the Bankruptcy Code to consider confirmation of the Plan (the

"Confirmation Hearing"); the Debtors having distributed notice of the Disclosure Statement Order

and the Confirmation Hearing (the "Confirmation Hearing Notice"), the Disclosure Statement and

the Ballots in accordance with the Disclosure Statement Order; the Debtors having filed the

Declaration of Service Regarding Solicitation Packages (Docket # 6956) and the Declaration of

---

[1]     Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the Plan (as such term is defined below). The definitions set forth in Section 1.01 of the Plan shall apply to these Findings of Fact, Conclusions of Law and Order Confirming Debtors' Second Amended Joint Plan of Reorganization, as Modified (this "Confirmation Order"). In addition, in accordance with Section 1.02 of the Plan, any capitalized term and phrases used in the Plan, the Disclosure Statement or this Confirmation Order that is not defined in the Plan, the Disclosure Statement or this Confirmation Order, shall have the meaning ascribed to that term or phrase, if any, in the Bankruptcy Code.

Supplemental Service Regarding Solicitation Packages (Docket #7194) (together, the "Mailing Affidavit"); the Debtors having filed the Declaration of Laurence M. Frazen Regarding Publication of Confirmation Hearing Notice (Docket # 7091) (the "Publication Affidavit"); the Debtors having filed the Declaration of Voting Agent Regarding Solicitation and Tabulation of Votes in Connection with the Debtors' Second Amended Joint Plan of Reorganization, as Modified (Docket # 7208) (the "Voting Certification"); the Court having considered the Plan, the Debtors' Memorandum of Law in Support of Confirmation of Debtors' Second Amended Plan of Reorganization, as Modified (the "Confirmation Memorandum"), and all filed objections and responses to, and statements and comments regarding, Confirmation and the records and files in the Chapter 11 Case; the Confirmation Hearing having commenced on December 16, 2003; the Court having heard the statements of counsel at the Confirmation Hearing; the Court having considered all testimony presented and evidence admitted at the Confirmation Hearing and the record in these proceedings to date; the Court having taken judicial notice of the papers and pleadings on file in the Chapter 11 Case; and it appearing to the Court that (a) the Confirmation Hearing Notice and the opportunity of any party in interest to object to Confirmation were fair, adequate and appropriate as to all parties to be affected by the Plan and the transactions contemplated thereby, and (b) the legal and factual bases set forth in the Confirmation Memorandum and presented at the Confirmation Hearing establish just cause for the relief granted herein;

NOW, THEREFORE, the Court hereby makes the following Findings of Fact, Conclusions of Law and enters the following Order:

I.      **FINDINGS OF FACT**

      A.      <u>Jurisdiction and Venue</u>

         1.      This Confirmation Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, as made applicable by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

         2.      On the Petition Date, the Debtors commenced the Chapter 11 Case in good faith by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334 and the Amended General Order of the United States District Court for the Western District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).  The Debtors were and are qualified to be debtors under Section 109 of the Bankruptcy Code.

         3.      Venue in the Western District of Missouri was proper as of the Petition Date and continues to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.

      B.      <u>Compliance with the Requirements of Section 1129 of the Bankruptcy Code</u>

         1.      <u>Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>

            a.      The Plan complies with all applicable provisions of the Bankruptcy Code as required by Section 1129(a)(1) of the Bankruptcy Code, including, without limitation, Sections 1122 and 1123 of the Bankruptcy Code.  Pursuant to Section 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article II of the Plan designates separate Classes of Claims and Interests (other than Administrative Claims, Priority Tax Claims and DIP Loan Claims) for the plan of each Debtor.  As required by Section 1122(a) of the Bankruptcy Code, each such Class of Claims and

Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. In accordance with Section 1122(b) of the Bankruptcy Code, the Plan provides for a single Class of Allowed General Unsecured Claims against Industries of $1000 or less. This Class is reasonable and necessary for administrative convenience.

b. Pursuant to Section 1123(a)(2) and (3) of the Bankruptcy Code, Article IV of the Plan specifies all Claims and Interests that are Unimpaired under the Plan and specifies the treatment of all Claims and Interests that are Impaired under the Plan.

c. Pursuant to Section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class.

d. Pursuant to Section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for the Plan's implementation. On and after the Effective Date, the Liquidating Trust and Reorganized Industries will have sufficient Cash and assets necessary to make the distributions required to be made pursuant to the terms of the Plan. Moreover, Article V and various other provisions of the Plan specifically provide adequate means for the Plan's implementation, including, without limitation: (i) vesting of all right, title and interest in all of the Debtors' property and assets (excluding the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets), including, without limitation, all rights and causes of action, in the Liquidating Trust on the Effective Date; (ii) the continued existence of Reorganized Industries from and after the Effective Date; (iii) the establishment and funding of the Coffeyville LLC on the Effective Date (in the event that the Debtors own the Coffeyville Assets on the Effective Date); (iv) the establishment and funding of the Transferred Asset Trusts on the Effective Date; (v) funding for the Plan in accordance with the provisions of the Plan; (vi) establishment and funding of accounts necessary or appropriate to effectuate the provisions of the Plan; (vii) establishment of

the Liquidating Trust and the appointment of the Liquidating Trustee; (viii) creation of the Post-Confirmation Committee; (vi) closing of the Chapter 11 Case; (ix) continuation of "retiree benefits" not terminated during the Chapter 11 Case; and (x) establishment of the Class 11 Distribution Pool.

e.     The form of amended certificate of incorporation for Reorganized Industries has been filed with the Court and includes all provisions required to be included under Section 1123(a)(6) of the Bankruptcy Code.

f.     The identities of the officers and directors of Reorganized Industries, the Liquidating Trustee and the Committee Members have been disclosed to the Court. Sections 2.4 and 5.3 of the Liquidating Trust Agreement provide the manner in which a successor Liquidating Trustee and successor Committee Members are to be chosen. As required by Section 1123(a)(7) of the Bankruptcy Code, (a) the Debtors have selected the initial officers, directors and trustee in a manner consistent with the interests of creditors and equity security holders and with public policy, and (b) the manner in which successor officers, directors and trustees will be chosen is also consistent with those interests and with public policy.

2.     Section 1129(a)(2) – Compliance by the Debtors with Applicable
Provisions of the Bankruptcy Code

The Debtors, as the proponents of the Plan, complied with all applicable provisions of the Bankruptcy Code as required by Section 1129(a)(2) of the Bankruptcy Code, including, without limitation, Sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019. The procedures by which the Ballots were solicited and tabulated were fair, properly conducted and in accordance with Section 1125(b) of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

3.     Section 1129(a)(3) – Proposal of the Plan in Good Faith

The Debtors proposed the Plan in good faith and not by any means forbidden by law.  Consistent with the purposes of Chapter 11 of the Bankruptcy Code, the Plan is designed to distribute the net proceeds realized from the liquidation of the Debtors' assets in accordance with the priorities established by the Bankruptcy Code.  Moreover, the Plan itself, and the process leading to its formulation, provides additional and independent evidence of the Debtors' good faith.

4.    Section 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to Section 1129(a)(4) of the Bankruptcy Code, any payments made by the Debtors to Professionals for services or for costs and expenses in, or in connection with, the Chapter 11 Case have been or will be disclosed to the Court in applications to employ Professionals and in interim applications for compensation of fees and reimbursement of expenses. Any compensation of fees or reimbursement of expenses paid by the Debtors to Professionals pursuant to monthly invoices or interim applications, together with all other fees and expenses incurred by Professionals in the Chapter 11 Case, will be subject to final approval by the Court pursuant to Section 330 of the Bankruptcy Code.

5.    Section 1129(a)(5) – Disclosure of Identities of Officers and Directors of Reorganized Industries, Liquidating Trustee and Committee Members; Consistency of Such Appointments with the Interests of Creditors, Equity Holders and Public Policy

Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the identities of and proposed compensation for the officers and directors of Reorganized Industries, the Liquidating Trustee and the Committee Members have been disclosed to the Court.  In accordance with the Court's findings contained in the record of the Confirmation Hearing, the selection of and compensation for the officers and directors of Reorganized Industries, the Liquidating Trustee and the Committee Members is consistent with the interests of the holders of Claims and Interests and with public policy.  Notwithstanding the foregoing, the Debtors shall distribute the final version of the engagement letter (the "JPM Engagement Letter") with J.P. Morgan Trust Company, N.A. ("JPM") to the Bankruptcy Committees, and the Bankruptcy Committees shall have five days thereafter to file an objection with the Court objecting to the compensation to be paid to JPM.

6.    Section 1129(a)(6) – Approval of Rate Change by Regulatory Commission

The Debtors' businesses do not involve the establishment of rates over which any governmental regulatory commission has or will have jurisdiction after Confirmation. Accordingly, Section 1129(a)(6) of the Bankruptcy Code is not applicable.

7.    Section 1129(a)(7) – Best interest of Creditors and Holders of Interests

With respect to each Impaired Class of Claims or Interests, each holder of an Allowed Claim or Interest in each such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the applicable Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.

1708411.6

8.    <u>Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class</u>

a.    Pursuant to Sections 1126 and 1129(a)(6) of the Bankruptcy Code, (a) as indicated in Article IV of the Plan, Classes 1, 2, 3, 6 and 8 are Unimpaired and, pursuant to Section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan, (b) as indicated in Article IV of the Plan, the holders of Claims in Classes 13, 15, 17, and 18 are the proponents of the Plan and, accordingly, are conclusively presumed to have accepted the Plan; and (c) as indicated in the Voting Certification, holders of Allowed Claims and Interests in Classes 4, 5, 7, 9, 10, 11, 12 and 14 have accepted the Plan pursuant to Section 1126(a) of the Bankruptcy Code.  Notwithstanding the lack of compliance with Section 1129(a)(8) of the Bankruptcy Code with respect to Classes 16 and 19, the Plan is confirmable because, as more fully set forth in Section I.B.14 of this Confirmation Order, the Plan satisfies Section 1129(b) of the Bankruptcy Code with respect to these Classes.

b.    The provisions of the Plan with respect to the holders of Unimpaired Claims are fair and appropriate.

9.    <u>Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code</u>

The Plan provides for treatment of Administrative Expense Claims, Priority Tax Claims and Other Priority Claims in the manner required by Section 1129(a)(9) of the Bankruptcy Code.

10.    <u>Section 1129(a)(10) – Acceptance by at Least One Impaired Class</u>

As required by Section 1129(a)(10) of the Bankruptcy Code and as indicated in the Voting Certification, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, excluding votes cast by insiders.

11.  <u>Section 1129(a)(11) – Feasibility of the Plan</u>

The Plan satisfies Section 1129(a)(11) of the Bankruptcy Code because the Plan is

a liquidating plan of reorganization.

12.  <u>Section 1129(a)(12) – Payment of Bankruptcy Fees</u>

In accordance with Section 1129(a)(12) of the Bankruptcy Code, Section 11.3 of

the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930.  The fees payable

under 28 U.S.C. § 1930 shall be determined by the United States Trustee for this District.

13.  <u>Section 1129(a)(13) – Retiree Benefits</u>

In accordance with Section 1129(a)(13) of the Bankruptcy Code, the Plan provides

for the continuation after the Effective Date of all retiree benefits (as that term is defined in Section

1114 of the Bankruptcy Code) of the Debtors not terminated prior to the Effective Date to the

extent required by Section 1129(a)(13) of the Bankruptcy Code, without prejudice to the Debtor's

right under applicable non-bankruptcy law to modify, amend or terminate such benefits following

the Effective Date.

14.  Section 1129(b) – Confirmation of the Plan Over Nonacceptance
      of Impaired Classes

Pursuant to Section 1129(b)(1) of the Bankruptcy Code, the Plan is confirmed

notwithstanding the fact that the holders of Allowed Claims in Classes 16 and 19 did not accept

the Plan pursuant to Section 1126(c) of the Bankruptcy Code.  The Plan does not discriminate

unfairly and is fair and equitable with respect to the holders of Allowed Claims in Classes 16 and

19.  No holders of any Claim or Interest junior to any of the holders of Allowed Claims in Classes

16 and 19 will receive or retain any property under the Plan on account of such junior Claim or

Interest.

1708411.6

15.     Section 1129(d) – Principal Purpose of the Plan

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of

the application of Section 5 of the Securities Act of 1933.

C.     Non-Material Amendments to the Plan

The proposed amendments to the Plan (including, without limitation, the amendments

identified in the Notice and Filing of Non-Material Amendments to Debtors' Second Amended

Joint Plan of Reorganization, as Modified (Docket # 7209)) (the "Non-Material Amendments")

constitute non-material amendments to the Plan and comply with the requirements of Section 1127

of the Bankruptcy Code.

D.     Funding for the Plan

1.     Cash in the amount of $25,000 constitutes sufficient funds for all operations

of Reorganized Industries other than those operations, if any, related to the Industries Retained

Assets and/or services to be provided to the Liquidating Trust (which operations shall be funded,

if at all, under the Management Agreement).

2.     The proposed funding amounts set forth on Plan Exhibit D (or, in the case of

the South Hutchinson, KS grain elevator, the Lawrence, KS nitrogen plant, the Topeka, KS grain

elevator, the Wichita, KS grain elevator and the Wichita, KS north industrial corridor

(collectively, the "Kansas Transferred Assets"), such other amounts as may be subsequently

determined by the Court prior to the Effective Date) constitute sufficient capitalization for the

maintenance, remediation (or other regulatory compliance) and/or disposition of each Transferred

Asset.

3.     Cash in the amount of $6,500,000 represents the Available Cash estimated

to be available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares

as of the Effective Date after all Administrative Claims against Foods, all Priority Tax Claims against Foods, all Class 1 Claims against Foods, all Class 3 Claims against Foods, all Class 10 Claims and all Class 18 Claims against Foods have been (i) Allowed and paid in full (including, with respect to Class 10, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Foods have been repaid.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

1.    The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334 and Amended General Order of the United States District Court for the Western District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). Each of the Debtors was and is qualified to be a debtor under Section 109 of the Bankruptcy Code.

2.    Venue in the Western District of Missouri was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.

### B.    Compliance with Section 1129 of the Bankruptcy Code

As set forth in Section I.B of this Confirmation Order, the Plan complies with the applicable requirements of Section 1129 of the Bankruptcy Code.

### C.    Approval of Settlements, Compromises, Releases and Related Provisions

Pursuant to Section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, all settlements, compromises, releases, indemnifications and exculpations set forth in the Plan and set forth in and implemented by this Confirmation Order, including, without limitation, the releases and exculpations set forth in Sections 5.8 and 11.9 of the Plan and the settlement set forth in Paragraph III.C.19 of this Confirmation Order, are hereby approved as fair, equitable, reasonable

1708411.6

11

and in the best interests of the Debtors, Reorganized Industries and their estates, creditors and equity security holders.

     D.    <u>Agreements and Other Documents</u>

        Pursuant to Section 1142(b) of the Bankruptcy Code and Section 303 of the Delaware General Corporation Law (regardless of the state of incorporation), no action of the directors or stockholders of the Debtors or Reorganized Industries will be required to authorize them (or any of their officers, employees or agents acting on their behalf) to (i) effectuate and carry out the Plan and all orders of the Court relating thereto, (ii) consummate the transactions contemplated by the Plan and all orders of the Court relating thereto, or (iii) take or do any other action or thing contemplated by the Plan and all orders of the Court relating thereto as may be necessary or appropriate to fully effectuate the intents and purposes thereof, including, without limitation, entering into, executing, delivering, implementing and consummating all contracts, instruments, releases and other agreements (including, without limitation, the Liquidating Trust Agreement, the Management Agreement and the Transition Services Agreement to be entered into by and between Reorganized Industries and the Liquidating Trustee (the "Transition Services Agreement")) created or to be created in connection with the Plan (collectively, the "Plan Documents"), and all such actions and things hereby are or will be deemed to have been taken or done with like effect as if they had been authorized and approved by unanimous actions of the directors and the stockholders of the Debtors and Reorganized Industries.

     E.    <u>Funding for the Plan</u>

        1.    Cash in the amount of $25,000 constitutes sufficient funds for all operations of Reorganized Industries other than those operations, if any, related to the Industries Retained Assets and/or services to be provided to the Liquidating Trust.

2.     The proposed funding amounts set forth on <u>Plan Exhibit D</u> (or, in the case of the Kansas Transferred Assets, such other amounts as may be subsequently determined by the Court prior to the Effective Date) constitute sufficient capitalization for the maintenance, remediation (or other regulatory compliance) and/or disposition of each Transferred Asset.

3.     Cash in the amount of $6,500,000 constitutes sufficient funds to be reserved by the Liquidating Trustee in the Class 11 Distribution Pool.

F.     <u>Validity and Enforceability of Plan Provisions</u>

Each term and provision of the Plan, as modified or interpreted by the Court, is valid and enforceable pursuant to its terms.

III.     <u>**THEREFORE, IT IS HEREBY ORDERED:**</u>

A.     <u>Confirmation of the Plan and Notice of Confirmation Hearing</u>

1.     The record of the Confirmation Hearing is hereby closed.

2.     The Plan (including all Plan Exhibits) is hereby approved and confirmed in all respects pursuant to Section 1129 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that if there is any conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.  All objections and responses to, and statements regarding, the Plan, to the extent they have not been withdrawn prior to entry of this Confirmation Order or are not cured by the relief granted herein, are hereby overruled.

3.     The Debtors, Reorganized Industries, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Committee, the Committee Members and each other appropriate party are hereby authorized and directed to take all actions necessary or appropriate to enter into, execute, deliver, implement and consummate the Plan Documents and to take such other steps and perform such other acts as may be necessary to implement and effectuate the Plan, and are further

1708411.6

13

authorized and directed to execute and deliver any instrument and perform any other act that is

necessary for the consummation of the Plan, including the implementation of the Plan Documents

and the execution and filing of all documents necessary to effectuate the merger of Foods into

Industries, in accordance with Section 1142(b) of the Bankruptcy Code.  The approvals and

authorizations specifically set forth in this Confirmation Order are nonexclusive and are not

intended to limit the authority, under otherwise applicable law, of any Debtor, Reorganized

Industries, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Committee and the

Committee Members to take any and all actions necessary or appropriate to implement, effectuate

and consummate the Plan, this Confirmation Order and the respective transactions contemplated

thereby.

4.      As established through the Mailing Affidavit and the Publication Affidavit,

the Debtors provided good and sufficient notice of the Confirmation Hearing and the deadline for

filing and serving objections to the Plan, which notice is hereby approved.

5.      Each Debtor shall have the right to declare an Effective Date for its

separate plan in the event that this action is necessary and appropriate for such Debtors and its

creditors.  In the event one or more, but less than all, of the Debtors wish to exercise their right to

declare an Effective Date for their respective plans, such Debtors shall consult with the

Bankruptcy Committees and present the proposed action to the Court.   Notwithstanding any other

provision in this Confirmation Order to the contrary, the Effective Date shall not be more than 180

days after the Confirmation Date.

6.      In the event that the ultimate disposition of that certain appeal

entitled *Official Committee of Unsecured Creditors, Appellant, v. Farmland Industries,*

*Inc. et al., Appellees,* Case No. 03-3335, currently pending in the Eighth Circuit Court of

Appeals, requires the treatment and/or payment of the Creditor Transaction Fee other than

as provided in Sections 3.1(a) and 3.8 of the Plan, the Plan shall automatically be deemed

amended and modified as necessary (and without further notice) to provide such alternative

treatment and/or payment.

      B.      <u>Effects of Confirmation</u>

           1.      <u>Executory Contracts and Unexpired Leases</u>

               a.      The executory contract and unexpired lease provisions of Article VI

of the Plan are hereby approved.

               b.      Except as otherwise provided in Section 6.3 of the Plan, on the

Effective Date, all executory contracts and unexpired leases that exist between a Debtor and any

Entity (including, without limitation, the IRB Indentures not Reinstated on or prior to the Effective

Date and the Trust Indentures), except for any executory contract or unexpired lease (a) which has

been assumed or rejected pursuant to an order of this Court entered prior to the Confirmation Date

or pursuant to this Confirmation Order, or (b) as to which a motion for approval of the assumption

of such executory contract or unexpired lease has been filed and served prior to the Confirmation

Date (except to the extent that any such motion is ultimately denied or withdrawn), shall be, and

hereby is, deemed to have been rejected by the appropriate Debtor, pursuant to Section 365 of the

Bankruptcy Code, as of the Confirmation Date; <u>provided</u>, <u>however</u>, that (i) all executory contracts

and unexpired leases with the Debtors relating to the lease and sublease of the Debtors'

headquarters property at 12200 North Ambassador Drive, Kansas City, Missouri, including (A)

that certain Build-To-Suit Lease/Sublease Agreement, dated September 9, 1999, between HDP-

Kansas City, L.L.C. ("HDP") and Industries, (B) that certain Agreement, dated August 1, 1999,

between Industries and the City of Kansas City, Missouri (the "City"), which is required by the

lease of the Debtors' headquarters between HDP and the City, (C) the Cooperative Agreement, dated August 15, 1999, between Industries and the City, and (D) the Guaranty made by Higgins Development Partners, L.L.C. in favor of Industries, shall be deemed rejected on (and such rejection shall be effective as of) February 29, 2004: (ii) all executory contracts and expired leases relating to the lease of the print plant in North Kansas City, Missouri, including specifically that certain Lease, dated as of September 19, 2001, by and between Cherokee North Kansas City, LLC and Farmland, as amended or supplemented, shall be deemed rejected on (and such rejection shall be effective as of) February 29, 2004; and (iii)  the Amendment and Restatement of Information Technology Services Agreement dated February 28, 2001 (as amended from time to time, the "CGE&Y Agreement"), between Industries and OneSystem Group, LLC (k/n/a Cap Gemini Ernst & Young Kansas City Service Center, LLC)("CGE&Y"), shall be deemed rejected on (and such rejection shall be effective as of) the Effective Date; provided, however, that in the event that CGE&Y and Reorganized Industries and/or the Liquidating Trust enter into an agreement for CGE&Y to provide services to the Liquidating Trust and/or Reorganized Industries commencing on or after the Effective Date, CGE&Y shall be deemed to have waived any right to assert a claim against any of the Debtors or the Liquidating Trust arising from rejection of the CGE&Y Agreement.

    c.  If the rejection of an executory contract or unexpired lease during the Chapter 11 Case (including any rejection of an executory contract or unexpired lease pursuant to Section 6.1 of the Plan) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor, the Liquidating Trust, the Liquidating Trustee or the properties of any of them unless a proof of Claim is filed with the clerk of the Court and served upon counsel to the Debtors, and counsel to the Bankruptcy Committees, (i) if such rejection is effective on or

prior to the Confirmation Date, within 30 days after the Confirmation Date, (ii) if such rejection is effective after the Confirmation Date, within 30 days after service of notice of such rejection, or (iii) if such rejection is pursuant to Section 6.1 of the Plan, within 30 days after the Effective Date.

d.     On the Effective Date, Reorganized Industries shall be deemed to have assumed or assumed and assigned, as the case may be, each executory contract and unexpired lease listed on Plan Exhibit B.  This Confirmation Order shall be, and hereby is, deemed to constitute the Court's express approval, pursuant to Section 365 of the Bankruptcy Code, of each such assumption or assumption and assignment, as the case may be, effective as of the Effective Date.

e.     In the event that Industries owns the Coffeyville Assets on the Effective Date, on the Effective Date Reorganized Industries shall be deemed to have assumed and assigned to the Coffeyville LLC each executory contract and unexpired lease listed on Plan Exhibit E, provided, however, that the Debtors reserve their right, at any time prior to the Effective Date, to amend Plan Exhibit E to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.  This Confirmation Order shall be, and hereby is, deemed to constitute the Court's conditional approval, pursuant to Section 365 of the Bankruptcy Code, of each such assumption or assumption and assignment, as the case may be, effective as of the Effective Date.  In the event that Industries owns the Coffeyville Assets on the Effective Date and there exists a dispute regarding any unpaid monetary obligations under (i) the Master Lease Agreement by and between Reliant Energy Solutions, LLC, predecessor in interest to General Electric Capital Corporation, and Industries dated May 1, 2001 or (ii) any executory contracts or unexpired leases with National Cooperative Refinery Association listed on Plan Exhibit E, such

disputes shall be resolved in accordance with Section 365(b) of the Bankruptcy Code and Section 6.4 of the Plan.

f.        Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default are indicated on Plan Exhibit B and Plan Exhibit E and shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor party to the contract or lease or the assignee of such Debtor party assuming such contract or lease, by Cure.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Reorganized Industries or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption or assignment (each, a "Cure Dispute") that cannot be resolved consensually among the parties, Reorganized Industries (with the consent of the Liquidating Trustee) shall have the right to reject the contract or lease for a period of five Business Days after entry of a Final Order adjudicating a Cure Dispute in a manner that is not acceptable to Reorganized Industries (with the consent of the Liquidating Trustee).

2.        Injunctions and Stays to Remain in Effect

a.        Unless expressly modified or lifted by the Court and except as otherwise provided in the following subparagraph (b), all injunctions or stays provided for in the Chapter 11 Case, including in this Confirmation Order, under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Final Distribution Date.

b.        Notwithstanding the preceding subparagraph (a) and subject to the rights and claims of the United States contained in paragraph III.C.3.d of this Confirmation Order, the prosecution (whether directly, derivatively or otherwise) of any claim, obligation, suit,

judgment, damage, demand, debt, right, cause of action, liability or interest (i) released by

operation of Section 5.8 of the Plan or exculpated by operation of Section 11.9 of the Plan is

hereby permanently enjoined, and (ii) against Texaco Development Corporation and its direct and

indirect parents, subsidiaries and affiliates arising from or relating to the Coffeyville, Kansas

gasification and hydrogen production facility is hereby permanently enjoined.

 3. Rights of Action

 a. On and after the Effective Date, except as provided in Section 11.9

of the Plan, the Liquidating Trustee, on behalf of and as a court-appointed representative of each

Debtor and for the benefit of each Estate (as vested in the Liquidating Trust pursuant to the Plan),

will, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, retain and become the holder of,

and have the exclusive right to enforce any and all present or future Litigation Claims and any and

all rights of any and all of the Debtors that arose before or after the Commencement Date,

including, but not limited to, rights, claims, causes of action, avoiding powers, suits and

proceedings arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and

all potential rights, claims and causes of action related to payments made by the Debtors prior to

the Petition Date and disclosed in the Schedules. The Liquidating Trustee may pursue, abandon,

settle or release any or all such Litigation Claims and rights of action pursuant to the terms of the

Plan and the Liquidating Trust Agreement, as it deems appropriate, without the need to obtain

approval or any other or further relief from the Court.

 b. On and after the Effective Date, all Entities are permanently

enjoined from commencing or continuing in any manner any action or proceeding (whether

directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, Litigation

Claim, debt, right or cause of action of the Debtors for which the Liquidating Trustee retains sole

and exclusive authority to pursue in accordance with Section 5.10(a) of the Plan.

            c.        The allowance of any Claim prior to the Effective Date shall not

constitute a waiver of any Litigation Claim against the holder of such Claim.

        C.        <u>Matters Relating to Implementation of the Plan</u>

            1.        <u>Binding Effect</u>

            Except as otherwise provided in section 1141(d)(3) of the Bankruptcy

Code, on and after the Confirmation Date, the provisions of the Plan shall be binding upon and

inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in

the Debtors, their respective successors and assigns (including, but not limited to, the Liquidating

Trust and the Liquidating Trustee), and all other parties-in-interest in this Chapter 11 Case.

            2.        <u>Continued Corporate Existence of the Debtors; Vesting of Assets</u>

            a.        On the Effective Date, all right, title and interest in all of the

Debtors' property and assets (excluding the Industries Retained Assets, the Transferred Assets and

the Coffeyville Assets), including without limitation, all rights and causes of action, whether

arising by contract, under the Bankruptcy Code (including, without limitation pursuant to Section

1123(b)(3)(B) of the Bankruptcy Code), under the Plan or under other applicable law, including,

without limitation, all rights the Debtors have under the Plan, shall vest in the Liquidating Trust.

            b.        On the Effective Date, Foods shall be merged into Industries, after

which Industries shall continue to exist as Reorganized Industries.  Reorganized Industries shall be

governed and managed under and in accordance with the Plan, the Management Agreement and its

amended certificate of incorporation and bylaws; <u>provided</u>, <u>however</u>, that all provisions contained

in such documents related to the SF Phosphates, Limited Company will not be effective if the SF

Phosphates Interest has been disposed of prior to the Effective Date.  Reorganized Industries is

authorized to effectuate the Plan and the transactions contemplated by the Plan and to take any

proceedings or actions provided for or contemplated by the Plan (in each case in a manner

consistent with the Plan and the Liquidating Trust Agreement), including, without limitation, such

proceedings or actions related to the Industries Retained Assets, the Transferred Assets and the

Coffeyville Assets as may be necessary and appropriate, all without further action by the

stockholders of Reorganized Industries, and with like effect as if such actions had been taken by

unanimous action of the stockholders of Reorganized Industries.  All recoveries received by

Reorganized Industries on account of the Industries Retained Assets, the Transferred Assets or any

other assets of the Debtors shall be remitted to the Liquidating Trust and held by the Liquidating

Trustee on account of the Estate to which such recoveries are allocable.  The Management

Agreement, the Transition Services Agreement and the amended certificate of incorporation and

bylaws of Reorganized Industries (substantially in the forms that have been filed with the Court)

are hereby approved.  Reorganized Industries is authorized to retain Cash in the amount of $25,000

for all operations of Reorganized Industries other than those operations, if any, related to the

Industries Retained Assets and/or services to be provided to the Liquidating Trust (which shall be

funded, if at all, under the Management Agreement).

        c.        In the event that the Debtors own the Coffeyville Assets on the

Effective Date, on the Effective Date, (i) all of the Debtors' right, title and interest in the

Coffeyville Assets shall be transferred to the Coffeyville LLC, and (ii) the executory contracts and

unexpired leases listed on Plan Exhibit E shall be assumed and assigned to the Coffeyville LLC;

provided, however, that the Liquidating Trustee shall have the option (at its sole discretion in

accordance with the Liquidating Trust Agreement) to transfer any of the Coffeyville Assets to the

Liquidating Trust.  The Liquidating Trust is authorized to fund the Coffeyville LLC with Cash in the amount determined by the Court on or prior to the Effective Date to constitute sufficient capitalization for the continued maintenance of the Coffeyville LLC and any necessary remediation or other regulatory compliance related to the Coffeyville Assets.

        d.      On the Effective Date, (i) all of the Debtors' right, title and interest in each Transferred Asset owned by the Debtors on the Effective Date shall be transferred to a Transferred Asset Trust, and (ii) the Liquidating Trust is authorized to fund each Transferred Asset Trust with that amount of capital set forth on Plan Exhibit D (or, with respect to the Kansas Transferred Assets, such other amount as determined by the Court prior to the Effective Date) for the maintenance, remediation (or other regulatory compliance) and/or disposition of each such Transferred Asset.  In the event that the Debtors modify any information contained on Plan Exhibit D after the Confirmation Date, the Debtors shall provide notice of such modification (the "Exhibit D Modification") to the United States Environmental Protection Agency and to the state regulatory agency involved with the Transferred Asset affected by the Exhibit D Modification and such parties may object to the Exhibit D Modification within twenty days after service of such notice. The trust documents and related documents for each Transferred Asset Trust (substantially in the forms that have been filed with the Court) are hereby approved.

        e.      On the Effective Date, SFA, Transportation and Pipeline shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Debtors shall file with the appropriate public office certificates of dissolution.

f.    From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, to withdraw their business operation from any state in which the Debtors were previously conducting their business operations.

3.    Discharge, Releases and Related Provisions

a.    No Discharge of the Debtors

The Debtors shall not be discharged by operation of Section 1141 of the Bankruptcy Code.

b.    Releases

Pursuant to Section 5.8 of the Plan, on the Effective Date, the Debtors and the Liquidating Trustee, on behalf of the Liquidating Trust, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan (other than the rights of the Debtor, the Liquidating Trust or the Liquidating Trustee to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan, and that may be asserted by or on behalf of the Debtors or their Estates or the Liquidating Trust against the Lenders, the agents under the Pre-Petition Credit Agreement, the financial

1708411.6

23

institutions party to the DIP Credit Agreement, the agents under the DIP Credit Agreement, and

their respective agents and professionals.

c.    <u>Exculpation</u>

(i)    Subject to limitations required by applicable ethical rules

and standards of conduct, and except as limited in subparagraph (ii)[2/], none of the Debtors, the

Liquidating Trust, the Liquidating Trustee, the Bankruptcy Committees, the Indenture Trustees, the

Lenders, the financial institutions party to the DIP Credit Agreement, nor any of their respective

present or former members, officers, directors, employees, advisors, or attorneys shall have or

incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of

their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or

any of their successors or assigns, for any act or omission from and after the Petition Date in

connection with, relating to, or arising out of, the Chapter 11 Case, the commencement of the

Chapter 11 Case, the administration of the Chapter 11 Case, the pursuit of and the approval of the

sales of the Debtors' assets (and the related asset purchase agreement), the formulation, negotiation

or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of

confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the

administration of the Plan or the property to be distributed under the Plan, except for their gross

negligence or willful misconduct; <u>provided</u>, <u>however</u>, any present or former officer or director of

any Debtors shall be liable to any holder of a Claim or Interest, or any other party in interest, or

any of their successor or assigns, for: (i) any breach of such person's duty of loyalty to the Debtors,

(ii) any act or omission not in subjective good faith or which involves intentional misconduct or a

knowing violation of law, and (iii) any transaction for which such person derived an improper

---

[2/]    All references to "subparagraph" contained in this Section III.C.3.c shall be deemed to refer to the appropriate subparagraph of Section III.C.3.c of the Confirmation Order.

benefit, and in all respects such persons shall be entitled to reasonably rely upon the advice of the

Debtors' counsel (including in-house counsel) with respect to their duties and responsibilities

under the Plan.  In addition, the Indenture Trustees under the Demand Certificates and the

Subordinated Certificates shall not have or incur any liability to any holder (registered or

unregistered) of any Demand Certificate or Subordinated Certificate or any claim based on any

Demand Certificate or Subordinated Certificate as a result of any inaccuracy or mistake in the

books and records of Industries (in their capacities as paying agents and registrars under the Trust

Indentures for the Demand Certificates and the Subordinated Certificates.

        (ii)     The exculpatory provisions contained in subparagraph (i)

(x) shall not limit the claims and rights, if any, of the United States, and (y) shall apply to any

person or entity who was not the beneficiary of a post-petition indemnification obligation of the

Debtors only to the extent provided in subparagraph (iii).

        (iii)     Any claims that would otherwise be subject to the

exculpatory provisions contained in subparagraph (i) but for the provisions of subparagraph (ii)(y)

may only be asserted in the Court and only if filed on or before ninety days after the Effective

Date.  In the event that any such claims are not filed timely in the Court, the exemption contained in

subparagraph (ii)(y) shall be terminated with respect to such claims, and such claims shall be

deemed subject to the exculpatory provisions contained in subparagraph (i).

        (iv)     Any non-exculpated claims against the parties set forth in

subparagraph (i) arising from or related to the matters set forth in subparagraph (i) may only be

asserted and filed in the Court.

(v)    The Court retains exclusive jurisdiction to determine all matters arising from or related to claims against the parties set forth in subparagraph (i) that arise from or relate to the matters set forth in subparagraph (i).

(vi)    The exculpation provisions contained in Section 11.9(a) of the Plan shall not discharge or enjoin collection from any responsible non-Debtor parties who may be liable for taxes owed by the Debtors to governmental units.

4.    <u>Rights and Claims of the United States</u>

Nothing in the Plan or anything filed with it, attached to it, incorporated in it, or referred to in it, and nothing in any Order of the Court shall be construed to, or operate to, bar the United States from pursuing any police or regulatory actions against the Debtors or their successors or assigns.  Further, nothing in the Plan or anything filed with it, attached to it, incorporated in it, or referred to in it, and nothing in any Order of the Court shall affect or limit in any manner the rights and claims of the United States against non-Debtors.

5.    <u>Creation of the Liquidating Trust; Appointment of the Liquidating Trustee</u>

In accordance with the Court's findings contained in the record of the Confirmation Hearing, the Court hereby approves (i) the Liquidating Trust Agreement, substantially in the form attached to the Plan as <u>Plan Exhibit A</u>, (ii) the creation of the Liquidating Trust, and (ii) the appointment of JPM as the Liquidating Trustee for and on behalf of the Debtors, effective as of the Effective Date.  From and after the Effective Date, the Liquidating Trustee shall serve on behalf of the Debtors in accordance with the terms of the Plan, the Liquidating Trust Agreement and the JPM Engagement Letter (substantially in the form filed with the Court) and shall possess and retain all rights and powers conferred upon the Liquidating Trustee by the Liquidating Trust Agreement, the Plan and any order of the Court.  Notwithstanding the foregoing, the Debtors shall distribute the

JPM Engagement Letter to the Bankruptcy Committees, and the Bankruptcy Committees shall have five days thereafter to file an objection with the Court objecting to the compensation to be paid to JPM.  The Court hereby approves and designates the Liquidating Trust and the Liquidating Trustee as a representative of each Estate and finds that the Liquidating Trust and the Liquidating Trustee are acting on behalf of and for the benefit of the Beneficiaries in accordance with the distribution scheme set forth in the Plan.

6.    Creation of the Post-Confirmation Committee

The Court hereby approves (i) the creation of the Post-Confirmation Committee, effective as of the Effective Date, and (ii) the appointment of Committee Members, whose identities have been disclosed to the Court.  The Post-Confirmation Committee shall have the rights and responsibilities set forth in the Plan and the Liquidating Trust Agreement.

7.    Exemption from Stamp Tax or Similar Tax

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers in the United States from a Debtor to the Liquidating Trust or any other Entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents are hereby ordered to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8.    Cancellation of Industries Common Shares

As provided by the Plan, on the Effective Date (or such later date(s) as may be determined by Reorganized Industries with the consent of the Liquidating Trustee), (i) that amount

of Industries Common Shares whose cancellation, in the Debtors' reasonable judgment, can be

offset in full against appropriate losses and net operating losses shall be deemed canceled on a Pro

Rata basis without further act or action under any applicable agreement, law, regulation, order or

rule, and the Industries Common Shares evidenced thereby shall be extinguished, and (ii) any

remaining Industries Common Shares shall be deemed Reinstated.

9.    Corporate Actions

a.    As of or following the Effective Date, pursuant to Sections 1123(a)

and 1142(b) of the Bankruptcy Code, Section 303 of the Delaware General Corporation Law

(regardless of the state of incorporation) and the applicable law of the state of incorporation of

Reorganized Industries not inconsistent with Section 303 of the Delaware General Corporation

Law, Reorganized Industries shall be, and hereby is, authorized, in accordance with applicable

terms of the Plan, the Liquidating Trust Agreement, the Management Agreement and this

Confirmation Order, to take all actions necessary to implement the amended certificate of

incorporation and bylaws of Reorganized Industries (substantially in the forms that have been filed

with the Court).

b.    Pursuant to Section 1142(b) of the Bankruptcy Code, Section 303 of

the Delaware General Corporation Law (regardless of the state of incorporation) and the

applicable law of the state of incorporation of such Debtor or Reorganized Industries not

inconsistent with Section 303 of the Delaware General Corporation Law, the Debtors and

Reorganized Industries shall be, and hereby are, authorized and directed to effectuate the Plan, the

transactions contemplated by the Plan, the Plan Documents and this Confirmation Order, to take

any proceedings or actions provided for or contemplated by the Plan, the Plan Documents or this

Confirmation Order, and to execute, deliver, implement and perform their obligations under Plan,

the Plan Documents and any other agreements, instruments and other documents that may be

necessary or appropriate for the implementation or consummation of the Plan, all without further

action by their respective directors or stockholders, and with like effect as if such actions had been

taken by unanimous action of the respective directors and stockholders of the appropriate Debtor

or Reorganized Industries.

        c.      Pursuant to Section 1142(b) of the Bankruptcy Code and Section

303 of the Delaware General Corporation Law (regardless of the state of incorporation), if any of

the actions described in the Plan or this Confirmation Order would otherwise require the consent

or approval of the directors or stockholders of any Debtor or Reorganized Industries, this

Confirmation Order shall constitute such consent or approval, and such actions shall be, and

hereby are, deemed to have been taken by unanimous action of the directors and stockholders of

the appropriate Debtor or Reorganized Industries.

        10.      <u>Objections to Claims</u>

      From and after the Effective Date, the Liquidating Trustee shall have the exclusive

right to make and file and continue prosecution of objections to the allowance, classification

and/or amount of any Claim or Interest with the Court, and shall serve such objections upon

holders of each of the Claims and Interests to which objections are made by the Objection

Deadline.  The Objection Deadline shall be 180 days after the Effective Date, unless such date is

extended by the Court upon request by the Liquidating Trustee.

        11.      <u>Interest on Allowed Priority Tax Claims</u>

      Priority Tax Claims that are allowed on or after the Effective Date shall accrue

interest at the applicable legal rate from the Effective Date until the date of actual payment.

        12.      <u>Payment of Fees and Expenses of Indenture Trustees</u>

Without further order of the Bankruptcy Court except as provided below, the Liquidating Trustee, on the Initial Distribution Date, shall pay all properly documented previously unpaid fees and expenses of the Indenture Trustee for services rendered during the period up to and including the Effective Date, including the compensation, disbursements and expenses of the agents and legal counsel to the Indenture Trustees, in connection with the performance of their duties under the Trust Indentures and IRB Indentures. Upon payment in full of such fees and expenses, the liens of the Indenture Trustee on the current distributions to the holders of the Demand Certificates, Subordinated Certificates and Industrial Revenue Bonds, as applicable, for such fees and expenses shall be released and extinguished. Payment of such fees and expenses shall be deemed to be a distribution on account of the Allowed Claims of the Holders of the Demand Certificates, Subordinated Certificates or Industrial Revenue Bonds, as applicable, and the Liquidating Trustee shall deduct all such amounts paid from the initial distributions to be made to the holders of such Claims. The Indenture Trustees may, but shall not be required to, make application to the Bankruptcy Court for payment of such fees and expenses as an administrative expense claim under 11 U.S.C. § 503 or otherwise. In the event of a dispute between the Liquidating Trustee and any Indenture Trustee about the amount of any fees and expenses to be paid to such Indenture Trustee, unless such Indenture Trustee elects to make an application under 11 U.S.C. § 503, then (i) the dispute concerning such fees and expenses shall be submitted to the Bankruptcy Court and the dispute shall be resolved by the Bankruptcy Court in accordance with the standard for allowance and payment of fees and expenses under the applicable Trust Indenture or IRB Indenture (and not with any reference to "substantial contribution" under Sections 503(b)(3), (4), or (5) of the Bankruptcy Code), and (ii) pending resolution of such dispute, the liens of such Indenture Trustee shall not be released and the Liquidating Trustee shall reserve sufficient amounts

from the distributions to holders of Class 4 Claims, Class 5 Claims or General Unsecured Claim

of the Industrial Revenue Bonds (as applicable) to pay the disputed fees and expenses in full.

13.     Interest on Demand Certificates

For purposes of Section 3.5 of the Plan, the effective interest rate payable on the

Demand Certificates as of the Petition Date was 7.5% per annum.

14.     No Distributions on Account of PBGC Claims

All of the PBGC Claims have been satisfied in full, and no further distributions

will be made to the PBGC under the Plan.

15.     Resolution of Agriliance Claims

As of the Effective Date, Reorganized Industries shall, on behalf of itself, its

successors and assigns, release any and all claims or demands, including, but not limited to claims

arising under 11 U.S.C. § 544(a), against Agriliance LLC ("Agriliance") for the avoidance of

Agriliance's ownership interest in, and Industries' transfer of ownership to, the real property used

by Industries in the wholesale marketing of plant food and crop protection products in North

America located in (a) Jonesboro, Arkansas, (b) Crescent City, Illinois, (c) Muscatine, Iowa, (d)

Council Bluffs, Iowa, (e) St. Paul, Minnesota, (f) Grant, Nebraska, and (g) Watertown, South

Dakota (collectively, the "Transferred Property").  As of the Effective Date, Agriliance shall, on

behalf of itself, its successors and assigns, release any and all claims or demands relating to

Industries' transfer of ownership of the Transferred Property to Agriliance, including, but not

limited to, claims under Section 8.3 of the Joint Venture Agreement effective January 1, 2000.

Within five Business Days after the Effective Date, Reorganized Industries shall deliver to

Agriliance deeds to the Transferred Property in form sufficient to evidence the prior transfer of the

Transferred Property from Industries to Agriliance.   Reorganized Industries shall pay to

Agriliance, by wire transfer on the earlier of the date the parties agree upon an amount or the Determination Date (as defined below), the amount of damages incurred by Agriliance (measured solely by the amount of commissions lost by Agriliance as a result of the sales described in this sentence) for the sales of product by Industries in violation of Section 8.3 of the Joint Venture Agreement among the Debtors, Cenex Harvest States Cooperatives, United Country Brands LLC and Land O'Lakes, Inc., effective January 1, 2000 (the "Joint Venture Agreement"). The process for determining the amount of damages (measured as stated above) shall be as follows: Reorganized Industries agrees to deliver to Agriliance any and all information requested by Agriliance pursuant to written request made to Reorganized Industries with respect to sales of fertilizer products to entities other than Agriliance. Within ten days after the Effective Date or the date on which the sale of the Coffeyville Asset is closed (provided that the parties acknowledge that the damages claim sought by Agriliance is not limited to sales from the Coffeyville facility), whichever occurs later, Agriliance shall deliver to Reorganized Industries the amount it alleges as the proper amount along with its underlying calculations and assumptions. Within ten days thereafter, Reorganized Industries shall deliver to Agriliance the amount it alleges as the proper amount along with its underlying calculations and assumptions. The senior management of each of Reorganized Industries and Agriliance will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through the negotiations of senior management within 60 days after the delivery of Reorganized Industries response, such dispute shall be resolved fully and finally in Kansas City, Missouri by an arbitrator selected pursuant to, and an arbitration governed by, the Commercial Arbitration Rules of the American Arbitration Association. The arbitrator shall resolve the dispute within 30 days after selection (such date of resolution, the "Determination Date") and judgment upon the award rendered by such arbitrator shall be deemed an

1708411.6

Administrative Claim against Industries to be paid under the terms of the Plan, and may be entered in any court of competent jurisdiction.

16.     Establishment of Class 11 Distribution Pool

Cash in the amount of $6,500,000 shall be reserved by the Liquidating Trustee in the Class 11 Distribution Pool; provided, however, that the Liquidating Trustee shall have the right to reduce the amount of Cash reserved in the Class 11 Distribution Pool in the event that such amount is determined to be in excess of the amount actually available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares.

17.     Provisions Related to DIP Loan Claims

Within 20 days after the Confirmation Date (but in no event after the Effective Date), each party to that certain appeal entitled *The Official Committee of Unsecured Creditors of Farmland Industries, Inc., et al., Appellant, v. Farmland Industries, Inc. and Deutsche Bank Americas Trust Company, as Agent, Appellees*, Case No. 03-0472-CV-W-DW, currently pending in the United District Court for the Western District of Missouri (the "DIP Appeal") shall execute an agreement reasonably acceptable to each party approving the voluntary dismissal of the DIP Appeal with prejudice (the "DIP Appeal Agreement").  Counsel for the Debtors shall hold the DIP Appeal Agreement, in escrow, pending the occurrence of the Effective Date.  In the event that the DIP Appeal is still pending on the Effective Date, on the Effective Date, the Debtors are authorized and directed to file the DIP Appeal Agreement with the clerk of the United States District Court for the Western District of Missouri (the "Clerk"), to pay any court costs or fees that may be due and to perform such other acts as shall be necessary (whether pursuant to Bankruptcy Rule 8001(c) or otherwise) to effectuate the dismissal of the DIP Appeal.  Until such time as the Clerk has entered an order dismissing the DIP Appeal with prejudice, the Effective Date shall not

be deemed to have occurred, which condition to the Effective Date can only be waived by the Debtors with the consent of the DIP Lenders.

Nothing in the Plan shall alter or modify that certain Final Order Authorizing Debtors To Obtain Post-Petition Replacement Letters Of Credit Pursuant To 11 U.S.C. § 364 And Approving And Authorizing Agreement For Adequate Protection For DIP Lenders And Authorizing Debtors To Enter Into Collateral Account Agreement With DIP Lenders, dated November 7, 2003.  On and after the Effective Date, the funds currently held by Deutsche Bank Trust Company Americas, as agent for the Pre-Petition Lenders and the DIP Lenders (the "Agent"), in the collateral account established in connection with that certain Agreement Regarding Adequate Protection, dated as of November 7, 2003 (the "Adequate Protection Agreement"), including without limitation the expense reserve delivered to the Agent pursuant to Section 5F of the Adequate Protection Agreement, shall continue to be held by the Agent in accordance with the terms and conditions of the Adequate Protection Agreement. The Agent shall be entitled to apply such funds to any and all obligations and liabilities of every nature arising under either the Pre-Petition Credit Agreement, the DIP Credit Agreement or the Adequate Protection Agreement, including without limitation, claims for fees and expenses, including attorneys' fees and expenses, indemnification obligations and reimbursement claims for draws on existing letters of credit. The Agent shall be entitled to draw on such funds in accordance with the terms and conditions of the Adequate Protection Agreement without any demand or presentation to any party, including without limitation the Debtors and the Liquidating Trustee, and without any application to the Bankruptcy Court.  Those sections and subsections specified in section 10.9 of the Pre-Petition Credit Agreement and Section 10.9 of the DIP Credit Agreement shall survive confirmation of the Plan.

18.     <u>Disputed Claim Reserve for Disputed Claims of Safeco Insurance Company</u>

Unless otherwise ordered by the Court, on the Effective Date the Liquidating Trustee shall reserve $46,700,000 in a Disputed Claims Reserve on account of the Disputed Claim of Safeco Insurance Company, to be maintained in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

19.     Workers' Compensation Procedures

The Liquidating Trustee (as successor to the Debtors and representative of the Estates), in consultation with the Post-Confirmation Committee, shall be authorized to settle, resolve and pay workers' compensation claims against the Debtors, in accordance with the procedures established in the Order Granting Debtors Motion for Omnibus Authority to Effectuate Settlements with Workers' Compensation Claimants and Establishing Procedures for Resolution of Contested Workers' Compensation Claims dated February 19, 2003, as modified herein.  The Liquidating Trustee, in consultation with the Post-Confirmation Committee, is authorized to settle workers' compensation claims against the Debtors (each such settlement, a "Compensation Settlement").  The automatic stay is hereby modified solely to permit approval of Compensation Settlements by the appropriate administrative tribunals, without the need for entry into a Stipulation for Relief from the Automatic Stay (each, a "Stay Stipulation"), and without further notice or hearing.  With respect to those workers' compensation claims that cannot be resolved by Compensation Settlements, the Liquidating Trustee, in consultation with the Post-Confirmation Committee, shall be authorized to enter into a Stay Stipulation with such claimant to permit such workers' compensation claim to be adjudicated by the appropriate administrative tribunal, which Stay Stipulation shall be effective immediately upon the filing of a notice of such Stay Stipulation with the Court.  The Liquidating Trustee shall be authorized to pay workers' compensation claims upon the entry of a final, non-appealable order by such administrative tribunal (each, a

"Compensation Award").   Upon payment of such Compensation Settlement or Compensation Award, or upon the entry of a judgment in favor of the Liquidating Trustee which does not require further payments, such workers' compensation claimant shall be deemed to have withdrawn its proof of claim, if any, filed in the Chapter 11 Case.

20.    Settlement with Retiree Committee

On or as soon as reasonably practicable after the Effective Date, the Liquidating Trustee shall distribute Cash in the aggregate amount of $7,600,000 (the "Settlement Payment") in accordance with the Proposed Methodology for Distribution of Retirees' Benefits (Docket # 7212) to the then participants in the three retiree benefit programs (the "Retiree Benefit Programs") as such programs were modified and terminated in accordance with 11 U.S.C. Section 1114 pursuant to agreement of the Debtors, the Bankruptcy Committees and the official committee of retired employees appointed by order dated September 23, 2003 (the "Retiree Committee") and approved by the Court on or about December 16, 2003 (the "Settlement").   Payment of the pro rata portion of the Settlement Payment to each participant in the two Executive Split Dollar Insurance Plans terminated by the Settlement shall be conditioned upon the entitled participant executing and delivering a full release to the Debtors and the Retiree Committee.   The Settlement shall be deemed to constitute the release of any and all claims against the Debtors, their successors, or the Retiree Committee, that any participant in the Retiree Benefit Programs has or may have relating to or arising out of such Retiree Benefit Programs and/or the Settlement.

21.    Continued Retention of Special Litigation Counsel by Litigation Trust

Notwithstanding any other provision of the Plan or this Confirmation Order, and pursuant to its authority under Section 5.4 of the Plan, the Liquidating Trust shall, effective as of the Effective Date, continue the retention and employment of Dickstein Shapiro Morin & Oshinsky

LLP ("Dickstein"), Schmiedeskamp, Robertson, Neu & Mitchell ("Schmiedeskamp") and Lindquist & Vennum P.L.L.P. ("Lindquist") as special litigation co-counsel to the Liquidating Trust, as successor to the Debtors, for Dickstein, Schmiedeskamp and Lindquist to continue to provide legal services in connection with the Debtors' claims and causes of action against the producers of various vitamin products and amino acids for, among other things, price fixing in violation of federal and state antitrust laws, solely on the terms and conditions set forth in this paragraph and in (1) the engagement letter dated May 25, 1999 between Dickstein, Schmiedeskamp and the Debtors (the "Retention Agreement"), (2) the co-counsel agreement between Dickstein and Schmiedeskamp dated June 9, 1999 (the "Co-Counsel Agreement"), (3) the affiliation agreement between Dickstein and Lindquist (the "Affiliation Agreement"), and (4) the Order Authorizing Debtor and Debtor in Possession to Continue to Employ Dickstein Shapiro Morin & Oshinsky LLP, Schmiedeskamp, Robertson, Neu & Mitchell, and Lindquist & Vennum P.L.L.P. as Special Litigation Counsel in connection with the Vitamin Litigation, entered by the Court on June 21, 2002 (collectively, the "Employment Order"); provided, that the Liquidating Trust shall pay Dickstein, Schmiedeskamp and Lindquist for such legal services rendered by them without further notice, motion, application or order from the Court; and provided further, that the Liquidating Trust's continued retention and employment of Dickstein, Schmiedeskamp and Lindquist as special litigation co-counsel as set forth in this paragraph shall not otherwise be affected by or subject to any other term or provision of the Plan or this Confirmation Order that is not consistent with the terms of the Retention Agreement, Co-Counsel Agreement, Affiliation Agreement or the Employment Order, including without limitation any term or provision relating to the assumption or rejection of executory contracts and unexpired leases, the retention of

Professionals, the compensation of Professionals, or the transfer of any Estate property free and clear of liens, claims, interests and encumbrances.

Notwithstanding any other provision of the Plan or this Confirmation Order, and pursuant to its authority under Section 5.4 of the Plan, the Liquidating Trust shall, effective as of the Effective Date, continue the retention and employment of Dickstein and Schmiedeskamp as special litigation counsel to the Liquidating Trust, as successor to the Debtors, for Dickstein and Schmiedeskamp to continue to provide legal services in connection with the Debtors' claims and causes of action against the producers of various corrugated containers and/or corrugated sheets for, among other things, price fixing in violation of federal and state antitrust laws, solely on the terms and conditions set forth in this paragraph and in (1) the engagement letter dated March 5, 2003 between Dickstein and the Debtors (the "Linerboard Retention Agreement"), (2) the co-counsel agreement between Schmiedeskamp and Dickstein dated August 7, 2003 (the "Linerboard Co-Counsel Agreement"), and (3) the Order Authorizing Debtor and Debtor in Possession to Employ Dickstein Shapiro Morin & Oshinsky LLP and Schmiedeskamp, Robertson, Neu & Mitchell as Special Litigation Counsel in connection with the Linerboard Litigation, entered by the Court in the Chapter 11 Case (collectively, the "Linerboard Employment Order"); provided, that the Liquidating Trust shall pay Dickstein and Schmiedeskamp for such legal services rendered by them without further notice, motion, application or order from the Court; and provided further, that the Liquidating Trust's continued retention and employment of Dickstein and Schmiedeskamp as special litigation co-counsel as set forth in this paragraph shall not otherwise be affected by or subject to any other term or provision of the Plan or this Confirmation Order that is not consistent with the terms of the Linerboard Retention Agreement, the Linerboard Co-Counsel Agreement or the Linerboard Employment Order, including without limitation any term or provision relating to

the assumption or rejection of executory contracts and unexpired leases, the retention of Professionals, the compensation of Professionals, or the transfer of any Estate property free and clear of liens, claims, interests and encumbrances.

D.     Substantial Consummation

The substantial consummation of the Plan, within the meaning of Section 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

E.     Payment of Statutory Fees

On or before the Effective Date, the Debtors or the Liquidating Trustee, as the case may be, shall pay all fees payable pursuant to 28 U.S.C. § 1930. After the Effective Date, the Liquidating Trustee shall continue to pay such fees until a final decree is entered closing each Chapter 11 Case.

F.     Reference to and Validity and Enforceability of Plan Provisions

The failure to reference any particular provision of the Plan in this Confirmation Order shall have no effect on the binding effect, enforceability or legality of such provision and such provisions shall have the same binding effect, enforceability or legality as every other provision of the Plan. Each term and provision of the Plan, as modified or interpreted by the Court, is valid and enforceable pursuant to its terms.

G.     Solicitation of Plan

Pursuant to and in accordance with Section 1125(e) of the Bankruptcy Code, all persons that solicited acceptances or rejections of the Plan shall not be liable, on account of such solicitation, for violation of any applicable law, rule or regulation governing solicitation of acceptance of a plan.

H.     Retention of Jurisdiction

1708411.6

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of this Confirmation Order and the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising under, arising out of, or related to, the Chapter 11 Case, the Plan and the Liquidating Trust Agreement to the fullest extent permitted by law, including, among other things, jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests; provided, however, that, notwithstanding anything in the Plan or other relevant documents to the contrary, the Bankruptcy Court may estimate and/or limit any Claims only to the extent permitted by law;

2.      Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Liquidating Trustee shall be made in the ordinary course of business and shall not be subject to the approval of the Court;

3.      Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

4.      Effectuate performance of and payments under the provisions of the Plan;

5.     Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

6.     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or this Confirmation Order;

7.     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

8.     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Court, including, without limitation, this Confirmation Order;

9.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, consummation, or enforcement of the Plan or this Confirmation Order;

10.     Enter and implement such orders as may be necessary or appropriate if this Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

11.     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, this Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or this Confirmation Order;

1708411.6

12.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

13.     Except as otherwise limited in the Plan or this Confirmation Order, recover all assets of the Debtors and property of the Estates, wherever located;

14.     Hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

15.     Hear and determine such other matters as may be provided in this Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

16.     Enter a final decree closing each Chapter 11 Case.

Notwithstanding the foregoing, nothing shall preclude a court or tribunal that otherwise has jurisdiction and authority over any environmental matter from exercising such jurisdiction and authority, provided that if such a court or tribunal determines that a liability determination requires interpretation or enforcement of the Plan, the parties shall seek the Court's interpretation or enforcement of the Plan. The U.S. EPA and the Debtors agree that "Additional Sites" pursuant to the Settlement Agreement between the U.S. EPA and the Debtors may be raised at any time consistent with the Plan.

I.     Notice of Entry of Confirmation Order

1.     Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtors are hereby directed to serve a notice of the entry of this Confirmation Order, substantially in the form attached hereto as Exhibit 1 (the "Confirmation Notice"), on all holders of Claims and Interests and all other persons on whom the Confirmation Hearing Notice was served no later than 30 days

1708411.6

42

after the Confirmation Date; provided, however, that the Debtors shall be obligated to serve the

Confirmation Notice only on the record holders of such Claims and Interests.

       2.     The Debtors are hereby directed to publish the Confirmation Notice in the

following publications no later than 30 days after the Confirmation Date:

       a.     The Wall Street Journal (National Edition);

       b.     Kansas City Star;

       c.     Feedstuffs.

       Therefore, in consideration of all of the foregoing, IT IS ORDERED that the Plan is

hereby CONFIRMED and this Confirmation Order shall be effective immediately upon entry.

Dated:  December 19, 2003

               /s/ Jerry W. Venters
               UNITED STATES BANKRUPTCY JUDGE

Laurence M. Frazen, Esq.
Cynthia Dillard Parres, Esq.
Robert M. Thompson, Esq.
BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri  64105

Gregory D. Willard, Esq.
David M. Unseth, Esq.
Cullen K. Kuhn, Esq.
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750

Attorneys for the Debtors and Debtors-in-Possession to Serve

# **EXHIBIT 1**

**(Confirmation Notice)**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| | ) | |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors. | ) | Joint Administration |

**NOTICE OF CONFIRMATION OF**
**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED**

By Order dated December ___, 2003 (the "Confirmation Order"), the Bankruptcy Court confirmed the Debtors' Second Amended Joint Plan of Reorganization, as Modified (the "Plan"). Unless otherwise defined in this Notice, capitalized terms and phrases used herein shall have the meanings assigned to them in the Plan and the Confirmation Order, which in all respects govern the matters set forth herein. The Effective Date of the Plan is the date on which the conditions set forth in Article X of the Plan have been satisfied or waived as provided therein.

Subject to the provisions of Section 11.10 of the Plan, on and after the Confirmation Date, the provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, their respective successors and assigns (including, but not limited to, the Liquidating Trust and the Liquidating Trustee), and all other parties-in-interest in this Chapter 11 Case.

Except as otherwise provided in the Plan and in any agreements executed pursuant to the Plan or the Confirmation Order, on and after the Effective Date the Liquidating Trust and the Liquidating Trustee, as the representative of each Estate, except as otherwise limited in the Liquidating Trust Agreement, Plan or the Confirmation Order, shall be vested with all property, rights, interests, and powers of the Debtors and shall have all rights, powers, authority and duties set forth in the Plan, the Liquidating Trust Agreement and the Confirmation Order.

On the Effective Date (or such later date(s) as may be determined by Reorganized Industries with the consent of the Liquidating Trustee), (i) that amount of Industries Common Shares whose cancellation, in the Debtors' reasonable judgment, can be offset in full against appropriate losses and net operating losses shall be deemed canceled on a Pro Rata basis without further act or action under any applicable agreement, law, regulation, order or rule, and the Industries Common Shares evidenced thereby shall be extinguished, and (ii) any remaining Industries Common Shares shall be deemed Reinstated.

**DEADLINES FOR FILING REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS**

Other than as set forth in the Section 11.1 of the Plan and except with respect to payments payable in connection with post-petition severance obligations of the Debtors and the KERIT Plan, all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trust and, if prior to the Effective Date, counsel for the Debtors and each Bankruptcy Committee no later than 30 days after the Effective Date. In the event that the Debtors or the Liquidating Trustee, as the case may be, object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

**REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Except as otherwise provided in Section 6.3 of the Plan and in the Confirmation Order, on the Effective Date, all executory contracts and unexpired leases that exist between a Debtor and any Entity (including, without limitation, the Trust Indentures) shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (a) which has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date or pursuant to the Confirmation Order, or (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date (except to the extent that any such motion is ultimately denied or withdrawn). Entry of the Confirmation Order constituted the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases pursuant to the Plan.

If the rejection of an executory contract or unexpired lease during the Chapter 11 Case (including any rejection of an executory contract or unexpired lease pursuant to Section 6.1 of the Plan) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor, the Liquidating Trust, the Liquidating Trustee or the properties of any of them unless a proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors, and counsel to the Bankruptcy Committees, (i) if such rejection is effective on or prior to the Confirmation Date, within 30 days after the Confirmation Date, (ii) if such rejection is effective after the Confirmation Date, within 30 days after service of notice of such rejection, or (iii) if such rejection is pursuant to Section 6.1 of the Plan, within 30 days after the Effective Date.

## TENDER OF SECURITIES AND INSTRUMENTS

Except as otherwise required by the Liquidating Trustee, as a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, each holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods shall tender the applicable instruments, securities or other documentation evidencing such Claim or Interest to the Liquidating Trustee in accordance with written instructions to be provided to such holders by the Liquidating Trustee as promptly as practicable following the Effective Date. All tendered instruments and documentation relating to Industrial Revenue Bonds, Demand Certificates and Subordinated Certificates shall be marked as cancelled. All tendered securities and documentation relating to Old Securities of Foods shall be held by the Liquidating Trustee.

In addition to any requirements under the applicable certificate or articles of incorporation or by-laws of the applicable Debtor, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed shall, in lieu of tendering such instrument, security or documentation, deliver to the Liquidating Trustee (i) evidence satisfactory to the Liquidating Trustee or the applicable Indenture Trustee for the Industrial Revenue Bonds of the loss, theft, mutilation or destruction; and (ii) such indemnity or security as may be required by the Liquidating Trustee to hold the Liquidating Trustee and the Liquidating Trust harmless from any damages, liabilities or costs incurred in treating such individual as a holder of Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed. Upon compliance with this requirement by a holder of a Claim or Interest evidenced by Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods, such holder shall, for all purposes under the Plan, be deemed to have tendered its Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods.

Except as otherwise required by the Liquidating Trustee, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that fails to tender or is deemed to have failed to tender the applicable instruments, securities and documentation required to be tendered hereunder within one year after the Effective Date shall have its Claim or Interest discharged and shall be forever barred from asserting such Claim or Interest against the Liquidating Trust or its property and any distribution to have been made on account of such Claim or Interest shall be treated as an undeliverable distribution in accordance with Section 7.7 of the Plan.

As a condition precedent to receiving any distribution from the Class 8 Redemption Account, on or before 180 days after the Effective Date, holders of Industries Preferred Shares must tender and assign to the Liquidating Trustee the applicable instruments, securities or other documentation evidencing such Industries Preferred Shares and any causes of action against any person or entity arising from or related to those Industries Preferred Shares, all in accordance with written instructions to be provided to holders of Industries Preferred Shares by the Liquidating Trustee as promptly as practicable following the Effective Date. If for any reason the Liquidating Trustee can not assert the causes of action, claims or rights, then the holder shall assign to the Liquidating Trustee the causes of action and/or claims and agrees to provide  to the Liquidating Trustee such cooperation as may be necessary for the Liquidating Trustee to prosecute and realize upon the causes of actions and/or claims in the name of such Industries Preferred Shareholders.  It shall be a condition precedent to such cooperation that the Liquidating Trustee shall provide indemnification and expense reimbursement reasonably acceptable to such Industries Preferred Shareholders. Any holder of Industries Preferred Shares that fails to tender or is deemed to have failed to tender the applicable instruments, securities, documentation, causes of action, claims and rights required to be tendered and assigned hereunder within 180 days after the Effective Date shall be forever barred from receiving any distribution from the Class 8 Redemption Account and any funds held in the Class 8 Redemption Account on account of such Industries Preferred Shares shall be withdrawn by the Liquidating Trustee from the Class 8 Redemption Account and administered in accordance with the Plan.

## NO DISCHARGE

The Debtors shall not be discharged by operation of Section 1141 of the Bankruptcy Code of and from any and all debts and claims that arose against them before the date of entry of the Confirmation Order.

## COPIES OF CONFIRMATION ORDER

Copies of the Confirmation Order may be obtained by contacting Bankruptcy Management Corporation at the toll free number (888) 909-0100 or via Bankruptcy Management Corporation's website www.bmccorp.net/farmland.

Dated: December ___, 2003                                    BY ORDER OF THE COURT

1708411.6

E-FILED
Wednesday, 31 May, 2006  04:42:45 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 3

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **In Re:  FARMLAND INDUSTRIES, INC.**  )  | **In Proceedings Under Chapter 11** |
| **FARMLAND FOODS, INC.  SFA, INC.**  )  | **Case No. 02-50557-JWV  Case No. 02-** |
| **FARMLAND TRANSPORTATION, INC.**  )  | **50561-JWV  Case No. 02-50562-JWV** |
| **FARMLAND PIPE LINE COMPANY**  )  | **Case No. 02-50564-JWV  Case No. 02-** |
| **Debtors.**  )  | **50565-JWV  Joint Administration** |
| )  | |
| )  | |
| )  | |
| )  | |
| )  | |
| )  | |
| )  | |
| )  | |

## ORDER ESTABLISHING BAR DATE FOR FILING PROOFS OF
## CLAIM OR INTEREST AND APPROVING FORM OF NOTICE

This matter, having come before the Court upon the Debtors' Motion for
Order Establishing Bar Date for Filing Proofs of Claim or Interest and Approving Form
of Notice (the "Motion"), and having considered the Motion, the arguments of counsel
and for good cause shown, the Court finds as follows:

IT IS HEREBY ORDERED that the bar date (the "Bar Date") for filing
proofs of claim or interest by all creditors and equity security holders, including the
claims of governmental units for claims incurred prior to May 31, 2002, shall be
**January 10, 2003**.

IT IS FURTHER ORDERED that any entity whose claim is not scheduled
or is scheduled as disputed, contingent, or unliquidated or whose claim differs in amount
from that listed in Debtors' bankruptcy schedules is required to file proof of claim on or
before the Bar Date, and any creditor, other than a creditor who holds an administrative
claim, who fails to do so will forever be barred from asserting any claim against the
Debtors and from voting upon, or receiving distributions under any reorganization plan,

or from participating in these cases in any regard. Further, the holder of any such unfiled claim is bound by the terms of any plan of reorganization confirmed by the Court in these cases.

IT IS FURTHER ORDERED that this Order does not affect the Court's prior allowance of the claims of the pre-petition Lenders. The pre-petition Lenders need not file proof(s) of claim as their claims have previously been allowed by prior order of this Court.

IT IS FURTHER ORDERED that the granting of this Order does not affect any proofs of claims already on file in these proceedings.

IT IS FURTHER ORDERED that notice of the Bar Date shall be served on all creditors and other interested parties in substantially the same form as Exhibit A to the Motion and shall be mailed by no later than November 3, 2002.

IT IS FURTHER ORDERED that Proofs of Claim shall be mailed to all creditors in substantially the same form as Exhibit B to the Motion.

IT IS SO ORDERED.

Dated: October 24, 2002.

/s/ Jerry W. Venters
**United States Bankruptcy Judge**

ORDER SUBMITTED BY:

Laurence M. Frazen          MO #31309
Cynthia Dillard Parres      MO #37826
Robert M. Thompson          MO # 38156
BRYAN CAVE LLP
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone:  (816) 374-3200
Telecopy:  (816) 374-3300

Attorneys for Debtors and Debtors in Possession

Frazen to Serve

E-FILED
Wednesday, 31 May, 2006  04:43:09 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| | ) | |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors. | ) | Joint Administration |

## DISCLOSURE STATEMENT FOR DEBTORS'
## SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED

Gregory D. Willard, Esq.                     Laurence M. Frazen, Esq.
David M. Unseth, Esq.                        Cynthia Dillard Parres, Esq.
Cullen K. Kuhn, Esq.                         Robert M. Thompson, Esq.
BRYAN CAVE LLP                               BRYAN CAVE LLP
211 North Broadway, Suite 3600               1200 Main Street, Suite 3500
St. Louis, Missouri 63102-2750               Kansas City, Missouri  64105

Attorneys for Debtors and Debtors-in-Possession

Dated: October 31, 2003

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................... 1
        A.      General ....................................................................................................... 1
        B.      Voting Instructions And Procedures........................................................... 1
                1.      Voting Procedures, Ballots And Balloting Deadline...................... 1
                2.      Voting Record Date....................................................................... 3
                3.      Voting Multiple Claims ................................................................ 3
                4.      Incomplete Ballots ....................................................................... 3
                5.      Defects And Irregularities ............................................................ 3
                6.      Confirmation Hearing ................................................................... 3
                7.      Recommendations......................................................................... 4

II.     HISTORY AND STRUCTURE OF THE DEBTORS .............................................. 5
        A.      Introduction................................................................................................ 5
        B.      Description Of The Debtors' Businesses .................................................... 6
                1.      Meat Processing And Marketing................................................... 6
                2.      Crop Production Business............................................................. 7
                3.      Petroleum Business....................................................................... 8
                4.      Other Businesses.......................................................................... 9
        C.      Historical Financial Results ..................................................................... 10
        D.      Events Leading To Chapter 11 ................................................................. 10
        E.      General Corporate Structure .................................................................... 11
        F.      Pre-Petition Secured Debt Obligations..................................................... 11

III.    THE CHAPTER 11 CASE...................................................................................... 11
        A.      Continuation Of Business Operations After The Petition Date................. 11
        B.      Corporate Management ............................................................................ 12
        C.      First Day Orders...................................................................................... 13
        D.      DIP Financing And Use Of Cash Collateral ............................................ 14
        E.      Appointment Of The Bankruptcy Committees ......................................... 14
                1.      Creditors' Committee.................................................................. 14
                2.      Bondholders' Committee ............................................................ 15
        F.      Key Employee Retention And Incentive Target Plan................................ 15
        G.      Marketing and Disposition of the Debtors' Assets ................................... 15
                1.      Asset Sales Authorized To Date.................................................. 15
                2.      Disposition Of The Pork Business............................................... 22
                3.      Disposition Of The Beef Interests ............................................... 25
                4.      Other Business Operations.......................................................... 27
        H.      Case Administration................................................................................. 28
                1.      Claims Information And Estimates............................................... 28
                2.      Claims Agent............................................................................. 28
                3.      Balloting Agent ......................................................................... 28
                4.      Claims Transfer Procedures....................................................... 28
        I.      Significant Business And Legal Matters.................................................... 29
                1.      Procedures For Workers' Compensation Claims ......................... 29

|  | 2. | Procedures For Mechanics' Lien Claims..................................................... | 29 |
|  | 3. | Proposed Termination Of Certain Employee Benefits............................... | 29 |
|  | 4. | Proposed Settlement With U.S. EPA......................................................... | 30 |
|  | 5. | Pending Environmental Claims................................................................. | 31 |
|  | 6. | Adjudication Regarding Subordinated Certificates................................... | 32 |
|  | 7. | Insurance Proceeds For Albert Lea Plant ................................................. | 32 |
|  | 8. | Pending Litigation and Automatic Stay.................................................... | 33 |

| IV. | SUMMARY OF THE PLAN..................................................................................... | 34 |
| A. | Introduction........................................................................................................ | 34 |
| B. | Classification Of Claims And Interests................................................................ | 35 |
| C. | Treatment Of Claims And Interests And Summary Of Distributions Under The Plan ............................................................................................................................ | 36 |
| D. | Provisions Governing Distributions..................................................................... | 44 |
|  | 1. | Distributions............................................................................................ | 44 |
|  | 2. | Interest On Claims................................................................................... | 45 |
|  | 3. | Means Of Cash Payment.......................................................................... | 45 |
|  | 4. | Distributions On The Initial Distribution Date........................................ | 45 |
|  | 5. | Distributions On A Subsequent Distribution Date................................... | 45 |
|  | 6. | Distributions On The Final Distribution Date ......................................... | 46 |
|  | 7. | Delivery Of Distributions; Undeliverable Distributions.......................... | 46 |
|  | 8. | Tender Of Securities And Instruments; Reinstatement of Preferred Shares; Cancellation of Trust Indentures............................................................. | 47 |
|  | 9. | Withholding And Reporting Requirements............................................... | 48 |
|  | 10. | Setoffs..................................................................................................... | 48 |
|  | 11. | No Recourse ............................................................................................ | 49 |
|  | 12. | Transactions On Business Days ............................................................... | 49 |
|  | 13. | No Distributions In Excess Of Allowed Amounts Of Claim.................... | 49 |
|  | 14. | Intercompany Advances; Intercompany Claims........................................ | 49 |
| E. | Implementation of the Plan ................................................................................. | 50 |
|  | 1. | Continued Existence of the Debtors; Vesting Of Assets........................... | 50 |
|  | 2. | Funding For The Plan.............................................................................. | 51 |
|  | 3. | Accounts.................................................................................................. | 52 |
|  | 4. | Liquidating Trust; Liquidating Trustee ................................................... | 52 |
|  | 5. | Post-Confirmation Committee.................................................................. | 53 |
|  | 6. | Effectuating Documents; Further Transactions......................................... | 54 |
|  | 7. | Exemption From Certain Transfer Taxes.................................................. | 54 |
|  | 8. | Releases and Related Matters................................................................... | 54 |
|  | 9. | Closing Of The Chapter 11 Case.............................................................. | 55 |
|  | 10. | Rights of Action...................................................................................... | 55 |
| F. | Pension Benefits and Retiree Benefits ................................................................ | 56 |
| G. | Establishment Of Class 11 Distribution Pool; Minority Foods Shares; Establishment of Industries Distribution Pool.......................................................................... | 57 |
| H. | Treatment Of Executory Contracts and Unexpired Leases.................................. | 58 |
|  | 1. | Rejected Executory Contracts And Unexpired Leases.............................. | 58 |
|  | 2. | Rejection Damages Bar Date.................................................................... | 58 |
|  | 3. | Assumed Executory Contracts And Unexpired Leases.............................. | 58 |

   4. Payments Related To Assumed Executory Contracts And Unexpired Leases ......................................................................................................... 59
I. Disputed, Contingent and Unliquidated Claims.................................... 59
   1. Prosecution of Objections to Claims............................................ 59
   2. Treatment of Disputed Claims; Disputed Claims Reserves.............. 60
   3. Estimation................................................................................. 60
J. Conditions Precedent To Confirmation And Consummation Of The Plan........... 60
   1. Conditions To Effective Date...................................................... 60
   2. Waiver of Conditions.................................................................. 61
   3. Notice of Effective Date.............................................................. 61
K. Payment Of Certain Fees And Expenses.............................................. 61
   1. Professional Fee Claims.............................................................. 61
   2. Administrative Claims................................................................ 62
   3. Fees and Expenses of the Indenture Trustees................................ 62
   4. Statutory Fees........................................................................... 62
L. Modifications Of The Plan; Severability Of Plan Provisions................... 62
M. Successors And Assigns................................................................... 63
N. Revocation, Withdrawal, Or Non-Consummation................................. 63
O. Dissolution Of The Bankruptcy Committees........................................ 64
P. Terms Of Injunctions Or Stays......................................................... 64

V. CONFIRMATION OF THE PLAN.................................................................. 64
A. Introduction.................................................................................. 64
B. Voting.......................................................................................... 64
C. Acceptance.................................................................................... 65
D. Confirmation Of The Plan................................................................ 65
   1. Best Interests Of Holders Of Claims And Interests......................... 66
   2. Financial Feasibility.................................................................. 72
   3. Acceptance By Impaired Classes.................................................. 72
   4. Cram Down............................................................................... 72
   5. Classification Of Claims And Interests......................................... 74
E. Effect Of Confirmation Of The Plan................................................... 74
   1. No Discharge............................................................................. 74
   2. Release Of Assets...................................................................... 74
   3. Exculpation And Limitation Of Liability....................................... 74
   4. Binding Effect........................................................................... 75
F. Retention of Jurisdiction ................................................................ 75

VI. CERTAIN FACTORS TO BE CONSIDERED................................................... 75
A. Risk That Distributions May Be Less Than Estimated By Debtors......... 76
B. Risk Of Non-Confirmation Of The Plan.............................................. 76
C. Non-Consensual Confirmation Of The Plan......................................... 77
D. Conditions Precedent To The Occurrence Of The Effective Date........... 77
E. Liquidation Of The Debtors' Assets................................................... 77
F. Litigation Risks............................................................................. 77
G. Alternatives To The Plan................................................................. 77

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES............................................ 78

A.    Certain Federal Income Tax Consequences to the Debtors.................................... 78
    1.    Transfer Of Assets To The Liquidating Trust ............................................. 78
    2.    Merger Of Foods Into Industries ................................................................ 79
    3.    Cancellation Of Industries Common Shares ............................................... 79
    4.    Cancellation Of Indebtedness And Reduction Of Tax Attributes ............... 81
    5.    Alternative Minimum Tax ........................................................................... 82
B.    United States Federal Income Tax Consequences To Holders Of Claims And
    Interests ...................................................................................................................... 82
    1.    Holders Of Allowed Claims And Interests Receiving Consideration ......... 82
    2.    Holders Of Industries Common Shares ...................................................... 84
    3.    Holders Of Old Securities Of Foods ........................................................... 85
    4.    Holders Of Old Securities Of Transportation, SFA And Pipeline ............. 85
    5.    Holders Of Subordinated Claims ................................................................ 85
    6.    Distributions In Discharge Of Accrued Interest ......................................... 86
    7.    Information Reporting And Backup Withholding ....................................... 86
C.    Tax Treatment Of The Liquidating Trust ................................................................... 87
    1.    Classification Of The Liquidating Trust And Ownership Of Beneficial
        Interests In Liquidating Trust ..................................................................... 87
    2.    Tax Reporting ............................................................................................. 87

VIII.    CONCLUSION ...................................................................................................................... 89

**TABLE OF APPENDICES**

Appendix A                Second Amended Joint Plan of Reorganization, as Modified

Appendix B                Historical Statements

Appendix C                Organization Structure of the Debtors

Appendix D                Liquidation Analysis for the Debtors

Appendix E                Orders Related to Non-Debtor Owned Properties

**DISCLAIMER**

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED, DATED OCTOBER 31, 2003 (AS MAY BE FURTHER AMENDED OR MODIFIED, THE "<u>PLAN</u>"). NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASES AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN OR SUCH STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID AND TO SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS INCLUDED AS <u>APPENDIX A</u> HERETO).  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF ALLOWED CLAIMS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL APPENDICES ANNEXED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT DECEMBER 5, 2003 (THE "<u>BALLOTING DEADLINE</u>").  TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY THE BALLOTING AGENT ON OR BEFORE THE BALLOTING DEADLINE.  PLEASE SEE THE DISCLOSURE STATEMENT FOR THE VOTING INSTRUCTIONS.  BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR ELECTRONIC MAIL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL

OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OR INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

# I.  INTRODUCTION

## A.  General

Farmland Industries, Inc., Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company (collectively, the "Debtors") hereby propose the following disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes for the Debtors' Second Amended Joint Plan of Reorganization, as modified (as may be further amended or modified, the "Plan").

This Disclosure Statement sets forth certain information regarding the Debtors' operations and finances, the Debtors' need to seek Chapter 11 protection and the utilization of the Debtors' assets.  This Disclosure Statement also describes the terms and provisions of the Plan, including potential alternatives to the Plan, certain effects of confirmation of the Plan and the distributions proposed to be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that the holders of Allowed Claims and Allowed Interests in the Voting Classes must follow for their votes to be counted.

CAPITALIZED TERMS USED AND NOT DEFINED HEREIN SHALL HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN UNLESS THE CONTEXT REQUIRES OTHERWISE.

The Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor holding an Allowed Claim in each of the relevant Voting Classes to make an informed judgment about the Plan.

## B.  Voting Instructions And Procedures

### 1.  Voting Procedures, Ballots And Balloting Deadline

Under the Plan, all holders of Allowed Claims and Allowed Interests in Classes 4, 5, 7, 9, 10, 11, 12, 14, 16 and 19 (the "Voting Classes") are Impaired and entitled to vote on the Plan.  Holders of Claims in each of Classes 1, 2, 3, 6 and 8 are Unimpaired under the Plan and are deemed to have accepted the Plan.  Holders of Claims and Interests in Classes 13, 15, 17 and 18 are conclusively deemed to accept the Plan as proponents of the Plan.  For a description of the Classes of Claims and Interests and their treatment under the Plan, see Section IV.C, *Treatment of Claims and Interests and Summary of Distributions under the Plan*.

**Only persons who hold Claims and Interests on the Record Date are entitled to receive a copy of this Disclosure Statement.  Only persons who hold Allowed Claims and Allowed Interests in the Voting Classes on the Confirmation Date are entitled to vote whether to accept the Plan.**

Separate pre-addressed return envelopes have been supplied for the Ballots.  Holders of Allowed Claims and Allowed Interests in the Voting Classes should take care to use the proper pre-addressed envelope to ensure that Ballots are returned to the proper address.  In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is now or hereafter determined to be a Disputed Claim this

amount may not be the amount ultimately allowed for purposes of distribution) and the Debtor and the Class to which the Claim or Interest has been attributed. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT. In order for a Ballot to be counted, it must be completed, signed and sent in the enclosed pre-addressed envelope to the "Balloting Agent" so as to be received by the Balloting Deadline at the following address:

*if by mail to:*

> Bankruptcy Management Corporation
> Attn: Farmland Voting Agent
> P.O. Box 905
> El Segundo, California 90245-0905

*if by hand delivery or overnight delivery to:*

> Bankruptcy Management Corporation
> Attn: Farmland Voting Agent
> 1330 East Franklin Avenue
> El Segundo, California 90245

If you are a holder of an Allowed Claim or an Allowed Interest in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, please contact:

> Bankruptcy Management Corporation
> Attn: Farmland Voting Agent
> 1330 East Franklin Avenue
> El Segundo, California 90245
> (888) 909-0100

ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO THE BALLOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE BALLOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE OR ELECTRONIC MAIL BE COUNTED. The Balloting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is Impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are employed. The Debtors have reserved their right to seek to "cram down" the Plan on non-accepting Impaired Classes of Claims and Interests. See Section V.D.4, *Cram Down*.

### 2.   Voting Record Date

The record date for voting on the Plan is 5:00 p.m. (Kansas City time) on October 8, 2003 (the "Record Date").

### 3.   Voting Multiple Claims

Any person who holds Allowed Claims in more than one Voting Class is required to vote separately with respect to each such Voting Class in which such person holds an Allowed Claim. Please use a separate Ballot to vote all Allowed Claims in each Voting Class.

### 4.   Incomplete Ballots

Any Ballot received which is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan.

### 5.   Defects And Irregularities

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, whose determination will be final and binding. Unless the Ballot being furnished is timely submitted to the Balloting Agent by the Balloting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid and, therefore, decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court.  In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.  The Debtors reserve the right to reject any and all Ballots not in proper form.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will incur any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 6.   Confirmation Hearing

**The Bankruptcy Court will hold the hearing regarding confirmation of the Plan (the "Confirmation Hearing") commencing on December 16, 2003 at 2:30 p.m. at the United States Bankruptcy Court, Charles Evans Whittaker Courthouse, 400 E. 9th Street, Kansas City, Missouri 64106, before Bankruptcy Judge Jerry W. Venters.**  The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing.  At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained for each of the

Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to the confirmation of the Plan must be in writing and must comply in all respects with the Notice accompanying this Disclosure Statement.

### 7.  Recommendations

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF ALLOWED CLAIMS AND ALLOWED INTERESTS IN THE VOTING CLASSES TO ACCEPT THE PLAN.

## II.  HISTORY AND STRUCTURE OF THE DEBTORS

### A.  Introduction

Industries, founded in 1929 and formally incorporated in Kansas in 1931, is a farm supply cooperative and a processing and marketing cooperative.  Its principal executive offices are at 12200 North Ambassador Drive, Kansas City, Missouri 64163.

Industries was originally founded as the Union Oil Co. when six farmer-owned cooperatives joined together to buy and distribute petroleum products.  It continued to grow over the years, becoming known as the Consumer Cooperative Association.  In 1966, the company changed its name to "Farmland Industries, Inc."  By its 72nd anniversary in 2001, Industries was one of the nation's largest companies, with annual revenues of $11.8 billion.  As of the Petition Date, Industries functioned as a farm-to-table agribusiness company.  The other Debtors are subsidiaries of Industries.

As of the Petition Date, the Debtors conducted business primarily in two operating areas.  First, on the output side of the agricultural industry, they operated as a processing and marketing cooperative.  Second, on the input side of the agricultural industry, they operated as a farm supply cooperative.

The output side of the Debtors' business consisted of the processing and marketing of pork products, through Foods, and the processing and marketing of beef products, through Farmland National Beef Packing Company, L.P. ("National Beef"), which was 71.2% owned by the Debtors.  In 2002, approximately 73% of the hogs and 23% of the cattle processed by Foods and National Beef, respectively, were supplied by the Debtors' cooperative members.  Substantially all the pork and beef products that Foods and National Beef sold in 2002 were processed in plants they own or lease.

As of the Petition Date, the Debtors' farm supply operations consisted of two principal product divisions: crop production and petroleum. Principal products of the crop production division were nitrogen and phosphate-based fertilizers and, through an ownership interest in a joint venture, a complete line of insecticides, herbicides and mixed chemicals.  Principal products of the petroleum division were refined fuels, propane and petroleum refining by-products.  The Debtors manufactured approximately 80% of the dollar value of their crop production and petroleum products sold in 2002.  Approximately 82% of the crop production products and 23% of the petroleum products sold in 2002 were sold through the Debtors' ventures to farm cooperative associations which are members of Industries and who, in turn, distribute these products primarily to farmers and ranchers.

The farm supply businesses of the Debtors have been highly seasonal.  Historically, the majority of sales of crop production products occur in the spring and fall.  Margins for refined petroleum fuels historically has been concentrated in the summer.

The Debtors competed for market share with numerous participants of various sizes and with various levels of vertical integration, and product and geographical diversification. Competitors in the crop production industry include global producers of nitrogen- and phosphate-based fertilizers, major chemical companies and product importers and brokers.  In the petroleum

industry, competitors include major oil companies and independent refiners.  The pork and beef processing industries are comprised of a large variety of competitive participants.

## B.  Description Of The Debtors' Businesses

### 1.  Meat Processing And Marketing

The Debtors' meat processing and marketing businesses were primarily conducted by Foods and National Beef.  National Beef is not a Debtor in these Chapter 11 proceedings.

#### a)  Pork Processing and Marketing

Foods is a food processor, supplying fresh pork and processed meat products to U.S. retailers, foodservice operators, industrial accounts and international customers.  Started in 1959, Foods began as a one-facility hog slaughtering operation and has grown to be the sixth largest pork processor in the United States, with three plants that have an annual slaughter capacity of 7.5 million hogs. In addition to processing and marketing fresh pork, Foods also processes and markets branded pork and processed meats, including bacon, processed ham products, fresh and processed sausage products and specialty deli meats. These products are marketed under a variety of brand names including: Farmland, Farmstead, OhSe, Maple River, Carando and Roegelein.  Product distribution is through national and regional retail and food service chains, distributors and in international markets.  Although Foods does not directly own any hog production facilities, during the 1990's Foods synthetically vertically integrated into hog production through contractual arrangements with farmer-owned hog production operations.

Foods' slaughtering facilities are located in Denison, Iowa; Monmouth, Illinois; and Crete, Nebraska.  During 2000, 2001 and 2002, Foods slaughtered approximately 7.4 million, 6.4 million and 6.9 million hogs, respectively.  Facilities to further process primal beef and pork cuts are located in Springfield, Massachusetts; New Riegel, Ohio; Wichita, Kansas; and Carroll, Iowa.  Foods leases and operates two "case ready" facilities, which are located in Salt Lake City, Utah and Omaha, Nebraska.  Foods also has a "case ready" co-packaging arrangement at a facility in Madison, Wisconsin.  ("Case ready" refers to meat products which are prepared to the specifications of retailers and which do not require additional preparation work prior to sale by the retailer).  In aggregate, Foods has the capacity to produce close to 3 billion pounds of pork products, representing approximately 15% of projected 2002 U.S. pork production.  Foods enjoys a customer base that includes such blue-chip retailers as Wal-Mart, which has allowed Foods to increase its sales of branded and other value-added products.

#### b)  Beef Processing and Marketing

Industries first invested in National Beef in 1993.  National Beef engages in meat packing and processing and is the fourth largest beef packer in the United States.  As of the Petition Date, Industries directly or indirectly owned 71.2% of the ownership interests of National Beef (the "Beef Interests").  Operating from five facilities, National Beef produces fresh, frozen, and "case-ready" branded and nonbranded products for domestic consumption as well as foreign consumption in 25 countries.  It has two main slaughtering facilities and a portion-control facility in Kansas, one "case-ready" facility in Pennsylvania and a second "case-ready" facility in Georgia.  During 2000, 2001 and 2002, National Beef slaughtered approximately 2.7 million, 2.8 million and 3.1 million cattle,

respectively.  National Beef's products include fresh and frozen beef, boxed beef and "case ready" beef.  Product distribution is through national and regional retail and food service chains, distributors and in international markets.  National Beef estimates that slightly more than 55% of its sales are to the retail sector and approximately 30% of its sales are to the foodservice sector.

National Beef has four wholly-owned subsidiaries and owns a controlling interest in Kansas City Steak Company, L.L.C., a portion-control company that provides steaks to premium steak houses in the United States and directly to consumers via mail-order catalogs.  In addition, through a wholly-owned subsidiary, National Beef owns a 47.5% interest in aLF Ventures, LLC, a joint venture with DMV International.  aLF Ventures, LLC holds the worldwide exclusive rights to market activated lactoferrin, a natural product that has been recently granted "Generally Recognized as Safe" status by the Food and Drug Administration for use in protecting fresh beef from bacteria such as *E. coli*.

## 2.  Crop Production Business

As of the Petition Date, the Debtors manufactured nitrogen-based fertilizer at five U.S. facilities and, through a 50% owned joint venture, Farmland MissChem, Limited ("FMCL"), operated an off-shore facility in the Republic of Trinidad and Tobago.  The operating domestic nitrogen plants were located in Enid, Oklahoma; Dodge City, Kansas; Coffeyville, Kansas; Fort Dodge, Iowa; and Beatrice, Nebraska.  The Debtors also owned nitrogen fertilizer plants in Lawrence, Kansas and Pollock, Louisiana, which were permanently shut down prior to the Petition Date.  The Debtors also owned a 50% interest in two phosphate fertilizer manufacturing joint ventures: Farmland-Hydro, LP ("FHLP"), a joint venture in Florida, and SF Phosphates, Limited Company ("SF Phosphates"), a joint venture with operations in Utah and Wyoming. Substantially all of the Debtors' domestic fertilizer production is sold to Agriliance LLC, an agronomy marketing joint venture in which the Debtors have an indirect minority ownership interest.

Due to unfavorable market conditions during 2002, the Debtors temporarily curtailed production of nitrogen-based fertilizers at various production plants.  Also, the Debtors experienced mechanical problems at the Coffeyville, Kansas nitrogen facility which limited production to 70% of the facility's planned capacity.  As a result, the production plants in aggregate operated at approximately 63% of their capacity during the 2002 fiscal year.  Annual anhydrous ammonia production of nitrogen-based plant foods for fiscal years 2000, 2001 and 2002, including Industries' 50% share of the output of Farmland MissChem Limited, totaled approximately 2.9 million tons, 2.4 million tons and 2.1 million tons, respectively.

Prior to the Petition Date, Industries closed its Lawrence, Kansas and Pollock, Louisiana plants.  These two plants contributed 29% of Industries' total anhydrous ammonia production capacity.

Each of the operating domestic nitrogen fertilizer plants had capacity to further process anhydrous ammonia into upgraded nitrogen products (UAN solutions, urea and liquid nitrogen).  In 2000, 2001 and 2002, production of these upgraded products was approximately 1.8 million tons, 1.8 million tons and 1.5 million tons, respectively.

In May 2003, the Debtors sold four of the domestic nitrogen fertilizer production plants and all of its interest in Farmland MissChem, Limited to Koch Nitrogen Company.  The Debtors

entered into a contract to sell the closed Pollock, Louisiana plant. See Section III.G.1.r, *Nitrogen Fertilizer Assets.* The only nitrogen facilities the Debtors currently own are (i) the Lawrence, Kansas facility, which facility is no longer manufacturing nitrogen-based fertilizer, and (ii) the Coffeyville, Kansas facility, which facility in fiscal 2002 accounted for approximately 12% of the Debtors' anhydrous ammonia production, approximately 34% of the Debtors' UAN production and approximately 18% of the Debtors' total nitrogen production.

In November 2002, the Debtors sold their interest in the FHLP phosphate fertilizer operations to Cargill.

Industries and J.R. Simplot ("Simplot") each own a 50% interest in SF Phosphates. The SF Phosphates plant produces monoammonium phosphate and super phosphoric acid with annual production for 2000, 2001 and 2002 of 543,000 tons, 553,000 tons and 536,000 tons, respectively. Under the joint venture agreement, Industries and Simplot each purchase 50% of SF Phosphates' production. Industries sells its share of such production to Agriliance LLC. On July 30, 2002, Simplot filed a complaint for declaratory judgment against Industries in the Bankruptcy Court, Adversary Proceeding No. 02-4147 (the "Simplot Litigation"). In this proceeding, Simplot asserts that, by operation of Utah Revised Limited Liability Company Act, Industries' commencement of the Chapter 11 Case caused Industries to forfeit governance rights in SF Phosphates. Industries believes that this Utah state law is preempted by the Bankruptcy Code and, as a result, Industries maintains its governance rights in relation to SF Phosphates. Industries is currently in the process of selling the SF Phosphates Interest to Simplot, subject to higher and better bids. See Section III.G.1.ee, *Sale of SF Phosphates Interest.* In connection with such sale, Industries and Simplot had entered into a settlement agreement that, among other things, (i) amends the various transfer restrictions contained in the operating agreement for SF Phosphates, (ii) provides that the transferee of the SF Phosphates Interest will become a substitute member of Industries, with full voting rights, and (ii) provides for Industries, SF Phosphates and Simplot to release each other from all claims (other than purchases and sale of products in the ordinary course of business).

Industries continues to have a 50% ownership interest in United Country Brands ("UCB"), and UCB has a 50% ownership interests in Agriliance LLC. Industries' 50% ownership interest in UCB is reduced by 13.1% of the Agriliance LLC crop production products earnings which, in the past, were allocated to Wilbur-Ellis Company and are now allocated to CHS Cooperatives. Agriliance LLC markets and distributes a complete line of crop production products, including nitrogen and phosphate-based plant foods, as well as a complete line of crop protection products such as insecticides, herbicides and mixed chemicals. Industries continues to sell substantially all of its crop production products, including its share of SF Phosphates' production, to Agriliance LLC at a formula price based on the prevailing market price.

### 3.  Petroleum Business

Industries participates in the petroleum industry as a mid-continent refiner and, through November 30, 2001, participated as a wholesale distributor of petroleum products. The principal products of this business segment are refined fuels, propane and by-products of the petroleum refinery.

Industries manages and operates a petroleum refinery at Coffeyville, Kansas with approximately 95,000 barrel per day capacity. The refinery converts crude oil into refined products

such as gasoline, diesel fuel, and distillates.  Production at the refinery accounted for approximately 90% of Industries' refined fuel sales in 2002.  Substantially all of the refined fuels produced at the refinery are sold to CHS Cooperatives at a formula price tied to market value.

### 4.  Other Businesses

Industries participates in various other businesses, including the following:

#### a)  Feed

Industries has an 8% ownership interest in Land O'Lakes Farmland Feed ("LOLFF").  LOLFF is a leading market producer of animal feed in the United States, producing both commercial and lifestyle feed for a variety of animals, including dairy cattle, beef cattle, swine, poultry, horses and other specialty animals such as laboratory and zoo animals.  LOLFF markets animal feed products under the Land O'Lakes Feed label.  Through its wholly-owned subsidiary Purina Mills LLC, LOLFF also markets animal feed (other than dog and cat food) under the leading brands in the industry: Purina, Chow and the "Checkerboard" Nine Square logo.  As of December 31, 2002, LOLFF operated a geographically diverse network of 100 feed mills and distributed its animal feed nationally through approximately 1,300 local cooperatives, through approximately 3,500 independent dealers operating under the Purina brand name and directly to customers.

#### b)  Domestic Grain

Industries currently owns or leases the following grain storage terminals: (i) 5.823 million bushel capacity storage terminal in Hutchinson, Kansas; (ii) 18.307 million bushel capacity storage terminal in Hutchinson, Kansas; (iii) 10.039 million bushel capacity storage terminal in Kansas City, Kansas; (iv) 11.988 million bushel capacity storage terminal in Topeka, Kansas; (v) 10.502 million bushel capacity storage terminal in Wichita, Kansas; (vi) 5.072 million bushel capacity storage terminal in Lincoln, Nebraska; (vii) 0.847 million bushel capacity storage terminal in Omaha, Nebraska; (viii) 7.700 million bushel capacity storage terminal in Enid, Oklahoma; (ix) 11.036 million bushel capacity storage terminal in Enid, Oklahoma; (x) 16.007 million bushel capacity storage terminal in Enid, Oklahoma; (xi) 15.289 million bushel capacity storage terminal in Enid, Oklahoma; (xii) 3.226 million bushel capacity storage terminal in Amarillo, Texas; (xiii) 1.413 million bushel capacity storage terminal in Black, Texas; (xiv) 15.341 million bushel capacity storage terminal in Ft. Worth, Texas; (xv) 21.980 million bushel capacity storage terminal in Ft. Worth, Texas; (xvi) 9.842 million bushel capacity storage terminal in Hereford, Texas; (xvii) 3.223 million bushel capacity storage terminal in Galveston, Texas; and (xviii) 1.095 million bushel capacity storage terminal in Wellington, Kansas (collectively, the "Grain Elevators").  Each of the Grain Elevators is currently leased (or subleased) to ADM/Farmland, a wholly-owned subsidiary of Archer-Daniels-Midland Company, Inc. ("ADM"), pursuant to a master lease (the "Grain Elevator Master Lease").  The Grain Elevator Master Lease has the following basic components: (i) ADM/Farmland leases the Grain Elevators for an initial term of five years, with four five-year options to renew; (ii) Industries receives a fixed payment equivalent to depreciation, amortization and taxes related to the Grain Elevators; and (iii) Industries receives a variable component equal to 50% of the earnings from the Grain Elevators and is responsible for 50% of the losses related to the operation of the Grain Elevators.  During the past year, ADM/Farmland reported losses of approximately $16 million related to the operation of the Grain Elevators.  Industries is currently conducting an audit of this

previous year's operations to verify the validity of these reported losses and expects such an audit to be completed in October 2003.

c)   International Grain

Industries owns a number of foreign subsidiaries (collectively referred to as "<u>Tradigrain</u>"), which were engaged in international grain operations through February 2002. Subsequent to February 2002, Industries has overseen the orderly windup of Tradigrain operations and assets. This process continues and should be substantially completed by December 2003.

## C.  Historical Financial Results

Set forth in <u>Appendix B</u> is selected historical financial data for each of the Debtors for the nine-month period ended May 31, 2003, for the three-month period ended August 31, 2002, for the nine-month period ended May 31, 2002, and for the years ended August 31, 1999, 2000 and 2001. The financial statements for the years ended August 31, 1999, 2000 and 2001 were included in Industries' Annual Report on Form 10-K filed with the SEC.

## D.  Events Leading To Chapter 11

In the 1990's, the Debtors pursued an expansion strategy that emphasized acquisition of new businesses and expansion of existing operations. This strategy resulted in rising corporate expenses and increased debt. The combination of higher debt levels and decreased earnings left the Debtors vulnerable to an economic downturn.

In 2001, the Debtors' management implemented a strategic initiative called Navigating Tomorrow, designed to reduce debt and secure the long-term financial success of the Debtors.

During the twelve months ended February 28, 2002, Industries reduced its debt (including off balance sheet debt related to its Coffeyville nitrogen facility) by over $500 million, the largest reduction in the cooperative's history. General and administrative expenses were reduced by approximately $29 million, or 38%. Cash flow reached a five-year high, increasing more than $400 million from 2000.

Notwithstanding these cost reductions, the Debtors experienced liquidity problems due to the underperformance of certain business segments. Principally, margins available in fertilizer manufacturing eroded dramatically.

Lack of rain in the wheat belt that hampered fertilizer demand, low commodity prices, and continued volatility in domestic natural gas prices resulted in the Debtors' Crop Production business segment reporting a loss of $78 million for the first six months of fiscal year 2002.

During the year leading up to the Petition Date, nitrogen fertilizer prices dropped significantly. Ammonia prices fell approximately 55 percent and urea prices decreased 49 percent between the fall of 2001 and the Petition Date.

Despite strong financial performance by the meat segment of the Debtors' business, losses in the fertilizer business caused severe cash flow problems for the Debtors. During the first five

months of calendar year 2002, the Debtors' liquidity situation continued to erode as fertilizer sales did not develop as expected.

The operating losses in the Debtors' crop production and petroleum businesses, coupled with planned maintenance on the Debtors' Coffeyville, Kansas refinery, significantly hampered cash flow during the spring of 2002. In Industries' Quarterly Report on Form 10-Q for the quarter ended February 28, 2002 (filed with the SEC), Industries stated that it may not be able to generate sufficient cash flow from operations to avoid covenant defaults under the Pre-Petition Credit Agreement at the end of the third quarter or maintain its ability to borrow under the Pre-Petition Credit Agreement and might be forced to seek protection from creditors if conditions did not improve. Concerns regarding the Debtors' financial condition led to increased cash demands and more restrictive payment terms from trade creditors, as well as increased demands for early redemptions of subordinated debt, which adversely affected the Debtors' ability to fund ongoing operations and service debt. Because of this liquidity crisis, the Debtors filed their respective Chapter 11 petitions.

On May 31, 2002, the Debtors filed voluntary petitions for protection under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The filings were made in order to facilitate the restructuring of the Debtors' trade liabilities, debt, and other obligations. The Debtors continue to manage their businesses as debtors-in-possession.

### E. General Corporate Structure

Industries is a farm supply cooperative and a processing and marketing cooperative that is incorporated in the state of Kansas. Industries owns virtually all of the stock of the other Debtors, which are incorporated in Kansas, Missouri and Arkansas. In addition, Industries owns interests in several other subsidiaries and joint ventures. A current organizational chart of the Debtors is attached hereto as Appendix C.

### F. Pre-Petition Secured Debt Obligations

On February 7, 2002, Industries, Foods and a syndicate of banks entered into the Pre-Petition Credit Agreement. As of the Petition Date, the Debtors were indebted under the Pre-Petition Credit Agreement in the approximate amount of $399.7 million (consisting of $233.0 million in revolving loans, $31.7 million of letters of credit obligations and a $135.0 million term loan) plus additional fees and expenses. The Pre-Petition Credit Agreement was secured by substantially all of the Debtors' major assets, including accounts receivable, inventories, property, plant and equipment and intangible assets. Capital derived from the Pre-Petition Credit Agreement was used for capitalizing fixed assets and working capital and other operating expenses.

### III. THE CHAPTER 11 CASE

### A. Continuation Of Business Operations After The Petition Date

On May 31, 2002, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their business in the ordinary course of business. Transactions outside of the ordinary course of business require Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors and the enforcement of liens against property of the Debtors. This relief provides the Debtors with the "breathing spell" necessary to assess and reorganize their business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

### B. Corporate Management

The current executive officers of Industries are as follows:

Robert B. Terry is President and Chief Executive Officer of Industries. Mr. Terry was appointed to his present position in May 2002. Previously he was Executive Vice President, General Counsel & Corporate Secretary. Mr. Terry joined Industries in 1989.

Steven R. Rhodes is Executive Vice President and Chief Financial Officer of Industries. Mr. Rhodes was appointed to his present position in May 2002. Previously he held various positions in North American Grain, Transportation, and Corporate Divisions of Industries. Mr. Rhodes joined Industries in 1979.

Stanley A. Riemann is Executive Vice President of Industries and President of Crop Production. Mr. Riemann was appointed to his present position in May 1999. Previously he held various positions in the Crop Nutrients and Crop Protection areas. Mr. Riemann joined Industries in 1974.

Robert W. Schuller is Vice President, General Counsel and Corporate Secretary of Industries. Mr. Schuller was appointed to his present position in May 2002. Mr. Schuller joined Industries in 1994 in the Legal Division.

J. Randall Vance is Vice President and Treasurer of Industries. Mr. Vance was appointed to his present position in July 2002. Previously he served as Assistant Treasurer. Mr. Vance joined Industries in 1991.

Dennis M. Alt is Vice President, Strategic Projects of Industries. Mr. Alt was appointed to this position in June 2002. Before his appointment, Mr. Alt was an Associate General Counsel in Industries' Legal Division. Prior to re-joining Industries in 2002, he was a shareholder with Stinson Mag & Fizzell.

George Richter is Vice President of Industries and President of the Pork Division. Mr. Richter was appointed to his present position in 1999. Previously he served as Vice President, Sales and Marketing for Foods. Mr. Richter joined Industries in 1971.

Timothy R. Daugherty is Vice President, Administration of Industries. Mr. Daugherty was appointed to his present position in June 2002. Previously he served as Vice President and President of World Grain and as Vice President of Marketing for a geographic territory that included Kansas, Colorado and Utah. Mr. Daugherty joined Industries in 1985.

### C.  First Day Orders

On the Petition Date, the Debtors filed several motions seeking certain relief by virtue of so-called "first day orders."  First day orders are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.  The first day orders obtained in these cases are typical for large Chapter 11 cases.

The first day orders in the Chapter 11 Cases authorized, among other things:

a)  Joint administration of each of the Debtor's bankruptcy cases;

b)  The DIP Credit Agreement, on an interim basis (the "Interim DIP Order");

c)  The retention of the following professionals to serve on behalf of the Debtors:  (i) Bryan Cave LLP, as bankruptcy counsel; and (ii) Bankruptcy Management Corporation, as claims agent;

d)  The maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

e)  Payment of employees' accrued pre-petition wages and employee benefit claims;

f)  Continued utility services during the pendency of the Chapter 11 Case;

g)  The continued retention of professionals regularly employed by the Debtors in the ordinary course of business;

h)  The maintenance of certain pre-petition customer programs and practices;

i)  Administrative expense treatment for certain holders of valid reclamation claims;

j)  The payment of certain pre-petition tax claims;

k)  The payment of certain pre-petition critical trade vendor claims;

l)  The payment of certain pre-petition obligations to sales brokers; and

m)  The payment of certain obligations under the Packers and Stockyards Act.

### D. DIP Financing And Use Of Cash Collateral

Subsequent to the Petition Date, the Debtors and a syndicate of banks entered into the DIP Credit Agreement, which was subsequently revised and approved by the Bankruptcy Court, to provide up to $306.0 million in post-petition financing. The credit facility created under the DIP Credit Agreement (the "DIP Credit Facility") expires on the occurrence of an event that constitutes a commitment termination date (as defined in the DIP Credit Agreement) or, if no such event has occurred, on November 30, 2003. The DIP Credit Facility was authorized by the Bankruptcy Court on an interim basis pursuant to the Interim DIP Order, and on a final basis pursuant to an order dated July 2, 2002 (the "Final DIP Order").

The DIP Credit Facility is collateralized by a first priority priming lien on all assets of the Debtors including all real, personal and mixed property, both tangible and intangible, but excluding rights in respect of avoidance actions approved by the Bankruptcy Court under the Bankruptcy Code. The DIP Credit Agreement allows for super priority administrative expense claim status in the Chapter 11 Case with priority over certain other administrative expenses of the kind specified or ordered pursuant to provisions of the Bankruptcy Code. The DIP Credit Agreement also includes various restrictive covenants prohibiting the Debtors from, among other things, incurring additional indebtedness, permitting any liens or encumbrances on property or assets, making investments, or becoming liable for any contingent obligations. Subsequent to the execution of the DIP Credit Agreement, cash received by the Debtors from their operations was used to pay, in full, the revolving loans outstanding under the Pre-Petition Credit Agreement.

On or about January 14, 2003, the Debtors filed their Motion for Order Authorizing First Amendment to DIP Credit Agreement, seeking authority to enter into a first amendment to the DIP Credit Agreement (the "First DIP Amendment"). The First DIP Amendment granted the Debtors the ability to request additional time necessary to formulate the necessary analyses required for the Plan and this Disclosure Statement in exchange for, among other things, certain reductions in availability under the DIP Credit Facility, certain principal reduction payments under the DIP Credit Facility and schedules and timelines for the marketing and sale of certain of the Debtors' assets. On March 3, 2003, the Bankruptcy Court entered an interim order approving the First DIP Amendment. On April 17, 2003, the Bankruptcy Court entered its Memorandum Opinion and Order, approving the First DIP Amendment on a final basis.

As of October 24, 2003, the Debtors had borrowings under the DIP Credit Agreement of $0, and $10.5 million of the facility was being utilized to support letters of credit. The Debtors are currently seeking Bankruptcy Court approval of a replacement letter of credit facility.

The financial institutions party to the DIP Credit Agreement allege that they have future contingent obligations that have not yet been adequately addressed in the Plan. The Debtors believe that this issue will be addressed at or prior to the Confirmation Hearing.

### E. Appointment Of The Bankruptcy Committees

#### 1. Creditors' Committee

On June 7, 2002, the United States Trustee appointed the Creditors' Committee. The Creditors' Committee is currently comprised of the following members: BP Companies; Sempra

Energy Trading Corp.; Cap Gemini Ernst & Young; PSC Industrial Outsourcing Inc.; Packaging Corporation of America; and Ray K. Pardun. The Creditors' Committee has retained the law firms of Akin Gump Strauss Hauer & Feld LLP and Husch & Eppenberger as its counsel.

### 2. Bondholders' Committee

On June 7, 2002, the United States Trustee appointed the Bondholders' Committee. The Bondholders' Committee is currently comprised of seven members: J P Morgan Chase Bank, as Indenture Trustee; DeSoto County Cooperative; UMB Bank, NA; Farmland Insurance; Robert A. Reseigh; Peter S. Hancock; and Keith A. Sharf. The Bondholders' Committee has retained the law firms of Foley & Lardner and Polsinelli Shalton & Welte as its counsel.

### F. Key Employee Retention And Incentive Target Plan

Following the Petition Date, the Debtors' management has sought to maximize value for creditors in these reorganization proceedings. Part of this process necessarily includes marketing certain of the Debtors' assets and businesses for potential sale. The sale process, as with any sale process, will likely lead to the loss of employment by many of the Debtors' key employees. In essence, many of the Debtors' key employees have been asked to work tirelessly toward the elimination of their own employment. Without protection against sudden loss of income, many of those individuals comprising the Debtors' key personnel (the "Key Employees") may have been forced to seek alternative employment to protect the well being of themselves and their families. Such a premature loss of these Key Employees would obviously have had a devastating impact on the Debtors' ability to maximize recoveries to creditors. Moreover, the economic cost to replace these Key Employees, both in terms of actual dollars spent and lost productivity, could have been enormous.

Accordingly, to provide the financial security that enabled these Key Employees to continue working diligently to maximize the value of these estates, the Debtors determined that it was necessary and appropriate to offer incentive compensation to these Key Employees. Therefore, with input from the Bankruptcy Committees and other constituent groups, the Debtors proposed their Key Employee Retention and Incentive Target Plan (the "KERIT Plan"). The KERIT Plan provides incentive compensation and retention payments to the Key Employees critical to the ongoing operation of the Debtors' businesses. The maximum potential incremental cost of the KERIT Plan to the Debtors is approximately $8 million. The KERIT Plan payments were structured to maximize the likelihood that the Key Employees would remain in the employ of the Debtors for the period of time required for a successful outcome in the Chapter 11 Cases. By order dated November 4, 2002, the Bankruptcy Court approved the KERIT Plan.

### G. Marketing and Disposition of the Debtors' Assets

### 1. Asset Sales Authorized To Date

The Debtors are currently marketing and selling substantially all of their assets. To date, the Bankruptcy Court has authorized the Debtors to sell certain of their assets, including the following:

a)   Warehouse Assets in Port Lavaca, Texas

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including assets associated with a warehouse in Port Lavaca, Texas, together with the assumption and assignment of certain executory contracts and unexpired leases.  Helena Chemical Company made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Helena Chemical Company for a purchase price of $588,550.

b)   Warehouse Assets in Memphis, Tennessee

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including assets associated with a warehouse in Memphis, Tennessee, together with the assumption and assignment of certain executory contracts and unexpired leases.  Agriliance LLC made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Agriliance LLC for a purchase price of $5,302,500.

c)   Assets in Iowa, Louisiana and Mowata, Louisiana

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets located in Iowa, Louisiana and Mowata, Louisiana, together with the assumption and assignment of certain executory contracts and unexpired leases.  G&H Seed Company made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to G&H Seed Company for a purchase price of $440,000 plus certain inventory and receivables.

d)   Assets in Minden, Louisiana

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets located in Minden, Louisiana.  Minden Farm and Gardens, LLC made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Minden Farm and Gardens, LLC for a purchase price of $266,500 plus certain inventory and receivables.

e)   Assets in Clarksdale, Mississippi

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets located in Clarksdale, Mississippi.  Rayburn and Sons, Inc. made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Rayburn and Sons, Inc. for a purchase price of $20,881.

f)   Pipeline Assets in Kansas

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets related to a 32-mile segment of pipeline from Caney, Kansas to Neodesha, Kansas.  Cherokee Basin Pipeline, L.L.C. made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Cherokee Basin Pipeline, L.L.C. for a purchase price of $875,000.

g)    Farm Supply Store in Collins, Mississippi

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including the Farm Supply Store a/k/a Collins Farm Supply, consisting of an office, warehouse, 400-ton capacity dry fertilizer storage shed, 4 ½ acres of land, furniture, fixtures and equipment in Collins, Mississippi.  Richard Woolwine made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Richard Woolwine for a purchase price of $175,000 plus 45% of the wholesale price for the inventory.

h)    Grain Elevator in Paul, Idaho

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including a steel elevator with a 245,000 bushel capacity located on 1.82 acres of land in Paul, Idaho. Magic Valley Produce, Inc. made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Magic Valley Produce for a purchase price of $290,000.

i)    Ownership Interest in Flag, Inc. and Flag, L.P.

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including 2,500 shares of common stock of Flag, Inc. and the Debtors' 24.75% limited partnership interest in Flag, L.P.  Flag, L.P. made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Flag, L.P. for a purchase price consisting of (i) $204,000 in cash, (ii) 388 shares of $25 par value common stock of Industries, and (iii) $170,500 non-negotiable qualified patronage equity credits issued by Industries.

j)    Assets Utilized by Farmland Transportation Operations

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including the transportation equipment, inventory, shop and office equipment and customer lists utilized by Farmland Transportation Operations, together with the assumption and assignment of executory contracts and unexpired leases related to these assets.  Cenex Harvest States Cooperatives made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to Cenex Harvest States Cooperatives for a purchase price of $1,300,000, plus the value of truck and tractor parts inventory.

k)    Fertilizer River Terminal Warehouse in North Little Rock, Arkansas

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including the liquid and dry fertilizer river terminal warehouse located in North Little Rock, Arkansas and various assets used in connection with the operations, together with the assumption and assignment of executory contracts and unexpired leases related to these assets.  HelmFertilizer Corporation made the highest and best offer for these assets.  The Bankruptcy Court subsequently authorized the sale of these assets to HelmFertilizer Corporation for a purchase price of $2,775,000.

l)    Fertilizer River Terminal Warehouse in Sugar Creek, Missouri

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including the dry fertilizer river terminal warehouse located in Sugar Creek, Missouri and the

17

decommissioned facilities for the storage or liquid fertilizer and anhydrous ammonia. At an auction held on February 24, 2003, LaFarge North America, Inc.. was the highest and best bidder for these assets. The Bankruptcy Court subsequently authorized the sale of these assets to LaFarge North America, Inc. for a purchase price of $1,000,000.

m) Ownership Interest in Farmer's Grain Terminal, L.L.C.

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including the Debtors' 48% ownership interest in Farmer's Grain Terminal, L.L.C., a grain storage and handling joint venture located in Slater, Missouri, together with the assumption and assignment of certain executory contracts related to these assets. At an auction held on January 13, 2003, Fletcher Grain Company, Inc. was the highest and best bidder for these assets. The Bankruptcy Court subsequently authorized the sale of these assets to Fletcher Grain Company, Inc. for a purchase price of $825,000.

n) Fertilizer Warehouse in Greenville, Mississippi

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including a fertilizer warehouse located in Greenville, Mississippi. At an auction held on March 21, 2003, United Agri-Products, Inc. d/b/a UAP Midsouth was the highest and best bidder for these assets. The Bankruptcy Court subsequently authorized the sale of these assets to United Agri-Products, Inc. d/b/a UAP Midsouth for a purchase price of $3,130,000.

o) Ownership Interest in National Carriers, Inc.

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including the Debtors' 99.44% ownership interest in National Carriers, Inc., a trucking company located in Liberal, Kansas that operates approximately 975 tractors and 1,175 trailers. At an auction held on March 10, 2003, Farmland National Beef Packing Company L.P. was the highest and best bidder for these assets. The Bankruptcy Court subsequently authorized the sale of these assets to Farmland National Beef Packing Company L.P. for a purchase price of $5,050,000.

p) Vacant Land in East Lawrence, Kansas

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, including approximately 179 acres of vacant land located in East Lawrence, Kansas. After consideration of all of the circumstances, the Debtors identified a lead bid in the amount of $5,040,000. At an auction, Eastside Acquisitions LLC was the highest and best bidder for these assets. The sale of this vacant land to Eastside Acquisitions LLC closed on June 25, 2003.

q) Grease Plant Assets in North Kansas City, Missouri

The Bankruptcy Court authorized the sale of certain furniture, fixtures, leasehold improvements, computer hardware and software, office supplies, telephone numbers, business records and goodwill associated with a lubricating grease manufacturing and packing plant in a leased industrial complex in North Kansas City, Missouri to N L Grease, LLC, for consideration consisting of the following acts by N L Grease, LLC: (i) hiring 7 of the 10 employees currently working at the plant; (ii) reimbursing the Debtors the lesser of $40,000 or the actual cost of

severance benefits for those employees of the plant not hired by N L Grease, LLC; and (iii) entering into a new lease with the landlord for the real estate upon which the plant operates.

In conjunction with this sale, Cenex Harvest Sale Cooperatives has elected to exercise its option to purchase the equipment located at this plant for the sum of $1,000 and to purchase the raw material inventory, work in progress and finished goods inventory at cost, estimated to be approximately $1,307,000.

r)  Nitrogen Fertilizer Assets

The Debtors retained UBS Warburg LLC ("UBS") as financial advisor charged with the marketing of the following: (i) certain assets associated with the anhydrous ammonia production and terminal facilities owned or leased by the Debtors in Kansas, Nebraska, Oklahoma, Minnesota, Iowa, Texas, Illinois and Louisiana (the "Domestic Fertilizer Assets"), and (ii) certain of the Debtors' interests in an anhydrous ammonia production facility in The Republic of Trinidad and Tobago (the "Foreign Fertilizer Assets" and, together with the Domestic Fertilizer Assets, the "Fertilizer Assets").  After identifying potential purchasers of the Fertilizer Assets, the Debtors and UBS initiated discussions with these potential purchasers.  After consideration of all of the circumstances, the Debtors identified Koch Nitrogen Company ("Koch") as the "stalking horse" bidder for the sale of the Domestic Fertilizer Assets and the Foreign Fertilizer Assets.

The Bankruptcy Court approved auction and bidding procedures for the sale of the Fertilizer Assets, including the assumption and assignment of certain executory contracts and unexpired leases related to the Fertilizer Assets.  Pursuant to these auction and bid procedures, the Debtors conducted an auction of Fertilizer Assets on March 26-27, 2003.  At the conclusion of the auction, the Debtors determined that: (i) Koch made the highest and best bid for substantially all of the Domestic Fertilizer Assets for an estimated purchase price of $131,171,548, consisting of an estimated $98,102,912 in cash and an estimated $33,068,636 in assumed liabilities, together with additional consideration consisting of various amendments to its asset purchase agreement; (ii) Koch made the highest and best bid for the Foreign Fertilizer Assets for an estimated purchase price of $128,617,030. The Bankruptcy Court authorized the sale of the Domestic Fertilizer Assets and the Foreign Fertilizer Assets to Koch on April 17, 2003.

Also in connection with the auction for the Fertilizer Assets, Vanguard Synfuels, LLC made the highest and best bid for the ammonia plant in Pollock, Louisiana for a purchase price of $2,040,000; and CF Industries, Inc. made the highest and best bid for the ammonia terminal in Devils Lake, North Dakota for a purchase price of $200,000.  The Bankruptcy Court authorized the sale of these assets to Vanguard Synfuels, LLC and CF Industries, Inc. on April 30, 2003 and June 3, 2003.

s)  Possible Disposition of the Grain Elevators

The Debtors have been engaged in discussions with the Bankruptcy Committees regarding a possible disposition of the Grain Elevators.  The Debtors have received an appraisal of the Grain Elevators and are awaiting the completion of an audit of ADM/Farmland's previous year's operations.  Until such time as the audit has been completed and have been reviewed by the Debtors and the Bankruptcy Committees, disclosure of the terms of any possible disposition of the Grain Elevators would not be constructive for  this sale process.

t) Crop Production Phosphate Assets

Prior to August 31, 2002, the board of directors of Industries authorized the sale of substantially all of the assets of Farmland Hydro. Subsequent to August 31, 2002, Industries and Norsk Hydro a.s, the other 50% owner of Farmland Hydro, signed an agreement with Cargill Fertilizer, Inc. under which Cargill agreed to purchase substantially all the assets and assume substantially all the liabilities of Farmland Hydro. The Bankruptcy Court approved the sales agreement in October 2002. This transaction was consummated in November 2002.

u) Miscellaneous Assets

On September 27, 2002, the Bankruptcy Court entered its Order Approving Procedures For Sale of Miscellaneous Assets of Debtors Pursuant to Section 363 of the Bankruptcy Code (the "Miscellaneous Assets Order"), pursuant to which the Bankruptcy Court approved certain procedures for the sale of certain miscellaneous assets of the Debtors without further Bankruptcy Court authorization. To date, the Debtors have concluded sales totaling approximately $973,000 pursuant to the Miscellaneous Assets Order:

v) Anhydrous Ammonia Trailers

On February 27, 2003, the Bankruptcy Court entered its Order Approving Procedures For Sale of Trailers Pursuant to Section 363 of the Bankruptcy Code (the "Trailer Sale Order"), pursuant to which the Bankruptcy Court approved certain procedures for the sale of the Debtors' fleet of anhydrous ammonia trailers. To date, the Debtors have concluded sales of approximately 243 trailers, generating net sale proceeds in excess of $4.8 million.

w) Assets in Hastings, Nebraska

The Bankruptcy Court approved auction and bid procedures for the sale of certain assets, located in Hastings, Nebraska. Pursuant to these auction and bid procedures, the Debtors held an auction of these assets on May 12, 2003. The Bankruptcy Court authorized the sale of these assets to Equalizer, Inc. on May 19, 2003 for $1,925,000.

x) Ownership Interest in Alton Grain Terminal, LLC

On April 30, 2003, the Bankruptcy Court entered its Order Approving the Sale of Debtors' 14% Membership Interest in Alton Grain Terminal, LLC, an entity that owns and operates a grain handling and storage facility in Alton, North Dakota, to Alton Grain Terminal, LLC, for the purchase price of $530,950.

y) Ownership Interest in Southern Farm Fish Processors, Inc.

On February 25, 2003, the Bankruptcy Court authorized the Debtors to vote their 100 % interest in Southern Farm Fish Processors, Inc. ("SFFP") in favor of the sale by SFFP of substantially all of SFFP's assets, which include a 10 acre parcel of land, a building, equipment, inventory and accounts receivable associated with a catfish processing plant in Eudora, Arkansas to Arkansas Catfish Growers, LLC ("ACG"), and to compromise certain claims in connection with such asset sale. The purchase price for these assets was $200,000 plus the value of the inventory and accounts receivable.

z)   Ownership Interest in Alliance Farms, LLC

On December 10, 2002, the Bankruptcy Court authorized the Debtors to vote their 34.7% interest in Alliance Farms, LLC, a limited liability company formed for the purpose of hog production, in favor of the marketing of Alliance Farms, LLC's assets.

aa)  Ownership Interest in Northeast Arkansas Oil Company, LLC

The Bankruptcy Court entered its Order authorizing the Debtors vote their 100 % interest in Northeast Arkansas Oil Company, LLC ("NEA") in favor of the sale by NEA of substantially all of NEA's assets, which include leasehold rights, fixtures and equipment used in the operation of the Newport Tiger Mart Truck Stop in Newport, Arkansas, to Magness Oil Co. for the purchase price of $537,500.

bb) Outstanding Loan to Perryton Equity Exchange

The Bankruptcy Court approved a compromised settlement of a loan due the Debtors by Perryton Equity Exchange of Perryton, Texas.  The approximate outstanding loan value of $6.8 million was settled for the amount of $5.5 million cash.  The settlement was completed in December 2002.

cc) Sale of Major Plant Components and Spare Parts in Lawrence, Kansas

The Bankruptcy Court approved (i) auction and bid procedures for the sale of the major components related to a fertilizer plant located in Lawrence, Kansas, including an ammonia plant, two nitric acid plants and a urea plant (the "Lawrence Plant Components"), and (ii) auction procedures for the sale of certain spare parts, supplies and ancillary equipment associated with the Lawrence Plant Components (the "Lawrence Spare Parts").

In accordance with the auction and bid procedures for the Lawrence Plant Components, the Debtors are authorized to enter into one or more agreements for the sale of the Lawrence Plant Components, subject to higher and better offers and Bankruptcy Court approval.  The Debtors continue to market the Lawrence Plant Components to interested parties.  To date, the Debtors have not entered into any definitive agreement for the sale of any of the Lawrence Plant Components.

In accordance with the auction procedures for the Lawrence Spare Parts, the Debtors conducted an auction of the Lawrence Spare Parts on October 24 - 25, 2003, which auction netted sale proceeds of approximately $1.25 million.

dd) Sale of Coffeyville Assets

The Debtors have entered into an asset purchase agreement with an affiliate of Pegasus Partners II, L.P. for the purchase and sale of the Coffeyville Assets.  Subject to higher and better bids, the cash purchase price for the Coffeyville Assets is $22 million.  The aggregate consideration for the Coffeyville Assets is estimated to be as much as $281 million, including cash, payments of up to $85 million for crude oil and other raw materials, materials in process and finished products, an earn-out of up to $40 million based on net cash flow (if any) from closing until December 31, 2007, and assumed liabilities, including potential claims under environmental laws.  On September 25,

2003, the Debtors filed a motion with the Bankruptcy Court, requesting authority to sell the Coffeyville Assets in accordance with certain auction and bid procedures, including the assumption and assignment of designated contracts and leases . By order dated October 10, 2003, the Bankruptcy Court approved the auction and bid procedures for the sale of the Coffeyville Assets, which provide that, in the event that qualifying competing bids are received by the Debtors, an auction will commence on November 3, 2003. To the extent that any of these designated contracts or leases is subsequently excluded from the sale of the Coffeyville Assets and rejected by the Debtors, there exists the risk that the counterparties to any such rejected contracts or leases could assert significant rejection damage claims against the Debtors. Section 5.1(c) of the Plan provides the procedures for the disposition of the Coffeyville Assets in the event that the Debtors own the Coffeyville Assets on the Effective Date.

Adversary proceedings are now pending in the Bankruptcy Court to resolve the extent, validity and priority of various mechanics' liens, materialmans' liens and artisans' liens filed against portions of the Coffeyville Assets. See Section III.I.2, *Procedures For Mechanics' Lien Claims*.

ee) Sale of SF Phosphates Interest

The Debtors have entered into an asset purchase agreement with Simplot for the purchase and sale of the SF Phosphates Interest for consideration totaling approximately $64.5 million, subject to higher and better bids. On September 30, 2003, the Debtors filed a motion with the Bankruptcy Court, requesting authority to sell the SF Phosphates Interest in accordance with certain auction and bid procedures. By order dated October 9, 2003, the Bankruptcy Court approved the auction and bid procedures for the SF Phosphates Interest, which provide that, in the event that qualifying competing bids are received by the Debtors, an auction will commence on November 3, 2003.

## 2. Disposition Of The Pork Business

a) Evaluation of a Possible Sale of the Pork Business

The Debtors retained Goldsmith Agio Helms ("Goldsmith") to, among other things, assist the Debtors in exploring a possible sale of the Pork Business. Goldsmith held numerous discussions with officers and key employees involved with the Pork Business, reviewed financial and non-financial information on the Pork Business, and worked with management to prepare a Confidential Memorandum on the Pork Business (the "Goldsmith Confidential Memorandum"). While the Goldsmith Confidential Memorandum was being prepared, Goldsmith contacted numerous potential strategic and financial buyers to determine their level of interest in acquiring the Pork Business. Confidential and other business information was provided to interested parties. Several interested parties made initial indications of interest in the Pork Business.

b) Evaluation of a Possible Reorganization of the Pork Business

The Debtors also retained Trinity Capital, LLC ("Trinity") to, among other things, assist the Debtors in evaluating options for the reorganization of the Pork Business, including the valuation of the Pork Business, conducting due diligence of the operations and assets of the Pork Business, identifying and reviewing prospective alliance partners (including negotiations with such potential alliance partners and any financing relating thereto), and advising and assisting with business plans

and the presentation of such plans.  As part of this process, various producer groups were solicited. Ultimately, no producer group made a proposal to purchase an ownership interest in the Pork Business.

### c)  Sale of the Pork Business

Following discussions with interested parties, the Debtors, in consultation with the Bankruptcy Committees, reviewed both the sale and reorganization options and concluded that a sale of the Pork Business provided the greatest opportunity to maximize value for the Estates.  On July 14, 2003, Foods and Industries entered into an Asset Sale and Purchase Agreement (the "Pork Purchase Agreement") with KC Acquisition, Inc. and Smithfield Foods, Inc. (collectively, "Smithfield") pursuant to which Foods and Industries agreed to sell the Pork Business in accordance with Section 363 of the Bankruptcy Code.  The sale of the Pork Business will be consummated through the sale of substantially all the assets of the Pork Business.

The Pork Purchase Agreement provides that the purchase price for the Pork Business will be $363,500,000.  Smithfield has deposited $35,000,000 in an escrow account (the "Pork Escrow Deposit") for the benefit of Industries and Foods.

On July 15, 2003, the Debtors filed a motion with the Bankruptcy Court (the "Sale Motion"), requesting entry of an order: (i) approving the proposed auction and bid procedures (the "Auction and Bid Procedures"); (ii) approving a $10,000,000 break-up fee (the "Pork Break-Up Fee") to be paid to Smithfield in the event that the Pork Purchase Agreement is terminated as a result of the acceptance of a competing bid; (iii) approving the form and manner of notice; (iv) authorizing the sale of the assets of the Pork Business free and clear of liens, claim and encumbrances (subject to higher or better offers); and (v) approving the assumption and assignment of executory contracts and leases in connection with such sale.

A hearing with respect to the Sale Motion was held July 29, 2003, and pursuant to order dated July 31, 2003  (the "Sale Procedures Order"), the Bankruptcy Court approved the Sale Motion, subject to final approval of the sale of the Pork Business.

With respect to competing bids, the approved Auction and Bid Procedures contemplate, among other things, that:

- Any person submitting a competing bid demonstrate evidence of committed financing and otherwise demonstrate its ability to consummate the proposed transaction in a time period acceptable to Industries and Foods;

- Any competing bid be in writing, identify proposed changes to the terms and conditions of the Pork Purchase Agreement and identify: (i) the bidder, (ii) the consideration, and if such consideration includes non-cash consideration, the bidder's opinion as to its cash equivalency and method of determination thereof, (iii) financial information with respect to the bidder and its ability to consummate the proposed transaction and (iv) all terms and conditions of the competing bid;

- Any competing bid include information and representations regarding compliance with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended;

- To be a "higher or better offer," any competing bid be at least $374,500,000 (which represents Smithfield's offer, plus the Pork Break-Up Fee, plus $1,000,000) and not (i) be subject to terms, conditions or restrictions unacceptable to Industries and Foods, or (ii) require any break-up fee, termination fee, or any similar buyer protections;

- Any competing offer include an earnest money deposit which equals or exceeds the Pork Escrow Deposit, or if the competing bid is for less than all of the assets of the Pork Business, then the earnest money deposit shall be no less than 10% of the competing bid; and

- Any competing bid be submitted prior to 5:00 p.m. Central Time on September 12, 2003 (the "Pork Competing Bid Deadline");

Before the Pork Competing Bid Deadline, Debtors received a competing bid from Ambassador Acquisition Company, LLC, an indirect wholly-owned subsidiary of Cargill, Incorporated (the "Cargill Bid"), which provides for a purchase price of $385,000,000 for the Pork Business. Debtors, after consultation with the Official Committee of Unsecured Creditors, the Official Committee of Bondholders, and Debtors' financial advisors and attorneys, determined that the Cargill Bid met the requirements of the Auction and Bid Procedures. Accordingly, an auction (the "Auction") was scheduled for October 12, 2003.

With respect to the Auction, the approved Auction and Bid Procedures contemplate, among other things, that:

- Overbids must be in amounts at least $1,000,000 in excess of the prior bid, and Smithfield will be allowed to match each and every overbid;

- The Pork Break-up Fee shall be taken into account in determining the amount bid in each round of bidding;

- Debtors shall determine, in their sole and absolute discretion (subject to Bankruptcy Court approval), the highest bid for the Pork Business, whether that bid be for the Pork Business in bulk or the aggregate of bids for parcels of the Pork Business; and

- If for any reason the highest bidder fails to consummate the acquisition of the Pork Business pursuant to an accepted bid, then the next highest or best bid for the Pork Business shall automatically be deemed the accepted bid and Debtors may sell the Pork Business to such bidder as soon as commercially reasonable without further order of the Bankruptcy Court.

At the conclusion of the Auction, the Debtors determined that Smithfield made the highest and best bid for the Pork Business. Smithfield's bid includes cash consideration of $367.4 million and certain additional consideration. As part of its prevailing bid, Smithfield agreed to assume the Farmland Industries, Inc. Employee Retirement Plan (the "Farmland Pension Plan"). The Debtors believe that Smithfield's assumption of the Farmland Pension Plan resolves the PBGC Claims filed by the PBGC.

On October 28, 2003, the Bankruptcy Court entered its order authorizing the sale of the Pork Business to Smithfield. The following is an unofficial transcript of the October 28, 2003, comments of Debtors' counsel at the hearing with respect to matters supplemental to the sale of the Pork Business: "Mr. Frazen: Yes. The last item – there are two items. They're both related to the same matter. It's the motion to approve an agreement between Farmland Industries, the Official Committees, and Foods management, and the request for an expedited hearing and a request to file two documents under seal in connection with them. And, the issue addressed by this motion arises under the following background. Immediately prior to the auction, the management of Foods expressed certain concerns relating to the compensation of the Foods management employees had received and their rights under the Debtors' KERIT or incentive plan that the court had approved on November 6th. In light of the auction on October 12th and the desire to have a smooth transition to a new buyer, the parties sat down for a series of negotiations with the Foods management group to resolve the issue prior to the auction such that both buyers were comfortable with the resolution. Both buyers were fully informed as to the circumstances and were given a copy of the document that's been filed with Your Honor. The Debtor wishes to avoid making the information contained in the documents public for the reason that it contains sensitive information concerning these employees' particular compensation and believes that it is proper for the Court to consider under 107(b), these items to be filed under seal, and we would ask that the Court do so and approve the motion approving the transactions and the arrangement that is reflected in the agreement that was negotiated between the Debtor and the Committees and the management group."

The sale of the Pork Business to Smithfield closed on October 28, 2003.

### 3. Disposition Of The Beef Interests

On the Petition Date, Industries' ownership of the Beef Interests gave it approximately 71.2% of the voting interests of National Beef. USPBCo., LLC ("USPBCo.") and U.S. Premium, Ltd. (together with USPBCo., the "USPB Group"), a large producer-owned cattle marketing cooperative, owned the remaining partnership interests and supply approximately 30% of National Beef's cattle.

#### a) The Governance of National Beef

Founded in 1969, National Beef engages in meat packing and processing and is the fourth largest beef packer in the United States. Operating from five facilities, National Beef produces fresh, frozen, and case-ready branded and nonbranded products for domestic consumption as well as foreign consumption in 25 countries. It has two main slaughtering facilities and a portion-control facility in Kansas, one case-ready facility in Pennsylvania and a second case-ready facility in Georgia. National Beef estimates that slightly more than 55% of its sales are to the retail sector and approximately 30% of its sales are to the foodservice sector. National Beef enjoys a customer base that includes such blue-chip retailers as Wal-Mart, which has allowed National Beef to increase its sales of branded and other value-added products.

National Beef has four wholly-owned subsidiaries and owns a controlling interest in Kansas City Steak Company, L.L.C., a portion-control company that provides steaks to premium steak houses in the United States and directly to consumers via mail-order catalogs. In addition, through a wholly-owned subsidiary, National Beef owns a 47.5% interest in aLF Ventures, LLC, a joint venture with DMV International. aLF Ventures holds the worldwide exclusive rights to market

activated lactoferrin, a natural product that has been recently granted "Generally Recognized as Safe" status by the Food and Drug Administration for use in protecting fresh beef from bacteria such as *E. coli.*

### b)  Marketing Process

The Debtors retained Goldsmith to, among other things, assist the Debtors in marketing the Beef Interests.  Goldsmith prepared and distributed a Confidential Memorandum on National Beef (the "Beef Confidential Memorandum") aimed at educating potential buyers on National Beef and intended to establish valuation and interest in order to pursue potential transactions involving National Beef.

The Beef Confidential Memorandum was prepared from information provided to Goldsmith by Industries and National Beef.  Prior to its distribution, Goldsmith and Industries provided the Beef Confidential Memorandum to management of National Beef and to the USPB Group and received comments on the Beef Confidential Memorandum, which were incorporated into the Beef Confidential Memorandum.  In addition, the list of companies that were approached by Goldsmith was reviewed with Industries, National Beef management and the USPB Group.

### c)  Sale of the Beef Interests

On June 12, 2003, Foods, Industries and NBPCo. entered into an Asset Purchase and Sale Agreement with the USPB Group and U.S. Premium Products, LLC (the "Beef Purchase Agreement") pursuant to which Foods and Industries agreed to sell the Beef Interests in accordance with section 363 of the Bankruptcy Code.  The sale of the Beef Interests will be consummated through the sale of: (i) Industries' limited partnership interest in National Beef and (ii) Industries' and Foods' equity interests in NBPCo.

The Beef Purchase Agreement provides for a $232,000,000 purchase price for the Beef Interests.  The USPB Group has deposited an aggregate of $10,000,000 in an escrow account (the "Deposit Escrow Account") for the benefit of Industries and Foods.  The net proceeds of the sale will be distributed pursuant to the Final DIP Order.

On June 13, 2003, the Bankruptcy Court issued an order: (i) authorizing the sale of the Beef Interests (subject to higher and better offers);  (ii) approving auction and bid procedures; and (iii) approving a $7,000,000 break-up fee (the "Beef Break-Up Fee") to be paid by Industries and Foods to the USPB Group in the event that the Beef Purchase Agreement is terminated as a result of Industries' and Foods' acceptance of a competing bid.

The court-approved procedures for the submission and consideration of competing offers for the Beef Interests required, among other things, that:

- Any person submitting a competing offer demonstrate evidence of committed financing or otherwise demonstrate its ability to consummate the proposed transaction in a time period acceptable to Industries and Foods;

- Any competing offer be in writing, contain substantially similar terms and conditions as the Beef Purchase Agreement and identify: (i) the bidder, (ii) the consideration,

(iii) financial information with respect to the bidder and its ability to consummate the transaction and (iv) all terms and conditions of the competing offer;

- Any competing offer include information and representations regarding compliance with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended;

- To be a "higher or better offer," any competing offer must be at least $239,500,000 (which represents the USPB Group's offer, plus the Break-Up Fee, plus $500,000) and must not (i) require financing, (ii) be subject to terms, conditions or restrictions unacceptable to Industries or Foods, or (iii) require any break-up fee, termination fee, or any similar buyer protections;

- Any competing offer include an earnest money deposit which equals or exceeds the USPB Group's deposit; and

- Any competing offer be submitted by 5:00 p.m. Central Time on July 7, 2003 (the "Beef Competing Bid Deadline").

An auction was scheduled for July 9, 2003 to address any competing bids submitted prior to the Beef Competing Bid Deadline. No competing bids were received by the Beef Competing Bid Deadline so the auction was not held.

The Sale Hearing was conducted on July 15, 2003 and the Debtors sought the Bankruptcy Court's approval of the Beef Purchase Agreement and the transactions contemplated thereby. The Bankruptcy Court entered its final order authorizing the sale of the Beef Interests, free and clear of liens, claims and encumbrances, on July 22, 2003. The sale of the Beef Interests pursuant to the Beef Purchase Agreement closed on August 6, 2003. Industries' ownership interest in Farmland National Beef aLF, LLC was not sold as part of the Beef Interest.

### 4. Other Business Operations

Industries is currently winding up its international grain business. As a part of this process, Industries has sold its export elevator located in Argentina, sold substantially all of its inventories related to its international grain business and has settled litigation in Brazil related to misappropriated soybeans. Industries continues to collect certain long-term receivables, governmental receivables and trade receivables from troubled accounts related to the business. The Debtors anticipate that Industries will receive in excess of $10 million from the windup of Industries' international grain business.

The Debtors have discontinued operations at their fertilizer plant located in Lawrence, Kansas (the "Lawrence Fertilizer Plant"), which is primarily comprised of several parcels of real estate (the "Lawrence Real Estate"), the Lawrence Plant Components and the Lawrence Spare Parts. See Section III.G.1.cc, *Major Plant Components and Spare Parts located in Lawrence, Kansas*. Although the Debtors remain open to any offers to purchase the Lawrence Fertilizer Plant in its entirety, the Debtors have determined that a sale of both the Lawrence Plant Components (either in its entirety or as separate components) and the Lawrence Spare Parts currently constitute the best method for maximizing the value of the Lawrence Fertilizer Plant for their creditors. To this end, the Debtors

conducted an auction of the Lawrence Spare Parts on October 24 – 25, 2003.  In addition, although the Debtors have not entered into any definitive agreements for the sale of any of the Lawrence Plant Components to date, the Debtors continue to market the Lawrence Plant Components to interested parties.  The Debtors anticipate that any sale of the Lawrence Plant Components may not be completed for over twelve months due to the time necessary to dismantle and remove such items.  The Debtors are currently meeting (and will continue to meet) any environmental obligations related to the Lawrence Fertilizer Plant.

### H.  Case Administration

#### 1.  Claims Information And Estimates

The Debtors filed their Schedules in July 2002 and filed amended Schedules in October 2002.  Thereafter, by its Order Establishing Bar Date for Filing Proofs of Claim and Interest and Approving Form of Notice dated October 24, 2002, the Bankruptcy Court established January 10, 2003, as the final date for filing proofs of claim against the Debtors.  The Debtors have not completed their analysis of all Claims asserted against the Debtors.

#### 2.  Claims Agent

By order of the Bankruptcy Court, dated June 5, 2002, Bankruptcy Management Corporation ("BMC") was appointed the official claims agent of the clerk of the Bankruptcy Court and assumed responsibility to: (a) provide notice to the Debtors' creditors of the Bankruptcy Code section 341 meeting; (b) provide form proofs of claim and notices related thereto to creditors; and (c) docket and maintain proofs of claim filed in the Chapter 11 Cases.

#### 3.  Balloting Agent

By order of the Bankruptcy Court, dated June 5, 2002, BMC was employed to assist the Debtors with the balloting process in connection with the Plan.

#### 4.  Claims Transfer Procedures

On December 20, 2002, the Bankruptcy Court entered its Interim Order Pursuant to Sections 362 and 105(a) of the Bankruptcy Code Establishing Notification Procedures Regarding (A) Applicability of the Automatic Stay Enjoining Certain Transfers of Claims and (B) Approval Procedures for Trading in Claims Against Farmland Industries, Inc., Et Al., establishing, on an interim basis, certain procedures that must be satisfied before the sale or other transfer of claims against the Debtors would be deemed effective.  On February 11, 2003, the Bankruptcy Court entered its Final Order Pursuant to Sections 362 and 105(a) of the Bankruptcy Code Establishing Notification Procedures Regarding (A) Applicability of the Automatic Stay Enjoining Certain Transfers of Claims and (B) Approval Procedures for Trading in Claims Against Farmland Industries, Inc., Et Al., establishing, on a final basis, certain procedures that must be satisfied before the sale or other transfer of claims against the Debtors would be deemed effective.

## I.   Significant Business And Legal Matters

### 1.   Procedures For Workers' Compensation Claims

On June 5, 2002, the Bankruptcy Court entered its Order Authorizing Payment of Prepetition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits, granting the Debtors, among other things, the authority to settle and pay worker's compensation claims under the Debtors' workers' compensation program in the ordinary course of business.

On February 19, 2003, the Bankruptcy Court entered its Order Granting Debtors' Motion for Omnibus Authority to Effectuate Settlements with Workers' Compensation Claimants and Establishing Procedures for Resolution of Contested Workers' Compensation Claims, establishing procedures for workers' compensation claims that the Debtors are unable to settle in the ordinary course of their business.  Under these procedures, the Bankruptcy Court will approve immediately upon submission (without the necessity of filing a motion, providing notice or holding a hearing) any stipulation for relief from stay filed by the Debtors and workers' compensation claimants for final settlement workers' compensation claims against the Debtors that are subject to administrative court approval.  Prior to the submission of such stipulations to the Bankruptcy Court, the Debtors must circulate the stipulations to certain designated representatives of the Bankruptcy Committees and the Lenders.

### 2.   Procedures For Mechanics' Lien Claims

On October 17, 2002, the Debtors filed a motion for an order authorizing procedures for determining the extend, validity and priority of mechanics' and/or artisans' liens (the "Mechanics' Lien Procedures").  The Mechanics' Lien Procedures proposed a schedule and process for filing and prosecuting adversary proceedings in the Bankruptcy Court to resolve more than 100 mechanics' and artisans' liens affecting property of the Debtors situated in five states.  On November 8, 2002, the Bankruptcy Court entered its memorandum opinion and order, granting the Mechanics' Lien Procedures, with certain modifications as set forth therein.  Accordingly, adversary proceedings are now pending in the Bankruptcy Court to resolve the extent, validity and priority of each of these mechanics' and/or artisans' liens.

### 3.   Proposed Termination Of Certain Employee Benefits

The Debtors currently provide benefits to former or retired employees under a group term life insurance policy with Minnesota Life Insurance Company (the "Group Policy") at an annual cost of approximately $756,000.  Having determined, in the reasonable exercise of their business judgment, that the termination of benefits to former or retired employees under the Group Policy was in the best economic interest of the Debtors' estates and creditors, the Debtors filed a motion seeking authority to terminate certain life insurance benefits to former or retired employees under the Group Policy.  Pursuant to negotiations with the carrier for the Group Policy, the affected former or retired employees could elect to continue their individual life insurance policies in force and effect at their own cost if they choose to do so following termination of their benefits under the Group Policy.  On May 28, 2003, the Bankruptcy Court entered an order denying this motion without prejudice to a later refiling of the motion in compliance with section 1114 of the Bankruptcy Code.

The Debtors currently provide several benefits programs for certain current and former executive employees and members of the board of directors of Industries. Having determined, in a reasonable exercise of their business judgment, that termination of these benefits programs are in the best interest of the Debtors' estates and creditors, the Debtors filed a motion seeking authority to terminate these benefits programs and to reject certain executory employment agreements. On May 28, 2003, the Bankruptcy Court entered an order granting, in part, and denying, in part, this motion.

For further discussion regarding retiree benefits, see Section IV.F, *Pension Benefits and Retiree Benefits.*

### 4. Proposed Settlement With U.S. EPA

The U.S. Environmental Protection Agency (the "EPA") has asserted that Industries is liable for response costs incurred and to be incurred by the United States in the course of responding to releases and threats of releases of hazardous substances into the environment for the following sites: (i) 57th and North Broadway Site, Wichita, Kansas; (ii) Hastings Area-Wide Groundwater Site - Operable Unit 19, Hastings, Nebraska; (iii) FAR-MAR-CO subsite of the Hastings Groundwater Site; (iv) Obee Road Site, Hutchison, Kansas; (v) Container Recycling, Inc. Site in Kansas City, Kansas; and (vi) Taracorp Site, Granite City, Illinois (collectively, the "Liquidated Sites"). The EPA has also asserted that Industries is liable for penalties for violations of certain environmental statutes, specifically, that Industries is liable for civil penalties for three violations of Section 311 of the Clean Water Act (CWA) for oil spills which occurred (i) into the Verdigris River on November 19, 1998; (ii) near Rock, Kansas on January 4, 2002; (iii) in Osage County near Bartlesville, Oklahoma on July 23, 2001. Further, the EPA contended that Industries is liable for civil penalties for violations of the "mobile source" requirements of Sections 211(h) and (k) of the Clean Air Act (CAA) at the Coffeyville refinery in Coffeyville, Kansas (collectively, the "Liquidated Civil Penalties").

Industries and the EPA have proposed to compromise and settle the Liquidated Sites and the Liquidated Civil Penalties (the "EPA Settlement") as follows:

• With respect to the EPA's claim for penalties based on the Debtors' alleged violations of Section 311 of the CWA, 33 U.S.C. § 1321, by spills of oil into (i) the Verdigris River on November 19, 1998; (ii) near Rock, Kansas on January 4, 2002; (iii) in Osage County near Bartlesville, Oklahoma on July 23, 2001: the EPA shall have an Allowed General Unsecured Claim against Industries of $1,575,000, as authorized by Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A).

• With respect to the EPA's claim for penalties based on the Debtors' alleged violation of Sections 211(h) and (k) of the Clean Air Act (CAA), 42 U.S.C. § 7545(h) and (k), at Industries' refinery in Coffeyville, Kansas: the EPA shall have an Allowed General Unsecured Claim against Industries of $17,000, as authorized by Sections 211 and 205 of the CAA, 42 U.S.C. §§ 7545 and 7524.

• With respect to the 57th and North Broadway Site, Wichita, Kansas: the EPA shall have an Allowed General Unsecured Claim against Industries of $250,000.

- With respect to the Hastings Area-Wide Groundwater Site - Operable Unit 19, Hastings, Nebraska: the EPA shall have an Allowed General Unsecured Claim against Industries of $333,340.

- With respect to the FAR-MAR-CO subsite of the Hastings Area-Wide Groundwater Site, Hastings, Nebraska: the EPA shall have an Allowed General Unsecured Claim against Industries of $10,000.

- With respect to the Obee Road Site, Hutchison, Kansas: the EPA shall have an Allowed General Unsecured Claim against Industries of $65,598.60 in settlement of past costs but excluding settlement of claims for future costs.

- With respect to the Container Recycling, Inc., Site, Kansas City, Kansas: the EPA shall have an Allowed General Unsecured Claim against Industries of $351,360.

- With respect to the Taracorp Site, Granite City, Illinois: the EPA shall have an Allowed General Unsecured Claim against Industries of $91,584.

In exchange for resolution of the Liquidated Sites and Liquidated Civil Penalties pursuant to the EPA Settlement, EPA provides a covenant not to sue and contribution protection as to the Debtors with regard to the claims addressed, and agrees not to object to provisions of the Plan that are consistent with the EPA Settlement. To the extent that a provision of the Plan is not addressed by the EPA Settlement, the Debtors and the EPA reserve all rights with regard to the Plan. The EPA Settlement also creates a structure for analysis and payment of future EPA response cost claims as allowed unsecured claims under the Plan.

The Debtors' entry into the EPA Settlement was approved by the Bankruptcy Court on April 17, 2003. Notice of the EPA Settlement appeared in the federal register on April 17, 2003. 68 Fed. Reg. 19006 (April 17, 2003). After the public comment period on the EPA Settlement ended, the EPA filed a joint motion for final approval of the EPA Settlement on June 12, 2003, which motion was granted by the Bankruptcy Court by order dated July 22, 2003.

### 5. Pending Environmental Claims

Claims totaling in excess of $100 million that relate to environmental matters based on Industries' alleged pre-petition conduct have been filed against Industries. The largest of these claims is a natural resource damage ("NRD") claim filed by the Missouri Department of Natural Resources ("MDNR"). The remaining claims are primarily private party claims for contribution related to past and future cleanup costs resulting from alleged pre-petition releases of hazardous substances by Industries. Many of these private party claims overlap with each other and with government claims and some are barred by the contribution protection obtained in the EPA Settlement discussed above. The Debtors believe that, with regard to the majority of these claims (including the NRD claim), they have defenses, under applicable bankruptcy and/or environmental law, to either the claim or the amount of the claim. The validity and amount of these claims will be resolved through the claims objection process.

To the extent that the Liquidating Trust and/or Reorganized Industries own properties (such as the refinery located in Coffeyville, Kansas) that are the subject of these claims or other

applicable environmental regulatory requirements after the Effective Date, such entities may have ongoing obligations to address certain environmental issues in their capacity as the owner of such properties.  Section 5.1(d) of the Plan provides that, on the Effective Date, certain identified properties owned by the Debtors on the Effective Date will be transferred to separate trusts, which trusts will funded with sufficient capitalization for the maintenance, remediation and/or disposition of such properties.  See Section IV.E.1, *Continued Existing of the Debtors; Vesting of Assets.*

Industries is subject to certain orders (including, but not limited to, those order listed on Appendix E attached hereto) to investigate and/or cleanup environmental contamination at certain non-Debtor owned properties.  While Industries has been performing its obligations under these orders during the Chapter 11 Case, because all of the properties involve pre-petition conduct at non-Debtor owned properties, Industries believes that these orders are not ongoing obligations of Reorganized Industries, but should be permanently resolved as allowed unsecured claims as part of the Plan and Confirmation.  Industries will seek, in consultation with the Bankruptcy Committees, such permanent resolutions through Confirmation and the claims objection process, as appropriate.

### 6.  Adjudication Regarding Subordinated Certificates

On December 24, 2002, Industries filed a Complaint for Declaratory Judgment (the "Declaratory Judgment Complaint"), seeking declaratory relief to determine the relative priority between and among the Subordinated Certificates.  In the Declaratory Judgment Complaint, Industries alleged that the documents evidencing and otherwise related to the Subordinated Certificates demonstrated the parties' intent for each issue of Subordinated Certificates to share equal priority with each other issue of Subordinated Certificates.  On February 18, 2003, Wells Fargo Bank Minnesota, National Association, in its capacity as successor trustee for the Subordinated Certificates filed its answer to the Declaratory Judgment Complaint, admitting each of the material allegations contained in the Complaint and stated further that it did not oppose the declaratory relief sought by Industries in the Declaratory Judgment Complaint.  On March 24, 2003, the Bankruptcy Court entered its Declaratory Judgment, ordering that, between and among themselves, each issue of Subordinated Certificates shared equal priority.

### 7.  Insurance Proceeds For Albert Lea Plant

On July 8, 2001, a fire occurred at the Albert Lea, Minnesota meat processing facility (the "Albert Lea Plant"), which fire severely damaged and/or destroyed buildings, equipment and inventory located at the Albert Lea Plant.  On January 14, 2002, the Albert Lea City Council adopted a resolution approving and authorizing an Order for Removal requiring the demolition of the entire building and facilities at the Albert Lea Plant and brought an action for such demolition.  On March 3, 2003, Freebourn County District Court entered judgment for the demolition and removal of the entire building and facilities at the Albert Lea Plant.

The fire loss at the Albert Lea Plant was insured under a $500 million blanket policy covering this facility and other property of Debtors.  This policy provides for replacement coverage, or in the alternative, coverage on an actual cash value basis.  The Debtors submitted the Insurance Claim to the insurers based upon the total loss sustained at the Albert Lea Plant.  Following its submission, the Debtors and the insurers engaged in settlement discussions. As a result of those discussions, the Debtors and the insurers have agreed to settle all claims between the insurers and the Debtors arising from the fire at the Albert Lea Plant for the sum of $60 million, a portion of

which has been previously paid by the insurers. The parties have scheduled a November 4, 2003 hearing to approve the settlement.

### 8. Pending Litigation and Automatic Stay

The nature of the Debtors' businesses is such that they are routinely involved in litigation. As a result of the Chapter 11 Case, pursuant to section 362 of the Bankruptcy Code, all litigation pending against the Debtors has been stayed, except in instances where the Bankruptcy Court has granted a party relief from the stay. Litigation matters involving the Debtors include those disclosed in the Schedules and those discussed herein.

    a)  Pending Proceedings Involving the National Labor Relations Board ("NLRB")

The NLRB filed a proof of claim against Industries (the "NLRB Claim") in the amount of $11,697,395.28, for which $651,000.00 is designated as an Other Priority Claim against Industries pursuant to sections 507(a)(3) and (a)(4) of the Bankruptcy Code, and for which $11,046,395.28 is designated as a general unsecured claim against Industries. The NLRB bases its Claim on ten charges currently pending before the NLRB, which charges relate to allegations and administrative findings that Industries violated the National Labor Relations Act. The NLRB contends that its Claim represents the amounts that would result from the NLRB's successful prosecution of its charges that constitute the NLRB Claim. The Debtors have filed an objection to the NLRB Claim, which objection is currently pending before the Bankruptcy Court. The NLRB also asserts that the Bankruptcy Court lacks jurisdiction to estimate the NLRB Claim under section 502(c) of the Bankruptcy Code.

    b)  Pending Adversary Proceedings

A number of adversary proceedings have been commenced in the Bankruptcy Court during the Chapter 11 Case. Copies of all pleadings filed in these adversary proceedings can be accessed via the Bankruptcy Court's case management / electronic case filing system: ecf.mowb.uscourts.gov.

    c)  Known Claims Against Third Parties

The Debtors currently hold certain claims or rights of action against a number of parties and continue to review claims against certain parties that may ripen into litigation. Neither the listing nor the failure to list any party herein shall prejudice the Debtors' rights to pursue any claims, rights of action or proceedings that have arisen or may arise in the future in the ordinary course of the Debtors' businesses. Known claims or rights or action against third parties include, without limitation, the following:

        (1) The Debtors have asserted claims against Ultimate Thermal, Inc. in connection with the fire at the Albert Lea Plant. The Debtors may also assert claims against Veit & Company in connection with the demolition of the Albert Lea Plant.

        (2) The Debtors are investigating potential claims against Agriliance LLC, Cenex Harvest States Cooperatives, Land O'Lakes, Inc. and related entities in connection with the formation of Agriliance LLC and the conduct of its business.

(3)  The Debtors have asserted claims against Reliance Insurance Company in connection with property losses the Debtors sustained for risks insured by Reliance Insurance Company.

(4)  The Debtors are participants in an opt-out group of companies that are pursuing price-fixing claims against several manufacturers of linerboard, including Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit-Stone Container Corp., International Paper Company, Georgia-Pacific Corporation, Temple-Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company.

(5)  The Debtors have filed a complaint with the Kansas Corporation Commission against Mid-America Pipeline Company, The Williams Companies and others regarding violations of the regulations governing utilities and common carriers.

(6)  The Debtors have potential claims against WB Swine/Pork Technology for amounts owing under a hog purchase contract.

(7)  The Debtors have a claim for repayment of promissory notes issued by Platz Enterprises and Jeff Platz and guaranteed by William Platz.

(8)  The Debtors have a claim against Lincoln National Life Insurance Company from its administration of the SF Services 401(k) plan.

(9)  The Debtors have asserted claims against certain securities agents to whom the Debtors have made loans.

(10)   The Debtors have asserted claims against Black & Veatch Pritchard in connection with the construction of the Coffeyville, KS gasification complex.

(11)   The Debtors are pursuing collection of monies from Cook Composite for services provided by Transportation.

(12)   The Debtors continue to pursue numerous collection matters in the ordinary course.

## IV. SUMMARY OF THE PLAN

### A.  Introduction

Set forth in this Article is a description of the basic terms of the Plan.  This description is not intended, nor should it be relied upon, to substitute for a careful review of the actual terms of the Plan, a complete copy of which is annexed hereto as <u>Appendix A</u>.

## B.  Classification Of Claims And Interests

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with this standard.  The Plan divides Claims against and Interests in the Debtors into the following Classes:

Class 1 consists of all Other Priority Claims.

Class 2 consists of all Secured Lender Claims.

Class 3 consists of all Other Secured Claims.

Class 4 consists of all Demand Certificates Claims.

Class 5 consists of all Subordinated Certificates Claims.

Class 6 consists of all Convenience Claims against Industries.

Class 7 consists of all General Unsecured Claims against Industries.

Class 8 consists of all Industries Preferred Shares.

Class 9 consists of all Industries Common Shares.

Class 10 consists of all General Unsecured Claims against Foods.

Class 11 consists of all Old Securities of Foods.

Class 12 consists of all General Unsecured Claims against Transportation.

Class 13 consists of all Old Securities of Transportation.

Class 14 consists of all General Unsecured Claims against SFA.

Class 15 consists of all Old Securities of SFA..

Class 16 consists of all General Unsecured Claims against Pipeline.

Class 17 consists of all Old Securities of Pipeline.

Class 18 consists of all Intercompany Claims.

Class 19 consists of all Subordinated Claims.

For a description of the treatment of the Claims and Interests and a summary of distributions under the Plan, see Section IV.C, *Treatment of Claims and Interests and Summary of Distributions under the Plan*.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class. A Claim or Interest may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

Although the PBGC previously filed the PBGC Claims against certain of the Debtors, all of the PBGC Claims will be resolved by the assumption of the liabilities associated with such Claims in connection with the sale of the Pork Business. No distributions will be made to the PBGC under the Plan.

The Plan, though proposed jointly, constitutes separate plans proposed by each Debtor. Therefore, the classifications set forth below shall be deemed to apply separately (as appropriate) with respect to each such plan. Accordingly, each Debtor reserves the right to request confirmation of its separate plan in the event that such separate confirmation is necessary and appropriate for such Debtor and its creditors. In addition, each Debtor reserves the right to declare an Effective Date for its separate plan in the event that this action is necessary and appropriate for such Debtor and its creditors. **There may exist circumstances in which one or more, but less than all, of the Debtors would declare an Effective Date for such Debtors' separate plans at the same time.** As an example, a delay in the sale of the Coffeyville Assets could delay Industries from declaring an Effective Date for its separate plan and, as a result, could delay distributions to creditors of Industries by as much as several months. In the event that one or more, but less than all, of the Debtors wish to exercise their right to declare an Effective Date, such Debtors will consult with the Bankruptcy Committees and then present the proposed action to the Bankruptcy Court.

## C. Treatment Of Claims And Interests And Summary Of Distributions Under The Plan

The following table sets forth a brief summary of the classification and treatment of Claims and Interests and the estimated distributions to the holders of Allowed Claims and Allowed Interests under the Plan. The information set forth in the tables is for convenience of reference only. Each holder of a Claim or Interest should refer to Article III of the Plan, Section IV.B, *Classification of Claims and Interests*, and the liquidation analysis annexed as <u>Appendix D</u> hereto for a full understanding of the classification and treatment of Claims and Interests provided under the Plan. The estimates set forth in the table constitute the Debtors' estimates of the likely distributions from the Debtors' orderly liquidating of their Estates and may differ from actual distributions by reason of, among other things, variations in the amounts of Allowed Claims and the existence and resolution of Disputed Claims. The Debtors reserve their rights to update or modify the estimated distributions set forth in the table. Unless otherwise noted, these estimates are as of October 24, 2003.

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| _ | **Administrative Claims**<br><br>Estimated Allowed Claims: $204.1 million<br><br>Estimated Percentage Recovery: 100% | Except as otherwise provided for herein, and subject to the requirements of Sections 11.1-11.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Administrative Claim, each holder of an Allowed Administrative Claim shall receive in full and complete satisfaction of such Allowed Administrative Claim (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case and all liabilities and obligations of the Debtors under the KERIT Plan shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. Notwithstanding the foregoing, (i) the Bondholder Transaction Fee shall be payable only from distributions otherwise payable to holders of Allowed Class 5 Claims and shall be paid prior to the payment of any distributions to holders of Allowed Class 5 Claims, and (ii) the Creditor Transaction Fee shall be payable only from distributions otherwise payable to holders of Allowed Class 7 Claims and shall be paid prior to the payment of any distributions to holders of Allowed Class 7 Claims.<br><br>The Allowed Administrative Claims are currently comprised of the following: (i) $96.5 million in post-petition intercompany obligations; (ii) $13.5 million in post-petition trade payables; (iii) $5.0 in Professional Fee Claims; (iii) $23.7 million in outstanding checks; (iv) $14.5 million in employee obligations; and (v) $50.9 million in other current liabilities constituting Administrative Claims. |
| _ | **Priority Tax Claims**<br><br>Estimated Allowed Claims: $9.8 million<br><br>Estimated Percentage | Except as otherwise provided for herein, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (iii) the date such Priority Tax Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | Recovery: 100% | Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive in full and complete satisfaction of such Allowed Priority Tax Claim (x) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing. |
| _ | **DIP Loan Claims**<br><br>Estimated Allowed Claims: $10.5 million<br><br>Estimated Percentage Recovery: 100% | If then outstanding on the Effective Date, the DIP Loan Claims shall be paid in full on the Effective Date according to the terms of the DIP Credit Agreement. Notwithstanding anything in the Plan to the contrary, the DIP Loan Claims shall have the superpriority status set forth in the orders authorizing and evidencing the DIP Loan Claims. |
| 1 | **Other Priority Claims**<br><br>Estimated Allowed Claims: $0.1 million<br><br>Estimated Percentage Recovery: 100% | On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Claim becomes an Allowed Class 1 Claim, or (iii) the date such Class 1 Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Class 1 Claim, each holder of an Allowed Class 1 Claim shall receive, in full and complete satisfaction of such Allowed Class 1 Claim (x) Cash equal to the unpaid portion of such Allowed Class 1 Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing. The legal, equitable and contractual rights of the holders of Allowed Class 1 Claims are Unimpaired by the Plan. |
| 2 | **Secured Lender Claims**<br><br>Estimated Allowed Claims: $0.0 million<br><br>Estimated Percentage Recovery: 100% | On the Effective Date, the Allowed Secured Lender Claims, if any, shall be satisfied and paid in full in the amount of said Claims then outstanding. Net cash proceeds from Section 363 asset sales prior to the Confirmation Date shall be remitted for application against the Secured Lender Claims. The Secured Lender Claims, if any, outstanding on the Effective Date shall be paid in full in Cash from net cash proceeds from Section 363 asset sales that occur after the Confirmation Date and prior to the Effective Date. Nothing in the Plan shall alter or affect any intermediate payments made by the Debtors to the Secured Lenders prior to the Effective Date. Class 2 is Unimpaired by the Plan. |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| 3 | **Other Secured Claims**<br><br>Estimated Allowed Claims: $19.0 million<br><br>Estimated Percentage Recovery: 100% | Subject to the provisions of Section 3.1(d) of the Plan, on or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 3 Claim shall receive one of the following distributions: (a) payment of such holder's Allowed Other Secured Claim in full in Cash; (b) the sale or disposition proceeds of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Debtors' interest in such Collateral; (c) the surrender of the Collateral securing such Allowed Other Secured Claim to the holder of such Allowed Other Secured Claim; (d) the Reinstatement of such Allowed Other Secured Claim; or (e) such other distribution or treatment as may be ordered by the Bankruptcy Court or as shall be necessary to satisfy the requirements of the Bankruptcy Code.  The manner and treatment of each Allowed Other Secured Claim shall be determined by the Liquidating Trustee in his sole and absolute discretion.  Nothing in this Section 3.4 or elsewhere in the Plan shall preclude the Liquidating Trustee from challenging the validity of any alleged Lien on any asset of a Debtor or the value of such Collateral.  The legal, equitable and contractual rights of the holders of Allowed Class 3 Claims are Unimpaired by the Plan.<br><br>The Allowed Other Secured Claims are currently comprised of the following: (i) $15.9 million for certain of the Industrial Revenue Bonds; (ii) $2.5 million in secured tax claims; and (iii) $.6 million in other miscellaneous secured claims. |
| 4 | **Demand Certificates Claims**<br><br>Estimated Allowed Claims: $20.0 million<br><br>Estimated Percentage Recovery: 100% | As of the Effective Date, all notes, instruments and other documents evidencing the Demand Certificates shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Demand Certificates evidenced thereby shall be extinguished. Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, until all Allowed Class 4 Claims have been paid in full (including payment of interest through the Effective Date at the rate provided in the Demand Certificates) less any amounts payable to the Indenture Trustee for the Demand Certificates pursuant to Section 3.1(d) of the Plan, each holder of an Allowed Class 4 Claim shall receive, in full and complete satisfaction of such Allowed Class 4 Claim, (i) its Pro Rata share of the Industries Distribution Pool plus (ii) its Pro Rata Share of the funds otherwise payable to holders of Allowed Class 5 Claims pursuant to clause (i) of the second sentence of Section 3.6 of the Plan less (iii) its Pro Rata share of any amounts payable to the Indenture Trustees for |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|-------|---------------------------|-----------|
| | | the Demand Certificates pursuant to Section 3.1(d) of the Plan.  Class 4 is Impaired by the Plan. |
| 5 | **Subordinated Certificates Claims**<br><br>Estimated Allowed Claims: $557.3 million<br><br>Estimated Percentage Recovery: 60% - 82% | As of the Effective Date, all notes, instruments and other documents evidencing the Subordinated Certificates shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Subordinated Certificates evidenced thereby shall be extinguished.  Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 5 Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 5 Claim, (i) its Pro Rata share of the Industries Distribution Pool <u>less</u> (ii) its Pro Rata share of those funds required to be paid to holders of Allowed Class 4 Claims in accordance with clause (ii) of the second sentence of Section 3.5 of the Plan <u>plus</u> (iii) after all Allowed Class 4 Claims have been paid in full, its Pro Rata share of the funds otherwise payable to holders of Allowed Class 4 Claims pursuant to clause (i) of the second sentence of Section 3.5 of the Plan <u>less</u> (iv) its Pro Rata share of the Bondholder Transaction Fee <u>less</u> (v) its Pro Rata share any amounts payable to the Indenture Trustees for the Subordinated Certificates pursuant to Section 3.1(d) of the Plan.  According to the Bondholders' Committee, the Bondholder Transaction Fee will be approximately $1.112 million to $1.725 million based on currently estimated recoveries, but greater recoveries would result in an increased amount.  Class 5 is Impaired by the Plan. |
| 6 | **Convenience Claims against Industries**<br><br>Estimated Allowed Claims: $2.0 million<br><br>Estimated Percentage Recovery: 100% | Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 6 Claim shall receive, in full and complete satisfaction of such Allowed Class 6 Claim, Cash equal to the amount of such Allowed Claim.  Class 6 is Unimpaired by the Plan. |
| 7 | **General Unsecured Claims against Industries**<br><br>Estimated Allowed Claims: $274.6 million - $499.1 million | Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 7 Claim shall receive, in full and complete satisfaction of such Allowed Class 7 Claim, its Pro Rata share of the Industries Distribution Pool <u>less</u> the Creditor Transaction Fee. According to the Creditors' Committee, the Creditor Transaction Fee will be approximately $1.087 million to $3 million.  Class 7 is Impaired by the Plan. |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | Estimated Percentage Recovery: 60% - 82% | |
| 8 | **Industries Preferred Shares**<br><br>Estimated Allowed Interests: $100 million<br><br>Estimated Percentage Recovery: 0% | The Industries Preferred Shares shall be Reinstated on the Effective Date.  Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made on account of the Industries Preferred Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid.  Class 8 is Unimpaired by the Plan. |
| 9 | **Industries Common Shares**<br><br>Estimated Allowed Interests: $596.7<br><br>Estimated Percentage Recovery: 0% | On the Effective Date (or such later date(s) as may be determined by Reorganized Industries with the consent of the Liquidating Trustee), (i) that amount of Industries Common Shares whose cancellation, in the Debtors' reasonable judgment, can be offset in full against appropriate losses and net operating losses shall be deemed canceled on a Pro Rata basis without further act or action under any applicable agreement, law, regulation, order or rule, and the Industries Common Shares evidenced thereby shall be extinguished, a nd (ii) any remaining Industries Common Shares shall be deemed Reinstated.  Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made (or dividend paid) on account of any remaining Industries Common Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate), or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid.  In accordance with and as provided by the Plan, any remaining Industries Common Shares shall be deemed to continue in effect and Common Shares shall be deemed to continue in effect and |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | | shall not be deemed canceled or extinguished under any other law or regulation.  Class 9 is Impaired by the Plan. |
| 10 | **General Unsecured Claims against Foods**<br><br>Estimated Allowed Claims: $33.0 million<br><br>Estimated Percentage Recovery: 100% | Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 10 Claim shall receive, in full and complete satisfaction of such Allowed Class 10 Claim, Cash equal to the amount of its Allowed Class 10 Claim plus interest at the Plan Rate from the Petition Date through the Effective Date.  Class 10 is Impaired by the Plan; provided, however, that holders of Allowed Class 10 Claims that arise from the rejection of an executory contract or unexpired leases shall receive interest at the Plan Rate only from the date of such rejection through the Effective Date. |
| 11 | **Old Securities of Foods** | As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Foods shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule and the Old Securities of Foods evidenced thereby shall be extinguished.  The holders of Allowed Class 11 Interests that constitute Minority Foods Shares shall receive their Pro Rata share of the Class 11 Distribution Pool.  Class 11 is Impaired by the Plan. |
| 12 | **General Unsecured Claims against Transportation**<br><br>Estimated Allowed Claims: $3.2 million<br><br>Estimated Percentage Recovery: 100% | Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 12 Claim shall receive, in full and complete satisfaction of such Allowed Class 12 Claim, Cash equal to the amount of its Allowed Class 12 Claim.  Class 12 is Impaired by the Plan. |
| 13 | **Old Securities of Transportation**<br><br>Estimated Percentage Recovery: 0% | As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Transportation shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of Transportation evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of Transportation after all Administrative Claims against Transportation, all Priority Tax Claims against Transportation, all Class 1 Claims against Transportation, all Class 3 Claims against Transportation, all Class 12 Claims and all Class 18 Claims against Transportation have been (i) Allowed and paid (including, with respect to Class 12, payment of interest at the |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | | Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Transportation have been repaid, shall vest in the Liquidating Trust.  Class 13 is Impaired by the Plan. |
| 14 | **General Unsecured Claims against SFA**<br><br>Estimated Allowed Claims: $2.2 million<br><br>Estimated Percentage Recovery: 100% | Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 14 Claim shall receive, in full and complete satisfaction of such Allowed Class 14 Claim, Cash equal to the amount of its Allowed Class 14 Claim.  Class 14 is Impaired by the Plan. |
| 15 | **Old Securities of SFA**<br><br><br>Estimated Percentage Recovery: 0% | As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of SFA shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of SFA evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of SFA after all Administrative Claims against SFA, all Priority Tax Claims against SFA, all Class 1 Claims against SFA, all Class 3 Claims against SFA, all Class 14 Claims and all Class 18 Claims against SFA have been (i) Allowed and paid (including, with respect to Class 14, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by SFA have been repaid, shall vest in the Liquidating Trust.  Class 15 is Impaired by the Plan. |
| 16 | **General Unsecured Claims against Pipeline**<br><br>Estimated Allowed Claims: $1.0 million<br><br>Estimated Percentage Recovery: 100% | Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 16 Claim shall receive, in full and complete satisfaction of such Allowed Class 16 Claim, Cash equal to the amount of its Allowed Class 16 Claim.  Class 16 is Impaired by the Plan. |
| 17 | **Old Securities of Pipeline**<br><br><br>Estimated Percentage | As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Pipeline shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of Pipeline evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of Pipeline |

| CLASS | TYPE OF CLAIM OR INTEREST | TREATMENT |
|---|---|---|
| | Recovery: 0% | after all Administrative Claims against Pipeline, all Priority Tax Claims against Pipeline, all Class 1 Claims against Pipeline, all Class 3 Claims against Pipeline, all Class 16 Claims and all Class 18 Claims against Pipeline have been (i) Allowed and paid (including, with respect to Class 16, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Pipeline have been repaid, shall vest in the Liquidating Trust. Class 17 is Impaired by the Plan. |
| 18 | **Intercompany Claims**<br><br>Estimated Allowed Claims: $198.0 million<br><br>Estimated Percentage Recovery: 100% | On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 18 Claim shall receive, in full and complete satisfaction of such Allowed Class 18 Claim, (x) Cash equal to the unpaid portion of such Allowed Class 18 Claim or (y) such other treatment as to which the Debtors or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing. Class 18 is Impaired by the Plan. |
| 19 | **Subordinated Claims**<br><br>Estimated Allowed Claims: $0.0 million<br><br>Estimated Percentage Recovery: 0% | In accordance with section 510(b) and (c) of the Bankruptcy Code, no distribution shall be made on account of the Subordinated Claims until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid. Class 19 is Impaired by the Plan. |

### D. Provisions Governing Distributions

#### 1. Distributions

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made by the Liquidating Trustee pursuant to the terms and conditions contained in the Plan and the Liquidating Trust Agreement; provided, however, that no distribution shall be made on behalf of any Claim which may be subject to disallowance under section 502(d) of the Bankruptcy Code. At the close of business on the Effective Date, the Claims and Interest register shall be closed, and there shall be no further changes in the record holders of any Claims or Interests. The Liquidating Trustee shall have

44

no obligation to recognize any transfer of any Claims or Interest occurring after the Effective Date. The Liquidating Trustee shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Article 4 of the Plan) with only those record holders stated on the Claims register as of the close of business on the Effective Date.

### 2.    Interest On Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable law, including section 1129(a) of the Bankruptcy Code, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim; provided, however, that any interest determined to be payable in respect of any Claim shall be calculated at the Plan Rate. This provision shall not apply to Allowed Secured Lender Claims and DIP Loan Claims.

### 3.    Means Of Cash Payment

Any payment to be made by the Liquidating Trustee pursuant to the Plan will be in U.S. dollars and may be made, at the sole discretion of the Liquidating Trustee, by draft, check, electronic funds transfer, or as otherwise required or provided in any relevant agreement or applicable law.

### 4.    Distributions On The Initial Distribution Date

As soon as is practicable after the Effective Date, subject to the reservation of adequate funds in the Liquidating Trust Administrative Reserve, each Disputed Claims Reserve and any other reserves established under the Plan or the Liquidating Trust Agreement as and when appropriate, the Liquidating Trustee shall deliver proceeds of Collateral and/or Available Cash to holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date.  All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

### 5.    Distributions On A Subsequent Distribution Date

Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the Initial Distribution Date, the Liquidating Trustee shall, on a Subsequent Distribution Date, which date shall be whenever the aggregate amount distributable to holders of Allowed Claims equals or exceeds $1,000,000 (but in no event shall such date be less than three months, or more than one year, after the next previous distribution date), distribute such proceeds of Collateral and/or Available Cash or other reasonably distributable assets to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Subsequent Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Subsequent Distribution Date had been disallowed on the Initial Distribution Date; provided, however, that the Liquidating Trustee

shall not be required to make any distribution on a Subsequent Distribution Date on account of an Allowed Claim or Interest in an amount less than $100; provided further, however, that in no event shall the foregoing impair the right of the Liquidating Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the Liquidating Trustee.  All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

## 6.　Distributions On The Final Distribution Date

Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the Initial Distribution Date, any Subsequent Distribution Date and after the liquidation of any and all assets of the Debtors and after all Disputed Claim and Disputed Interests of Beneficiaries become (in whole or in part) Allowed Claims or Allowed Interests or have been disallowed by Final Order, the Liquidating Trustee shall establish the Final Distribution Date upon which the Liquidating Trustee shall distribute such proceeds of Collateral and/or Available Cash or other assets to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Final Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Final Distribution Date had been disallowed on the Initial Distribution Date, taking into account all previous distributions; provided, however, that in no event shall the foregoing impair the right of the Liquidating Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the Liquidating Trust. Within 20 Business Days prior to making the final distribution, the Liquidating Trustee shall notify the Post-Confirmation Committee that the Liquidating Trustee deems all assets to be liquidated and all Claims and Interest of Beneficiaries to be resolved and that the Liquidating Trustee intends to establish the Final Distribution Date.

## 7.　Delivery Of Distributions; Undeliverable Distributions

Distributions to holders of Allowed Claims and Allowed Interests shall be made by the Liquidating Trustee (a) at the addresses set forth on the proofs of Claim or Interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of Claim or Interest, (c) at the addresses reflected in the Schedules if no proof of Claim or Interest has been filed and the Liquidating Trustee has not received a written notice of a change of address, or (d) at the addresses contained in the official records of the Debtors or the applicable Indenture Trustee for the Industrial Revenue Bonds, or (e) at the addresses set forth in a properly completed letter of transmittal accompanying securities properly remitted to the Debtors. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidating Trustee is notified, in accordance with the Liquidating Trust Agreement, of such holder's then current address. Claims or Interests held by holders whose distributions are returned as undeliverable and who fail to notify the Liquidating Trustee of their respective correct

addresses within one year after such distributions are returned to the Liquidating Trustee as undeliverable shall be expunged, after which date all unclaimed property (including, without limitation, all unclaimed property held in the Class 11 Distribution Pool) shall (i) revert to the Liquidating Trust free of any restrictions thereon and the Claims or Interests of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary, or (ii) if the Liquidating Trust has been terminated, be delivered to the clerk of the Bankruptcy Court. All undeliverable distributions that revert to the Liquidating Trust shall be used to satisfy the costs of administering the Plan and the Liquidating Trust and/or distributed to other holders of Allowed Claims or Allowed Interests of the same Class on the Final Distribution Date. Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### 8. Tender Of Securities And Instruments; Reinstatement of Preferred Shares; Cancellation of Trust Indentures

Except as otherwise required by the Liquidating Trustee, as a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, each holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods shall tender the applicable instruments, securities or other documentation evidencing such Claim or Interest to the Liquidating Trustee in accordance with written instructions to be provided to such holders by the Liquidating Trustee as promptly as practicable following the Effective Date. All tendered instruments and documentation relating to Industrial Revenue Bonds, Demand Certificates and Subordinated Certificates shall be marked as cancelled. All tendered securities and documentation relating to Old Securities of Foods shall be held by the Liquidating Trustee.

The Industries Preferred Shares are comprised of two million shares of 8% Series A Cumulative Redeemable Preferred Shares with an aggregate liquidation preference of $100.0 million. The Industries Preferred Shares do not have any stated maturity, are not subject to any sinking fund or mandatory redemption provisions and are not convertible into any other security. Under the Plan, the Industries Preferred Shares shall be Reinstated on the Effective Date. Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made on account of the Industries Preferred Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid. Because the Debtors do not anticipate that any distribution will be payable on account of Industries Preferred Shares, the holders of Industries Preferred Shares are not required to tender the Industries Preferred Shares to the Liquidating Trustee.

In addition to any requirements under the applicable certificate or articles of incorporation or by-laws of the applicable Debtor, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed shall, in lieu of tendering such instrument, security or documentation, deliver to the Liquidating Trustee (i) evidence satisfactory to the Liquidating Trustee or the applicable Indenture Trustee for the Industrial Revenue Bonds of the loss, theft, mutilation or

destruction; and (ii) such indemnity or security as may be required by the Liquidating Trustee to hold the Liquidating Trustee and the Liquidating Trust harmless from any damages, liabilities or costs incurred in treating such individual as a holder of Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed. Upon compliance with this Section 7.8(b) by a holder of a Claim or Interest evidenced by Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods, such holder shall, for all purposes under the Plan, be deemed to have tendered its Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods.

Except as otherwise required by the Liquidating Trustee, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that fails to tender or is deemed to have failed to tender the applicable instruments, securities and documentation required to be tendered hereunder within one year after the Effective Date shall have its Claim or Interest discharged and shall be forever barred from asserting such Claim or Interest against the Liquidating Trust or its property and any distribution to have been made on account of such Claim or Interest shall be treated as an undeliverable distribution in accordance with Section 7.7 of the Plan.

The notice of the Confirmation Order shall contain a description of the requirements contained in Section 7.8 of the Plan.

On the Effective Date, each Trust Indenture for Industrial Revenue Bonds not Reinstated on the Effective Date shall be deemed cancelled as permitted by section 1123(a)(5)(F) of the Bankruptcy Code.

### 9.  Withholding And Reporting Requirements

In connection with the Plan and all distributions hereunder, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

### 10.  Setoffs

The Liquidating Trustee may, but shall not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, claims, right and causes of action of any nature whatsoever that the Liquidating Trustee may have against the holder of such Allowed Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trustee of any such claim that the Liquidating Trustee may have against such holder, including, without limitation, any Litigation Claims.  Nothing contained herein is intended or shall be construed to limit or otherwise affect any claims, defenses or rights of any Entity to setoff or recoupment.  The Debtors, the Liquidating Trustee and Reorganized Industries expressly reserve all such claims, defenses and rights with respect to setoff and recoupment.

### 11.  No Recourse

Notwithstanding that the Allowed amount of any particular Claim may be reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or Allowed in an amount for which there is insufficient Cash in the relevant account to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no such holder shall have recourse to the Estates, the Bankruptcy Committees, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Committee, Reorganized Industries or any of their respective professionals, or their successors or assigns, or the holder of any other Claim, or any of their respective property. Nothing in the Plan, however, shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

### 12.  Transactions On Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day and shall be deemed to have been completed as of the required date.

### 13.  No Distributions In Excess Of Allowed Amounts Of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim plus interest at the Plan Rate from the Petition Date through the Effective Date plus Tax Distributions.

### 14.  Intercompany Advances; Intercompany Claims

In the event that the Liquidating Trustee determines that there does not exist sufficient Cash in the Estate of any Debtor (a "Benefited Debtor") to make payments to all holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Class 1 Claims asserted against such Benefited Debtor (or to deposit sufficient funds in Disputed Claims Reserves for all Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Class 1 Claims asserted against such Benefited Debtor), then the Liquidating Trustee shall utilize Cash in the one or more of the other Estates to make such payments or deposit such funds on behalf of the Estate of such Benefited Debtor (such payments and deposits, the "Intercompany Advances") and the Estate(s) of such Debtor(s) shall thereupon have a direct right of reimbursement from the Estate of such Benefited Debtor to the extent of the Intercompany Advances extended to such Benefited Debtor (a "Reimbursement Right").  Except as otherwise provided herein, the Liquidating Trustee shall ensure that all Intercompany Advances are repaid prior to making any distributions to holders of Allowed General Unsecured Claims asserted against such Benefited Debtor.

The Debtors currently believe that the Estate of each Debtor contains sufficient assets to make payments to all holders of Allowed Administrative Claim, Allowed Priority Tax Claims, Allowed Class 1 Claims asserted against such Debtor.  Because it is probable that all of the Debtors' assets will not have be liquidated to Cash as of the Effective Date, the Debtors propose to utilize Intercompany Advances (if at all) to permit the Debtors to make prompt payments to the holders of these Allowed Claims.

On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Intercompany Claim shall receive, in full and complete satisfaction of such Intercompany 18 Claim, (x) Cash equal to the unpaid portion of such Allowed Intercompany Claim or (y) such other treatment as to which the Debtors or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing.  The sole Intercompany Claim is $198.0 million pre-petition obligation that Foods owes to Industries.

## E.  Implementation of the Plan

### 1.  Continued Existence of the Debtors; Vesting Of Assets

On the Effective Date, all right, title and interest in all of the Debtors' property and assets (excluding the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets), including without limitation, all rights and causes of action, whether arising by contract, under the Bankruptcy Code (including, without limitation pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code), under the Plan or under other applicable law, including, without limitation, all rights the Debtors have under the Plan, shall vest in the Liquidating Trust.  The Industries Retained Assets are comprised primarily of ownership interests that the Debtors hold in certain non-Debtor entities, which ownership interests the Debtors believe, after careful analysis, can be more effectively maintained and disposed of by Reorganized Industries, rather than the Liquidating Trust.  The Debtors expect the costs associated with maintaining the Industries Retained Assets to be minimal.

On the Effective Date, Foods shall be merged into Industries, after which Industries shall continue to exist as Reorganized Industries.  Reorganized Industries shall be governed and managed under and in accordance with the Plan, the Management Agreement and its amended certificate of incorporation and bylaws; provided, however, that all provisions contained in such documents related to the SF Phosphates, Limited Company will not be effective if the SF Phosphates Interest has been disposed of prior to the Effective Date.  Reorganized Industries shall be authorized to effectuate the Plan and the transactions contemplated by the Plan and to take any proceedings or actions provided for or contemplated by the Plan (in each case in a manner consistent with the Plan and the Liquidating Trust Agreement), including, without limitation, such proceedings or actions related to the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets as may be necessary and appropriate, all without further action by the stockholders of Reorganized Industries, and with like effect as if such actions had been taken by unanimous action of the stockholders of Reorganized Industries.  All recoveries received by Reorganized Industries on account of the Industries Retained Assets, the Transferred Assets or any other assets of the Debtors shall be remitted to the Liquidating Trust and held by the Liquidating Trustee on account of the Estate to which such recoveries are allocable.  Forms of the Management Agreement and the amended certificate of incorporation and bylaws of Reorganized Industries shall be filed with the Bankruptcy Court at least five Business Days prior to commencement of the Confirmation Hearing. The identities of the officers and directors of Reorganized Industries shall be disclosed to the Bankruptcy Court no later than five Business Days prior to the commencement of the Confirmation Hearing, together with any additional information required under Section 1129(a)(5) of the Bankruptcy Code.  The Bankruptcy Committees and any creditor or party in interest may object to the identities of the proposed officers and directors of Reorganized Industries (and the proposed compensation to be provided to such persons) no later than one Business Day prior to the commencement of the Confirmation Hearing.  Notwithstanding any other provision hereof, Cash or Cash equivalents in an amount disclosed to the Bankruptcy Court at least five Business Days prior

to the commencement of the Confirmation Hearing shall remain as assets of Reorganized Industries to fund all operations of Reorganized Industries other than those operations, if any, related to the Industries Retained Assets and/or services to be provided to the Liquidating Trust (which shall be funded, if at all, under the Management Agreement).

In the event that the Debtors own the Coffeyville Assets on the Effective Date, on the Effective Date, (i) all of the Debtors' right, title and interest in the Coffeyville Assets shall be transferred to a Delaware limited liability company (the "Coffeyville LLC") to be established and wholly owned by the Liquidating Trust, and (ii) the executory contracts and unexpired leases listed on Plan Exhibit E shall be assumed and assigned to the Coffeyville LLC; provided, however, that the Liquidating Trust shall have the option (at its sole discretion in accordance with the Liquidating Trust Agreement) to transfer any of the Coffeyville Assets to the Liquidating Trust. The Coffeyville LLC shall be funded with that amount of capital determined by the Bankruptcy Court at the Confirmation Hearing to constitute sufficient capitalization for the continued maintenance of the Coffeyville LLC and any necessary remediation or other regulatory compliance related to the Coffeyville Assets. Forms of the certificate of organization and operation agreement for the Coffeyville LLC shall be filed with the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing.

On the Effective Date, (i) all of the Debtors' right, title and interest in each Transferred Asset owned by the Debtors on the Effective Date shall be transferred to a trust (each such trust, a "Transferred Asset Trust"), and (ii) the Liquidating Trust shall fund each Transferred Asset Trust with that amount of capital set forth on Plan Exhibit D or such other amount as determined by the Bankruptcy Court at the Confirmation Hearing (or at such other time prior to the Effective Date), which amount shall constitute sufficient capitalization for the maintenance, remediation (or other regulatory compliance) and/or disposition of each such Transferred Asset. Forms of the trust documents and related documents for each Transferred Asset Trust shall be filed with the Bankruptcy Court no later than five Business Days prior to the commencement of the Confirmation Hearing.

On the Effective Date, SFA, Transportation and Pipeline shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Debtors shall file with the appropriate public office certificates of dissolution.

From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, to withdraw their business operation from any state in which the Debtors were previously conducting their business operation.

## 2. Funding For The Plan

The Plan shall be funded in accordance with the provisions of the Plan from (a) Available Cash on the Effective Date and (b) Cash available after the Effective Date from, among other things, the liquidation of the Debtors' remaining assets, the prosecution and enforcement of Litigation Claims, and any release of funds from the Disputed Claims Reserve after the Effective Date. All Available Cash realized from the liquidation of the Debtors' remaining assets that is not Collateral for the Secured Lender Claims or DIP Loan Claims, the prosecution and enforcement of Litigation Claims, and the release of funds from the Disputed Claims Reserve (to the extent not

otherwise payable to the Pre-Petition Lenders or the DIP Lenders) shall be allocated to the appropriate Estate(s) and shall be maintained by the Liquidating Trustee for distribution to the holders of Allowed Claims as provided in the Plan and the Liquidating Trust Agreement.

### 3.  Accounts

The Debtors (subject to approval of the Bankruptcy Committees, which approval shall not be unreasonably withheld) and, from and after the Effective Date, the Liquidating Trustee may establish or maintain one or more interest-bearing accounts as they determine may be necessary or appropriate to effectuate the provisions of the Plan consistent with section 345 of the Bankruptcy Code and any orders of the Bankruptcy Court.

### 4.  Liquidating Trust; Liquidating Trustee

Prior to the Effective Date, the Debtors shall establish the Liquidating Trust in accordance with Sections 5.1(c) herein and subject to the terms of the Liquidating Trust Agreement and the Plan. The Bankruptcy Committees shall establish the Post-Confirmation Committee and appoint the Committee Members in accordance with the Liquidating Trust Agreement and the Plan. By Confirmation of the Plan, the Bankruptcy Court specifically approves and designates the Liquidating Trust and the Liquidating Trustee as a representative of each Estate and finds that the Liquidating Trust and the Liquidating Trustee are acting on behalf of and for the benefit of the Beneficiaries in accordance with the distribution scheme set forth in the Plan. The establishment of the Liquidating Trust shall not give a holder of a Claim against any Debtor or any Estate any rights as against any other Debtor or any other Estate, except as provided for in Section 7.11 of the Plan. The Liquidating Trust is an intended third-party beneficiary of the Plan to the fullest extent allowable under the laws of the State of Delaware, the laws of the United States or any other applicable law. The identity of the Liquidating Trustee shall be disclosed to the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing. The Bankruptcy Committees and any creditor or party in interest may object to the identity of the proposed Liquidating Trustee (and the proposed compensation to be provided to such person) no later than one Business Day prior to the commencement of the Confirmation Hearing.

The Liquidating Trust and the Liquidating Trustee, as the representative of each Estate, except as otherwise limited in the Liquidating Trust Agreement, Plan or the Confirmation Order, shall be vested with all property, rights, interests, and powers of the Debtors. Subject to the provisions of the Liquidating Trust Agreement, the Liquidating Trustee's rights and authority include, without limitation, all of the following:

(a)  control, management and disposal of all Liquidating Trust Assets for the benefit of the holders of Allowed Claims and Allowed Class 11 Interests who may receive distributions under the Plan;

(b)  prosecution of Litigation Claims on behalf of the Debtors and/or the Estates and/or the Liquidating Trust, including preference, fraudulent conveyance, avoidance and other actions whether against insiders or any other third parties;

(c)  filing of objections to Claims or actions to subordinate Claims or recharacterize debt as equity and the filing and pursuit of any other pleading, motion,

52

stipulation or other item in connection with any matter arising under, in or in connection with the Chapter 11 Case;

(d)    filing of tax returns;

(e)    transfer (subject to Bankruptcy Court approval) of right, title and interest in and to any Liquidating Trust Assets; and

(f)    undertake any other action in the best interests of the Trust and/or its beneficiaries and not inconsistent with the provisions of the Liquidating Trust Agreement, the Plan, and the Confirmation Order.

The funding of the Liquidating Trust pursuant to Section 5.1(c) hereof shall be treated for all purposes of the Tax Code as a deemed transfer to the Beneficiaries, followed by a deemed transfer by the Beneficiaries to the Liquidating Trust. The Beneficiaries shall be treated as the grantors and deemed owners of the Liquidating Trust. The valuation of the property and assets transferred to the Liquidating Trust shall be consistent and shall be used for all federal income tax purposes.

Neither the Liquidating Trust nor the Liquidating Trustee shall have any successor or transferee liability for liabilities of the Debtors or shall be deemed a joint employer, co-employer or successor employer with the Debtors and shall have no obligation to pay wages, severance pay, WARN Act claims, benefits (including, without limitation, benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985) or any other payment to employees of the Debtors, except to the extent that such payments are payable in respect of Allowed Claims against the Debtors.

From and after the Effective Date, the Liquidating Trust shall be subject to all terms and conditions contained in the Liquidating Trust Agreement and the Plan.

## 5.  Post-Confirmation Committee

On the Effective Date, there shall be constituted the Post-Confirmation Committee consisting of Committee Members, the number and method for selection of which shall be agreed to by the Bankruptcy Committees and disclosed to the Bankruptcy Court at least ten Business Days prior to the commencement of the Confirmation Hearing or as otherwise ordered by the Bankruptcy Court. The identities of the Committee Members shall be disclosed to the Bankruptcy Court on the Confirmation Date. In the event that (a) no one is willing to serve on the Post-Confirmation Committee or (b) there shall have been fewer than one-half of the original number of Committee Members serving for a period of 30 consecutive days, then the Liquidating Trustee may, during such vacancy, ignore any reference in the Plan, the Liquidating Trust Agreement, or the Confirmation Order to a Post-Confirmation Committee, and all references to the Post-Confirmation Committee's ongoing duties and rights in the Plan, the Liquidating Trust Agreement, and the Confirmation Order shall be null and void during such time period.

The Post-Confirmation Committee shall have the rights and responsibilities set forth in the Plan and the Liquidating Trust Agreement. The Committee Members shall be entitled to reimbursement of their reasonable expenses. The Committee Members shall receive such compensation as shall be disclosed to the Bankruptcy Court, upon consent of the Debtors and the

Bankruptcy Committees, not less than five Business Days prior to the commencement of the Confirmation Hearing.

Neither the Post-Confirmation Committee nor any of the Committee Members shall be liable for the acts or omissions of any other member of the Post-Confirmation Committee, nor shall any Committee Member be liable for any act or omission taken in its capacity as a Committee Member, other than acts or omissions resulting from such Committee Member's willful misconduct or gross negligence.

The Post-Confirmation Committee shall adopt by-laws which shall provide for the governance of the Post-Confirmation Committee, except as may be otherwise set forth in the Liquidating Trust Agreement.

A Committee Member shall recuse himself or herself from any decisions or deliberations regarding actions taken or proposed to be taken by the Liquidating Trustee or the Estates with respect to the Claims, Interests, or rights of such Committee Member, the entity appointing such Committee Member, or any affiliate of the foregoing.

## 6.   Effectuating Documents; Further Transactions

Prior to the Effective Date, the chief executive officer, chief financial officer, or any other appropriate officer of Industries or any other applicable Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Industries or any other applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

## 7.   Exemption From Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers in the United States from a Debtor to the Liquidating Trust or any other Entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 8.   Releases and Related Matters

### a)   Releases by Debtors

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Liquidating Trustee, on behalf of the Liquidating Trust, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan (other than the rights of the Debtor, the Liquidating Trust or the

Liquidating Trustee to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan, and that may be asserted by or on behalf of the Debtors or their Estates or the Liquidating Trust against the Lenders, the agents under the Pre-Petition Credit Agreement, the financial institutions party to the DIP Credit Agreement, the agents under the DIP Credit Agreement, and their respective agents and professionals.

The Debtors are not aware of any viable or valuable claims that are being released under these provisions, but the Debtors have not conducted an exhaustive investigation of this issue.

b)  Injunction Related to Releases

The Confirmation Order will enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released by operation of Section 5.8 of the Plan or exculpated by operation of Section 11.9 of the Plan.

## 9.  Closing Of The Chapter 11 Case

When substantially all remaining assets of the Debtors, Reorganized Industries or the Liquidating Trust (except the Transferred Assets), as the case may be, have been liquidated and converted into Cash (other than those assets abandoned by Debtors or the Liquidating Trust, as the case may be), and such Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## 10.  Rights of Action

On and after the Effective Date, except as provided in Section 11.9 of the Plan, the Liquidating Trustee, on behalf of and as a court-appointed representative of each Debtor and for the benefit of each Estate (as vested in the Liquidating Trust pursuant to the Plan), will, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, retain and become the holder of, and have the exclusive right to enforce any and all present or future Litigation Claims and any and all rights of any and all of the Debtors that arose before or after the Commencement Date, including, but not limited to, rights, claims, causes of action, avoiding powers, suits and proceedings arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and all potential rights, claims and causes of action related to payments made by the Debtors prior to the Petition Date and disclosed in the Schedules.  The Liquidating Trustee may pursue, abandon, settle or release any or all such Litigation Claims and rights of action pursuant to the terms of the Plan and the Liquidating Trust Agreement, as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court.

On and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or

otherwise) on account of or respecting any Claim, Litigation Claim, debt, right or cause of action of the Debtors for which the Liquidating Trustee retains sole and exclusive authority to pursue in accordance with Section 5.10(a) of the Plan.

The allowance of any Claim prior to the Effective Date shall not constitute a waiver of any Litigation Claim against the holder of such Claim.

The Litigation Claims include potential avoidance or other bankruptcy causes of actions, including potential rights, claims and causes of action related to payments made by the Debtors prior to the Petition Date and disclosed in the Schedules. Copies of the Schedules can be accessed via the Bankruptcy Court's case management / electronic case filing system: ecf.mowb.uscourts.gov. The Litigation Claims also include non-bankruptcy claims, rights of action, suits or proceedings that arise in the ordinary course of the Debtors' businesses. The Debtors currently hold certain claims or rights of action against a number of parties and continue to review claims against certain parties that may ripen into litigation. Neither the listing nor the failure to list any party herein should prejudice the Debtors' rights to pursue any claims, rights of action or proceedings that have arisen or may arise in the future in the ordinary course of the Debtors' businesses. In addition, the Bankruptcy Committees are investigating possible pre-petition claims and rights of action. In the event that this investigation has not been completed by the Effective Date, the Liquidating Trustee may continue this investigation or initiate such other investigations as the Liquidating Trustee deems proper.

### F. Pension Benefits and Retiree Benefits

The Debtors sponsor the Farmland Pension Plan, which is a qualified ERISA plan that includes approximately 18,000 participants, including both active employees and retirees. The PBGC filed the PBGC Claims against each of the Debtors in the amount of $141.7 million and asserted the joint and several liability of each Debtor for such Claims. In connection with its purchase of the Pork Business, Smithfield has agreed to assume sponsorship and associated liabilities of the Farmland Pension Plan, including the funding of accrued benefits under the Farmland Pension Plan. The Debtors believe that Smithfield's assumption of the Farmland Pension Plan resolves the PBGC Claims.

On September 23, 2003, the Bankruptcy Court appointed a committee of retired employees (the "Retiree Committee") to serve as the "authorized representative" of those person receiving "retiree benefits" (as that term is defined in section 1114 of the Bankruptcy Code) from the Debtors. The Retiree Committee is vested with the duties accorded an "authorized representative" under section 1114(e), (f), (g), (h), and (k) of the Bankruptcy Code. Section 1114 of the Bankruptcy Code outlines certain procedures for modification or termination of "retiree benefits." Any "retiree benefits" (as that term is defined in section 1114 of the Bankruptcy Code) of the Debtors not terminated during the Chapter 11 Case shall continue after the Effective Date to the extent required by section 1129(a)(13) of the Bankruptcy Code, without prejudice to the Debtor's right under applicable non-bankruptcy law to modify, amend or terminate such benefits. To the extent that any "retiree benefits" continue after the Effective Date, the Liquidating Trustee and/or Reorganized Industries expressly reserve the right to terminate such benefits in accordance with applicable non-bankruptcy law. For a further discussion of certain "retiree benefit" programs administered by the Debtors, see Section III.I.3, *Proposed Termination Of Certain Employee Benefits.*

### G.  Establishment Of Class 11 Distribution Pool; Minority Foods Shares; Establishment of Industries Distribution Pool

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Foods (including the Minority Foods Shares) shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule and the Old Securities of Foods evidenced thereby shall be extinguished.  The holders of Allowed Class 11 Interests that constitute Minority Foods Shares shall receive their Pro Rata share of the Class 11 Distribution Pool.  On or prior to the Effective Date, and subject to approval of the Bankruptcy Court, the Debtors, in consultation with the Bankruptcy Committees, shall determine the amount of Cash to be reserved by the Liquidating Trustee in a separate account (the "Class 11 Distribution Pool") for distribution to holders of Allowed Class 11 Interests that constitute Minority Foods Shares in accordance with the Plan and the Liquidating Trust Agreement, which amount shall represent the Available Cash estimated to be available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares as of the Effective Date after all Administrative Claims against Foods, all Priority Tax Claims against Foods, all Class 1 Claims against Foods, all Class 3 Claims against Foods, all Class 10 Claims and all Class 18 Claims against Foods have been (i) Allowed and paid in full (including, with respect to Class 10, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Foods have been repaid; provided, however, that the Liquidating Trustee reserves the right to reduce the Class 11 Distribution Pool in the event that the amount reserved in the Class 11 Distribution Pool is determined to be in excess of the amount actually available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares.

The Minority Foods Shares, which represent approximately 3% of the outstanding common shares of Foods, represent the common shares of Foods that were not tendered to Industries in 1991.  The Plan provides for the cancellation of all Old Securities of Foods (including the Minority Foods Shares) on the Effective Date.  Therefore, in order to ensure that the holders of the Minority Foods Shares will receive any distributions directly attributable to their ownership interest in Foods, the Plan proposes to fund a reserve (i.e., the Class 11 Distribution Pool) with that amount of Cash estimated to be available for distribution to holders of the Minority Foods Shares after payment in full of all Allowed Claims against Foods having priority over the Old Securities of Foods.

The Industries Distribution Pool will be comprised of all Available Cash in the Estate of Industries after all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 2 Claims, all Class 3 Claims against Industries, all Class 6 Claims and all Intercompany Advances payable by Industries have been (i) Allowed and paid or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn.  The Liquidating Trustee may deposit the Available Cash comprising the Industries Distribution Pool in one or more accounts, as permitted under the Plan and the Liquidating Trust Agreement.  The documents evidencing or otherwise related to the Demand Certificates and the Subordinated Certificates clearly identify them as debt securities, not equity securities.  The Debtors believe that, although the Demand Certificates Claims and the Subordinated Certificates Claims constitute Claims that are pari passu with the General Unsecured Claims of Industries, as between the Subordinated Certificates Claims a nd the Demand Certificates Claims, the Subordinated Certificates Claims are contractually subordinate to the Demand Certificate Claims.  As a result, the Plan provides that each holder of Allowed Class 4 Claims will

57

receive (i) its Pro Rata share of the Industries Distribution Pool (after payment in full of the fees and expenses of the Indenture Trustee for the Demand Certificates) plus (ii) the funds otherwise payable to holders of Allowed Class 5 Claims in an amount equal to the amount necessary to pay its Allowed Class 4 Claim in full, including payment of interest at the rate provided in the Demand Certificates through the Effective Date.  Holders of Allowed Claims in Classes 4, 5 and 7 will receive distributions from the Industries Distribution Pool in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

### H.  Treatment Of Executory Contracts and Unexpired Leases

#### 1.  Rejected Executory Contracts And Unexpired Leases

Except as otherwise provided in Section 6.3 of the Plan, on the Effective Date, all executory contracts and unexpired leases that exist between a Debtor and any Entity (including, without limitation, the Trust Indentures) shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (a) which has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date or pursuant to the Confirmation Order, or (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date (except to the extent that any such motion is ultimately denied or withdrawn).  Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases pursuant to the Plan.

#### 2.  Rejection Damages Bar Date

If the rejection of an executory contract or unexpired lease during the Chapter 11 Case (including any rejection of an executory contract or unexpired lease pursuant to Section 6.1 of the Plan) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor, the Liquidating Trust, the Liquidating Trustee or the properties of any of them unless a proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors, and counsel to the Bankruptcy Committees, (i) if such rejection is effective on or prior to the Confirmation Date, within 30 days after the Confirmation Date, (ii) if such rejection is effective after the Confirmation Date, within 30 days after service of notice of such rejection, or (iii) if such rejection is pursuant to Section 6.1 of the Plan, within 30 days after the Effective Date.

#### 3.  Assumed Executory Contracts And Unexpired Leases

On the Effective Date, Reorganized Industries shall be deemed to have assumed or assumed and assigned, as the case may be, each executory contract and unexpired lease listed on Plan Exhibit B, provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date, to amend Plan Exhibit B to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease assumptions or assumptions and assignments, as the case may be, described above, as of the Effective Date.

In the event that Industries owns the Coffeyville Assets on the Effective Date, on the Effective Date Reorganized Industries shall be deemed to have assumed and assigned to the

Coffeyville LLC each executory contract and unexpired lease listed on <u>Plan Exhibit E</u>, <u>provided</u>, <u>however</u>, that the Debtors reserve their right, at any time prior to the Effective Date, to amend <u>Plan Exhibit E</u> to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the conditional assumptions and assignments of the executory contracts and unexpired leases listed on <u>Plan Exhibit E</u>, as of the Effective Date.

### 4.   Payments Related To Assumed Executory Contracts And Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default are indicated on <u>Plan Exhibit B</u> and <u>Plan Exhibit E</u> and shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor party to the contract or lease or the assignee of such Debtor party assuming such contract or lease, by Cure.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Reorganized Industries or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption or assignment (each, a "<u>Cure Dispute</u>") that cannot be resolved consensually among the parties, Reorganized Industries (with the consent of the Liquidating Trustee) shall have the right to reject the contract or lease for a period of five Business Days after entry of a Final Order adjudicating a Cure Dispute in a manner that is not acceptable to Reorganized Industries (with the consent of the Liquidating Trustee).

## I.   Disputed, Contingent and Unliquidated Claims

### 1.   Prosecution of Objections to Claims

#### a)   Objections to Claims

All objections to Claims (other than Professional Fee Claims) and Interests must be filed and served on the holders of such Claims and Interests by the Objection Deadline.

#### b)   Authority to Prosecute Objections

From and after the Effective Date, the Liquidating Trustee shall have the exclusive right to make and file and continue prosecution of objections to the allowance, classification and/or amount of any Claim or Interest with the Bankruptcy Court, and shall serve such objections upon holders of each of the Claims and Interests to which objections are made by the Objection Deadline.  Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee is authorized and empowered, but not required, to resolve consensually any disputes regarding the allowance, classification and/or amount of any Claim or Interest.  All objections by the Liquidating Trustee shall be litigated to a Final Order except to the extent the Liquidating Trustee, in his discretion, elects to withdraw any such objection, or compromise, settle or otherwise resolve any such objection, in which event the Liquidating Trustee may settle, compromise or otherwise resolve any Disputed Claim or Interest without approval of the Bankruptcy Court. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee and the Post-Confirmation Committee shall

establish appropriate protocol for the prosecution, settlement, compromise, withdrawal or litigation to judgment of all objections to Claims and Interests.

### 2. Treatment of Disputed Claims; Disputed Claims Reserves

Subject to the provisions of Section 7.1 of the Plan and notwithstanding any other provisions of the Plan or the Liquidating Trust Agreement to the contrary, no payments or distributions will be made on account of a Disputed Claim or Disputed Interest, or, if less than the entire Claim or Interest is a Disputed Claim or Disputed Interest, the portion of a Claim or Interest that is Disputed, until such Claim or Interest becomes an Allowed Claim or Allowed Interest.  On the Effective Date or as soon as practicable thereafter, the Liquidating Trustee shall reserve Cash in one or more Disputed Claims Reserves in an amount equal to the Face Amount of: (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in Classes 1, 2, 3, 4, 5, 6, 7, 10, 12, 14, 16 and 18; provided, however, that the Liquidating Trustee shall have the right to file a motion with the Bankruptcy Court to estimate, reduce or modify the amount to be reserved with respect to any such Disputed Claims.  Each Disputed Claims Reserve shall be established and maintained in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

### 3. Estimation

The Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee, as the case may be, have previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any contingent or unliquidated Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanisms.

### J. Conditions Precedent To Confirmation And Consummation Of The Plan

### 1. Conditions To Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with this Section:

a)   The Confirmation Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Debtors and the Bankruptcy Committees and shall provide that the Debtors and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan.

b)    All Plan Exhibits shall be in form and substance reasonably acceptable to the Debtors and the Bankruptcy Committees and shall have been executed and delivered.

c)    All actions, documents and agreements necessary to implement the Plan shall have been effected or executed or are ready to be executed.

d)    The Debtors shall have paid the then outstanding balances of the Secured Lender Claims and the DIP Loan Claims in full.

e)    The closing of the sales of the Pork Business and the SF Phosphate Interest shall have occurred.

f)    The closing of the sale of the Coffeyville Assets shall have occurred.

g)    The Insurance Claim shall have been settled and paid in full.

h)    The Debtors shall have determined, in consultation with the Bankruptcy Committees, that the occurrence of the Effective Date is in the best interest of creditors and parties in interest.

The Debtors anticipate that the Effective Date will occur within thirty days after Confirmation.

### 2.  Waiver of Conditions

The requirement that the Confirmation Order must be a Final Order may be waived by the Debtors, with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld.  The requirement that the closing of the sale of the Coffeyville Assets shall have occurred may be waived by the Debtors, with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld, if the closing of the sale of the Coffeyville Assets shall not have occurred by the closing date established in connection with a Bankruptcy Court-approved sale of the Coffeyville Assets.

### 3.  Notice of Effective Date

The Liquidating Trustee shall file and serve an appropriate notice of the Effective Date within seven Business Days of the Effective Date.

## K.  Payment Of Certain Fees And Expenses

### 1.  Professional Fee Claims

All final requests for compensation or reimbursement for Professionals pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date and Substantial Contribution Claims under section 503(b)(4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Liquidating Trustee and its counsel no later than 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the Liquidating Trustee and its counsel and

the requesting Professional or other Entity no later than 30 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### 2.  Administrative Claims

Other than as set forth in Section 11.1 of the Plan and except with respect to payments payable in connection with the KERIT Plan, all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trust and, if prior to the Effective Date, counsel for the Debtors and each Bankruptcy Committee no later than 30 days after the Effective Date. In the event that the Debtors or the Liquidating Trustee, as the case may be, object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

### 3.  Fees and Expenses of the Indenture Trustees

Without further order of the Bankruptcy Court, the Indenture Trustees shall be entitled to payment out of distributions otherwise payable to the holders of the Demand Certificates, the Subordinated Certificates or the Industrial Revenue Bonds (as applicable) of all properly documented unpaid fees and expenses for services rendered under the Trust Indentures and the IRB Indentures, including compensation, disbursements and expenses of agents and legal counsel to the Indenture Trustees in connection with the performance of their duties under the Trust Indentures and the IRB Indentures.  Upon payment in full of such fees and expenses, any liens of the Indenture Trustees on current distributions to holders of Demand Certificates, Subordinated Certificates and Industries Revenue Bonds shall be released and extinguished.

### 4.  Statutory Fees

All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation shall be paid on or before the Effective Date.

### L.  Modifications Of The Plan; Severability Of Plan Provisions

The Debtors reserve the right (with the consent of the Bankruptcy Committees in the case of material modifications or amendments), and in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan and the Liquidating Trust Agreement at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors (subject to consent of the Bankruptcy Committees and the administrative agent under the Pre-Petition Credit Agreement, which consent shall not be unreasonably withheld) may amend or modify the Plan and the Liquidating Trust Agreement, in accordance with Section 1127 of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim or Allowed Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Interest of such holder.  In addition, the Plan shall be deemed automatically amended and modified to the extent determined necessary by the Bankruptcy Court to comply with the DIP Credit Agreement.

In the event that any Impaired Class shall not accept the Plan, at the written election of the Debtors (with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld) filed with the Bankruptcy Court with respect to any one or more of said nonaccepting Classes and any Classes junior to such nonaccepting Classes, the Plan shall be modified and amended automatically and without further notice to provide such treatment, as determined necessary by the Bankruptcy Court, sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Classes rejecting the Plan, and, in particular, the treatment necessary to meet the requirements of Sections 1129(a) and (b) of the Bankruptcy Code with respect to (i) the rejecting Classes and (ii) any other Classes adversely affected by such modifications.  In particular, the treatment of any nonaccepting Classes or adversely affected Classes shall be modified and amended from that set forth in Article III, even if less favorable, to the minimum treatment necessary to meet the requirements of sections 1129(a) and (b) of the Bankruptcy Code.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of any Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### M. Successors And Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### N. Revocation, Withdrawal, Or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and to file subsequent plans of reorganization; provided, however, that any revocation or withdrawal of the Plan after the Confirmation Date shall be with the consent of the Bankruptcy Committees and the administrative agent under the Pre-Petition Credit Agreement, which consent shall not be unreasonably withheld.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (x) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Entity, (y) prejudice in any manner the rights of any Debtor or any Entity in any further proceedings involving a Debtor, or (z) constitute an admission of any sort by any Debtor or any other Entity.

### O.  Dissolution Of The Bankruptcy Committees

On the Effective Date, the Bankruptcy Committees will dissolve and their respective members (only in their capacity as members of the Bankruptcy Committees) will be released and discharged from all further authority, duties, responsibilities and obligations arising from or related to the Chapter 11 Case. The members of the Bankruptcy Committees and the Professionals retained by the Bankruptcy Committees will not be entitled to compensation or reimbursement of expenses for any services rendered to the Bankruptcy Committees after the Effective Date.

### P.  Terms Of Injunctions Or Stays

Unless expressly modified or lifted by the Bankruptcy Court, all injunctions or stays provided for in the Chapter 11 Case, including in the Confirmation Order, under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Final Distribution Date.

## V.  CONFIRMATION OF THE PLAN

### A.  Introduction

The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code before such plan can be confirmed.  It requires further that a debtor's disclosure statement concerning such plan is adequate and includes information concerning all payments made or promised by the debtor in connection with the plan.

If the Plan is confirmed, the Debtors expect the Effective Date to occur as promptly as practicable after the Confirmation Date.

To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met.  Thus, even if the requisite vote is achieved for each Voting Class, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

### B.  Voting

Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Allowed Interests that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan.  A holder of a Claim or Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered Impaired.  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims and Interests that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote.

Votes on the Plan will be counted only in respect of Allowed Claims and Allowed Interests that (i) belong to a Voting Class or (ii) are otherwise permitted by the Bankruptcy Court to vote.

## C.  Acceptance

The Bankruptcy Code defines acceptance of a plan by an Impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote.  Acceptance of a plan need only be solicited from holders of claims whose claims are Impaired and not deemed to have rejected the Plan.  Except in the context of a "cram down" pursuant to section 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of Impaired claims accepts the plan.

In the event the requisite vote is not obtained, the Debtors have the right, assuming that at least one Class of Impaired Claims has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or impaired interests if the bankruptcy court finds that the plan does not discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes.  This procedure is commonly referred to in bankruptcy parlance as "cram down."  For a more detailed description of the requirements for acceptance of a plan and of the criteria for confirmation of a plan notwithstanding rejection by certain Impaired classes, see Section V.D.4, *Cram Down*.  The Plan is predicated on all Voting Classes voting to accept the Plan; however, if any Voting Classes vote to reject the Plan, the Debtors may request a "cram down" of such Classes at the Confirmation Hearing.  In any event, the Debtors will seek a "cram down" of the Plan on Classes deemed to reject the Plan by virtue of receiving no distributions thereunder.

## D.  Confirmation Of The Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the Chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual must be consistent with the

interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

• With respect to each class of impaired claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.

• Each class of claims or interests has either accepted the plan or is not impaired under the plan.

• Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date, equal to the allowed amount of such claim.

• If a class of claims is impaired, at least one impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

• Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes not receiving any distribution under the Plan, the Debtors believe that (i) the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) the Debtors have complied or will have complied with all of the requirements of Chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

## 1. Best Interests Of Holders Of Claims And Interests

The "best interests" test requires that a bankruptcy court find either that all members of each Impaired class have accepted the plan or that each holder of an allowed claim or interest of each Impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. Annexed as <u>Appendix D</u> hereto is a liquidation analysis which demonstrates that the Plan satisfies the "best interests" test.

The Debtors believe that, under the Plan, holders of Impaired Claims and Impaired Interests against the Debtors will receive property with a value equal to or in excess of the value such holders

would receive in the event each of the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

To estimate the likely return to holders of Claims and Interests in the event of Chapter 7 liquidations of the Debtors, the Debtors have estimated the amount of liquidation proceeds with respect to each Debtor that would be available for distribution and the allocation of such proceeds among the Classes of Claims and Interests of each Debtor based upon their relative priority. As further described below, to estimate the liquidation proceeds, the Debtors assumed that the assets of each of the Debtors were sold in a straight liquidation. Liquidation proceeds available for distribution to holders of Claims and Interests of each Debtor would consist of the net proceeds from the disposition of such Debtor's assets, augmented by other cash held by such Debtor.

The relative priority in the distribution of liquidation proceeds with respect to any Claim or Interest depends upon (i) its status as secured, priority unsecured, non-priority unsecured or equity, and (ii) its relative subordination.

In general, the liquidation proceeds for each Debtor would be allocated in the following priority: (i) first, to the Claims of secured creditors of each Debtor to the extent of the value of their collateral; (ii) second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of each Debtors' Chapter 7 case, including certain tax liabilities; (iii) third, to the unpaid Administrative Claims of each Debtor's Chapter 11 case; (iv) fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code; (v) fifth, to the General Unsecured Claims of each Debtor (subject to any relative subordination of Claims); and (vi) sixth, to equity holders of each Debtor. Each Debtor's liquidation costs in Chapter 7 would include the compensation of a bankruptcy trustee, as well as compensation of counsel and of other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, claims arising from the operation of the Debtor during the pendency of the Chapter 7 case and all unpaid Administrative Claims incurred by the Debtor during the Chapter 11 case that are Allowed Claims in the Chapter 7 case. The liquidation itself may trigger certain Claims entitled to priority in payment under the Bankruptcy Code, such as Claims for severance pay to certain employees.

As set forth below, the Debtors' have estimated the range of gross liquidation proceeds for each of the Debtors. Based upon the priorities outlined above, the Debtors believe that net proceeds, if any, available for distribution to Impaired Claims in a Chapter 7 liquidation would be significantly less than the estimated distributions to Impaired Claims under the Plan.

This Chapter 7 liquidation analysis is intended solely for the purpose of discussing the effects of hypothetical Chapter 7 liquidations of the Debtors. This Chapter 7 liquidation analysis is based upon numerous estimates and assumptions that, although developed and considered reasonable by the Debtors' management and its financial advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors. This liquidation analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in the liquidation analysis would be realized if the Debtors were, in fact, to undergo such liquidations.

a)      Significant Uncertainties

In addition to the General Assumptions and the Specific Assumptions that are set forth below, there are significant areas of uncertainty that exist with respect to this liquidation analysis.

The liquidation analysis assumes that the liquidation of the Debtors' estates would commence on December 31, 2003 and would be substantially complete within a six-month period. The wind-down costs during this six-month liquidation period have been estimated by the Debtors' management, and any deviation from this time frame could have a material impact on the wind-down costs, Administrative Claims, proceeds from asset sales and the ultimate recovery to the holders of Claims and Interests.

If the implementation of the liquidation were delayed, there is a possibility that the Debtors would sustain significant operating losses during the delay period, thus adversely impacting the net liquidation proceeds available to each Debtor's estate.

In any liquidation there is a general risk of unanticipated events, which could have a significant impact on the projected cash receipts and disbursements.  These events include changes in the general economic condition, changes in the market value of the respective Debtors' assets and problems with current and former employees.

In addition to the Specific Assumptions described below, the following General Assumptions were used in formulating the liquidation analysis.

b)   General Assumptions

A.      *Operations During Liquidation Process and Wind-Down Expense* – With the exception of SFA, which has already substantially wound down operations, all Debtor entities will maintain operations during the liquidation process to the extent possible.  It is assumed that all operations will be break-even on a cash flow basis.  As such, the incremental wind-down expense will consist primarily of stay bonuses and other incentives intended to encourage maximization of liquidation proceeds.

B.      *Estimation of Outstanding Claims* – Given the accelerated liquidation conditions of a Chapter 7 proceeding, the Debtors have assumed there will be significant additional contract rejection claims.  As such, the estimate of total claims for the purposes of this analysis is based on the upper end of the range as contemplated under the Plan. The significant variation in estimated claims for Class 7 is based in large part on upper end and lower end of the range of rejection claims the Debtors estimate may be asserted against Industries.

C.      *Intercompany Balances* – The Debtors have numerous and significant intercompany balances amongst each other.  Pursuant to section 553 of the Bankruptcy Code, the Debtor has offset all post-petition and pre-petition intercompany balances such that a single line-item remains as either an Administrative Claim in the case of post-petition balances or a General Unsecured Claim in the case of pre-petition balances.

68

D.    *Treatment of DIP Loan Claims and Secured Lender Claims* – For the purposes of this liquidation analysis, any outstanding DIP Loan Claims and Secured Lender Claims are satisfied as of the Effective Date.

E.    *Nature and Timing of the Liquidation Process* – Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other things, collect and convert the property of a debtor's estate to cash and close the estate as expeditiously as is compatible with the best interest of the parties in interest. Solely for purposes of preparing this liquidation analysis, it is assumed that the Chapter 11 case of each Debtor would be converted to a Chapter 7 liquidation on December 31, 2003. It is assumed that the Debtors' assets will be sold during the following six-month period. Management believes that it is unlikely that the actual sale period would be shorter than those assumed, and there can be no assurance that the actual sale period would not be longer than assumed. It is likely that if the sale period was longer, net sale proceeds would be diminished.

F.    *Estimated Liquidation Proceeds* – All assets are assumed to be sold in a straight liquidation to the highest bidder. Estimates of the potential proceeds from the disposition of assets were provided by either the Debtors or the financial advisors directly involved in the asset sales efforts to date. The following list identifies factors considered by the Debtors and its various financial advisors in estimating the proceeds that might be received from the liquidation sales.

- Indications of interest from potential third-party acquirers
- The historical cost of the assets
- Asset location and local market demand
- Previously issued third-party appraisals
- Recently transacted sales of similar assets
- Management's experience and expertise in asset resale values
- Analysis of liabilities and obligations relating to particular assets
- Current industry trends
- "Distress sale value", which differs from the price at which assets would be sold to a willing buyer by a willing seller, assuming that neither is under any compulsion to buy or sell, and assuming both are informed of the relevant facts

G.    *Additional Liabilities and Reserves* – The Debtors believe that in addition to the expenses that would be incurred by the Debtors in the Chapter 11 Case, there would be certain actual and contingent liabilities and expenses for which provision would be required in Chapter 7 liquidations before distributions could be made to creditors, including: (i) certain liabilities that are not dischargeable pursuant to the Bankruptcy Code; (ii) Administrative Claims, including damages from rejected post-petition contracts, the fees of a Chapter 7 trustee and of counsel and other professionals (including financial advisors and accountants), retention bonuses paid to employees to effectuate the wind-down process and other liabilities (including retirement, vacation pay and other employee-related administrative costs and liabilities) that would be funded from continuing operations if the Debtors were reorganized as a going-concern; and (iii) certain other administrative costs. Management believes that

there is significant uncertainty as to the reliability of the Debtors' estimates of the amounts related to the foregoing that have been assumed in the liquidation analysis.

H.     *Distributions: Absolute Priority* – Under a Chapter 7 liquidation, all secured claims are required to be satisfied from the proceeds of the collateral securing such claims before any such proceeds could be distributed to any other creditors. The following analysis assumed the application of the rule of absolute priority of distributions with respect to the remaining proceeds. Under the rule of absolute priority, no junior creditor receives any distribution until all senior creditors are paid in full. To the extent that proceeds remain after satisfaction of all secured claims, the proceeds would first be distributed to the holders of Administrative Claims, then to Claims entitled to priority in payment under the Bankruptcy Code, then to General Unsecured Claims and finally (if at all) to equity holders of the Debtors. Based upon the liquidation assumptions of the Debtors' management, the proceeds generated from Chapter 7 liquidations of the Debtors' assets would result in a substantial diminution in the recovery percentage to holders of General Unsecured Claims.

I.     *Conclusion* – The Debtors believe that the holders of Claims and Interests will not receive recoveries under the Plan less than that realized in Chapter 7 liquidation.

The following Specific Assumptions (as well as those set forth in the footnotes to the table below) were used in formulating the liquidation analysis.

c)   Specific Assumptions

A.     *Gross Liquidation Proceeds for Industries* – The gross liquidation proceeds for Industries include Industries' existing cash balances, proceeds from liquidation of retained working capital, intercompany assets, estimated proceeds from the sale of SF Phosphate Interests, and excess distributions from the liquidation of the Debtor Subsidiaries (which primarily includes excess proceeds from the sale of the Pork Business), and the straight liquidation sale of Industries' remaining assets. The Debtors have ascribed a "low" value and a "high" value for these gross liquidation proceeds as follows (in $millions):

|                                                  | Low Value |         | High Value |         |
|--------------------------------------------------|-----------|---------|------------|---------|
| Cash and cash equivalent                         | $         | 297.8   | $          | 297.8   |
| Accounts receivable                              |           | 19.7    |            | 26.2    |
| Inventory                                        |           | 61.1    |            | 61.1    |
| Debtor subsidiary intercompany assets            |           | 182.3   |            | 182.3   |
| Other Industries assets                          |           | 45.0    |            | 59.1    |
| SF Phosphates sale                               |           | 64.5    |            | 64.5    |
| Excess distributions from Debtor subsidiaries    |           | 233.6   |            | 234.5   |
| Environmental/Tax/Other Reserves                 |           | (163.1) |            | (114.2) |
| Gross liquidation proceeds                       | $         | 740.9   | $          | 811.3   |

B.    *Gross Liquidation Proceeds for Foods* - The gross liquidation proceeds for Foods include assumed gross proceeds from the sale of Foods as a going concern as contemplated in the Pork Purchase Agreement signed with Smithfield and intercompany balances due Foods from Industries.  The Debtors have ascribed a "low" value and a "high" value for these gross liquidation proceeds as follows (in $millions):

|                                          | Low Value | High Value |
|------------------------------------------|-----------|------------|
| Cash and cash equivalent                 | $     -   | $     -    |
| Accounts receivable                      | -         | -          |
| Inventory                                | -         | -          |
| Fixed assets                             | 376.6     | 377.1      |
| Debtor subsidiary intercompany assets    | 85.2      | 85.2       |
| Other Foods assets                       | -         | -          |
| Gross liquidation proceeds               | $   461.8 | $   462.3  |

C.    *Gross Liquidation Proceeds for Transportation* - The gross liquidation proceeds for Transportation include assumed gross proceeds from the liquidation of Transportation's working capital and from intercompany balances due primarily from Industries.  The Debtors have ascribed a "low" value and a "high" value for these gross liquidation proceeds as follows (in $millions):

|                                          | Low Value | High Value |
|------------------------------------------|-----------|------------|
| Cash and cash equivalent                 | $     -   | $     -    |
| Accounts receivable                      | 0.2       | 0.4        |
| Debtor subsidiary intercompany assets    | 8.8       | 8.8        |
| Other Transportation assets              | -         | -          |
| Gross liquidation proceeds               | $     9.0 | $     9.2  |

D.    *Gross Liquidation Proceeds for SFA* - The gross liquidation proceeds for SFA include assumed gross proceeds from the straight liquidation and/or sale of SFA's working capital and fixed assets and from intercompany balances due from Industries.  The Debtors have ascribed a "low" value and a "high" value for these gross liquidation proceeds as follows (in $millions):

|                                          | Low Value | High Value |
|------------------------------------------|-----------|------------|
| Cash and cash equivalent                 | $     0.2 | $     0.2  |
| Accounts receivable                      | -         | 0.0        |
| Fixed assets                             | -         | 0.0        |
| Debtor subsidiary intercompany assets    | 10.9      | 10.9       |
| Other SFA assets                         | -         | -          |
| Gross liquidation proceeds               | $    11.1 | $    11.2  |

E.     *Gross Liquidation Proceeds for Pipeline* - The gross liquidation proceeds for Pipeline include assumed gross proceeds from intercompany balances due from Industries. The Debtors have ascribed a "low" value and a "high" value for these gross liquidation proceeds as follows (in $millions):

|  | Low Value | High Value |
|---|---|---|
| Cash and cash equivalent | $       - | $       - |
| Accounts receivable | - | - |
| Fixed assets | - | - |
| Debtor subsidiary intercompany assets | 7.1 | 7.1 |
| Other Pipeline assets | - | - |
| Gross liquidation proceeds | $     7.1 | $     7.1 |

## 2.   Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Confirmation not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). The Plan is a liquidating plan of reorganization. Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

## 3.   Acceptance By Impaired Classes

A class is impaired under a plan unless, with respect to each claim or interest of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding a demand for accelerated payment (a) cures any default and reinstates the maturity of the obligation; (b) compensates the holder of such claim for damages incurred on account of reasonable reliance on contractual provisions; and (c) does not otherwise alter legal, equitable or contractual rights. A class that is not impaired under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

With respect to the Plan, Classes 1, 2, 3, 6 and 8 are Unimpaired by the Plan and the Claim and Interest holders in such Classes deemed by law to have accepted the Plan. Classes 13, 15, 17 and 18 are conclusively presumed to accept the Plan because the Claim and Interest holders in such Classes are the proponents of the Plan. The holders of Claims in the Voting Classes are Impaired and entitled to vote on the Plan.

## 4.   Cram Down

THE DEBTORS RESERVE THE RIGHT TO CRAM DOWN THE PLAN ON NON-ACCEPTING CLASSES OF CLAIMS AND INTERESTS.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the

Bankruptcy Code.  Under the "cram down" provisions, upon the request of a plan proponent a bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class, (ii) the plan is fair and equitable with respect to each non-accepting impaired class, and (iii) at least one impaired class has accepted the plan.  These standards ensure that holders of junior interests, such as common stockholders, cannot retain any interest in the debtor under a plan that has been rejected by a senior class of impaired claims or interests unless such impaired claims or interests are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a non-accepting class, depending on whether the class is comprised of secured or unsecured claims or interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.  In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting Impaired class receives more than payment in full on its claims.

With respect to a Voting Class that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) each holder of an unsecured Claim in the non-accepting Voting Class receives or retains under such Plan property of a value equal to the allowed amount of its Claim, or (ii) the holders of Claims or holders of Interests that are junior to the Claims in such non-accepting Voting Class will not receive or retain any property under the Plan.  Additionally, the Debtors must demonstrate that the holders of Claims that are senior to the Claims of the non-accepting Voting Class receive no more than payment in full on their Claims under the Plan.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more of the Voting Classes have failed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.  The Debtors believe that the Plan satisfies the "cram down" requirements of the Bankruptcy Code.  The Debtors may seek confirmation of the Plan over the objection of non-accepting Voting Classes, as well as over the objection of individual holders of Claims who are members of an accepting Voting Class.  In addition, the Debtors intend to seek "cram down" of the Plan on the Classes deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code by virtue of receiving no distributions thereunder.  Nevertheless, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### 5. Classification Of Claims And Interests

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan place each claim or interest into a class with other claims or interests which are "substantially similar."

## E. Effect Of Confirmation Of The Plan

### 1. No Discharge

The Confirmation Order shall not discharge any Debtor from any debt or liability that arose before Confirmation, as provided in section 1141(d)(3)(A) of the Bankruptcy Code.

### 2. Release Of Assets

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtors, their assets and properties. Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Article X of the Plan, and Liquidating Trustee shall perform its duties and obligations pursuant to the Liquidating Trust Agreement and the Plan.

### 3. Exculpation And Limitation Of Liability

Subject to limitations required by applicable ethical rules and standards of conduct, and except as limited in Section 11.9(b) of the Plan, none of the Debtors, the Liquidating Trust, the Liquidating Trustee, the Bankruptcy Committees, the Indenture Trustees, the Lenders, the financial institutions party to the DIP Credit Agreement, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission from and after the Petition Date in connection with, relating to, or arising out of, the Chapter 11 Case, the commencement of the Chapter 11 Case, the administration of the Chapter 11 Case, the pursuit of and the approval of the sales of the Debtors' assets (and the related asset purchase agreement), the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct; provided, however, any present or former officer or director of any Debtors shall be liable to any holder of a Claim or Interest, or any other party in interest, or any of their successor or assigns, for: (i) any breach of such person's duty of loyalty to the Debtors, (ii) any act or omission not in subjective good faith or which involves intentional misconduct or a knowing violation of law, and (iii) any transaction for which such person derived an improper benefit, and in all respects such persons shall be entitled to reasonably rely upon the advice of the Debtors' counsel (including in-house counsel) with respect to their duties and responsibilities under the Plan. In addition, the Indenture Trustees under the Demand Certificates and the Subordinated Certificates shall not have or incur any liability to any holder (registered or unregistered) of any Demand Certificate or Subordinated Certificate or any claim based on any Demand Certificate or Subordinated Certificate as a result of any inaccuracy or mistake in the books and records of Industries (in their capacities as paying agents and registrars under the Trust Indentures for the Demand Certificates and the Subordinated Certificates).

The exculpatory provisions contained in Section 11.9(a) of the Plan (i) shall not limit the claims and rights, if any, of the United States, and (ii) shall apply to any person or entity who was not the beneficiary of a post-petition indemnification obligation of the Debtors only to the extent provided in Section 11.9(c) of the Plan.

Any claims that would otherwise be subject to the exculpatory provisions contained in Section 11.9(a) of the Plan but for the provisions of Section 11.9(b)(ii) of the Plan may only be asserted in the Bankruptcy Court and only if filed on or before ninety days after the Effective Date. In the event that any such claims are not filed timely in the Bankruptcy Court, the exemption contained in Section 11.9(b)(ii) of the Plan shall be terminated with respect to such claims, and such claims shall be deemed subject to the exculpatory provisions contained in Section 11.9(a) of the Plan.

Any non-exculpated claims against the parties set forth in Section 11.9(a) of the Plan arising from or related to the matters set forth in Section 11.9(a) of the Plan may only be asserted and filed in the Bankruptcy Court.

The Bankruptcy Court shall retain exclusive jurisdiction to determine all matters arising from or related to claims against the parties set forth in Section 11.9(a) of the Plan arising from or related to the matters set forth in Section 11.9(a) of the Plan.

The Debtors are not aware of any claims, meritorious or otherwise, that are being exculpated under the Plan.

### 4.  Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Liquidating Trust, the Liquidating Trustee and all other parties-in-interest in this Chapter 11 Case.

### F.  Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, those matters enumerated in Article X of the Plan.

## VI. CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.  Risk That Distributions May Be Less Than Estimated By Debtors

The distributions and recoveries set forth in this Disclosure Statement are based on the Debtors' estimate of Allowed Claims as of October 24, 2003 and include the Debtors' best current estimate of Allowed Claims for damages under rejected contracts and leases that had not been formally asserted against the Debtors as of October 24, 2003.  The Debtors project that the Claims asserted against them will be resolved in and reduced to an amount that approximates their estimates and may seek an order or orders from the Bankruptcy Court estimating the maximum dollar amount of Allowed Claims and Disputed Claims or otherwise determining and fixing the amount of the Disputed Claims Reserve.  This estimate will be used to calculate and fix distributions to holders of Allowed Claims and the amount of the Disputed Claims Reserve.  Such a procedure may also be utilized, in the sole discretion of the Debtors, for Administrative Claims, Other Priority Claims, Priority Tax Claims and/or other Claims.  There can be no assurance, however, that such estimates will prove accurate.  The Debtors do not believe that these risks pose a bar to confirmation of the Plan.

In addition, there exists the potential that holders of certain Claims (including, without limitation, Claims related to environmental matters) that the Debtors contend constitute General Unsecured Claims will assert that such Claims constitute Administrative Claims.  To the extent that any of such Claims are ultimately adjudicated to be Allowed Administrative Claims, the distributions could significantly and materially differ from the actual distributions made under the Plan.  If and to the extent the Debtors have underestimated the amount of any Allowed Claims or any Disputed Claims Reserves for Administrative Claims, Other Priority Claims or Priority Tax Claims, the Debtors could be required to redirect Available Cash to such Disputed Claims Reserves, resulting in a potential dilution of Available Cash.  Therefore, the distributions discussed herein could significantly and materially differ from the actual distributions made under the Plan.  Distributions will also be affected by the following: (i) the amount of Available Cash the Debtors are able to realize from the pursuit of Litigation Claims; (ii) the amount of Allowed Claims for rejected contracts and leases that have not yet been formally asserted against the Debtors; (iii) the amount of Allowed Administrative Claim that have not yet been asserted against the Debtors; (iv) the amount of Allowed Priority Tax Claims may be greater than estimated by the Debtors; and (v) the costs of continuing to administer the Chapter 11 Cases and wind down the Debtors' businesses.

The Debtors reserve the right to object to the amount or classification of any Claim.  Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim whose Claim is subject to a successful objection.  Any such holder may not receive the estimated distributions set forth herein.

### B.  Risk Of Non-Confirmation Of The Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a liquidation under Chapter 7 of the Bankruptcy Code or that an alternative plan would be on terms as favorable to the holders of Allowed Claims and Allowed Interests as the terms of the Plan.

### C.  Non-Consensual Confirmation Of The Plan

Pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan without the acceptances of all Impaired Classes, so long as at least one Impaired Class of Claims has accepted the Plan.  For a description of the "cram down" provisions of the Bankruptcy Code, see Section V.D.4, *Cram Down.*

### D.  Conditions Precedent To The Occurrence Of The Effective Date

Article IX of the Plan sets forth the conditions precedent to the occurrence of the Effective Date, including the closing of the sales of the Coffeyville Assets, the SF Phosphates Interest and the Pork Business.  There can be no assurance that these conditions will be satisfied.

### E.  Liquidation Of The Debtors' Assets

Except to the extent that the Debtors' assets have already been liquidated to Cash, the Liquidating Trustee's ability to make the distributions described in the Plan depends on the liquidation of the Debtors' assets.  Although the Liquidating Trustee will endeavor to liquidate these assets as expeditiously as possible and in such a manner as to maximize the Cash realized from such liquidation, the Debtors cannot warrant either the timing or the amount of distributions under the Plan.

### F.  Litigation Risks

The Debtors have not completed their analysis of possible claims that may ultimately be pursued by the Liquidating Trustee, including but not limited to preference, fraudulent conveyance and other avoidance actions, lender liability claims, fraud claims and breach of fiduciary duty claims.  The Liquidating Trustee will pursue all or certain of these or other claims in accordance with the provisions of the Plan and the Confirmation Order.  The costs of pursuing such litigation will be paid out of Cash available to the Estate and there can be no assurances that the Liquidating Trustee will prevail in such litigation.  In addition, objections to certain Claims may require separate litigation.  Accordingly, although recoveries on causes of action may enhance distributions, the distributions currently projected by the Debtors may be reduced by the costs of such litigation.

### G.  Alternatives To The Plan

After careful review of the estimated recoveries in a Chapter 7 liquidation scenario, the Debtors have concluded that the recovery to holders of Claims and Interest will be maximized by the Plan.  According to the liquidation analysis prepared by the Debtors with the assistance of its financial advisors, distributions to holders of Claims and Interests will occur much sooner and have greater value to holders of Claims under the Plan than under any other alternative.  Should the Plan not be confirmed, it is likely that the distributions to holders of Claims and Interests would be delayed and would be materially reduced by the additional fees and other costs associated with a Chapter 7 liquidation.  Accordingly, the Debtors believe that the Plan offers the best prospect of recovery for the holders of Claims and Interests against the Debtors and recommend that you vote to accept the Plan.

# VII.　CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and to the holders of the Demand Certificates Claims, Subordinated Certificates Claims, General Unsecured Claims against Industries, Industries Common Shares, Old Securities of Foods, Old Securities of Transportation, Old Securities of SFA, Old Securities of Pipeline, Intercompany Claims, and Subordinated Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date hereof and all of which are subject to change, with possible retroactive effect.  This description is for informational purposes only, and due to the lack of definitive judicial or administrative authority and interpretation in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and except with respect to the ability to use Member NOLs (defined below) to offset tax benefit income generated from the cancellation of Industries Common Shares that constitute Industries Member Equity (defined below) and whether income is generated with respect to any outstanding patronage equity in Industries absent formal cancellation, Debtors have not obtained and do not intend to seek a ruling from the Internal Revenue Service (the "Service") as to any of such tax consequences.  There can be no assurance that the Service will not challenge one or more of the tax consequences of the Plan described below.

The following discussion is limited to holders of Demand Certificates Claims, Subordinated Certificates Claims, General Unsecured Claims against Industries, Industries Common Shares, Old Securities of Foods, Old Securities of Transportation, Old Securities of SFA, Old Securities of Pipeline, Intercompany Claims, and Subordinated Claims that hold their Claims or Interests as capital assets or whose Claims or Interests otherwise arose in the ordinary course of business, and does not address all matters that may be relevant to particular classes of holders that are subject to special rules under the Code, including, without limitation, financial institutions, securities dealers, broker-dealers, tax-exempt entities, insurance companies, foreign persons, or holders that hold their Securities as part of a "straddle" or a "conversion transaction" (as defined in the Code).  Consequently, such holders may be subject to special rules not discussed below.  In addition, estate and gift tax issues are not addressed herein.

THIS DISCUSSION DOES NOT ADDRESS ANY TAX LAWS OTHER THAN UNITED STATES FEDERAL INCOME TAX LAWS.  THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY FEDERAL ESTATE, STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## A.　Certain Federal Income Tax Consequences to the Debtors

### 1.　Transfer Of Assets To The Liquidating Trust

On the Effective Date, Debtors will transfer all right, title and interest in all of the Debtors' property and assets (excluding the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets), including without limitation, all rights and causes of action, whether arising by contract, under the Bankruptcy Code, under the Plan or under other applicable law, including,

78

without limitation, all rights the Debtors have under the Plan (together with the net proceeds of the Industries Retained Assets and the Coffeyville Assets, the "Remaining Assets") to the Liquidating Trust on behalf of holders of Allowed Claims and Interests to the extent they are Beneficiaries. The Debtors thereafter will not have any beneficial interest, contingent or otherwise, in the Liquidating Trust. See "Tax Treatment of the Liquidating Trust and Ownership of Beneficial Interests in the Liquidating Trust" below. Such transfers will constitute a taxable disposition of the Remaining Assets, resulting in the recognition of gain or loss by the Debtors equal to the difference between the sum of the fair market value of the assets at the time of such transfers and the amount of any liabilities assumed by the Liquidating Trust and the Debtors' adjusted tax basis in such assets.

The Debtors believe they will recognize a net gain for tax purposes as a result of the transfer to the Liquidating Trust and the already completed and further anticipated asset sales, including the sales of the Pork Business and the SF Phosphates Interests. However, a significant portion, if not all, of such gain should be offset for United States federal income tax purposes by available net operating losses and Debtors do not believe they will incur a material net tax liability with respect to the transfer and other asset sales. Any gain realized on the disposition of the Industries Retained Assets may result in a material tax liability with respect to the disposition.

## 2. Merger Of Foods Into Industries

Under the Plan, Foods will be merged into Industries with Industries surviving. If, as the Debtors expect, the merger of Foods into Industries complies with the provisions of Section 368(a)(1)(A) of the Code, the merger contemplated by the Plan will qualify as an "A reorganization" for United States federal income tax purposes, in which case Industries will not recognize either gain or loss for United States federal income tax purposes upon the merger.

## 3. Cancellation Of Industries Common Shares

### a) Tax Benefit Income

Under the Plan, a portion of the Industries Common Shares will be cancelled and, to the extent such Industries Common Shares constitute Industries Member Equity (defined below), offset against appropriate losses and available Member NOLs and Non Member NOLs (defined below). Any remaining Industries Common Shares will be reinstated on the Effective Date and shall not be cancelled or extinguished. Such Industries Common Shares however are expected to be worthless on the Effective Date.

Cancellation of Industries Common Shares that constitute patronage dividends issued to members, associate members and patrons of Industries in the form of member common stock, associate member common stock or capital credits (the "Industries Member Equity") may result in income to Industries under the tax benefit rule. It is the position of the Service that cooperatives recognize tax benefit income upon the cancellation or redemption of patronage equity at a discount because (i) at the time the patronage equity was issued the cooperative claimed a deduction for United States federal income tax purposes and the patrons receiving the patronage equity reported a like amount of income; and (ii) upon the cancellation or redemption of the patronage equity, the cooperative is relieved of its obligation to redeem the patronage equity in the future at its stated value. Under the Service's approach, the amount of tax benefit income which would be realized by Industries upon cancellation of Industries Common Shares that constitute Industries Member

Equity is equal to the difference between the face amount of Industries Common Shares that constitute Industries Member Equity outstanding and the sum of any cash and the fair market value of any other property received in exchange for the Industries Common Shares that constitute Industries Member Equity.

Contrary to the Service's position, the Eleventh Circuit Court of Appeals has held that no tax benefit income is realized when patronage equity is cancelled or otherwise redeemed for less than its face value. Under the view of the Eleventh Circuit, when a cooperative pays a patronage dividend through the issuance of a qualified written notice based on consent, the dividend is deemed for tax purposes to have been paid in cash, with the patron then using the cash to acquire the qualified written notice. *Gold Kist, Inc. v. Comm'r*, 110 F.3d 769 (11th Cir. 1997).

The Service disagrees with the decision in *Gold Kist* and has stated that it fully intends to litigate any taxpayer claim that tax benefit income is not recognized based on the decision in *Gold Kist*. To the extent that tax benefit income may be realized with respect to the portion of the Industries Common Shares that constitute Industries Member Equity that are cancelled pursuant to the Plan, Debtors believe that there will be sufficient losses and NOLs (defined below) to offset this tax benefit income. See, "*Cancellation of Industries Common Shares-Net Operating Losses*," below.

Based on current projections it is estimated that approximately $45,000,000 Industries Common Shares that constitute Industries Member Equity will not be cancelled. These outstanding Industries Common Shares are believed to be worthless as it is unlikely that there will be any remaining proceeds from the liquidation after Creditors' Claims are paid. Industries believes that it will not recognize tax benefit income merely as a result of the Industries Common Shares that constitute Industries Member Equity becoming worthless. Industries has requested a private letter ruling from the Service to the affect that income is not generated with respect to any outstanding patronage equity in Industries absent formal cancellation. If the Service does not grant such a ruling and treats the patronage equity as cancelled and not otherwise excluded from taxation, Industries will be subject to tax on the amount of outstanding patronage equity unless Industries were to successfully contest the issue in court.

b)  Net Operating Losses

As a cooperative, Industries' net operating losses ("NOLs") are classified as either NOLs resulting from activities with patrons ("Member NOLs") or NOLs resulting from activities with non patrons ("NonMember NOLs"). Member NOLs may only be used to offset member sourced income, whereas NonMember NOLs may be used to offset both member sourced income and non-member sourced income. The Service has granted Industries' private letter ruling request providing that Industries will be able to utilize current patronage sourced losses and available Member NOLs by canceling an equal amount of the Industries Common Shares that constitute Industries Member Equity. Industries will cancel Industries Common Shares that constitute Industries Member Equity only to the extent it has available losses, NonMember NOLs and Member NOLs. All remaining Industries Common Shares that constitute Industries Member Equity will remain outstanding under the Plan.

Industries has approximately $481,000,000 of Industries Common Shares that constitute Industries Member Equity outstanding. Based on current projections, following the transfer of the Remaining Assets to the Liquidating Trust and consummation of the proposed asset sales, Industries

believes it will have losses, NonMember NOLS and Member NOLs of approximately $436,000,000 available to offset any tax benefit income resulting from cancellation of Industries Common Shares that constitute Industries Member Equity. Therefore, it is anticipated that Industries will cancel approximately $436,000,000 of the Industries Member Equity and leave approximately $45,000,000 Industries Common Shares that constitute Industries Member Equity outstanding.

Thus, after the offset against tax benefit income and gains from asset sales, Industries expects to have no NOLs remaining prior to any cancellation of indebtedness attribute reduction. See, "*Cancellation of Indebtedness and Reduction of Tax Attributes*," below.

In the event Industries cancels an amount of Industries Common Shares that constitute Industries Member Equity that exceeds its available losses and NOLs, or Industries Common Shares that constitute Industries Member Equity that remain outstanding are deemed to generate tax benefit income by virtue of being worthless, the Debtors will be subject to tax on the amount of tax benefit income that is not offset by the available losses and NOLs, unless the Debtors prevail on a *Gold Kist* or similar type argument wherein tax benefit income is not recognized.

### 4. Cancellation Of Indebtedness And Reduction Of Tax Attributes

In connection with the Plan, the amount of Industries' aggregate outstanding indebtedness will be substantially reduced. A taxpayer generally realizes cancellation of debt ("COD") income for United States federal income tax purposes equal to the amount of any indebtedness that is discharged or canceled during the taxable year. Whether a debt is considered discharged is dependent upon the substance of the transaction. Generally a debt is considered discharged at the point when it becomes clear that the debt will never have to be paid. In the case of an exchange, such as that contemplated by the Plan, where outstanding indebtedness is exchanged for other property (such as Cash and the Remaining Assets), the amount of such COD income is, in general, equal to the excess of the adjusted issue price (including accrued but unpaid interest) of the indebtedness over the fair market value of the other property issued therefor. However, Section 108(a) of the Code provides that if the discharge is granted by a court in a Chapter 11 proceeding or is pursuant to a plan approved by such court, such income is excluded from the taxpayer's taxable income. Consequently, any COD income attributable to the Plan will be excluded from Debtors' taxable income and Debtors' will not incur any tax liability with respect to such COD income.

However, Section 108(b) of the Code provides, in general, that certain tax attributes of a debtor, including any NOLs and certain tax credits, must be reduced by the amount of the debtor's COD income that is excluded under Section 108(a) of the Code. To the extent that the amount excluded exceeds these tax attributes, the debtor's tax basis in its property is reduced by the amount of such excluded COD income, except that such reduction is limited to the excess of the aggregate tax basis of the property held by the debtor over the aggregate liabilities of the debtor immediately after the transaction. Recent Treasury Regulations provide that in a consolidated group situation, NOLs are reduced on a consolidated basis. In addition, the Treasury Regulations clarify that all of the consolidated attributes of the group may be available for reduction when the debt of a member of the group is discharged, based upon the member's relationship in the group, and provides a methodology for reducing such attributes.

As a result of the Plan, and assuming the aggregate issue price for each of the debt instruments issued in the Plan is equal to its aggregate principal amount, Industries estimates that the

attribute reduction required under Section 108(b) will completely eliminate the NOLs of Industries and its subsidiaries as of the end of the taxable year in which the Plan is confirmed. However, because the attribute reduction occurs after the determination of the Debtors' normal tax liability for a taxable year, such attribute reduction is not expected to impact Debtors' use of NOLs to offset tax benefit income or gain with respect to asset sales.

### 5. Alternative Minimum Tax

In general, an "alternative minimum tax" ("AMT") is imposed on a corporation's "alternative minimum taxable income" at a rate of 20% to the extent such tax exceeds the corporation's regular United States federal income tax. In computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might be able to offset all of its taxable income for regular United States federal income tax purposes by available NOLs, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOLs (as recomputed for AMT purposes), resulting in an effective AMT rate of 2%.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular United States federal income tax liability in future taxable years when the corporation is no longer subject to the AMT. Debtors believe that they may be subject to an AMT liability as a result of their use of NOLs to offset tax benefit income or gain on asset sales.

### B. United States Federal Income Tax Consequences To Holders Of Claims And Interests

The United States federal income tax consequences of the Plan to holders of Claims and Interests and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for or by the Plan will depend upon, among other things, (i) the manner in which a holder acquired a Claim or Interest; (ii) the length of time a Claim or Interest has been held; (iii) whether the Claim or Interest was acquired at a discount; (iv) whether the holder has taken a bad debt deduction in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim or Interest; (vi) the method of tax accounting of the holder; (vii) whether a Claim or Interest is an installment obligation for United States federal income tax purposes; (viii) whether the holder's present Claim or Interest constitutes a security for United States federal income tax purposes; and (ix) the type of consideration received or deemed received by the holder in exchange for its Claim or Interest. Therefore, holders of Claims and Interests should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such holders as a result thereof.

### 1. Holders Of Allowed Claims And Interests Receiving Consideration

#### a) Unimpaired Claims and Interests

Under the Plan, Allowed Claims and Interests in Class 1 (Other Priority Claims), Class 2 (Secured Lender Claims), Class 3 (Other Secured Claims), Class 6 (Convenience Claims against Industries) and Class 8 (Industries Preferred Shares) (collectively, the "Unimpaired Claims") are Unimpaired by the Plan. The satisfaction of the Unimpaired Claims will have the same United

States federal income tax consequences to the holders that it would have had if the Plan were not confirmed. To the extent that the fair market value of the Remaining Assets on the Effective Date equals or exceeds the amount of such Claims on the Effective Date, such Claims shall be deemed satisfied for tax purposes on the Effective Date when the Remaining Assets are transferred to the Liquidating Trust.

### b) Priority Impaired Claims

Under the Plan, holders of Claims in Class 10 (General Unsecured Claims against Foods), Class 12 (General Unsecured Claims against Transportation), Class 14 (General Unsecured Claims against SFA), Class 16 (General Unsecured Claims against Pipeline) and Class 18 (Intercompany Claims) (collectively, the "Priority Impaired Claims") will be fully satisfied provided that the fair market value of the Remaining Assets on the Effective Date equals or exceeds the amount of the Unimpaired Claims and Priority Impaired Claims on the Effective Date. The satisfaction of the Priority Impaired Claims will have the same United States federal income tax consequences to the holders that it would have had if the Plan were not confirmed.

### c) Impaired Claims

Under the Plan, holders of claims in Class 4 (Demand Certificates Claims), Class 5 (Subordinated Certificates Claims), and Class 7 (General Unsecured Claims against Industries) will receive, as consideration in satisfaction of their Allowed Claim, a pro rata share of the Industries Distribution Pool. Holders of Demand Certificates Claims, Subordinated Certificates Claims, and General Unsecured Claims against Industries will recognize ordinary interest income to the extent that any portion of such consideration is allocable to accrued but untaxed interest. See "*Distributions in Discharge of Accrued Interest*," below. The following discussion addresses only that portion of the consideration received by a such holders which is not allocable to accrued but untaxed interest.

Holders of Demand Certificates Claims, Subordinated Certificates Claims, and General Unsecured Claims against Industries will be deemed to have received a share of the Remaining Assets transferred to the Liquidating Trust in exchange for their Claims to the extent the fair market value of such assets on the Effective Date exceeds the aggregate amount of Administrative Claims against Industries, Priority Tax Claims against Industries, Unimpaired Claims and Priority Impaired Claims. Such transfer will constitute a taxable transaction and such holders will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in respect of its Allowed Claim (other than any claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Allowed Claim (other than any claim for accrued but unpaid interest).

To the extent the proceeds of the Industries Retained Assets are subsequently transferred to the Liquidating Trust, such transfer will increase the amount of gain previously recognized or reduce the amount of loss previously recognized by holders of Demand Certificates Claims, Subordinated Certificates Claims and General Unsecured Claims against Industries to the extent such proceeds are allocable to such holders. Such transfer to the Beneficiaries will constitute a taxable transaction to the Beneficiaries. Beneficiaries will determine the gain or loss on the transfer by comparing the value of the Liquidating Trust interest received in the exchange to the tax basis, if any, in their claims. As a result of such treatment, such holders of Allowed Claims will have to take into account the fair market value of their pro rata share, if any, of the Remaining Assets transferred on their behalf to the Liquidating Trust in determining the amount of gain or loss realized and required to be

recognized upon consummation of the Plan on the Effective Date. In addition, since such a Beneficiary's share of the assets held in the Liquidating Trust may change depending upon the resolution of Disputed Claims and the Industries Retained Assets, the holder may be prevented from recognizing any loss in connection with consummation of the Plan until the time that all such issues with respect to the Disputed Claims and the Industries Retained Assets have been resolved. The Liquidating Trustee will provide the holders of Allowed Claims with valuations of the Remaining Assets on behalf of and for the benefit of such holders and such valuations should be used consistently by the Liquidating Trust and such holders for all United States federal income tax purposes.

Where gain or loss is recognized by a holder of Subordinated Certificates Claims or General Unsecured Claims against Industries, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the obligation from which the Claim arose constitutes a capital asset in the hands of the holder and how long it has been held, and whether and to what extent the holder has previously claimed a bad debt deduction. A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code which could characterize a portion of the gain recognized as ordinary income. In addition, Section 582(c) of the Code provides that the sale or exchange of a bond, debenture, note or certificate or other evidence of indebtedness by certain financial institutions shall be considered the sale or exchange of a non-capital asset. Accordingly, any gain or loss recognized by such financial institutions as a result of the implementation of the Plan will be ordinary gain or loss, regardless of the nature of their Claims.

The transfer of the Remaining Assets to the Liquidating Trust by the Debtors as well as any subsequent transfers to the Liquidating Trust should be treated for tax purposes as a deemed transfer to the holders of Allowed Claims, to the extent they are Beneficiaries, followed by a deemed transfer by the Beneficiaries to the Liquidating Trust. See "*Tax Treatment of the Liquidating Trust*," below.

## 2. Holders Of Industries Common Shares

Under the Plan, a portion of the Industries Common Shares will be cancelled. The United States federal income tax consequences to the holders of claims in Class 9 (Industries Common Shares) will depend on whether or not the Industries Common Shares are Industries Member Equity in the hands of the holder.

### a) Industries Common Shares That Do Not Constitute Industries Member Equity

If a holder of Industries Common Shares that are not Industries Member Equity receives no consideration in exchange for its Industries Common Shares, and such Industries Common Shares are cancelled, such holder will generally recognize a loss equal to the holder's tax basis in its Industries Common Shares. Any such loss will generally be a capital loss and will be a long-term capital loss if the Industries Common Shares were held for more than one year.

    b)  Industries Common Shares That Constitute Industries Member Equity

If a holder of Industries Common Shares that represent Industries Member Equity receives no consideration in exchange for its Industries Common Shares that represent Industries Member Equity and such Industries Common Shares that represent Industries Member Equity are cancelled, such holder will generally recognize a loss equal to the holder's tax basis in its Industries Common Shares that represent Industries Member Equity.  Two Revenue Rulings issued by the Service in 1970 provide that an association's members and patrons will be allowed an ordinary loss deduction as a result of the cancellation.  Although the Service suspended these two Revenue Rulings in 1987, Debtors' believe that it is still the position of the Service that such loss is considered an ordinary loss.  If the loss is not treated as an ordinary loss as described above, the loss will be classified as a capital loss.

### 3.  Holders Of Old Securities Of Foods

Under the Plan, the Old Securities of Foods will be deemed cancelled as of the Effective Date and holders of Old Securities of Foods that constitute Minority Foods Shares will receive a pro rata share of the Class 11 Distribution Pool.  Such holders of Old Securities of Foods will recognize taxable loss (or gain) to the extent that the fair market value of their share of the Class 11 Distribution Pool is less (or greater) than the holder's tax basis in their Old Securities of Foods.  The gain or loss should be a capital gain or loss provided the shareholder held the Old Securities of Foods as a capital asset within the meaning of Code Section 1221.  If, however, a holder claimed a loss for tax purposes in a prior period on the ground that the Old Securities of Foods had become worthless, the holder would be required to recognize income equal to the fair market value of their share of the Class 11 Distribution Pool.

### 4.  Holders Of Old Securities Of Transportation, SFA And Pipeline

Under the Plan all Class 13 Interests (Old Securities of Transportation), Class 15 Interests (Old Securities of SFA), and Class 17 Interests (Old Securities of Pipeline) will be deemed cancelled as of the Effective Date and any cash remaining in the Estates of Transportation, SFA and Pipeline after the payment of Claims against each Estate as set forth in the Plan (the "Old Securities Cash") shall be transferred to the Liquidating Trust for the benefits of the creditors of Industries.  The holders of the Old Securities of Transportation, SFA and Pipeline will generally recognize a taxable loss (or gain) to the extent the Old Securities Cash is less (or greater) than the holder's tax basis in its respective Old Securities of Transportation, Old Securities of SFA, or Old Securities of Pipeline.  Any such loss (or gain) will generally be a capital loss (or gain) and will be a long-term capital loss (or gain) if the Old Securities of Transportation, Old Securities of SFA, or Old Securities of Pipeline were held for more than one year.

### 5.  Holders Of Subordinated Claims

Under the Plan, claims in Class 19 (Subordinated Claims) will not receive or retain any property until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment

of interest at the Plan Rate), (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid.

In general, loss will be recognized by a holder of a Subordinated Claim in an amount equal to the holder's adjusted tax basis in its Subordinated Claim (other than any claim for accrued but unpaid interest). See "*Distributions in Discharge of Accrued Interest,*" below.

Where loss is recognized by a holder of a Subordinated Claim, the character of such loss as long-term or short-term capital loss, or as ordinary loss will be determined by a number of factors, including the tax status of the holder, whether the obligation from which the Claim arose constitutes a capital asset in the hands of the holder and how long it has been held, and whether and to what extent the holder has previously claimed a bad debt deduction. A holder which purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Code which could characterize a portion of the gain recognized as ordinary income. In addition, Section 582(c) of the Code provides that the sale or exchange of a bond, debenture, note or certificate or other evidence of indebtedness by certain financial institutions shall be considered the sale or exchange of a non-capital asset. Accordingly, any gain or loss recognized by such financial institutions as a result of the implementation of the Plan will be ordinary gain or loss, regardless of the nature of their Claims.

## 6.    Distributions In Discharge Of Accrued Interest

To the extent the amount received by a holder is received in discharge of interest accrued on its Claim during its holding period, such amount will be taxable to the holder as interest income (if, under the holder's applicable accounting method, such interest was not previously included in the holder's gross income). Conversely, a holder will recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

Pursuant to the Plan, any distributions received by a holder in respect of an Allowed Claim shall be allocated first to the principal portion of the Claim to the extent thereof and thereafter to any Claim representing accrued interest through the Effective Date. There is no assurance, however, that such allocation will be respected for United States federal income tax purposes. Accordingly, all holders are advised to consult their own tax advisors to determine the amount of consideration received under the Plan that may be allocable to accrued interest.

## 7.    Information Reporting And Backup Withholding

Certain payments, including the payments of Claims pursuant to the Plan, are generally subject to information reporting by the Debtors to the Service. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

### C.  Tax Treatment Of The Liquidating Trust

#### 1.  Classification Of The Liquidating Trust And Ownership Of Beneficial Interests In Liquidating Trust

Pursuant to the Plan, the Debtors will transfer the Remaining Assets to the Liquidating Trust and the Liquidating Trust will become obligated to make distributions in accordance with the Plan. The Liquidating Trust is intended to qualify as a liquidating trust for United States federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for United States federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  The Service, in Revenue Procedure 94-45, set forth the general criteria for obtaining a Service ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan.  Although no such ruling will be requested, the Liquidating Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Liquidating Trustee and the Beneficiaries) are required to treat, for United States federal income tax purposes, the Liquidating Trust as a grantor trust of which the Beneficiaries are the owners and grantors, and the following discussion assumes that the Liquidating Trust will be respected as a liquidating trust.  However, no ruling has been requested from the Service concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the Service would not take a contrary position.  If the Service were to challenge successfully such classification, the United States federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed herein (including the potential for an entity level tax).

#### 2.  Tax Reporting

For all United States federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee and holders of beneficial interests in the Liquidating Trust) shall treat the transfer of the Remaining Assets to the Liquidating Trust, in accordance with the terms of the Plan, as a transfer of the Remaining Assets directly to the Beneficiaries, followed by the transfer of the Remaining Assets by such holders to the Liquidating Trust.  Consistent therewith, all parties shall treat the Liquidating Trust as a grantor trust of which such holders are the owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) shall be treated as the direct owners of an undivided beneficial interest in the assets and liabilities of the Liquidating Trust for all United States federal income tax purposes.  The Liquidating Trustee will determine the fair market value of the Remaining Assets and all parties, including the Beneficiaries, must consistently use such valuation for all United States federal income tax purposes.

Each of the Beneficiaries will be required to report on its United States federal income tax return(s) the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.  The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of the holder.

The United States federal income tax reporting obligation of the Beneficiaries is not dependent upon the Liquidating Trust distributing cash or other proceeds.  Therefore, Beneficiaries may receive net taxable income or gain in a taxable year regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder.  If a

87

holder does not receive distributions commensurate with the net taxable income or gain allocated to it in respect of any beneficial interests it holds in the Liquidating Trust, the holder may be entitled to a subsequent loss or deduction.  In general, a distribution of cash by the Liquidating Trust to the Beneficiaries will not be subject to tax since such Beneficiaries are already regarded for United States federal income tax purposes as owning the underlying assets.

The Liquidating Trustee will file with the Service returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).  The Liquidating Trustee will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its United States federal income tax return.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

[Remainder of Page Blank]

## VIII.  CONCLUSION

The Debtors urge holders of Claims and Interests in the Voting Classes to vote to accept the Plan and to evidence such acceptance by returning their completed and signed Ballots so they will be received by the Balloting Agent not later than the Balloting Deadline.

Dated: October 31, 2003

FARMLAND INDUSTRIES, INC.
FARMLAND FOODS, INC.
SFA, INC.
FARMLAND TRANSPORTATION, INC.
FARMLAND PIPE LINE COMPANY

By: _____ /s/ Robert B. Terry _____
Name: Robert B. Terry
Title: Authorized Signatory

Laurence M. Frazen, Esq.
Cynthia Dillard Parres, Esq.
Robert M. Thompson, Esq.
BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri  64105

Gregory D. Willard, Esq.
David M. Unseth, Esq.
Cullen K. Kuhn, Esq.
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750

Attorneys for the Debtors and Debtors-in-Possession

# **APPENDIX A**

Second Amended Joint Plan of Reorganization, as Modified

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| | ) | |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors. | ) | Joint Administration |

## DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED

Gregory D. Willard, Esq.                    Laurence M. Frazen, Esq.
David M. Unseth, Esq.                       Cynthia Dillard Parres, Esq.
Cullen K. Kuhn, Esq.                        Robert M. Thompson, Esq.
BRYAN CAVE LLP                              BRYAN CAVE LLP
211 North Broadway, Suite 3600              1200 Main Street, Suite 3500
St. Louis, Missouri 63102-2750             Kansas City, Missouri  64105

Attorneys for Debtors and Debtors-in-Possession

Dated: October 31, 2003

**TABLE OF CONTENTS**                              **Page**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME
    AND GOVERNING LAW ................................................................... 1
1.1 "Administrative Claim" ...................................................................... 1
1.2 "Allowed" .......................................................................................... 1
1.3 "Allowed Class . . . Claim" ............................................................... 2
1.4 "Allowed Class . . . Interest" ............................................................ 2
1.5 "Allowed Interest" ............................................................................ 2
1.6 "Available Cash" ............................................................................... 2
1.7 "Ballot" .............................................................................................. 2
1.8 "Bankruptcy Code" ........................................................................... 2
1.9 "Bankruptcy Committees" ................................................................ 2
1.10 "Bankruptcy Court" ......................................................................... 2
1.11 "Bankruptcy Rules" .......................................................................... 2
1.12 "Bar Date(s)" ................................................................................... 3
1.13 "Beneficiaries" ................................................................................. 3
1.14 "Benefited Debtors" ......................................................................... 3
1.15 "Bondholder Transaction Fee" ......................................................... 3
1.16 "Bondholders' Committee" .............................................................. 3
1.17 "Business Day" ................................................................................. 3
1.18 "Cash" ............................................................................................... 3
1.19 "Chapter 11 Case" ............................................................................ 3
1.20 "Claim" ............................................................................................. 3
1.21 "Class" .............................................................................................. 3
1.22 "Class 11 Distribution Pool" ............................................................ 3
1.23 "Coffeyville Assets" ........................................................................ 3
1.24 "Collateral" ....................................................................................... 3
1.25 "Committee Members" ..................................................................... 3
1.26 "Confirmation" ................................................................................. 3
1.27 "Confirmation Date" ........................................................................ 3
1.28 "Confirmation Hearing" ................................................................... 3
1.29 "Confirmation Order" ....................................................................... 4
1.30 "Convenience Claim" ....................................................................... 4
1.31 "Creditor" ......................................................................................... 4
1.32 "Creditor Transaction Fee" .............................................................. 4
1.33 "Creditors' Committee" .................................................................... 4
1.34 "Cure" ............................................................................................... 4
1.35 "Debtor" ............................................................................................ 4
1.36 "Debtors" .......................................................................................... 4
1.37 "Demand Certificates" ..................................................................... 4
1.38 "Demand Certificates Claim" ........................................................... 4
1.39 "DIP Credit Agreement" ................................................................... 4
1.40 "DIP Loan Claims" ........................................................................... 4
1.41 "Disclosure Statement" .................................................................... 4

| | | |
|---|---|---|
| 1.42 | "Disputed Claim" | 5 |
| 1.43 | "Disputed Claim Amount" | 5 |
| 1.44 | "Disputed Claims Reserve" | 5 |
| 1.45 | "Disputed Interest" | 5 |
| 1.46 | "Disputed Interest Amount" | 5 |
| 1.47 | "Distribution Record Date" | 5 |
| 1.48 | "Effective Date" | 5 |
| 1.49 | "Entity" | 6 |
| 1.50 | "Ernst & Young" | 6 |
| 1.51 | "Estate(s)" | 6 |
| 1.52 | "Face Amount" | 6 |
| 1.53 | "Final Distribution Date" | 6 |
| 1.54 | "Final Order" | 6 |
| 1.55 | "Foods" | 6 |
| 1.56 | "General Unsecured Claim" | 6 |
| 1.57 | "Houlihan Lokey" | 6 |
| 1.58 | "Impaired" | 6 |
| 1.59 | "Indenture Trustees" | 6 |
| 1.60 | "Industrial Revenue Bonds" | 6 |
| 1.61 | "Industries" | 7 |
| 1.62 | "Industries Common Shares" | 7 |
| 1.63 | "Industries Distribution Pool" | 7 |
| 1.64 | "Industries Preferred Shares" | 7 |
| 1.65 | "Industries Retained Assets" | 7 |
| 1.66 | "Initial Distribution Date" | 7 |
| 1.67 | "Insurance Claim" | 7 |
| 1.68 | "Intercompany Advances" | 7 |
| 1.69 | "Intercompany Claim" | 7 |
| 1.70 | "Interest" | 7 |
| 1.71 | "IRB Indentures" | 7 |
| 1.72 | "KERIT Plan" | 7 |
| 1.73 | "Lender" | 7 |
| 1.74 | "Lien" | 8 |
| 1.75 | "Liquidating Trust" | 8 |
| 1.76 | "Liquidating Trust Administrative Reserve" | 8 |
| 1.77 | "Liquidating Trust Agreement" | 8 |
| 1.78 | "Liquidating Trust Assets" | 8 |
| 1.79 | "Liquidating Trustee" | 8 |
| 1.80 | "Litigation Claims" | 8 |
| 1.81 | "Loan Documents" | 8 |
| 1.82 | "Management Agreement" | 8 |
| 1.83 | "Minority Foods Shares" | 8 |
| 1.84 | "Non-Debtor Subsidiaries" | 8 |
| 1.85 | "Objection Deadline" | 8 |
| 1.86 | "Old Common Shares" | 9 |
| 1.87 | "Old Preferred Shares" | 9 |
| 1.88 | "Old Securities" | 9 |
| 1.89 | "Old Stock Options" | 9 |

1.90   "Old Warrants"...................................................................................................9
1.91   "Other Priority Claim"........................................................................................9
1.92   "Other Secured Claim".......................................................................................9
1.93   "PBGC"..............................................................................................................9
1.94   "PBGC Claims"..................................................................................................9
1.95   "Person".............................................................................................................9
1.96   "Petition Date"...................................................................................................9
1.97   "Pipeline"...........................................................................................................9
1.98   "Plan".................................................................................................................9
1.99   "Plan Exhibit"..................................................................................................10
1.100  "Plan Rate".......................................................................................................10
1.101  "Pork Business".................................................................................................10
1.102  "Post-Confirmation Committee".......................................................................10
1.103  "Pre-Petition Credit Agreement".......................................................................10
1.104  "Priority Tax Claim".........................................................................................10
1.105  "Pro Rata".........................................................................................................10
1.106  "Professional"...................................................................................................10
1.107  "Professional Fee Claim"..................................................................................10
1.108  "Register"..........................................................................................................10
1.109  "Reimbursement Right".....................................................................................10
1.110  "Reinstated" or "Reinstatement".......................................................................10
1.111  "Reorganized Industries"..................................................................................11
1.112  "Schedules".......................................................................................................11
1.113  "Secured Claim"................................................................................................11
1.114  "Secured Lender Claims"...................................................................................11
1.115  "SF Phosphates Interest"...................................................................................11
1.116  "SFA"................................................................................................................11
1.117  "Subordinated Certificates"..............................................................................11
1.118  "Subordinated Certificates Claim"....................................................................12
1.119  "Subordinated Claims".......................................................................................12
1.120  "Subsequent Distribution Date".........................................................................12
1.121  "Subsidiaries"...................................................................................................12
1.122  "Subsidiary Debtors".........................................................................................12
1.123  "Subsidiary Interests".......................................................................................12
1.124  "Substantial Contribution Claim"......................................................................12
1.125  "Tax Distribution".............................................................................................12
1.126  "Transferred Assets"..........................................................................................12
1.127  "Transportation"................................................................................................12
1.128  "Trust Indentures".............................................................................................12
1.129  "Unimpaired".....................................................................................................13
1.130  "Voting Record Date".........................................................................................13

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS.............................................14
2.1    Class 1 (Other Priority Claims).........................................................................14
2.2    Class 2 (Secured Lender Claims).......................................................................14
2.3    Class 3 (Other Secured Claims)........................................................................14
2.4    Class 4 (Demand Certificates Claims)...............................................................15
2.5    Class 5 (Subordinated Certificates Claims).......................................................15

2.6　　Class 6 (Convenience Claims against Industries)............................................................ 15
2.7　　Class 7 (General Unsecured Claims against Industries)................................................... 15
2.8　　Class 8 (Industries Preferred Shares) ................................................................................ 15
2.9　　Class 9 (Industries Common Shares) ................................................................................. 15
2.10　　Class 10 (General Unsecured Claims against Foods)...................................................... 15
2.11　　Class 11 (Old Securities of Foods).................................................................................... 15
2.12　　Class 12 (General Unsecured Claims against Transportation)......................................... 15
2.13　　Class 13 (Old Securities of Transportation)...................................................................... 15
2.14　　Class 14 (General Unsecured Claims against SFA)........................................................... 15
2.15　　Class 15 (Old Securities of SFA)........................................................................................ 15
2.16　　Class 16 (General Unsecured Claims against Pipeline).................................................... 16
2.17　　Class 17 (Old Securities of Pipeline) ................................................................................. 16
2.18　　Class 18 (Intercompany Claims) ........................................................................................ 16
2.19　　Class 19 (Subordinated Claims) ......................................................................................... 16

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS............................................... 16
3.1　　Unclassified Claims ................................................................................................................ 16
3.2　　Class 1 (Other Priority Claims) ............................................................................................ 17
3.3　　Class 2 (Secured Lender Claims).......................................................................................... 17
3.4　　Class 3 (Other Secured Claims) ........................................................................................... 18
3.5　　Class 4 (Demand Certificates Claims).................................................................................. 18
3.6　　Class 5 (Subordinated Certificates Claims).......................................................................... 18
3.7　　Class 6 (Convenience Claims against Industries)................................................................. 19
3.8　　Class 7 (General Unsecured Claims against Industries)...................................................... 19
3.9　　Class 8 (Industries Preferred Shares) ................................................................................... 19
3.10　　Class 9 (Industries Common Shares) ................................................................................. 19
3.11　　Class 10 (General Unsecured Claims against Foods)........................................................ 20
3.12　　Class 11 (Old Securities of Foods)...................................................................................... 20
3.13　　Class 12 (General Unsecured Claims against Transportation)........................................... 20
3.14　　Class 13 (Old Securities of Transportation)....................................................................... 20
3.15　　Class 14 (General Unsecured Claims against SFA)............................................................. 20
3.16　　Class 15 (Old Securities of SFA).......................................................................................... 21
3.17　　Class 16 (General Unsecured Claims against Pipeline)...................................................... 21
3.18　　Class 17 (Old Securities of Pipeline) ................................................................................... 21
3.19　　Class 18 (Intercompany Claims) .......................................................................................... 21
3.20　　Class 19 (Subordinated Claims) ........................................................................................... 21
3.21　　Reservation Of Rights Regarding Claims............................................................................. 22

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN............................................. 22
4.1　　Impaired Classes Of Claims And Interests Entitled To Vote............................................ 22
4.2　　Acceptance By An Impaired Class......................................................................................... 22
4.3　　Presumed Acceptances............................................................................................................ 22
4.4　　Summary of Classes Voting On The Plan ............................................................................ 22
4.5　　Confirmation Pursuant To Section 1129(b) Of The Bankruptcy Code ............................ 22

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN.......................................... 23
5.1　　Continued Existence Of The Debtors; Vesting Of Assets.................................................. 23
5.2　　Funding For The Plan............................................................................................................. 24

5.3   Accounts..................................................................................................25
5.4   Liquidating Trust; Liquidating Trustee .................................................25
5.5   Post-Confirmation Committee................................................................26
5.6   Effectuating Documents; Further Transactions......................................27
5.7   Exemption From Certain Transfer Taxes...............................................27
5.8   Releases And Related Matters................................................................27
5.9   Closing Of The Chapter 11 Case...........................................................28
5.10   Rights of Action...................................................................................28
5.11   Retiree Benefits ..................................................................................29
5.12   Establishment of Class 11 Distribution Pool .......................................29

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES29
6.1   Rejected Executory Contracts And Unexpired Leases............................29
6.2   Rejection Damages Bar Date..................................................................30
6.3   Assumed Executory Contracts And Unexpired Leases ...........................30
6.4   Payments Related To Assumed Executory Contracts And Unexpired Leases...................30

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ........................31
7.1   Distributions..........................................................................................31
7.2   Interest On Claims.................................................................................31
7.3   Means Of Cash Payment........................................................................31
7.4   Distributions on the Initial Distribution Date.........................................31
7.5   Distributions on a Subsequent Distribution Date....................................32
7.6   Distributions on the Final Distribution Date ..........................................32
7.7   Delivery Of Distributions; Undeliverable Distributions..........................33
7.8   Tender Of Securities And Instruments; Cancellation of Trust Indentures .......................33
7.9   Withholding And Reporting Requirements..............................................34
7.10   Setoffs.................................................................................................34
7.11   No Recourse ........................................................................................35
7.12   Transactions On Business Days ...........................................................35
7.13   No Distribution In Excess Of Allowed Amount Of Claim ...................35
7.14   Intercompany Advances.......................................................................35

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
          UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO ..36
8.1   Prosecution Of Objections To Claims....................................................36
8.2   Treatment Of Disputed Claims; Disputed Claims Reserves.....................36
8.3   Estimation.............................................................................................36

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
          OF THE PLAN...............................................................................37
9.1   Conditions To Effective Date.................................................................37
9.2   Waiver Of Conditions............................................................................38
9.3   Notice Of Effective Date.......................................................................38

ARTICLE X RETENTION OF JURISDICTION .......................................................38

ARTICLE XI MISCELLANEOUS PROVISIONS......................................................40

11.1    Deadline For Filing Professional Fee Claims; Objections To Professional Fee Claims ... 40
11.2    Deadline For Filing Administrative Claims; Objections To Administrative Claims......... 40
11.3    Payment Of Statutory Fees.................................................................................. 40
11.4    Modifications And Amendments............................................................................ 40
11.5    Severability Of Plan Provisions ........................................................................... 41
11.6    Successors And Assigns ...................................................................................... 41
11.7    No Discharge ..................................................................................................... 41
11.8    Release Of Assets .............................................................................................. 41
11.9    Exculpation And Limitation Of Liability................................................................ 42
11.10   Binding Effect.................................................................................................... 43
11.11   Revocation, Withdrawal, Or Non-Consummation.................................................. 43
11.12   Plan Exhibits..................................................................................................... 43
11.13   Notices.............................................................................................................. 43
11.14   Dissolution Of The Bankruptcy Committees ........................................................ 45
11.15   Term Of Injunctions Or Stays.............................................................................. 45
11.16   Headings........................................................................................................... 45

# INTRODUCTION

Farmland Industries, Inc., Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company (collectively, the "Debtors") hereby propose the following second amended joint plan of reorganization, as modified (as may be further amended or modified, the "Plan") for the resolution of their outstanding creditor Claims (as defined herein) and equity Interests (as defined herein). Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of the Debtors' history, businesses, properties, results of operations, risk factors, a summary and analysis of the Plan, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

All holders of Claims and Interests are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Fed. R. Bankr. P. 3019 and Article XI, including Section 11.4 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## ARTICLE I
## DEFINITIONS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

## A.    Scope Of Definitions; Rules Of Construction

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

## B.    Definitions

**1.1    "Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, commissions, severance payments or other compensation for services rendered after the commencement of the Chapter 11 Case, (b) Professional Fee Claims, (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930 and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

**1.2    "Allowed"** means, with regard to any Claim other than an Administrative Claim, a Claim or any portion thereof (a) that has been allowed by a Final Order, or (b) as to which, on or by the Effective Date, (i) no proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and noncontingent amount of which is listed on the Schedules, other than a Claim that is

listed on the Schedules as zero, in an unknown amount, or as disputed, or (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed by the Objection Deadline or by such other applicable period of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any and all objections to its allowance have been settled or withdrawn or have been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.  With regard to an Administrative Claim, *"Allowed"* means an Administrative Claim, or any portion thereof, (a) incurred or arising after the Petition Date and prior to the Effective Date, (b) as to which a request for payment has been timely filed with the Bankruptcy Court in a liquidated amount, and as to which either (i) no objection to its allowance has been filed by the Objection Deadline or by such other applicable period of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any and all objections to its allowance have been settled or withdrawn or have been denied by a Final Order.

1.3    **"Allowed Class . . . Claim"** means an Allowed Claim in the particular Class described.

1.4    **"Allowed Class . . . Interest"** means an Allowed Interest in the particular Class described.

1.5    **"Allowed Interest"** means an Interest that (a) is registered as of the Distribution Record Date in a stock register maintained by or on behalf of the Debtors and (b) is not a Disputed Interest.

1.6    **"Available Cash"** means all Cash of each separate Estate (other than the proceeds of Collateral securing any Allowed Secured Claim) from and after the Effective Date that is not subject to any Reimbursement Right, <u>less</u> the amount of Cash deposited or to be deposited, from time to time, into (i) the Liquidating Trust Administrative Reserve, (ii) the Disputed Claims Reserves, and (iii) any other reserves established under the Plan or the Liquidating Trust Agreement, which Cash shall be maintained separately with respect to each Estate.

1.7    **"Ballot"** means each of the ballot forms distributed with the Disclosure Statement to holders of Impaired Claims entitled to vote as specified in Article IV of the Plan, in connection with the solicitation of acceptances of the Plan.

1.8    **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

1.9    **"Bankruptcy Committees"** means, collectively, the Bondholders' Committee and the Creditors' Committee.

1.10    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of Missouri or such other court as may have jurisdiction over the Chapter 11 Case.

1.11    **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**1.12** **"Bar Date(s)"** means the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of Claim or Interest against the Debtors.

**1.13** **"Beneficiaries"** means the holders of Allowed Claims and Allowed Class 11 Interests that are beneficiaries of the Liquidating Trust.

**1.14** **"Benefited Debtors"** has the meaning set forth in Section 7.14 of the Plan.

**1.15** **"Bondholder Transaction Fee"** means the "completion fee" payable to Ernst & Young pursuant to the agreement between the Bondholders' Committee and Ernst & Young.

**1.16** **"Bondholders' Committee"** means the official committee of bondholders appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Case.

**1.17** **"Business Day"** means any day except for Saturday, Sunday or a "legal holiday" (as defined in Fed. R. Bankr. P. 9006(a)).

**1.18** **"Cash"** means legal tender of the United States or equivalents thereof.

**1.19** **"Chapter 11 Case"** means the jointly administered Chapter 11 cases of the Debtors.

**1.20** **"Claim"** means a "claim" against the Debtors, or any of them, whether or not asserted, as defined in section 101 of the Bankruptcy Code.

**1.21** **"Class"** means a category of holders of Claims or Interests, as described in Article II of the Plan.

**1.22** **"Class 11 Distribution Pool"** has the meaning set forth in Section 5.12 of the Plan.

**1.23** **"Coffeyville Assets"** means all of the assets associated with the following, including, without limitation, the executory contracts and unexpired leases listed on Plan Exhibit E: (i) a petroleum refinery owned by Industries in Coffeyville, Kansas; (ii) a fertilizer production facility owned by Industries in Coffeyville, Kansas; (iii) a petroleum refinery owned by Industries in Phillipsburg, Kansas; and (iv) a petroleum pipeline system related to Industries' refining operations.

**1.24** **"Collateral"** means any property or interest in the property of an Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.25** **"Committee Members"** has the meaning set forth in Section 5.5 of the Plan.

**1.26** **"Confirmation"** means entry by the Bankruptcy Court of the Confirmation Order.

**1.27** **"Confirmation Date"** means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

**1.28** **"Confirmation Hearing"** means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code.

**1.29** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming the Plan.

**1.30** **"Convenience Claim"** means any Claim that otherwise would be an Allowed Class 7 Claim in an amount equal to or less than $1,000.

**1.31** **"Creditor"** means any Entity who holds a Claim against any of the Debtors.

**1.32** **"Creditor Transaction Fee"** means the "success fee" payable to Houlihan Lokey pursuant to the agreement between the Creditors' Committee and Houlihan Lokey.

**1.33** **"Creditors' Committee"** means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Case.

**1.34** **"Cure"** means the distribution of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable nonbankruptcy law.

**1.35** **"Debtor"** means any of the Debtors.

**1.36** **"Debtors"** means Farmland Industries, Inc., Farmland Foods, Inc., Farmland Transportation, Inc., SFA Inc. and Farmland Pipe Line Company, including in their capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**1.37** **"Demand Certificates"** means: (a) Demand Loan Certificates dated November 20, 1981 with an original authorized principal amount of $500,000,000.00; and (b) Demand Loan Certificates dated December 4, 1997 issuable in Series with an unlimited authorized aggregate principal amount.

**1.38** **"Demand Certificates Claim"** means a Claim arising out of or related to the Demand Certificates.

**1.39** **"DIP Credit Agreement"** means the First Amended and Restated Debtor-In-Possession Credit Agreement and Adequate Protection Stipulation dated as of June 5, 2002, together with any amendments, by and among Industries and Foods, as borrowers, the financial institutions party thereto, as lenders, and Deutsche Bank Trust Company Americas, as administrative agent.

**1.40** **"DIP Loan Claims"** means the Allowed Claims held by those certain financial institutions participating under the DIP Credit Agreement, which Claims constitute superpriority Administrative Claims senior to all other Claims and are secured by Liens on substantially all of the assets of the Debtors.

**1.41** **"Disclosure Statement"** means the written disclosure statement that relates to the Plan, as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017.

**1.42** **"Disputed Claim"** means, with respect to a Claim, such Claim or any portion thereof that is not an Allowed Claim, and includes, without limitation, Claims (other than Allowed Claims) that (a) have not been listed on the Schedules or have been listed on the Schedules at zero, or as contingent, unliquidated or disputed, or (b) are the subject to an objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.43** **"Disputed Claim Amount"** means (a) if a liquidated amount is set forth in a timely filed proof of Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the proof of Claim relating to the Disputed Claim; (ii) an amount agreed to by the Debtors or the Liquidating Trustee, as the case may be, and the holder of such Disputed Claim; or (iii) if a request for estimation is filed by the Debtors or the Liquidating Trustee, as the case may be, the amount at which such Claim is estimated by the Bankruptcy Court; (b) if no liquidated amount is set forth in the proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Debtors or the Liquidating Trustee, as the case may be, and the holder of such Disputed Claim or (ii) the amount estimated by the Bankruptcy Court with respect to such Disputed Claim; (c) if the Claim was listed on the Schedules as unliquidated, contingent or disputed and no proof of Claim was filed, or deemed to have been filed, by the applicable Bar Date and the Claim has not been resolved by written agreement of the parties or an order of the Bankruptcy Court, zero; or (d), with respect to a Disputed Administrative Claim, the liquidated amount set forth in any request for payment relating to the Disputed Administrative Claim.

**1.44** **"Disputed Claims Reserve"** means, in the event there exists any Disputed Claims on or after the Effective Date, Cash reserved by the Liquidating Trustee in separate interest-bearing accounts for the following: (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in each Class for which distributions are contemplated by the Plan; all in accordance with the provisions of the Plan and the Liquidating Trust Agreement and to be maintained under the Plan and the Liquidating Trust Agreement.

**1.45** **"Disputed Interest"** means an Interest, or any portion thereof, that is not an Allowed Interest and includes, without limitation, Interests (other than Allowed Interests) that (a) are not listed in the Schedules or are listed in the Schedules as contingent, unliquidated or disputed, or (b) are the subject of an objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.46** **"Disputed Interest Amount"** means, with respect to a Disputed Interest, the number of shares set forth in a timely filed proof of Interest.

**1.47** **"Distribution Record Date"** means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the Confirmation Date or such other date designated in the Confirmation Order.

**1.48** **"Effective Date"** means the Business Day on which all conditions to the consummation of the Plan as set forth in Section 9.1 of the Plan have been satisfied or waived as provided in Article IX of the Plan and is the effective date of the Plan.

**1.49**    **"Entity"** has the meaning set forth in section 101 of the Bankruptcy Code and also means, without limitation, a Person, joint venture, trust, estate, unincorporated association or organization, limited liability company, governmental entity or political subdivision, agency or representative thereof, or any other entity.

**1.50**    **"Ernst & Young"** means Ernst & Young Corporate Finance, in their capacity as Professionals for the Bondholders' Committee.

**1.51**    **"Estate(s)"** means, individually, the estate of each Debtor in the Chapter 11 Case, and, collectively, the estates of all Debtors in the Chapter 11 Case, created pursuant to section 541 of the Bankruptcy Code.

**1.52**    **"Face Amount"** means (a) when used in reference to a Disputed Claim, the Disputed Claim Amount, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

**1.53**    **"Final Distribution Date"** has the meaning set forth in Section 7.6 of the Plan.

**1.54**    **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and (unless the Debtors, in compliance with Section 9.2 of the Plan, or the Liquidating Trustee, in its sole discretion, shall have waived the requirement therefor) as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.55**    **"Foods"** means Farmland Foods, Inc.

**1.56**    **"General Unsecured Claim"** means a Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Secured Lender Claim, Other Secured Claim, Convenience Claim, Intercompany Claim or Subordinated Claim, and does not include any Reimbursement Right.

**1.57**    **"Houlihan Lokey"** means Houlihan Lokey Howard and Zukin Financial Advisors, Inc., in their capacity as Professionals for the Creditors' Committee.

**1.58**    **"Impaired"** means, when used with reference to a Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.59**    **"Indenture Trustees"** means each of the trustees under the Trust Indentures and the IRB Indentures.

**1.60**    **"Industrial Revenue Bonds"** means: (a) Taxable Industrial Revenue Bond, Series 1999 of Kansas City, Missouri dated August 1, 1999 in the original principal amount of $40,000,000.00; (b) City of Galveston, Texas, Special Contract Revenue Bonds, Series 1977, in the original principal amount of $26,000,000; (c) City of Galveston, Texas, Special Contract Refunding Revenue Bonds (Farmland Industries, Inc. Project), Series 1998, in the original principal amount of $8,500,000; (d) City of Coffeyville, Kansas, Taxable Industrial Revenue Bonds, Series A, 1997 (Farmland Industries, Inc.) in the aggregate original principal amount of $255,110,000; and (e) City

6

of Coffeyville, Kansas Subordinated Taxable Industrial Revenue Bonds, Series B, 1997 (Farmland Industries, Inc.) in the aggregate original principal amount of $10,520,000.

**1.61**    **"Industries"** means Farmland Industries, Inc.

**1.62**    **"Industries Common Shares"** means the Old Common Shares of Industries (including, without limitation, common stock, associate member common stock and capital credits of Industries), the Old Stock Options of Industries and the Old Warrants.

**1.63**    **"Industries Distribution Pool"** means all Available Cash in the Estate of Industries after all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 6 Claims and all Intercompany Advances payable by Industries have been (i) Allowed and paid or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) Disputed and sufficient Cash reserved in a Disputed Claims Reserve, (iii) disallowed or (iv) withdrawn.

**1.64**    **"Industries Preferred Shares"** means the Old Preferred Shares of Industries.

**1.65**    **"Industries Retained Assets"** means those assets of Industries and/or Foods identified on Plan Exhibit C, which assets shall be retained by and vested in Reorganized Industries on the Effective Date; provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit C to delete any assets therefrom or add any assets thereto and to provide notice of any such amendments to the Bankruptcy Court.

**1.66**    **"Initial Distribution Date"** has the meaning set forth in Section 7.5 of the Plan.

**1.67**    **"Insurance Claim"** means the insurance claim arising under a $500 million blanket insurance policy that relates to the damage and/or destruction of buildings, equipment and inventory located at Foods' Albert Lea, Minnesota meat processing facility.

**1.68**    **"Intercompany Advances"** has the meaning set forth in Section 7.14 of the Plan.

**1.69**    **"Intercompany Claim"** means any Claim by a Debtor against another Debtor that was incurred or arose prior to the Petition Date.

**1.70**    **"Interest"** means (a) the legal, equitable, contractual and other rights of any Entity (including any 401(k) plan or plan participant) with respect to Old Securities of the Debtors, and (b) the legal, equitable, contractual or other rights of any Entity to acquire or receive any of the foregoing.

**1.71**    **"IRB Indentures"** means the trust indentures for each of the Industrial Revenue Bonds.

**1.72**    **"KERIT Plan"** means the Key Employee Retention and Incentive Target Plan approved by the Bankruptcy Court by order dated November 4, 2002.

**1.73**    **"Lender"** means a "Lender" as defined in the Pre-Petition Credit Agreement.

**1.74** **"Lien"** means a charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.75** **"Liquidating Trust"** means the trust created pursuant to Section 5.4 of the Plan and evidenced by the Liquidating Trust Agreement.

**1.76** **"Liquidating Trust Administrative Reserve"** has the meaning set forth in the Liquidating Trust Agreement.

**1.77** **"Liquidating Trust Agreement"** means the trust agreement establishing the Liquidating Trust, substantially in the form attached hereto as Plan Exhibit A, which shall be approved in the Confirmation Order and entered into by the Debtors and the Liquidating Trustee on the Effective Date pursuant to the terms of the Plan; provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date with the consent of the Bankruptcy Committees, to amend Plan Exhibit A and to provide notice of any such amendments to the Bankruptcy Court. All of the terms and conditions of the Liquidating Trust Agreement are incorporated into the Plan and are subject to the terms and provisions of the Plan.

**1.78** **"Liquidating Trust Assets"** has the meaning set forth in the Liquidating Trust Agreement.

**1.79** **"Liquidating Trustee"** has the meaning set forth in the Liquidating Trust Agreement.

**1.80** **"Litigation Claims"** means the claims, rights, causes of action, defenses, counterclaims, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtors, the Estates or the Bankruptcy Committees may hold or assert against any non-Debtor Entity, including, without limitation, all claims, rights of action, suits and proceedings under Chapter 5 of the Bankruptcy Code; provided, however, that *"Litigation Claims"* shall not include any Industries Retained Assets or Transferred Assets.

**1.81** **"Loan Documents"** means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

**1.82** **"Management Agreement"** means the agreement, if any, entered into by the Liquidating Trustee and Reorganized Industries on the Effective Date pursuant to the terms of the Plan and the Liquidating Trust Agreement, substantially in the form to be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing. All of the terms and conditions of the Management Agreement are subject to the terms and provisions of the Plan.

**1.83** **"Minority Foods Shares"** means the Old Securities of Foods held by an Entity other than Industries.

**1.84** **"Non-Debtor Subsidiaries"** means, collectively, the direct and indirect subsidiaries of Industries which have not commenced Chapter 11 cases and thus are not Debtors.

**1.85** **"Objection Deadline"** means the last day for filing objections to Disputed Claims (other than Disputed Professional Fee Claims) or Disputed Interests, which day shall be 180 days

after the Effective Date, unless such date is extended by the Bankruptcy Court upon request by the Liquidating Trustee.

**1.86**   **"Old Common Shares"** means the common shares of any of the Debtors issued and outstanding as of the Petition Date, including, without limitation, any patronage dividends issued to members, associate members and/or patrons of any Debtor in the form of common stock, associate member common stock or capital credits.

**1.87**   **"Old Preferred Shares"** means the preferred shares of any of the Debtors issued and outstanding as of the Petition Date.

**1.88**   **"Old Securities"** means, collectively, the Old Common Shares, the Old Preferred Shares, the Old Warrants and the Old Stock Options of any of the Debtors.

**1.89**   **"Old Stock Options"** means the outstanding options to purchase Old Common Shares or Old Preferred Shares of any of the Debtors issued and outstanding as of the Petition Date.

**1.90**   **"Old Warrants"** means the warrants issued to former patrons of SF Services, Inc. in conjunction with the merger of Industries and SF Services, Inc. that entitled the holder to convert such warrants to Old Common Shares of Industries if certain product purchases were made by such patron from Industries during the seven year period following such merger.

**1.91**   **"Other Priority Claim"** means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

**1.92**   **"Other Secured Claim"** means a Secured Claim against any of the Debtors, as the case may be, other than the Secured Lender Claims, including, without limitation, (i) Secured Claims arising under or in connection with any Industrial Revenue Bonds and that remain unpaid obligations of the Debtors as of the Effective Date, and (ii) mechanics', materialmans', artisans' and similar type liens that constitute Secured Claims.

**1.93**   **"PBGC"** means Pension Benefit Guaranty Corporation.

**1.94**   **"PBGC Claims"** means any and all Claims of the PBGC against the Debtors arising from or related to pension plan termination, unfunded benefit liability and/or unpaid premiums and any and all Claims of the PBGC on behalf of any pension plans administered by the Debtors for due and unpaid minimum funding contributions under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461.

**1.95**   **"Person"** means a "person" as defined in section 101 of the Bankruptcy Code.

**1.96**   **"Petition Date"** means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Case.

**1.97**   **"Pipeline"** means Farmland Pipe Line Company.

**1.98**   **"Plan"** means this Chapter 11 reorganization plan and all exhibits and schedules attached hereto or referenced herein, as the same may be amended, modified or supplemented from time to time.

**1.99**     **"Plan Exhibit"** means any exhibit or schedule attached hereto.

**1.100**     **"Plan Rate"** means the federal judgment rate established under 28 U.S.C. § 1961 as of the Petition Date.

**1.101**     **"Pork Business"** means the Debtors' pork processing operations, including, without limitation, substantially all of the assets of Foods.

**1.102**     **"Post-Confirmation Committee"** has the meaning set forth in Section 5.5 of the Plan.

**1.103**     **"Pre-Petition Credit Agreement"** means the Credit Agreement, dated as of February 7, 2002, by and among Industries and Foods, as borrowers, the financial institutions party thereto, as lenders, CoBank ACB and Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., as co-syndication agents, Harris Trust & Savings Bank and U.S. Bank National Association, as co-documentation agents, and Deutsche Bank Trust Company Americas, as administrative agent.

**1.104**     **"Priority Tax Claim"** means a Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.105**     **"Pro Rata"** means, at any time, the proportion that the Face Amount of a Claim (or the number of shares representing an Interest) in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims) in such Class (or the aggregate number of shares (including Disputed Interests) representing such Class of Interests), unless the Plan provides otherwise; provided, however, that with respect to the Industries Distribution Pool, *"Pro Rata"* means with respect to a Claim in Class 4, Class 5 or Class 7, the proportion that the Face Amount of a Claim in Class 4, Class 5 or Class 7 bears to the aggregate Face Amount of all Claims (including Disputed Claims) in Classes 4, 5 and 7.

**1.106**     **"Professional"** means any professional employed in the Chapter 11 Case pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise and any professionals seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.107**     **"Professional Fee Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date.

**1.108**     **"Register"** has the meaning set forth in the Liquidating Trust Agreement.

**1.109**     **"Reimbursement Right"** has the meaning set forth in Section 7.14 of the Plan.

**1.110**     **"Reinstated" or "Reinstatement"** means (i) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating

10

the maturity of such Claim or Interest as such maturity existed before such default; (c) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

**1.111** **"Reorganized Industries"** means Industries, as reorganized on and after the Effective Date.

**1.112** **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs, if any, filed in the Bankruptcy Court by the Debtors as such schedules or statements may be amended or supplemented from time to time in accordance with Fed. R. Bankr. P. 1009 or orders of the Bankruptcy Court.

**1.113** **"Secured Claim"** means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

**1.114** **"Secured Lender Claims"** means the Claims of the Lenders arising under or as a result of the Pre-Petition Credit Agreement and the Loan Documents.

**1.115** **"SF Phosphates Interest"** means Industries' ownership interest in SF Phosphates, Limited Company.

**1.116** **"SFA"** means SFA, Inc.

**1.117** **"Subordinated Certificates"** means: (a) 5 Year Subordinated Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, with an original authorized principal amount of $500,000,000.00; (b) 10 Year Subordinated Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, with an original authorized principal amount of $500,000,000.00; (c) 20 Year Subordinated Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, with an original authorized principal amount of $500,000,000.00; (d) 10 Year Subordinated Monthly Income Capital Investment Certificates issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, with an original authorized principal amount of $500,000,000.00; (e) 10 Year Subordinated Individual Retirement Account Certificates

issued under the Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, with an original authorized principal amount of $500,000,000.00; (f) 5 Year Subordinated Monthly Income Capital Investment Certificates issued under the Indenture dated November 11, 1985, with an original authorized principal amount of $500,000,000.00; and (g) Series A through Series H Subordinated Debenture Bonds issued under a Subordinated Indenture dated December 4, 1997, with an unlimited authorized aggregate principal amount.

**1.118** **"Subordinated Certificates Claim"** means a Claim arising out of or related to the Subordinated Certificates.

**1.119** **"Subordinated Claims"** means any Claim arising from, related to or on account of any Old Security of Industries that is subordinated pursuant to sections 510(b) or (c) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Old Security of Industries, any Claim for damages arising from the purchase or sale of an Old Security of Industries, any Claim for reimbursement, contribution or indemnification on account of any such Claim, or any Claim arising out of or related to the rejection of Old Warrants.

**1.120** **"Subsequent Distribution Date"** has the meaning set forth in Section 7.5 of the Plan.

**1.121** **"Subsidiaries"** mean, collectively, the Subsidiary Debtors and the Non-Debtor Subsidiaries.

**1.122** **"Subsidiary Debtors"** means, collectively, Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company.

**1.123** **"Subsidiary Interests"** means, collectively, the issued and outstanding shares of common stock of the Subsidiary Debtors directly or indirectly owned by Industries, as of the Petition Date.

**1.124** **"Substantial Contribution Claim"** means a claim for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Case pursuant to section 503(b)(3),(4), or (5) of the Bankruptcy Code.

**1.125** **"Tax Distribution"** has the meaning set forth in Section 1.1 of the Liquidating Trust Agreement.

**1.126** **"Transferred Assets"** means those assets of the Debtors identified on Plan Exhibit D, which assets shall be transferred as provided in Section 5.1(d) of the Plan; provided, however, that the Debtors reserve their right, at any time prior to the Effective Date, upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit D to delete any assets therefrom, add any assets thereto or modify any other information contained thereon and to provide notice of any such amendments to the Bankruptcy Court.

**1.127** **"Transportation"** means Farmland Transportation, Inc.

**1.128** **"Trust Indentures"** means: (a) Indenture dated November 20, 1981, as amended January 4, 1982, providing for the issuance of demand loan certificates; (b) Indenture dated

12

November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, providing for the issuance of 5 Year Subordinated Capital Investment Certificates; (c) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, providing for the issuance of 10 Year Subordinated Capital Investment Certificates; (d) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated December 3, 1991, providing for the issuance of 20 Year Subordinated Monthly Income Capital Investment Certificates; (e) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, providing for the issuance of 10 Year Subordinated Monthly Income Capital Investment Certificates; (f) Indenture dated November 8, 1984, as amended by Amendment No. 1 dated January 3, 1985, as further amended by Amendment No. 2 dated November 20, 1985, providing for the issuance of 10 Year Subordinated Individual Retirement Account Certificates; (g) Indenture dated November 11, 1985, providing for the issuance of 5 Year Subordinated Monthly Income Capital Investment Certificates; (h) Indenture dated December 4, 1997, providing for the issuance of unsubordinated debt securities, including demand loan certificates; (i) Subordinated Indenture dated December 4, 1997, providing for the issuance of subordinated debt securities in series; and (j) the trust indentures for each issue of Industrial Revenue Bonds.

**1.129** **"Unimpaired"** means, when used with reference to a Claim or Interest, a Claim or Interest that is not Impaired.

**1.130** **"Voting Record Date"** means the voting record date for voting to accept or reject the Plan, as determined by the Bankruptcy Court.

## C.    Rules Of Interpretation

For purposes of the Plan (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (d) the words "herein", "hereof", "hereunder", "hereto" and other words of similar import refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## D.    Computation Of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

E.     **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (i) the State of Delaware shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.   Nothing contained in this Section I.E is intended to, or shall, affect the substantive law otherwise applicable to the allowance or disallowance of a Claim or Interest or the rights granted to the Liquidating Trustee, including, without limitation, those rights granted pursuant to Section 5.10 of the Plan.

# ARTICLE II
# CLASSIFICATION OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Loan Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Section 3.1 of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class. A Claim or Interest may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

Although the PBGC previously filed the PBGC Claims against certain of the Debtors, all of the PBGC Claims will be resolved by the assumption of the liabilities associated with such Claims in connection with the sale of the Pork Business.  No distributions will be made to the PBGC under the Plan.

The Plan, though proposed jointly, constitutes separate plans proposed by each Debtor. Therefore, the classifications set forth below shall be deemed to apply separately (as appropriate) with respect to each such plan.  Accordingly, each Debtor reserves the right to request confirmation of its separate plan in the event that such separate confirmation is necessary and appropriate for such Debtors and its creditors.

**2.1     Class 1 (Other Priority Claims)**

Class 1 consists of all Other Priority Claims.

**2.2     Class 2 (Secured Lender Claims)**

Class 2 consists of all Secured Lender Claims.

**2.3     Class 3 (Other Secured Claims)**

Class 3 consists of all Other Secured Claims.

14

**2.4**    **Class 4 (Demand Certificates Claims)**

Class 4 consists of all Demand Certificates Claims.

**2.5**    **Class 5 (Subordinated Certificates Claims)**

Class 5 consists of all Subordinated Certificates Claims.

**2.6**    **Class 6 (Convenience Claims against Industries)**

Class 6 consists of all Convenience Claims against Industries.

**2.7**    **Class 7 (General Unsecured Claims against Industries)**

Class 7 consists of all General Unsecured Claims against Industries.

**2.8**    **Class 8 (Industries Preferred Shares)**

Class 8 consists of all Industries Preferred Shares.

**2.9**    **Class 9 (Industries Common Shares)**

Class 9 consists of all Industries Common Shares.

**2.10**    **Class 10 (General Unsecured Claims against Foods)**

Class 10 consists of all General Unsecured Claims against Foods.

**2.11**    **Class 11 (Old Securities of Foods)**

Class 11 consists of all Old Securities of Foods.

**2.12**    **Class 12 (General Unsecured Claims against Transportation)**

Class 12 consists of all General Unsecured Claims against Transportation.

**2.13**    **Class 13 (Old Securities of Transportation)**

Class 13 consists of all Old Securities of Transportation.

**2.14**    **Class 14 (General Unsecured Claims against SFA)**

Class 14 consists of all General Unsecured Claims against SFA.

**2.15**    **Class 15 (Old Securities of SFA)**

Class 15 consists of all Old Securities of SFA.

**2.16    Class 16 (General Unsecured Claims against Pipeline)**

Class 16 consists of all General Unsecured Claims against Pipeline.

**2.17    Class 17 (Old Securities of Pipeline)**

Class 17 consists of all Old Securities of Pipeline.

**2.18    Class 18 (Intercompany Claims)**

Class 18 consists of all Intercompany Claims.

**2.19    Class 19 (Subordinated Claims)**

Class 19 consists of all Subordinated Claims.

**ARTICLE III**
**TREATMENT OF CLAIMS AND INTERESTS**

**3.1    Unclassified Claims**

 (a) Administrative Claims

Except as otherwise provided for herein, and subject to the requirements of Sections 11.1-11.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Administrative Claim, each holder of an Allowed Administrative Claim shall receive in full and complete satisfaction of such Allowed Administrative Claim (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case and all liabilities and obligations of the Debtors under the KERIT Plan shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Notwithstanding the foregoing, (i) the Bondholder Transaction Fee shall be payable only from distributions otherwise payable to holders of Allowed Class 5 Claims and shall be paid prior to the payment of any distributions to holders of Allowed Class 5 Claims, and (ii) the Creditor Transaction Fee shall be payable only from distributions otherwise payable to holders of Allowed Class 7 Claims and shall be paid prior to the payment of any distributions to holders of Allowed Class 7 Claims.

 (b) Priority Tax Claims

Except as otherwise provided for herein, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (iii) the date such Priority Tax Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating

16

Trustee, as the case may be, and the holder of such Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive in full and complete satisfaction of such Allowed Priority Tax Claim (x) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing.

(c)      DIP Loan Claims

If then outstanding on the Effective Date, the DIP Loan Claims shall be paid in full on the Effective Date according to the terms of the DIP Credit Agreement. Notwithstanding anything in the Plan to the contrary, the DIP Loan Claims shall have the superpriority status set forth in the orders authorizing and evidencing the DIP Loan Claims.

(d)      Fees and Expenses of the Indenture Trustees

Without further order of the Bankruptcy Court, the Indenture Trustees shall be entitled to payment out of distributions otherwise payable to the holders of the Demand Certificates, the Subordinated Certificates or the Industrial Revenue Bonds (as applicable) of all properly documented unpaid fees and expenses for services rendered under the Trust Indentures and the IRB Indentures, including compensation, disbursements and expenses of agents and legal counsel to the Indenture Trustees in connection with the performance of their duties under the Trust Indentures and the IRB Indentures. Upon payment in full of such fees and expenses, any liens of the Indenture Trustees on current distributions to holders of Demand Certificates, Subordinated Certificates and Industries Revenue Bonds shall be released and extinguished.

## 3.2      Class 1 (Other Priority Claims)

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date such Claim becomes an Allowed Class 1 Claim, or (iii) the date such Class 1 Claim becomes payable pursuant to any agreement between a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and the holder of such Class 1 Claim, each holder of an Allowed Class 1 Claim shall receive, in full and complete satisfaction of such Allowed Class 1 Claim (x) Cash equal to the unpaid portion of such Allowed Class 1 Claim or (y) such other treatment as to which a Debtor (with the consent of the Bankruptcy Committees) or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing. The legal, equitable and contractual rights of the holders of Allowed Class 1 Claims are Unimpaired by the Plan.

## 3.3      Class 2 (Secured Lender Claims)

On the Effective Date, the Allowed Secured Lender Claims, if any, shall be satisfied and paid in full in the amount of said Claims then outstanding. Net cash proceeds from Section 363 asset sales prior to the Confirmation Date shall be remitted for application against the Secured Lender Claims. The Secured Lender Claims, if any, outstanding on the Effective Date shall be paid in full in Cash from net cash proceeds from Section 363 asset sales that occur after the Confirmation Date and prior to the Effective Date. Nothing in the Plan shall alter or affect any intermediate payments made by the Debtors to the Secured Lenders prior to the Effective Date. Class 2 is Unimpaired by the Plan.

### 3.4      Class 3 (Other Secured Claims)

Subject to the provisions of Section 3.1(d) of the Plan, on or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 3 Claim shall receive one of the following distributions: (a) payment of such holder's Allowed Other Secured Claim in full in Cash; (b) the sale or disposition proceeds of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the Debtors' interest in such Collateral; (c) the surrender of the Collateral securing such Allowed Other Secured Claim to the holder of such Allowed Other Secured Claim; (d) the Reinstatement of such Allowed Other Secured Claim; or (e) such other distribution or treatment as may be ordered by the Bankruptcy Court or as shall be necessary to satisfy the requirements of the Bankruptcy Code.  The manner and treatment of each Allowed Other Secured Claim shall be determined by the Liquidating Trustee in his sole and absolute discretion.  Nothing in this Section 3.4 or elsewhere in the Plan shall preclude the Liquidating Trustee from challenging the validity of any alleged Lien on any asset of a Debtor or the value of such Collateral.  The legal, equitable and contractual rights of the holders of Allowed Class 3 Claims are Unimpaired by the Plan.

### 3.5      Class 4 (Demand Certificates Claims)

As of the Effective Date, all notes, instruments and other documents evidencing the Demand Certificates shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Demand Certificates evidenced thereby shall be extinguished. Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, until all Allowed Class 4 Claims have been paid in full (including payment of interest through the Effective Date at the rate provided in the Demand Certificates) less any amounts payable to the Indenture Trustee for the Demand Certificates pursuant to Section 3.1(d) of the Plan, each holder of an Allowed Class 4 Claim shall receive, in full and complete satisfaction of such Allowed Class 4 Claim, (i) its Pro Rata share of the Industries Distribution Pool plus (ii) its Pro Rata Share of the funds otherwise payable to holders of Allowed Class 5 Claims pursuant to clause (i) of the second sentence of Section 3.6 of the Plan less (iii) its Pro Rata share of any amounts payable to the Indenture Trustees for the Demand Certificates pursuant to Section 3.1(d) of the Plan.  Class 4 is Impaired by the Plan.

### 3.6      Class 5 (Subordinated Certificates Claims)

As of the Effective Date, all notes, instruments and other documents evidencing the Subordinated Certificates shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Subordinated Certificates evidenced thereby shall be extinguished.  Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 5 Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 5 Claim, (i) its Pro Rata share of the Industries Distribution Pool less (ii) its Pro Rata share of those funds required to be paid to holders of Allowed Class 4 Claims in accordance with clause (ii) of the second sentence of Section 3.5 of the Plan plus (iii) after all Allowed Class 4 Claims have been paid in full, its Pro Rata share of the funds otherwise payable to holders of Allowed Class 4 Claims pursuant to clause (i) of the second sentence of Section 3.5 of the Plan less (iv) its Pro Rata share of the Bondholder Transaction Fee less (v) its Pro Rata share of any amounts payable to the Indenture Trustees for the Subordinated Certificates pursuant to Section 3.1(d) of the Plan.  Class 5 is Impaired by the Plan.

18

### 3.7 Class 6 (Convenience Claims against Industries)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 6 Claim shall receive, in full and complete satisfaction of such Allowed Class 6 Claim, Cash equal to the amount of such Allowed Claim. Class 6 is Unimpaired by the Plan.

### 3.8 Class 7 (General Unsecured Claims against Industries)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 7 Claim shall receive, in full and complete satisfaction of such Allowed Class 7 Claim, its Pro Rata share of the Industries Distribution Pool less the Creditor Transaction Fee. Class 7 is Impaired by the Plan.

### 3.9 Class 8 (Industries Preferred Shares)

The Industries Preferred Shares shall be Reinstated on the Effective Date. Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made on account of the Industries Preferred Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid. Class 8 is Unimpaired by the Plan.

### 3.10 Class 9 (Industries Common Shares)

On the Effective Date (or such later date(s) as may be determined by Reorganized Industries with the consent of the Liquidating Trustee), (i) that amount of Industries Common Shares whose cancellation, in the Debtors' reasonable judgment, can be offset in full against appropriate losses and net operating losses shall be deemed canceled on a Pro Rata basis without further act or action under any applicable agreement, law, regulation, order or rule, and the Industries Common Shares evidenced thereby shall be extinguished, and (ii) any remaining Industries Common Shares shall be deemed Reinstated. Notwithstanding such Reinstatement and in accordance with applicable law, no distribution shall be made (or dividend paid) on account of any remaining Industries Common Shares until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate), or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid. In accordance with and as provided by the Plan, any remaining Industries Common Shares shall be deemed to continue in effect and shall not be deemed canceled or extinguished under any other law or regulation. Class 9 is Impaired by the Plan.

### 3.11    Class 10 (General Unsecured Claims against Foods)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 10 Claim shall receive, in full and complete satisfaction of such Allowed Class 10 Claim, Cash equal to the amount of its Allowed Class 10 Claim plus interest at the Plan Rate from the Petition Date through the Effective Date.  Class 10 is Impaired by the Plan; provided, however, that holders of Allowed Class 10 Claims that arise from the rejection of an executory contract or unexpired leases shall receive interest at the Plan Rate only from the date of such rejection through the Effective Date.

### 3.12    Class 11 (Old Securities of Foods)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Foods shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule and the Old Securities of Foods evidenced thereby shall be extinguished.  The holders of Allowed Class 11 Interests that constitute Minority Foods Shares shall receive their Pro Rata share of the Class 11 Distribution Pool.  Class 11 is Impaired by the Plan.

### 3.13    Class 12 (General Unsecured Claims against Transportation)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 12 Claim shall receive, in full and complete satisfaction of such Allowed Class 12 Claim, Cash equal to the amount of its Allowed Class 12 Claim.  Class 12 is Impaired by the Plan.

### 3.14    Class 13 (Old Securities of Transportation)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Transportation shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of Transportation evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of Transportation after all Administrative Claims against Transportation, all Priority Tax Claims against Transportation, all Class 1 Claims against Transportation, all Class 3 Claims against Transportation, all Class 12 Claims and all Class 18 Claims against Transportation have been (i) Allowed and paid (including, with respect to Class 12, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Transportation have been repaid, shall vest in the Liquidating Trust.  Class 13 is Impaired by the Plan.

### 3.15    Class 14 (General Unsecured Claims against SFA)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 14 Claim shall receive, in full and complete satisfaction of such Allowed Class 14 Claim, Cash equal to the amount of its Allowed Class 14 Claim.  Class 14 is Impaired by the Plan.

### 3.16    Class 15 (Old Securities of SFA)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of SFA shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of SFA evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of SFA after all Administrative Claims against SFA, all Priority Tax Claims against SFA, all Class 1 Claims against SFA, all Class 3 Claims against SFA, all Class 14 Claims and all Class 18 Claims against SFA have been (i) Allowed and paid (including, with respect to Class 14, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by SFA have been repaid, shall vest in the Liquidating Trust.  Class 15 is Impaired by the Plan.

### 3.17    Class 16 (General Unsecured Claims against Pipeline)

Subject to the provisions of Article VII of the Plan and the Liquidating Trust Agreement, each holder of an Allowed Class 16 Claim shall receive, in full and complete satisfaction of such Allowed Class 16 Claim, Cash equal to the amount of its Allowed Class 16 Claim.  Class 16 is Impaired by the Plan.

### 3.18    Class 17 (Old Securities of Pipeline)

As of the Effective Date, the stock certificates and other instruments evidencing the Old Securities of Pipeline shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Old Securities of Pipeline evidenced thereby shall be extinguished.  Any Cash remaining in the Estate of Pipeline after all Administrative Claims against Pipeline, all Priority Tax Claims against Pipeline, all Class 1 Claims against Pipeline, all Class 3 Claims against Pipeline, all Class 16 Claims and all Class 18 Claims against Pipeline have been (i) Allowed and paid (including, with respect to Class 16, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Pipeline have been repaid, shall vest in the Liquidating Trust.  Class 17 is Impaired by the Plan.

### 3.19    Class 18 (Intercompany Claims)

On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 18 Claim shall receive, in full and complete satisfaction of such Allowed Class 18 Claim, (x) Cash equal to the unpaid portion of such Allowed Class 18 Claim or (y) such other treatment as to which the Debtors or the Liquidating Trustee, as the case may be, and such holder shall have agreed upon in writing.  Class 18 is Impaired by the Plan.

### 3.20    Class 19 (Subordinated Claims)

In accordance with section 510(b) and (c) of the Bankruptcy Code, no distribution shall be made on account of the Subordinated Claims until all Administrative Claims against Industries, all Priority Tax Claims against Industries, all Class 1 Claims against Industries, all Class 3 Claims against Industries, all Class 4 Claims, all Class 5 Claims, all Class 6 Claims, all Class 7 Claims, all Interests in Class 8 and all Class 18 Claims against Industries have been (i) Allowed and paid in full (including, with respect to Classes 5 and 7, payment of interest at the Plan Rate) or, with respect to Class 3

21

Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Industries have been repaid.  Class 19 is Impaired by the Plan.

### 3.21    Reservation Of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Liquidating Trustee's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

### 4.1    Impaired Classes Of Claims And Interests Entitled To Vote

Subject to Section 4.3 of the Plan, Claim and Interest holders in each Impaired Class of Claims or Interests are entitled to vote as a class to accept or reject the Plan.

### 4.2    Acceptance By An Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 4.3    Presumed Acceptances

Classes 1, 2, 3, 6 and 8 are Unimpaired by the Plan. Under section 1126(f) of the Bankruptcy Code, such Claim and Interest holders are conclusively presumed to accept the Plan, and the votes of such Claim and Interest holders will not be solicited.  Classes 13, 15, 17 and 18 are conclusively presumed to accept the Plan because the Claim and Interest holders in such Classes are the proponents of the Plan.

### 4.4    Summary of Classes Voting On The Plan

As a result of the provisions of Sections 4.1, 4.3 and 4.4 of the Plan, the votes of holders of Claims in Classes 4, 5, 7, 9, 10, 11, 12, 14, 16 and 19 will be solicited with respect to the Plan.

### 4.5    Confirmation Pursuant To Section 1129(b) Of The Bankruptcy Code

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**ARTICLE V**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**5.1    Continued Existence Of The Debtors; Vesting Of Assets**

(a)    On the Effective Date, all right, title and interest in all of the Debtors' property and assets (excluding the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets), including without limitation, all rights and causes of action, whether arising by contract, under the Bankruptcy Code (including, without limitation pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code), under the Plan or under other applicable law, including, without limitation, all rights the Debtors have under the Plan, shall vest in the Liquidating Trust.

(b)    On the Effective Date, Foods shall be merged into Industries, after which Industries shall continue to exist as Reorganized Industries. Reorganized Industries shall be governed and managed under and in accordance with the Plan, the Management Agreement and its amended certificate of incorporation and bylaws; provided, however, that all provisions contained in such documents related to the SF Phosphates, Limited Company will not be effective if the SF Phosphates Interest has been disposed of prior to the Effective Date. Reorganized Industries shall be authorized to effectuate the Plan and the transactions contemplated by the Plan and to take any proceedings or actions provided for or contemplated by the Plan (in each case in a manner consistent with the Plan and the Liquidating Trust Agreement), including, without limitation, such proceedings or actions related to the Industries Retained Assets, the Transferred Assets and the Coffeyville Assets as may be necessary and appropriate, all without further action by the stockholders of Reorganized Industries, and with like effect as if such actions had been taken by unanimous action of the stockholders of Reorganized Industries. All recoveries received by Reorganized Industries on account of the Industries Retained Assets, the Transferred Assets or any other assets of the Debtors shall be remitted to the Liquidating Trust and held by the Liquidating Trustee on account of the Estate to which such recoveries are allocable. Forms of the Management Agreement and the amended certificate of incorporation and bylaws of Reorganized Industries shall be filed with the Bankruptcy Court at least five Business Days prior to commencement of the Confirmation Hearing. The identities of the officers and directors of Reorganized Industries shall be disclosed to the Bankruptcy Court no later than five Business Days prior to the commencement of the Confirmation Hearing, together with any additional information required under Section 1129(a)(5) of the Bankruptcy Code. The Bankruptcy Committees and any creditor or party in interest may object to the identities of the proposed officers and directors of Reorganized Industries (and the proposed compensation to be provided to such persons) no later than one Business Day prior to the commencement of the Confirmation Hearing. Notwithstanding any other provision hereof, Cash or Cash equivalents in an amount disclosed to the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing shall remain as assets of Reorganized Industries to fund all operations of Reorganized Industries other than those operations, if any, related to the Industries Retained Assets and/or services to be provided to the Liquidating Trust (which shall be funded, if at all, under the Management Agreement).

(c)    In the event that the Debtors own the Coffeyville Assets on the Effective Date, on the Effective Date, (i) all of the Debtors' right, title and interest in the Coffeyville Assets shall be transferred to a Delaware limited liability company (the "Coffeyville LLC") to be

23

established and wholly owned by the Liquidating Trust, and (ii) the executory contracts and unexpired leases listed on Plan Exhibit E shall be assumed and assigned to the Coffeyville LLC; provided, however, that the Liquidating Trust shall have the option (at its sole discretion in accordance with the Liquidating Trust Agreement) to transfer any of the Coffeyville Assets to the Liquidating Trust. The Coffeyville LLC shall be funded with that amount of capital determined by the Bankruptcy Court at the Confirmation Hearing to constitute sufficient capitalization for the continued maintenance of the Coffeyville LLC and any necessary remediation or other regulatory compliance related to the Coffeyville Assets. Forms of the certificate of organization and operating agreement for the Coffeyville LLC shall be filed with the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing.

(d)     On the Effective Date, (i) all of the Debtors' right, title and interest in each Transferred Asset owned by the Debtors on the Effective Date shall be transferred to a trust (each such trust, a "Transferred Asset Trust"), and (ii) the Liquidating Trust shall fund each Transferred Asset Trust with that amount of capital set forth on Plan Exhibit D or such other amount as determined by the Bankruptcy Court at the Confirmation Hearing (or at such other time prior to the Effective Date), which amount shall constitute sufficient capitalization for the maintenance, remediation (or other regulatory compliance) and/or disposition of each such Transferred Asset. Forms of the trust documents and related documents for each Transferred Asset Trust shall be filed with the Bankruptcy Court no later than five Business Days prior to the commencement of the Confirmation Hearing.

(e)     On the Effective Date, SFA, Transportation and Pipeline shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Debtors shall file with the appropriate public office certificates of dissolution.

(f)     From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, to withdraw their business operation from any state in which the Debtors were previously conducting their business operation.

### 5.2    Funding For The Plan

The Plan shall be funded in accordance with the provisions of the Plan from (a) Available Cash on the Effective Date and (b) Cash available after the Effective Date from, among other things, the liquidation of the Debtors' remaining assets, the prosecution and enforcement of Litigation Claims, and any release of funds from the Disputed Claims Reserve after the Effective Date. All Available Cash realized from the liquidation of the Debtors' remaining assets that is not Collateral for the Secured Lender Claims or DIP Loan Claims, the prosecution and enforcement of Litigation Claims, and the release of funds from the Disputed Claims Reserve (to the extent not otherwise payable to the Pre-Petition Lenders or the DIP Lenders) shall be allocated to the appropriate Estate(s) and shall be maintained by the Liquidating Trustee for distribution to the holders of Allowed Claims as provided in the Plan and the Liquidating Trust Agreement.

### 5.3     Accounts

The Debtors (subject to approval of the Bankruptcy Committees, which approval shall not be unreasonably withheld) and, from and after the Effective Date, the Liquidating Trustee may establish or maintain one or more interest-bearing accounts as they determine may be necessary or appropriate to effectuate the provisions of the Plan consistent with section 345 of the Bankruptcy Code and any orders of the Bankruptcy Court.

### 5.4     Liquidating Trust; Liquidating Trustee

(a)     Prior to the Effective Date, the Debtors shall establish the Liquidating Trust in accordance with Sections 5.1(c) herein and subject to the terms of the Liquidating Trust Agreement and the Plan.  The Bankruptcy Committees shall establish the Post-Confirmation Committee and appoint the Committee Members in accordance with the Liquidating Trust Agreement and the Plan.  By Confirmation of the Plan, the Bankruptcy Court specifically approves and designates the Liquidating Trust and the Liquidating Trustee as a representative of each Estate and finds that the Liquidating Trust and the Liquidating Trustee are acting on behalf of and for the benefit of the Beneficiaries in accordance with the distribution scheme set forth in the Plan.  The establishment of the Liquidating Trust shall not give a holder of a Claim against any Debtor or any Estate any rights as against any other Debtor or any other Estate, except as provided for in Section 7.11 of the Plan.  The Liquidating Trust is an intended third-party beneficiary of the Plan to the fullest extent allowable under the laws of the State of Delaware, the laws of the United States or any other applicable law.  The identity of the Liquidating Trustee shall be disclosed to the Bankruptcy Court at least five Business Days prior to the commencement of the Confirmation Hearing.  The Bankruptcy Committees and any creditor or party in interest may object to the identity of the proposed Liquidating Trustee (and the proposed compensation to be provided to such person) no later than one Business Day prior to the commencement of the Confirmation Hearing.

(b)     The Liquidating Trust and the Liquidating Trustee, as the representative of each Estate, except as otherwise limited in the Liquidating Trust Agreement, Plan or the Confirmation Order, shall be vested with all property, rights, interests, and powers of the Debtors.  Subject to the provisions of the Liquidating Trust Agreement, the Liquidating Trustee's rights and authority include, without limitation, all of the following:

(i)     control, management and disposal of all Liquidating Trust Assets for the benefit of the holders of Allowed Claims and Allowed Class 11 Interests who may receive distributions under the Plan;

(ii)     prosecution of Litigation Claims on behalf of the Debtors and/or the Estates and/or the Liquidating Trust, including preference, fraudulent conveyance, avoidance and other actions whether against insiders or any other third parties;

(iii)     filing of objections to Claims or actions to subordinate Claims or recharacterize debt as equity and the filing and pursuit of any other pleading, motion, stipulation or other item in connection with any matter arising under, in or in connection with the Chapter 11 Case;

(iv)     filing of tax returns;

(v)     transfer (subject to Bankruptcy Court approval) of right, title and interest in and to any Liquidating Trust Assets; and

(vi)     undertake any other action in the best interests of the Trust and/or its beneficiaries and not inconsistent with the provisions of the Liquidating Trust Agreement, the Plan, and the Confirmation Order.

(c)     The funding of the Liquidating Trust pursuant to Section 5.1(c) hereof shall be treated for all purposes of the Tax Code as a deemed transfer to the Beneficiaries, followed by a deemed transfer by the Beneficiaries to the Liquidating Trust. The Beneficiaries shall be treated as the grantors and deemed owners of the Liquidating Trust. The valuation of the property and assets transferred to the Liquidating Trust shall be consistent and shall be used for all federal income tax purposes.

(d)     Neither the Liquidating Trust nor the Liquidating Trustee shall have any successor or transferee liability for liabilities of the Debtors or shall be deemed a joint employer, co-employer or successor employer with the Debtors and shall have no obligation to pay wages, severance pay, WARN Act claims, benefits (including, without limitation, benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985) or any other payment to employees of the Debtors, except to the extent that such payments are payable in respect of Allowed Claims against the Debtors.

(e)     From and after the Effective Date, the Liquidating Trust shall be subject to all terms and conditions contained in the Liquidating Trust Agreement and the Plan.

## 5.5     Post-Confirmation Committee

(a)     On the Effective Date, there shall be constituted a committee (the "Post-Confirmation Committee") consisting of members (the "Committee Members"), the number and method for selection of which shall be agreed to by the Bankruptcy Committees and disclosed to the Bankruptcy Court at least ten Business Days prior to the commencement of the Confirmation Hearing or as otherwise ordered by the Bankruptcy Court. The identities of the Committee Members shall be disclosed to the Bankruptcy Court on the Confirmation Date. In the event that (a) no one is willing to serve on the Post-Confirmation Committee or (b) there shall have been fewer than one-half of the original number of Committee Members serving for a period of 30 consecutive days, then the Liquidating Trustee may, during such vacancy, ignore any reference in the Plan, the Liquidating Trust Agreement, or the Confirmation Order to a Post-Confirmation Committee, and all references to the Post-Confirmation Committee's ongoing duties and rights in the Plan, the Liquidating Trust Agreement, and the Confirmation Order shall be null and void during such time period.

(b)     The Post-Confirmation Committee shall have the rights and responsibilities set forth in this Plan and the Liquidating Trust Agreement. The Committee Members shall be entitled to reimbursement of their reasonable expenses. The Committee Members shall receive such compensation as shall be disclosed to the Bankruptcy Court, upon

consent of the Debtors and the Bankruptcy Committees, not less than five Business Days prior to the commencement of the Confirmation Hearing.

(c)      Neither the Post-Confirmation Committee nor any of the Committee Members shall be liable for the acts or omissions of any other member of the Post-Confirmation Committee, nor shall any Committee Member be liable for any act or omission taken in its capacity as a Committee Member, other than acts or omissions resulting from such Committee Member's willful misconduct or gross negligence.

(d)      The Post-Confirmation Committee shall adopt by-laws which shall provide for the governance of the Post-Confirmation Committee, except as may be otherwise set forth in the Liquidating Trust Agreement.

(e)      A Committee Member shall recuse himself or herself from any decisions or deliberations regarding actions taken or proposed to be taken by the Liquidating Trustee or the Estates with respect to the Claims, Interests, or rights of such Committee Member, the entity appointing such Committee Member, or any affiliate of the foregoing.

### 5.6      Effectuating Documents; Further Transactions

Prior to the Effective Date, the chief executive officer, chief financial officer, or any other appropriate officer of Industries or any other applicable Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Industries or any other applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

### 5.7      Exemption From Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers in the United States from a Debtor to the Liquidating Trust or any other Entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.8      Releases And Related Matters

(a)      Releases by Debtors

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Liquidating Trustee, on behalf of the Liquidating Trust, will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan (other than the rights of the Debtor, the Liquidating Trust or the

27

Liquidating Trustee to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Non-Debtor Subsidiaries, the Chapter 11 Case or the Plan, and that may be asserted by or on behalf of the Debtors or their Estates or the Liquidating Trust against the Lenders, the agents under the Pre-Petition Credit Agreement, the financial institutions party to the DIP Credit Agreement, the agents under the DIP Credit Agreement, and their respective agents and professionals.

(b)    Injunction Related to Releases

The Confirmation Order will enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released by operation of Section 5.8 of the Plan or exculpated by operation of Section 11.9 of the Plan.

## 5.9    Closing Of The Chapter 11 Case

When substantially all remaining assets of the Debtors, Reorganized Industries or the Liquidating Trust (except the Transferred Assets), as the case may be, have been liquidated and converted into Cash (other than those assets abandoned by Debtors or the Liquidating Trust, as the case may be), and such Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## 5.10    Rights of Action

(a)    On and after the Effective Date, except as provided in Section 11.9 of the Plan, the Liquidating Trustee, on behalf of and as a court-appointed representative of each Debtor and for the benefit of each Estate (as vested in the Liquidating Trust pursuant to the Plan), will, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, retain and become the holder of, and have the exclusive right to enforce any and all present or future Litigation Claims and any and all rights of any and all of the Debtors that arose before or after the Commencement Date, including, but not limited to, rights, claims, causes of action, avoiding powers, suits and proceedings arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and all potential rights, claims and causes of action related to payments made by the Debtors prior to the Petition Date and disclosed in the Schedules. The Liquidating Trustee may pursue, abandon, settle or release any or all such Litigation Claims and rights of action pursuant to the terms of the Plan and the Liquidating Trust Agreement, as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court.

(b)    On and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, Litigation Claim,

debt, right or cause of action of the Debtors for which the Liquidating Trustee retains sole and exclusive authority to pursue in accordance with Section 5.10(a) of the Plan.

(c)    The allowance of any Claim prior to the Effective Date shall not constitute a waiver of any Litigation Claim against the holder of such Claim.

### 5.11    Retiree Benefits

Any "retiree benefits" (as that term is defined in section 1114 of the Bankruptcy Code) of the Debtors not terminated during the Chapter 11 Case shall continue after the Effective Date to the extent required by section 1129(a)(13) of the Bankruptcy Code, without prejudice to the Debtor's right under applicable non-bankruptcy law to modify, amend or terminate such benefits. To the extent that any "retiree benefits" continue after the Effective Date, the Liquidating Trustee and/or Reorganized Industries expressly reserve the right to terminate such benefits in accordance with applicable non-bankruptcy law.

### 5.12    Establishment of Class 11 Distribution Pool

On or prior to the Effective Date, and subject to approval of the Bankruptcy Court, the Debtors, in consultation with the Bankruptcy Committees, shall determine the amount of Cash to be reserved by the Liquidating Trustee in a separate account (the "Class 11 Distribution Pool") for distribution to holders of Allowed Class 11 Interests that constitute Minority Foods Shares in accordance with the Plan and the Liquidating Trust Agreement, which amount shall represent the Available Cash estimated to be available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares as of the Effective Date after all Administrative Claims against Foods, all Priority Tax Claims against Foods, all Class 1 Claims against Foods, all Class 3 Claims against Foods, all Class 10 Claims and all Class 18 Claims against Foods have been (i) Allowed and paid in full (including, with respect to Class 10, payment of interest at the Plan Rate) or, with respect to Class 3 Claims, Allowed and treated in accordance with Section 3.4 of the Plan, (ii) disallowed or (iii) withdrawn, and all Intercompany Advances payable by Foods have been repaid; provided, however, that the Liquidating Trustee reserves the right to reduce the Class 11 Distribution Pool in the event that the amount reserved in the Class 11 Distribution Pool is determined to be in excess of the amount actually available for distribution to Allowed Class 11 Interests constituting Minority Foods Shares.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1    Rejected Executory Contracts And Unexpired Leases

Except as otherwise provided in Section 6.3 of the Plan, on the Effective Date, all executory contracts and unexpired leases that exist between a Debtor and any Entity (including, without limitation, the Trust Indentures) shall be deemed rejected as of the Confirmation Date, except for any executory contract or unexpired lease (a) which has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date or pursuant to the Confirmation Order, or (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date (except to the extent that any such motion is ultimately denied or withdrawn).  Entry of the Confirmation Order

29

shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases pursuant to the Plan.

## 6.2    Rejection Damages Bar Date

If the rejection of an executory contract or unexpired lease during the Chapter 11 Case (including any rejection of an executory contract or unexpired lease pursuant to Section 6.1 of the Plan) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor, the Liquidating Trust, the Liquidating Trustee or the properties of any of them unless a proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors, and counsel to the Bankruptcy Committees, (i) if such rejection is effective on or prior to the Confirmation Date, within 30 days after the Confirmation Date, (ii) if such rejection is effective after the Confirmation Date, within 30 days after service of notice of such rejection, or (iii) if such rejection is pursuant to Section 6.1 of the Plan, within 30 days after the Effective Date.

## 6.3    Assumed Executory Contracts And Unexpired Leases

(a)    On the Effective Date, Reorganized Industries shall be deemed to have assumed or assumed and assigned, as the case may be, each executory contract and unexpired lease listed on Plan Exhibit B, provided, however, that the Debtors reserve their right, at any time prior to the Confirmation Date, to amend Plan Exhibit B to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease assumptions or assumptions and assignments, as the case may be, described above, as of the Effective Date.

(b)    In the event that Industries owns the Coffeyville Assets on the Effective Date, on the Effective Date Reorganized Industries shall be deemed to have assumed and assigned to the Coffeyville LLC each executory contract and unexpired lease listed on Plan Exhibit E, provided, however, that the Debtors reserve their right, at any time prior to the Effective Date, to amend Plan Exhibit E to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the conditional assumptions and assignments of the executory contracts and unexpired leases listed on Plan Exhibit E, as of the Effective Date.

## 6.4    Payments Related To Assumed Executory Contracts And Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default are indicated on Plan Exhibit B and Plan Exhibit E and shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor party to the contract or lease or the assignee of such Debtor party assuming such contract or lease, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Reorganized Industries or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption or assignment (each, a "Cure Dispute") that cannot be

resolved consensually among the parties, Reorganized Industries (with the consent of the Liquidating Trustee) shall have the right to reject the contract or lease for a period of five Business Days after entry of a Final Order adjudicating a Cure Dispute in a manner that is not acceptable to Reorganized Industries (with the consent of the Liquidating Trustee).

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1    Distributions

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made by the Liquidating Trustee pursuant to the terms and conditions contained in the Plan and the Liquidating Trust Agreement; provided, however, that no distribution shall be made on behalf of any Claim which may be subject to disallowance under section 502(d) of the Bankruptcy Code.  At the close of business on the Effective Date, the Claims and Interest register shall be closed, and there shall be no further changes in the record holders of any Claims or Interests.  The Liquidating Trustee shall have no obligation to recognize any transfer of any Claims or Interest occurring after the Effective Date. The Liquidating Trustee shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Article 4 of the Plan) with only those record holders stated on the Claims register as of the close of business on the Effective Date.

### 7.2    Interest On Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable law, including section 1129(a) of the Bankruptcy Code, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim; provided, however, that any interest determined to be payable in respect of any Claim shall be calculated at the Plan Rate.  This provision shall not apply to Allowed Secured Lender Claims and DIP Loan Claims.

### 7.3    Means Of Cash Payment

Any payment to be made by the Liquidating Trustee pursuant to the Plan will be in U.S. dollars and may be made, at the sole discretion of the Liquidating Trustee, by draft, check, electronic funds transfer, or as otherwise required or provided in any relevant agreement or applicable law.

### 7.4    Distributions on the Initial Distribution Date

As soon as is practicable after the Effective Date, subject to the reservation of adequate funds in the Liquidating Trust Administrative Reserve, each Disputed Claims Reserve and any other reserves established under the Plan or the Liquidating Trust Agreement as and when appropriate, the Liquidating Trustee shall deliver proceeds of Collateral and/or Available Cash to holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date.  All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

**7.5     Distributions on a Subsequent Distribution Date**

Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the date of making the distributions required by Section 7.4 of the Plan (the "Initial Distribution Date"), the Liquidating Trustee shall, on a subsequent date (each, a "Subsequent Distribution Date"), which date shall be whenever the aggregate amount distributable to holders of Allowed Claims equals or exceeds $1,000,000 (but in no event shall such date be less than three months, or more than one year, after the next previous distribution date), distribute such proceeds of Collateral and/or Available Cash or other reasonably distributable assets to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Subsequent Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Subsequent Distribution Date had been disallowed on the Initial Distribution Date; provided, however, that the Liquidating Trustee shall not be required to make any distribution on a Subsequent Distribution Date on account of an Allowed Claim or Interest in an amount less than $100; provided further, however, that in no event shall the foregoing impair the right of the Liquidating Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the Liquidating Trustee.  All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

**7.6     Distributions on the Final Distribution Date**

Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the Initial Distribution Date, any Subsequent Distribution Date and after the liquidation of any and all assets of the Debtors and after all Disputed Claim and Disputed Interests of Beneficiaries have become (in whole or in part) Allowed Claims or Allowed Interests or have been disallowed by Final Order, the Liquidating Trustee shall establish a final distribution date (the "Final Distribution Date") upon which the Liquidating Trustee shall distribute such proceeds of Collateral and/or Available Cash or other assets to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Final Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Final Distribution Date had been disallowed on the Initial Distribution Date, taking into account all previous distributions; provided, however, that in no event shall the foregoing impair the right of the Liquidating Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the Liquidating Trust.  Within 20 Business Days prior to making the final distribution, the Liquidating Trustee shall notify the Post-Confirmation Committee that the Liquidating Trustee deems all assets

to be liquidated and all Claims and Interest of Beneficiaries to be resolved and that the Liquidating Trustee intends to establish the Final Distribution Date.

### 7.7    Delivery Of Distributions; Undeliverable Distributions

Distributions to holders of Allowed Claims and Allowed Interests shall be made by the Liquidating Trustee (a) at the addresses set forth on the proofs of Claim or Interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of Claim or Interest, (c) at the addresses reflected in the Schedules if no proof of Claim or Interest has been filed and the Liquidating Trustee has not received a written notice of a change of address, or (d) at the addresses contained in the official records of the Debtors or the applicable Indenture Trustee for the Industrial Revenue Bonds, or (e) at the addresses set forth in a properly completed letter of transmittal accompanying securities properly remitted to the Debtors. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidating Trustee is notified, in accordance with the Liquidating Trust Agreement, of such holder's then current address. Claims or Interests held by holders whose distributions are returned as undeliverable and who fail to notify the Liquidating Trustee of their respective correct addresses within one year after such distributions are returned to the Liquidating Trustee as undeliverable shall be expunged, after which date all unclaimed property (including, without limitation, all unclaimed property held in the Class 11 Distribution Pool) shall (i) revert to the Liquidating Trust free of any restrictions thereon and the Claims or Interests of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary, or (ii) if the Liquidating Trust has been terminated, be delivered to the clerk of the Bankruptcy Court.  All undeliverable distributions that revert to the Liquidating Trust shall be used to satisfy the costs of administering the Plan and the Liquidating Trust and/or distributed to other holders of Allowed Claims or Allowed Interests of the same Class on the Final Distribution Date.  Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim or Allowed Interest.

### 7.8    Tender Of Securities And Instruments; Cancellation of Trust Indentures

(a)    Except as otherwise required by the Liquidating Trustee, as a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, each holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods shall tender the applicable instruments, securities or other documentation evidencing such Claim or Interest to the Liquidating Trustee in accordance with written instructions to be provided to such holders by the Liquidating Trustee as promptly as practicable following the Effective Date.  All tendered instruments and documentation relating to Industrial Revenue Bonds, Demand Certificates and Subordinated Certificates shall be marked as cancelled.  All tendered securities and documentation relating to Old Securities of Foods shall be held by the Liquidating Trustee.

(b)    In addition to any requirements under the applicable certificate or articles of incorporation or by-laws of the applicable Debtor, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed shall, in lieu of tendering

such instrument, security or documentation, deliver to the Liquidating Trustee (i) evidence satisfactory to the Liquidating Trustee or the applicable Indenture Trustee for the Industrial Revenue Bonds of the loss, theft, mutilation or destruction; and (ii) such indemnity or security as may be required by the Liquidating Trustee to hold the Liquidating Trustee and the Liquidating Trust harmless from any damages, liabilities or costs incurred in treating such individual as a holder of Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods that has been lost, stolen, mutilated or destroyed. Upon compliance with this Section 7.8(b) by a holder of a Claim or Interest evidenced by Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods, such holder shall, for all purposes under the Plan, be deemed to have tendered its Industrial Revenue Bonds, Demand Certificates, Subordinated Certificates or Old Securities of Foods.

(c)     Except as otherwise required by the Liquidating Trustee, any holder of Industrial Revenue Bonds not Reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods that fails to tender or is deemed to have failed to tender the applicable instruments, securities and documentation required to be tendered hereunder within one year after the Effective Date shall have its Claim or Interest discharged and shall be forever barred from asserting such Claim or Interest against the Liquidating Trust or its property and any distribution to have been made on account of such Claim or Interest shall be treated as an undeliverable distribution in accordance with Section 7.7 of the Plan.

(d)     The notice of the Confirmation Order shall contain a description of the requirements contained in this Section 7.8.

(e)     On the Effective Date, each Trust Indenture for Industrial Revenue Bonds not Reinstated on the Effective Date shall be deemed cancelled as permitted by section 1123(a)(5)(F) of the Bankruptcy Code.

## 7.9     Withholding And Reporting Requirements

In connection with the Plan and all distributions hereunder, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

## 7.10    Setoffs

The Liquidating Trustee may, but shall not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, claims, right and causes of action of any nature whatsoever that the Liquidating Trustee may have against the holder of such Allowed Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trustee of any such claim that the Liquidating Trustee may have against such holder, including, without limitation, any Litigation Claims.  Nothing contained herein is intended or shall be construed to limit or otherwise affect any claims, defenses or rights of any Entity to setoff or

recoupment. The Debtors, the Liquidating Trustee and Reorganized Industries expressly reserve all such claims, defenses and rights with respect to setoff and recoupment.

### 7.11   No Recourse

Notwithstanding that the Allowed amount of any particular Claim may be reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or Allowed in an amount for which there is insufficient Cash in the relevant account to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no such holder shall have recourse to the Estates, the Bankruptcy Committees, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Committee, Reorganized Industries or any of their respective professionals, or their successors or assigns, or the holder of any other Claim, or any of their respective property. Nothing in the Plan, however, shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

### 7.12   Transactions On Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day and shall be deemed to have been completed as of the required date.

### 7.13   No Distribution In Excess Of Allowed Amount Of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim plus interest at the Plan Rate from the Petition Date through the Effective Date plus Tax Distributions.

### 7.14   Intercompany Advances

In the event that the Liquidating Trustee determines that there does not exist sufficient Cash in the Estate of any Debtor (a "Benefited Debtor") to make payments to all holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Class 1 Claims asserted against such Benefited Debtor (or to deposit sufficient funds in Disputed Claims Reserves for all Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Class 1 Claims asserted against such Benefited Debtor), then the Liquidating Trustee shall utilize Cash in the one or more of the other Estates to make such payments or deposit such funds on behalf of the Estate of such Benefited Debtor (such payments and deposits, the "Intercompany Advances") and the Estate(s) of such Debtor(s) shall thereupon have a direct right of reimbursement from the Estate of such Benefited Debtor to the extent of the Intercompany Advances extended to such Benefited Debtor (a "Reimbursement Right"). Except as otherwise provided herein, the Liquidating Trustee shall ensure that all Intercompany Advances are repaid prior to making any distributions to holders of Allowed General Unsecured Claims asserted against such Benefited Debtor.

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND**
**UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO**

**8.1    Prosecution Of Objections To Claims**

(a)    Objections to Claims

All objections to Claims (other than Professional Fee Claims) and Interests must be filed and served on the holders of such Claims and Interests by the Objection Deadline.

(b)    Authority to Prosecute Objections

From and after the Effective Date, the Liquidating Trustee shall have the exclusive right to make and file and continue prosecution of objections to the allowance, classification and/or amount of any Claim or Interest with the Bankruptcy Court, and shall serve such objections upon holders of each of the Claims and Interests to which objections are made by the Objection Deadline.  Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee is authorized and empowered, but not required, to resolve consensually any disputes regarding the allowance, classification and/or amount of any Claim or Interest.  All objections by the Liquidating Trustee shall be litigated to a Final Order except to the extent the Liquidating Trustee, in his discretion, elects to withdraw any such objection, or compromise, settle or otherwise resolve any such objection, in which event the Liquidating Trustee may settle, compromise or otherwise resolve any Disputed Claim or Interest without approval of the Bankruptcy Court. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee and the Post-Confirmation Committee shall establish appropriate protocol for the prosecution, settlement, compromise, withdrawal or litigation to judgment of all objections to Claims and Interests.

**8.2    Treatment Of Disputed Claims; Disputed Claims Reserves**

Subject to the provisions of Section 7.1 of the Plan and notwithstanding any other provisions of the Plan or the Liquidating Trust Agreement to the contrary, no payments or distributions will be made on account of a Disputed Claim or Disputed Interest, or, if less than the entire Claim or Interest is a Disputed Claim or Disputed Interest, the portion of a Claim or Interest that is Disputed, until such Claim or Interest becomes an Allowed Claim or Allowed Interest.  On the Effective Date or as soon as practicable thereafter, the Liquidating Trustee shall reserve Cash in one or more Disputed Claims Reserves in an amount equal to the Face Amount of: (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in Classes 1, 2, 3, 4, 5, 6, 7, 10, 12, 14, 16 and 18; provided, however, that the Liquidating Trustee shall have the right to file a motion with the Bankruptcy Court to estimate, reduce or modify the amount to be reserved with respect to any such Disputed Claims.  Each Disputed Claims Reserve shall be established and maintained in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

**8.3    Estimation**

The Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee, as the case may be, have previously objected to

such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any contingent or unliquidated Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

### 9.1    Conditions To Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with this Section:

(a) The Confirmation Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Debtors and the Bankruptcy Committees and shall provide that the Debtors and the Liquidating Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan.

(b) All Plan Exhibits shall be in form and substance reasonably acceptable to the Debtors and the Bankruptcy Committees and shall have been executed and delivered.

(c) All actions, documents and agreements necessary to implement the Plan shall have been effected or executed or are ready to be executed.

(d) The Debtors shall have paid the then outstanding balances of the Secured Lender Claims and the DIP Loan Claims in full.

(e) The closing of the sales of the Pork Business and the SF Phosphate Interest shall have occurred.

(f) The closing of the sale of the Coffeyville Assets shall have occurred.

(g) The Insurance Claim shall have been settled and paid in full.

(h) The Debtors shall have determined, in consultation with the Bankruptcy Committees, that the occurrence of the Effective Date is in the best interest of creditors and parties in interest.

**9.2     Waiver Of Conditions**

The requirement that the Confirmation Order must be a Final Order may be waived by the Debtors, with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld.  The requirement that the closing of the sale of the Coffeyville Assets shall have occurred may be waived by the Debtors, with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld, if the closing of the sale of the Coffeyville Assets shall not have occurred by the closing date established in connection with a Bankruptcy Court-approved sale of the Coffeyville Assets.

**9.3     Notice Of Effective Date**

The Liquidating Trustee shall file and serve an appropriate notice of the Effective Date within seven Business Days of the Effective Date.

## ARTICLE X
## RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Liquidating Trustee shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)     Effectuate performance of and payments under the provisions of the Plan;

(e)     Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

(f)     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases,

38

and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(h)     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(l)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(m)     Except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(p)     Enter a final decree closing the Chapter 11 Case.

# ARTICLE XI
# MISCELLANEOUS PROVISIONS

### 11.1    Deadline For Filing Professional Fee Claims; Objections To Professional Fee Claims

All final requests for compensation or reimbursement for Professionals pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date and Substantial Contribution Claims under section 503(b)(4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Liquidating Trustee and its counsel no later than 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the Liquidating Trustee and its counsel and the requesting Professional or other Entity no later than 30 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### 11.2    Deadline For Filing Administrative Claims; Objections To Administrative Claims

Other than as set forth in Section 11.1 of the Plan and except with respect to payments payable in connection with the KERIT Plan, all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trust and, if prior to the Effective Date, counsel for the Debtors and each Bankruptcy Committee no later than 30 days after the Effective Date. In the event that the Debtors or the Liquidating Trustee, as the case may be, object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

### 11.3    Payment Of Statutory Fees

All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation shall be paid on or before the Effective Date.

### 11.4    Modifications And Amendments

(a)    The Debtors reserve the right (with the consent of the Bankruptcy Committees in the case of material modifications or amendments), and in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan and the Liquidating Trust Agreement at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors (subject to consent of the Bankruptcy Committees and the administrative agent under the Pre-Petition Credit Agreement, which consent shall not be unreasonably withheld) may amend or modify the Plan and the Liquidating Trust Agreement, in accordance with Section 1127 of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim or Allowed Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or

40

Interest of such holder. In addition, the Plan shall be deemed automatically amended and modified to the extent determined necessary by the Bankruptcy Court to comply with the DIP Credit Agreement.

(b)    In the event that any Impaired Class shall not accept the Plan, at the written election of the Debtors (with the consent of the Bankruptcy Committees, which consent shall not be unreasonably withheld) filed with the Bankruptcy Court with respect to any one or more of said nonaccepting Classes and any Classes junior to such nonaccepting Classes, the Plan shall be modified and amended automatically and without further notice to provide such treatment, as determined necessary by the Bankruptcy Court, sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Classes rejecting the Plan, and, in particular, the treatment necessary to meet the requirements of Sections 1129(a) and (b) of the Bankruptcy Code with respect to (i) the rejecting Classes and (ii) any other Classes adversely affected by such modifications. In particular, the treatment of any nonaccepting Classes or adversely affected Classes shall be modified and amended from that set forth in Article III, even if less favorable, to the minimum treatment necessary to meet the requirements of sections 1129(a) and (b) of the Bankruptcy Code.

### 11.5    Severability Of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of any Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 11.6    Successors And Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 11.7    No Discharge

The Confirmation Order shall not discharge any Debtor from any debt or liability that arose before Confirmation, as provided in section 1141(d)(3)(A) of the Bankruptcy Code.

### 11.8    Release Of Assets

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtors, their assets and properties. Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the

subject matters set forth in Article X of the Plan, and Liquidating Trustee shall perform its duties and obligations pursuant to the Liquidating Trust Agreement and the Plan.

### 11.9    Exculpation And Limitation Of Liability

(a)    Subject to limitations required by applicable ethical rules and standards of conduct, and except as limited in Section 11.9(b) below, none of the Debtors, the Liquidating Trust, the Liquidating Trustee, the Bankruptcy Committees, the Indenture Trustees, the Lenders, the financial institutions party to the DIP Credit Agreement, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission from and after the Petition Date in connection with, relating to, or arising out of, the Chapter 11 Case, the commencement of the Chapter 11 Case, the administration of the Chapter 11 Case, the pursuit of and the approval of the sales of the Debtors' assets (and the related asset purchase agreement), the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct; provided, however, any present or former officer or director of any Debtors shall be liable to any holder of a Claim or Interest, or any other party in interest, or any of their successor or assigns, for: (i) any breach of such person's duty of loyalty to the Debtors, (ii) any act or omission not in subjective good faith or which involves intentional misconduct or a knowing violation of law, and (iii) any transaction for which such person derived an improper benefit, and in all respects such persons shall be entitled to reasonably rely upon the advice of the Debtors' counsel (including in-house counsel) with respect to their duties and responsibilities under the Plan.  In addition, the Indenture Trustees under the Demand Certificates and the Subordinated Certificates shall not have or incur any liability to any holder (registered or unregistered) of any Demand Certificate or Subordinated Certificate or any claim based on any Demand Certificate or Subordinated Certificate as a result of any inaccuracy or mistake in the books and records of Industries (in their capacities as paying agents and registrars under the Trust Indentures for the Demand Certificates and the Subordinated Certificates).

(b)    The exculpatory provisions contained in Section 11.9(a) of the Plan (i) shall not limit the claims and rights, if any, of the United States, and (ii) shall apply to any person or entity who was not the beneficiary of a post-petition indemnification obligation of the Debtors only to the extent provided in Section 11.9(c).

(c)    Any claims that would otherwise be subject to the exculpatory provisions contained in Section 11.9(a) but for the provisions of Section 11.9(b)(ii) may only be asserted in the Bankruptcy Court and only if filed on or before ninety days after the Effective Date.  In the event that any such claims are not filed timely in the Bankruptcy Court, the exemption contained in Section 11.9(b)(ii) shall be terminated with respect to such claims, and such claims shall be deemed subject to the exculpatory provisions contained in Section 11.9(a).

(d)       Any non-exculpated claims against the parties set forth in Section 11.9(a) arising from or related to the matters set forth in Section 11.9(a) may only be asserted and filed in the Bankruptcy Court.

(e)       The Bankruptcy Court shall retain exclusive jurisdiction to determine all matters arising from or related to claims against the parties set forth in Section 11.9(a) that arise from or relate to the matters set forth in Section 11.9(a).

### 11.10    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Liquidating Trust, the Liquidating Trustee and all other parties-in-interest in this Chapter 11 Case.

### 11.11    Revocation, Withdrawal, Or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and to file subsequent plans of reorganization; provided, however, that any revocation or withdrawal of the Plan after the Confirmation Date shall be with the consent of the Bankruptcy Committees and the administrative agent under the Pre-Petition Credit Agreement, which consent shall not be unreasonably withheld.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (x) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Entity, (y) prejudice in any manner the rights of any Debtor or any Entity in any further proceedings involving a Debtor, or (z) constitute an admission of any sort by any Debtor or any other Entity.

### 11.12    Plan Exhibits

Any and all Plan Exhibits, or other lists or schedules not filed with the Plan, shall be filed with the Clerk of the Bankruptcy Court at least five Business Days prior to the date of the commencement of the hearing on the approval of the Disclosure Statement and shall be actually provided to all parties identified in Section 11.13 at the addresses provided in such Section at least five Business Days prior to the date of the commencement of the hearing on the approval of the Disclosure Statement.  Upon such filing, such documents may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any such document upon written request to the Debtors in accordance with Section 11.13 of the Plan.

### 11.13    Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or the Liquidating Trustee under the Plan shall be (a) in writing, (b) served by (i) certified

mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (b) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

FARMLAND INDUSTRIES, INC., et al.
12200 North Ambassador Drive
Kansas City, Missouri 64163-1244
Attn: Chief Executive Officer
Telephone: (816) 713-7000
Facsimile:  (816) 713-6397

with a copy to:

BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri 64105
Attn: Laurence M. Frazen
Telephone: (816) 374-3200
Facsimile: (816) 374-3300

and

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Attn: Evan M. Jones, Esq.
Telephone: (213) 430-6236
Facsimile: (213) 430-6407

and

AKIN GUMP STRAUSS HAUER & FELD LLP
1900 Pennzoil Place – South Tower
711 Louisiana
Houston, Texas 77002
Attn: S. Margie Venus, Esq.
Telephone: (713) 220-5800
Facsimile: (713) 236-0822

and

HUSCH & EPPENBERGER
1200 Main Street, Suite 1700
Kansas City, Missouri 64105
Attn: Christopher Redmond, Esq.
Telephone: (816) 421-4800
Facsimile: (816) 421-0596

44

and

FOLEY & LARDNER
321 North Clark Street
Suite 2800
Chicago, Illinois 60610-4764
Attn: Michael Small, Esq.
Telephone:  (312) 832-4500
Facsimile:  (312) 832-4700

and

POLSINELLI SHALTON & WELTE
700 W. 47th Street, Suite 1000
Kansas City, Missouri 64112-1808
Attn: Daniel J. Flanigan, Esq.
        James E. Bird, Esq.
Telephone:  (816) 753-1000
Facsimile:  (816) 753-1536

### 11.14    Dissolution Of The Bankruptcy Committees

On the Effective Date, the Bankruptcy Committees will dissolve and their respective members (only in their capacity as members of the Bankruptcy Committees) will be released and discharged from all further authority, duties, responsibilities and obligations arising from or related to the Chapter 11 Case. The members of the Bankruptcy Committees and the Professionals retained by the Bankruptcy Committees will not be entitled to compensation or reimbursement of expenses for any services rendered to the Bankruptcy Committees after the Effective Date.

### 11.15    Term Of Injunctions Or Stays

Unless expressly modified or lifted by the Bankruptcy Court, all injunctions or stays provided for in the Chapter 11 Case, including in the Confirmation Order, under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Final Distribution Date.

### 11.16    Headings

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose

[Remainder of Page Blank]

45

Dated: October 31, 2003

FARMLAND INDUSTRIES, INC.
FARMLAND FOODS, INC.
SFA, INC.
FARMLAND TRANSPORTATION, INC.
FARMLAND PIPE LINE COMPANY


By:  /s/ Robert B. Terry
Name:  Robert B. Terry
Title: Authorized Signatory


Laurence M. Frazen, Esq.
Cynthia Dillard Parres, Esq.
Robert M. Thompson, Esq.
BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, Missouri  64105

Gregory D. Willard, Esq.
David M. Unseth, Esq.
Cullen K. Kuhn, Esq.
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750

Attorneys for the Debtors and Debtors-in-Possession

# **PLAN EXHIBIT A**

Liquidating Trust Agreement[1]

---

[1]    The Debtors reserve their right, at any time prior to the Confirmation Date, to amend Plan Exhibit A and to provide notice of any such amendments to the Bankruptcy Court.

# FI LIQUIDATING TRUST AGREEMENT

This FI Liquidating Trust Agreement (the "Agreement"), dated as of _____ 2003 (the "Effective Date"), by and among Farmland Industries, Inc., both in its own capacity and as successor in interest to Farmland Foods, Inc., Farmland Transportation, Inc., SFA, Inc. and Farmland Pipe Line Company (collectively, the "Debtors") and _____, as trust administrator (together, with any successor appointed under the terms hereof, the "Trustee"), provides for the establishment of a liquidating trust evidenced hereby (the "FI Liquidating Trust") for the sole benefit of the Beneficiaries (as defined below). This Agreement is being entered into in connection with the Chapter 11 Debtors' First Amended Joint Plan of Liquidation dated July 31, 2003 as may be subsequently amended (the "Plan"), filed in the Debtors' cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court") and the order entered by the Bankruptcy Court confirming the Plan (the "Confirmation Order").

## RECITALS

WHEREAS, the FI Liquidating Trust is established pursuant to section 5.4 of the Plan for the sole purpose of liquidating and distributing the Trust Assets (as defined below) for the benefit of the Beneficiaries (as defined below), as a liquidating trust in accordance with 26 C.F.R. § 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the FI Liquidating Trust; and

WHEREAS, the Confirmation Order having been entered on _____, 2003; and

WHEREAS, the FI Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the Internal Revenue Code of 1986, as amended (the "Code"), with the Beneficiaries (as defined below) treated as the grantors and owners of the Trust Assets; and

WHEREAS, the Trustee has agreed to act as Trustee under this Agreement and to manage the Trust as Trustee upon and subject to the terms and conditions set forth herein, in the Plan, and in the Confirmation Order;

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions. The following initially capitalized terms shall have the meanings ascribed to them below for all purposes under this Agreement.  All initially capitalized terms not otherwise defined in this Agreement shall have the meanings given to them in the Plan. All initially capitalized terms not otherwise defined in this Agreement or the Plan shall have the meanings given them in the Bankruptcy Code.

"Avoidance Actions" means any avoidance actions under Chapter 5 of the Bankruptcy Code or any applicable state law.

"Beneficiaries" means holders of Allowed Claims and Allowed Class 11 Interests.

"Business Day" means any day except for Saturday, Sunday or a "legal holiday" (as defined in Fed. R. Bankr. P. 9006(a)).

"Cash" means legal tender of the United States or equivalents thereof.

"Claim" means a Claim (as such term is defined in the Plan) against the Debtors, or any of them, whether or not asserted, as defined in section 101 of the Bankruptcy Code.

"Class 11 Interests" means those Interests of Farmland Foods classified under the Plan as Class 11.

"Code" is defined in the third recital hereof.

"Deemed Tax Amount" means the amount, determined by the Trustee with respect to each Beneficiary on a consistent basis, of the estimated federal income tax obligation which such Beneficiary can be reasonably anticipated to incur with respect to the net taxable income of the FI Liquation Trust, taking into consideration all deductions, credit, or losses otherwise allocable to such Beneficiary.

"Disputed Claim" means, with respect to a Claim, such Claim or any portion thereof that is not an Allowed Claim, and includes, without limitation, Claims (other than Allowed Claims) that (a) have not been listed on the Schedules or have been listed on the Schedules at zero, or as contingent, unliquidated or disputed, or (b) are subject to an objection filed in the Bankruptcy Court and which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

"Disputed Claims Reserve" means, in the event there exists any Disputed Claims on or after the Effective Date, Cash, reserved by the Liquidating Trust in separate interest bearing accounts for the following:  (i) Disputed Administrative Claims asserted against each Debtor; (ii) Disputed Priority Tax Claims asserted against each Debtor; and (iii) Disputed Claims in each Class for which distributions are contemplated by the Plan; all in accordance with the provisions of the Plan and this Agreement and to be maintained under the Plan and this Agreement.

"Distribution" means any distribution made to holders of Allowed Claims or Allowed Class 11 Interests under the Plan or this Agreement.

"IRS" means the United States Internal Revenue Service.

"Liquidating Trust Administrative Reserve" is defined in section 4.2(b).

"Objection Deadline" means the last day for filing Disputed Claims (other than Disputed Professional Fee Claims) or Disputed Interests, which day shall be 180 days after the Effective Date, unless such date is extended by the Bankruptcy Court upon request by the Trustee.

"Permitted Investments" is defined in section 3.4(vi).

"Person" means a "person" as defined in section 101 of the Bankruptcy Code.

"Post Confirmation Committee" means the committee appointed in accordance with the Plan, which shall oversee the operation of the FI Liquidating Trust and have the duties and responsibilities specified in the Plan and in Section 2.4 of this Agreement.

"Priority Claim" means a Claim against the Debtors that is an Administrative Claim, a Priority Tax Claim, a DIP Loan Claim or an Other Priority Claim.

"Remaining Assets" means those Trust Assets remaining in or transferable to the FI Liquidating Trust following the payment of all Allowed Secured Claims and Allowed Priority Claims.

"Tax Distribution" means a Distribution to a Beneficiary made with respect to any net taxable income of the Trust which is allocated to such Beneficiary for United States federal income tax purposes.

"Termination Date" is defined in section 8.1.

"Treasury Regulation" means the United States Treasury regulations, including any temporary regulations from time to time promulgated under the Code.

"Trust Assets" means all property and assets of each Estate and Reorganized Industries as and when required by the Plan to be transferred to the FI Liquidating Trust.

## ARTICLE II
## ESTABLISHMENT OF THE FI LIQUIDATING TRUST

2.1    Transfer of Assets to FI Liquidating Trust.

(a)    The Debtors and the Trustee hereby establish the FI Liquidating Trust on behalf, and for the sole and exclusive benefit, of the Beneficiaries. On the date hereof, the Debtors shall deliver to the FI Liquidating Trust the Trust Assets required to be transferred to the FI Liquidating Trust on the Effective Date, for the benefit and on behalf of the Beneficiaries, pursuant to sections 7.1 and 7.7 of the Plan. The Debtors agree to make, and the Trustee agrees to accept, additional transfers of the Trust Assets to the FI Liquidating Trust consistent with the terms of the Plan. The Trustee hereby agrees to accept and hold the Trust Assets in the FI Liquidating Trust for the sole and exclusive benefit of the Beneficiaries, subject to the terms of this Agreement and the Plan. Following the transfer of the Trust Assets to the FI Liquidating Trust, the Debtors shall have no interest in, or with respect to, the Trust Assets.

(b)    The Trust Assets shall be valued consistently pursuant to section 6.2 of this Agreement, and those valuations shall be used for all U.S. federal income tax purposes.

(c)     Reorganized Industries shall retain only such books and records as are necessary to manage the Industries Retained Assets, the Industries Transferred Assets, any Rejected Assets and its corporate affairs.  All other books and records of the Debtors shall be transferred to the FI Liquidating Trust.   The FI Liquidating Trust and Reorganized Industries shall provide reasonable access to the books and records in its possession to each other as may be necessary to effectuate the Plan and the transactions contemplated by the Plan.  Any attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the FI Liquidating Trust shall vest exclusively in the Trustee and his representatives, and the Trustee is authorized to take all necessary actions to effectuate the transfer of such privileges.  After the Effective Date, no person other than the Trustee may assert or waive any privilege of the Debtors or any Estate or to make any admission or statement against interest respecting the Debtors or any Estate.

(d)     The FI Liquidating Trust is irrevocable.

2.2     <u>Intention of Parties</u>. All parties (x) intend to create a liquidating trust in accordance with Treasury Regulation § 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, which shall be treated as a grantor trust for United States federal income tax purposes pursuant to sections 671-677 of the Code, and (y) agree that the transfer of the Trust Assets by the Debtors to the FI Liquidating Trust shall be treated for federal income tax purposes as a taxable sale or exchange of the Trust Assets (other than Cash) by the Debtors to the Beneficiaries and a transfer from the Beneficiaries to the FI Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes. More particularly, for U.S. federal income tax purposes:

(a)     Each Beneficiary holding an Allowed Secured Claim or an Allowed Priority Claim that is not fully paid on the Effective Date shall be deemed to have received from the Debtors on the Effective Date, and immediately contributed to the FI Liquidating Trust, an amount of Cash equal to the amount of such Beneficiary's Claim that was not actually paid on the Effective Date.

(b)     Each Beneficiary holding an Allowed Claim or Allowed Class 11 Interest that is not an Allowed Secured Claim or an Allowed Priority Claim shall be deemed (i) to have received from the Debtors on the Effective Date, and immediately contributed to the FI Liquidating Trust, an interest in Remaining Assets equal to its pro rata interest in the Remaining Assets and (ii) to receive from the Debtors on each subsequent date on which the Debtor makes a transfer to the FI Liquidating Trust and to have immediately contributed to the FI Liquidating Trust its pro rata portion of the assets so transferred by the Debtors.

2.3     <u>Purposes of the FI Liquidating Trust</u>. Subject to section 8.1, the FI Liquidating Trust shall continue in existence so long as necessary for the purpose of liquidating the Trust Assets, in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the FI Liquidating Trust. Consistent with such

objective, the Trustee, in an orderly manner and subject to the provisions of the Plan and this Agreement, shall:

(a)      make all Distributions under the Plan and this Agreement;

(b)      satisfy its obligations under the Plan and this Agreement, including, but not limited to, those specifically set forth in sections 5.4(a)-(b) and 7.1 of the Plan;

(c)      enforce and prosecute the Litigation Claims, and other claims, interests, rights and privileges of the Debtors, including, but not limited to, the prosecution of Avoidance Actions;

(d)      on a timely basis under the Plan, object to Claims and Class 11 Interests asserted against the Debtors;

(e)      litigate or resolve Disputed Claims and Disputed Class 11 Interests;

(f)      administer the Plan; and

(g)      file appropriate tax returns in accordance with section 6.2.

2.4      The Post Confirmation Committee.

(a)      The Post Confirmation Committee shall consist of four members.  Each Bankruptcy Committee shall appoint two persons to serve on the Post Confirmation Committee.  Decisions of the Post Confirmation Committee shall require at least three votes in favor of or against the matter proposed.  The Trustee shall report to and consult with, and as determined herein or as otherwise requested by the Post Confirmation Committee, shall follow the instructions of the Post Confirmation Committee with regard to the implementation of the Plan.  If three votes cannot be obtained in favor of or against the Trustee's proposal, the Trustee may seek the Court's approval of the proposal without further voting by the Post Confirmation Committee.  The Trustee shall render monthly written reports to the Post Confirmation Committee.

(b)      If a member of the Post Confirmation Committee sells, transfers or assigns its Claim, such member shall be immediately removed.

(c)      If a member of the Post Confirmation Committee resigns or is removed pursuant to Section 2.4(b) of this Agreement, the remaining members of the Post Confirmation Committee shall elect a replacement member who must be the holder of the same class of claim as the resigning or removed member of the Post Confirmation Committee.

(d)      The Post Confirmation Committee may retain the services of attorneys, accountants and other agents that, in the discretion of the Post Confirmation Committee, are necessary to assist the Post Confirmation Committee in the performance of its duties. The reasonable fees and expenses of such professionals shall be paid by the FI Liquidating Trust upon the monthly submission of statements to the Trustee and the Post

Confirmation Committee.  The payment of the reasonable fees and expenses of the Post Confirmation Committee's retained professional shall be made in the ordinary course of business from the FI Liquidating Trust and shall not be subject to the approval of the Bankruptcy Court.

(e)    The Post Confirmation Committee shall monitor the performance by the Trustee of its obligations under the Plan and this Agreement. The Post Confirmation Committee shall also review and either approve or reject:

(i)    budgets for the FI Liquidating Trust that the Trustee may be required or requested to prepare and submit to the Post Confirmation Committee;

(ii)    proposals by the Trustee to modify the Plan;

(iii)    proposals by the Trustee to set or postpone the scheduled date of a Distribution to holders of Allowed Claims or Allowed Class 11 Interests;

(iv)    proposals by the Trustee to sell, abandon or otherwise transfer non-cash Trust Assets;

(v)    proposals by the Trustee to retain professionals, employees or agents to assist in the administration of the FI Liquidating Trust;

(vi)    proposals by the Trustee with respect to initiation and prosecution of litigation, including but not limited to, objections to Claims, Class 11 Interests and Litigation Claims; and

(vii)    proposals by the Trustee with respect to disposition and settlement of any Claim, Class 11 Interest or Litigation Claim, including any Avoidance Action, provided, however, that the Post Confirmation Committee may designate parameters within with the Trustee need not seek approval for settlement of Claims, Class 11 Interests or Litigation Claims;

(f)    Except as otherwise specifically provided herein and in the Plan, members of the Post Confirmation Committee shall not be held personally liable for any claim asserted against the FI Liquidating Trust, the Trustee, the Trustee's employees, the Post Confirmation Committee's employees, any of the Trustee's professionals or representatives or any of the Post Confirmation Committee's professionals or representatives. Without limiting the generality of the foregoing, the members of the Post Confirmation Committee shall not be liable for any error of judgment with respect to their oversight of the FI Liquidating Trust and/or the activities of the Trustee made in good faith, or with respect to any action taken or omitted to be taken in good faith, except for actions or omissions to act that are due to gross negligence, willful misconduct or intentional fraud.

(g)    The members of the Post Confirmation Committee shall be and hereby are exculpated by all Persons from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the

members of the Post Confirmation Committee or any of the Post Confirmation Committee members' professionals or representatives by this Agreement or applicable law or otherwise, except for actions or omissions to act that are due to gross negligence, willful misconduct or fraud after the date hereof. The FI Liquidating Trust shall indemnify, defend and hold harmless the members of the Post Confirmation Committee and their professionals or representatives from and against any and all claims, causes of action, liabilities, obligations, losses, damages or reasonable expenses (including reasonable attorneys' fees and expenses) (other than and only to the extent due to such Post Confirmation Committee member's or such professionals' or representatives' gross negligence, willful misconduct or intentional fraud) to the fullest extent permitted by applicable law.

(h)     The duties, responsibilities and powers of the members of the Post Confirmation Committee to oversee the FI Liquidating Trust and/or the activities of the Trustee shall terminate on the date the FI Liquidating Trust is dissolved pursuant to Article VIII of this Agreement and section 7.9 of the Plan, provided that paragraphs (d) and (e) of this section 2.4 shall survive such termination, dissolution and entry.

## ARTICLE III
## TRUSTEE

3.1     <u>Appointment</u>. The Debtors hereby designate _____ to serve as the initial Trustee, and _____ hereby accepts such appointment and agrees to serve in such capacity, effective as of the date hereof.

3.2     <u>Generally</u>. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the FI Liquidating Trust and not otherwise. The Trustee shall have the authority to bind the FI Liquidating Trust, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually. The Trustee shall owe a fiduciary duty to the Beneficiaries.

3.3     <u>Rights and Powers of the Trustee</u>.

(a)     The Trustee shall have all the rights, powers and duties necessary to carry out its responsibilities under the Plan and this Agreement.

(b)     In exercising its rights and powers and carrying out its duties under the Plan and this Agreement, upon the approval of the Post Confirmation Committee, the Trustee shall have the authority to retain such professionals (including, without limitation, disbursing and transfer agents, legal counsel and/or other agents or advisors) on the Trustee's own behalf and on behalf of the Trust, as the Trustee deems appropriate and compensate such professionals from the Trust Assets on customary terms reasonably acceptable to the Trustee and the Post Confirmation Committee, without any requirement of approval by the Bankruptcy Court, subject to the terms of section 3.8 of this Agreement. Professionals so retained are not required to be "disinterested persons" (as such term is defined in the Bankruptcy Code) and may include, without limitation,

counsel or financial advisors to the Debtors, the Bankruptcy Committees, or any member of the Bankruptcy Committees.

3.4    <u>Scope of Trustee's Duties</u>. The duties of the Trustee shall include, but shall not be limited to:

(i)    considering, pursuing and to the extent the Trustee deems advisable, with the approval of the Post Confirmation Committee, settling, abandoning, selling or assigning any of the Litigation Claims, including, but not limited to, the Avoidance Actions.

(ii)    preparing and submitting a proposed budget of expenses and, to the extent feasible, anticipated recoveries of cash, for the nine months following the Effective Date. The Trustee shall present such additional budgets as are requested by the Post Confirmation Committee, which shall be subject to the approval of the Post Confirmation Committee.

(iii)    preparing and submitting to the Post Confirmation Committee such additional budgets as may be required by the Post Confirmation Committee.

(iv)    preparing and submitting to the Post Confirmation Committee a monthly report of Cash held in the FI Liquidating Trust.

(v)    operating within approved budgets as they may be modified with the consent of the Post Confirmation Committee.

(vi)    investing the Cash held in the Liquidating Trust in accordance with the terms of Section 5.3 of the Plan (collectively, the "<u>Permitted Investments</u>"); provided, however, that the scope of the Permitted Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation § 301.7701-4(d), maybe permitted to invest in, pursuant to the Treasury Regulations and Rev. Proc. 94-45, 1994-28 C.B. 124, or any modification in IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(vii)    calculating and paying all Distributions to be made under the Plan and other orders of the Bankruptcy Court to holders of Allowed Claims and Allowed Class 11 Interests.

(viii)    to the extent the Trustee deems advisable, with the approval of the Post Confirmation Committee, litigating and settling (with the approval of the Post Confirmation Committee) all objections to Claims and Class 11 Interests, except that the Trustee has the authority to settle without first consulting the Post Confirmation Committee (a) any Priority Claim if the allowed amount of such Claim is less than $15,000.00 and (b) any unsecured Claim if the allowed amount of such Claim is less than $250,000.00, unless otherwise instructed by the Post Confirmation Committee after a minimum three-fourths vote.

(ix)     taking all other actions necessary or appropriate to implement or consummate the Plan and/or this Agreement, including, without limitation, all actions necessary to fulfill the Debtors' obligations under the KERIT Plan.

(x)     reviewing and objecting to Claims and Class 11 Interests as appropriate, and resolving all Disputed Claims and Disputed Class 11 Interests.

(xi)     filing any and all tax and information returns with respect to the FI Liquidating Trust consistent with the treatment of the FI Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and paying taxes properly payable by the FI Liquidating Trust, if any, and making Distributions, including Tax Distributions, to Beneficiaries net of any such taxes.

(xii)     complying with the provisions of the Plan.

(xiii)     such other responsibilities as may be necessary and proper to carry out the provisions of this Agreement.

3.5     <u>Limitation of Trustee's Authority</u>.

(a)     Except as otherwise provided in the Plan and the Confirmation Order, the Trustee shall not and is not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom or take any action, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the FI Liquidating Trust or as permitted under this Agreement, and shall take such actions consistent with the orderly liquidation of the Trust Assets as is required by applicable law and consistent with the treatment of the FI Liquidating Trust as a liquidating trust under Treasury Regulation §301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, and such actions permitted herein.

(b)     The Trustee shall take specific actions upon the receipt of directions and instructions from the Post Confirmation Committee. The Trustee may rely and act upon the directions and instructions of the Post Confirmation Committee given in accordance with and pursuant to this Agreement, and the Trustee shall not be liable for any action taken or omitted to be taken by it in reliance upon such directions and instructions.

3.6     <u>Liability of Trustee</u>.

(a)     Except as otherwise specifically provided herein, the Trustee, the Trustee's employees and the Trustee's professionals or representatives shall not be held personally liable for any claim asserted against the FI Liquidating Trust, the Trustee, the Trustee's employees, the Post Confirmation Committee's members, any of the Trustee's professionals or representatives or any of the Post Confirmation Committee's professionals or representatives. Without limiting the generality of the foregoing, the Trustee, the Trustee's employees and any of the Trustee's professionals or representatives shall not be liable for any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith, except for actions or omissions to act that are due to gross negligence, willful misconduct or intentional fraud.

(b)     The Trustee shall not be liable for interest or obligated to produce income on any moneys received by the FI Liquidating Trust hereunder and held for Distribution or payment to the Beneficiaries, except as such interest or other income shall actually be received by the Trustee.

(c)     Nothing in this Section 3.6 shall be deemed to protect the Trustee from personal liability with respect to the assessment of fines or penalties against the Trustee which may be assessed by any government agency for failure to comply with applicable law.

3.7     Reliance by Trustee.

(a)     Except as otherwise provided in sections 2.4 and 3.6 hereof (i) the Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties; and (ii) the Trustee may consult with accounting advisors and other professionals to be selected by it, and the Trustee shall not be liable for any action taken or omitted to be taken by it in accordance with the advice thereof.

(b)     If the Trustee is unsure of the application of any provision of this Agreement or any other agreement relating to the transactions contemplated hereby, the Trustee may consult with the Post Confirmation Committee and request and rely upon the instructions of the Post Confirmation Committee; provided, however, that if the Trustee shall not have received instructions from the Post Confirmation Committee within fifteen (15) days after the date of such request, until instructed otherwise, the Trustee may, but shall be under no duty to, take or refrain from taking such action as it shall deem advisable in the best interests of the FI Liquidating Trust and the Beneficiaries.

3.8     Compensation of the Trustee.  Any commission or fees which may be fixed by applicable law for trustees or fiduciaries are hereby waived by the Trustee.  The Trustee shall receive compensation as  has been  approved by Bankruptcy Committees and disclosed to the Bankruptcy Court at the Confirmation Hearing.  Such compensation shall be paid from the Liquidating Trust Administrative Reserve.  In addition, the Trustee shall be entitled to reimbursement from the Liquidating Trust Administrative Reserve of all reasonable expenses and costs to administer the Liquidating Trust, distribute to the Beneficiaries the Available Cash, litigate any Litigation Claims or take other actions contemplated herein.  The Trustee shall provide to the Post Confirmation Committee a written report detailing all such expenditures on such schedule and  by such written documentation as the  Post Confirmation Committee may reasonably require.

3.9     Exculpation; Indemnification.  The Trustee, the Trustee's employees and the Trustee's professionals and representatives shall be and hereby are exculpated by all Persons from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Trustee by this Agreement or applicable law or otherwise, except for actions or omissions to act that are due to gross negligence, willful misconduct, intentional fraud or violations of applicable law of such persons after the date

hereof. The FI Liquidating Trust shall indemnify, defend and hold harmless the Trustee, the Trustee's employees and the Trustee's professionals or representatives from and against any and all claims, causes of action, liabilities, obligations, losses, damages or reasonable expenses (including reasonable attorneys' fees and expenses) (other than and only to the extent due to the Trustee's gross negligence, willful misconduct, fraud or violation of applicable law) to the fullest extent permitted by applicable law.

3.10    <u>Termination</u>. The duties, responsibilities and powers of the Trustee shall terminate on the date the FI Liquidating Trust is dissolved pursuant to Article IX of this Agreement, provided that sections 3.8 and 3.9 above shall survive such termination and dissolution.

## ARTICLE IV
## BOOKS, RECORDS AND DISTRIBUTIONS

4.1    <u>Books and Records</u>. The Trustee shall maintain books and records relating to the assets and income of the FI Liquidating Trust and the payment of expenses of, and liabilities of, the FI Liquidating Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof in accordance with Article VI hereof and to comply with applicable provisions of law. The Post Confirmation Committee shall have the right to inspect the books and records of the FI Liquidating Trust. Except as provided in section 6.1 hereof, nothing in this Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the FI Liquidating Trust, or as a condition for making any payment or Distribution out of the Trust Assets.

4.2    <u>Distributions</u>.

(a)    <u>General Operating Account; Other Accounts</u>. The Trustee shall maintain in a general operating account all Cash received from the Debtors or obtained at any time in the future with respect to the FI Liquidating Trust. The Trustee shall establish and maintain such other accounts as he deems necessary and appropriate to carry forth the terms of the Plan and the FI Liquidating Trust, including, without limitation, the Liquidating Trust Administrative Reserve and the Disputed Claims Reserves.

(b)    <u>Liquidating Trust Administrative Reserve</u>. The Trustee shall establish a separate interest-bearing account (the "<u>Liquidating Trust Administrative Reserve</u>") and deposit funds into such reserve, in an amount to be determined by the Trustee with the approval of the Post Confirmation Committee, as reasonably sufficient to pay the costs, fees, and expenses arising from the administration of the Plan and the FI Liquidating Trust. Furthermore, to the extent the Trustee determines that funding of the Liquidating Trust Administrative Reserve is insufficient, additional funds from the Trust Assets, including, but not limited to any Disputed Claims Reserve, to the extent necessary for such purposes, may be allocated by the Trustee to the Liquidating Trust Administrative Reserve, after notice and approval by to the Post Confirmation Committee. After all costs and expenses associated with the FI Liquidating Trust have been paid, and/or upon the reasonable determination of the Trustee, in consultation with the Post Confirmation Committee that the funds in the Liquidating Trust Administrative Reserve exceed the amounts necessary to pay the expenses for which such fund is established, the remaining

or excess funds, as applicable, in the Liquidating Trust Administrative Reserve shall be distributed, net of any Tax Distribution approved by the Trustee, Pro Rata to holders of Allowed Claims in accordance with this Agreement, the Plan, and the Confirmation Order.

(c)     <u>Distributions on Initial Distribution Date</u>. As soon as is practicable and prudent after the Effective Date, subject to the reservation of adequate funds in the Liquidating Trust Administrative Reserve and each Disputed Claims Reserve, the Trustee shall deliver proceeds of Collateral and/or Available Cash to holders of Claims entitled to Distributions under the Plan that were Allowed as of the Effective Date. All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.

(d)     <u>Distributions on a Subsequent Distribution Date</u>. Unless otherwise provided in the Plan, to the extent that proceeds of Collateral and/or Available Cash or other reasonably distributable assets are available subsequent to the Initial Distribution Date, the Trustee shall, on a Subsequent Distribution Date, which date shall be whenever the aggregate amount distributable to holders of Allowed Claims equals or exceeds $1,000,000 (but in no event shall such date be less than three months, or more than one year, after the next previous distribution date), distribute such proceeds of Collateral and/or Available Cash or other reasonably distributable assets to the holders of Claims entitled to Distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such proceeds of Collateral and/or Available Cash had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Subsequent Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Subsequent Distribution Date had been disallowed on the Initial Distribution Date; <u>provided</u>, <u>however</u>, that the Liquidating Trustee shall not be required to make any Distribution on a Subsequent Distribution Date on account of an Allowed Claim in an amount less than $100, except in the case of a Distribution on the Final Distribution Date in accordance with Section 7.6 of the Plan; <u>provided</u> <u>further</u>, <u>however</u>, that in no event shall the foregoing impair the right of the Trustee to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the FI Liquidating Trust. All payments shall be made in accordance with the priorities established by the Plan and in accordance with the terms and conditions of the Plan and the Confirmation Order.  The foregoing notwithstanding, at least annually, the Liquidating Trustee shall distribute to the Beneficiaries an amount equal to (A-B), where A is the sum of the net income from investments earned by the Liquidating Trust and the net proceeds from the sale of assets and B is such amount as the Liquidating Trustee deems reasonably necessary to maintain the value of the Liquidating Trust Assets and to satisfy the expenses and contingent liabilities of the Liquidating Trust (including Disputed Claims).  In addition to distributions with respect to Allowed Claims, Beneficiaries shall be entitled to receive Tax Distributions with respect to the net taxable income of the Liquidating Trust allocated to them for federal

income tax purposes in such amount as the Liquidating Trustee, in his sole discretion, deems reasonable and appropriate.

(e)    <u>Distributions on the Final Distribution Date</u>. Unless otherwise provided in the Plan, after the liquidation of any and all Trust Assets to the fullest extent reasonably possible, the Trustee shall establish the Final Distribution Date, upon which the Trustee shall distribute such Cash or other assets remaining after satisfaction of all expenses and other obligations of the FI Liquidating Trust to the holders of Claims entitled to distributions under the Plan that were Allowed as of the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in amounts necessary to cause such holders to have received aggregate distributions of Cash in respect of such Allowed Claims on the Initial Distribution Date if (a) such Cash or other assets had been available for distribution on the Initial Distribution Date, (b) such Allowed Claims had been Allowed on the Initial Distribution Date in the amounts in which they are Allowed on the Final Distribution Date, and (c) Claims or portions thereof that have become disallowed subsequent to the Initial Distribution Date and on or before the Final Distribution Date had been disallowed on the Initial Distribution Date, taking into account all previous distributions; <u>provided</u>, <u>however</u>, that in no event shall the foregoing impair the right of the Plan Administrator to use funds in any Disputed Claims Reserve to satisfy the costs of administering the Plan and the FI Liquidating Trust or to make Tax Distributions which the Trustee deems reasonable and appropriate. Within 20 Business Days prior to making the final distribution, the Trustee shall notify the Post Confirmation Committee that the Trustee deems all assets to be liquidated and that the Trustee intends to establish the Final Distribution Date.

(f)    <u>Setoffs</u>. The Trustee may, but shall not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, claims, right and causes of action of any nature whatsoever that the Trustee, as successor to and assignee from the Allowed Debtors, may have or have had against the holder of such Allowed Claim or any prior holder of such Claim if the Allowed Claim has been transferred; <u>provided</u>, <u>however</u>, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release current or former by the Trustee of any such claim that the Debtors or the Trustee may have against such current or former holder.

(g)    <u>Disputed Payment</u>. If any dispute arises as to the identity of a holder of an Allowed Claim or Allowed Class 11 Interest who is to receive any Distribution, the Trustee may, in lieu of making such Distribution to such person, make such Distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute or otherwise withhold payment until the Bankruptcy Court has determined the identity of the holder upon request by the Trustee.

(h)    <u>No Distribution in Excess of Allowed Amount of Claim</u>. Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of sum of the Allowed amount of such Claim and

the Deemed Tax Amount for all taxable periods, unless such holder is entitled to interest at the Plan Rate pursuant to the Plan.

## ARTICLE V
## SUCCESSOR TRUSTEE

5.1    <u>Resignation</u>. The Trustee may resign by giving not less than sixty (60) days prior written notice thereof to the Post Confirmation Committee.

5.2    <u>Removal</u>. The Trustee may be removed upon a minimum three-fourths vote of the Post Confirmation Committee, with or without cause. If the Trustee is removed for cause, the Post Confirmation Committee or successor Trustee shall have the right to seek disgorgement from the Trustee of all or a portion of the fee paid to such removed Trustee. In the event of the removal of the Trustee without cause, the Trustee shall be entitled to immediate payment of all compensation earned by the Trustee through and including the date of such removal.

5.3    <u>Acceptance of Appointment by Successor Trustee</u>. Any successor Trustee shall be appointed after a minimum three-fourths vote of the Post Confirmation Committee, by an acknowledged written instrument delivered to the successor Trustee. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the FI Liquidating Trust records. Thereupon, such successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the FI Liquidating Trust with like effect as if originally named herein; <u>provided</u>, <u>however</u>, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the FI Liquidating Trust all the estates, properties, rights, powers and trusts of such predecessor Trustee.

## ARTICLE VI
## REPORTING

6.1    <u>Reports</u>

(a)    In addition to the reporting otherwise required by this Agreement, as soon as practicable upon termination of the FI Liquidating Trust, the Trustee shall submit to the Post Confirmation Committee a written report, including: (i) audited financial statements of the FI Liquidating Trust for the period commencing on the date hereof and ending on the Termination Date and the receipts and disbursements of the Trustee for such period; and (ii) a description of any action taken by the Trustee in the performance of its duties which materially affects the FI Liquidating Trust and of which notice has not previously been given to the Post Confirmation Committee. All such reports shall be in form and substance reasonably acceptable to the Post Confirmation Committee.

(b)    Upon the occurrence of any change, circumstance or effect that could reasonably be determined to be materially adverse to the FI Liquidating Trust, the Trustee shall promptly notify the Post Confirmation Committee in writing of such occurrence. The Trustee may, but shall not be required to, consult with, and rely upon the advice of, the Post Confirmation Committee in making a determination that such a change,

14

circumstance or effect has occurred, and the Trustee shall not be liable for any determination made by it in reliance upon the advice thereof.

6.2    United States Federal Income Tax.

(a)    Grantor Trust Status. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall make timely filings of annual federal income tax returns attached to Form 1041 reflecting the items of income, gain or loss, deductions or credits of the FI Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a). The Trustee shall value the Trust Assets on a consistent basis and such valuations shall be used for all federal income tax purposes by the Trustee and the Beneficiaries. Consistent with its status as a grantor trust, the FI Liquidating Trust shall not be, and the Beneficiaries shall be, responsible for the payment of their allocable portion of any federal income tax liability related to the operation of the Liquidating Trust.

(b)    Attributions of FI Liquidating Trust Taxable Income. Subject to the provisions of section 6.2(a) hereof, attribution of taxable income or credits of the FI Liquidating Trust shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately prior to such deemed distribution, the FI Liquidating Trust had distributed all of its other assets (valued for this purpose at their "tax book value") to the Beneficiaries, taking into account all prior and concurrent Distributions from the FI Liquidating Trust. Similarly, taxable losses or deductions of the FI Liquidating Trust shall be attributed by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Trust Assets. The tax book value of the Trust Assets for this purpose shall equal their fair market value on the date hereof or, if later, the date such assets were acquired by the FI Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRS, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    Compliance. The FI Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority with respect to Distributions.

6.3    Other. The Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the FI Liquidating Trust that, upon the advice of counsel, are identified to the Trustee as required by any governmental authority.

# ARTICLE VII
# BENEFICIARIES' INTERESTS

7.1     <u>Beneficial Interests</u>. The interests of the Beneficiaries in the FI Liquidating Trust shall be uncertificated and shall be reflected only on the records of the FI Liquidating Trust maintained by the Trustee. The proportionate interest of each Beneficiary in the FI Liquidating Trust shall be in the priority and amount of each Beneficiary's Allowed Claim or Allowed Class 11 Interest, and the Trustee shall be fully protected and incur no liability to any Beneficiary or any other Person in making any Distribution in accordance with such proportionate interests.

7.2     <u>Transfer</u>. The interests of the Beneficiaries in the FI Liquidating Trust are not negotiable and shall be transferable after written notice to the Trustee only: (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficiary), or (b) by operation of law. The Trustee shall not be required to record any transfer in favor of any transferee who, in the sole discretion of the Trustee, is or might be construed to be ambiguous, or create uncertainty as to the holder of the interest in the FI Liquidating Trust, and in so doing the Trustee shall be fully protected and incur no liability to any Person pursuant to section 3.6 hereof. Until a transfer is in fact recorded on the books and records maintained by the Trustee for the purpose of identifying the Beneficiaries, the Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make Distributions and send communications to the Beneficiaries, as though it has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other Person pursuant to section 3.6 hereof.

# ARTICLE VIII
# TERMINATION OF FI LIQUIDATING TRUST

8.1     <u>Termination of FI Liquidating Trust</u>. The Trustee shall seek authority from the Bankruptcy Court to dissolve the FI Liquidating Trust as part of the process of closing the Bankruptcy Case, consistent with section 5.9 of the Plan, when each of the following conditions are satisfied (such date being referred to herein as the "<u>Termination Date</u>"):

(a)     all Disputed Claims and Disputed Class 11 Interests have become Allowed Claims and Allowed Class 11 Interests or have been disallowed by Final Order,

(b)     all Litigation Claims, including any Avoidance Actions, have been resolved;

(c)     all other Trust Assets have been liquidated;

(d)     all Cash from the liquidation of the Trust Assets has been distributed in accordance with the Plan and this Agreement; and

(e)     if any Cash remains after the payment in full (including post-petition interest at the Plan Rate) of the Allowed Claims of all Beneficiaries and any other distributions in accordance with the Plan and this Agreement, such remaining Cash has been transferred to Reorganized Industries.

Notwithstanding the foregoing, the FI Liquidating Trust shall not remain in being for more than four (4) years, unless such term is extended pursuant to section 8.2 of this Agreement.

8.2    <u>Extension of Term of FI Liquidating Trust</u>. Any extension of the term of the FI Liquidating Trust set forth in section 8.1 hereof must be (i) for a finite period of time, (ii) preceded by the Trustee's receipt of a favorable ruling from the IRS that the FI Liquidating Trust's continued existence beyond such period would not adversely affect the status of the FI Liquidating Trust as a liquidating trust within the meaning of § 301.7701-4(d) of the Treasury Regulations for U.S. federal income tax purposes, and (iii) approved by the Bankruptcy Court within six (6) months of the beginning of the extended term.

**ARTICLE IX**
**AMENDMENT AND WAIVER**

Subject to approval of the Bankruptcy Court, any provision of this Agreement may be amended or waived with the approval of the Trustee and a three-fourths vote of the Post Confirmation Committee; provided further that no change shall be made to this Agreement that would (i) adversely affect the Distributions otherwise required to be made to any Beneficiary, (ii) adversely affect the U.S. federal income tax status of the FI Liquidating Trust as a "grantor trust" (in accordance with section 6.2 hereof), if applicable, or (iii) unless agreed to in writing by the affected Trustee, adversely affect the rights of the Trustee. Technical amendments to this Agreement may be made as necessary to cure any ambiguity, defect or inconsistency in this Agreement or enable the FI Liquidating Trust to effectuate the terms of this Agreement, with the consent of the Trustee and a three-fourths vote of the Post Confirmation Committee, provided that such amendment does not adversely affect the rights of the Beneficiaries.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

10.1    <u>Cooperation</u>. Simultaneously with or immediately prior to the effectiveness of this Agreement, the Debtors shall provide the Trustee with copies of such of its books and records and such further information as the Bankruptcy Committees have requested for the purpose of performing its duties and exercising its powers hereunder.

10.2    <u>Laws as to Construction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law which would require the application of the law of another jurisdiction.

10.3    <u>Actions Taken on Other Than Business Day</u>. If any payment or act is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

10.4    <u>Severability</u>. If any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of

such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

10.5    Notices. All notices and other communications provided for or permitted hereunder shall be made in writing by hand-delivery, certified or registered first-class mail, next-day air courier or telecopier to the following addresses:

If to the Trustee:

**[Insert Trustee contact info]**
Attn:_____
Direct:
Facsimile:
E-Mail:

If to the Post Confirmation Committee:

**[Insert #1 contact info]**
Attention:
Direct:
Facsimile:
E-Mail:

**[Insert #2 contact info]**
Attention:
Direct:
Facsimile:
E-Mail:

**[Insert #3 contact Info]**
Attention:
Direct:
Facsimile:
E-Mail:

**[Insert #4 contact Info]**
Attention:
Direct:
Facsimile:
E-Mail:

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; one (1) Business Day after being timely delivered to a next-day air courier; and when receipt is acknowledged by the addressee, if telecopied.

10.6    <u>Headings</u>. The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

10.7    <u>Conflict with Plan</u>. In the event of a conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

10.8    <u>Retention of Jurisdiction</u>. After the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over (i) the FI Liquidating Trust, including the performance of the duties of the Trustee and the Post Confirmation Committee in overseeing the FI Liquidating Trust and (ii) the interpretation of this Agreement and all issues arising under or related to this Agreement.

10.9    <u>Third Party Beneficiaries</u>. Except for the Beneficiaries, nothing in this Agreement is intended to confer upon any Person that is not a party hereto any rights or remedies hereunder.

10.10    <u>Successors and Assigns</u>. The terms of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

10.11    <u>Counterparts</u>. This Agreement may be signed by the parties hereto in counterparts, which, when taken together, shall constitute one and the same document.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date of the first above written.

**FARMLAND INDUSTRIES, INC.**
**FARMLAND FOODS, INC.**
**SFA, INC.**
**FARMLAND TRANSPORTATION, INC.**
**FARMLAND PIPE LINE COMPANY**

By: _____
Name:   Robert B. Terry, Authorized
        Signatory


By: _____
                  , as Trustee

## PLAN EXHIBIT B

Assumed Executory Contracts and Unexpired Leases[2]

| Name | Disposition | Cure Amount |
|---|---|---|
| Operating Agreement of Agrifarm Industries, LLC, dated as of March 19, 1998 | Assumed by Reorganized Industries | $0.00 |
| Agreement among Wilbur-Ellis Company, Farmland Industries, Inc., Wilfarm, L.L.C., Cenex Harvest States Cooperatives and United Country Brands LLC, dated March 2000 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of Agriliance LLC, dated as of January 4, 2000 | Assumed by Reorganized Industries | $0.00 |
| Management Services Agreement with Agriliance LLC, dated as of January 4, 2000 | Assumed by Reorganized Industries | $0.00 |
| Put Option Agreements with Agriliance LLC, dated January 2000 | Assumed by Reorganized Industries | $0.00 |
| Seed Agreement with Agriliance LLC, dated January 2000 | Assumed by Reorganized Industries | $0.00 |
| Bylaws adopted by Alliance Farms Cooperative Association, dated May 3, 1994 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of Dakota Energy Retail Ventures, L.L.C., dated as of May 2, 1997 | Assumed by Reorganized Industries | $0.00 |
| Limited Liability Company Agreement of Farmland-Harvest States, LLC, dated as of September 10, 1996 | Assumed by Reorganized Industries | $0.00 |
| Limited Liability Company Agreement of Farmland National Beef aLF, LLC, dated as of July 16, 2001 | Assumed by Reorganized Industries | $0.00 |

---

[2]    The Debtors reserve their right to add any unexpired lease or executory contract to, or delete any unexpired lease of executory contract from, this Plan Exhibit in accordance with Section 6.3 of the Plan.

| | | |
|---|---|---|
| Operating Agreement of Husky Hogs, L.L.C., dated as of January 26, 1999 | Assumed by Reorganized Industries | $0.00 |
| Limited Liability Company Agreement of Land O'Lakes Farmland Feed LLC, dated as of September 1, 2000 | Assumed by Reorganized Industries | $0.00 |
| Fourth Amendment Modifying Economic Interest of Land O'Lakes Farmland Feed LLC, dated as of October 12, 2001 | Assumed by Reorganized Industries | $0.00 |
| Third Amended and Restated Operating Agreement of Resource21, LLC, dated October 1, 1997 | Assumed by Reorganized Industries | $0.00 |
| Bylaws of TruAI, Inc., dated as of March 8, 1995 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of United Bakeries International, Inc., dated as of January 31, 2001 | Assumed by Reorganized Industries | $0.00 |
| Joint Venture Agreement among Farmland Industries, Inc., Cenex Harvest States Cooperatives, United Country Brands LLC and Land O'Lakes, Inc., effective January 1, 2000 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of United Country Brands LLC, effective January 4, 2000 | Assumed by Reorganized Industries | $0.00 |
| Operating Agreement of United Processors, L.L.C. | Assumed by Reorganized Industries | $0.00 |
| Third Amended and Restated Operating Agreement of Westland Terminal, L.L.C., dated as of January 15, 1997 | Assumed by Reorganized Industries | $0.00 |

## **PLAN EXHIBIT C**

### Industries Retained Assets[3/]

1.      Interest in Agrifarm Industries, LLC

2.      Interest in Agriliance LLC

3.      Interest in Alliance Farms Cooperative Association

4.      Interest in Dakota Energy Retail Ventures, L.L.C.

5.      Interest in Farmland-Harvest States, LLC

6.      Interest in Farmland National Beef aLF, LLC

7.      Interest in Husky Hogs, L.L.C.

8.      Interest in Land O'Lakes Farmland Feed LLC

9.      Interest in Resource21, LLC

10.     Interest in TruAI, Inc.

11.     Interest in United Bakeries International, Inc.

12.     Interest in United Country Brands LLC

13.     Interest in United Processors, L.L.C.

14.     Interest in Westland Terminal, L.L.C.

15.     Interest in Double Circle Farm Supply Company

16.     Interest in Farmers Petroleum, Inc.

---

[3/]     The Debtors reserve their right, at any time prior to the Confirmation Date, upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit C to delete any assets therefrom or add any assets thereto and to provide notice of any such amendments to the Bankruptcy Court.

## **PLAN EXHIBIT D**

Transferred Assets[4/]

| PROPERTY DESCRIPTION | OWNER OF PROPERTY | REGULATORY AGENCIES INVOLVED | PROPOSED FUNDING FOR TRUST |
|---|---|---|---|
| Joplin, MO Gypsum Stack Property | Farmland Industries, Inc. | Missouri Department of Natural Resources | $5,292,119 |
| South Hutchinson, KS Grain Elevator | Farmland Industries, Inc. | Kansas Department of Health and Environment | $916,382 |
| Fertilizer Storage Tank adjacent to former Enid, OK Feed Mill facility | Farmland Industries, Inc. | Oklahoma Department of Environmental Quality | $91,594 |
| Lawrence, KS nitrogen plant | Farmland Industries, Inc. | Kansas Department of Health and Environment; U.S. EPA | $4,894,210 |
| Scottsbluff, NE former refinery site | Farmland Industries, Inc. | Nebraska Department of Environmental Quality | $185,855 |
| Doniphan, NE UAN Pit Release | Farmland Industries, Inc. | Nebraska Department of Environmental Quality | $536,305 |
| North Kansas City, MO Manufacturing Complex | Farmland Industries, Inc. | Missouri Department of Natural Resources | $217,689 |
| Augusta, AK Farm Supply Operation | SFA, Inc. | Arkansas Department of Environmental Quality | $37,171 |
| Topeka, KS Grain Elevator | Farmland Industries, Inc. | Kansas Department of Health and Environment | $425,912 |
| Wichita, KS Grain Elevator | Farmland Industries, Inc. | Kansas Department of Health and Environment | $358,644 |
| Wichita, KS North Industrial Corridor | Farmland Industries, Inc. | Kansas Department of Health and Environment | $97,087 |

---

[4/] The Debtors reserve their right, at any time prior to the Effective Date, upon prior consent of the Bankruptcy Committees, to amend Plan Exhibit D to delete any assets therefrom, add any assets thereto or modify any other information contained thereon and to provide notice of any such amendments to the Bankruptcy Court.

## **PLAN EXHIBIT E**

Executory Contracts and Unexpired Leases related to Coffeyville Assets[5/]

---

[5/]     The Debtors reserve their right, at any time prior to the Effective Date, to amend Plan Exhibit E to delete an unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto and to provide notice of any such deletion or addition to all affected parties.

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | MATHWORKS | MATLAB PLS TOOL BOX | Software | | Coffeyville |
| | MICROSOFT CORP | SERVER SOFTWARE | Software | | Coffeyville |
| | MICROSOFT CORP | SERVER CLIENT | Software | | Coffeyville |
| | MICROSOFT CORP | MAIL SERVER | Software | | Coffeyville |
| | MICROSOFT CORP | MAIL CLIENT | Software | | Coffeyville |
| | MICROSOFT CORP | ISA 2000 SERVER | Software | | Coffeyville |
| | MICROSOFT CORP | OFFICE PRO 2000 | Software | | Coffeyville |
| | MICROSOFT CORP | DESKTOP OP. SYSTEM | Software | | Coffeyville |
| | MICROSOFT CORP | VISIO 5.O | Software | | Coffeyville |
| | MICROSOFT CORP | VISIO 2000 | Software | | Coffeyville |
| | MICROSOFT CORP | WIN NT 4.0 SVR | Software | | Coffeyville |
| | ADOBE | ACROBAT 5.0 | Software | | Coffeyville |
| | ALLEN BRADLEY | RSLOGIC 500 | Software | | Coffeyville |
| | ALLEN BRADLEY | AI LADDER | Software | | Coffeyville |
| | Aspen Technology Inc | ADVISOR 7.0 | Software | | Coffeyville |
| | ATR | PRISM | Software | | Coffeyville |
| | Autodesk | AUTOCAD | Software | | Coffeyville |
| | Autodesk | AUTOCAD LT | Software | | Coffeyville |
| | BR&E | Prosim\Tsweet | Software | | Coffeyville |
| | BST | BAPPT | Software | | Coffeyville |
| | COMPUTER ASSOCIATES | ARCSERVE | Software | | Coffeyville |
| | COX BUSINESS SERVICES | COX | Software | | Coffeyville |
| | DTN CORP | FARMDATA | Software | | Coffeyville |
| | ENTEK | ENLINE66 | Software | | Coffeyville |
| | ENTEK | ODYSSEY | Software | | Coffeyville |
| | Epcon International | I : PROCESS | Software | | Coffeyville |
| | ETI | FEMS | Software | | Coffeyville |
| | Flir Systems | Thermacam 2000 | Software | | Coffeyville |
| | GE | CIMPLICITY | Software | | Gathering System |
| | Haverly Systems Inc | GRTMPS | Software | | Coffeyville |
| | Haverly Systems Inc | Template | Software | | Coffeyville |
| | Haverly Systems Inc | iCDM/Flash Assay | Software | | Coffeyville |
| | Haverly Systems Inc | OMNI PC/ASM | Software | | Coffeyville |
| | Haverly Systems Inc | CAL-II | Software | | Coffeyville |
| | HONEYWELL INC | LIMS | Software | | Coffeyville |
| | HONEYWELL INC | SESP | Software | $8,534.72 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | HONEYWELL INC | UNLIMITED PARTS | Software | | Coffeyville |
| | HONEYWELL INC | HI-SPEC | Software | | Coffeyville |
| | HONEYWELL INC | SCAN 3000 | Software | | Coffeyville |
| | INDUSTRIAL AUTOMATION TECHNOLOGY | PEBUILD | Software | | Coffeyville |
| | INDUSTRIAL AUTOMATION TECHNOLOGY | DSMAP | Software | | Coffeyville |
| | ICARUS CORPORATION | QUESTIMATE | Software | | Coffeyville |
| | INFOGRAPHICS | APOGEE 8.11.866 | Software | | Coffeyville |
| | INVENSYS | WONDERWARE | Software | | Gathering System |
| | Isa Press | CLIP SYMBOLS | Software | | Coffeyville |
| | KBC (Profimatics, Inc) | FCC-SIM | Software | | Coffeyville |
| | KENONIC CONTROLS | FLOWELL | Software | | Coffeyville |
| | Kodak Polychrome Graphics LLC | PICTURE EASY | Software | | Coffeyville |
| | KRAUTKRAMER | ULTRAPIPE | Software | | Coffeyville |
| | Kronos Inc | KRONOS | Software | | Coffeyville |
| | MACROSOLVE, INC | | Software | | |
| | MACROSOLVE INC | RFBARCODE | Software | | Coffeyville |
| | MATHWORKS | MATLAB | Software | | Coffeyville |
| | MICROSOFT CORP | NT4.0 CLIENTS | Software | | Coffeyville |
| | MICROSOFT CORP | NT 2000 WKST | Software | | Coffeyville |
| | Mro Software (Formerly Psdi) | MAXIMO | Software | | Coffeyville |
| | Oracle Corp | ORACLE (Enterprise) | Software | | Coffeyville |
| | Oracle Corp | ORACLE (Workgroup) | Software | | Coffeyville |
| | Pdma Corp | MCE MOTOR TESTER | Software | | Coffeyville |
| | Petrometrix Inc | PETRO | Software | | Coffeyville |
| | Primavera Systems Inc | PRIMAVERA-P3 | Software | | Coffeyville |
| | Primavera Systems Inc | PRIMAVERA-P1.3 | Software | | Coffeyville |
| | RICHARDSON ENG | RICHARDSON | Software | | Coffeyville |
| | SYMANTEC CORPORATION | Norton Anti Virus | Software | | Coffeyville |
| | SYMANTEC CORPORATION | Norton Ghost | Software | | Coffeyville |
| | SYMANTEC CORPORATION | PROCOM + | Software | | Coffeyville |
| | Toptech Systems, Inc | TMS5 | Software | | Coffeyville |
| | Toptech Systems, Inc | PHINDOWS | Software | | Coffeyville |
| | Toptech Systems, Inc | T-TALKW | Software | | Coffeyville |
| | Toptech Systems, Inc | FAIRCOM | Software | | Coffeyville |
| | TREMETRICS | OHM | Software | | Coffeyville |
| | TRINITY | BREEZE HAZ | Software | | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | TRISYS | TAPITT 2000 | Software | | Coffeyville |
| | Uop | WKCOMPLY | Software | | Coffeyville |
| | Uop | TRIOS | Software | | Coffeyville |
| | WINESTIMATOR INC | WINEST PRO+ | Software | | Coffeyville |
| | Zytax | ZYTAX | Software | | Coffeyville |
| | HONEYWELL INC | HONEYWELL | Software | | |
| | Bourque Data Systems Inc | RAILTRAC | Software | | |
| | Mid-America Building Maintenance, Inc. | Janitorial Services Agreement | Service Agreement | $0.00 | Coffeyville |
| | American Petroleum Institute ("API') | Petroleum and Allied Industry Agreement | | | Coffeyville |
| | Ammonia Casale S.A. | License Agreement | | | |
| 1022 | ARCO | Lease between ARCO (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1023 | ARCO | Lease between ARCO (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | IIYS, Inc. (now AspenTech) | IIYS Advisor License and Maintenance Agreement | | | Coffeyville |
| | Atchison Topeka and Santa Fe Railroad Company | Contract for Industry Track | Track Agreement | $0.00 | Coffeyville |
| | Atchison Topeka and Santa Fe Railroad Company | License for parking motor vehicles on right of way | License for Parking Motor Vehicles on Right of Way | $0.00 | Coffeyville |
| | Atchison Topeka and Santa Fe Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Atchison, Topeka and Santa Fe Railway Company | Pipe Line License | Lease Agreement | $0.00 | Gathering System |
| | Atchison, Topeka and Santa Fe Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Atchison, Topeka and Santa Fe Railway Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Atchison, Topeka and Santa Fe Railway Company | Power Line License | License Agreement | $0.00 | Gathering System |
| | Atchison, Topeka and Santa Fe Railway Company (apparently assigned to South Kansas and Oklahoma Railroad.) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | The Atchison Topeka and Santa Fe Railroad Company | Agreement for Private or Farm Crossing | License Agreement | $0.00 | Coffeyville |
| | The Atchison Topeka and Santa Fe Railroad Company | Shackle Rod Line License | License Agreement | $0.00 | Coffeyville |
| | Williams Pipe Line Company | Joint Tariff Agreement | Joint Tariff Agreement | $0.00 | Coffeyville |
| 0810 | Williams Pipe Line Company | Petroleum Products Transportation Agreement | Transport Agreement | $0.00 | Coffeyville |
| | AX&P, Inc. | Crude Oil Purchase Agreement | Agreement | $0.00 | Gathering System |
| | Baker Tanks, Inc. | Polymer Tank Rental Agreement | | | Coffeyville |
| 813 | Banc One | Lease Agreement for 98 UAN tank cars. | | $0      0 | |
| 0257 | Banks Construction Company, Inc. | Coke Handling Agreement | | $237,407.00 | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | Black Hills Energy Resources, Inc. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| | BlackJack Oil Company | Crude Oil Purchase Contract | Purchase Contract | $0.00 | Gathering System |
| | BOC Gases | Rental Agreement of Nitrogen Tank and Vaporizer at Alky | Lease Agreement | $1,300.00 | Coffeyville |
| | BOC Gases | Rental Agreement of Nitrogen Tank and Vaporizer at Area 1 | Lease Agreement | $1,300.00 | Coffeyville |
| | BOC Gases | Rental Agreement of Oxygen Tank and Vaporizer at Sulfur unit | Lease Agreement | $1,300.00 | Coffeyville |
| | BP America Production Co. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| 1028 | Brothers Dairy Incorporated | Surface Lease between Brothers Dairy Incorporated (Lessor) & Farmland Industries, Inc. (Lessee) | Surface Lease | $0.00 | Gathering System |
| | Bruker Analytical X-Ray Systems, Inc. | Service Agreement | | | Coffeyville |
| | Bryan Research and Engineering, Inc. | Software Licensing Agreement | | | Coffeyville |
| | GE Capital Modular Space | CEMS Trailer Lease #822356 | Lease Agreement | $634.00 | Coffeyville |
| 0773 | GE Capital Modular Space | Lease of a 14x70 office trailer | Equipment Lease | $1,130.00 | Coffeyville |
| N31285 | Carolyn Tolson [Lease assignment from Robert & Harriet Labodie] | Lease of Property located in Osage County, OK | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0757 | Cenex Harvest States Cooperatives | Terminal Throughput Agreement | Purchase Agreement | $0.00 | Phillipsburg |
| 0758 | Cenex Harvest States Cooperatives | Refinery Supply Agreement for purchase of refined energy products manufactured at Coffeyville refinery | Purchase Agreement | $0.00 | Coffeyville |
| | Central and South West Services, Inc. and the City of Coffeyville, KS | Payment Security Agreement | | | |
| | Chicago, Burlington & Quincy Railroad Company | Contract for Pipe Line | Lease Agreement | $0.00 | Gathering System |
| 0762 | Citation Oil and Gas Corp. | Crude Oil Purchase Agreement | Purchase Agreement | $0.00 | Gathering System |
| 0761 | Citation Oil and Gas Corp. | Crude Oil Purchase Agreement | Purchase Agreements | $0.00 | Gathering System |
| 1493 | City of Coffeyville, Kansas | Petroleum Coke Gasification to Nitrogen Fertilizer Electric Service Agreement (requires modification) | | $0.00 | |
| | The Coleman Company, Inc. | Agreement | Agreement | $0.00 | Coffeyville |
| N31393 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31265 | Freedom Group Inc. | Membership Agreement | Agreement | $0.00 | Coffeyville |
| | Sinclair Pipe Line Company (assigned from Missouri-Kansas-Texas Railroad Company) | Pipe Line License | Lease Agreement | $0.00 | Gathering System |
| 0793 | Sinclair Oil Corporation | Asphalt Services Agreement for the terminaling of Roll Saturate and Roofing Flux ("Products") | Service Agreement | $0.00 | Phillipsburg |
| 0796 | Terra Resources, Inc. | Agreement for Preferential Right to Purchase Crude Oil | Purchase Agreement | $0.00 | Gathering System |
| N31255 | Mobil Oil Corporation | Sludge Coking Process License Agreement | License Agreement | $42,590.77 | Coffeyville |
| N31258 | Exxon Research and Engineering Company | Flexicracking Process License and Engineering Agreement | License Agreement | $26,996.00 | Coffeyville |
| N31261 | W.R. Grace & Co. – Conn. | Desox Injection Equipment Lease | Equipment Lease | $3,050.00 | Coffeyville |
| | Oxbow Carbon and Minerals LLC | Petroleum Coke Agreement | | $0.00 | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | Black Hills Energy Resources, Inc. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| 0789 | ONEOK NGL Marketing, L.P. | Agreement | Lease Agreement | $0.00 | Coffeyville |
| | Corroon & Black Company of New York | Agreement | Agreement | $0.00 | Coffeyville |
| | Project Software and Development, Inc. (now MRO) | Software License Agreement | | | Coffeyville |
| 1081 | Sun Pipe Line Company | Lease between Sun Pipe Line Company  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31256 | Union Carbide Corporation | Total Isomerization Process License Agreement | License Agreement | $0.00 | Coffeyville |
| | Corroon & Black Company of New York | Agreement | Agreement | $0.00 | Coffeyville |
| 0800 | TexPar Energy, Inc. | Purchase/Sale Agreement for CBO/Slurry | Purchase Agreement | $0.00 | Coffeyville |
| 1041 | Estate Land Company | Lease between Estate Land Company  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0808 | Williams Pipe Line Company | Crude Oil Pipeline Agreement (16" Coffeyville line) | Purchase Agreement | $0.00 | Coffeyville |
| 1072 | Octagon Investment   Company (Originally with John M. Kane Land Trust) | Lease between Octagon Investment   Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1493 | City of Coffeyville, Kansas | Petroleum Coke Gasification to Nitrogen Fertilizer Electric Service Agreement (requires modification) | | $0.00 | |
| | Prime Energy | Air Compressor Rental Agreement | | | Coffeyville |
| 1038 | Don W. Steeples and David J. Steeples | Lease between Don W. Steeples and David J. Steeples  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31280 | Donald Adams,Jim Childress, Lonnie Adams, Mary Cochran, Melvin Cochran [Original lease was between Samuel Dix and Prairie Oil & Gas.] | Lease of Property located in Creek County, OK | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Quest Resource Corporation | Base Contract For Sale and Purchase of Natural Gas | Natural Gas Purchase Agreement | | Coffeyville |
| 1040 | Elton Bowman and Una Mae Bowman | Lease between Elton Bowman and Una Mae Bowman  (Lessor) & Farmland Industries, Inc. (Lessee) | Surface Lease | $0.00 | Gathering System |
| | Energy Support Providers, LLC | Natural Gas Agency Agreement | | | Coffeyville |
| | Engineered Recovery Systems, Inc. | Service Agreement | | | Coffeyville |
| | Entek IRD Corporation | ESAFE Agreement (Includes Enline 66 and Odyssey) | | | Coffeyville |
| 0768 | EOTT Energy Operating Limited Party | Crude Oil Exchange Contract | Exchange Agreement | $0.00 | Gathering System |
| 0769 | EOTT Energy Operating Limited Party | Crude Oil Exchange Contract | Exchange Agreement | $0.00 | Gathering System |
| 1041 | Estate Land Company | Lease between Estate Land Company  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31258 | Exxon Research and Engineering Company | Flexicracking Process License and Engineering Agreement | License Agreement | $26,996.00 | Coffeyville |
| 819 | Farm Credit | Lease Agreement for 100 UAN tank cars. | | $114,206.00 | |
| N31248 | Phillips Petroleum Company | Metals Passivation License Agreement | License Agreement | $0.00 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| N31260 | Phillips Petroleum Company | Reforming Technology License Agreement | License Agreement | $0.00 | Coffeyville |
| N31265 | Freedom Group Inc. | Membership Agreement | Agreement | $0.00 | Coffeyville |
| | GE Capital Modular Space | CEMS Trailer Lease #822356 | Lease Agreement | $634.00 | Coffeyville |
| 0773 | GE Capital Modular Space | Lease of a 14x70 office trailer | Equipment Lease | $1,130.00 | Coffeyville |
| 0774 | GE Capital Modular Space | Lease for double wide office | Equipment Lease | $2,046.00 | Coffeyville |
| 842 | GE Capital Railcar Services | Railcar lease | Lease Agreement for 18 tank cars | $18,900.00 | |
| N31435 | GATX | Lease Agreement for 150 Ammonia tank cars | | $428,794.00 | |
| 1044 | Gratia Kemp | Lease between Gratia Kemp (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31273 | Greeley Gas Company (now ATMOS) (Original agreement was in name of United Cities Gas Co. which sold to Greeley and which then sold to Atmos) | Sales and Transportation Service Agreement | Service Agreement | $154,490.00 | Coffeyville |
| | Harbison Walker Refractices | Refractory Purchase Order | | $0.00 | |
| | Harry R. Defler Corp. | Petroleum Coke Purchase Order | | $0.00 | |
| | Harry R. Defler Corp. | Petroleum Coke Purchase Order | | $0.00 | |
| | Haverly Systems, Inc. | CAL II Use Rights License Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | GRTMPS Continuous Maintenance Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | ICDM Software Continuous Maintenance Agreement Renewal | | | Coffeyville |
| | Haverly Systems, Inc. | Template Continuous Maintenance Agreement | | | Coffeyville |
| 0776 | Honeywell Hi-Spec Solutions | Advanced Process Control Technical Service Contract | Service Agreement | $0.00 | Coffeyville |
| | Honeywell International Inc. | Industrial Services Agreement No. 14284 | | $7,608.00 | |
| 0777 | Honeywell International Inc. | Industrial Control Services Agreement | Service Agreement | $8,535.00 | Coffeyville |
| 1028 | Brothers Dairy Incorporated | Surface Lease between Brothers Dairy Incorporated (Lessor) & Farmland Industries, Inc. (Lessee) | Surface Lease | $0.00 | Gathering System |
| 1046 | James A. Wheeler and Leta Beth Wheeler | Lease between James A. Wheeler and Leta Beth Wheeler (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | TPA, Inc. | License Agreement - TPA Technology (Oxygen Injection) | Technology License Agreement | $0.00 | Coffeyville |
| | TPA, Inc. | License Agreement - TPA Technology (Sulfur Recovery) | Technology License Agreement | $0.00 | Coffeyville |
| 1047 | James R. and Mary E. Conrad | Lease between James R. and Mary E. Conrad (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1048 | Jayhawk Pipeline Corporation | Lease between Jayhawk Pipeline Corporation (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31388 | ATSF & MKT Railroads | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| | Bryan Research and Engineering, Inc. | Software Licensing Agreement | | | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 1050 | Jody Morgan | Lease between Jody Morgan (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31415 | Union Pacific Railroad (Agmt originally w/Midland Valley Railroad Company) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| N31419 | Union Pacific Railroad | Pipe Line License | | $0.00 | Gathering System |
| N31420 | Union Pacific Railroad (Agmt originally w/Missouri Pacific RR Co) | Pipe Line License | | $0.00 | Coffeyville |
| N31421 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| N31422 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| | AX&P, Inc. | Crude Oil Purchase Agreement | Agreement | $0.00 | Gathering System |
| N31262 | Westar Energy (f/k/a Kansas Gas and Electric Co.) | Electric Service Agreement for Coffeyville Refinery | Service Agreement | $946,051.00 | Coffeyville |
| N31522 | Kansas Water Office | Water Purchase Contract (Coffeyville) | | $0.00 | |
| 1052 | Kaw Pipe Line Company | Sublease between Kaw Pipe Line Company  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Sublease | $0.00 | Gathering System |
| 1053 | Kaw Pipe Line Company | Sublease between Kaw Pipe Line Company  (Sublessor) & Farmland Industries, Inc. (Sublessee) | Non-Residential Real Property Sublease | $0.00 | Gathering System |
| | Profimatics, Inc. (now KBC) | FCC-SIMOPT Software Package License Agreement | | | Coffeyville |
| 1054 | Kenneth Bever (Orignally N. C. Spurlock) | Lease between Kenneth Bever (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0782 | Koch Sulfur Products Company, LLC | Purchase Contract for molten sulfur | Purchase Agreement | $3,346.60 | Coffeyville |
| | L&G Petroleum | Crude Oil Purchase Agreement | Agreement | | |
| | Entek IRD Corporation | ESAFE Agreement (Includes Enline 66 and Odyssey) | | | Coffeyville |
| N31262 | Westar Energy (f/k/a Kansas Gas and Electric Co.) | Electric Service Agreement for Coffeyville Refinery | Service Agreement | $946,051.00 | Coffeyville |
| 1061 | Laurence and Lorene Diehl | Lease between Laurence and Lorene Diehl  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Chicago, Rock Island and Pacific Railroad Company (now Kyle R.R.) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Chicago, Rock Island and Pacific Railroad Company (now U.P.) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Chicago, Rock Island and Pacific Railroad Company (now UP | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Kansas Texas Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Kansas Texas Railroad Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Kansas Texas Railroad Company | Pipeline Agreement - Crossing | License Agreement | $0.00 | Coffeyville |
| | Missouri Kansas Texas Railroad Company | Power Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Kansas Texas Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 1062 | Leland H. Schumacher  and Augusta Brungardt | Lease between Leland H. Schumacher  and Augusta Brungardt  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1063 | Madean Heyen and June Heyen | Lease between Madean Heyen and June Heyen  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1394 | Marguerite Swain | Lease between Marguerite Swain (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31247 | Petrolite Corporation | Petreco Desalting Equipment Agreement | Equipment Lease | $0.00 | Coffeyville |
| N31259 | Merichem Company | Process License Agreement | License Agreement | $4,343.00 | Coffeyville |
|  | MFA Incorporated | Prepay Ammonia Contract No. 400038381 |  |  |  |
|  | MFA Incorporated | Prepay Ammonia Contract No. 40038382 |  |  |  |
|  | Mid-America Building Maintenance, Inc. | Janitorial Services Agreement | Service Agreement | $0.00 | Coffeyville |
| 1067 | Mid-America Pipeline system (now Williams Energy Services) | Pipeline Capacity Lease and Operating Agreement between Mid-America Pipeline system (Lessor) & Farmland Industries, Inc. (Lessee) | Equipment Lease | $0.00 | Coffeyville |
|  | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
|  | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
|  | Missouri Pacific Railroad Company | Supplemental Agreement & Lease | License Agreement | $0.00 | Gathering System |
|  | Missouri Pacific Railroad Company | Wire Line License | License Agreement | $0.00 | Gathering System |
|  | Missouri Pacific Railroad Company (Agmt originally w/Mo-Ks-Tx Railroad) | Pipe Line License | License Agreement | $0.00 | Coffeyville |
|  | Missouri Pacific Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| N31391 | Missouri Pacific Railroad | Agreement for Pipe Line Crossing | Lease Agreement | $0.00 | Coffeyville |
| N31392 | Missouri Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31255 | Mobil Oil Corporation | Sludge Coking Process License Agreement | License Agreement | $42,590.77 | Coffeyville |
| 1043 | Mrs. Faye Taylor and Mrs. Mabel E. Allred | Lease between Floyd Allred, Mrs. Faye Taylor and Mrs. Mabel E. Allred (Lessor) & Farmland Industries, Inc. (Lessee) Mrs. Mabel E. Allred (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 1396 | Nancy and Parker Badenhop | Lease between Nancy and Parker Badenhop  (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
|  | National Cooperative Refinery Assoc. | Employee Lease Agreement | Agreement |  | Gathering System |
|  | National Cooperative Refinery Association | Equipment Lease Agreement | Equipment Lease | $0.00 | Gathering System |
| 0783 | National Cooperative Refinery Assoc | Accounting Services Agreement | Service Agreement | $18,343.45 | Coffeyville |
| 0786 | National Cooperative Refinery Assoc | Crude Oil Purchase Agreement | Purchase Agreement | $1,486,521.00 | Coffeyville |
| 0785 | National Cooperative Refinery Association | Crude Oil Exchange Contract (#5993) | Exchange Agreement | $72,649.35 | Gathering System |
| 0769 | EOTT Energy Operating Limited Party | Crude Oil Exchange Contract | Exchange Agreement | $0.00 | Gathering System |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 1072 | Octagon Investment Company (Originally with John M. Kane Land Trust) | Lease between Octagon Investment Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0789 | ONEOK NGL Marketing, L.P. | Agreement | Lease Agreement | $0.00 | Coffeyville |
| | Oxbow Carbon and Minerals LLC | Petroleum Coke Agreement | | $0.00 | |
| N31283 | Paulette A Briley and James L. Briley (Contract is in name of Bill Brown & Betty Lowery). | Lease of Property located in Chautauqua County, OK | Non-Residential Real Property Lease | $300.00 | Gathering System |
| | Peter Berick | Water Treatment Agreement | | | Coffeyville |
| N31247 | Petrolite Corporation | Petreco Desalting Equipment Agreement | Equipment Lease | $0.00 | Coffeyville |
| N31245 | Petrolite Corporation, Ltd. | License Agreement | License Agreement for Vertical Desalter | $8,898.00 | Coffeyville |
| N31246 | Petrolite Corporation, Ltd. | Electrical Purification Equipment Loan Agreement | Equipment Lease for Spherical Desalter | $0.00 | Coffeyville |
| N31260 | Phillips Petroleum Company | Reforming Technology License Agreement | License Agreement | $0.00 | Coffeyville |
| N31248 | Phillips Petroleum Company | Metals Passivation License Agreement | License Agreement | $0.00 | Coffeyville |
| 852 | Pitney Bowes | Lease Agreement for 200 UAN tank cars. | | $210,663.00 | |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R370748 | Lease Agreement | $75.00 | Coffeyville |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R412310 replaces #R310475 | Lease Agreement | $75.00 | Coffeyville |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R8055994 | Lease Agreement | $86.00 | Coffeyville |
| | Imaginistics (f/k/a Pitney Bowes) | Fax machine rental contract #R8962785 | Lease Agreement | $38.00 | Coffeyville |
| | Prime Energy | Air Compressor Rental Agreement | | | Coffeyville |
| N31266 | Process Industry Practices | Subscription and License Agreement | License Agreement | $0.00 | Coffeyville |
| | Project Software and Development, Inc. (now MRO) | Software License Agreement | | | Coffeyville |
| | Quest Resource Corporation | Base Contract For Sale and Purchase of Natural Gas | Natural Gas Purchase Agreement | $0.00 | Coffeyville |
| 1595 | GE Capital (as assigned by Reliant Energy Solutions) | Master Lease Agreement | Equipment Lease | $0.00 | Coffeyville |
| N31264 | Rexel Nelson | Agreement for Sale on Consignment (electrical motors) | Sale Agreement | $0.00 | Coffeyville |
| 1077 | Robert L. Campbell | Lease between Robert L. Campbell (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Coffeyville |
| | Royster-Clark, Inc. | Prepay Ammonia Contract No. 400038380 | | | |
| 1020 | Running "F", Inc. | Lease between Running "F", Inc. (Lessor) & Farmland Industries, Inc (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| N31284 | Ruth Spurgeon (Assigned from Edward & Norma Miller). | Lease of Property located in Nowata County, OK | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Saint-Gobain Ceramics and Plastics, Inc. | Refractory Agreement | | $0.00 | |
| 0792 | Seaway Crude Pipeline Company | Division of Rates Agreement | Service Agreement | $196,236.72 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0792 | Seaway Crude Pipeline Company | Division of Rates Agreement | Service Agreement | $196,236.72 | Coffeyville |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Havland Station | | Gathering System |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Susank Station | | Gathering System |
| | Shannahan Crane & Hoist, Inc. | Inspection Agreement | | | Coffeyville |
| 0793 | Sinclair Oil Corporation | Asphalt Services Agreement for the terminaling of Roll Saturate and Roofing Flux ("Products") | Service Agreement | $0.00 | Phillipsburg |
| | Sinclair Pipe Line Company (assigned from Missouri-Kansas-Texas Railroad Company) | Pipe Line License | Lease Agreement | | Gathering System |
| | South Kansas & Oklahoma Railroad | Overhead Utility Bridge Agreement | Agreement | $0.00 | Coffeyville |
| | South Kansas & Oklahoma Railroad | Pipeline Agreement | Agreement | $0.00 | Coffeyville |
| | South Kansas & Oklahoma Railroad | Waterline Agreement | Agreement | $0.00 | Coffeyville |
| | South Kansas and Oklahoma Railroad | License Agreement for Wire, Pipe and Cable Transverse Crossings and Longitudinal Occupations | License Agreement | $0.00 | Coffeyville |
| | South Kansas and Oklahoma Railroad | Pipeline Agreement - Crossing | Lease Agreement | $0.00 | Gathering System |
| | Southeast Kansas Railroad | Industry Track Agreement | Track Agreement | $0.00 | Coffeyville |
| | Southeast Kansas Railroad | Industry Tract Agreement | Railcar Storage | $0.00 | Coffeyville |
| | St. Louis-San Francisco Railway Company | Pipe Line Crossing Contract | Lease Agreement | $0.00 | Gathering System |
| | St. Louis-San Francisco Railway Company | Pipe Line Crossing Contract | License Agreement | $0.00 | Gathering System |
| N31405 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| N31406 | The Staubach Company (Agmt originally w/St. Louis San Francisco Railway Company) | Pipe Line Crossing Contract | | | Gathering System |
| N31408 Extension Rider | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | License Agreement | | Coffeyville |
| N31409 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Coffeyville |
| N31410 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Gathering System |
| N31411 | The Staubach Company (Agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Gathering System |
| N31412 | The Staubach Company (agmt originally w/Atchison, Topeka and Santa Fe Railway Company) | Pipe Line License | | $0.00 | Gathering System |
| N31413 | The Staubach Company (Agmt originally w/St Louis-San Francisco RR Co) | Pipe Line Crossing Contract | | $0.00 | Gathering System |
| N31414 | The Staubach Company (Agmt originally w/St. Louis-San Frisco RR Co) | Pipe Line License | | $0.00 | Gathering System |
| N31388 | ATSF & MKT Railroads | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| 0794 | Sun Company, Inc. | Crude Oil Bulk Purchase Agreement | Purchase Agreement. Farmland sells to Sun | $0.00 | Gathering System |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0795 | Sun Company, Inc. | Sale Agreement for Light Cycle Oil | Sale Agreement - Farmland sells to Sun | $0.00 | Gathering System |
| 1081 | Sun Pipe Line Company | Lease between Sun Pipe Line Company (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0796 | Terra Resources, Inc. | Agreement for Preferential Right to Purchase Crude Oil | Purchase Agreement | $0.00 | Gathering System |
| | Tessenderlo Kerley, Inc. | Ground Lease | Lease Agreement | | Coffeyville |
| 0797 | Tessenderlo Kerley Inc. | Sulfur Processing Agreement | Service Agreement | $796,446.00 | Coffeyville |
| 1495 | Tessenderlo Kerley, Inc. | Phase II Sulfur Processing Agreement (requires modification) | | $331,349.00 | |
| | Texaco Development Corporation | THGP Technical Services Agreement | | | |
| 0290 | Texaco Development Corporation | License Agreement for Use of the Texaco Gasification Process, Texaco Hydrogen Generation Process, and Texaco Gasification Power Systems (requires modification) | | $1,316,244.20 | |
| | Texaco, Inc. | License Agreement - Texaco General Equipment and Materials Specifications (GEMS) | License Agreement | $62,500.00 | Coffeyville |
| 0800 | TexPar Energy, Inc. | Purchase/Sale Agreement for CBO/Slurry | Purchase Agreement | $0.00 | Coffeyville |
| 0259 | The BOC Group, Inc. | On-Site Product Supply Agreement with the BOC Group, Inc. dated 12/3/97 (requires modifications) | | $0.00 | |
| 1067 | Mid-America Pipeline system (now Williams Energy Services) | Pipeline Capacity Lease and Operating Agreement between Mid-America Pipeline system (Lessor) & Farmland Industries, Inc. (Lessee) | Equipment Lease | $0.00 | Coffeyville |
| | American Petroleum Institute ("API") | Petroleum and Allied Industry Agreement | | | Coffeyville |
| | BP America Production Co. | Crude Oil Agreement | Agreement | $0.00 | Gathering System |
| | The Coleman Company, Inc. | Agreement | Agreement | $0.00 | Coffeyville |
| | Harbison Walker Refractives | Refractory Purchase Order | | $0.00 | |
| | L&G Petroleum | Crude Oil Purchase Agreement | Agreement | | |
| | MFA Incorporated | Prepay Ammonia Contract No. 400038381 | | | |
| | MFA Incorporated | Prepay Ammonia Contract No. 40038382 | | | |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Haviland Station | | Gathering System |
| | Seminole Transportation and Gathering, Inc. | Lease Agreement | Lease Agreement for Susank Station | | Gathering System |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038378 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038379 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038386 | | | |
| 0257 | Banks Construction Company, Inc. | Coke Handling Agreement | | $237,407.00 | |
| 0259 | The BOC Group, Inc. | On-Site Product Supply Agreement with the BOC Group, Inc. dated 12/3/97 (requires modifications) | | $0.00 | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0786 | National Cooperative Refinery Assoc | Crude Oil Purchase Agreement | Purchase Agreement | $1,486,521.00 | Coffeyville |
| 0805 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease for RGBs (Contract No. 2003-0001) – Conway Holding | RGB Storage Lease | $0.00 | Coffeyville |
| N31273 | Greeley Gas Company (now ATMOS) (Original agreement was in name of United Cities Gas Co. which sold to Greeley and which then sold to Atmos) | Sales and Transportation Service Agreement | Service Agreement | $154,490.00 | Coffeyville |
| | Baker Tanks, Inc. | Polymer Tank Rental Agreement | | | Coffeyville |
| | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Pacific Railroad Company | Pipe Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Pacific Railroad Company | Supplemental Agreement & Lease | License Agreement | $0.00 | Gathering System |
| | Missouri Pacific Railroad Company | Wire Line License | License Agreement | $0.00 | Gathering System |
| | Missouri Pacific Railroad Company (Agmt originally w/Mo-Ks-Tx Railroad) | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| | Missouri Pacific Railway Company | Pipe Line License | License Agreement | $0.00 | Coffeyville |
| N31391 | Missouri Pacific Railroad | Agreement for Pipe Line Crossing | Lease Agreement | $0.00 | Coffeyville |
| N31392 | Missouri Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| | Royster-Clark, Inc. | Prepay Ammonia Contract No. 400038380 | | | Coffeyville |
| | ZyTax, Inc. | Software License Agreement | | | Coffeyville |
| 1048 | Jayhawk Pipeline Corporation | Lease between Jayhawk Pipeline Corporation (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| 0761 | Citation Oil and Gas Corp. | Crude Oil Purchase Agreement | Purchase Agreements | $0.00 | Gathering System |
| | Honeywell International Inc. | Industrial Services Agreement No. 14284 | | $7,608.00 | |
| 0777 | Honeywell International Inc. | Industrial Control Services Agreement | Service Agreement | $8,535.00 | Coffeyville |
| 0782 | Koch Sulfur Products Company, LLC | Purchase Contract for molten sulfur | Purchase Agreement | $3,346.60 | Coffeyville |
| 0795 | Sun Company, Inc. | Sale Agreement for Light Cycle Oil | Sale Agreement - Farmland sells to Sun | $0.00 | Gathering System |
| | Tessenderlo Kerley, Inc. | Ground Lease | Lease Agreement | | Coffeyville |
| 0797 | Tessenderlo Kerley Inc. | Sulfur Processing Agreement | Service Agreement | $796,446.00 | Coffeyville |
| N31250 | Universal Oil Products Company | UOP Platforming Process License Agreement | License Agreement | $0.00 | Coffeyville |
| | Saint-Gobain Ceramics and Plastics, Inc. | Refractory Agreement | | $0.00 | |
| | The Prairie Oil & Gas Company | Lease | Lease Agreement | $0.00 | Gathering System |
| | The Prairie Oil & Gas Company | Lease | Lease Agreement | $0.00 | Gathering System |
| N31264 | Rexel Nelson | Agreement for Sale on Consignment (electrical motors) | Sale Agreement | $0.00 | Coffeyville |
| | Texaco, Inc. | License Agreement - Texaco General Equipment and Materials Specifications (GEMS) | License Agreement | $62,500.00 | Coffeyville |
| 1053 | Kaw Pipe Line Company | Sublease between Kaw Pipe Line Company (Sublessor) & Farmland Industries, Inc. (Sublessee) | Non-Residential Real Property Sublease | $0.00 | Gathering System |
| | Texaco Development Corporation | THGP Technical Services Agreement | | | |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| 0290 | Texaco Development Corporation | License Agreement for Use of the Texaco Gasification Process, Texaco Hydrogen Generation Process, and Texaco Gasification Power Systems (requires modification) | | $1,316,244.20 | |
| 0805 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease for RGBs (Contract No. 2003-0001) – Conway Holding | RGB Storage Lease | $0.00 | Coffeyville |
| N31259 | Merichem Company | Process License Agreement | License Agreement | $4,343.00 | Coffeyville |
| | Toptech Systems, Inc. | Software Support and Maintenance Agreement | | | Coffeyville |
| | TPA, Inc. | License Agreement - TPA Technology (Oxygen Injection) | Technology License Agreement | $0.00 | Coffeyville |
| | TPA, Inc. | License Agreement - TPA Technology (Sulfur Recovery) | Technology License Agreement | $0.00 | Coffeyville |
| N31256 | Union Carbide Corporation | Total Isomerization Process License Agreement | License Agreement | $0.00 | Coffeyville |
| N31399 | Union Pacific Railroad | Track Lease Agreement - First Amendment | Lease Agreement | $0.00 | Coffeyville |
| N31400 | Union Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31399 | Union Pacific Railroad | Track Lease Agreement - First Amendment | Lease Agreement | $0.00 | Coffeyville |
| N31400 | Union Pacific Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31415 | Union Pacific Railroad (Agmt originally w/Midland Valley Railroad Company) | Pipe Line License | License Agreement | $0.00 | Gathering System |
| N31419 | Union Pacific Railroad | Pipe Line License | | $0.00 | Gathering System |
| N31420 | Union Pacific Railroad (Agmt originally w/Missouri Pacific RR Co) | Pipe Line License | | $0.00 | Coffeyville |
| N31421 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| N31422 | Union Pacific Railroad | Pipe Line License | | $0.00 | Coffeyville |
| N31393 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31394 | Missouri-Kansas-Texas Railroad | Electric Power Transmission Line Across or Along Railroad Company Property | Lease Agreement | $0.00 | Coffeyville |
| N31395 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N31396 | Missouri-Kansas-Texas Railroad | Pipe Line License | Lease Agreement | $0.00 | Coffeyville |
| N30877 | Union Pacific Railroad (Agmt originally w/Mo-Ks-Tx Railroad) | Power Line License | License Agreement | $0.00 | Coffeyville |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038378 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038379 | | | |
| | United Suppliers, Inc. | Prepay Ammonia Contract No. 400038386 | | | |
| N31249 | Universal Oil Products Company | UOP "HF" Alkylation Process License Agreement | License Agreement | $6,153.00 | Coffeyville |
| N31250 | Universal Oil Products Company | UOP Platforming Process License Agreement | License Agreement | $0.00 | Coffeyville |
| | Universal Oil Products Company | LPG Merox Process Agreement | License Agreement | $0.00 | Coffeyville |
| N31251 | Universal Oil Products Company | UOP Merox Process License Agreement | License Agreement | $0.00 | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| N31252 | Universal Oil Products Company | Unifying Process Agreement | Service Agreement | $0.00 | Coffeyville |
| | UOP | Precious Metals Lease | | $15,638.14 | Coffeyville |
| N31257 | UOP Process Division | Hydrobon Process License | License Agreement | $0.00 | Coffeyville |
| N31253 | UOP Process Division, a division of | Service Agreement | Service Agreement | $3,568.00 | Coffeyville |
| N31254 | UOP Process Division, a division of | UOP HC Platforming Process Guarantee Agreement | Service Agreement | $0.00 | Coffeyville |
| | UOP | Selexol Process License Agreement | | | |
| | Profimatics, Inc. (now KBC) | FCC-SIMOPT Software Package License Agreement | | | Coffeyville |
| 1085 | Veva Conness | Lease between Veva Conness (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Haverly Systems, Inc. | CAL II Use Rights License Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | GRTMPS Continuous Maintenance Agreement | | | Coffeyville |
| | Haverly Systems, Inc. | ICDM Software Continuous Maintenance Agreement Renewal | | | Coffeyville |
| | Haverly Systems, Inc. | Template Continuous Maintenance Agreement | | | Coffeyville |
| | Vivian Mayer, Raymond Clark, Lyle Shawler, Faye Clark & Mary Shawler (Original Lessor was W. M. & Maude Clark) | Surface Lease | Agreement | $0.00 | Gathering System |
| 1086 | Wade and Margarte Waldschmidt | Lease between Wade Margarte Waldschmidt (Lessor) & APCO Pipe Line (Lessee) assigned to Farmland on 11/10/71. | Non-Residential Real Property Lease | $12.50 | Gathering System |
| 1087 | Wade S. Waldschmidt | Lease between Wade Waldschmidt (Lessor) & Farmland Industries, Inc. (Lessee) | Non-Residential Real Property Lease | $0.00 | Gathering System |
| | Shannahan Crane & Hoist, Inc. | Inspection Agreement | | | Coffeyville |
| 0805 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease for RGBs (Contract No. 2003-0001) – Conway Holding | RGB Storage Lease | $0.00 | Coffeyville |
| 0806 | Williams Midstream Natural Gas Liquids, Inc | Product Storage Lease (Contract No. 2003-0016) – Conway Holding | Isobutane Storage Lease | $0.00 | Coffeyville |
| | Williams Midstream Natural Gas Liquids, Inc. | Product Storage Lease (contract No. 2003-0002) | RGB Storage Lease | $0.00 | Coffeyville |
| 0809 | Williams Pipe Line Company | Agreement of Capacity Lease and Operating Agreement (for portions of 8" and 10" pipelines between Coffeyville and Caney Junction, Kansas, and Coffeyville and Independence, Kansas) | Equipment Lease | $38,750.00 | Coffeyville |
| | Williams Pipe Line Company | Joint Tariff Agreement | Joint Tariff Agreement | $0.00 | Coffeyville |
| 0810 | Williams Pipe Line Company | Petroleum Products Transportation Agreement | Transport Agreement | $0.00 | Coffeyville |
| 0808 | Williams Pipe Line Company | Crude Oil Pipeline Agreement (16" Coffeyville line) | Purchase Agreement | $0.00 | Coffeyville |
| | Wilson Supply, a unit of Smith International, Inc. | Purchasing and Warehouse Services Agreement | Service Agreement | $151,145.77 | Coffeyville |
| N31261 | W.R. Grace & Co. – Conn. | Desox Injection Equipment Lease | Equipment Lease | $3,050.00 | Coffeyville |
| | ZyTax, Inc. | Software License Agreement | | | Coffeyville |

| CONTRACT NO | CONTRACT PARTY | EXACT TITLE OF CONTRACT | CONTRACT TYPE | CURE AMOUNTS | SITE |
|---|---|---|---|---|---|
| | Adobe | Acrobat 5.0 | Software | 0.00 | Coffeyville |
| | Autodesk | Autocad | Software | 0.00 | Coffeyville |
| | Autodesk | Autocad LT | Software | 0.00 | Coffeyville |
| | Computer Associates Internationsl | AcrServe | Software | 393.00 | Coffeyville |
| | Mathsoft Engineering & Education Inc | Mathcad | Software | 0.00 | Gathering System |
| | Palm Inc | Palm Desktop | Software | 0.00 | Gathering System |
| | Prolink Microsystems Inc | Prolink | Software | 0.00 | Gathering System |
| | Bachelor Controls (BCI) | Automated loadout system | Software | 0.00 | Gathering System |
| | Invensys | Triconex Operating | Software | 0.00 | Gathering System |
| | Invensys | Triconex Recorder | Software | 0.00 | Gathering System |
| | Honeywell Inc | Uniformance | Software | 0.00 | Gathering System |
| | Microsoft | Visio 2000 | Software | 0.00 | Gathering System |
| | Microsoft | Visual Basic | Software | 0.00 | Gathering System |
| | NUS | York DTS Software | Software | 0 | Gathering System |
| | CSI | CSI 8117 Pro-Align | Software | 0 | Gathering System |
| | Modicon | York DTS Software | Software | 0 | Gathering System |
| | Williams | Interactive Maintenance Training | Software | 0 | Gathering system |
| | CSI | CSI Model 2120-2 RBM | Software | 0 | Gathering System |
| | VSI | Ecowatch VSI | Software | 0 | Gathering System |
| | GE | GE Ditronics Software | Software | 0 | Gathering System |
| | Honeywell | Honeywell | Software | 40000 | Gathering System |

## **APPENDIX B**

Historical Statements

**FARMLAND INDUSTRIES, INC.**
**(Pre-Petition)**
**BALANCE SHEET**

| | August 31 | | | May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amounts in Thousands) | | |
| **ASSETS** | | | | |
| | | | | |
| Current Assets: | | | | |
| Accounts receivable - trade | 261,271 | 139,781 | 123,862 | 78,385 |
| Accounts receivable - inter-company | 55,107 | 45,667 | 45,429 | 25,227 |
| Inventories | 646,588 | 548,749 | 342,498 | 189,091 |
| Deferred income taxes | 48,817 | 44,794 | 62,358 | 57,806 |
| Other current assets | 111,545 | 154,830 | 76,426 | 50,676 |
| Other current assets - inter-company | 101,493 | 117,194 | 165,581 | 92,941 |
| | | | | |
| Total Current Assets | 1,224,821 | 1,051,015 | 816,154 | 494,126 |
| | | | | |
| Investments and Long-Term Receivables: | | | | |
| Investments and LT receivables - 3rd party | 326,317 | 396,712 | 369,881 | 333,081 |
| Investments and LT receivables - inter-company | 291,128 | 308,025 | 248,343 | 227,813 |
| | | | | |
| Total Investments and Long-Term Receivables | 617,445 | 704,737 | 618,224 | 560,894 |
| | | | | |
| Property, Plant and Equipment: | | | | |
| Property, plant and equipment, at cost | 1,186,563 | 1,187,417 | 1,067,708 | 1,208,737 |
| Less accumulated depreciation and amortization | (680,857) | (704,085) | (660,244) | (587,839) |
| | | | | |
| Net Property, Plant and Equipment | 505,706 | 483,332 | 407,464 | 620,898 |
| | | | | |
| Other Assets | 214,248 | 190,486 | 214,482 | 198,515 |
| | | | | |
| Total  Assets | 2,562,220 | 2,429,570 | 2,056,324 | 1,874,433 |
| | | | | |
| **LIABILITIES AND EQUITIES** | | | | |
| | | | | |
| Current Liabilities: | | | | |
| Demand loan certificates | 25,054 | 25,731 | 17,696 | 0 |
| Short-term notes payable | 416,477 | 430,839 | 238,125 | 12,035 |
| Current maturities of long-term debt | 25,040 | 38,876 | 43,119 | 82,739 |
| Accounts payable - trade | 271,477 | 122,938 | 174,870 | 181,691 |
| Other current liabilities - 3rd Party | 195,785 | 347,845 | 197,554 | 157,505 |
| Other current liabilities - inter-company | 1,690 | 11,902 | (2,377) | 19,093 |
| | | | | |
| Total Current Liabilities | 935,523 | 978,131 | 668,987 | 453,063 |
| | | | | |
| Long-Term Liabilities: | | | | |
| L-T borrowings(excluding current maturities) | 712,160 | 583,993 | 529,636 | 798,837 |
| Other long-term liabilities | 37,413 | 37,370 | 36,453 | 43,657 |
| | | | | |
| Total Long-Term Liabilities | 749,573 | 621,363 | 566,089 | 842,494 |
| | | | | |
| Deferred Income Taxes | 57,075 | 48,514 | 70,909 | 74,364 |
| | | | | |
| Minority Owners' Equity in Subsidiaries | (322) | 0 | 0 | 0 |
| | | | | |
| Loss to surplus | (4,113) | (32,321) | (1,975) | (269,367) |
| | | | | |
| Income to patrons | (30,269) | (8,002) | 0 | 0 |
| | | | | |
| Capital Shares and Equities: | | | | |
| Common shares | 508,022 | 522,876 | 527,562 | 527,419 |
| Earned surplus and other equities | 346,731 | 299,009 | 224,752 | 246,460 |
| | | | | |
| Total Capital Shares and Equities | 854,753 | 821,885 | 752,314 | 773,879 |
| | | | | |
| Total Liabilities and Equities | 2,562,220 | 2,429,570 | 2,056,324 | 1,874,433 |

**FARMLAND INDUSTRIES, INC.**
**(Post-Petition)**
**BALANCE SHEET**
**(Amounts in Thousands)**

|  | May 31 |
|  | 2003 |

ASSETS

Current Assets:

| | |
|---|---:|
| Accounts receivable - trade | 47,980 |
| Accounts receivable - inter-company | 31,876 |
| Inventories | 116,309 |
| Other current assets | 47,895 |
| Other current assets - inter-company | 112,519 |
| **Total Current Assets** | 356,579 |

Investments and Long-Term Receivables:

| | |
|---|---:|
| Investments and LT receivables - 3rd Party | 213,028 |
| Investments and LT receivables - inter-company | 236,950 |
| **Total Investments and Long-Term Receivables** | 449,978 |

Property, Plant and Equipment:

| | |
|---|---:|
| Property, plant and equipment, at cost | 524,580 |
| Less accumulated depreciation and amortization | (426,980) |
| **Net Property, Plant and Equipment** | 97,600 |
| Other Assets | 84,124 |
| **Total  Assets** | 988,281 |

LIABILITIES AND EQUITIES

Current Liabilities:

| | |
|---|---:|
| Current maturities of long-term debt | 22,603 |
| Accounts payable - trade | 21,607 |
| Other current liabilities - 3rd party | 24,350 |
| Other current liabilities - inter-company | 133,170 |
| **Total Current Liabilities** | 201,730 |
| Liabilities Subject to Compromise | 810,464 |

Long-Term Liabilities:

| | |
|---|---:|
| L-T borrowings(excluding current maturities) | 15,200 |
| Other long-term liabilities | 39,015 |
| **Total Long-Term Liabilities** | 54,215 |
| Deferred Income Taxes | 9,998 |
| Net loss | (472,718) |

Capital Shares and Equities:

| | |
|---|---:|
| Preferred shares | 100,000 |
| Common shares | 526,075 |
| Accumulated other comprehensive income | 3 |
| Earned surplus and other equities | (241,486) |
| **Total Capital Shares and Equities** | 384,592 |
| **Total Liabilities and Equities** | 988,281 |

**FARMLAND INDUSTRIES, INC.**
**(Pre-Petition)**
**STATEMENT OF OPERATIONS**

| | Year Ended August 31 | | | Nine Months Ended May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amount in Thousands) | | |
| Sales | 7,152,018 | 7,541,956 | 5,795,724 | 2,957,617 |
| Cost of sales | 7,035,820 | 7,425,309 | 5,741,286 | 3,033,896 |
| Gross income | 116,198 | 116,647 | 54,438 | (76,279) |
| Selling, general and administrative expense | (230,048) | (223,460) | (130,585) | (99,727) |
| Restructuring and other charges | 0 | 0 | (42,478) | (55,577) |
| Interest Expense | (82,801) | (101,582) | (115,415) | (62,612) |
| Interest Income | 23,781 | 20,504 | 28,118 | 13,119 |
| Other income (expense) | 85,605 | 76,581 | 130,185 | (15,974) |
| Equity in net income of investees | 65,495 | 56,904 | 27,460 | 23,291 |
| Minority owners' interest in net income of subsidiaries | (340) | 504 | 0 | 0 |
| Reorganization expense | 0 | 0 | 0 | (51,419) |
| Loss from continuing operations before income tax benefit and cumulative effect of changes in accounting principles | (22,110) | (53,902) | (48,277) | (325,178) |
| Income tax benefit | 17,997 | 21,580 | 26,371 | 55,811 |
| Loss from continuing operations before cumulative effect of changes in accounting principles | (4,113) | (32,321) | (21,906) | (269,367) |
| Cumulative effect of changes in accounting for derivative financial instruments and planned major maintenance costs, net of applicable income tax expense | 0 | 0 | 19,931 | 0 |
| Net loss | (4,113) | (32,321) | (1,975) | (269,367) |

**FARMLAND INDUSTRIES, INC.**
**(Post-Petition)**
**STATEMENT OF OPERATIONS**
**(Amounts in Thousands)**

|  | Three Months Ended August 31 | Nine Months Ended May 31 |
|---|---|---|
|  | 2002 | 2003 |
| Sales | 514,827 | 1,740,409 |
| Cost of sales | 528,123 | 1,711,752 |
| Gross income | (13,296) | 28,657 |
| Selling, general & administrative expense | (18,008) | (37,345) |
| Restructuring and other (charges) credits | (2,639) | 2,311 |
| Interest expense | (13,021) | (17,774) |
| Interest income | (155) | 4,124 |
| Other income (expense) | (63,773) | 44,677 |
| Equity in net income of investees | 11,776 | 18,388 |
| Reorganization (expense) income | (16,953) | (515,756) |
| Loss from continuing operations before income tax benefit (expense) | (116,069) | (472,718) |
| Income tax benefit (expense) | (7,943) | 0 |
| Net loss | (124,012) | (472,718) |

**FARMLAND FOODS, INC.**
**(Pre-Petition)**
**BALANCE SHEET**

| | August 31 | | | May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amounts in Thousands) | | |
| **ASSETS** | | | | |
| | | | | |
| **Current Assets:** | | | | |
| Accounts receivable - trade | 72,510 | 71,134 | 72,922 | 73,625 |
| Accounts receivable - inter-company | 7,388 | 618 | 1,719 | 2,901 |
| Inventories | 106,150 | 108,825 | 117,491 | 98,082 |
| Other current assets | 7,018 | 10,666 | 13,287 | 3,768 |
| | | | | |
| Total Current Assets | 193,066 | 191,243 | 205,419 | 178,376 |
| | | | | |
| | | | | |
| **Investments and Long-Term Receivables:** | | | | |
| Investments and LT receivables - 3rd Party | 670 | 699 | 508 | 221 |
| Investments and LT receivables - inter-company | 61 | 61 | 61 | 61 |
| | | | | |
| Total Investments and Long-Term Receivables | 731 | 760 | 569 | 282 |
| | | | | |
| **Property, Plant and Equipment:** | | | | |
| Property, plant and equipment, at cost | 255,429 | 303,694 | 318,487 | 331,968 |
| Less accumulated depreciation and amortz. | (126,589) | (152,086) | (164,895) | (177,862) |
| | | | | |
| Net Property, Plant and Equipment | 128,840 | 151,608 | 153,592 | 154,106 |
| | | | | |
| Other Assets | 10,406 | 10,476 | 15,997 | 10,361 |
| | | | | |
| Total Assets | 333,043 | 354,087 | 375,577 | 343,125 |
| | | | | |
| **LIABILITIES AND EQUITIES** | | | | |
| | | | | |
| **Current Liabilities:** | | | | |
| Short-term notes payable - inter-company | 80,651 | 94,400 | 140,021 | 79,452 |
| Current maturities of long-term debt | 287 | 156 | 294 | 96 |
| Accounts payable - trade | 28,556 | 33,308 | 39,387 | 44,431 |
| Other current liabilities - 3rd party | 24,606 | 15,938 | 30,678 | 43,262 |
| Other current liabilities - inter-company | 18,816 | 17,907 | 20,355 | 20,562 |
| | | | | |
| Total Current Liabilities | 152,916 | 161,709 | 230,735 | 187,803 |
| | | | | |
| **Long-Term Liabilities:** | | | | |
| L-T borrowings(excluding current maturities) | 6,064 | 5,994 | 5,802 | 5,530 |
| L-T borrowings - inter-company | 56,800 | 56,800 | 56,800 | 56,800 |
| | | | | |
| Total Long-Term Liabilities | 62,864 | 62,794 | 62,602 | 62,330 |
| | | | | |
| Deferred Income Taxes | 3,338 | 3,338 | 0 | 0 |
| | | | | |
| **Distribution of current year income (loss)** | | | | |
| Net income (loss) | 27,453 | 12,703 | (43,048) | 10,758 |
| (Income) loss allocated to Farmland Industries, Inc. | (26,574) | 0 | 39,515 | 0 |
| | | | | |
| Net income (loss) to surplus | 879 | 12,703 | (3,533) | 10,758 |
| | | | | |
| **Capital Shares and Equities:** | | | | |
| Common shares | 20,865 | 20,484 | 20,480 | 17,153 |
| Earned surplus and other equities | 92,181 | 93,059 | 65,293 | 65,081 |
| | | | | |
| Total Capital Shares and Equities | 113,046 | 113,543 | 85,773 | 82,234 |
| | | | | |
| Total Liabilities and Equities | 333,043 | 354,087 | 375,577 | 343,125 |

**FARMLAND FOODS, INC.**
**(Post-Petition)**
**BALANCE SHEET**
**(Amounts in Thousands)**

|  | May 31 2003 |
|---|---|
| **ASSETS** | |
| **Current Assets:** | |
| Accounts receivable - trade | 70,971 |
| Accounts receivable - inter-company | 11,849 |
| Inventories | 87,177 |
| Other current assets | (1,003) |
| Other current assets - inter-company | 98,568 |
| Total Current Assets | 267,562 |
| **Investments and Long-Term Receivables:** | |
| Investments and LT receivables - 3rd Party | 207 |
| Investments and LT receivables - inter-company | 105 |
| Total Investments and Long-Term Receivables | 312 |
| **Property, Plant and Equipment:** | |
| Property, plant and equipment, at cost | 346,050 |
| Less accumulated depreciation and amortz. | (199,993) |
| Net Property, Plant and Equipment | 146,057 |
| Other Assets | (1,335) |
| Total  Assets | 412,596 |
| **LIABILITIES AND EQUITIES** | |
| **Current Liabilities:** | |
| Short-term notes payable - inter-company | 89,970 |
| Current maturities of long-term debt | 94 |
| Accounts payable - trade | 13,419 |
| Other current liabilities - 3rd party | 43,526 |
| Other current liabilities - inter-company | 40,196 |
| Total Current Liabilities | 187,205 |
| Liabilities Subject to Compromise | 53,930 |
| **Long-Term Liabilities:** | |
| L-T borrowings(excluding current maturities) | 3,939 |
| L-T borrowings - inter-company | 56,800 |
| Total Long-Term Liabilities | 60,739 |
| Deferred Income Taxes | (9,053) |
| Net income | 21,906 |
| **Capital Shares and Equities:** | |
| Common shares | 17,153 |
| Earned surplus and other equities | 80,716 |
| Total Capital Shares and Equities | 97,869 |
| Total Liabilities and Equities | 412,596 |

**FARMLAND FOODS, INC.**
**(Pre-Petition)**
**STATEMENT OF OPERATIONS**

| | Year Ended August 31 | | | Nine Months Ended May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | (Amount in Thousands) | | | |
| Sales | 1,448,970 | 1,659,570 | 1,649,657 | 1,258,838 |
| Cost of sales | 1,247,332 | 1,472,172 | 1,499,086 | 1,118,899 |
| Gross income | 201,638 | 187,398 | 150,571 | 139,939 |
| Selling, general & administrative expense | (157,419) | (160,003) | (159,293) | (114,947) |
| Restructuring expense | 0 | 0 | (17,396) | 0 |
| Interest expense | (18,249) | (11,790) | (14,784) | (11,818) |
| Interest income | 9 | (0) | 14 | 0 |
| Other income (expense) | 2,237 | (2,889) | (4,212) | (2,416) |
| Equity in net income (loss) of investees | 15 | (13) | (3) | 0 |
| Income (loss) from continuing operations before income tax benefit (expense) and cumulative effect of changes in accounting principles | 28,231 | 12,703 | (45,103) | 10,758 |
| Income tax benefit (expense) | (778) | 0 | 2,210 | 0 |
| Income (loss) from continuing operations before cumulative effect of changes in accounting principles | 27,453 | 12,703 | (42,893) | 10,758 |
| Cumulative effect of changes in accounting for derivative financial instruments, net of applicable income tax expense | 0 | 0 | (155) | 0 |
| Net income (loss) | 27,453 | 12,703 | (43,048) | 10,758 |

## FARMLAND FOODS, INC.
### (Post-Petition)
## STATEMENT OF OPERATIONS
### (Amounts in Thousands)

|  | Three Months Ended August 31 | Nine Months Ended May 31 |
|---|---|---|
|  | 2002 | 2003 |
| Sales | 386,672 | 1,230,322 |
| Cost of Sales | 325,787 | 1,080,951 |
| Gross income | 60,885 | 149,371 |
| Selling, general & administrative expense | (42,876) | (107,905) |
| Interest expense | (827) | (3,591) |
| Interest income | 0 | 1 |
| Other income (expense) | (11,284) | 2,038 |
| Reorganization (expense) income | 752 | (18,008) |
| Income (loss) from continuing operations before income tax benefit (expense) | 6,650 | 21,906 |
| Income tax benefit (expense) | (1,772) | 0 |
| Net income | 4,878 | 21,906 |

# FARMLAND PIPE LINE COMPANY
## (Pre-Petition)
## BALANCE SHEET

|  | August 31 | | | May 31 |
|---|---|---|---|---|
|  | 1999 | 2000 | 2001 | 2002 |
|  | | (Amounts in Thousands) | | |
| **ASSETS** | | | | |
| | | | | |
| Current Assets: | | | | |
| Accounts receivable - trade | 179 | 139 | 262 | 146 |
| Accounts receivable - inter-company | 0 | 6,443 | 5,904 | 0 |
| Other current assets - inter-company | 0 | 0 | 1,276 | 7,494 |
| | | | | |
| Total Current Assets | 179 | 6,582 | 7,442 | 7,640 |
| | | | | |
| Total Assets | 179 | 6,582 | 7,442 | 7,640 |
| | | | | |
| **LIABILITIES AND EQUITIES** | | | | |
| | | | | |
| Current Liabilities: | | | | |
| Accounts payable - trade | (391) | 0 | 0 | 81 |
| Other current liabilities - 3rd party | 750 | 799 | 1,626 | 928 |
| Other current liabilities - inter-company | (4,018) | 1,463 | 0 | 0 |
| | | | | |
| Total Current Liabilities | (3,659) | 2,262 | 1,626 | 1,009 |
| | | | | |
| Income to surplus | 884 | 482 | 1,495 | 815 |
| | | | | |
| Capital Shares and Equities: | | | | |
| Common shares | 0 | 0 | 0 | 0 |
| Earned surplus and other equities | 2,954 | 3,838 | 4,321 | 5,816 |
| | | | | |
| Total Capital Shares and Equities | 2,954 | 3,838 | 4,321 | 5,816 |
| | | | | |
| Total Liabilities and Equities | 179 | 6,582 | 7,442 | 7,640 |

# FARMLAND PIPE LINE COMPANY
## (Post-Petition)
## BALANCE SHEET
## (Amounts in Thousands)

|  | May 31 |
|---|---|
|  | 2003 |

**ASSETS**

Current Assets:

| | |
|---|---|
| Accounts receivable - trade | 300 |
| Other current assets - inter-company | 7,825 |
| Total Current Assets | 8,125 |
| Total  Assets | 8,125 |

LIABILITIES AND EQUITIES

Current Liabilities:

| | |
|---|---|
| Accounts payable - trade | 196 |
| Other current liabilities - 3rd party | 416 |
| Other current liabilities - inter-company | 523 |
| Total Current Liabilities | 1,135 |
| Liabilities Subject to Compromise | 120 |
| Net income | 176 |

Capital Shares and Equities:

| | |
|---|---|
| Common shares | 0 |
| Earned surplus and other equities | 6,694 |
| Total Capital Shares and Equities | 6,694 |
| Total Liabilities and Equities | 8,125 |

**FARMLAND PIPE LINE COMPANY**
**(Pre-Petition)**
**STATEMENTS OF OPERATIONS**

|  | Year Ended August 31 | | | Nine Months Ended May 31 |
|  | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
|  |  | (Amounts in Thousands) | | |
| Sales | 0 | 0 | 0 | 0 |
| Cost of sales | (1,612) | (1,555) | (1,883) | (590) |
| Gross income | 1,612 | 1,555 | 1,883 | 590 |
| Selling, general & administrative expense | (3) | (3) | (3) | (3) |
| Interest income | 261 | 442 | 443 | 228 |
| Income from continuing operations before income tax expense | 1,870 | 1,994 | 2,323 | 815 |
| Income tax expense | (986) | (1,512) | (828) | 0 |
| Net income | 884 | 482 | 1,495 | 815 |

**FARMLAND PIPE LINE COMPANY**
**(Post-Petition)**
**STATEMENT OF OPERATIONS**
**(Amounts in Thousands)**

|  | Three Months Ended August 31 2002 | Nine Months Ended May 31 2003 |
|---|---|---|
| Sales | 0 | 0 |
| Cost of sales | (71) | (190) |
| Gross income | 71 | 190 |
| Selling, general and administrative expenses | 0 | (5) |
| Interest income | 5 | 0 |
| Reorganization (expense) income | (1) | (9) |
| Income from continuing operations before income tax benefit (expense) | 75 | 176 |
| Income tax benefit (expense) | (11) | 0 |
| Net income | 64 | 176 |

## FARMLAND TRANSPORTATION, INC.
## (Pre-Petition)
## BALANCE SHEET

| | August 31 | | | May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amounts in Thousands) | | |

**ASSETS**

Current Assets:

| | | | | |
|---|---|---|---|---|
| Accounts receivable - trade | 3,765 | 3,879 | 6,958 | 6,894 |
| Accounts receivable - inter-company | 3,920 | 1,872 | 916 | 776 |
| Other current assets - 3rd party | 17 | (4) | (1) | 27 |
| Other current assets - inter-company | 6,426 | 4,384 | 2,577 | 2,903 |
| Total Current Assets | 14,128 | 10,131 | 10,450 | 10,600 |

Property, Plant and Equipment:

| | | | | |
|---|---|---|---|---|
| Property, plant and equipment, at cost | 166 | 143 | 143 | 143 |
| Less accumulated depreciation and amortz. | (148) | (140) | (143) | (143) |
| Net Property, Plant and Equipment | 18 | 3 | 0 | 0 |
| Other Assets | 106 | 89 | 25 | 188 |
| Total  Assets | 14,252 | 10,223 | 10,475 | 10,788 |

**LIABILITIES AND EQUITIES**

Current Liabilities:

| | | | | |
|---|---|---|---|---|
| Accounts payable - trade | 3,205 | 925 | 557 | 1,042 |
| Other current liabilities - 3rd party | 3,549 | 1,514 | 1,471 | 1,127 |
| Oher current liabilities - inter-company | 419 | 7 | 443 | 202 |
| Total Current Liabilities | 7,173 | 2,446 | 2,471 | 2,371 |

Long-Term Liabilities

| | | | | |
|---|---|---|---|---|
| Long-term borrowings (excluding current maturities) | 32 | 0 | 0 | 0 |
| Total Long-term Liabilities | 32 | 0 | 0 | 0 |
| Deferred Income Taxes | (63) | (63) | 0 | 0 |
| Income to surplus | 749 | 730 | 164 | 413 |

Capital Shares and Equities:

| | | | | |
|---|---|---|---|---|
| Common shares | 0 | 0 | 0 | 0 |
| Earned surplus and other equities | 6,361 | 7,110 | 7,840 | 8,004 |
| Total Capital Shares and Equities | 6,361 | 7,110 | 7,840 | 8,004 |
| Total Liabilities and Equities | 14,252 | 10,223 | 10,475 | 10,788 |

# FARMLAND TRANSPORTATION, INC.
## (Post-Petition)
## BALANCE SHEET
## (Amounts in Thousands)

|  | May 31 |
| --- | --- |
|  | 2003 |
| **ASSETS** |  |
|  |  |
| Current Assets: |  |
| Accounts receivable - trade | 1,101 |
| Accounts receivable - inter-company | 642 |
| Other current assets | (11) |
| Other current assets - inter-company | 8,561 |
|  |  |
| Total Current Assets | 10,293 |
|  |  |
| Property, Plant and Equipment: |  |
| Property, plant and equipment, at cost | 143 |
| Less accumulated depreciation and amortz. | (143) |
|  |  |
| Net Property, Plant and Equipment | 0 |
|  |  |
| Other Assets | 310 |
|  |  |
| Total  Assets | 10,603 |
|  |  |
| **LIABILITIES AND EQUITIES** |  |
|  |  |
| Current Liabilities: |  |
| Accounts payable - trade | 0 |
| Other current liabilities - 3rd party | 665 |
| Other current liabilities - inter-company | 500 |
|  |  |
| Total Current Liabilities | 1,165 |
|  |  |
| Liabilities Subject to Compromise | 3,383 |
|  |  |
| Net loss | (1,155) |
|  |  |
| Capital Shares and Equities: |  |
| Common shares | 0 |
| Earned surplus and other equities | 7,210 |
|  |  |
| Total Capital Shares and Equities | 7,210 |
|  |  |
| Total Liabilities and Equities | 10,603 |

**FARMLAND TRANSPORTATION, INC.**
**(Pre-Petition)**
**STATEMENT OF OPERATIONS**

| | Year Ended August 31 | | | Nine Months Ended May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amounts in Thousands) | | |
| Sales | 86,131 | 52,483 | 42,602 | 39,938 |
| Cost of sales | 81,416 | 48,228 | 38,044 | 36,555 |
| Gross income | 4,715 | 4,255 | 4,558 | 3,383 |
| Selling, general and administrative expense | (4,027) | (3,760) | (4,631) | (3,092) |
| Interest expense | 561 | 565 | 0 | 0 |
| Interest income | 0 | 0 | 336 | 121 |
| Other income | 0 | 13 | 10 | 1 |
| Income from continuing operations before income tax expense | 1,249 | 1,073 | 273 | 413 |
| Income tax expense | (500) | (343) | (109) | 0 |
| Net income | 749 | 730 | 164 | 413 |

**FARMLAND TRANSPORTATION, INC.**
**(Post-Petition)**
**STATEMENT OF OPERATIONS**
**(Amounts in Thousands)**

|  | Three Months Ended<br>August 31 | Nine Months Ended<br>May 31 |
|---|---|---|
|  | 2002 | 2003 |
| Sales | 10,721 | 17,304 |
| Cost of sales | 9,919 | 15,902 |
| Gross income | 802 | 1,402 |
| Selling, general & administrative expense | (1,849) | (2,187) |
| Other income (expense) | 14 | (195) |
| Reorganization expense | 0 | (175) |
| Loss from continuing operations<br>  before income tax benefit (expense) | (1,033) | (1,155) |
| Income tax benefit (expense) | (173) | 0 |
| Net loss | (1,206) | (1,155) |

**SFA, INC.**
**(Pre-Petition)**
**BALANCE SHEET**

| | August 31 | | | May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amounts in Thousands) | | |

ASSETS

Current Assets:

| | | | | |
|---|---|---|---|---|
| Accounts receivable - trade | 3,005 | 4,212 | 3,095 | 2,408 |
| Accounts receivable - inter-company | (154) | 29 | 29 | 32 |
| Inventories | 4,058 | 3,161 | 3,436 | 2,588 |
| Other current assets - 3rd party | 328 | 277 | 756 | 180 |
| Other current assets - inter-company | 0 | 0 | 696 | 6,077 |
| Total Current Assets | 7,237 | 7,679 | 8,012 | 11,285 |
| Investments and Long-Term Receivables | 0 | 0 | 110 | 378 |

Property, Plant and Equipment:

| | | | | |
|---|---|---|---|---|
| Property, plant and equipment, at cost | 3,068 | 4,495 | 4,542 | 2,203 |
| Less accumulated depreciation and amortz. | (266) | (1,705) | (1,946) | (1,324) |
| Net Property, Plant and Equipment | 2,802 | 2,790 | 2,596 | 879 |
| Other Assets | 471 | 447 | 385 | 35 |
| Total  Assets | 10,510 | 10,916 | 11,103 | 12,577 |

LIABILITIES AND EQUITIES

Current Liabilities:

| | | | | |
|---|---|---|---|---|
| Accounts payable - trade | 102 | 1,053 | 1,157 | 3,110 |
| Other current liabilities - 3rd party | 1,649 | (29) | 363 | (77) |
| Other current liabilities - inter-company | 40 | 296 | 0 | 0 |
| Total Current Liabilities | 1,791 | 1,378 | 1,520 | 3,033 |

Long-Term Liabilities

| | | | | |
|---|---|---|---|---|
| Long-term borrowings (excluding current maturities) | (865) | 0 | 0 | 0 |
| Total Long-Term Liabilities | (865) | 0 | 0 | 0 |
| Income (loss) to surplus | 321 | 256 | 45 | (40) |

Capital Shares and Equities:

| | | | | |
|---|---|---|---|---|
| Common shares | 1 | 1 | 1 | 1 |
| Earned surplus and other equities | 9,262 | 9,281 | 9,537 | 9,583 |
| Total Capital Shares and Equities | 9,263 | 9,282 | 9,538 | 9,584 |
| Total Liabilities and Equities | 10,510 | 10,916 | 11,103 | 12,577 |

]

**SFA, INC.**
**(Post-Petition)**
**BALANCE SHEET**
**(Amounts in Thousands)**

|                                                      | May 31 |
|------------------------------------------------------|--------|
|                                                      | 2003   |
| **ASSETS**                                           |        |
| Current Assets:                                      |        |
| Accounts receivable - trade                          | 165    |
| Other current assets                                 | 14     |
| Other current assets - inter-company                 | 11,229 |
| Total Current Assets                                 | 11,408 |
| Investments and Long-Term Receivables                | 437    |
| Property, Plant and Equipment:                       |        |
| Property, plant and equipment, at cost               | 441    |
| Less accumulated depreciation and amortization       | (351)  |
| Net Property, Plant and Equipment                    | 90     |
| Other Assets                                         | 0      |
| Total  Assets                                        | 11,935 |
| **LIABILITIES AND EQUITIES**                         |        |
| Current Liabilities:                                 |        |
| Accounts payable - trade                             | (62)   |
| Other current liabilities - 3rd party                | 23     |
| Other current liabilities - inter-company            | 89     |
| Total Current Liabilities                            | 50     |
| Liabilities Subject to Compromise                    | 3,846  |
| Net loss                                             | (688)  |
| Capital Shares and Equities:                         |        |
| Common shares                                        | 1      |
| Earned surplus and other equities                    | 8,726  |
| Total Capital Shares and Equities                    | 8,727  |
| Total Liabilities and Equities                       | 11,935 |

**SFA, INC.**
**(Pre-Petition)**
**STATEMENT OF OPERATIONS**

| | Year Ended August 31 | | | Nine Months Ended May 31 |
|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 |
| | | (Amounts in Thousands) | | |
| Sales | 34,332 | 35,389 | 34,599 | 16,944 |
| Cost of sales | 29,069 | 30,284 | 29,272 | 13,922 |
| Gross income | 5,263 | 5,105 | 5,327 | 3,022 |
| Selling, general & administrative expense | (7,322) | (6,945) | (7,259) | (5,120) |
| Interest expense | 0 | (33) | (17) | 62 |
| Interest income | 10 | 247 | 11 | 0 |
| Other income | 2,370 | 1,726 | 2,007 | 1,996 |
| Income (loss) from continuing operations before income tax (expense) benefit | 321 | 100 | 69 | (40) |
| Income tax (expense) benefit | 0 | 156 | (24) | 0 |
| Net income (loss) | 321 | 256 | 45 | (40) |

**SFA, INC.**
**(Post-Petition)**
**STATEMENT OF OPERATIONS**
**(Amounts in Thousands)**

|  | Three Months Ended August 31 | Nine Months Ended May 31 |
|---|---|---|
|  | 2002 | 2003 |
| Sales | 3,450 | 1,313 |
| Cost of sales | 2,998 | 1,062 |
| Gross income | 452 | 251 |
| Selling, general & administrative expense | (1,216) | (1,125) |
| Other income (expense) | 38 | 245 |
| Reorganization (expense) income | (337) | (59) |
| Loss from continuing operations before income tax benefit (expense) | (1,063) | (688) |
| Income tax benefit (expense) | 247 | 0 |
| Net loss | (816) | (688) |

**<u>APPENDIX C</u>**

Organization Structure of the Debtors



## **APPENDIX D**

Liquidation Analysis for the Debtors

The Debtors believe that the Plan meets the "best interests" test as set forth in section 1129(a)(7) of the Bankruptcy Code.  The Debtors believe that, under the Plan, holders of Impaired Claims and Impaired Interests against the Debtors will receive property with a value equal to or in excess of the value such holders would receive in the event each of the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis that supports these conclusions is detailed in Section V.D.1, *Best Interest of Holders of Claims and Interest,* and is summarized on the attached chart.  Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors, and are also based upon assumption with respect to certain liquidation decisions which could be subject to change.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.  Some of the risk factors associated with the values contained in the Liquidation Analysis are described in Section VI.A, *Risk That Distributions May Be Less Than Estimated By Debtors.*  In addition, all distributions under the Plan will be paid over time in accordance with the distribution procedures outlined in Section IV.D, *Provisions Governing Distributions.*

| Class of Claims | Estimated Amount of Claims ($millions) (Low/High) | Estimated Amount of Claims ($millions) (Low/High) | Estimated Recovery Percentage (Low/High) | Estimated Recovery Percentage (Low/High) |
|---|---|---|---|---|
| | Chapter 11 | Chapter 7 | Chapter 11 | Chapter 7 |
| Administrative Claims (1) | $204.1 | $231.2/$233.3 | 100% | 100%/100% |
| Priority Tax Claims | $9.8 | $9.8 | 100% | 100% |
| DIP Loan Claims | $10.5 | $10.5 | 100% | 100% |
| Class 1 - Other Priority Claims | $0.1 | $0.1 | 100% | 100% |
| Class 2 - Secured Lender Claims | $0.0 | $0.0 | 100% | 100% |
| Class 3 - Other Secured Claims | $19.0 | $19.0 | 100% | 100% |
| Class 4 - Demand Certificates Claims | $20.0 | $20.0 | 100% | 100% |
| Class 5 - Subordinated Certificates Claims | $557.3 | $557.3 | 60%/82% | 42%/49% |
| Class 6 - Convenience Claims against Industries | $2.0 | $2.0 | 100% | 100% |
| Class 7 - General Unsecured Claims against Industries | $274.6/$499.1 | $499.1 | 60%/82% | 44%/51% |
| Class 8 - Industries Preferred Shares | $100.0 | $100.0 | 0% | 0% |
| Class 9 - Industries Common Shares | $596.7 | $596.7 | 0% | 0% |
| Class 10 - General Unsecured Claims against Foods | $33.0 | $33.0 | 100% | 100% |
| Class 11 - Old Securities of Foods | n/a | n/a | See note 2 below | See note 2 below |
| Class 12 - General Unsecured Claims against Transportation | $3.2 | $3.2 | 100% | 100% |
| Class 13 - Old Securities of Transportation | n/a | n/a | 0% | 0% |
| Class 14 - General Unsecured Claims against SFA | $2.2 | $2.2 | 100% | 100% |
| Class 15 - Old Securities of SFA | n/a | n/a | 0% | 0% |
| Class 16 - General Unsecured Claims against Pipeline | $1.0 | $1.0 | 100% | 100% |
| Class 17 - Old Securities of Pipeline | n/a | n/a | 0% | 0% |
| Class 18 - Intercompany Claims | $198.0 | $198.0 | 100% | 100% |
| Class 19 - Subordinated Claims | $0.0 | $0.0 | 0% | 0% |

(1) In the context of a Chapter 7 liquidation, "Administrative Claims" include both the Administrative Claims incurred in the Chapter 11 cases as well as the Chapter 7 administrative and wind-down expenses, including, without limitation, Chapter 7 trustee fees, professional fees, wind-down costs and other administrative expenses incurred in the context of the Chapter 7 liquidations.

(2) The Class 11 distribution pool is not less than the estimated distributions that the holders of the Minority Foods shares would receive in a Chapter 7 liquidation.

## **APPENDIX E**

Orders Related to Non-Debtor Owned Property[1/]

1. Hutchinson, KS Steel Plant (4th and Airport Road) (Kansas Department of Health and Environment, 95-E-0245, April 1996; 96-E-0247, October 18, 1996)

2. North Kansas City, MO (Missouri Department of Natural Resources, June 13, 2002)

3. St. Joseph, MO Facility (Lower Lake Road) (Missouri Department of Natural Resources, November 20, 2000)

4. St. Joseph, MO (4th and Senaca) (U.S. EPA, VII-90-0002)

5. Hastings, NE Far-Mar-Co Subsite (U.S. EPA and Nebraska Department of Environmental Quality, USDC-Nebraska Civil Docket No. 4:960V3076, May 7, 1997)

---

[1/] The Debtors reserve their right, at any time prior to the Effective Date, upon prior consent of the Bankruptcy Committees, to amend Appendix E to modify any other information contained thereon and to provide notice of any such amendments to the Bankruptcy Court.

E-FILED
Wednesday, 31 May, 2006  04:44:12 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 5

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERB DISTRICT OF MISSOSURI

In re:                                  )    In Proceedings Under Chapter 11
                                        )
FARMLAND INDUSTRIES, INC., et al.,      )    Case No. 02-50557-JWV
                                        )    Joint Administration
                    Debtors.            )
                                        )

## DECLARATION OF SERVICE REGARDING:

| | | |
|---|---|---|
| 1. | NOTICE OF CHAPTER 11 BANKRUPTCY CASE, MEETING OF CREDITORS, & DEADLINES | Attached hereto as Exhibit 1 |
| 2. | NOTICE TO CREDITORS AND OTHER PARTIES IN INTEREST OF LAST DATE TO FILE PROOFS OF CLAIM | Attached hereto as Exhibit 2 |
| 3. | PROOF OF CLAIM [CUSTOM—NAME ONLY] | Sample attached hereto as Exhibit 3 |
| 4. | PROOF OF CLAIM [CUSTOM—NAME AND AMOUNT] | Sample attached hereto as Exhibit 4 |
| 5. | PROOF OF CLAIM [BLANK] | Attached hereto as Exhibit 5 |

I, James H. Myers, state as follows:

1.      I am over eighteen years of age and I believe the statements contained herein are true based on my personal knowledge. My business address is c/o Bankruptcy Management Corporation, 1330 East Franklin Avenue, El Segundo, California 90245.

2.      At the direction of Bryan Cave LLP, attorneys for the debtors and debtors in possession in the above-captioned cases, I caused the above-listed documents to be served on the parties listed in Exhibit 6 as follows:

        a.      Exhibits 1, 2 and 3 were served on the parties referenced as Service List 1788;

*page 1 of 5677*

     b.     Exhibits 1, 2 and 4 were served on the parties referenced as Service List 1789;

     c.     Exhibits 2 and 3 were served on the parties referenced as Service Lists1801, 1803, 1842 , and 1883;

     d.     Exhibits 2 and 4 were served on the parties referenced as Service Lists 1802 and 1832; and

     e.     Exhibits 2 and 5 were served on the parties referenced as Service List 1836.

3.     Except as stated in Exhibit 6, such service was effected on November 1, 2002 via first-class mail and deposited with the United States Postal Service with postage thereon fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: November _20_ , 2002
El Segundo, California

_____
James H. Myers

State of California     )
                  ) ss
County of Los Angeles     )

     Personally appeared before me on this _20_ day of November 2002, James H. Myers, an individual, known to me to be the person who executed the foregoing instrument and acknowledged the same.

_____
Angeline M. Carter
My Commission Expires July 20, 2005

ANGELINE M. CARTER
Commission # 1314038
Notary Public - California
Los Angeles County
My Comm. Expires Jul 20, 2005

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | ANDREW P MCDONOUGH, 4843 GLENDALE CIR, MARIANNA, FL 32446 |
| 1803 | ANDREW PALLET & WOOD FIBER CO, 190 SE 34TH ST, DES MOINES, IA 50317 |
| 1803 | ANDREW PALLET & WOOD FIBER CO, 190 SE 34TH ST, DES MOINES, IA 50317-7321 |
| 1803 | ANDREW PAUL WITT, C/O EMPRISE BANK NA HUTCHINSON, PO BOX 1488, HUTCHINSON, KS 67504-1488 |
| 1803 | ANDREW PEDERSEN, R R 1, ROLFE, IA 50581 |
| 1803 | ANDREW R DEWITT, 6310 MARTY ST, OVERLAND PARK, KS 66202 |
| 1803 | ANDREW R. DEWITT, 6310 MARTY, OVERLAND PARK, KS 66202 |
| 1803 | ANDREW ROLLINS, PO BOX 121, RIO, IL 61472-0121 |
| 1789 | ANDREW SIMONS, 12949 NW 230TH, MADRID, IA 50156 |
| 1803 | ANDREW STERLING FOUNDATION, 5549 SE 61ST ST, BERRYTON, KS 66409-9665 |
| 1803 | ANDREW STERLING FOUNDATION, MIKE STERNLING, 5549 SE 61ST ST, BERRYTON, KS 66409 |
| 1803 | ANDREW T. HARNESS FFE, 4001 SANDHILL RD TRLR 204, SPRINGFIELD, IL 62702-1158 |
| 1803 | ANDREW WREN, 1063 E 5TH AVE, MONMOUTH, IL 61462-2442 |
| 1789 | ANDREW, ALICE M, 217 N 7TH ST, WYMORE, NE 68466 |
| 1803 | ANDREW, BRANDY N, 1228 3RD ST, TRUMANN, AR 72472-1305 |
| 1803 | ANDREW, JEFFERY A, 5392 US HIGHWAY 151, PLATTEVILLE, WI 53818-8906 |
| 1842 | ANDREW, SCOTT, PO BOX 133 DOUGLAS ST, RANDOLPH, NE 68771<br>*served 11-5-02* |
| 1803 | ANDREWS ASPHALT CONSTRUCTION INC, PO BOX 750015, 2530 NW MENOKEN RD, TOPEKA, KS 66675-0015 |
| 1803 | ANDREWS ASPHALT CONSTRUCTN INC, PO BOX 750015, TOPEKA, KS 66675-0015 |
| 1803 | ANDREWS ASSOCIATED FOOD, MAIN STREET, GROVE HILL, AL 36451 |
| 1803 | ANDREWS ASSOCIATED FOODS #2, 430 MAIN ST, GROVE HILL, AL 36451 |
| 1803 | ANDREWS ASSOCIATED FOODS #2, 430 MAIN STREET, GROVE HILL, AL 36451 |
| 1803 | ANDREWS BARTLETT EXPO SERVICES, 1055 RESEARCH CENTER ATL DR SW, ATLANTA, GA 30331 |
| 1803 | ANDREWS BARTLETT EXPO SERVICES, 1849 W 24TH ST, CLEVELAND, OH 44113-3599 |
| 1803 | ANDREWS BARTLETT EXPO SERVICES, 5248 SOUTH CIERO AVE, CHICAGO, IL 60638 |
| 1802 | ANDREWS ROOFING & SHEET METAL INC, PO BOX 687, CARROLL, IA 51401-0687 |
| 1803 | ANDREWS ROOFING & SHEET, METAL INC, BOX 687, CARROLL, IA 51401 |
| 1803 | ANDREWS TRANSPORT INC, PO BOX 163469, FORT WORTH, TX 76161-3469 |
| 1802 | ANDREWS TRANSPORT INC, PO BOX 678186, DALLAS, TX 75267-8186 |
| 1842 | ANDREWS, BLAINE, 208 SOUTH 3RD, HAMPTON, NE 68843<br>*served 11-5-02* |
| 1803 | ANDREWS, BRUCE A, 3222 TWIN WASH SQ, FORT COLLINS, CO 80528-9453 |
| 1842 | ANDREWS, DENNIS D, 803 S T RD, HAMPTON, NE 68843<br>*served 11-5-02* |
| 1803 | ANDREWS, DENNIS J, 2215 N 153RD ST, BASEHOR, KS 66007-9382 |
| 1803 | ANDREWS, DENNIS L, PO BOX 469, AMITY, OR 97101-0469 |
| 1842 | ANDREWS, DEWEY O, RT 1 BOX 37, AFTON, OK 74331-9603<br>*served 11-5-02* |
| 1802 | ANDREWS, HUBERT, 2305 2ND AVE, DODGE CITY, KS 67801 |
| 1803 | ANDREWS, JERRY R, 97 KNOX ROAD 1300 N, GALESBURG, IL 61401-8759 |
| 1803 | ANDREWS, JOHN EDWARD, 605 BLUFF ST APT 228, DUBUQUE, IA 52001-4677 |
| 1803 | ANDREWS, JONI E, PO BOX 173, VANNDALE, AR 72387-0173 |
| 1803 | ANDREWS, KAREN J, 1025 SUFFIELD ST, AGAWAM, MA 01001-2997 |
| 1802 | ANDREWS, KYLEEN, 418 5TH AVE NW, WATERTOWN, SD 57201 |
| 1842 | ANDREWS, LARRY, RR 1 BOX 68, BERESFORD, SD 57004<br>*served 11-5-02* |
| 1803 | ANDREWS, LINDA, 10115 N WYANDOTTE ST, KANSAS CITY, MO 64155-1783 |

**Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice**

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | BUTLER COUNTY CSEA, 118 HIGH STREET, HAMILTON, OH 45011 |
| 1803 | BUTLER COUNTY LANDFILL INC, PO BOX 126, DAVID CITY, NE 68632-0126 |
| 1789 | BUTLER COUNTY TREASURER, 205 W CENTRAL, ROOM 207, EL DORADO, KS 66434 |
| 1789 | BUTLER COUNTY TREASURER, A/C LAURA JANE OIL CO, 205 W CENTRAL AVE, EL DORADO, KS 67042-2100 |
| 1803 | BUTLER COUNTY TREASURER, BUTLER COUNTY COURTHOUSE, 205 W CENTRAL AVE STE 207, EL DORADO, KS 67042-2106 |
| 1842 | BUTLER COUNTY TREASURER, BUTLER COUNTY COURTHOUSE, 205 W CENTRAL ROOM 207, EL DORADO, KS 66434<br>*served 11-5-02* |
| 1803 | BUTLER FOOD SALES, RT 2 KENTON STATION RD, MAYSVILLE, KY 41056 |
| 1801 | BUTLER FOODS, 2300 E BUTLER ST, PHILADELPHIA, PA 19137-1012 |
| 1803 | BUTLER NUTRITION CENTER, 20 HENRY ST, BUTLER, OH 44822 |
| 1803 | BUTLER PAPER, PO BOX 285, WICHITA, KS 67201-0285 |
| 1842 | BUTLER PORK FARM INC, 15627 40TH ST, WAPELLO, IA 52653<br>*served 11-5-02* |
| 1803 | BUTLER REFRIGERATED INC, 690 PERRY HWY, HARMONY, PA 16037-8412 |
| 1803 | BUTLER REFRIGERATED INC, 690 PERRY HWY, HARMONY, PA 16037-8412 |
| 1803 | BUTLER REFRIGERATED INC, 690 PERRY HWY, HARMONY, PA 16037-8412 |
| 1803 | BUTLER REFRIGERATED MEATS INC, 690 PERRY HWY, HARMONY, PA 16037-8412 |
| 1802 | BUTLER RURAL ELECTRIC COOP ASSN, PO BOX 2991, WICHITA, KS 67201-2991 |
| 1803 | BUTLER SHOP N SAVE, HANSEN & 6TH AVE, BUTLER, PA 16001 |
| 1842 | BUTLER SNOW O'MARA STEVENS & CANNADA PLLC, 210 E CAPITOL ST FL 17, PO BOX 22567, JACKSON, MS 39225-2567<br>*served 11-5-02* |
| 1803 | BUTLER SNOW OMARA STEVENS &, CANNADA PLLC, P O BOX 22567, 210 E CAPITOL ST FL 17, JACKSON, MS 39225-2567 |
| 1842 | BUTLER TRANSPORT INC, 1017 S COY ST, PO BOX 172023, KANSAS CITY, KS 66117<br>*served 11-5-02* |
| 1803 | BUTLER TRANSPORT INC, PO BOX 17023, KANSAS CITY, KS 66117 |
| 1803 | BUTLER TRANSPORT INC, PO BOX 172023, 1017 S COY ST, KANSAS CITY, KS 66117 |
| 1803 | BUTLER TRANSPORT, 1017 S COY, P O BOX 172023, KANSAS CITY, KS 66117-1023 |
| 1803 | BUTLER, ANDREW Y, 808 S D ST, MONMOUTH, IL 61462-2555 |
| 1789 | BUTLER, BILLY, 423 S. 4TH, MEDFORD, OK 73759 |
| 1788 | BUTLER, BILLY, 423 S. 4TH, MEDFORD, OK 73759 |
| 1803 | BUTLER, BOBBIE C, 7512 N W 84TH TERRACE, KANSAS CITY, MO 64153 |
| 1802 | BUTLER, BOBBIE C, 7512 NW 84TH TER, KANSAS CITY, MO 64153 |
| 1803 | BUTLER, BRIAN K., 6117 WINCHESTER DR, OKLAHOMA CITY, OK 73162-1720 |
| 1842 | BUTLER, BRIAN K, RR 1, CHARTER OAK, IA 51439<br>*served 11-5-02* |
| 1789 | BUTLER, CHARLES A, 2576 TUTTLE RD, MASON, MI 48854 |
| 1803 | BUTLER, CHARLES R, 808 S D ST, MONMOUTH, IL 61462-2555 |
| 1803 | BUTLER, CHARLES W, 3503 SWEENEY DR, DICKINSON, TX 77539-4561 |
| 1803 | BUTLER, CONCHETTA M, PO BOX 231, MONMOUTH, IL 61462-0231 |
| 1842 | BUTLER, CURTIS J, 2481 200 ST, ARION, IA 51520<br>*served 11-5-02* |
| 1842 | BUTLER, DALE L, 7719 COTTONTAIL ST, WICHITA, KS 67212-3622<br>*served 11-5-02* |
| 1842 | BUTLER, DAVE, 2650 230TH AVE, GRAND MOUND, IA 52751<br>*served 11-5-02* |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | CASS COUNTY FRIEND OF THE, COURT, PO BOX 38, CASSOPOLIS, MI 49031-0038 |
| 1803 | CASS COUNTY RECORDER, CASS COUNTY COURTHOUSE, 5 W 7TH ST, ATLANTIC, IA 50022 |
| 1842 | CASS COUNTY SERVICE COMPANY, PO BOX 108, VIRGINIA, IL 62611<br>*served 11-5-02* |
| 1842 | CASS COUNTY TREASURER, CASS CO GOVERNMENT BLDG, 200 COURT PARK, LOGANSPORT, IN 46947<br>*served 11-5-02* |
| 1803 | CASS COUNTY TREASURER, CASS COUNTY COURTHOUSE, 5 W 7TH ST, ATLANTIC, IA 50022-1492 |
| 1803 | CASS COUNTY TREASURER, CASS COUNTY GOVT BLDG, 200 COURT PARK, LOGANSPORT, IN 46947 |
| 1803 | CASS COUNTY TREASURER, PO BOX 2806, FARGO, ND 58108-2806 |
| 1789 | CASS COUNTY TREASURER, PO BOX C, 201 1/2 W ELDORA AVE, WEEPING WATER, NE 68463-0195 |
| 1802 | CASS COUNTY VOITURE 1218 40/8, 416 S 7TH, PLATTSMOUTH, NE 68048 |
| 1842 | CASS COUNTY, PO BOX 204, WEEPING WATER, NE 68463<br>*served 11-5-02* |
| 1803 | CASS INFORMATION SYSTEMS INC, PO BOX 2498, COLUMBUS, OH 43216-2498 |
| 1803 | CASS INFORMATION SYSTEMS INC, PO BOX 2498, COLUMBUS, OH 43216-2498 |
| 1802 | CASS, ALFRED, RR 1 BOX 41, BEAVER CITY, NE 68926 |
| 1842 | CASS, JIM, PO BOX 96, HEREFORD, CO 80732<br>*served 11-5-02* |
| 1802 | CASS, LAURA, 3536 W 92ND TERR, LEAWOOD, KS 66206 |
| 1842 | CASS, RALPH D, 2352 GIBBON AVE, FONTANELLE, IA 50846-9744<br>*served 11-5-02* |
| 1789 | CASS, ROBERT T, 3023 WARBLER LN, HUMBLE, TX 77396 |
| 1803 | CASSANDRA L WALLACE FFE, 1300 S 6TH ST, MONMOUTH, IL 61462-2858 |
| 1803 | CASSANDRA L WALLACE, 1300 S 6TH ST, MONMOUTH, IL 61462-2858 |
| 1803 | CASSCOE COMMUNITY CENTER, 2340 RIVER ROAD, CASSCOE, AR 72026 |
| 1803 | CASSEL HILLS GOLF CLUB, 201 CLUB HOUSE WAY, VANDALIA, OH 45377 |
| 1842 | CASSEL, ALLEN, RR 1, MANCHESTER, IA 52057<br>*served 11-5-02* |
| 1803 | CASSEL, JULIE M, 503 N SNAPP ST, ABINGDON, IL 61410-1365 |
| 1803 | CASSELL, WILLIAM G, 212 COTTAGE AVE, GALESBURG, IL 61401-5014 |
| 1802 | CASSELMAN, MADGE, 2605 RIVERCREST DR, ARLINGTON, TX 76006 |
| 1802 | CASSELS, EUGENE, RR 2 BOX 210A, GROTON, SD 57445 |
| 1803 | CASSEM TIERNEY ADAMS GOTCH &, DOUGLAS, 8805 INDIAN HILLS DR SUITE 300, OMAHA, NE 68114 |
| 1802 | CASSEM TIERNEY ADAMS GOTCH, & DOUGLAS, 8805 INDIAN HILLS DR STE 300, OMAHA, NE 68114 |
| 1802 | CASSEM TIERNEY ADAMS GOTCH, & DOUGLAS, 8805 INDIAN HILLS DR STE 300, OMAHA, NE 68114 |
| 1842 | CASSENS, JOHN E JR, RR 1, SCHLESWIG, IA 51461<br>*served 11-5-02* |
| 1803 | CASSIA COUNTY TREASURER, CASSIA COUNTY COURTHOUSE, 1459 OVERLAND AVE, BURLEY, ID 83318-1862 |
| 1842 | CASSIDAY, AMY R., 14622 GRANT STREET, DOLTON, IL 60419-2021<br>*served 11-5-02* |
| 1803 | CASSIDAY, AMY R, 707 S CROSS ST APT 4, ROBINSON, IL 62454-2245 |
| 1842 | CASSIDAY, CHRISTOPHER D, 1026 S 8TH ST, MONMOUTH, IL 61462-2963<br>*served 11-5-02* |
| 1803 | CASSIDAY, CHRISTOPHER D, 1060 E 5TH AVE, MONMOUTH, IL 61462-2443 |
| 1842 | CASSIDAY, JASON A., 509 E. BROADWAY, APT. C, MONMOUTH, IL 61462-1892<br>*served 11-5-02* |
| 1803 | CASSIDAY, JASON A, 201 DUFFIELD AVE APT 2, GALESBURG, IL 61401-8119 |
| 1842 | CASSIDAY, JAY C, 819 S MAIN ST, MONMOUTH, IL 61462-2653<br>*served 11-5-02* |
| 1803 | CASSIDAY, JENNIFER S, 25 COKELS CT, MONMOUTH, IL 61462-2583 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst  Name and Address of Served Party**

| | |
|---|---|
| 1803 | CASSIDAY, ROBERT C, PO BOX 163, SMITHSHIRE, IL 61478-0163 |
| 1842 | CASSIDAY, TRACY R, 1026 S 8TH ST, MONMOUTH, IL 61462-2963<br>*served 11-5-02* |
| 1803 | CASSIDAY, TRACY R, 1060 E 5TH AVE, MONMOUTH, IL 61462-2443 |
| 1802 | CASSIDY, LAURICE, 5267 SW RAINTREE PKY, LEES SUMMIT, MO 64082 |
| 1842 | CASSIDY, MARTHA, 198 WASH POND RD, HAMPSTEAD, NH 03841-2111<br>*served 11-5-02* |
| 1842 | CASSIDY, ROBERT D, 45 SEWARD AVE, SPRINGFIELD, OR 97477-1378<br>*served 11-5-02* |
| 1803 | CASSIDY, SAFEENA B, 1218 OLD MILL LN, ELK GROVE VLG, IL 60007-4085 |
| 1842 | CASSIDY, SAFEENA, 1218 OLD MILL LN, ELK GROVE VILLAGE, IL 60007-4085<br>*served 11-5-02* |
| 1803 | CASSIDYS, 2511 W MAHOTT RD, EAU CLAIRE, WI 54703 |
| 1803 | CASSIE DECKER, 727 S SUNNY LN, MONMOUTH, IL 61462 |
| 1842 | CASSMANN, DAVID H, 2305 HIGHWAY 18 E, ALGONA, IA 50511<br>*served 11-5-02* |
| 1803 | CASSMEYER FARMS, 6714 HEDGEWOOD LN, JEFFERSON CITY, MO 65101-8875 |
| 1842 | CASSMEYER, RON, HCR 65 BOX 105, WESTPHALIA, MO 65085<br>*served 11-5-02* |
| 1789 | CASSON BORDER TRANSFER LLC, 841 N INDUSTRIAL PARK AVE, NOGALES, AZ 85621 |
| 1803 | CASSON BORDER TRANSFER LLC, 841 N INDUSTRIAL PARK AVE, NOGALES, AZ 85621 |
| 1803 | CASSON, ROBERT, 23075 305TH ST, MCCLELLAND, IA 51548 |
| 1803 | CASSUTT, CHAD, 1850 ELLIS ST APT 106, DUBUQUE, IA 52001-4463 |
| 1802 | CAST FARMS INC, 2737 PIONEER ROAD, MILFORD, NE 68405-8764 |
| 1803 | CAST, WAYNE R, RR 2 BOX 300A, PRINCETON, MO 64673-9467 |
| 1842 | CASTAGNA, JAMIE, 19204 AMBER WAY, NOBLESVILLE, IN 46060<br>*served 11-5-02* |
| 1801 | CASTAGNA, 19204 AMBERWAY, NOBLESVILLE, IN 46060 |
| 1801 | CASTAGNA, 405 FOREST HILLS DR., LOUISIANA, MO 63353 |
| 1803 | CASTANEDA, ARTURO, RR 1 BOX 23, GLADSTONE, IL 61437-9709 |
| 1803 | CASTANEDA, DANNY G, 2341 IVY AVE TRLR 19, CRETE, NE 68333-1167 |
| 1803 | CASTANEDA, EUSTAQUIO, 142 4TH AVE, MOLINE, IL 61265-1132 |
| 1883 | CASTANEDA, GRICELDA, 444 15TH AVE, EAST MOLINE, IL 61244-1315<br>*served on 11-20-02* |
| 1803 | CASTANEDA, NADIA L, 411 N 17TH ST APT 2, DENISON, IA 51442-1564 |
| 1803 | CASTANEDA, PEDRO A, 907 1ST AVE SW, AUSTIN, MN 55912-2466 |
| 1803 | CASTANEDA, PEDRO, 1128 E 16TH ST, CRETE, NE 68333-1805 |
| 1803 | CASTANEDA, RAMIRO, 412 S G ST, WELLINGTON, KS 67152-3124 |
| 1803 | CASTANEDA, RICARDO, 618 JUNIPER AVE, CRETE, NE 68333-2835 |
| 1803 | CASTANEDA-ANDRADE, JAIME, 1205 E 16TH ST, CRETE, NE 68333-1808 |
| 1842 | CASTANO, VIOLET W, 20416 LEONARD RD, LUTZ, FL 33549-8347<br>*served 11-5-02* |
| 1802 | CASTANOLA, STACY, 496 NUESTRA AVE, SUNNYVALE, CA 94086 |
| 1803 | CASTANON-REYES, EXIQUIO, 303 COURT ST, ALBERT LEA, MN 56007-2625 |
| 1803 | CASTEEL, CRYSTAL L, 1711 W CARL SANDBURG DR 102A, GALESBURG, IL 61401-1381 |
| 1842 | CASTEEL, JOE, 1717 BLAKE PL, SANTA ROSA, CA 95403<br>*served 11-5-02* |
| 1803 | CASTEEL, MICHAEL, 834 S A ST, MONMOUTH, IL 61462-2600 |
| 1803 | CASTEEL, PAMELA R, PO BOX 417, WILBER, NE 68465-0417 |
| 1803 | CASTEEL, TERESA K, 834 S A ST, MONMOUTH, IL 61462-2600 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1789 | CHARLES EZZELL, 1633 HILLVIEW RD, ABILENE, TX 79601-4810 |
| 1803 | CHARLES F EGGERS, 2519 AIRPORT ST, DENISON, IA 51442-7602 |
| 1803 | CHARLES F GOTTO FFE, DUBUQUE, IA 52001 |
| 1803 | CHARLES F KERSTEN, 2645 235 TRAIL, LOGANIA 51546, LOGAN, IA 51546 |
| 1789 | CHARLES F LATHROP, PO BOX 818, SANTA CLARA, UT 84765-0818 |
| 1803 | CHARLES F PHILIPP, 13720 LAKEWOOD DR, STE GENEVIERE, MO 63670 |
| 1803 | CHARLES F PHILIPP, 13720 LAKEWOOD DR, SAINTE GENEVIEVE, MO 63670 |
| 1789 | CHARLES F STONE III, C/O DAWSON-MARKWELL EXPLORATION CO, PO BOX 2446, OKLAHOMA CITY, OK 73101-2446 |
| 1789 | CHARLES F THOMPSON, 141 N ASH ST, VALLEY CENTER, KS 67147-2536 |
| 1803 | CHARLES FOX, 165 BELLEVUE AVE, WARWICK, RI 02888 |
| 1803 | CHARLES FOX, 165 BELLEVUE AVE, WARWICK, RI 02888 |
| 1803 | CHARLES FRANCIS MORELAND FFE, 2145 JERICHO RD, PEOSTA, IA 52068 |
| 1789 | CHARLES FREDERICK SCHAFER, 909 W 1ST ST APT 8, PELLA, IA 50219-1441 |
| 1803 | CHARLES FURMAN FFE, 2409 45TH STREET, LITTLE YORK, IL 61453-9730 |
| 1803 | CHARLES G HOLLINGSWORTH, CGH FARMS, 412 BOB O LINK LN, WHARTON, TX 77488 |
| 1789 | CHARLES G JOCHEMS CHILDRENS TRUST, C/O WILLIAM D JOCHEMS, 654 REDSTONE BLDV, CARBONDALE, CO 81623 |
| 1803 | CHARLES G LAWSON TRUCKING INC, 7815 MOBILE HWY, HOPE HULL, AL 36043 |
| 1789 | CHARLES G MCCUNE REV LIVING TRUST, CHARLES G MCCUNE TRUSTEE, 563 E ROSEWOOD ST, ROSE HILL, KS 67133-9233 |
| 1803 | CHARLES G OR KATHRINE E KEENE, 808 W 12TH AVE, CROSSETT, AK 71635-3806 |
| 1803 | CHARLES G PATTON, 522 N CARDINGTON ST, WICHITA, KS 67212 |
| 1789 | CHARLES G ROSELIUS &, VERA LEE ROSELIUS, RR 1 BOX 240, DEWEY, OK 74029-9801 |
| 1803 | CHARLES G SCHREUR, MAIL RETURNED 1988, KANAWHA, IA 50447 |
| 1803 | CHARLES G STEINKUHLER, 900 S LOCUST ST, SWEET SPRINGS, MO 65351-1518 |
| 1803 | CHARLES GARDENS, 120 S RUBY LN, FAIRVIEW HEIGHTS, IL 62208 |
| 1803 | CHARLES GILLETTE FFE, 119 S 6TH ST, MONMOUTH, IL 61462-2323 |
| 1803 | CHARLES GILLETTE, 119 S 6TH ST, MONMOUTH, IL 61462-2323 |
| 1789 | CHARLES GOERING, 2385 190TH ST, MARION, KS 66861-9422 |
| 1803 | CHARLES GUY EVANS & SONS INC, PO BOX 306, 142 E PINE AVE, WIGGINS, MS 39577 |
| 1803 | CHARLES H CORNISH, 45 SCHOOL ST, ENFIELD, CT 06082 |
| 1803 | CHARLES H CORNISH, 45 SCHOOL ST, ENFIELD, CT 06082 |
| 1803 | CHARLES H CROUSE JR, 839 COTTONWOOD DR, MALVERN, PA 19355 |
| 1789 | CHARLES H DUNN, ADDRESS UNKNOWN, |
| 1803 | CHARLES H ESCHER, 1267 BLUEBIRD PL, MANNING IA 51455, MANNING, IA 51455 |
| 1803 | CHARLES H MAYBEE, 12414 N 75TH EAST AVE, COLLINSVILLE, OK 74021-7110 |
| 1789 | CHARLES H NUGEN & BETTY NUGEN JTWROS, 3455 PINTO TRL, FORT WORTH, TX 76116-6726 |
| 1803 | CHARLES H PIKE, 2306 3RD AVE, DODGE CITY, KS 67801 |
| 1803 | CHARLES H PITTMAN, 809 W MILL ST, UKIAH, CA 95482 |
| 1803 | CHARLES H PITTMAN, 809 W MILL ST, UKIAH, CA 95482 |
| 1803 | CHARLES H PURVIANCE, 16088 SUN SUMMIT PT, SAN DIEGO, CA 92127-2050 |
| 1803 | CHARLES H SMITH JR, 45 BARNSIDE DR, BEDFORD, NH 03110 |
| 1803 | CHARLES H SMITH JR, 45 BARNSIDE DR, BEDFORD, NH 03110 |
| 1803 | CHARLES H VAN NESS, 8404 TAHITI RD, FT MYERS, FL 33912 |
| 1803 | CHARLES H VAN NESS, 8404 TAHITI RD, FORT MYERS, FL 33912 |
| 1803 | CHARLES H. NEMMERS FFE, DUBUQUE, IA 52001 |
| 1803 | CHARLES HACKEL, RR 1 BOX 133, SCOTIA, NE 68875-9749 |

**Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice**

Svc Lst  Name and Address of Served Party

| | |
|---|---|
| 1803 | CHURCH, VIRGINIA M, 8342B HIGHWAY 163, HARRISBURG, AR 72432-8918 |
| 1803 | CHURCHILL CONSULTIN, 8014 LICHTENAUER DR, LENEXA, KS 66219-2038 |
| 1803 | CHURCHILL LABORATORIES INC, PO BOX 971351, BOCA RATON, FL 33497 |
| 1803 | CHURCHILL TRUCK LINES INC, PO BOX 20626, BLOOMINGTON, MN 55420-0626 |
| 1802 | CHURCHILL, BRUCE F, 2290 COUNTY ROAD 1900, DE WITT, NE 68341-2212 |
| 1803 | CHURCHILL, CODY, 205 WOODHAVEN DR, SMITHVILLE, MO 64089-9638 |
| 1803 | CHURCHILL, DAVID C, PO BOX 434, WILBER, NE 68465-0434 |
| 1789 | CHURCHILL, DONALD C, RFD 2, GOBLES, MI 49055 |
| 1803 | CHURCHILL, GREGORY C, 427 N 3RD ST, MONMOUTH, IL 61462-1832 |
| 1803 | CHURCHILL, JANICE L, ROUTE 1 BOX 52A, DEWITT, NE 68341 |
| 1803 | CHURCHILL, JENNIFER W, PO BOX 434, WILBER, NE 68465-0434 |
| 1789 | CHURCHILL, RALPH, RFD 1, GOBLES, MI 49055 |
| 1803 | CHURCHWELL, GLENDA F, 20844 BARBARA RD, HARRISBURG, AR 72432-8897 |
| 1803 | CHURN, PAMELA K, 1762 NEWCOMER DR, GALESBURG, IL 61401-6650 |
| 1803 | CHURRAY, MARY A, 1629 140TH, PLEASANT DALE, NE 68423-9000 |
| 1803 | CHUTARO, EARLYNDA, 1103 1/2 IOWA ST, DUBUQUE, IA 52001-4820 |
| 1803 | CHUTARO, ELMI H., 1103 1/2 IOWA ST APT 202, DUBUQUE, IA 52001-4820 |
| 1803 | CHUX TRUX INC, PO BOX 367, WAKEENEY, KS 67672 |
| 1803 | CHWPD, 7540 LBJ FWY STE 100, DALLAS, TX 75251-1008 |
| 1803 | CHWPD, STE 100, 7540 LYNDON B JOHNSON FWY, DALLAS, TX 75251-1008 |
| 1803 | CHWPG INC DBA PROVISIONS, LOCKBOX #7073PO BOX 1450, MINNEAPOLIS, MN 55485-7073 |
| 1803 | CHWPG INC, DBA PROVISIONS, P O BOX 1450, MINNEAPOLIS, MN 55485-7073 |
| 1803 | CHWPG, PO BOX 59159, MINNEAPOLIS, MN 59159 |
| 1803 | CHWPG, PO BOX 59159, MINNEAPOLIS, MN 55459-8200 |
| 1803 | CI AG INC, RR 1, CISSNA PARK, IL 60924 |
| 1842 | CI AG, INC, RURAL ROUTE, CISSNA PARK, IL 60924<br>served 11-5-02 |
| 1803 | CIA LABS, 1717 COMMERCIAL, PO BOX 3022, SAINT JOSEPH, MO 64503-0022 |
| 1803 | CIA LABS, PO BOX 3022, 1717 COMMERCIAL ST, SAINT JOSEPH, MO 64503-0022 |
| 1803 | CIA RADIATOR WORKS, 4040 HORN LAKE RD, MEMPHIS, TN 38109 |
| 1842 | CIASCHINI, JOHN B, 138 CHESTNUT ST, WEST SPRINGFIELD, MA 01089-2827<br>served 11-5-02 |
| 1842 | CIASCHINI, JOHN B, 138 CHESTNUT ST, W SPRINGFIELD, MA 01089-2827<br>served 11-5-02 |
| 1803 | CIAVARELLA FOOD SERVICE, 100 RIVERDALE RD, RIVERDALE, NJ 07457-1700 |
| 1803 | CIBA GEIGY 3114121 2223121, AGRICULTURAL DIV, P O BOX 500357, SAINT LOUIS, MO 63150-0357 |
| 1842 | CIBA GEIGY CORP, C/O WERT, THERESA, PO BOX 18300, GREENSBORO, NC 27419-8300<br>served 11-5-02 |
| 1803 | CIBA GEIGY CORP, THERESA WERT, P O BOX 18300, GREENSBORO, NC 27419-8300 |
| 1803 | CIBA GEIGY, PO BOX 2277, RAHWAY, NJ 7065-2277 |
| 1803 | CIBA SPECIALTY, PO BOX 2372, CAROL STREAM, IL 60132-2372 |
| 1803 | CIBA SPECIALTY, PO BOX 2372, CAROL STREAM, IL 60132-2372 |
| 1789 | CIBA-GEIGY CORP-FUNK SEED, 5950 FAIRVIEW RD SU 616, CHARLOTTE, NC 28265 |
| 1789 | CIBATCO, 16447 F DR SOUTH, ALBION, MI 49224 |
| 1803 | CIBER INC, PO BOX 5912, DENVER, CO 80217-5912 |
| 1803 | CIBT INC, PO BOX 79407, BALTIMORE, MD 21279-0407 |
| 1803 | CICERO GRAPHIC RESOURCES INC, 3130 S 24TH ST, KANSAS CITY, KS 66106-4709 |
| 1803 | CICERO GRAPHIC RESOURCES INC, 5030 MACKEY ST, PO BOX 410016, OVERLAND PARK, KS 66203-1334 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | CONNIE BLACK, 13754 E 25TH PL, AURORA, CO 80011 |
| 1803 | CONNIE BLACK, 13754 E 25TH PLACE, AURORA, CO 80011 |
| 1789 | CONNIE DIX, PO BOX 416 203 W PARK AVE, BALD KNOB, AR 72010 |
| 1803 | CONNIE DOUGAN FFE, 226 GLEN DR, IOWA FALLS, IA 50126 |
| 1789 | CONNIE ELAINE FLETCHER, 502 SOONER RD, BARTLESVILLE, OK 74003-1427 |
| 1803 | CONNIE F CARTER FFE, 3781 ULLIN PL, DUNLAPIA, 51529 |
| 1803 | CONNIE F HEIL FFE, 541 N DORIS ST, WICHITA, KS 67212-2457 |
| 1803 | CONNIE F HOLMES, 305 S GREEN ST, WICHITA, KS 67211-2018 |
| 1803 | CONNIE F LANKFORD  FFE, 5012 W DOUGLAS, WICHITA, KS 67212-2434 |
| 1803 | CONNIE F MCDONALDUSE 30889, 5303 E MURDOCK ST, WICHITA, KS 67208-3561 |
| 1803 | CONNIE G WALBRECHT & ATTORNEYS, LOWE & ALBERTS PC, 1624 NORMAN AVE, CRETE, NE 68333 |
| 1803 | CONNIE G WALBRECHT & ATTORNEYS, LOWE & ALBERTS PC, 1624 NORMAN AVE, CRETE, NE 68333 |
| 1789 | CONNIE GESSLER, 4712 W BEAUMONT ST, TAMPA, FL 33611-2104 |
| 1803 | CONNIE HEDGES FFE, 427 NORTH 3RD, MONMOUTH, IL 61462 |
| 1803 | CONNIE J HEDGES, 427 N 3RD ST, MONMOUTH, IL 61462-1832 |
| 1803 | CONNIE J NORDBOE-TINKER, 200 E 1ST ST N STE 540, WICHITA, KS 67202-2110 |
| 1803 | CONNIE J NORDBOE-TINKER, ROBBINS, TINKER, SMITH & TINK, 200 E FIRSTSTE 540, WICHITA, KS 67202-2110 |
| 1803 | CONNIE JEFFREY  FFE, 873 E TOWNSHIP ROAD 42, SYCAMORE, OH 44882-9531 |
| 1789 | CONNIE JEFFRIES, 624 CRESTWAY ST BOX 473, WELLINGTON, KS 67152-3215 |
| 1803 | CONNIE JO REITER  FFE, DUBUQUE, IA 52001 |
| 1803 | CONNIE K FITZMAURICE, 7212 NW RHODE AVE, KANSAS CITY, MO 64152-2824 |
| 1803 | CONNIE K MARTIN FFE, 224 SW ORCHARD ST, TOPEKA, KS 66606-2402 |
| 1803 | CONNIE L BOCKENSTEDT  FFE, DUBUQUE, IA 52001 |
| 1803 | CONNIE L CASPERSON, 1315 BOHNKER HILL RD, DENISON, IA 51442-2515 |
| 1803 | CONNIE L JEFFREY, 873 E TOWNSHIP ROAD 42, SYCAMORE, OH 44882-9531 |
| 1842 | CONNIE LAPASEOTES LTD, BOX 327, BRIDGEPORT, NE 69336<br>*served 11-5-02* |
| 1803 | CONNIE LAWRENCE, 502 PARK AVE, EXCELSIOR SPRINGS, MO 64024 |
| 1803 | CONNIE M HALL, 148 N YALE ST, WICHITA, KS 67206 |
| 1803 | CONNIE M SMITH  FFE, 330 S TYLER RD APT 225, WICHITA, KS 67209-1663 |
| 1803 | CONNIE M WAMPLER, PO BOX 96, EDNA, KS 67342 |
| 1803 | CONNIE MCGINNES FFE, 24 LINCOLN CT, MONMOUTH, IL 61462-2461 |
| 1789 | CONNIE MOORE, RR 1 BOX 314, NOWATA, OK 74048-9763 |
| 1789 | CONNIE POLON, 777 N MICHIGAN AVENUE, CHICAGO, IL 60611-2617 |
| 1803 | CONNIE R SEIBERT, 377 INDIANA AVE, GALESBURG, IL 61401-5416 |
| 1803 | CONNIE REUTER FFE, 2996 OWEN CT APT 1, DUBUQUE, IA 52002-1028 |
| 1803 | CONNIE ROUDENBUSIT, 817 GEORGIAN AVE, SELLERSBURG, IN 47172-1024 |
| 1803 | CONNIE S (A) HOLLANDER  FFE, PO BOX 325, SCHLESWIG, IA 51461-0325 |
| 1803 | CONNIE S FRYMAN, 542 S 7TH ST, SHARPSVILLE, PA 16150 |
| 1803 | CONNIE S FRYMAN, 542 SEVENTH ST, SHARPSVILLE, PA 16150 |
| 1803 | CONNIE S HULL, 24 LINCOLN CT, MONMOUTH, IL 61462-2461 |
| 1803 | CONNIE S MATHIS, 24423 COUNTRY VIEW DR, KEARNEY, MO 64060 |
| 1803 | CONNIE S MATHIS, 24423 COUNTRYVIEW DR, KEARNEY, MO 64060 |
| 1803 | CONNIE S PORTER FFE, 203 N 16TH ST, DENISON, IA 51442-1543 |
| 1803 | CONNIE S PORTER, 203 N 16TH ST, DENISON, IA 51442-1543 |
| 1803 | CONNIE S. MOYERS, RR 2, CLOVIS, NM 88101-9802 |
| 1803 | CONNIE SCHULTZ  FFE, 58256 180TH ST, WELLS, MN 56097-6717 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | CRETE VOLUNTEER FIRE DEPT, 210 E 14TH ST, CRETE, NE 68333-1643 |
| 1802 | CRETE VOLUNTEER FIRE DEPT, 210 E 14TH ST, CRETE, NE 68333-1643 |
| 1803 | CRETE WOMENS BOWLING ASSOC., WEST HWY 33, CRETE, NE 68333 |
| 1803 | CRETE WOMENS BOWLING ASSOC, W HIGHWAY 33, CRETE, NE 68333 |
| 1842 | CREUTZBERG FARMS INC, RT 2 BOX 171, CENTRAL CITY, NE 68826 |
| | *served 11-5-02* |
| 1803 | CREW, KENNETH, 661 STATE ROUTE 29, SPARLAND, IL 61565-9392 |
| 1803 | CREWS CONTROL INC, 12510 PROSPERITY DR, STE 120, SILVER SPRING, MD 20904 |
| 1803 | CREWS, SANDRA M, 5725 N HAGENER RD, BEARDSTOWN, IL 62618-8323 |
| 1842 | CREWS, TUDA LIBBY, WILD WILD WEST COWBOY COOKIES, PO BOX 1804, CHEYENNE, WY 82003 |
| | *served 11-5-02* |
| 1842 | CREWS, ZACH, RR 2 BOX 97, SLATER, MO 65349 |
| | *served 11-5-02* |
| 1802 | CRG ENTERPRISES INC, 1377 US HIGHWAY 67, MONMOUTH, IL 61462 |
| 1842 | CRI FEEDERS INC, PO BOX 1303, GUYMON, OK 73942 |
| | *served 11-5-02* |
| 1802 | CRIBB, BETTY, 111 SOUTH CHURCH ST, LA PLATA, MO 63549 |
| 1802 | CRIBB, LLOYD, 111 S CHURCH ST, LAPLATA, MO 63549 |
| 1789 | CRIBBS, FLOYD R, 1764 LEE SEMINARY RD LOT 22, COOKEVILLE, TN 38506 |
| 1789 | CRIBBS, JAMES L, 442 CARDINAL PL, LAKELAND, FL 33803 |
| 1803 | CRICK, RODNEY E, 20402 P ROAD, CIMARRON, KS 67835 |
| 1803 | CRICKET ENTERPRISES CORP, RR 2 BOX 159, NOWATA, OK 74048-9683 |
| 1803 | CRICKET RIDGE GOLF COURSE, 22087 POCKET RD, BATESVILLE, IN 47006 |
| 1803 | CRICKET, PO BOX 660021, DALLAS, TX 75266-0021 |
| 1803 | CRIDDLE, ERIN E, 112 W 10TH ST, COAL VALLEY, IL 61240-9119 |
| 1789 | CRIDER, CHARLES M, 333 S LAKE HOWARD DR APT 314D, WINTER HAVEN, FL 33880 |
| 1789 | CRIDER, PRESTON E, 1612 HALL RD, PLANT CITY, FL 33565 |
| 1803 | CRIEG GRANDY, RR 1 BOX 52, ROZEL, KS 67574 |
| 1802 | CRIGHTON, FRANCES, 911 MADISON CT, ERIE, CO 805166514 |
| 1803 | CRIGLER, LARRY L, PO BOX 434, SLEDGE, MS 38670-0434 |
| 1803 | CRIM, AUTHER, 1223 CLOVERLEAF RD, WACO, TX 76705-2310 |
| 1802 | CRIM, DONALD R, 3322 N 100TH ST, KANSAS CITY, KS 66109-3515 |
| 1842 | CRIM, HOMER L, 2203 N REIFF ST LOT 1, GARDEN CITY, KS 67846-9751 |
| | *served 11-5-02* |
| 1803 | CRIM, RON ALLAN, 1024 W FAIRWOOD LN, OLATHE, KS 66061-2414 |
| 1789 | CRI-MET, 3607 ENGLISH TURN RD., BRAITHWAITE, LA 70040 |
| 1803 | CRIMINS, CLAYTON R, 339 5TH ST NW, FORT DODGE, IA 50501-2338 |
| 1842 | CRIMMINS, JAMES, RR, CLAY CENTER, KS 67432 |
| | *served 11-5-02* |
| 1802 | CRIMSON STONE INC., 6510 KEENES MILL ROAD, COTTONDALE, AL 35453 |
| 1803 | CRINGAN, MARY B, 7120 N SHANNON, KANSAS CITY, MO 64152 |
| 1842 | CRIPE, GARY J., P.O. BOX 232, DUBUQUE, IA 52004-0232 |
| | *served 11-5-02* |
| 1803 | CRIPE, GARY J, 1091 ROCKDALE RD APT 6, DUBUQUE, IA 52003-7883 |
| 1803 | CRIPPEN, ILCE N, 1622 11TH ST, COLUMBUS, NE 68601-5929 |
| 1842 | CRIPPEN, MICKEY RAY, PO BOX 97, IUKA, IL 62849 |
| | *served 11-5-02* |
| 1883 | CRIPPEN, STEVEN, 1622 11TH ST, COLUMBUS, NE 68601-5929 |
| | *served on 11-20-02* |
| 1803 | CRIPPES, JAMES A, 1862 CHURCHILL DR, DUBUQUE, IA 52001-4023 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

| Svc Lst | Name and Address of Served Party |
|---|---|
| 1801 | ELIOT SCOTT CO, 785 S CONGRESS AVE, DELRAY BEACH, FL 33445-4624 |
| 1803 | ELIOT SPITZER - NEW YORK ATTORNEY G, DEPT. OF LAW - THE CAPITOL, 2ND FL., ALBANY, NY 12224 |
| 1802 | ELIOT, WAYNE, 541 S WIRE, HAYSVILLE, KS 67060 |
| 1789 | ELIOTT H RADCLIFF, 7416 COOK RD, FOLEY, AL 36535-5104 |
| 1802 | ELIS TIRES, 1340 SIBLEY ROAD, MINDEN, LA 71055 |
| 1803 | ELISA A MARTIN  FFE, 801 NE 98 TERR, KANSAS CITY, MO 64155 |
| 1803 | ELISA A MARTIN, 801 NE 98TH TER, KANSAS CITY, MO 64155 |
| 1803 | ELISA GROATHOUSE  FFE, 526 NORMAN AVE, CRETE, NE 68333-2737 |
| 1803 | ELISA LLANES, 517 E WILSON ST, PORT LAVACA, TX 77979 |
| 1803 | ELISA TECHNOLOGIES INC, 4581 L NW 6TH ST, GAINESVILLE, FL 32609 |
| 1803 | ELISA TECHNOLOGIES INC, 4581-L NW 6TH STREET, GAINESVILLE, FL 32609 |
| 1803 | ELISAE A K KANESHIRO, 45 342 KOA KAHIKO ST, KANEOHE, HI 96744 |
| 1803 | ELISAE A K KANESHIRO, 45 342 KOA KAHIKO ST, KANEOHE, HI 96744 |
| 1803 | ELISEO RIZO, 2120 BROADWAY APT 1, DENISON, IA 51442-1655 |
| 1803 | ELISEO V RIZO FFE, 2120 BROADWAY APT 1, DENISON, IA 51442-1655 |
| 1803 | ELISERIO, MARIA C, PO BOX 44, DORCHESTER, NE 68343-0044 |
| 1803 | ELISHA, GANT, 547 VERSEY ST, EUDORA, AR 71640-2106 |
| 1803 | ELISONDO HENAJOSA, SANTIAGO, 217 3RD AVE NE APT 7, AUSTIN, MN 55912-3445 |
| 1803 | ELISONDO, JERARDO, 4239 11TH AVE, MOLINE, IL 61265-2583 |
| 1802 | ELITE ASSOCIATES INC, 22511 ASPAN ST STE E, LAKE FOREST, CA 92630 |
| 1842 | ELITE BROKERAGE SERVICE, 15710 JFK BLVD, SUITE 400, PO BOX 62047, HOUSTON, TX 77205-2047 <br> *served 11-5-02* |
| 1803 | ELITE BROKERAGE SERVICE, PO BOX 62047, 15710 JFK BLVD STE 400, HOUSTON, TX 77205-2047 |
| 1803 | ELITE DEMONSTRATIONS, 6261 W ATLANTIC BLVD, MARGATE, FL 33063-5105 |
| 1803 | ELITE DEMOS, 3351 S MAIN ST, SALT LAKE CITY, UT 84115-4443 |
| 1803 | ELITE EXPRESS INC, C/O SYSTRAN FIN SVCS, PO BOX 640296, PITTSBURGH, PA 15264-0296 |
| 1803 | ELITE EXPRESS, ALTERNATIVE PAYEE - 113285, P O BOX 640296, PITTSBURGH, PA 15264-0296 |
| 1842 | ELITE EXPRESS, PO BOX 640296, PITTSBURGH, PA 15264-0296 <br> *served 11-5-02* |
| 1803 | ELITE FLEET INC, PO BOX 906, ST JOSEPH, MO 64502 |
| 1803 | ELITE PRESENTATION INC, 10300 CONSTITUTION AVE NE STE C, ALBUQUERQUE, NM 87112-5373 |
| 1803 | ELITE PRESENTATION INC, 10300 CONSTITUTION NE SUITE C, ALBUQUERQUE, NM 87112-5373 |
| 1803 | ELITE PRESENTATIONS INC, 10300 CONSTITUTION AVE NE # C, ALBUQUERQUE, NM 87112-5373 |
| 1803 | ELITE PROFESSIONALS, C/O METRO FACTORS, P.O. BOX 38604, DALLAS, TX 75238 |
| 1803 | ELITE PROMOTIONS INC, 5080 N ELSTON AVE, CHICAGO, IL 60630 |
| 1803 | ELITE PROMOTIONS, 5080 N ELSTON AVE, CHICAGO, IL 60630 |
| 1803 | ELITE SPICE INC, 7151 MONTEVIDEO RD, JESSUP, MD 20794-9308 |
| 1803 | ELITE SPICE INC, 7151 MONTEVIDEO RD, JESSUP, MD 20794-9308 |
| 1803 | ELITE TIRE & AUTOMOTIVE INC, PO BOX 406, MARION, AR 72364 |
| 1803 | ELIZABETH A BAVERY, 318 N JEFFERSON ST, LEWISTOWN, IL 61542-1133 |
| 1803 | ELIZABETH A CHOATE  FFE, 311 1ST ST APT 4, MONMOUTH, IL 61462-1769 |
| 1803 | ELIZABETH A CHOATE, 210 N E ST, MONMOUTH, IL 61462-1650 |
| 1789 | ELIZABETH A ELAM FOR LIFE, C/O FIRST NATIONAL BANK, SEDAN, KS 67361 |
| 1803 | ELIZABETH A KAZMIERCZAK, 23 WABASH AVE, CHEEKTOWAGA, NY 14206 |
| 1803 | ELIZABETH A KAZMIERCZAK, 23 WABASH ST, CHEEKTOWAGA, NY 14206 |
| 1803 | ELIZABETH A MAYBAUM*DONT USE*, 978 E DRAKE DR, TEMPE, AZ 85283 |
| 1803 | ELIZABETH A RODGERS, 6233 PLANETT RD, TERRE HAUTE, IN 47805 |
| 1803 | ELIZABETH A RODGERS, 6233 PLANETT RD, TERRE HAUTE, IN 47805 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1842 | HILLERY, MERVILLE, 22609 COUNTY F, DARLINGTON, WI 53530 |
| | *served 11-5-02* |
| 1802 | HILLESHEIM, NANCY, 109 FORD ST, NASHUA, IA 50658 |
| 1789 | HILLESHIEM, ROBERT L, 2701 DIXIE RD, LAKELAND, FL 33801 |
| 1803 | HILLESON, JOHN, 1306 PAW PAW RD, LEE, IL 60530 |
| 1802 | HILLESTAD FARMS, 21779 463 AVE, VOLGA, SD 57071 |
| 1802 | HILLESTAD, GORDON, 46512 216TH ST, VOLGA, SD 57071 |
| 1842 | HILLESTAD, RICK, 46250 218 ST, VOLGA, SD 57071 |
| | *served 11-5-02* |
| 1802 | HILLESTAD, RICK, 46250 218TH ST, VOLGA, SD 57071 |
| 1842 | HILLESTAD, ROBIN, 21779 463 AVE, VOLGA, SD 57071 |
| | *served 11-5-02* |
| 1802 | HILLESTAD, ROBIN, 21779 463RD AVE, VOLGA, SD 57071 |
| 1842 | HILLESTAD, RON, 21779 463 AVE, VOLGA, SD 57071 |
| | *served 11-5-02* |
| 1802 | HILLESTAD, RON, 21779 463RD AVE, VOLGA, SD 57071 |
| 1789 | HILLGREN, LEONARD R, 729 E 5TH, CRETE, NE 68333 |
| 1803 | HILLGREN, LEONARD R, HARBOR NORTH LOT 33, CRETE, NE 68333 |
| 1803 | HILLIARD CORPORATION, 100 W 4TH ST, ELMIRA, NY 14901-2190 |
| 1803 | HILLIARD, REBECCA A, PO BOX 442, STONEWALL, MS 39363-0442 |
| 1803 | HILLIER, KATHY C, RR 1 BOX 204, GLADSTONE, IL 61437-9752 |
| 1803 | HILLIER, MICHAEL, PO BOX 591, LAVACA, AR 72941-0591 |
| 1803 | HILLIER, TARA T, 748 WILLARD ST, GALESBURG, IL 61401-3010 |
| 1842 | HILLIGAS, RYAN JAMES, 1909 N V RD, HAMPTON, NE 68843-2917 |
| | *served 11-5-02* |
| 1803 | HILLIKER, ROGER, PO BOX 143, BEAVER XING, NE 68313-0143 |
| 1803 | HILLIS L OWENS, LEOTI KS 67861, LEOTI, KS |
| 1803 | HILLIS, BARBARA J, 206 SOUTHERN AVE, PARSONS, KS 67357-5236 |
| 1803 | HILLMAN, BILLY R, PO  BOX 112, SHERARD, MS 38669 |
| 1803 | HILLMAN, DANIEL W, PO BOX 405, AVON, IL 61415-0405 |
| 1803 | HILLMAN, DESIREE ZOE, 8309 E WOODVIEW DR APT A, SHERWOOD, AR 72120-4170 |
| 1842 | HILLMAN, GERALD E, RR 2, SEWARD, NE 68434 |
| | *served 11-5-02* |
| 1842 | HILLMAN, HARLAN, RR 1, SYRACUSE, NE 68446 |
| | *served 11-5-02* |
| 1803 | HILLMAN, HARRIS F, RR 2 BOX 183G, GLENVILLE, MN 56036-9645 |
| 1803 | HILLMAN, JEFFREY, 7A LEE ST, FOREST LAKE, MN 55025-2655 |
| 1803 | HILLMAN, JON G, 1506 S 8TH RD, DOUGLAS, NE 68344-8923 |
| 1803 | HILLMAN, JULIE A, 302 LAFAYETTE, AVON, IL 61415 |
| 1842 | HILLMAN, KATHERINE M, PO BOX 526, CASTLETON, IL 61426-0526 |
| | *served 11-5-02* |
| 1803 | HILLMAN, KATHERINE M, PO BOX 641, MONMOUTH, IL 61462-0641 |
| 1803 | HILLMAN, KATHRYN M, 1016 30TH ST, SMITHSHIRE, IL 61478-9611 |
| 1842 | HILLMAN, LOUIS, 2329 210TH, WHEATLAND, IA 52777 |
| | *served 11-5-02* |
| 1803 | HILLMAN, ROBERT L, 1122 E 6TH AVE, MONMOUTH, IL 61462-2449 |
| 1802 | HILLMAN, TERRY M, 6100 NE GLADSTONE LN, GLADSTONE, MO 64119-2166 |
| 1803 | HILLMANN PAINT CONTRACTINC INC, 511 S E DRIVE, CLEARWATER, KS 67026 |
| 1803 | HILLMANN PAINT CONTRACTING INC, 511 SOUTHEAST DR, CLEARWATER, KS 67026-9426 |
| 1789 | HILLOCK, EUGENE F, 3995 JEDDO RD, JEDDO, MI 48032 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | JASON MCGUIRE, 1655 SPRING LOOP WAY, WINER GARDEN, FL 34787 |
| 1803 | JASON NICHOLS, 1647 E BELMONT, SPRINGFIELD, MO 65802 |
| 1803 | JASON P ALLARD, 7661 ABBY LN SE, CALEDONIA, MI 49316 |
| 1803 | JASON P ALLARD, 7661 ABBY LN SE, CALEDONIA, MI 49316 |
| 1803 | JASON P SMITH, 12004 NW 7TH, YUKON, OK 73099 |
| 1803 | JASON P SMITH, 12004 NW 7TH ST, YUKON, OK 73099 |
| 1803 | JASON PIRTLE, PHOTOGRAPHY & FILM, 712 W 76TH TER, KANSAS CITY, MO 64114 |
| 1803 | JASON R BRIES FFE, DUBUQUE, IA 52001 |
| 1803 | JASON R KRAMER  FFE, 1100 W 11TH ST, TRLR 8, CRETE, NE 68333-2099 |
| 1803 | JASON R LECHTENBERG, 10185 HIGHWAY 18, POSTVILLE, IA 52162 |
| 1803 | JASON R LECHTENBERG, 10185 HIGHWAY 18, POSTVILLE, IA 52162 |
| 1803 | JASON R WEST, PO BOX 472, OQUAWKA, IL 61469-0472 |
| 1803 | JASON ROLFES  FFE, FARMLAND HOG BUYING STATION, PO BOX 193, RENWICK, IA 50577-0193 |
| 1803 | JASON ROLFES, FARMLAND HOG BUYING STA, RENWICK, IA 50577-0193 |
| 1803 | JASON SCHAR FFE, 215 WEST PERRY ST, TIFFIN, OH 44883 |
| 1803 | JASON SCHER FFE, 226 S MONROE ST APT 3, TIFFIN, OH 44883-2935 |
| 1803 | JASON SCHULZ, 8408 N POMONA AVE, KANSAS CITY, MO 64153 |
| 1803 | JASON SEGAR/NETWORK FOOD BRKS, TINICUM INDUSTRIAL PARK MS#21, 10 INDUSTRIAL HWY, PHILADELPHIA, PA 19113-2001 |
| 1803 | JASON SMITH FFE, 2722 MAPLE ST, WICHITA, KS 67213-2624 |
| 1803 | JASON T HOLLOWAY FFE, TOPEKA, KS |
| 1803 | JASON VAN LANINGHAM, PO BOX 101, CLATONIA, NE 68328-0101 |
| 1803 | JASON VANLANINGHAM, 500 JEFFERSON ST, CLATONIA, NE 68328-5002 |
| 1803 | JASON W INNES, 4310 S 4710 W, WEST VALLEY, UT 84120 |
| 1803 | JASON W TUCKER FFE, 305 HENDERSON RD., KNOXVILLE, IL 61448-1019 |
| 1803 | JASON W TUCKER, 305 HENDERSON RD, KNOXVILLE, IL 61448-1019 |
| 1803 | JASON W VEITH, 416 S REYNOLDS AVE, NORTH PLATTE, NE 69101 |
| 1803 | JASON WIEBERS FFE, 1005 200TH ST, SCHLESWIG, IA 51461-7525 |
| 1803 | JASON WILCOX  FFE, PO BOX 204T, NEW RIEGEL, OH 44853-0204 |
| 1803 | JASON YOUNG, 602 E PATTERSON, SALISBURY, MO 65281 |
| 1803 | JASON ZIEMER, PO BOX 102, WELCOME, MN 56181 |
| 1803 | JASONS DRY ICE INC, 2103 CHARLES AVE, SAINT PAUL, MN 55114-1314 |
| 1803 | JASONS DRY ICE INC, 2103 CHARLES AVE, SAINT PAUL, MN 55114-1314 |
| 1802 | JASONS FOODS INC, 3655 WOODHEAD DR, NORTHBROOK, IL 60062-1816 |
| 1803 | JASONS FOODS INC, 3655 WOODHEAD DR, NORTHBROOK, IL 60062-1878 |
| 1803 | JASONS FOODS INC, PO BOX 809289, CHICAGO, IL 60680-9289 |
| 1803 | JASONS FOODS INC, PO BOX 809289, CHICAGO, IL 60680-9289 |
| 1803 | JASONS LAWN & TREE CARE, PO BOX 492, ANKENY, IA 50021 |
| 1842 | JASPER COOPERATIVE AAL, PO BOX 38, STRINGER, MS 39481<br>served 11-5-02 |
| 1803 | JASPER COUNTY CIRCUIT CLERK, 601 S PEARL AVE STE 300, JOPLIN, MO 64801 |
| 1803 | JASPER COUNTY COLLECTOR, JASPER COUNTY COURTHOUSE, P O BOX 107, NEWTON, IL 62448 |
| 1803 | JASPER COUNTY COLLECTOR, JASPER COUNTY COURTHOUSE, P O BOX 421, CARTHAGE, MO 64836-0421 |
| 1789 | JASPER COUNTY COLLECTOR, PO BOX 421, CARTHAGE, MO 64836-0421 |
| 1842 | JASPER COUNTY EMERGENCY SERVICES, 13870 DISPATCH LN, CARTHAGE, MO 64836-0801<br>served 11-5-02 |
| 1803 | JASPER COUNTY EMERGENCY SERVICES, PO BOX 801, 13870 DISPATCH LN, CARTHAGE, MO 64836-0801 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1842 | LINN COUNTY FARMERS, C/O ANDERSON COMPANY COOP, PO BOX 129, LACYGNE, KS 66040-0129<br>served 11-5-02 |
| 1803 | LINN COUNTY TREASURER, LINN COUNTY COURTHOUSE, 930 1ST ST SW, CEDAR RAPIDS, IA 52404-2161 |
| 1802 | LINN ENTERPRISES, INC, BOX 38, LINN, KS 66953 |
| 1803 | LINN FREIGHT FORWARDERS, 413 ROOD RD STE 6, CALEXICO, CA 92231 |
| 1842 | LINN GROVE LIQUIDATION TRUST, C/O BILL WILEY, PO BOX 190, MARATHON, IA 50565<br>served 11-5-02 |
| 1803 | LINN LUMBER CO, 573 5TH STREET, LINN, KS 66953 |
| 1803 | LINN POST & PIPE INC, PO BOX 276, LINN, KS 66953-0276 |
| 1803 | LINN THRIFTWAY 675, EAST HWY 50, LINN, MO 65051 |
| 1842 | LINN THRIFTWAY STORE #675, E HIGHWAY 50, LINN, MO 65051<br>served 11-5-02 |
| 1803 | LINN THRIFTWAY, STORE #675, E HIGHWAY 50, LINN, MO 65051 |
| 1803 | LINN, GREGORY E, 205 MINNESOTA ST, GLIDDEN, IA 51443-1037 |
| 1803 | LINN, JEREMY E, PO BOX 272, GLIDDEN, IA 51443-0272 |
| 1842 | LINN, JERRY J, 61905 224TH ST, NEVADA, IA 50201<br>served 11-5-02 |
| 1802 | LINN, VELTA, 717 KINGSTON DR, YUKON, OK 730993820 |
| 1789 | LINNA, BILL, 1945 EAGER RD, HOWELL, MI 48843 |
| 1802 | LINNEBUR, FLORIAN, 200 CLARK, SPEARVILLE, KS 67876 |
| 1802 | LINNEBUR, JOHN, 42891 COUNTY ROAD 4, ROGGEN, CO 806528301 |
| 1803 | LINNEBUR, NORBERT, 12946 FOOTHILL RD, SPEARVILLE, KS 67876-8726 |
| 1802 | LINNEMAN, CATHERINE, RR 1 BOX 386B, ESTELLINE, SD 57234 |
| 1802 | LINNEMAN, DAVID, 46361 197TH ST, BRUCE, SD 57220 |
| 1802 | LINNEMAN, JAMES E, 1248 N 7TH ST, FORT DODGE, IA 50501 |
| 1803 | LINNEMAN, JAMES E, 1248 NORTH 7TH ST, FORT DODGE, IA 50501 |
| 1842 | LINNEMAN, KAREN, RR 5, PO BOX 207, CARROLLTON, MO 64633<br>served 11-5-02 |
| 1802 | LINNEMAN, KAREN, RT 5 BOX 207, CARROLLTON, MO 64633 |
| 1803 | LINNEMAN, KIM R, 2420 WASHINGTON ST, BURLINGTON, IA 52601-1859 |
| 1802 | LINNENBURGER, DAVID, RT 2 BOX 213A, CANTON, MO 63435 |
| 1802 | LINNENBURGER, SANDRA, RR 2 BOX 213A, CANTON, MO 63435 |
| 1803 | LINNETTE KEPPEN, 705 HEATON AVE NW, PALM BAY, FL 32907-7784 |
| 1803 | LINNETTE KEPPEN, 705 HEATON AVE NW, PALM BAY, FL 32907-7784 |
| 1803 | LINNIA E BATES, 18909 E 3RD ST, TULSA, OK 74108-2301 |
| 1789 | LINNIE LEE DAVEY, 8655 FRESNO CIR APT 504A, HUNTINGTON BEACH, CA 92646-5729 |
| 1803 | LINOLEUM CARPET SERVICE INC, 511 W 21ST ST, CARROLL, IA 51401-3539 |
| 1803 | LINOLEUM CARPET SERVICE INC, 511 W 21ST ST, CARROLL, IA 51401-3539 |
| 1803 | LINPAC MATERIAL HANDLING, 705 WILSON PKWY, BARDSTOWN, KY 40004 |
| 1803 | LINPAC MATERIAL HANDLING, ROPAK INC, P O BOX 513205, LOS ANGELES, CA 90051-1205 |
| 1803 | LINPAC MATERIALS HANDLING INC, PO BOX 513205, LOS ANGELES, CA 90051 |
| 1803 | LINPAC PLASTICS INC, PO BOX 1545, WILSON, NC 27894-1545 |
| 1803 | LINPAC PLASTICS INC, PO BOX 1545, WILSON, NC 27894-1545 |
| 1803 | LINS MARKET, 350 S MOAPA VALLEY BLVD, OVERTON, NV 89040 |
| 1803 | LINS, 1220 W STATE, HURRICANE, UT 84737 |
| 1803 | LINS, 1220 W STATE ST, HURRICANE, UT 84737 |
| 1802 | LINSCO, PO BOX 502210, SAN DIEGO, CA 921502210 |
| 1803 | LINSEIS, PO BOX 666, PRINCETON JUNCTION, NJ 08550-0666 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst  Name and Address of Served Party**

| | |
|---|---|
| 1803 | MELINDA MORIN, PO BOX 1146, BUFFALO, NY 14240-1146 |
| 1803 | MELINDA S HUDGENS FFE, 1733 CORRINGTON AVE, KANSAS CITY, MO 64126-2731 |
| 1803 | MELINDA SNOW, 5009 WIND SONG DR, KILLEEN, TX 76542-4332 |
| 1803 | MELINDA SNOW, 5009 WINDSONG DR, KILLEEN, TX 76542 |
| 1803 | MELINDA WAITE, C/O HNB TRUST DEPT, PO BOX 1047, ARKANSAS CITY, KS 67005-1047 |
| 1803 | MELINGS MOTEL, JUNCTION 67 & 34 N, MONMOUTH, IL 61462 |
| 1803 | MELINGS MOTEL, JUNCTION 67 & 34 NORTH, MONMOUTH, IL 61462 |
| 1803 | MELINGS RESTAURANT LOUNGE, 1129 N MAIN ST, MONMOUTH, IL 61462-1275 |
| 1802 | MELINGS RESTAURANT LOUNGE, 1129 N MAIN ST, MONMOUTH, IL 61462-1275 |
| 1803 | MELISA A BROMAGHIM, 1631 HYPERION DR, WATERLOO, IA 50703 |
| 1803 | MELISA A BROMAGHIM, 1631 HYPERIOR DR, WATERLOO, IA 50703 |
| 1803 | MELISA A LOYD, 1631 HYPERIOR DR, WATERLOO, IA 50703 |
| 1803 | MELISA A MCCUE, 10232 W 96TH ST, OVERLAND PARK, KS 66212 |
| 1803 | MELISA A MCCUE, 10232 W 96TH ST, OVERLAND PARK, KS 66212 |
| 1803 | MELISA FEHRIC FFE, 1660 G ST APT 208, LINCOLN, NE 68508-3729 |
| 1803 | MELISA FEHRIC, 1660 G ST SPT 208, LINCOLN, NE 68508-3729 |
| 1803 | MELISHA R MARTINEZ  FFE, 2946 HIGHWAY 30 TRLR #1, DENISON, IA 51442-7561 |
| 1803 | MELISHA R MARTINEZ, 220 AVENUE B, DENISON, IA 51442-1827 |
| 1803 | MELISSA A ARZT, 11 WILDWOOD, LINNCREEK, MO 65052 |
| 1803 | MELISSA A ARZT, 11 WILDWOOD, LINN CREEK, MO 65052-9631 |
| 1803 | MELISSA A GORBY, PO BOX 397, NEGLEY, OH 44441 |
| 1803 | MELISSA A GORBY, PO BOX 397, NEGLEY, OH 44441 |
| 1803 | MELISSA A MILLER, PO BOX 33, KEITHSBURG, IL 61442-0033 |
| 1803 | MELISSA A PEREZ, 817 MC CONNEL STREET, FINDLEY, OH 45840 |
| 1789 | MELISSA CALVERT TRUST, F & M BANK & TRUST CO TRUSTEE, PO BOX 3688, TULSA, OK 74101-3688 |
| 1789 | MELISSA CROW, 195 TRIPLE T DR, BOONE, NC 28607-8865 |
| 1803 | MELISSA D HALE  FFE, 522 E BROADWAY APT B, MONMOUTH, IL 61462-1978 |
| 1803 | MELISSA D RAMIREZ, 208 W 9TH ST, DORCHESTER, NE 68343-1169 |
| 1789 | MELISSA DUNNE SIROKY, 2677 DALTON ST, WICHITA, KS 67210-1912 |
| 1803 | MELISSA DUQUE FFE, 1201 PEELER DR APT 1, FOSTORIA, OH 44830-3521 |
| 1803 | MELISSA K SIMS, WIMBISCUS LAW FIRM, 102 E SAINT PAUL ST, SPRING VALLEY, IL 61362 |
| 1803 | MELISSA K WEBBER, 611 E 5TH AVE, CANEY, KS 67333 |
| 1803 | MELISSA KREISER, 22 WALKER AVE, HERSHEY, PA 17033-1163 |
| 1803 | MELISSA KREISER, 22 WALKER AVE, HERSHEY, PA 17033 |
| 1803 | MELISSA L HARRINGTON/BLOCKED, TERMINATED, 1532 20TH AVE APT 6W, SILVIS, IL 61282-2054 |
| 1803 | MELISSA MCELMEEL, 1916 GRACE ST, DUBUQUE, IA 52001-6041 |
| 1803 | MELISSA MCELMEEL, 1916 GRACE ST, DUBUQUE, IA 52001-6041 |
| 1803 | MELISSA MILLER  FFE, PO BOX 33, KEITHSBURG, IL 61442-0033 |
| 1803 | MELISSA PERSZ, 817 MCCONNELL ST, FINDLAY, OH 45840 |
| 1803 | MELISSA PHILLIPS FFE, 412 S 2ND ST, MONMOUTH, IL 61462-2271 |
| 1803 | MELISSA SWENSON, 136 W 1150 S, PAYSON, UT 84651 |
| 1803 | MELISSA TAYLOR, 4216 METROPOLITAN, KANSAS CITY, KS 66106 |
| 1803 | MELISSA TAYLOR, 4216 METROPOLITAN AVE, KANSAS CITY, KS 66106-2548 |
| 1803 | MELISSA TUKUA, 1420 W CLARK ST, ALBERT LEA, MN 56007-1755 |
| 1803 | MELISSA TUKUA, 1420 W CLARK ST, ALBERT LEA, MN 56007-1755 |
| 1789 | MELISSA WHITNEY &, LAWRENCE R WHITNEY, RR 3 BOX 30, WINFIELD, KS 67156-9406 |
| 1803 | MELITON GARCIA, 633 HUISACHE, ROBSTOWN, TX 78380 |
| 1802 | MELIUS, JOANNE, 15924 359TH AVE, FAULKTON, SD 574386101 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | MITSUI & CO INC, 200 E RANDOLPH ST STE 5200, CHICAGO, IL 60601-6527 |
| 1789 | MITSUI & CO USA INC, 601 S FIGUEROA ST STE 1900, LOS ANGELES, CA 90017 |
| 1803 | MITSUI NEW YORK, PRODUCE DEPT, 200 PARK AVE, NEW YORK, NY 10166-0130 |
| 1803 | MITSUI OSK LINES (AMER) INC, PO BOX 477, JERSEY CITY, NJ 07303 |
| 1803 | MITSUI OSK LINES (AMER) INC, PO BOX 477, JERSEY CITY, NJ 07303 |
| 1803 | MITSUI PLASTICS INC, PO BOX 14050, NEWARK, NJ 07198-0001 |
| 1803 | MITSVEN, KIMBERLY A., 1002 13TH AVE S, DENISON, IA 51442-2577 |
| 1803 | MITTELMAN FRUNITURE CO, INC, 501 FUNSTON, KANSAS CITY, KS 66115 |
| 1842 | MITTELSTED, ALLEN L., 213 W ELM ST, WEST UNION, IA 52175-1313<br>*served 11-5-02* |
| 1842 | MITTELSTED, MARK, 12394 KING RD, WEST UNION, IA 52175<br>*served 11-5-02* |
| 1842 | MITTELSTET, MICKEY R, 3112 INDIAN DR, ENID, OK 73703-6417<br>*served 11-5-02* |
| 1789 | MITTEN TRUCK STOP, MITTEN INC, OAKLEY, KS 67748 |
| 1803 | MITTEN TRUCK STOP, PO BOX 267, OAKLEY, KS 67748 |
| 1803 | MITTIE WILLIAMS, 2611 SW EVANS AVE, LAWTON, OK 73505-7343 |
| 1803 | MITZEL & SON INC, 38466 133RD ST, ABERDEEN, SD 57401 |
| 1803 | MITZEL & SONS INC, 38466 133RD ST, ABERDEEN, SD 57401-8406 |
| 1803 | MITZEL & SONS INC, 38466 133RD ST, ABERDEEN, SD 57401-8406 |
| 1803 | MITZELS AMERICAN KITCHENS, 425 PONTIUS AVE N, SEATTLE, WA 98109-5474 |
| 1803 | MITZELS AMERICAN KITCHENS, 425 PONTIUS AVE N, SEATTLE, WA 98109-5474 |
| 1803 | MIX TRUCKING, 2424 IRVING ST, DENVER, CO 80211 |
| 1802 | MIXDORF, ADELINE, 312 BIG JIM CT, BOX 273, DUNKERTON, IA 50626 |
| 1803 | MIXON BROTHERS WOOD PRESERVING, PO BOX 327, IDABEL, OK 74745 |
| 1803 | MIXON, AMBER, 1205 HIGHWAY 208 W, DERMOTT, AR 71638-9450 |
| 1803 | MIXON, DANIEL, 3604 MEDALLION CIR, JONESBORO, AR 72404-0607 |
| 1803 | MIXON, HOLLY, 1609 BAIRD AVE, GALESBURG, IL 61401-6303 |
| 1803 | MIX-RITE FEED MILL INC, W10380 MAIN STREET, KENNAN, WI 54537 |
| 1842 | MIZAC INC, RR 1 BOX 223, PURCELL, OK 73080<br>*served 11-5-02* |
| 1842 | MIZE, ALLEN, 545 CO RD 537, ITTA BENA, MS 38941<br>*served 11-5-02* |
| 1803 | MIZE, KARIN E, 1118 S D ST, MONMOUTH, IL 61462-2561 |
| 1803 | MIZE, KELLY JOE, 1033 S B ST, MONMOUTH, IL 61462-2543 |
| 1842 | MIZE, KELLY JOE, PO BOX 662, MONMOUTH, 61462-0662<br>*served 11-5-02* |
| 1803 | MIZE, MICHAEL J, 1118 S D ST, MONMOUTH, IL 61462-2561 |
| 1803 | MIZE, SEAN P, 1109 S 3RD ST, MONMOUTH, IL 61462-2726 |
| 1803 | MIZEN, NEIL, 216 HUDSON ST, TIFFIN, OH 44883-1422 |
| 1842 | MIZER, KENNETH, RR 2, BOX 140, MARSHALL, MO 65340<br>*served 11-5-02* |
| 1842 | MIZER, MAX A, RR 1, JENNINGS, KS 67643<br>*served 11-5-02* |
| 1842 | MIZER, PAUL, RR 2 BOX 140, MARSHALL, MO 65340<br>*served 11-5-02* |
| 1803 | MIZER, RICK L, 1213 E 5TH ST, COFFEYVILLE, KS 67337-7117 |
| 1803 | MIZES THRIFTWAY #178, 212 N MAIN, CLEARWATER, KS 67430 |
| 1803 | MIZES THRIFTWAY, STORE #178, 212 N MAIN, CAWKER CITY, KS 67430 |
| 1803 | MIZZOU NAMA, CAREER SERV OFFICE C MAGRUDER, 2 64 AGRICULTURE BLDG, COLUMBIA, MO 65211 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | RICHARD W NELSON, RR 1, HOOPER NE 68031, HOOPER, NE |
| 1803 | RICHARD W OLSON, 15517 CHARLES, OMAHA, NE 68154 |
| 1803 | RICHARD W OLSON, 15517 CHARLES, OMAHA, NE 68154 |
| 1803 | RICHARD W PARTON  FFE, 1330 COTTONWOOD LN, WICHITA, KS 67233 |
| 1803 | RICHARD W PARTON, 1330 COTTONWOOD LN, WICHITA, KS 67233 |
| 1803 | RICHARD W PENNER, 22790 SW 103RD RD, BEATRICE, NE 68310 |
| 1803 | RICHARD W SCHUCK JR, C/O FARMLAND INDUSTRIES INC, P O BOX 20111, KANSAS CITY, MO 64195-0111 |
| 1803 | RICHARD W SCHUCK JR, C/O FARMLAND INDUSTRIES INC, P O BOX 7305, KANSAS CITY, MO 64116-0005 |
| 1803 | RICHARD W SEBERT, MAIL RETURNED 1987 &95, HAMPTON, IA 50441 |
| 1803 | RICHARD W SOWERS, 2771 400TH STREET, STORY CITY, IA 50248 |
| 1803 | RICHARD W STONER JR, 908 20TH AVE, CORALVILLE, IA 52241-1404 |
| 1803 | RICHARD W VANDASSELAAR  FFE, DUBUQUE, IA 52001 |
| 1803 | RICHARD W WHITMAN SR, 203 E BROADWAY, MONMOUTH, IL 61462-1868 |
| 1803 | RICHARD W WHITMAN SR, 203 E BROADWAY, MONMOUTH, IL 61462-1868 |
| 1803 | RICHARD W. FATHERLEY, PO BOX 172114, KANSAS CITY, KS 66117-1114 |
| 1803 | RICHARD WACHTER, RR1, BOX 135, WAUSA NE 68786, |
| 1803 | RICHARD WALKER, 62300 295TH STREET, CAMRIDGE, IA 50046 |
| 1789 | RICHARD WEBB<br>SOUTH KANSAS & OKLAHOMA RAILROAD, 315 W 3RD ST, PITTSBURG, KS 66762-4706 |
| 1803 | RICHARD WEBSTER, R R 3 BOX 428, PENDER NE 68047, PENDER, NE |
| 1803 | RICHARD WEISHAHN, 1500 S 9TH ST, BEATRICE, NE 68310 |
| 1802 | RICHARD WELDING EQUIPMENT, INC., P.O. BOX 960, JENNINGS, LA 70546 |
| 1803 | RICHARD WIIG, 206 CHECKER ST, IRWIN, IA 51446 |
| 1803 | RICHARD WILSON, COLO, IA 50056 |
| 1803 | RICHARD WINDER, 21955 OTTAWA RD, ERIE, KS 66733 |
| 1803 | RICHARD WITH, S74W19035 BAY CT, MUSKEGO, WI 53150-9533 |
| 1803 | RICHARD WOLF TRUCKING, PO BOX 76, CAMBRIDGE, WI 53523 |
| 1803 | RICHARD WOOD, PO BOX 1493, BLUE SPRINGS, MO 64013-1493 |
| 1803 | RICHARD WOODS FFE, 5115 LOOMAN ST, WICHITA, KS 67220-3032 |
| 1803 | RICHARD ZASTROW, BOX 24, CORDOVA NE 68330, CORDOVA, NE 68330 |
| 1803 | RICHARD ZOLLINGER, C/O NORTH DAKOTA STATE UNIVERSITY, P O BOX 5051, FARGO, ND 58105 |
| 1842 | RICHARD, BRAD, RR 2, BENKELMAN, NE 69021<br>*served 11-5-02* |
| 1802 | RICHARD, CARL, BOX 34, MILTONVALE, KS 67466 |
| 1842 | RICHARD, CHARLES M, RT 2, PO BOX 33, MILTONVALE, KS 67466<br>*served 11-5-02* |
| 1789 | RICHARD, ERVIN, 1394 HWY 384, LAKE CHARLES, LA 70605 |
| 1803 | RICHARD, JOHNATHAN C, 2009 E KNOX ST, GALESBURG, IL 61401-5425 |
| 1802 | RICHARD, LOREN, 412 E 9TH, ELLSWORTH, KS 674392510 |
| 1789 | RICHARD, MARVIN H, 300022 MANHATTAN BLVD, MINATARE, NE 69356 |
| 1842 | RICHARD, MIKE, RR 2, MILTONVALE, KS 67466<br>*served 11-5-02* |
| 1803 | RICHARD, THOMAS J., 493 HAYDEN LANE, DUBUQUE, IA 52001-6968 |
| 1842 | RICHARD, THOMAS J, 493 HAYDENS LN, DUBUQUE, IA 52001-6968<br>*served 11-5-02* |
| 1803 | RICHARD, TODD J., PO BOX 222, DENISON, IA 51442-0222 |
| 1803 | RICHARDS AMERICAN FOOD SERVICE, 14323 W COLLEGE AVE, MUSKEGO, WI 53150 |
| 1803 | RICHARDS AMERICAN FOOD SERVICE, 14323 W COLLEGE AVE, MUSKEGO, WI 53150 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| 1842 | ROWLAND, BRIAN A, PO BOX 121, ALBANY, IL 61230 |
| | *served 11-5-02* |
| 1883 | ROWLAND, ERVEN W, 3120 12TH AVE, COUNCILBLUFFS, IA 51501 |
| | *served on 11-20-02* |
| 1803 | ROWLAND, JAMES W, 639 FLEISHER ROAD, GALESBURG, IL 61401-8411 |
| 1842 | ROWLAND, JERRY L, PO BOX 53, QUEEN CITY, MO 63561 |
| | *served 11-5-02* |
| 1803 | ROWLAND, RON L, 72125 577TH AVE, PLYMOUTH, NE 68424-4001 |
| 1789 | ROWLAND, WILLIAM H, 617 TAMIAMI TRL N LOT 110, VENICE, FL 34292 |
| 1842 | ROWLES, RICHARD, 24579 ROWLES LANE, SHERRILL, IA 52073 |
| | *served 11-5-02* |
| 1842 | ROWLETTE, JAMES A, 1800 SEMINOLE DR APT 18, JOHNSON CITY, TN 37604-7077 |
| | *served 11-5-02* |
| 1803 | ROWLEY HOUSE OF PIZZA, 144 TURNPIKE RD, ROWLEY, MA 01969 |
| 1842 | ROWLEY, CRAIG, PO BOX 592, UDALL, KS 67146 |
| | *served 11-5-02* |
| 1802 | ROWLEY, LAWANNA, 9575 N 200 ROAD, BEGGS, OK 74421 |
| 1803 | ROWLEY, WAYNE, 116 COTTONWOOD AVE, DODGE CITY, KS 67801-5500 |
| 1842 | ROWLISON, JEFFREY, RR 1, PO BOX 155, ALMENA, KS 67622 |
| | *served 11-5-02* |
| 1802 | ROWLISON, JEFFREY, RR 1 BOX 155, ALMENA, KS 67622 |
| 1803 | ROWRY, QUEEN E, 600 HERNANDO ST, GREENVILLE, MS 38701-5242 |
| 1842 | ROWSE, ZANE M, HC 63 PO BOX 49, CHAMBERS, NE 68725 |
| | *served 11-5-02* |
| 1842 | ROWSEY, CHARLES L, 311 S 4TH ST, MONMOUTH, IL 61462-2221 |
| | *served 11-5-02* |
| 1803 | ROWSEY, VICKY D, 225 E 3RD AVE, MONMOUTH, IL 61462 |
| 1802 | ROWTON, CLYDE, 1004 JACKSON, SCOTT CITY, KS 67871 |
| 1803 | ROXANA S CARLOCK REVOCABLE TRUST, C/O ELFIE LACIO  MINERAL MANAGER, PO BOX 3296, WICHITA, KS 67201-3296 |
| 1803 | ROXANN TODD, RR 1, CUSHING IA 51018, CUSHING, IA 51018 |
| 1803 | ROXANNE ABLEMAN, 26750 ABLEMAN TRL, FARIBAULT, MN 55021 |
| 1803 | ROXANNE D. WYSS, A LA CARTE FOOD CONSULT. GRP., 1156 W 103RD ST STE 225, KANSAS CITY, MO 64114-4511 |
| 1803 | ROXANNE E CHAN, 895 HILLSIDE, ALBANY, CA 94706 |
| 1803 | ROXANNE E CHAN, 895 HILLSIDE AVE, ALBANY, CA 94706 |
| 1789 | ROXANNE E TUBB, 6710 STONEHAM DR, AMARILLO, TX 79109-6412 |
| 1789 | ROXANNE ELAINE REBER, 11311 KING ST, OVERLAND PARK, KS 66210-3421 |
| 1803 | ROXANNE L BROOKS, 6756 BLUE LAE RD, LAKE CITY, MI 49651 |
| 1803 | ROXANNE L BROOKS, 6786 W BLUE RD, LAKE CITY, MI 49651 |
| 1803 | ROXIDE INTERNATIONAL INC, PO BOX 249, NEW ROCHELLE, NY 10802 |
| 1803 | ROXIES MARKET OF QUINCY INC, 479 SOUTHERN ARTERY, QUINCY, MA 02169-4621 |
| 1803 | ROXIES, 479 SOUTHERN ARTERY, QUINCY, MA 02169-4621 |
| 1803 | ROXYS CAFE, 274 NORTH ST, HARRISBURG, PA 17101 |
| 1803 | ROXYS FAMOUS DELI, 1345 E THOUSAND OAKS BLVD, THOUSAND OAKS, CA 91362 |
| 1803 | ROY & BOBBIS CAFE, 101 S MAIN AVE, SIOUX FALLS, SD 57104 |
| 1803 | ROY & BOBBIS CAFE, 101 S MAIN AVE, MANAGER, SIOUX FALLS, SD 57104 |
| 1803 | ROY A ASMUSSEN & ASSOC INC, 10500 LUNT AVE STE 100, ROSEMONT, IL 60018-3427 |
| 1789 | ROY A BATES AND, BETTY JEAN BATES JT, 23 CRESTWAY ST, WELLINGTON, KS 67152-3277 |
| 1803 | ROY A HOWELL, MOORHEAD IA 51558, MOORHEAD, IA 51558 |
| 1803 | ROY A MEIER TRUCKING, RR 2, MITCHELL, NE 69357-9802 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | STAAB, GERALD J, 2205 ROBIN RD, DODGE CITY, KS 67801-2924 |
| 1842 | STAAB, GERALD, 46183 160 ST, REMSEN, IA 51050 <br> served 11-5-02 |
| 1802 | STAAB, KATHLEEN, 2049 280TH AVE, HAYS, KS 67601 |
| 1802 | STAAB, KATRINA, 2522 HENRY, HAYS, KS 67601 |
| 1802 | STAAB, KURT, 2428 TOULON AVE, HAYS, KS 67601 |
| 1802 | STAAB, MARCELLA, 811 FOREST, MARYVILLE, MO 64468 |
| 1842 | STAACK, JOHN, 37414 CEDAR AVE, STRAWBERRY PT, IA 52076 <br> served 11-5-02 |
| 1842 | STAAKE, SHIRLEY, 15753 COUNTRY RD, SAINT OLAF, IA 52072 <br> served 11-5-02 |
| 1842 | STAATS, PAT, BOX 533, ULYSSES, KS 67880 <br> served 11-5-02 |
| 1802 | STAATZ, JACK, 1820 WOLF RD, JUNCTION CITY, KS 664417801 |
| 1803 | STABEN, DAVID R, 805 WEARE, WOODBINE, IA 51579 |
| 1803 | STABEN, SALLY M., 24 5TH ST, WOODBINE, IA 51579-1258 |
| 1803 | STABLE T FARM, 10508 NW 59TH ST, KANSAS CITY, MO 64152 |
| 1842 | STABLES, JOHN W, RR 1 PO BOX 5, CARLETON, NE 68326 <br> served 11-5-02 |
| 1803 | STABLES, 530 H ST SE, MIAMI, OK 74354 |
| 1842 | STACCONE, VICTOR F, 11008 COPPERFIELD WAY, TALLAHASSEE, FL 32312 <br> served 11-5-02 |
| 1789 | STACER, JOHN A, 2943 BUHL RD, HARBOR BEACH, MI 48441 |
| 1803 | STACEY COURBAT, 406 VIKING ROAD, CEDAR FALLS, IA 50613 |
| 1803 | STACEY JACKSON FFE, PO BOX 801, MONMOUTH, IL 61462 |
| 1803 | STACEY K BURGESS, PO BOX 4, KIRKWOOD, IL 61447-0004 |
| 1803 | STACEY L HOFFMAN, 505 W 21ST ST, STERLING, IL 61081 |
| 1803 | STACEY L HOFFMAN, 505 W 21ST ST, STERLING, IL 61081 |
| 1803 | STACEY L LAWTON, 1902 WYATT CIR, DOVER, PA 17315-3672 |
| 1803 | STACEY L LAWTON, 1902 WYATT CT, DOVER, PA 17315 |
| 1803 | STACEY L SHERRY, 1300 N MAIN ST, MONMOUTH, IL 61462-1213 |
| 1789 | STACEY, ROBERT J, 16029 BIRD RD, LINDEN, MI 48451 |
| 1789 | STACEY, THOMAS D, 6100 CALKINS RD, FLINT, MI |
| 1842 | STACHECKI, THOMAS M, 3 W SALMON, SPOKANE, WA 99218 <br> served 11-5-02 |
| 1803 | STACHIA L WOOD FFE, 118 1ST ST, DANBURY, IA 51019 |
| 1842 | STACHOUR, RICK, 106 DEERHORN CT, AUSTIN, TX 78734 <br> served 11-5-02 |
| 1883 | STACHYRA, STANLEY F, 793 LAWRENCE AVE, GALESBURG, IL 61401-2456 <br> served on 11-20-02 |
| 1803 | STACI L VANWESTEN FFE, PO BOX 122, DAYKIN, NE 68338-0122 |
| 1803 | STACI L VANWESTEN, PO BOX 122, DAYKIN, NE 68338-0122 |
| 1803 | STACIA MARKWAY-K USE V# 37309, APT E, 6313 N LONDON AVE, KANSAS CITY, MO 64151-4734 |
| 1803 | STACIA MARKWAY-KEMNA  FFE, 600 E 71ST TER, KANSAS CITY, MO 64131 |
| 1803 | STACIE D GEORGE FFE, 2501 NW 64TH ST, KANSAS CITY, MO 64151-3075 |
| 1803 | STACIE D NOWELL FFE, 2501 NW 64TH ST, KANSAS CITY, MO 64151-3075 |
| 1803 | STACIE L POULSON  FFE, 1021 S A ST, MONMOUTH, IL 61462-2640 |
| 1803 | STACIE L POULSON, 1021 S A ST, MONMOUTH, IL 61462-2640 |
| 1803 | STACIE WITTMAN, LEAD ATTORNEY DYNA CORP, 120 SE 6TH ST STE 106, TOPEKA, KS 66603 |
| 1803 | STACKER, DOUGLAS L., 6542 STAFFORD TRCE, ZIONSVILLE, IN 46077-9176 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1803 | WINKER, ERIC L, HWY 30 E, GLIDDEN, IA 51443 |
| 1842 | WINKING, KEVIN L, 600 N MAIN ST, ROSEVILLE, IL 61473-9631<br>served 11-5-02 |
| 1842 | WINKLEMAN, TERRY L, 2295 S 10TH ST, INDEPENDENCE, KS 67301-8935<br>served 11-5-02 |
| 1842 | WINKLER GRAIN, RR 2, MONMOUTH, IL 61462<br>served 11-5-02 |
| 1803 | WINKLER GROCER, PO BOX 68, DALE, IN 47523-0068 |
| 1842 | WINKLER INC, C/O RICHARD D WINKLER, PRESIDENT, RR 1 PO BOX 45, LOOMIS, NE 68958<br>served 11-5-02 |
| 1803 | WINKLER MEATS INC, 733 S W WASHINGTON ST, PEORIA, IL 61653 |
| 1803 | WINKLER MEATS INC, 733 S W WASHINTON, PEORIA, IL 61653 |
| 1802 | WINKLER TRUCKING, INC., 3050 N. FRONTAGE RD, BILLINGS, MT 59101 |
| 1803 | WINKLER WHOLESALE GROCERS, PO BOX 68, DALE, IN 47523-0068 |
| 1803 | WINKLER WHOLESALE GROCERS, PO BOX 68, DALE, IN 47523-0068 |
| 1802 | WINKLER, ARNO, RT 2 10251 E CARTER SCHOOL RD, COLUMBIA, MO 65201 |
| 1802 | WINKLER, DARLENE, 215 E 8TH, STROMSBURG, NE 68666 |
| 1842 | WINKLER, JIM, 105 N ALEXANDER, ALEXIS, IL 61412<br>served 11-5-02 |
| 1803 | WINKLER, JOHN A, 206 W MARTIN ST, ABINGDON, IL 61410-1449 |
| 1842 | WINKLER, MARVIN, RT 2, PO BOX 112, CORNING, KS 66417<br>served 11-5-02 |
| 1842 | WINKLER, ROBERT P, 1824 ALVARADO DR, FENTON, MO 63026<br>served 11-5-02 |
| 1802 | WINKLER, ROD, RR 1 BOX 165, WETMORE, KS 66550 |
| 1842 | WINKLER, WAYNE, RR 1, ONEIDA, KS 66522,<br>served 11-5-02 |
| 1842 | WINKLER, WILLARD, 380 RIVERVIEW BLUFFS, METAMORA, IL 61548<br>served 11-5-02 |
| 1803 | WINKLES TRUCKS INC, PO BOX 898, PECOS, TX 79772-0898 |
| 1802 | WINKLES TRUCKS INC, PO BOX 898, PECOS, TX 79772 |
| 1789 | WINKLMEIER, HENRY W, 506 UTAH ST, LAWRENCE, KS 66046 |
| 1802 | WINKOWITSCH, DANIEL, 938 3RD ST BOX 34, DUMONT, IA 50625 |
| 1842 | WINKOWITSCH, LAWRENCE, RR 2, ALLISON, IA 50602<br>served 11-5-02 |
| 1803 | WINKY FOODS, 5251 S. MILLARD STR., CHICAGO, IL 60632 |
| 1803 | WINMILL TRANSPORT, 385 W HWY 39, BLACKFOOT, ID 83221 |
| 1802 | WINN BUNTING MEAT CO, 2250 LONE STAR DR, DALLAS, TX 75212 |
| 1803 | WINN DIXIE ATLANTIC INC, 5400 FULTON INDUS BLVD, ATLANTA, GA 30302 |
| 1803 | WINN DIXIE CHARLOTTE INC, PO BOX 31397, CHARLOTTE, NC 28231-1397 |
| 1803 | WINN DIXIE RALEIGH, PO BOX 40955, JACKSONVILLE, FL 32203 |
| 1803 | WINN DIXIE STORES INC, 1141 SW 12TH AVE, POMPANO BEACH, FL 33069-4677 |
| 1803 | WINN DIXIE STORES INC, PO BOX B, JACKSONVILLE, FL 32203-0297 |
| 1803 | WINN DIXIE STORES INC, STATE RD 53 S, MADISON, FL 32341-0622 |
| 1803 | WINN DIXIE, 5050 EDGEWOOD CT, JACKSONVILLE, FL 32254-3699 |
| 1803 | WINN DIXIE, PO BOX 40955, 5050 EDGEWOOD CT, JACKSONVILLE, FL 32203 |
| 1803 | WINN GENERAL STORE, PO BOX 143, WINN, ME 04495 |
| 1803 | WINN, DANNY, 150 N 7TH ST, DENISON, IA 51442-2456 |
| 1802 | WINN, DONALD, 18009 FALL DRIVE, INDEPENDENCE, MO 640556920 |
| 1803 | WINN, JIMMY N, 305 W RANDALL RD, CARROLL, IA 51401 |

## Exhibit 6 - BarDateNotice/POC/Supplemental 341(a) Notice

**Svc Lst Name and Address of Served Party**

| | |
|---|---|
| 1802 | YUTZ, JOHN, 19561 ENAMEL PLACE, CALLAO, MO 635343210 |
| 1789 | YUZENAS, ALEX, 13604 KAUFMAN RD, CAPAC, MI 48014 |
| 1803 | YVETTE MACSISAK, 181 ROSEWELL ST, SPRINGFIELD, MA 01109-1366 |
| 1803 | YVETTE MACSISAK, 181 ROSEWELL ST, SPRINGFIELD, MA 01109-1366 |
| 1789 | YVONNE A THOMPSON, 518 BLESSING RANCH RD, LIBERTY HILL, TX 78642-4506 |
| 1803 | YVONNE HAMMOND FFE, 1063 E 5TH AVE, MONMOUTH, IL 61462-2442 |
| 1803 | YVONNE HAMMOND, 1063 E 5TH AVE, MONMOUTH, IL 61462-2442 |
| 1803 | YVONNE NASSIF FFE, WICHITA, KS |
| 1803 | YVONNE R NASSIF, 225 N GOW ST, WICHITA, KS 67203-5433 |
| 1803 | YVONNE T BRADFORD, 3413 RUGER AVE, JANESVILLE, WI 53546-1931 |
| 1803 | YVONNE T. BRADFORD, 3413 RUGER AVE, JANESVILLE, WI 53546-1931 |
| 1803 | YW ELECTRIC ASSN INC, PO BOX Y, AKRON, CO 80720 |
| 1803 | YWCA FT DODGE, 826 1ST AVE N, FORT DODGE, IA 50501-3906 |
| 1803 | YWCA OF KANSAS CITY MISSOURI, 1021 PENNSYLVANIA AVE, KANSAS CITY, MO 64105 |
| 1803 | YZAGUIRRE, RENE J, 412 N 3RD ST, MARSHALLTOWN, IA 50158-5502 |
| 1803 | Z & G INTERNATIONAL INC, 3407 STATE ROUTE 759, SAINT JOSEPH, MO 64504-1044 |
| 1842 | Z & L HOGS INC, C/O ROGER ZIEMAM, PRESIDENT, RR BOX 84, ROYAL, IA 51357<br>*served 11-5-02* |
| 1803 | Z & R TRUCKING, 21306 DAWN HILL E RD, SILOAM SPRINGS, AR 72761 |
| 1803 | Z A A INC, 6510 SKYLARK LANE STE 101, LINCOLN, NE 44116 |
| 1842 | Z COMM, 301 S MAIN ST, PO BOX 41, YUMA, CO 80759<br>*served 11-5-02* |
| 1803 | Z COMM, PO BOX 41, 301 S MAIN ST, YUMA, CO 80759 |
| 1789 | Z DURWARD KINGSLEY, 4911 MANCHACA RD #152, AUSTIN, TX 78745 |
| 1803 | Z FARMS INC, BRUCE ZIEBELL, 31847 H AVE, HUBBARD, IA 50122 |
| 1803 | Z LINE LTD, 402 N COUNTY RD, TOLEDO, IA 52342-1008 |
| 1803 | Z PORK INC, ATTN GAWEN, 1601 EAST HWY 10, ORANGE CITY, IA 51041 |
| 1842 | Z PORK INC, C/O GAWEN ZOMERMAAND, 306 HWY 10 SW, ORANGE CITY, IA 51041<br>*served 11-5-02* |
| 1803 | Z TECH INC, 9645 W 116TH TER, OVERLAND PARK, KS 66210-2831 |
| 1803 | Z TRAILER SALES INC, PO BOX 626, 55780 STATE HIGHWAY 19, WINTHROP, MN 55396 |
| 1803 | Z X R COMPANY INC, PO BOX 1114, WARSAW, IN 46581-1114 |
| 1842 | ZABEL, AYUMI, 9870 N CHERRY ST, KANSAS CITY, MO 64155<br>*served 11-5-02* |
| 1802 | ZABEL, CALVIN, 30185 136TH ST, SELBY, SD 57472 |
| 1802 | ZABEL, CLARENCE, 713 K STREET, SMITH CENTER, KS 66967 |
| 1842 | ZABEL, DENNIS A, RR 1, DAYKIN, NE 68338<br>*served 11-5-02* |
| 1842 | ZABEL, DWAYNE G, RR 2, BELLE PLAINE, KS 67013<br>*served 11-5-02* |
| 1842 | ZABEL, FLOYD A, RT 2, WESTERN, NE 68464<br>*served 11-5-02* |
| 1803 | ZABEL, JOHN J., 6520 N MOKANE CT, KANSAS CITY, MO 64151-1375 |
| 1802 | ZABEL, MARCELLA, 30217 136TH ST, SELBY, SD 574726206 |
| 1842 | ZABEL, STEVEN, 30236 134 ST, SELBY, SD 57472-5707<br>*served 11-5-02* |
| 1802 | ZABEL, STEVEN, 30236 134TH ST, SELBY, SD 574725707 |
| 1842 | ZABEL, VERNE, 30217 136 ST, SELBY, SD 57472-6206<br>*served 11-5-02* |
| 1802 | ZABEL, VERNE, 30217 136TH ST, SELBY, SD 574726206 |

E-FILED
Wednesday, 31 May, 2006  04:47:08 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 6

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRIC OF MISSOURI

In re:                                                      )    Case No.      02-50557
                                                            )    Chapter  11
FARMLAND INDUSTRIES, INC. ET AL. [1]                        )    (Jointly Administered)
                                                            )    JERRY W. VENTERS
Debtors                                                     )

## AFFIDAVIT of J.P. MORGAN TRUST COMPANY, N.A.

I, Jeffrey Pirrung certify as follows:

A)  I am a Bankruptcy Consultant for J.P. MORGAN TRUST COMPANY, N.A., the Liquidating Trustee of the FI Liquidating Trust.

B)  On or before May 7, 2004, copies of the following documents were served via U.S. Mail, first class, postage prepaid:

1)  Notice of Effective Date and Certain Deadlines under Debtors' Second Amended Joint Plan of Reorganization, as Modified, a copy of which is attached hereto as Exhibit A;

2)  Expanded Notice of Effective Date and Certain Deadlines under Debtors' Second Amended Joint Plan of Reorganization, as Modified, a copy of which is attached hereto as Exhibit B.

A list of the parties served with each form of Notice is on file with the Liquidating Trustee, and may be obtained by contacting the undersigned.

Executed in Jacksonville, Florida, this 17th day of May, 2004.

_____/s/ Jeffrey Pirrung_____ _____
Jeffrey Pirrung
Bankruptcy Consultant
J.P. MORGAN TRUST COMPANY, N.A.
8475 WESTERN WAY, SUITE 110
JACKSONVILLE, FLORIDA 32256
(904)807-3000

STATE OF FLORIDA            )
                            ) SS:  JACKSONVILLE
COUNTY OF DUVAL             )

Subscribed, sworn to and acknowledged before me by Jeffrey Pirrung, Bankruptcy Consultant for J.P. MORGAN TRUST COMPANY, N.A. on the 17th day of May, 2004.

_____/s/Gail Culbreth_____
Notary Public
My Commission Expires: June 22, 2007

---

[1] The Debtors are the following entities: FARMLAND INDUSTRIES, INC., FARMLAND FOODS, INC., SFA, INC., FARMLAND TRANSPORTATION, INC., FARMLAND PIPE LINE COMPANY, INC.

Exhibit A

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors | ) | Joint Administration |

## NOTICE OF EFFECTIVE DATE AND CERTAIN DEADLINES UNDER DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED

**TO: ALL PARTIES IN INTEREST**

1. Please take notice that pursuant to § 9.3 of the Debtors' Second Amended Joint Plan of Reorganization, as Modified ("Plan")[1], notice is hereby given that the Effective Date of the Plan is May 1, 2004.

2. Please take further notice of the following deadlines under the Plan:

• § 11.1 – All final requests for compensation and reimbursement for Professionals pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date and Substantial Contribution Claims under § 503(b)(4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Liquidating Trustee and its counsel, Foley & Lardner, LLP at one of the following addresses ("Claim Delivery Address") no later than **June 15, 2004**.

**Claim Delivery Address**

| | |
|---|---|
| If sent by mail, send to: | If sent by messenger, send to: |
| FI Liquidating Trust | FI Liquidating Trust |
| Attn: Claims | Attn: Claims |
| P.O. Box 56798 | 8475 Western Way, Suite 110 |
| Jacksonville, FL 32241-6798 | Jacksonville, FL 32256 |

• §11.2 – Other than as set forth in § 11.1 of the Plan and except with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 case and payments payable in connection with post-petition severance obligations of the Debtors and the KERIT Plan (which claims shall be paid in the ordinary course of business according to the terms and conditions of the agreements relating thereto), all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee at the Claim Delivery Address no later than **May 31, 2004**.

• § 6.2 – All proofs of claim for rejection of executory contracts or unexpired leases pursuant to § 6.1 of the Plan must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee at the Claim Delivery Address by **May 31, 2004**.

3. Pursuant to and in accordance with § 7.8 of the Plan, as a condition to receiving a distribution on account of an Allowed Claim or Interest, each holder of Industrial Revenue Bonds not reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods must tender the applicable certificates, instruments, securities or other documentation evidencing such Claim or Interest ("certificates") to the Liquidating Trustee at one of the following addresses ("Certificate Delivery Address"). These certificates must be tendered by **April 30, 2005** or your Claim or Interest will be discharged and you will be forever barred from asserting such Claim or Interest.

**Certificate Delivery Addresses**

| | |
|---|---|
| If sent by mail, send to: | If sent by messenger, send to: |
| FI Liquidating Trust | FI Liquidating Trust |
| Attn: Certificates | Attn: Certificates |
| P.O. Box 7469 | 8475 Western Way, Suite 110 |
| North Kansas City, MO 64116-7469 | Jacksonville, FL 32256 |

**Delay in surrendering your certificate(s) will delay your distribution.**

(over)

A separate notice is being sent to known holders of Industries Preferred Shares. If you are such a holder and do not receive that notice, you should contact the Liquidating Trustee.

For further information, you may visit the website www.filiquidatingtrust.com. If you do not have access to the Internet you may contact the Liquidating Trustee in writing at FI Liquidating Trustee, c/o J.P. Morgan Trust Company, National Association, P.O. Box 56798, Jacksonville, FL 32241-6798. Please note on the envelope that this is in reference to the Farmland bankruptcy. Please refer to the Plan for all other relevant deadlines. The Initial Distribution Date under the Plan is projected to occur by June 30, 2004.

Dated: May 1, 2004                                                    BY ORDER OF THE COURT

---

[1] All capitalized terms in this Notice shall have their respective meanings set forth in the Plan. You are directed to the Plan, the Disclosure Statement and the Confirmation Order for further detail on the matters addressed in this Notice.

Exhibit B

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | In Proceedings under Chapter 11 |
| FARMLAND INDUSTRIES, INC., | ) | Case No. 02-50557 |
| FARMLAND FOODS, INC., | ) | Case No. 02-50561 |
| SFA, INC., | ) | Case No. 02-50562 |
| FARMLAND TRANSPORTATION, INC., | ) | Case No. 02-50564 |
| FARMLAND PIPE LINE COMPANY, | ) | Case No. 02-50565 |
| | ) | |
| Debtors | ) | Joint Administration |

### NOTICE OF EFFECTIVE DATE AND CERTAIN DEADLINES UNDER DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED

### TO: ALL PARTIES IN INTEREST

1.     Please take notice that pursuant to § 9.3 of the Debtors' Second Amended Joint Plan of Reorganization, as Modified  ("Plan")[1], notice is hereby given that the Effective Date of the Plan is **May 1, 2004**.  The FI Liquidating Trust has been established pursuant to § 5.4 of the Plan.  J.P. Morgan Trust Company, National Association, has been appointed as the Liquidating Trustee.

2.     Please take further notice of the following deadlines under the Plan:

### PROFESSIONALS

• § 11.1 – All final requests for compensation and reimbursement for Professionals pursuant to the §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date and Substantial Contribution Claims under  § 503(b)(4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Liquidating Trustee and its counsel, Foley & Lardner, LLP, at one of the following addresses ("Claim Delivery Address") no later than **June 15, 2004**.

**Claim Delivery Address**

| | |
|---|---|
| If sent by mail, send to: | If sent by messenger, send to: |
| FI Liquidating Trust | FI Liquidating Trust |
| Attn: Claims | Attn: Claims |
| P.O. Box 56798 | 8475 Western Way, Suite 110 |
| Jacksonville, FL  32241-6798 | Jacksonville, FL  32256 |

### ADMINISTRATIVE CLAIMS

• §11.2 – Other than as set forth in  § 11.1 of the Plan and except with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 case and payments payable in connection with post-petition severance obligations of the Debtors and the KERIT Plan (which claims shall be paid in the ordinary course of business according to the terms and conditions of the agreements relating thereto), all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee at the Claim Delivery Address no later than **May 31, 2004**.

## REJECTION CLAIMS

- § 6.2 – All proofs of claim for rejection of executory contracts or unexpired leases pursuant to § 6.1 of the Plan must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee at the Claim Delivery Address by **May 31, 2004**.

## TENDER OF BONDS, CERTIFICATES AND SECURITIES

3.      Pursuant to and in accordance with § 7.8 of the Plan, as a condition to receiving a distribution on account of an Allowed Claim or Interest, each holder of Industrial Revenue Bonds not reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods must tender the applicable certificates, instruments, securities or other documentation evidencing such Claim or Interest ("certificates") to the Liquidating Trustee at one of the following addresses ("Certificate Delivery Address").     These certificates must be tendered by **April 30, 2005** or your Claim or Interest will be discharged and you will be forever barred from asserting such Claim or Interest.

### Certificate Delivery Address

| | |
|---|---|
| If sent by mail, send to: | If sent by messenger, send to: |
| FI Liquidating Trust | FI Liquidating Trust |
| Attn: Certificates | Attn: Certificates |
| P.O. Box 7469 | 8475 Western Way, Suite 110 |
| North Kansas City, MO 64116-7469 | Jacksonville, FL 32256 |

**Delay in surrendering your certificate(s) will delay your distribution.**

A separate notice is being sent to known holders of Industries Preferred Shares. If you are such a holder and do not receive that notice, you should call 1-888-759-4429.

## ADDITIONAL INFORMATION

Below you will find answers to frequently asked questions. For further information, you may visit the website www.filiquidatingtrust.com. If you do not have access to the Internet you may contact the Liquidating Trustee in writing at FI Liquidating Trustee, c/o J.P. Morgan Trust Company, National Association, P.O. Box 56798, Jacksonville, FL 32241-6798. Please note on the envelope that this is in reference to the Farmland bankruptcy. Please refer to the Plan for all other relevant deadlines. The Initial Distribution Date under the Plan is projected to occur by June 30, 2004. If you require additional information, you should call 1-888-759-4429.

## GENERAL QUESTIONS AND ANSWERS

Q. Do I need to take any action due to receiving this notice?
A. You do **not** need to take any action based on the receipt of this notice **unless** you have an Administrative Claim (an unpaid claim arising after the petition date), a Claim arising from Professional Fees, a Claim arising from a rejected executory contract or unexpired lease, or are a holder of Industrial Revenue Bonds not reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods.

Q. When will I be receiving my distribution?
A. The initial distribution will be available to creditors holding Allowed Claims (as defined in the Plan) who are not the subject of a potential claim to return payments received before the

2

bankruptcy was filed on May 31, 2002 or otherwise are not the subject of a claim for setoff. The initial distribution, which is expected to occur before June 30, 2004, will be paid by the Liquidating Trustee to holders of Allowed Claims. The amount of your distribution will be in accordance with the terms of Article III of the Plan. Subsequent payments are expected to be made to holders of Allowed Claims in Classes 5 and 7 including a second distribution before the end of 2004.

Q. How do I know if there is a potential claim against me that would prevent the Liquidating Trustee from paying my claim?

A. If you have not been sent a demand letter by May 31, 2004, and are not subject to a claim for setoff, you will receive a distribution in the event you hold an Allowed Claim. If you are subject to a claim for setoff, you have been or will be notified in connection with an objection to your claim.

Q. What if I am the holder of Demand Certificates or Subordinated Certificates?

A. If you are the holder of Demand Certificates or Subordinated Certificates, you have an Allowed Claim. However, you will need to turn in your original certificates, or in the case of Series A through Series H bonds issued after January 1, 2001, the Irrevocable Bond Instruction, by sending them to the Certificate Delivery Address set forth above in order to receive your distribution.

Q. What if I've lost my certificates or they have been destroyed?

A. You should send an e-mail to certificates@filiquidatingtrust.com or call 1-888-759-4429. You will be sent a Lost Instrument Affidavit and Indemnity Agreement to complete and sign, and you will need to have your signature notarized. Once the Liquidating Trustee receives the completed documents, you will be able to receive distributions.

Q. My relative had Farmland Demand Certificates or Subordinated Certificates but is now deceased. What should I do?

A. A copy of the death certificate, notice appointing the executor of the estate (Letters Testamentary or other documentation) and the address of the executor should be sent to the Certificate Delivery Address set forth above. Upon receipt of those documents, claim files will be updated so that future correspondence and/or distributions will be sent to the executor.

Q. What if I have a change of address?

A. Changes of address must be sent in writing to: FI Liquidating Trustee, c/o J.P. Morgan Trust Company, National Association, P.O. Box 56798, Jacksonville, FL 32241-6798.

Q. How much can I write off for my taxes?

A. The Liquidating Trust cannot advise anyone with regard to the preparation of their taxes. You should talk to your accountant, attorney or tax advisor.

Q. Is Farmland still operating?

A. The Farmland name was sold along with other assets. You may see products with the logo or name "Farmland" but it is not the same company.

Q. I had Farmland Industries equity. What amount will I be paid for that?

A. Except as provided in the Plan with regard to Industries Preferred Shares, there are no distributions anticipated for holders of Farmland Industries equity.

3

Q. Where can I go to review Farmland bankruptcy documents?

A. You may go to this website: www.filiquidatingtrust.com to review certain documents and to obtain up-to-date information.    Documents are also available on-line from the U.S. Bankruptcy Court, Western District of Missouri at http://ecf.mowb.uscourts.gov    if    you have PACER access.

Dated: May 1, 2004

BY ORDER OF THE COURT
U.S. Bankruptcy Court
Western District of Missouri
400 East 9th Street, Room 1510
Kansas City, MO 64105

---

[1] All capitalized terms in this Notice shall have their respective meanings set forth in the Plan. You are directed to the Plan, the Disclosure Statement and the Confirmation Order for further detail on the matters addressed in this Notice.

## Exhibit B

19-738-504991
BAUMAN INSTRUMENT CORP
PO BOX 470583
TULSA OK 74147-0583

19-738-504993
BAUMANS
W3940 HWY 84
FREDONIA WI 53021-9784

19-738-504994
BAUMBERGER & SONS INC
1121 SE LORENZ
ANKENY IA 50021

19-738-504995
BILL BAUMCHEN
10715 HWY 63
EMMITT KS 66422

19-738-573509
BAUMERT, GARY L
102 J ST
NELIGH NE 68756-1650

19-738-573510
BAUMFALK, LEE M
PO BOX 147
DORCHESTER NE 68343-0147

19-738-573511
BAUMGARD, TOBIN M
21 PRIMROSE LN
KASOTA MN 56050-9780

19-738-504996
BAUMGARDNER CO INC
47 MIAMI ST
TIFFIN OH 44883-2226

19-738-573512
BAUMGARNER, TAMMY
PO BOX 112
TUPELO AR 72169-0112

19-738-504997
BAUMGARTNER CHEESE STORE
1023 16TH AVE
MONROE WI 53566

19-738-573513
BAUMHOVER, MICHELLE LYNN
2306 RED OAK DR
AMES IA 50014-9127

19-738-504998
BAUMS SUPER VALU
STORE #87
PO BOX 141
220 S 2ND ST
BOONVILLE IN 47601-0141

19-738-504999
BAUS CATERING SERVICE
1920 WARD AVE
LA CROSSE WI 54601

19-738-573514
BAUSTISTA, ALEJANDRO
406 N 16TH ST
DENISON IA 51442-1548

19-738-573515
BAUTISTA DE CASTANEDA, CARMEN
1205 E 16TH ST
CRETE NE 68333-1808

19-738-573516
BAUTISTA, ALEJANDRO
1071 MAIN ST APT 302
DUBUQUE IA 52001-4757

19-738-573517
BAUTISTA, AXEL
104 NE LAKE ST
TOPEKA KS 66616-1118

19-738-573518
BAUTISTA, ELZO A
1720 PROSPECT ST
LINCOLN NE 68502-2625

19-738-573519
BAUTISTA, GLORIA
704 W 13TH ST LOT 4
CRETE NE 68333-2004

19-738-573520
BAUTISTA, JOSE G
104 NE LAKE ST
TOPEKA KS 66616-1118

19-738-573521
BAUTISTA, JUAN
PO BOX 248
CRETE NE 68333-0248

19-738-573522
BAUTISTA, MARVIN A
1720 PROSPECT ST
LINCOLN NE 68502-2625

19-738-573523
BAUTISTA, TERESA Z
201 CHAMBERLIN DR TRLR 4
DENISON IA 51442-2809

19-738-573524
BAUTSCH, JEANETTE I
205 MARKET ST
BELLEVUE IA 52031-1217

19-738-573525
BAUTSCH, THOMAS L
205 MARKET ST
BELLEVUE IA 52031-1217

19-738-505000
BAVARIAN HAUS
196 DRURY LN
JACKSON MO 63755

19-738-573526
BAVERY, ELIZABETH A
318 N JEFFERSON ST
LEWISTOWN IL 61542-1133

19-738-505001
BAWCO INDUSTRIES INC
PO BOX 920
PEARLAND TX 77588-0920

19-738-505007
MELVIN BAX
BOX 153A
ST ELIZABETH MO 65075

19-738-505008
NORBERT BAX
RT1 BOX 102
ST ELIZABETH MO 65075

266

## Exhibit B

19-738-575783
BUTLER, CHARLES W
3503 SWEENEY DR
DICKINSON TX 77539-4561

19-738-575784
BUTLER, CONCHETTA M
PO BOX 231
MONMOUTH IL 61462-0231

19-738-575785
BUTLER, FRANCES F
1506 MORTON DR
EAST MOLINE IL 61244-1615

19-738-575786
BUTLER, JAMES L
BOX 90
HOLLANDALE MN 56045

19-738-575787
BUTLER, JEFFREY P
108 QUAIL RUN
MCPHERSON KS 67460

19-738-575788
BUTLER, JESSICA L
105 N MADISON ST
REPUBLIC OH 44867-9791

19-738-575789
BUTLER, KENYA
327 RIDGE AVE
GREENVILLE MS 38701-6248

19-738-575790
BUTLER, MICHAEL W
144 E ROBERTS ST
SEWARD NE 68434-1644

19-738-575791
BUTLER, PHARAOHTON
3126 BERT KOUNS LOOP APT 232
SHREVEPORT LA 71118-2959

19-738-575792
BUTLER, ROBERT L
5223 SW W DR
TOPEKA KS 66606-2504

19-738-575793
BUTLER, RONALD K
201 OAK ST
LONOKE AR 72086-3320

19-738-575794
BUTLER, SHERRI L
1238 N GREEN ST
WICHITA KS 67214-2514

19-738-575795
BUTLER, THOMAS
586 HICKORY RIDGE ST
PEOSTA IA 52068-9553

19-738-575796
BUTLER, THOMAS R
7509 NW 73RD PL
KANSAS CITY MO 64152-4439

19-738-575797
BUTLER-BOYLES, DONNA S
4842 SW TOPEKA BLVD LOT 3BOX4
TOPEKA KS 66609-1172

19-738-575798
BUTLETT, ALFRED J
996 DAVIS
DUBUQUE IA 52001-1303

19-738-520018
ERIC S BUTNER
901 WILLOW ST
MACON MO 63552

19-738-508343
BUTNERS COUNTRY MART
551 BUSINESS RTE 36E
MACON MO 63552

19-738-701171
BUTSONS ENTERPRISES
50 SUFFOLK RD
MANSFIELD MA 02048

19-738-508344
BUTSONS FOOD STORES
PO BOX 111
WOODSVILLE NH 03785

19-738-575799
BUTT, JIMMY DEAN
112 S CRESCENT AVE
INDEPENDENCE MO 64053-1232

19-738-508345
BUTTE COUNTY TREASURER
BUTTE COUNTY COURTHOUSE
PO BOX 121
ARCO ID 83213

19-738-701172
BUTTE PRODUCE
605 UTAH AVE
BUTTE MT 59701-2694

19-738-575800
BUTTER, LETTY A
606 OAK ST
COLFAX LA 71417-1429

19-738-701173
BUTTERCUP GRILL & BAR
660 YGNACIO VALLEY RD
WALNUT CREEK CA 94596

19-738-575801
BUTTERFIELD, CHARLES
2766 S SENECA ST APT E1
WICHITA KS 67217-2848

19-738-508346
BUTTERFIELDS STAGE
PO BOX 3864
PAGE AZ 86040

19-738-575802
BUTTERIS, ALLEN L
4891 US HWY 151
PLATTEVILLE WI 53818-8905

19-738-575803
BUTTERIS, RANDY K
17555 S JOHN DEERE RD TRLR 22
DUBUQUE IA 52001-8500

19-738-508347
BUTTERLY CO LTD
1815 NW 3RD ST
OKLAHOMA CITY OK 73106-2812

# Exhibit B

19-738-576538
CASON, JAMES C
3023 SE MINNESOTA AVE
TOPEKA KS 66605-2520

19-738-576539
CASON, WILDA KAY
PO BOX 226
TUCKERMAN AR 72473-0226

19-738-509598
CASPARS EAST 40
1401 INTERCHANGE AVE
BISMARCK ND 58501

19-738-509599
CASPER LUEBBERT
R R 2 BOX 207
WEST POINT NE 68788

19-738-576540
CASPERSON, ANDY J
1910 1ST AVE N APT 1V
DENISON IA 51442-1668

19-738-509600
CASS A TAPES
PO BOX 8123
KANSAS CITY MO 64112-8123

19-738-509601
CASS CO FRIEND OF COURT
PO BOX 38
CASSOPOLIS MI 49031-0038

19-738-509602
CASS COUNTY ABSTRACT CO INC
518 CHESTNUT ST
ATLANTIC IA 50022

19-738-509603
CASS COUNTY COLLECTOR
CASS COUNTY COURTHOUSE
201 W WALL ST
HARRISONVILLE MO 64701

19-738-509604
CASS COUNTY RECORDER
CASS COUNTY COURTHOUSE
5 W 7TH ST
ATLANTIC IA 50022

19-738-659351
CASS COUNTY REGISTER OF DEEDS
ATTN: CORPORATE OFFICER
REGISTER OF DEEDS
346 MAIN ST
PLATTSMOUTH NE 68048-1957

19-738-509605
CASS COUNTY TREASURER
CASS COUNTY GOVT BLDG
200 COURT PARK
LOGANSPORT IN 46947

19-738-509606
CASS COUNTY TREASURER
CASS COUNTY COURTHOUSE
5 W 7TH ST
ATLANTIC IA 50022-1492

19-738-509607
CASS COUNTY TREASURER
PO BOX 2806
FARGO ND 58108-2806

19-738-509608
CASS INFORMATION SYSTEMS INC
PO BOX 2498
COLUMBUS OH 43216-2498

19-738-509609
CASSANDRA L WALLACE
1300 S 6TH ST
MONMOUTH IL 61462-2858

19-738-509610
CASSCOE COMMUNITY CENTER
2340 RIVER RD
CASSCOE AR 72026

19-738-509611
CASSEL HILLS GOLF CLUB
201 CLUB HOUSE WAY
VANDALIA OH 45377

19-738-576541
CASSEL, JULIE M
503 N SNAPP ST
ABINGDON IL 61410-1365

19-738-576542
CASSELL, WILLIAM G
158 N PLEASANT AVE
GALESBURG IL 61401-3329

19-738-509612
CASSIA COUNTY TREASURER
CASSIA COUNTY COURTHOUSE
1459 OVERLAND AVE
BURLEY ID 83318-1862

19-738-656229
JAY C CASSIDAY
819 S MAIN ST
MONMOUTH IL 61462-2653

19-738-576543
CASSIDAY, AMY R
14622 GRANT ST
DOLTON IL 60419-2021

19-738-576544
CASSIDAY, CHRISTOPHER D
1060 E 5TH AVE
MONMOUTH IL 61462-2443

19-738-617426
CASSIDAY, CHRISTOPHER D
1060 E 5TH AVE
MONMOUTH IL 61462-2443

19-738-576545
CASSIDAY, JASON A
PO BOX 941
MONMOUTH IL 61462-0941

19-738-576546
CASSIDAY, JENNIFER S
25 COKELS CT
MONMOUTH IL 61462-2583

19-738-576547
CASSIDAY, ROBERT C
PO BOX 163
SMITHSHIRE IL 61478-0163

19-738-576548
CASSIDAY, TRACY R
1060 E 5TH AVE
MONMOUTH IL 61462-2443

19-738-617430
CASSIDAY, TRACY R
1026 S 8TH ST
MONMOUTH IL 61462-2963

548

# Exhibit B

19-738-510381
CHARLES JEFFRIES & SON TRUCKING INC
PO BOX 77
CAMBRIDGE IL 61238

19-738-570127
CHARLES JEFFRIES & SON TRUCKING INC
PO BOX 77
CAMBRIDGE IL 61238-0077

19-738-510382
CHARLES JOHNSON
3306 9TH AVE
COUNCIL BLUFFS IA 51501

19-738-510383
CHARLES K GRIFFITH
PO BOX 234
UNIONTOWN KS 66779

19-738-510384
CHARLES K STURDAVANT
5884 S SETTLEMENT WAY
BOISE ID 83705

19-738-510385
CHARLES KLEEB
RT 3
BROKEN BOW NE 68822
BROKEN BOW NE 68822

19-738-510386
CHARLES KOEHN
5305 Q RD
INGALLS KS 67853

19-738-510387
CHARLES KOEHN TRUCKING
19505 S RD
CIMARRON KS 67835

19-738-510388
CHARLES KROGH
300 E HARRISON
PO BOX 165
EXIRA IA 50076-0165

19-738-510389
CHARLES L BENSON
1200 MEADOW LN APT H
WATERLOO IA 50701-4660

19-738-510390
CHARLES L BRIDGEMAN
230 E 7TH ST APT 81A
UTE IA 51060-1021

19-738-510391
CHARLES L CROGHAN
219 ANN ST
MANNING IA 51455-1128

19-738-510392
CHARLES L GOTTO
512 PINE ST
MOORHEAD IA 51558-3008

19-738-510393
CHARLES L GROOM
2847 HWY 3
ROWAN IA 50470

19-738-660793
CHARLES L GROOM/BLOCKED TERMIN
2847 HWY 3
ROWAN IA 50470

19-738-510394
CHARLES L JAKABOSKY
425 FALCON LN
LAS VEGAS NV 89107

19-738-510395
CHARLES L JENKINS
22605 W 49TH TER
SHAWNEE KS 66226

19-738-510396
CHARLES L LAMMERS
2506 12TH AVE S
DENISON IA 51442-2556

19-738-510397
CHARLES L LOEFFELHOLZ
GLORIA S LOEFFELHOLZ
RR 1 BOX 342
WANN OK 74083-9769

19-738-510398
CHARLES L NEWMAN
MAIL RETURNED 1980 & 81& 95
DENISON IA 51442

19-738-510399
CHARLES L REGINI
243 PINE MDW
SPRING BRANCH TX 78070-5975

19-738-510400
CHARLES L RICE
16171 W HWY 54 LOT 145
GODDARD KS 67052-9296

19-738-510401
CHARLES L ROWSEY
311 S 4TH ST
MONMOUTH IL 61462-2221

19-738-510402
CHARLES L TOEDMAN
RR 1 BOX 138
RANSOM KS 67572-9747

19-738-510403
CHARLES L TOMLINSON
1356 IMPERIAL AVE
GALESBURG IL 61401

19-738-510404
CHARLES LATHROP
PO BOX 818
SANTA CLARA UT 84765-0818

19-738-510405
CHARLES LEE JEPSEN
MAIL RETURNED 1980 & 81 & 1995
UTE IA 51060

19-738-510406
CHARLES LINDSETH
C/O DAWSON MARKWELL EXPLORATION CO
PO BOX 2446
OKLAHOMA CITY OK 73101-2446

19-738-510407
CHARLES M CARDEN JR
826 N WALKERS MILL RD
GRIFFIN GA 30223

19-738-510408
CHARLES M DAHLKE
MITCHELLVILLE IA 50169

## Exhibit B

19-738-510436
CHARLES RODER
RR 1
LINN GROVE IA 51033
LINN GROVE IA 51033

19-738-510438
CHARLES S COX
RR 1 BOX 257D
COFFEYVILLE KS 67337

19-738-510439
CHARLES S MOBLEY
305 WEDGEWOOD DR
CLARKSVILLE TN 37043

19-738-701299
CHARLES SANDER
3321 SILVER ST
WICHITA KS 67217

19-738-510440
CHARLES SARGENT IRRIGATION INC
PO BOX 627
BROKEN BOW NE 68822

19-738-510441
CHARLES SCAIFE BOYD
PO BOX 5157
SHREVEPORT LA 71135-5157

19-738-510442
CHARLES SHIER
BEDFORD IA 50833

19-738-510443
CHARLES SOMMERFELD
28913 COUNTY RD 52
ILIFF CO 80736

19-738-510444
CHARLES STELLAR FOOD DIST INC
660 LINTON BLVD STE 206
DELRAY BEACH FL 33444

19-738-510445
CHARLES STEWART
5TH FL SPECIAL OPERATIONS
455 N MAIN ST
WICHITA KS 67202

19-738-510446
CHARLES STUBE CO INC
DEPT 962
PO BOX 8000
BUFFALO NY 14267

19-738-510447
CHARLES T BOLLMAN
303 S CENTER AVE
GALVA IL 61434-1750

19-738-510448
CHARLES T GORDON
6622 MOCKINGBIRD LN
HARRAH OK 73045-8516

19-738-510449
CHARLES T TIBBS
PO BOX 322
MONTICELLO UT 84535

19-738-510450
CHARLES TAGUE
RR 2 BOX 141
HURLAND MO 63547

19-738-510451
CHARLES V FURMAN
2409 45TH ST
LITTLE YORK IL 61453-9730

19-738-510452
CHARLES V SANDER
3321 SILVER ST
WICHITA KS 67217-3372

19-738-510453
CHARLES VOSSLER
RR 2 BOX 4
FRIEND NE 68359

19-738-510454
CHARLES W BLUM & RHODA P BLUM
RR 1 BOX 606
COPAN OK 74022-9801

19-738-510455
CHARLES W BLUM AND
RHODA P BLUM AS JOINT TENANTS
RR 1 BOX 277
COPAN OK 74022-9801

19-738-510456
CHARLES W BOWER
5325 BRERETON AVE
ORLANDO FL 32839

19-738-510457
CHARLES W BROWN
MAIL RETURNED 1975&76
MADRID IA 50201

19-738-510458
CHARLES W DEMOTT
223 N GUADALUPE ST
SANTA FE NM 87501

19-738-701300
CHARLES W E L COOK
PO BOX 501
AVON IL 61415-0501

19-738-510459
CHARLES W FABER
PO BOX 134
VAN ORIN IL 61374

19-738-510460
CHARLES W FISHER
MAIL RETURNED 1986 & 1995
HALBUR IA 51444

19-738-608651
CHARLES W JOHNSON
503 N SANGAMON
LINCOLN IL 62656

19-738-510461
CHARLES W KEYSER JR
826 OBERLIN RD
MIDDLETOWN PA 17057

19-738-510462
CHARLES W LILLY
RURAL RTE 2
LYONS NE 68038

19-738-510463
CHARLES W MCBRYDE SR
1400 BOSTON DR
PINE BLUFF AR 71601-5468

594

## Exhibit B

19-738-577165
CHRISTOFFERSON, KELLY A
974 S CEDAR ST
GALESBURG IL 61401-5922

19-738-577166
CHRISTOFFERSON, LAWRENCE A
974 S CEDAR ST
GALESBURG IL 61401-5922

19-738-577167
CHRISTOFFERSON, SCOTT E
PO BOX 96
KIRKWOOD IL 61447-0096

19-738-577168
CHRISTOFORATOS, ALFREDO P
1520 BOSWELL AVE APT 3
CRETE NE 68333-1773

19-738-510961
CHRISTONE CONSTRUCTION INC
118 CLARK ST
WATERLOO IA 50703

19-738-510962
CHRISTOPHER A ADKINS
400 N UNION ST
YATES CITY IL 61572-9344

19-738-510963
CHRISTOPHER A FRIEDEL
2221 CASADO ST
WICHITA KS 67217-1701

19-738-510964
CHRISTOPHER A GARCIA
1403 3RD AVE S APT 3
DENISON IA 51442-2012

19-738-510965
CHRISTOPHER A KIRBY
605 NE WINDROSE DR APT B
KANSAS CITY MO 64155-3219

19-738-510966
CHRISTOPHER A WALKER
3156 D AVE
KIRON IA 51448

19-738-510967
CHRISTOPHER B HODGES
14530 NW 73RD ST
KANSAS CITY MO 64152-5107

19-738-510968
CHRISTOPHER BUMPUS
13712 E 50TH ST
KANSAS CITY MO 64133

19-738-510969
CHRISTOPHER C JONES
1511 L AVE
MILFORD IA 51351

19-738-701343
CHRISTOPHER C LAROSE
1223 ARCADIA DR
GALESBURG IL 61401-2108

19-738-510970
CHRISTOPHER CROSS INC
PO BOX 1393
MANDEVILLE LA 70470-1393

19-738-510971
CHRISTOPHER CUZNER
8300 NE 75TH TER
KANSAS CITY MO 64158

19-738-510972
CHRISTOPHER D BENNETT
10429 SW 56TH AVE
OCALA FL 34476

19-738-510973
CHRISTOPHER D CASSIDAY
1060 E 5TH AVE
MONMOUTH IL 61462-2443

19-738-510974
CHRISTOPHER D PAUKEN
531 BENNINGTON
MAUMEE OH 43537

19-738-510975
CHRISTOPHER D WOLLBRINK
503 N G ST
MONMOUTH IL 61462-1042

19-738-510976
CHRISTOPHER E DEMORET
203 E 12TH ST
FORD KS 67842-9459

19-738-701344
CHRISTOPHER E FOSTER
2730 S SENECA ST
WICHITA KS 67217-2813

19-738-701345
CHRISTOPHER E LOVATO
929 3RD AVE S # 1
DENISON IA 51442-2421

19-738-510978
CHRISTOPHER E MULLIN JR
C/O ROB RAUH
2401 E SPEEDWAY BLVD
TUCSON AZ 85719-4735

19-738-510979
CHRISTOPHER F VALDIVIEZ
GRAIN VALLEY   64029

19-738-510980
CHRISTOPHER GONZALES
2250 IVY AVE TRLR 41
CRETE NE 68333-1173

19-738-701346
CHRISTOPHER GRAY
308 BROOKLINE PL
BARTLESVILLE OK 74006

19-738-510981
CHRISTOPHER J BERTRAND
1037 SETTLERS LN
DENISON IA 51442-1157

19-738-510982
CHRISTOPHER J CASEY
159 PLANTATION SHORES DR
TAVERNIER FL 33070

19-738-510983
CHRISTOPHER J CHASE
805 BROWN AVE
KINGSTON TN 37763

# Exhibit B

19-738-511054
CHUCKS TRUCKING INC
PO BOX 309
WEBSTER SPRINGS WV 26288

19-738-511055
CHUCKWAGON RESTAURANT
7475 RTE 75
ROCK CITY IL 61070

19-738-577179
CHUMLEY, G MICHAEL
17888 EVANS RD
TONANOXIE KS 66086

19-738-511056
CHUMS RESTAURANT
HWYS 47 & 61
TROY MO 63379

19-738-656630
CUONG VAN CHUNG
6110 NW 4TH ST
LINCOLN NE 68521-3773

19-738-577180
CHUOL, SANTO R
1810 S MAIN ST APT 420
S SALT LAKE UT 84115-2051

19-738-701354
CHUONG H MAI
2630 WOODS BLVD
LINCOLN NE 68502-5824

19-738-657963
ROBERT G CHURCH
2208 E 51ST ST S
WICHITA KS 67216-3221

19-738-511057
CHURCH OF CHRIST
ALCORN RD
HUMPHREY AR 72073

19-738-511058
CHURCH OF CHRIST OF DODGE CITY
C/O SWAIM FUNERAL HOME
1901 6TH AVE
DODGE CITY KS 67801

19-738-511059
CHURCH OF LATTER DAY SAINTS
12555 OUTER N FORTY
SAINT LOUIS MO 63141

19-738-511060
CHURCH OF ST JOHN
320 OAK ST
WISCONSIN RAPIDS WI 54494

19-738-608079
CHURCH ST DELI
150 CHURCH ST
AMSTERDAM NY 12010

19-738-511061
CHURCH ST DELI & IMPORT
150 CHURCH ST
AMSTERDAM NY 12010

19-738-701355
CHURCH STREET CAFE
101 S MAIN ST
NORTH SYRACUSE NY 13212

19-738-577181
CHURCH, JONATHAN R
2900 JADE CT
LOUISVILLE CO 80027-6047

19-738-577182
CHURCH, KATRINA
285 N JACKSON ST
BUSHNELL IL 61422

19-738-577183
CHURCH, ORVILLE L
2712 FENWICK RD
LAWRENCE KS 66046-5461

19-738-577184
CHURCH, RICHARD L
1300 N ERIE
LEXINGTON NE 68850

19-738-577185
CHURCH, ROBIN D
RR 1 BOX 263A
RONCEVERTE WV 24970-9732

19-738-577186
CHURCH, TONYA G
PO BOX 286
HARRISBURG AR 72432-0286

19-738-577187
CHURCH, VIRGINIA M
8342B HWY 163
HARRISBURG AR 72432-8918

19-738-511062
CHURCHILL CONSULTIN
8014 LICHTENAUER DR
LENEXA KS 66219-2038

19-738-511063
CHURCHILL LABORATORIES INC
PO BOX 971351
BOCA RATON FL 33497

19-738-577188
CHURCHILL, CODY
205 WOODHAVEN DR
SMITHVILLE MO 64089-9638

19-738-577189
CHURCHILL, DAVID C
PO BOX 434
WILBER NE 68465-0434

19-738-577190
CHURCHILL, GREGORY C
427 N 3RD ST
MONMOUTH IL 61462-1832

19-738-577191
CHURCHILL, JANICE L
RT 1 BOX 52A
DEWITT NE 68341

19-738-577192
CHURCHILL, JENNIFER W
PO BOX 434
WILBER NE 68465-0434

19-738-577193
CHURCHWELL, GLENDA F
20844 BARBARA RD
HARRISBURG AR 72432-8897

626

# Exhibit B

19-738-577636
CONCHAS, JESUS G
512 N 6TH ST
MONMOUTH IL 61462-1331

19-738-577637
CONCHAS, MARGARITA L
512 N 6TH ST
MONMOUTH IL 61462-1331

19-738-577638
CONCHAS, MARIO H
800 W 3RD AVE
MONMOUTH IL 61462-2024

19-738-577639
CONCHAS, RAMONA
512 N 6TH ST
MONMOUTH IL 61462

19-738-512783
CONCHETTA M BUTLER
PO BOX 231
MONMOUTH IL 61462-0231

19-738-701455
CONCO
PO BOX 61028
NEW ORLEANS LA 70161

19-738-512784
CONCO FOOD SERVICE
PO BOX 54495
NEW ORLEANS LA 70154-4495

19-738-512785
CONCO FOOD SERVICE
PO BOX 8848
524 W 61ST ST
SHREVEPORT LA 71148-8848

19-738-512786
CONCO FOOD SERVICE
918 EDWARDS AVE
HARAHAN LA 70123-3164

19-738-512787
CONCO INC
PO BOX 9166
WICHITA KS 67277

19-738-512788
CONCORD CARE CENTER
1375 DIVISION ST
GARNER IA 50438

19-738-512789
CONCORD FOODS
PO BOX 1307
230 CONCORD ST
DAYTON OH 45401-1307

19-738-607983
CONCORD FOODS INC
230 CONCORD ST
DAYTON OH 45401-1307

19-738-512790
CONCORD TELEPHONE CO
CT COMMUNICATIONS
PO BOX 96010
CHARLOTTE NC 28296-0010

19-738-512791
CONCORDE REFRIGERATED INC
PO BOX 137
ANKENY IA 50021-0137

19-738-512792
CONCORDIA FARMERS COOP CO
PO BOX 172
CONCORDIA MO 64020

19-738-512793
CONCORDIA UNIVERSITY
12800 N LAKESHORE DR
MEQUON WI 53097

19-738-512794
CONCORP INC
8100 NW 97TH TER
KANSAS CITY MO 64153

19-738-512795
CONCOURSE HOTEL
4300 INTERNATIONAL GTWY
COLUMBUS OH 43219

19-738-512796
CONCRETE ACCESSORIES
PO BOX 7717
WICHITA KS 67277-7717

19-738-512797
CONCRETE COMPLETE
PO BOX 273
LAWTON IA 51030-0273

19-738-512798
CONCRETE ENTERPRISES INC
PO BOX 1
2430 E 1ST ST
HUTCHINSON KS 67504-0001

19-738-701456
CONCRETE INDUSTRIES
6300 CORNHUSKER HWY
PO BOX 29529
LINCOLN NE 68529-0529

19-738-512799
CONCRETE MINNESOTA INC
2424 MYERS RD
ALBERT LEA MN 56007-5315

19-738-512800
CONCRETE PLACEMENT INC
19945 W 157TH ST
OLATHE KS 66062-3824

19-738-512801
CONCRETE PRODUCTS
PO BOX 3975
BARTLESVILLE OK 74006

19-738-512802
CONCRETE PRODUCTS CO
2222 3RD ST
SIOUX CITY IA 51101-2206

19-738-512803
CONCRETE SAWING INC
9413 N 29TH ST
OMAHA NE 68112

19-738-512804
CONDE NAST PUBLICATIONS INC
PO BOX 37666
BOONE IA 50037-0666

19-738-512805
CONDE SYSTEMS INC
7851 SCHILLINGER PARK W
MOBILE AL 36608-9697

## Exhibit B

19-738-701458
CONNIE DIXON
2323 S SHERIDAN ST
WICHITA KS 67213

19-738-512850
CONNIE F HOLMES
305 S GREEN ST
WICHITA KS 67211-2018

19-738-512851
CONNIE G WALBRECHT & ATTORNEYS
LOWE & ALBERTS PC
1624 NORMAN AVE
CRETE NE 68333

19-738-512852
CONNIE J HEDGES
427 N 3RD ST
MONMOUTH IL 61462-1832

19-738-512853
CONNIE J NORDBOE-TINKER
200 E 1ST ST N STE 540
WICHITA KS 67202-2110

19-738-512854
CONNIE K FITZMAURICE
7212 NW RHODE AVE
KANSAS CITY MO 64152-2824

19-738-512855
CONNIE K MARTIN
224 SW ORCHARD ST
TOPEKA KS 66606-2402

19-738-512856
CONNIE L CASPERSON
1315 BOHNKER HILL RD
DENISON IA 51442-2515

19-738-512857
CONNIE L JEFFREY
873 E TOWNSHIP RD 42
SYCAMORE OH 44882-9531

19-738-512858
CONNIE LAWRENCE
502 PARK ST
EXCELSIOR SPRINGS MO 64024-2409

19-738-512859
CONNIE M HALL
148 N YALE ST
WICHITA KS 67206

19-738-512860
CONNIE M WAMPLER
PO BOX 96
EDNA KS 67342

19-738-512862
CONNIE S FRYMAN
542 S 7TH ST
SHARPSVILLE PA 16150

19-738-512863
CONNIE S HULL
24 LINCOLN CT
MONMOUTH IL 61462-2461

19-738-512864
CONNIE S MATHIS
12223 NE 132ND TER
KEARNEY MO 64060

19-738-512865
CONNIE S PORTER
203 N 16TH ST
DENISON IA 51442-1543

19-738-512866
CONNIE SOMERS
5815 BROADMORE ST
ZEPHYRHILLS FL 33541-3240

19-738-512867
CONNIE W GILES
2307 S 9TH ST
LAFAYETTE IN 47909-2402

19-738-512868
CONNIE WALBRECT
1624 NORMAN AVE
CRETE NE 68333-1536

19-738-512869
CONNIES SANDWICHES
3644 S FOLSOM ST
LINCOLN NE 68522

19-738-577678
CONNOLLY JR, DANIEL JOSEPH
17555 S JOHN DEERE RD TRLR 6
DUBUQUE IA 52001-8500

19-738-661903
CONNOLLY O`MALLEY LILLIS HANSEN OLSON
LLP
ATTN MICHAEL O`MALLEY
317 SIXTH ST
300 BANK OF AMERICA BLDG
DES MOINES IA 50309

19-738-577679
CONNOLLY, JOHN T
4037 STOFFEL RD
BERNARD IA 52032-9519

19-738-577680
CONNOLLY, JUDY
1289 WALNUT ST
DUBUQUE IA 52001-6256

19-738-577681
CONNOLLY, PATRICK THOMAS
3712 PENNSYLVANIA AVE APT I94
DUBUQUE IA 52002-3716

19-738-577682
CONNOLLY, STANLEY
1170 WHITEWATER DR
CASCADE IA 52033-9603

19-738-577683
CONNOLLY, STEVEN D
3406 WALLER ST
DUBUQUE IA 52002-2855

19-738-512870
CONNOLLYS MARKET
PO BOX 946
RIDGELY MD 21660

19-738-512871
CONNOR BLAKE & GRIFFIN LLP
2600 MICHELSON DR STE 1450
IRVINE CA 92612

19-738-512872
CONNOR CO
PO BOX 9760
PEORIA IL 61612-9760

## Exhibit B

19-738-513933
CRETE HIGH SCHOOL
1500 E 15TH ST
CRETE NE 68333-1936

19-738-513934
CRETE LEGION BASEBALL
C/O DON VERNON
RR 2
CRETE NE 68333

19-738-513935
CRETE MACHINE INC
1830 W 12TH ST
CRETE NE 68333-2229

19-738-513936
CRETE MEDICAL CLINIC PC INC
1212 IVY AVE
CRETE NE 68333-2318

19-738-513937
CRETE MILLS
PO BOX 308
CRETE NE 68333-0308

19-738-513938
CRETE MUNICIPAL HOSPITAL
1540 GROVE AVE
CRETE NE 68333

19-738-513939
CRETE NEWS
PO BOX 40
1201 LINDEN AVE
CRETE NE 68333-0040

19-738-513940
CRETE PARKS & RECREATION
CITY HALL
CRETE NE 68333

19-738-513941
CRETE SOKOLICE GYM
607 IVY AVE
CRETE NE 68333-2828

19-738-701542
CRETE TRUE VALUE
1122 MAIN AVE
CRETE NE 68333

19-738-513942
CRETE VETERINARY CLINIC
PO BOX 8
CRETE NE 68333-0008

19-738-513943
CRETE WOMENS BOWLING ASSOC
W HWY 33
CRETE NE 68333

19-738-701543
CREVE COEUR GOLF COURSE
11400 OLDE CABIN RD
CREVE COEUR MO 63141-7117

19-738-578194
CREW, KENNETH
661 STATE RT 29
SPARLAND IL 61565-9392

19-738-578195
CREWS, SANDRA M
5725 N HAGENER RD
BEARDSTOWN IL 62618-8323

19-738-578196
CRICK, RODNEY E
20402 P RD
CIMARRON KS 67835

19-738-513944
CRICKET
PO BOX 660021
DALLAS TX 75266-0021

19-738-513945
CRICKET ENTERPRISES CORP
RR 2 BOX 159
NOWATA OK 74048-9683

19-738-513946
CRICKET RIDGE GOLF COURSE
22087 POCKET RD
BATESVILLE IN 47006

19-738-578197
CRIDDLE, ERIN E
112 W 10TH ST
COAL VALLEY IL 61240-9119

19-738-578198
CRIDER, HENRY C
254 E WATER ST APT 1
GALESBURG IL 61401-4718

19-738-578199
CRIDER, SONYA L
254 E WATER ST APT 1
GALESBURG IL 61401-4718

19-738-513947
CRIEG GRANDY
1040 E 7TH ST
CRAIG CO 81625-1305

19-738-578200
CRIGLER, LARRY L
PO BOX 434
SLEDGE MS 38670-0434

19-738-578201
CRIM, AUTHER
1223 CLOVERLEAF RD
WACO TX 76705-2310

19-738-578202
CRIM, RON ALLAN
1024 W FAIRWOOD LN
OLATHE KS 66061-2414

19-738-578203
CRIMINS, CLAYTON R
339 5TH ST NW
FORT DODGE IA 50501-2338

19-738-578204
CRINGAN, MARY B
7120 N SHANNON
KANSAS CITY MO 64152

19-738-578205
CRIPE, GARY J
PO BOX 232
DUBUQUE IA 52004-0232

19-738-656640
STEVEN CRIPPEN
1622 11TH ST
COLUMBUS NE 68601-5929

# Exhibit B

19-738-519394
ELISEO RIZO
PO BOX 328
MANILLA IA 51454-0328

19-738-701906
ELISEO SOLORSANO
2235 IVY AVE APT 25
CRETE NE 68333-1169

19-738-580296
ELISERIO, MARIA C
PO BOX 44
DORCHESTER NE 68343-0044

19-738-580297
ELISHA, GANT
547 VERSEY ST
EUDORA AR 71640-2106

19-738-580298
ELISONDO HENAJOSA, SANTIAGO
217 3RD AVE NE APT 7
AUSTIN MN 55912-3445

19-738-580299
ELISONDO, JERARDO
4239 11TH AVE
MOLINE IL 61265-2583

19-738-519395
ELITE BROKERAGE SERVICE
PO BOX 62047
15710 JFK BLVD STE 400
HOUSTON TX 77205-2047

19-738-519396
ELITE EXPRESS
ALTERNATIVE PAYEE 113285
PO BOX 640296
PITTSBURGH PA 15264-0296

19-738-519397
ELITE EXPRESS INC
C/O SYSTRAN FIN SVCS
PO BOX 640296
PITTSBURGH PA 15264-0296

19-738-519398
ELITE FLEET INC
PO BOX 906
ST JOSEPH MO 64502

19-738-701907
ELITE GROUP INC
15333 JKB BLVD 6TH FL
HOUSTON TX 77032

19-738-519399
ELITE PRESENTATION INC
10300 CONSTITUTION AVE NE STE C
ALBUQUERQUE NM 87112-5373

19-738-519400
ELITE PROFESSIONALS
C/O METRO FACTORS
PO BOX 38604
DALLAS TX 75238

19-738-519401
ELITE PROMOTIONS
5080 N ELSTON AVE
CHICAGO IL 60630

19-738-519402
ELITE SPICE INC
7151 MONTEVIDEO RD
JESSUP MD 20794-9308

19-738-519403
ELITE TIRE & AUTOMOTIVE INC
PO BOX 406
MARION AR 72364

19-738-701908
ELIU V RAMIREZ
315 1/2 14TH
DENISON IA 51442

19-738-519404
ELIZABETH A BAVERY
318 N JEFFERSON ST
LEWISTOWN IL 61542-1133

19-738-519405
ELIZABETH A CHOATE
210 N E ST
MONMOUTH IL 61462-1650

19-738-519406
ELIZABETH A KAZMIERCZAK
126 ATLANTIC AVE
BUFFALO NY 14212-2128

19-738-519407
ELIZABETH A RODGERS
6233 PLANETT RD
TERRE HAUTE IN 47805

19-738-519408
ELIZABETH ANN WALLACE
RR 3 BOX 4050
BARTLESVILLE OK 74003-9544

19-738-519409
ELIZABETH ANNE HEMBERGER
1220 W 20TH AVE N
ARGOMIA KS 67004-8014

19-738-519410
ELIZABETH C SPRAGG
5379 NE 37TH ST
KANSAS CITY MO 64117

19-738-519411
ELIZABETH CHAIREZ
2107 PARK PL
WICHITA KS 67203-2430

19-738-519412
ELIZABETH COLLINS
707 NW 39TH CIR
OKEECHOBEE FL 34972-1759

19-738-519413
ELIZABETH D CAMPBELL
PO BOX 514
LYON MS 38645

19-738-519414
ELIZABETH DURFEY
3223 W 12TH AVE
KENNEWICK WA 99338

19-738-519415
ELIZABETH ELLIOTT
RR 1 BOX 1056
LINDEN AL 36748-9801

19-738-569598
ELIZABETH GOMEZ/BLOCKED TERMINATED
1205 N 26TH ST
DENISON IA 51442-1137

## Exhibit B

19-738-581823
FULTON, ANTHONY J
1920 SE OHIO AVE
TOPEKA KS 66607-1350

19-738-581824
FULTON, LAKEIA
463 PROSPECT
EUDORA AR 71640

19-738-581825
FULTON, MELVA L
6126 SW 27TH ST APT 2
TOPEKA KS 66614-5258

19-738-581826
FULTON, TIMOTHY M
2010 SE OHIO AVE
TOPEKA KS 66607-1352

19-738-581827
FULVI, RICHARD J
65 ALTHEA ST
W SPRINGFIELD MA 01089-1138

19-738-523090
FUN CO INC
PO BOX 100931
3658 ATLANTA INDUSTRIAL DR NW STE D
ATLANTA GA 30384-0931

19-738-523091
FUN SERVICES
12119 JOHNSON DR
SHAWNEE KS 66216-1907

19-738-523092
FUN SERVICES INC
5617 CORVALLIS AVE N
MINNEAPOLIS MN 55429-3507

19-738-702171
FUN VALLEY
36000 HWY 160
SOUTH FORK CO 81154

19-738-523093
FUNCKS FAMILY RESTAURANT
664 W MAIN ST
PALMYRA PA 17078

19-738-608491
FUNDAMENTAL METALS & MINERALS GENERAL
COUNSEL
30 ROCKEFELLER PLZ STE 1933
NEW YORK NY 10020

19-738-581828
FUNEZ, HERSON
635 N 45TH ST APT 5
OMAHA NE 68132-2523

19-738-523094
FUNFOOD INC
PO BOX 109
SACO ME 04072

19-738-661992-CC
MAY FUNK
320 S LINCOLN ST
# 39
RUSSELL KS 67665-2910

19-738-523095
FUNK FARMS
3038 179TH ST
RUSSELL KS 67665

19-738-523096
FUNK MACHINE & SUPPLY INC
1805 YOLANDE AVE
LINCOLN NE 68521

19-738-523097
FUNK MANUFACTURING
2624 HWY 169
COFFEYVILLE KS 67337

19-738-581829
FUNK, NANCY LEE
791 GLEN OAK ST # 2
DUBUQUE IA 52001-6435

19-738-581830
FUNK, RANDY LYNN
513 E PROSPECT ST
MANCHESTER IA 52057-1403

19-738-581831
FUNNELL, ALYSSA D
2236 NW TAYLOR ST
TOPEKA KS 66608-1943

19-738-523098
FUNPLEX
ATTN JERRY SMITH
7003 Q ST
OMAHA NE 68117-1649

19-738-523099
FUNSET GRILL
3916 W COLLEGE AVE
APPLETON WI 54914

19-738-523100
FUNSHINE CLOWNS
1221 E BROADWAY
MONMOUTH IL 61462-1911

19-738-581832
FUNSTON, HEATH
2657 HAWK RD
ABILENE KS 67410-6026

19-738-581833
FURLONG, JAMES P
2840 OAK MEADOW CT
DUBUQUE IA 52003-5210

19-738-581834
FURLONG, JOAN E
2705 MONASTERY DR
DUBUQUE IA 52003-8041

19-738-581835
FURMAN, CHARLES V
2409 45TH ST
LITTLE YORK IL 61453-9730

19-738-656284
VINCENT M FURNALD
1413 E FREMONT ST
GALESBURG IL 61401-3037

19-738-523101
FURNAS VEEARC DRIVES
PO BOX D 3059
BOSTON MA 02241-3059

19-738-657250
CRAIG L FURNE
23 MORNINGSIDE DR
DENISON IA 51442-2236

## Exhibit B

19-738-584258
HAMMOND, KENTON E
215 N 3RD ST
MONMOUTH IL 61462-1828

19-738-584259
HAMMOND, LISA J
3004 4TH AVE
CANYON TX 79015

19-738-526040
HAMMOND, MIKE
C/O BERTELSEN FARM
2828 35TH ST
LITTLE YORK IL 61453

19-738-584260
HAMMOND, ROY L
5115 VINE ST APT 121
LINCOLN NE 68504-3371

19-738-584261
HAMMOND, SARA N
303 W ELM ST
BARDOLPH IL 61416-9742

19-738-584262
HAMMOND, TRAVIS S
254 N WASHINGTON
BUSHNELL IL 61422

19-738-584263
HAMMOND, YVONNE
1063 E 5TH AVE
MONMOUTH IL 61462-2442

19-738-526041
HAMMONS IMPLEMENT INC
2349 4TH AVE
GREELEY CO 80631-7160

19-738-700567
HAMNER PROVISION CO INC STA A
PO BOX 7207
SAN ANTONIO TX 78207

19-738-584264
HAMOR, JAMES E
BOX 374
ELLENDALE MN 56026

19-738-526042
HAMPDEN COUNTY SHERIFFS INC
PO BOX 5005
1170 MAIN ST
SPRINGFIELD MA 01101-5005

19-738-584265
HAMPE, CHRIS R
RR 2 BOX 183
VALLEY MILLS TX 76689-9430

19-738-526043
HAMPEL OIL DISTRIBUTORS
PO BOX 12346
WICHITA KS 67277

19-738-526044
HAMPEL OIL DISTRIBUTORS INC
PO BOX 12346
WICHITA KS 67277-2346

19-738-584266
HAMPEL, GARY G
770 N SILVER SPRINGS # 1404
WICHITA KS 67212-6092

19-738-584267
HAMPEL, MICHAEL E
PO BOX 253
TRIBUNE KS 67879-0253

19-738-526045
HAMPL TRANSPORTATION INC
PO BOX 96
MORSE BLUFF NE 68648

19-738-584268
HAMPSTEN, ASHLIE
570 GARFIELD ST
AMERICAN FLS ID 83211-1623

19-738-661963
HAMPTON & ROYCE, L C
119 W IRON AVE
PO BOX 1247
SALINA KS 67402-1247

19-738-526046
HAMPTON INN
3800 W KELLOGG DR
WICHITA KS 67213-2227

19-738-526047
HAMPTON INN
10591 METCALF FRONTAGE RD
OVERLAND PARK KS 66212

19-738-526048
HAMPTON INN APPLETON
350 FOX RIVER DR
APPLETON WI 54913-9116

19-738-526049
HAMPTON INN DENVER
INTERNATIONAL AIRPORT
6290 TOWER RD
DENVER CO 80249

19-738-526050
HAMPTON INN INC
1401 SW ASHWORTH PL
TOPEKA KS 66604-3737

19-738-526051
HAMPTON INN MADISON EAST
4820 HAYES RD
MADISON WI 53704-3261

19-738-526052
HAMPTON INN MKCLB
8551 N CHURCH RD
KANSAS CITY MO 64158

19-738-526053
HAMPTON MEAT PROCESSING COINC
PO BOX 545
HOPKINSVILLE KY 42241-0545

19-738-526054
HAMPTON PUGH CO
PO BOX 121
MC GEHEE AR 71654

19-738-584269
HAMPTON, ANGELIA R
1103 ASHLEY RD 36
WILMOT AR 71676-9416

19-738-584270
HAMPTON, BONNIE E
3313 BLUE MOUNTAIN DR
SAN JOSE CA 95127-4704

## Exhibit B

19-738-527583
HILLCREST CLINICS
PO BOX 5308
WACO TX 76708-0308

19-738-527584
HILLCREST COMMODITIES
PO BOX 2210
MOSES LAKE WA 98837

19-738-527585
HILLCREST COUNTRY CLUB
6098 FALL CREEK RD
INDIANAPOLIS IN 46220

19-738-527586
HILLCREST COUNTRY CLUB
4610 HILLCREST
BOISE ID 83705

19-738-527587
HILLCREST FAMILY SERVICES
PO BOX 1160
2005 ASBURY RD
DUBUQUE IA 52004-1160

19-738-527588
HILLCREST FOOD SERVICE INC
2695 E 40TH ST
CLEVELAND OH 44115-3508

19-738-527589
HILLCREST HEALTHCARE
DR RAY J MAILLOUX
808 E PECAN GROVE RD
SHERMAN TX 75090

19-738-527590
HILLCREST PORK LLC
47907 300TH ST
KINGSLEY IA 51028

19-738-527591
HILLCREST TRUCK STOP
16451 HWY 71 NE
NEW LONDON MN 56273

19-738-527592
HILLCREST WRECKER & GARAGE INC
3700 FRANKLIN PKWY CIR
LAWRENCE KS 66046

19-738-585664
HILLE, GREGORY J
227 LINDALE
HICKMAN NE 68372

19-738-585665
HILLEBRAND, CRIS A
1690 DREXEL ST
DUBUQUE IA 52001-5405

19-738-585666
HILLEBRAND, LINDA A
1320 GARFIELD AVE
DUBUQUE IA 52001-2235

19-738-658334
ROBERT F HILLER
7927 N CAMPBELL ST
KANSAS CITY MO 64118-1521

19-738-585667
HILLER, SANDY D
740 E BERRIEN ST
GALESBURG IL 61401-5118

19-738-527593
HILLESON, JOHN
1306 PAW PAW RD
LEE IL 60530

19-738-585668
HILLGREN, LEONARD R
HARBOR N LOT 33
CRETE NE 68333

19-738-585669
HILLIARD, MELISSA D
648 E MAIN ST
BUSHNELL IL 61422-1305

19-738-585670
HILLIARD, REBECCA A
PO BOX 442
STONEWALL MS 39363-0442

19-738-585671
HILLIARD, RICHARD L
202 N SHANNON DR APT 2 S
MACOMB IL 61455-1973

19-738-585672
HILLIER, CRISTINE G
234 E OLSON RD
MIDLAND MI 48640-8633

19-738-585673
HILLIER, KATHY C
RR 1 BOX 204
GLADSTONE IL 61437-9752

19-738-585674
HILLIER, MICHAEL
PO BOX 591
LAVACA AR 72941-0591

19-738-585675
HILLIER, TARA T
748 WILLARD ST
GALESBURG IL 61401-3010

19-738-585676
HILLIER, WILLIAM M
44 LORAINE DR
GALESBURG IL 61401-6681

19-738-585677
HILLIKER, ROGER
PO BOX 143
BEAVER XING NE 68313-0143

19-738-585678
HILLIS, BARBARA J
206 SOUTHERN AVE
PARSONS KS 67357-5236

19-738-533434
JON G HILLMAN JR
PO BOX 193
STERLING NE 68443-0193

19-738-585679
HILLMAN, BILLY R
PO BOX 112
SHERARD MS 38669

19-738-585680
HILLMAN, DANIEL W
PO BOX 405
AVON IL 61415-0405

## Exhibit B

19-738-702721
JASON A PROVINCE
105 N 8TH ST APT 404
LINCOLN NE 68508-1355

19-738-531526
JASON A SHORTER
31 BELKNAP ST # 3
DOVER NH 03820

19-738-702722
JASON ASENIERO
2726 S SENECA ST APT D12
WICHITA KS 67217-2821

19-738-702723
JASON B ALLINGTON
49714 S 80TH RD
WYMORE NE 68466-8001

19-738-531527
JASON BOEDER
N4401 COUNTY RD AB
LUXEMBURG WI 54217

19-738-531528
JASON C MARTIN
11315 W STATE RT 18 APT 16
FOSTORIA OH 44830-4602

19-738-531529
JASON C PETERSON
221 S WARD ST
OTTUMWA IA 52501

19-738-569671
JASON C VACEK/BLOCKED
TERMINATED
625 FOREST AVE APT 3
CRETE NE 68333-2957

19-738-531530
JASON COFFEY
2613 W 8TH ST
COFFEYVILLE KS 67337

19-738-531531
JASON D MCKINNEY
1655 N 25TH ST
FORT DODGE IA 50501

19-738-531533
JASON E ARNOLD
825 120TH AVE
ROSEVILLE IL 61473-9234

19-738-702724
JASON E FIALA
222 W 13TH ST
SCHUYLER NE 68661-1730

19-738-531534
JASON E NEWCOMB
536 N CHERRY ST
GALESBURG IL 61401-3708

19-738-569672
JASON E WORLEY/BLOCKED TERMINATED
400 N MAIN ST APT 2024
FOSTORIA OH 44830-2224

19-738-531535
JASON G BORMANN
7200 2 42ND ST
LINCOLN NE 68516

19-738-531536
JASON GREMS
1504 E 2000TH RD
EUDORA KS 66025

19-738-531537
JASON H SMITH
235 HIGHLAND AVE
GALESBURG IL 61401-3350

19-738-531538
JASON HUNGATE
CREATIVE SERV
425 WASHINGTON ST APT 104
KANSAS CITY MO 64105

19-738-531539
JASON J BAYLISS
PO BOX 1133
WILBER NE 68465-1133

19-738-531540
JASON J JONES
RR 2 BOX 6A
LUDELL KS 67744-9705

19-738-531541
JASON J KELLY
913 2ND AVE N
DENISON IA 51442-1831

19-738-702725
JASON K DENKER
702 LINCOLN
DORCHESTER NE 68343

19-738-531542
JASON K ISHIDA
14401 SE PETROVITSKY RD
RENTON WA 98058

19-738-531543
JASON K MISAK
2738 S MOSLEY ST
WICHITA KS 67216-1119

19-738-702726
JASON K STAMPER
12946 DAIRY ASHFORD RD STE 100
SUGAR LAND TX 77478

19-738-531544
JASON KING
5385 410TH ST
CYLINDER IA 50528

19-738-531545
JASON L SMITH
4960 S SENECA ST
LOT 22
WICHITA KS 67217

19-738-569673
JASON L SWOPE/BLOCKED TERMINATED
115 E WESTPLAINS RD APT 8
GRETNA NE 68028

19-738-531547
JASON M GILCHRIST
11 TAYLOR DR
EUFAULA AL 36027-5305

19-738-702727
JASON M MARSHALL
1302 N KELLOGG ST
GALESBURG IL 61401

## Exhibit B

19-738-531548
JASON MCGUIRE
1655 SPRING LOOP WAY
WINTER GARDEN FL 34787-2160

19-738-531549
JASON P ALLARD
7661 ABBY LN SE
CALEDONIA MI 49316

19-738-531550
JASON P SMITH
12004 NW 7TH ST
YUKON OK 73099

19-738-531551
JASON PIRTLE
PHOTOGRAPHY & FILM
712 W 76TH TER
KANSAS CITY MO 64114

19-738-531552
JASON R LECHTENBERG
10185 HWY 18
POSTVILLE IA 52162

19-738-531553
JASON R WEST
PO BOX 472
OQUAWKA IL 61469-0472

19-738-702728
JASON RAINEY
202 N LAMAR AVE
HAYSVILLE KS 67060

19-738-531554
JASON ROLFES
1416 1RST ST AVE S APT 2
DENNISON IA 51442-2027

19-738-531555
JASON SCHULZ
8408 N POMONA AVE
KANSAS CITY MO 64153

19-738-531556
JASON SEGAR NETWORK FOOD BRKS
10 INDUSTRIAL PARK
TINICUM INDUSTRIAL PARK MS# 21
LESTER PA 19113

19-738-702729
JASON SIMANOWITZ
3521 N MONROE AVE
KANSAS CITY MO 64417

19-738-531557
JASON VANLANINGHAM
500 JEFFERSON ST
CLATONIA NE 68328-5002

19-738-531558
JASON W INNES
4310 S 4710 W
WEST VALLEY UT 84120

19-738-531559
JASON W TUCKER
305 HENDERSON RD
KNOXVILLE IL 61448-1019

19-738-531560
JASON W VEITH
416 S REYNOLDS AVE
NORTH PLATTE NE 69101

19-738-531561
JASON YOUNG
602 E PATTERSON
SALISBURY MO 65281

19-738-531563
JASONS DRY ICE INC
2103 CHARLES AVE
SAINT PAUL MN 55114-1314

19-738-531564
JASONS FOODS INC
PO BOX 809289
CHICAGO IL 60680-9289

19-738-531565
JASONS LAWN & TREE CARE
PO BOX 492
ANKENY IA 50021

19-738-531566
JASPER COUNTY CIRCUIT CLERK
601 S PEARL AVE STE 300
JOPLIN MO 64801

19-738-531567
JASPER COUNTY COLLECTOR
JASPER COUNTY COURTHOUSE
PO BOX 421
CARTHAGE MO 64836-0421

19-738-531568
JASPER COUNTY COLLECTOR
JASPER COUNTY COURTHOUSE
PO BOX 107
NEWTON IL 62448

19-738-531569
JASPER COUNTY EMERGENCY SERVICES
PO BOX 801
13870 DISPATCH LN
CARTHAGE MO 64836-0801

19-738-531570
JASPER COUNTY FARM BUREAU COOP
PO BOX 238
2530 N MCKINLEY AVE
RENSSELAER IN 47978

19-738-531571
JASPER COUNTY SHERIFF
JASPER COUNTY COURTHOUSE RM 202
CARTHAGE MO 64836

19-738-608325
JASPER G & BERNICE WIGLESWORTH
8001 WOODLAND RD
SHAWNEE MISSION KS 66220

19-738-531572
JASPER INDUSTRIAL DEVELOPMENT
AUTHORITY
320 E 4TH ST
JOPLIN MO 64801

19-738-607798
JASPER QUALITY MEATS
1250 S WHEELER ST
JASPER TX 75951-5120

19-738-586965
JASPER, JOE L
1124 2ND AVE SE
DYERSVILLE IA 52040-8835

19-738-531573
JASPERS FAMILY RESTAURANT
1919 4TH AVE S
DENISON IA 51442

## Exhibit B

19-738-534803
KATHRYN S PETERS TRUST
KATHRYN S PETERS TRUSTEE
2108 GLYNNWOOD DR
BARTLESVILLE OK 74006-6204

19-738-534804
KATHRYN T WILSON
365 WESTVIEW LN
CONROE TX 77304-1274

19-738-534805
KATHY A DAUGHERTY
9639 GARNES RD
MERCERSBURG PA 17236

19-738-534806
KATHY BUCKLEY
1626 LINDENWOOD LN
LAWRENCE KS 66044

19-738-534807
KATHY C HILLIER
RR 1 BOX 204
GLADSTONE IL 61437-9752

19-738-569731
KATHY D MERRITT/BLOCKED
TERMINATED
1280 DEER HOLLOW BLVD
SARASOTA FL 34232-5926

19-738-534808
KATHY E MALENFANT
73 CHESWORTH ST
FALL RIVER MA 02723-2515

19-738-534809
KATHY E MARKLAY
10312 MAPLEDALE ST
BELLFLOWER CA 90706

19-738-534810
KATHY GIBSON
5910 55TH ST W
TACOMA WA 98467-2961

19-738-534811
KATHY GIEBNER
186 LYON ST
LUDLOW MA 01056-1151

19-738-534812
KATHY J OPDAHL
RR 1 BOX 74
ALDEN MN 56009-9730

19-738-568696
KATHY KUPER
WM SINKEY
2411 PARK ST
SHELDON IA 51201

19-738-534813
KATHY L PLAIA
2160 JOHNSON ST
SOUTH BEND IN 46628

19-738-534814
KATHY L REUSCH
2873 WELLMAN RD
LAWRENCE KS 66044

19-738-534815
KATHY LOVE
704 N ASH
MCPHERSON KS 67460

19-738-534816
KATHY MOORE C H E
3907 SW HARBOR DR
LEES SUMMIT MO 64082-4632

19-738-534817
KATHY TRANG TRAN
634 N 22ND ST
LINCOLN NE 68503-2917

19-738-534818
KATHYS DEMO SERVICE
325 A TEA ST
MARTIN TN 38237

19-738-534819
KATHYS KITCHEN
35 W CENTER ST
GERMANTOWN OH 45327

19-738-534820
KATIE B BATTAGLIA
528 POPLAR AVE
SOUTH SAN FRANCISCO CA 94080

19-738-534821
KATIE BUTCHER
12611 ROCKY HILL DR
HOUSTON TX 77066-1607

19-738-569732
KATIE J TALLEY/BLOCKED
TERMINATED
916 3RD AVE
MONMOUTH IL 61462-2026

19-738-534822
KATIE KIBURZ
2699 HWY 59
DENISON IA 51442

19-738-534823
KATIE M TIX
1503 WALNUT ST
HASTINGS MN 55033-3926

19-738-534824
KATIE MARTIN
3078 COUNTY RD 266
AUXVASSE MO 65231

19-738-534825
KATIE MURPHY
3308 NE 69TH ST
GLADSTONE MO 64119

19-738-703029
KATIES SUBS
PO BOX 141
POUND WI 54161

19-738-534827
KATINA L BREWER
918 E 11TH AVE
MONMOUTH IL 61462-2931

19-738-534828
KATIO HARPER
4910 W SAN MIGUEL ST
TAMPA FL 33629-5427

19-738-534829
KATOLIGHT CORP
SDS 12 0683
PO BOX 86
MINNEAPOLIS MN 55486-0683

# Exhibit B

```
19-738-587996
KELLOGG, ELENA
PO BOX 182
KIRKWOOD IL 61447-0182
```

```
19-738-587997
KELLOGG, LARRY R
15693 US HWY 61 S
BOSCOBEL WI 53805
```

```
19-738-656771
HOLLY J KELLY
810 QUINCE AVE # 7
CRETE NE 68333-2759
```

```
19-738-661827
JAMES P KELLY
MDOR BANKRUPTCY UNIT
BOX 55484
BOSTON MA 02205-5484
```

```
19-738-657377
JOHN J KELLY
PO BOX 512
DELOIT IA 51441-0512
```

```
19-738-657378
PATRICIA M KELLY
PO BOX 444
LAKE VIEW IA 51450-0444
```

```
19-738-657379
SUE KELLY
832 BROADWAY
DENISON IA 51442-2627
```

```
19-738-535072
KELLY A GRAMLICH
1104 WHITE BIRCH ST
LIBERTY MO 64068
```

```
19-738-703046
KELLY ALLEN
RR 3 BOX 254
CHELSEA OK 74016
```

```
19-738-703047
KELLY ARRANT
2754 YELLOWSTONE CT
WICHITA KS 67215
```

```
19-738-535073
KELLY B SAVAGE
302 N INGLEWOOD AVE
COFFEYVILLE KS 67337
```

```
19-738-535074
KELLY B WALKER
5420 NW 84TH TER APT 333
KANSAS CITY MO 64154-1462
```

```
19-738-535075
KELLY BIENSEN
2454 BIENFORD
STATE CENTER IA 50247
STATE CENTER IA 50247
```

```
19-738-703048
KELLY COMPLIANCE INC
#8 LEED RD
WINFIELD KS 67156
```

```
19-738-535076
KELLY CORPORATION
PO BOX 25
ALTAMONT IL 62411
```

```
19-738-535077
KELLY D MOSER
1143 NORMAN AVE
CRETE NE 68333-2138
```

```
19-738-535078
KELLY D SMITH
RR 2 BOX 236
COFFEYVILLE KS 67337
```

```
19-738-535079
KELLY D SMITH
90 S 2125 W
CEDAR CITY UT 84720
```

```
19-738-535080
KELLY ENGINEERING INC
815 8TH ST
BOONE IA 50036
```

```
19-738-535081
KELLY F DREES
HC 30 BOX 94
MAIL RET 95
MCCOOK NE 69001
```

```
19-738-703049
KELLY FITCH
901 S BRIARWOOD LN
MOUNT PLEASANT IA 52641
```

```
19-738-535082
KELLY FOODS INC
101 SEVIER ST
JOHNSON CITY TN 37604-6285
```

```
19-738-535083
KELLY GIBSON
7 W GEORGIA AVE
MEMPHIS TN 38103-4729
```

```
19-738-587998
KELLY II, TERRANCE P
2772 LAMOTTE ST
DUBUQUE IA 52001
```

```
19-738-535084
KELLY J BELT
PERRYTON  79070
```

```
19-738-535085
KELLY J BROWN
513 E BRASFIELD ST
SMITHVILLE MO 64089-8882
```

```
19-738-535086
KELLY J FIELDS
325 N SASSAFRASS ST
DEXTER MO 63841
```

```
19-738-703050
KELLY J LUBASH
10734 BORMAN CIR
OMAHA NE 68127-2927
```

```
19-738-535087
KELLY J MILLER
1859 W CHAMBERY DR
OLATHE KS 66061
```

```
19-738-535088
KELLY JOE MIZE
PO BOX 662
MONMOUTH IL 61462-0662
```

## Exhibit B

19-738-535568
KEVIN L LUNSFORD
32152 215TH ST
EASTON KS 66020

19-738-535569
KEVIN L MULDER
5609 E GROVE DR SE
KENTWOOD MI 49512

19-738-535570
KEVIN L ROGERS
2915 SW 11TH TER
LEES SUMMIT MO 64081

19-738-535571
KEVIN L ROTH
6102 NW 2ND CIR APT 365
LINCOLN NE 68521-4448

19-738-535572
KEVIN L SEGEBART
2527 HWY 59
DENISON IA 51442-7604

19-738-703072
KEVIN L THOMAS
9230 N 3980 RD
COPAN OK 74022-4615

19-738-535573
KEVIN L TICNOR
PO BOX 115
DE WITT NE 68341-0115

19-738-535574
KEVIN L WINKING
600 N MAIN ST
ROSEVILLE IL 61473-9631

19-738-535575
KEVIN L WISE
418 105TH ST
ROSEVILLE IL 61473-9476

19-738-535576
KEVIN LINDSAY TRUCKING
12618 WEEPING WATER
RD
WEEPING WATER NE 68463

19-738-535577
KEVIN LYNN
3399 KIMBERLY DR
DUBUQUE IA 52002-2818

19-738-535578
KEVIN M GIBSON
3409 TALBOT DR
ERLANGER KY 41018

19-738-535579
KEVIN M J KELLER
405 HART ST
SALINA KS 67401

19-738-535580
KEVIN M PLINE
715 HENNEPIN ST
DUBUQUE IA 52001-2022

19-738-703073
KEVIN MILLER
303 N 4TH AVE
PRINCETON IN 47670

19-738-535581
KEVIN MORAN MARINE SURVEYING SERV
MORAN MARINE
1211 CHATEAU KNLS
BETTENDORF IA 52722-3410

19-738-535582
KEVIN MOSS
304 S ELM
JEFFERSON IA 50129

19-738-535583
KEVIN OAKES TRUCKING
PO BOX 629
INDIANOLA MS 38751

19-738-535584
KEVIN P ADAMOWITCZ
81 E 221ST ST
EUCLID OH 44123

19-738-535585
KEVIN P FEUERBACH
34 WALNUT ST
LEBANON PA 17042

19-738-535586
KEVIN P LARSON
1245 N PRAIRIE ST
GALESBURG IL 61401

19-738-535587
KEVIN P MORGAN
9 WASON LN
ATKINSON NH 03811

19-738-535588
KEVIN P NEDWICK
2181 FIX RD
GRAND ISLAND NY 14072-2547

19-738-535589
KEVIN PIGMAN
310 ALFALFA RD
HELENA MT 59602

19-738-535590
KEVIN POCHOP
DBA PORK CHOP TRANSPORT
RR 2 BOX 93
ATWOOD KS 67730

19-738-535591
KEVIN POND
2405 SMITH ST
STUTTGART AR 72160

19-738-535592
KEVIN R ALTHAUS
2061 JEFFREY DR
DUBUQUE IA 52001-2919

19-738-535593
KEVIN R ANISKA TRUCKING
107 LAUREL LN
TAYLOR PA 18517

19-738-535594
KEVIN R BOECK
2538 Q AVE
DENISON TX 51442

19-738-535595
KEVIN R GOODMAN
12170 DEVILS HOLE RD
BOWLING GREEN OH 43402

## Exhibit B

19-738-538570
LINK HYDRAULIC & SUPPLY INC
180 WESTSIDE CT
DUBUQUE IA 52003

19-738-538571
LINK OIL COMPANY INC
PO BOX 86
DOUGLAS WY 82633

19-738-538572
LINK REPORTING SERVICE
PO BOX 16972
HATTIESBURG MS 39404-6972

19-738-538573
LINK TRUCK SERVICE INC
718 INDUSTRIAL DR
SPARTA IL 62286

19-738-538574
LINK TRUCKING
PO BOX 675
4TH & EDWARDS
OQUAWKA IL 61469

19-738-589837
LINK, AARON
910 CARNATION DR
WAPAKONETA OH 45895-1115

19-738-589838
LINK, MARY K
2265 TRENTON RD
DUBUQUE IA 52002-2119

19-738-589839
LINK, MICHAEL L
RR 1 BOX 211A
GLADSTONE IL 61437-9715

19-738-589840
LINK, RANDY
401 MAIN ST
HOLY CROSS IA 52053-9306

19-738-589841
LINK, RONALD V
6040 NW FOREST DR
PARKVILLE MO 64152-3114

19-738-589842
LINK, RONNIE R
PO BOX 28
LITTLE YORK IL 61453-0028

19-738-658304
JAMES D LINKEY
10303 NW MIRROR LAKE DR
KANSAS CITY MO 64152-2549

19-738-538575
LINKS
PO BOX 440
MINONG WI 54859-0440

19-738-538576
LINKS AT SAFE HAVEN
PO BOX 1311 GT
CAYMAN ISLANDS    CAYMAN ISLANDS

19-738-538577
LINKS INC
6913 SHADE LN
WICHITA KS 67212-6303

19-738-538578
LINKS INC
111 N FRANKLIN
GREENSBURG IN 47240

19-738-538579
LINN COOP OIL CO
MARION  52302

19-738-538580
LINN COOP OIL CO
325 35TH ST
MARION IA 52302-3815

19-738-538581
LINN COOPERATIVE OIL CO
325 35TH ST
MARION IA 52302

19-738-538582
LINN COUNTY COLLECTOR
PO BOX 78
LINNEUS MO 64653

19-738-538583
LINN COUNTY COLLECTOR
LINN COUNTY COUTHOUSE
PO BOX 100
ALBANY OR 97321-0031

19-738-538584
LINN COUNTY TREASURER
LINN COUNTY COURTHOUSE
930 1ST ST SW
CEDAR RAPIDS IA 52404-2161

19-738-538585
LINN FREIGHT FORWARDERS
413 ROOD RD STE 6
CALEXICO CA 92231

19-738-538586
LINN THRIFTWAY
STORE # 675
E HWY 50
LINN MO 65051

19-738-589843
LINN, GREGORY E
205 MINNESOTA ST
GLIDDEN IA 51443-1037

19-738-589844
LINN, JEREMY E
PO BOX 272
GLIDDEN IA 51443-0272

19-738-589845
LINNEBUR, NORBERT
12946 FOOTHILL RD
SPEARVILLE KS 67876-8726

19-738-589846
LINNEMAN, JAMES E
1248 N 7TH ST
FORT DODGE IA 50501

19-738-589847
LINNEMAN, KIM R
2420 WASHINGTON ST
BURLINGTON IA 52601-1859

19-738-538587
LINNETTE KEPPEN
705 HEATON AVE NW
PALM BAY FL 32907-7784

# Exhibit B

19-738-703473
MELISSA A ADAMS
8528 MONROVIA ST APT 728
LENEXA KS 66215

19-738-542043
MELISSA A ARZT
11 WILDWOOD
LINN CREEK MO 65052-9631

19-738-542044
MELISSA A GORBY
PO BOX 397
NEGLEY OH 44441

19-738-542045
MELISSA A MILLER
PO BOX 33
KEITHSBURG IL 61442-0033

19-738-542046
MELISSA D RAMIREZ
208 W 9TH ST
DORCHESTER NE 68343-1169

19-738-542047
MELISSA K SIMS
WIMBISCUS LAW FIRM
102 E SAINT PAUL ST
SPRING VALLEY IL 61362

19-738-542048
MELISSA K WEBBER
611 E 5TH AVE
CANEY KS 67333

19-738-542049
MELISSA KREISER
230 HARRIS ST
HARRISBURG PA 17102-2432

19-738-703474
MELISSA L HALL
1066 E 20TH ST APT 2
CRETE NE 68333-2550

19-738-569796
MELISSA L HARRINGTON/BLOCKED
301 7TH AVE
COLONA IL 61241-9770

19-738-542050
MELISSA MCELMEEL
1916 GRACE ST
DUBUQUE IA 52001-6041

19-738-542051
MELISSA PERSZ
817 MCCONNELL ST
FINDLAY OH 45840

19-738-542052
MELISSA SWENSON
136 W 1150 S
PAYSON UT 84651

19-738-542053
MELISSA TAYLOR
4216 METROPOLITAN AVE
KANSAS CITY KS 66106-2548

19-738-542054
MELISSA TUKUA
1420 W CLARK ST
ALBERT LEA MN 56007-1755

19-738-542055
MELITON GARCIA
633 HUISACHE
ROBSTOWN TX 78380

19-738-592381
MELL, DALE E
309 N WALNUT
PANA IL 62557

19-738-592382
MELL, JERRY
2723 PALM ST
AMARILLO TX 79107-2023

19-738-542056
MELLEMA ASSOCIATES INC
1801 E 79TH ST STE 1
MINNEAPOLIS MN 55425-1230

19-738-592383
MELLENBERGER, ROSEMERE
4062 HWY J
BENTON WI 53803

19-738-542057
MELLENBRUCH TRUCKING
PO BOX 44
LAWRENCE KS 66044

19-738-542058
MELLENCAMP FARMS INC
RR 3 BOX 36
CLARINDA IA 51632

19-738-542059
MELLENCAMP, MERLE
1898 QUINCE AVE
CLARINDA IA 51632

19-738-542060
MELLENCAMP, PAUL H
RR 1 BOX 17
CLARINDA IA 51632

19-738-592384
MELLENY, STEVEN
RR 2 BOX 1
ALEXIS IL 61412-9701

19-738-592385
MELLERKE, TIMOTHY C
PO BOX 171
AVON IL 61415-0171

19-738-592386
MELLIANI, OUAFAA
PO BOX 71
MOLINE IL 61266-0071

19-738-542061
MELLIES HOG FARM
C/O CHARLES R MELLIES
1128 27TH RD
MORGANVILLE KS 67468

19-738-592387
MELLINGER, TIMOTHY D
PO BOX 53
PORTSMOUTH IA 51565-0053

19-738-703475
MELLISSA PROCTOR
1317 MULBERRY ST
COFFEYVILLE KS 67337

## Exhibit B

19-738-592850
MILLER, MATTHEW A
1200 BEIER DR APT B
FOSTORIA OH 44830-3537

19-738-592851
MILLER, MATTHEW E
1001 S 2ND ST
MONMOUTH IL 61462-2715

19-738-592852
MILLER, MATTHEW J
2910 FAIRHAVEN ST
MUSCATINE IA 52761-2139

19-738-592853
MILLER, MAX B
707 LOCH LOMMOND
HUTCHINSON KS 67502

19-738-592854
MILLER, MELISSA A
PO BOX 33
KEITHSBURG IL 61442-0033

19-738-592855
MILLER, MELISSA A
913 BROADWAY
DENISON IA 51442-2634

19-738-592856
MILLER, MERVIN G
10631 N CAMPBELL ST
KANSAS CITY MO 64155-1543

19-738-592858
MILLER, MICHAEL D
2640 JACKSON ST
DUBUQUE IA 52001-3342

19-738-592859
MILLER, MICHAEL D
2230 68TH ST APT 1
DES MOINES IA 50322-4971

19-738-592857
MILLER, MICHAEL D
91 COUNTY RD 7150
WYNNE AR 72396-8119

19-738-592860
MILLER, MICHAEL E
1001 S 2ND ST
MONMOUTH IL 61462-2715

19-738-592861
MILLER, MICHAEL I
RT 1 BOX 82
PIERCE NE 68767

19-738-592862
MILLER, MICHAEL S
915 1ST ST
WEBSTER CITY IA 50595-2001

19-738-592863
MILLER, MICHELLE A
4327 COUNTY RD 745
JONESBORO AR 72401-0274

19-738-592864
MILLER, MICHELLE L
220 S 4TH ST
MONMOUTH IL 61462-2220

19-738-592865
MILLER, MONICA S
1204 S 24TH ST
PARSONS KS 67357-4812

19-738-592866
MILLER, MUREL L
508 TAYLOR ST
IDA GROVE IA 51445-1517

19-738-543695
MILLER, NELSON R
5160 CALKIUS AVE
WELLMAN IA 52356

19-738-592867
MILLER, OMER A
RT 2 BOX 260
WATHENA KS 66090

19-738-592868
MILLER, ORVILLE R
11422 W STATE RT 18
FOSTORIA OH 44830-3342

19-738-592869
MILLER, OVIE R
HC 61 BOX 186
ALEX OK 73002-9750

19-738-592870
MILLER, PAMELA S
PO BOX 173
DE WITT NE 68341-0173

19-738-592871
MILLER, PEGGY A
3526 E 14TH ST N
WICHITA KS 67208-2914

19-738-592872
MILLER, PHILIP J
RR 3 BOX 436
INDEPENDENCE KS 67301-9201

19-738-592873
MILLER, PHILIP J
1659 IOWA ST
DUBUQUE IA 52001-4829

19-738-592874
MILLER, PHILLIP J
1671 IOWA ST
DUBUQUE IA 52001-4829

19-738-592875
MILLER, REBECCA J
14402 226TH RD
CUMMINGS KS 66016-9192

19-738-592876
MILLER, RENATE
1209 9TH AVE SE
DYERSVILLE IA 52040-2407

19-738-592877
MILLER, RICHARD L
4201 NW 74TH CT
KANSAS CITY MO 64151-1484

19-738-592878
MILLER, ROBERT W
RT 1 BOX 77B
HARDY AR 72542

## Exhibit B

19-738-544131
MITZEL & SON INC
38466 133RD ST
ABERDEEN SD 57401

19-738-544132
MITZEL & SONS INC
38466 133RD ST
ABERDEEN SD 57401-8406

19-738-544134
MITZELS AMERICAN KITCHENS
425 PONTIUS AVE N
SEATTLE WA 98109-5474

19-738-544135
MIX TRUCKING
2424 IRVING ST
DENVER CO 80211

19-738-544137
MIX-RITE FEED MILL INC
W10380 MAIN ST
KENNAN WI 54537

19-738-544136
MIXON BROTHERS WOOD PRESERVING
PO BOX 327
IDABEL OK 74745

19-738-593051
MIXON, AMBER
1205 HWY 208 W
DERMOTT AR 71638-9450

19-738-593052
MIXON, DANIEL
3604 MEDALLION CIR
JONESBORO AR 72404-0607

19-738-593053
MIXON, HOLLY
1609 BAIRD AVE
GALESBURG IL 61401-6303

19-738-593054
MIXON, PATRICIA A
237 W WATER ST APT 1
GALESBURG IL 61401-4402

19-738-593055
MIZE, DIANA S
207 NW TEXAS
HOXIE AR 72433

19-738-593056
MIZE, KARIN E
1118 S D ST
MONMOUTH IL 61462-2561

19-738-593057
MIZE, KELLY JOE
1033 S B ST
MONMOUTH IL 61462-2543

19-738-593058
MIZE, MICHAEL J
1118 S D ST
MONMOUTH IL 61462-2561

19-738-593059
MIZE, SEAN P
1109 S 3RD ST
MONMOUTH IL 61462-2726

19-738-593060
MIZE, TONYA L
1242 E 1ST AVE
MONMOUTH IL 61462-2480

19-738-593061
MIZEN, NEIL
216 HUDSON ST
TIFFIN OH 44883-1422

19-738-593062
MIZER, RICK L
RR 1 BOX 277
S COFFEYVILLE OK 74072-9503

19-738-544138
MIZES THRIFTWAY
STORE # 178
212 N MAIN
CAWKER CITY KS 67430

19-738-544139
MIZZOU NAMA
CAREER SERV OFFICE C MAGRUDER
2 64 AGRICULTURE BLDG
COLUMBIA MO 65211

19-738-544140
MJ COMMUNICATIONS INC
PO BOX 16510 GMF
NORTH LITTLE ROCK AR 72231

19-738-544141
MJ OVELLETTE TRUCKING INC
4135 WILD FLOWER
WICHITA KS 67210

19-738-703602
MJ'S EAST
206 E 11TH ST
PO BOX 134
DE WITT IA 52742

19-738-544142
MJB SPOTTING SERV
EDWARDSVILLE   66113

19-738-531816
JEFFERY S MJELSTAD
1018 N 32ND ST
BILLINGS MT 59101

19-738-544143
MJK & CO
1551 CARDINAL AVE
MESERVEY IA 50457-8718

19-738-544144
MK DIAMOND PRODUCTS INC
PO BOX 2803
1315 STORM PKWY
TORRANCE CA 90509

19-738-544145
MLC FARMS & GUARANTY
STATE BK & TRUST CO
RR 4 BOX 3
BELOIT KS 67420

19-738-544146
MLC TRANSPORTATION LLC
PO BOX 217
MARATHON WI 54448

19-738-544147
MLM
PO BOX 19777
IRVINE CA 92623-9777

## Exhibit B

19-738-601658
SMICE, CRAIG D
511 N A ST
MONMOUTH IL 61462-1231

19-738-601659
SMICE, ELIZABETH H
217 E 1ST AVE APT 1
MONMOUTH IL 61462-1801

19-738-601660
SMICE, MICHAEL D
502 ORLANDO AVE
NORMAL IL 61761-1233

19-738-558450
SMICO MFG CO LLC
500 N MACARTHUR BLVD
OKLAHOMA CITY OK 73127-5602

19-738-601661
SMIDT, CONNIE
214 E LONGFELLOW ST
KANSAS CITY MO 64119-1727

19-738-558451
SMIEJA CHIROPRACTIC
23 3RD ST SE
WELLS MN 56097-1617

19-738-558452
SMILERS BAR & GRILL
600 MAIN ST
DICKSON CITY PA 18519

19-738-558453
SMILEY TRUCKING
BOX 244
UNIONVILLE MO 63565

19-738-601662
SMILEY, ANDRE A
723 CONFEDERATE ST
LAKE VILLAGE AR 71653-1812

19-738-558454
SMILEYS PANCAKE & STEAK
1255 N MADISON AVE
GREENWOOD IN 46142

19-738-558455
SMILEYS PANCAKE & STEAK
1301 S HIGH SCHOOL RD
INDIANAPOLIS IN 46241

19-738-558456
SMILEYS TOWING SVC
PO BOX 477
SIOUX CITY IA 51102-0477

19-738-558457
SMILING MOOSE SALOON & GRILL
PO BOX 66
NEW HOLSTEIN WI 53061

19-738-558458
SMILLIES IGA
STORE # 07 416
1421 S GLENSTONE AVE
SPRINGFIELD MO 65804-1405

19-738-601663
SMIRES, JOHN R
2350 QUINCY AVE
SAC IA 50583

19-738-601664
SMIT, JASON
1801 WILLSON AVE
WEBSTER CITY IA 50595

19-738-601665
SMITER, MICHELLE D
2845 FLEETWOOD CV
GREENVILLE MS 38701-8015

19-738-601693
BRENT L SMITH
410 5000 RD
COFFEYVILLE KS 67337-7714

19-738-656475
BRUCE L SMITH
RR 1 BOX 28
BIGGSVILLE IL 61418-9702

19-738-658084
CONNIE L SMITH
9100 E HARRY ST APT 3116
WICHITA KS 67207-4905

19-738-657935
DAVID A SMITH
14 S PROSTPECT ST
BLOOMVILLE OH 44818

19-738-656994
DAVID L SMITH
1328 COUNTY RD K
DORCHESTER NE 68343-2242

19-738-601749
DON E SMITH
2402 MORGAN
COFFEYVILLE KS 67337

19-738-656476
DONALD D SMITH
610 LAKE DR
WOODHULL IL 61409

19-738-657936
DUSTIN R SMITH
1200 PEELER DR APT 6
FOSTORIA OH 44830-3548

19-738-520099
ERNEST R SMITH
101 S FRANK AVE
GARRETSON SD 57030-2025

19-738-658372
ESTASIA MARIE SMITH
2362 SOMERSET ST
WICHITA KS 67204-5713

19-738-658085
GARY L SMITH
763 N MOUNT CARMEL ST
WICHITA KS 67203-4956

19-738-531532
JASON D SMITH
2477 N HONEYSUCKLE WAY
SPRINGFIELD MO 65802-9697

19-738-656477
JON H SMITH
155 E WASHINGTON ST
ROSEVILLE IL 61473-9654

## Exhibit B

19-738-553402
RICHARD W FATHERLEY
PO BOX 172114
KANSAS CITY KS 66117-1114

19-738-553403
RICHARD W FULLMER
1905 23RD ST
ANACORTES WA 98221

19-738-553404
RICHARD W HANLIN
PO BOX 151
SCHLESWIG IA 51461-0151

19-738-553405
RICHARD W JOHNSON
GARNER  50438

19-738-553406
RICHARD W JOHNSON
845 W 3RD ST
GARNER IA 50438

19-738-553407
RICHARD W JOYCE
310 BARRETT LAKE DR
SWANSEA IL 62226

19-738-553408
RICHARD W LEE AND
MARY L LEE JTWROS
PO BOX 124
ATLANTA KS 67008-0124

19-738-569851
RICHARD W LIND/BLOCKED
TERMINATED
1540 ALVAMAR DR
LAWRENCE KS 66047

19-738-553409
RICHARD W LUDINGTON
429 S ROMAINE ST
RENSSELAER IN 47978

19-738-553410
RICHARD W MONROE
PO BOX 126
4461 PARK ST
SANDYVILLE OH 44671-0126

19-738-553411
RICHARD W OLSON
15517 CHARLES
OMAHA NE 68154

19-738-553412
RICHARD W PARTON
1330 COTTONWOOD LN
WICHITA KS 67233

19-738-553418
RICHARD W PENDLETON
RR4 BOX 515
WINTERSET IA 50273

19-738-553413
RICHARD W PENNER
22790 SW 103RD RD
BEATRICE NE 68310

19-738-553414
RICHARD W SCHUCK JR
C/O FARMLAND INDUSTRIES INC
PO BOX 7305
KANSAS CITY MO 64116-0005

19-738-553415
RICHARD W SCHUCK JR
C/O FARMLAND INDUSTRIES INC
PO BOX 20111
KANSAS CITY MO 64195-0111

19-738-553416
RICHARD W SEBERT
MAIL RETURNED 1987 &95
HAMPTON IA 50441

19-738-553417
RICHARD W WHITMAN SR
203 E BROADWAY
MONMOUTH IL 61462-1868

19-738-553419
RICHARD WINDER
21955 OTTAWA RD
ERIE KS 66733

19-738-553420
RICHARD WOLF TRUCKING
PO BOX 76
CAMBRIDGE WI 53523

19-738-704269
RICHARD WOODS
2323 S SHERIDAN ST
WICHITA KS 67213

19-738-553421
RICHARD WORKMAN
820 E CROSS ST
FORREST CITY AR 72335

19-738-700479
RICHARD Y JACOBSON OD MEDICAL ARTS
BUILDING
1428 2ND AVE N
FORT DODGE IA 50501-4119

19-738-553422
RICHARD ZOLLINGER
C/O N DAKOTA STATE UNIVERSITY
PO BOX 5051
FARGO ND 58105

19-738-598399
RICHARD, JASON S
1955 PIERCE ST
DUBUQUE IA 52001-4366

19-738-598400
RICHARD, JOHNATHAN C
2009 E KNOX ST
GALESBURG IL 61401-5425

19-738-598401
RICHARD, THOMAS J
493 HAYDEN LN
DUBUQUE IA 52001-6968

19-738-598402
RICHARD, TODD J
PO BOX 222
DENISON IA 51442-0222

19-738-658170
EMMA RICHARDS
4607 N 47TH ST
OMAHA NE 68104-2408

19-738-553423
RICHARDS & CONOVER STEEL CO
6333 SAINT JOHN AVE
KANSAS CITY MO 64123-1926

# Exhibit B

19-738-601790
SMITH, JACOB
28723 525TH AVE
AUSTIN MN 55912-5736

19-738-601791
SMITH, JACOB C
1313 2ND AVE S
DENISON IA 51442-1934

19-738-601792
SMITH, JACQUELINE M
PO BOX 12
PARKDALE AR 71661-0012

19-738-601793
SMITH, JACQUELINE M
603 E COMPRESS ST APT 22
EUDORA AR 71640-2476

19-738-601795
SMITH, JAMES E
2409 WALL ST
SIOUX CITY IA 51104-3128

19-738-601794
SMITH, JAMES E
620 S 7TH ST
MONMOUTH IL 61462-2369

19-738-601796
SMITH, JAMES F
108 SHASTA DAISY LN
SMITHVILLE MO 64089-8248

19-738-601797
SMITH, JAMES L
802 S MICHIGAN ST # 2
PRAIRIE DU CHIEN WI 53821-2228

19-738-601798
SMITH, JAMES M
BOX 1017
OQUAWKA IL 61469

19-738-601799
SMITH, JAMES S
199 LNS FERRY RD
LK PROVIDENCE LA 71254-9393

19-738-601800
SMITH, JANET
1004 GARFIELD AVE
DUBUQUE IA 52001-3445

19-738-601801
SMITH, JASON D
42029 HEIDERSCHEIT RD
HOLY CROSS IA 52053-8007

19-738-601802
SMITH, JASON H
235 HIGHLAND AVE
GALESBURG IL 61401-3350

19-738-601803
SMITH, JASON L
4960 S SENECA ST LOT 22
WICHITA KS 67217-5152

19-738-601804
SMITH, JEANETTE L
PO BOX 393
WILMOT AR 71676-0393

19-738-601805
SMITH, JEFFERY D
758 PECK ST
GALESBURG IL 61401-3864

19-738-601806
SMITH, JEFFREY J
5222 US HWY 151 LOT 50
PLATTEVILLE WI 53818-9691

19-738-601807
SMITH, JEFFREY W
2452 N BELLWODD
WICHITA KS 67205

19-738-601808
SMITH, JENIFER M
PO BOX 458
SWIFTON AR 72471-0458

19-738-601809
SMITH, JENNIFER A
PO BOX 95
NEW AUGUSTA MS 39462-0095

19-738-601810
SMITH, JENNIFER L
2625 S W ST LOT 422
WICHITA KS 67217-1065

19-738-601811
SMITH, JEREMY D
1219 N 7TH ST
BURLINGTON IA 52601-4707

19-738-601812
SMITH, JEREMY L
408 2ND AVE
DEFIANCE IA 51527

19-738-601813
SMITH, JERI D
PO BOX 238
WILBER NE 68465-0238

19-738-601814
SMITH, JERID A
PO BOX 96
ALTONA IL 61414-0096

19-738-601815
SMITH, JERRY A
315 E MURRAY ST
MACOMB IL 61455-1513

19-738-601816
SMITH, JERRY L
6295 OLD CANTON RD APT 17C
JACKSON MS 39211-2934

19-738-601817
SMITH, JERRY L
RR 1 BOX 223A
MACON MS 39341-9730

19-738-601818
SMITH, JESSE P
1505 CORNELL ST
DUBUQUE IA 52001-0319

19-738-601819
SMITH, JESSE U
PO BOX 308
DEFIANCE IA 51527-0308

## Exhibit B

19-738-559553
ST VINCENTS HOSPITAL
2001 W 86TH ST
INDIANAPOLIS IN 46260-1991

19-738-559554
ST VINCENTS HOSPITAL
8401 HARCOURT RD
INDIANAPOLIS IN 46260

19-738-559555
ST WENCESLAUS SCHOOL
215 MAIN ST E
NEW PRAGUE MN 56071

19-738-560356
ST-LAMBERT TRANSPORT US INC
1201 CHEMIN IND
ST-NICOLAS  G7A 1A6 PQ

19-738-559558
STA UNITED INC
PO BOX 82089
LINCOLN NE 68501

19-738-602372
STAAB, DENNIS J
18570 153RD ST
BASEHOR KS 66007-3034

19-738-602373
STAAB, GERALD J
2205 ROBIN RD
DODGE CITY KS 67801-2924

19-738-602374
STABEN, DAVID R
805 WEARE
WOODBINE IA 51579

19-738-602375
STABEN, SALLY M
24 5TH ST
WOODBINE IA 51579-1258

19-738-559559
STABLE T FARM
10508 NW 59TH ST
KANSAS CITY MO 64152

19-738-559560
STABLES
530 H ST SE
MIAMI OK 74354

19-738-700092
STACEY AUSTIN AUSTIN FOOD BROKERS
10 INVERNESS DR E STE 270
ENGLEWOOD CO 80112

19-738-559561
STACEY K BURGESS
PO BOX 4
KIRKWOOD IL 61447-0004

19-738-559562
STACEY L HOFFMAN
505 W 21ST ST
STERLING IL 61081

19-738-559563
STACEY L LAWTON
1902 WYATT CIR
DOVER PA 17315-3672

19-738-559564
STACEY L SHERRY
1300 N MAIN ST
MONMOUTH IL 61462-1213

19-738-656488
STANLEY F STACHYRA
793 LAWRENCE AVE
GALESBURG IL 61401-2456

19-738-559565
STACI L VANWESTEN
PO BOX 122
DAYKIN NE 68338-0122

19-738-559566
STACIE L POULSON
1021 S A ST
MONMOUTH IL 61462-2640

19-738-559567
STACIE WITTMAN
LEAD ATTORNEY DYNA CORP
120 SE 6TH ST STE 106
TOPEKA KS 66603

19-738-602376
STACKER, DOUGLAS L
6542 STAFFORD TRCE
ZIONSVILLE IN 46077-9176

19-738-559568
STACLEAN DIFFUSER CO
PO BOX 1147
2205 EXECUTIVE DR
SALISBURY NC 28145-1147

19-738-559569
STACY A BUICKEROOD
7103 S DURANGO DR UNIT 211
LAS VEGAS NV 89113

19-738-559570
STACY BRYANT
1134 N ESTELLE ST
WICHITA KS 67214-3246

19-738-559571
STACY D ALLEN
1000 W WETTACK AVE
NOWATA OK 74048-3731

19-738-559572
STACY D MORRIS
1125 S 7TH ST
MONMOUTH IL 61462-2841

19-738-559573
STACY EQUIPMENT CO INC
DEPT L 161
COLUMBUS OH 43216

19-738-559574
STACY L SIMMONS
PO BOX 3635
LAWRENCE KS 66046

19-738-559575
STACY SHERBERNE TRUCKING
BOX 43
APLINGTON IA 50604

19-738-559576
STACY T JONES
4618 PINE CONE LN
ENID OK 73703-3448

## Exhibit B

19-738-563853
TRACY POSEY
1732 NE AVE J
BELLE GLADE FL 33430-2296

19-738-563854
TRACY R CASSIDAY
1060 E 5TH AVE
MONMOUTH IL 61462-2443

19-738-563855
TRACY RUSSELL
913 PRESCOTT DR
LAWRENCE KS 66049


19-738-569920
TRACY S CLARK/BLOCKED TERMINATED
C/O FARMLAND FOODS INC
9190 FM 2578
TERRELL TX 75160

19-738-563856
TRACY S COVALT
6880 THOMPSON RD
NEEDMORE PA 17238

19-738-563857
TRACY SPENCER CUSTODIAN
PETTY CASH FUND
816 N HALSTEAD ST
HUTCHINSON KS 67501-2043


19-738-563858
TRACY TANK SERVICE
PO BOX 253
PHILLIPSBURG KS 67661

19-738-563859
TRACY TRUCK LINE
112 ADAM ST
TRACY IA 50256

19-738-604123
TRACY, DANIEL B
380 SHORT ST
PLATTEVILLE WI 53818


19-738-604124
TRACY, HEATHER
639 W NETTLETON AVE
JONESBORO AR 72401-3971

19-738-604125
TRACY, HEATHER M
303 OVERLOOK DR
COFFEYVILLE KS 67337-2534

19-738-604126
TRACY, JOSHUA
1740 W MARKET ST APT F
TIFFIN OH 44883-4906


19-738-604127
TRACY, K ROSS
70 N 150 E
MALAD ID 83252

19-738-604128
TRACY, VICTOR J
83 COUNTRY ELMS EST
GALESBURG IL 61401-9256

19-738-563860
TRADE CENTER ASSOCIATES
300 BROOKES DR STE 100
HAZELWOOD MO 63042-2712


19-738-563861
TRADE DIMENSIONS INC
45 DANBURY RD
WILTON CT 06897

19-738-563862
TRADE INTL DORDRECHT INC
2218 E 117TH ST
BURNSVILLE MN 55337-1265

19-738-563863
TRADE MARK SIGNS INC
705 S OAKWOOD RD STE A4
ENID OK 73703


19-738-563864
TRADE SHOW ELECTRICAL
9 SUNSET WAY
HENDERSON NV 89014

19-738-563865
TRADE SHOW SADECV
AVE HIDALGO 13Y
TLALNE PLANTA EDO ME 54060 MEXICO

19-738-608172
TRADE SOURCE INC
2360 ORCHARD LAKE RD STE 105
SYLVAN LAKE MI 48320


19-738-705014
TRADE SOURCE INC
2360 ORCHARD LAKE RD STE 105
SYLVAN LAKE MI 48320-1613

19-738-563866
TRADE WEST BROKERAGE CO
4340 SW 110TH AVE STE 380
BEAVERTON OR 97006-5762

19-738-563867
TRADE WINDS
PO BOX 803828
KANSAS CITY MO 64180


19-738-563868
TRADE WINDS EAST
3141 E SKELLY DR
TULSA OK 74105

19-738-563869
TRADE WINDS TRANSIT INC
1000 W JOHN ROWAN
BARDSTOWN KY 40004

19-738-563870
TRADEPRO LLC
25 HIGHLAND PARK VLG STE 364
DALLAS TX 75205


19-738-607758
TRADEPRO LLC
25 HIGHLAND PARK VLG
DALLAS TX 75205

19-738-563871
TRADES & LABOR CREDIT UNION
610 S BROADWAY AVE
ALBERT LEA MN 56007-4526

19-738-563872
TRADEWINDS MARKET
872 N VENTURA RD
OXNARD CA 93030-4414

## Exhibit B

19-738-568556
WINGFOOT COMMERCIAL TIRE
SYSTEMS INC
BOSSIER CITY LA 71112

19-738-568557
WINGFOOT COMMERCIAL TIRE
SYSTEMS INC
LITTLE ROCK AR 72206

19-738-568558
WINGFOOT COMMERCIAL TIRE
SYSTEMS INC
PINE BLUFF AR 71601

19-738-568559
WINGFOOT COMMERCIAL TIRE
SYSTEMS INC
LUBBOCK TX 79404

19-738-568560
WINGFOOT COMMERCIAL TIRE
SYSTEMS INC
AMARILLO TX 79103

19-738-568561
WINGFOOT COMMERCIAL TIRE
SYSTEMS INC
WEST MEMPHIS AR 72303

19-738-568562
WINGO SERVICE CO INC
25222 GLEN LOCH DR
THE WOODLANDS TX 77380-2470

19-738-606966
WINGO, AIMEE A
PO BOX 48
LITTLE YORK IL 61453-0048

19-738-606967
WINGO, KEVIN L
472 YATES ST
GALESBURG IL 61401-2052

19-738-606968
WINGROVE, DAVID D
PO BOX 612
DOW CITY IA 51528-0612

19-738-606969
WINGROVE, RANDY R
108 HOWARD
DOW CITY IA 51528

19-738-606970
WINGROVE, SCOTT P
1615 5TH AVE N
DENISON IA 51442-1539

19-738-568563
WINGS N THINGS
529 I ST
ANCHORAGE AK 99501

19-738-568564
WINGS OVER HOUSTON
6284 BROOKHILL DR
HOUSTON TX 77087-1102

19-738-568565
WINGS OVER MID AMERICA
10 NW RICHARDS RD
KANSAS CITY MO 64116

19-738-568566
WINGS OVER MID AMERICA
10 NW RICHARDS RD
KANSAS CITY MO 64016

19-738-568567
WINIFRED JACOBS TRUST DATED 11/12/98
1000 SW SANTA FE LAKE RD
TOWANDA KS 67144-9213

19-738-568568
WINIFRED PATTERSON
PO BOX 991
BIG SPRING TX 79721-0991

19-738-568569
WINIMAY LONG &
RR 2 BOX 161
SEDAN KS 67361-9361

19-738-568570
WINKEL, JEFF
4649 220TH ST
ASHTON IA 51232

19-738-606971
WINKER, ERIC L
HWY 30 E
GLIDDEN IA 51443

19-738-656529
KEVIN L WINKING
600 N MAIN ST
ROSEVILLE IL 61473-9631

19-738-606972
WINKLEMAN, MICHAEL A
825 E 3RD ST
CHERRYVALE KS 67335-1604

19-738-568571
WINKLER MEATS INC
733 S W WASHINGTON ST
PEORIA IL 61653

19-738-568572
WINKLER WHOLESALE GROCERS
PO BOX 68
DALE IN 47523-0068

19-738-606973
WINKLER, JOHN A
206 W MARTIN ST
ABINGDON IL 61410-1449

19-738-568573
WINKLES TRUCKS INC
PO BOX 898
PECOS TX 79772-0898

19-738-568574
WINKY FOODS
5251 S MILLARD ST
CHICAGO IL 60632

19-738-568575
WINMILL TRANSPORT
385 W HWY 39
BLACKFOOT ID 83221

19-738-568576
WINN DIXIE
PO BOX 40955
5050 EDGEWOOD CT
JACKSONVILLE FL 32203

## Exhibit B

19-738-542782
MICHAEL R WORTMANN
509 E PEARL ST
ELKHORN NE 68022-1457

19-738-568869
WORTZ COMPANY
400 INDUSTRIAL BLVD
POTEAU OK 74953

19-738-607213
WOTHE, CRYSTAL J
205 MINNESOTA ST
GLIDDEN IA 51443-1037

19-738-568870
WOVEN HEART
315 THOMPSON AVE E
SAINT PAUL MN 55118

19-738-568871
WOVEN METAL PRODUCTS INC
FM517
ALVIN TX 77511

19-738-568872
WOW INC / WASH ON WHEELS
600 NW VANBUREN ST
TOPEKA KS 66608-1309

19-738-607214
WOZNIAK, JOHN L
BOX 1547 KNOX COLLEGE
GALESBURG IL 61402-1547

19-738-568873
WPMC OCCUPATIONAL HEALTH CLINIC
PO BOX 1478
3001 AVE A
DODGE CITY KS 67801

19-738-568874
WR AYERS SR
2404 S ST
FORT MYERS FL 33901-5218

19-738-659840
WR HUFF INVESTMENT ARM
ATTN PETER BENTZ PRINCIPAL
67 PARK PL
MORRISTOWN NJ 07960

19-738-607215
WRAGGE, MARK L
1017 GROVE
CRETE NE 68333

19-738-607216
WRAGGS, JOHN L
GENERAL DELIVERY
SAINT CLOUD MN 56301-9999

19-738-705284
WRANGLER RESTAURANT
302 MOUNT RUSHMORE RD
CUSTER SD 57730

19-738-568875
WRANGLERS OLDE COUNTRY REST
106 N SALEM WARREN RD
NORTH JACKSON OH 44451

19-738-568876
WRAY CLINIC
PO BOX 216
517 ADAMS ST
WRAY CO 80758

19-738-568877
WRAY ROOFING INC
PO BOX 420
NORTH NEWTON KS 67117

19-738-607217
WRAY, JEFFREY
433 BLANTON DR
TRUMANN AR 72472-3907

19-738-607218
WRAY, RUSSELL T
PO BOX 466
LOUISVILLE MS 39339-0466

19-738-568878
WRAYS
401 W NOB HILL BLVD
YAKIMA WA 98902

19-738-607219
WREGE, WAIVERLEE J
4230 NW 49TH ST
LINCOLN NE 68524-1105

19-738-568879
WREN ASPHALT PAVING
396890 W 500 RD
COPAN OK 74022

19-738-607220
WREN, ANDREW
1063 E 5TH AVE
MONMOUTH IL 61462-2442

19-738-607221
WREN, BARBARA
215 ASH ST
NEWPORT AR 72112-3201

19-738-607222
WREN, DAVID P
PO BOX 254
MONMOUTH IL 61462-0254

19-738-607223
WREN, PAMELA K
1063 E 5TH AVE
MONMOUTH IL 61462-2442

19-738-568880
WRENN HANDLING INC
5511 E SHELBY DR
MEMPHIS TN 38175-0600

19-738-607224
WRICH, WAYDE M
138 N WHITE
KANSAS CITY MO 64123

19-738-657702
BILL J WRIGHT
PO BOX 116
ODEBOLT IA 51458-0116

19-738-656531
RANDY L WRIGHT
402 W WARREN ST
AVON IL 61415-9561

19-738-568882
WRIGHT & WILHELMY CO
11005 E ST
OMAHA NE 68137-1252

## Exhibit B

19-738-607486
YUEN, JOSEPH P
PO BOX 23
RIVERTON KS 66770-0023

19-738-607487
YUILLE, BRENT
436 FLORIDA ST
LAWRENCE KS 66044-4652

19-738-569216
YUKON LOGISTICS INC
PO BOX 307
REMINGTON IN 47977

19-738-569217
YULE TRANSPORT INC
2957 NW 76TH ST
MEDFORD MN 55049

19-738-654810
. YULE, JAMES
1028 PACKWOOD RD
PACKWOOD IA 52580

19-738-569219
YUMA CLINIC
910 S MAIN ST
YUMA CO 80759

19-738-705309
YUMA COUNTY ABSTRACT CO
PO BOX 156
WRAY CO 80758

19-738-569220
YUMA COUNTY TREASURER
310 ASH ST # C
WRAY CO 80758-1850

19-738-660604
YUMA FARMERS MILLING & MERC CO
PO BOX 184
YUMA CO 80759-0184

19-738-569224
YUMA OIL COMPANY
PO BOX 197
BILLINGS MT 59103-0197

19-738-569222
YUMA OIL COMPANY
A/C BEATRICE O MATOWITZ
PO BOX 3313
BILLINGS MT 59103-3313

19-738-569221
YUMA OIL COMPANY
PO BOX 3313
BILLINGS MT 59103-3313

19-738-569223
YUMA OIL COMPANY
A/C JAMES D ODONNELL JR
PO BOX 3313
BILLINGS MT 59103-3313

19-738-569225
YUMS
# 4
4512 BENNING RD SE
WASHINGTON DC 20019

19-738-569226
YUMS
# 7
628 KENNEDY ST NW
WASHINGTON DC 20011

19-738-607488
YUSCHAK, DAVID M
162 COLLEGE FARM RD
PLATTEVILLE WI 53818-9558

19-738-607489
YUSTEN, CARMON D
302 STATE ST
FREEBORN MN 56032

19-738-607490
YUSTEN, JEFFREY K
745 GOLDENROD CT
CRETE NE 68333-3501

19-738-607491
YUSTEN, TYLER
914 LINCOLN AVE
ALBERT LEA MN 56007-1970

19-738-654775
YUTZ, JOHN & DONNA
19997 ENAMEL PL
CALLAO MO 63534-3218

19-738-569227
YVETTE MACSISAK
181 ROSEWELL ST
SPRINGFIELD MA 01109-1366

19-738-569228
YVONNE HAMMOND
1063 E 5TH AVE
MONMOUTH IL 61462-2442

19-738-569229
YVONNE R NASSIF
225 N GOW ST
WICHITA KS 67203-5433

19-738-569230
YVONNE T BRADFORD
3413 RUGER AVE
JANESVILLE WI 53546-1931

19-738-569231
YW ELECTRIC ASSN INC
PO BOX Y
AKRON CO 80720

19-738-569232
YWCA FT DODGE
826 1ST AVE N
FORT DODGE IA 50501-3906

19-738-569233
YWCA OF KANSAS CITY MISSOURI
1021 PENNSYLVANIA AVE
KANSAS CITY MO 64105

19-738-607492
YZAGUIRRE, RENE J
412 N 3RD ST
MARSHALLTOWN IA 50158-5502

19-738-569234
Z & G INTERNATIONAL INC
3407 STATE RT 759
SAINT JOSEPH MO 64504-1044

19-738-569235
Z & R TRUCKING
21306 DAWN HILL E RD
SILOAM SPRINGS AR 72761

## Exhibit B

19-757-616147
BURGERT, JOHN K
RR 2
PO BOX 47
PAWNEE CITY NE 68420

19-757-616149
BURGERT, KENNETH
RR 1 PO BOX 220
JULIAN NE 68378-9608

19-757-616168
BURGERT, NANCY J
RR 2 BOX 78
BUCHARD NE 68323

19-757-616174
BURGERT, RICHARD J
RR 2 BOX 78
BURCHARD NE 68323

19-757-615764
BURGESON, RODNEY D
25821 168TH ST
SPIRIT LAKE IA 51360-6858

19-757-39437
GARY BURGESS
11400 ADAMS CREEK RD
WAMEGO KS 66547

19-757-33363
ORVILLE BURGESS
6008 N BALES
GLADSTONE MO 64119

19-757-86151
BURGESS JR, JAMES L
601 ELM ST
MARKS MS 38646

19-757-615751
BURGESS, JOHN M
C/O FARMLAND INDUSTRIES INC
PO BOX 20111
KANSAS CITY MO 64195-0111

19-757-615743
BURGESS, STACEY K
PO BOX 4
KIRKWOOD IL 61447-0004

19-757-615800
BURGETT FARMS
557 GEAR ST
PLEASANTVILLE IA 50225

19-757-610910
BURGHARDT, VERYL A
RURAL RTE 1
SUMNER IA 50674

19-757-609252
RICKIE L BURGIN
RURAL RTE 1
WEBSTER CITY IA 50595

19-757-616080
BURGIN, RICKIE LEE
1209 MEADOW LN
WEBSTER CITY IA 50595-2751

19-757-611226
BURGMAIER, DON
RURAL RTE 1
CRESTON IA 50801

19-757-616081
BURGMAIER, GAYLE
3309 VINTON AVE
CRESTON IA 50801

19-757-610644
BURGOS, IDALIA C
1421 BROADWAY APT 4
DENISON IA 51442-2052

19-757-89287
DON BURGTORF
20315 24TH AVE
CONKLIN MI 49403

19-757-658511
WERNER BURHOOP
2972 AA AVE
BOX 227
HERINGTON KS 67449

19-757-615627
BURHOOP, DAVID
2450 24TH RD
BANCROFT NE 68004

19-757-615674
BURHOOP, WERNER
2972 AA AVE BOX 227
HERINGTON KS 67449

19-757-616686
BURIAN, KENNETH M
RR 1
PO BOX 26
CEDAR KS 67628

19-757-616623
BURIANEK, DONNA J
2341 IVY AVE TRLR 31
CRETE NE 68333-1167

19-757-616716
BURIANEK, ROBERT J
1652 ROKEBY RD
PLEASANT DALE NE 68423

19-757-90652
LESTER W BURK
71 PETUNIA PL
ZEPHYRHILLS FL 34248

19-757-616182
BURK, CHARLES
DBA BURKS PUREBREDS
PO BOX 67
SPALDING MI 49886-0067

19-757-616097
BURK, GARY
1121 3RD AVE N
DENISON IA 51442

19-757-616143
BURK, RUTH A
522 N 17TH ST
DENISON IA 51442-1513

19-757-611344
PAUL BURKARDT
RURAL RTE 2
HOLSTEIN IA 51025

19-757-611343
VINCENT BURKARDT
RURAL RTE 2
HOLSTEIN IA 51025

373

## Exhibit B

19-757-617372
CASPERS, ED
PO BOX 121
SWALEDALE IA 50477

19-757-617377
CASPERS, JON D
PO BOX 67
SWALEDALE IA 50477

19-757-617376
CASPERSON, CONNIE L
1315 BOHNKER HILL RD
DENISON IA 51442-2515

19-757-38609
ALFRED CASS
RR 1 BOX 41
BEAVER CITY NE 68926

19-757-1860
LAURA CASS
3536 W 92ND TER
LEAWOOD KS 66206

19-757-87520
ROBERT T CASS
3023 WARBLER LN
HUMBLE TX 77396

19-757-88889
CASS COOP INC
113 W STATE ST
CASSOPOLIS MI 49031

19-757-617555
CASS COUNTY
PO BOX 204
WEEPING WATER NE 68463

19-757-31319
CASS COUNTY FARM BUREAU
PO BOX 126
PLATTSMOUTH NE 68048-0126

19-757-101294
CASS COUNTY FARM BUREAU
PO BOX 126
PLATTSMOUTH NE 68048-0126

19-757-617560
CASS COUNTY SERVICE COMPANY
PO BOX 108
VIRGINIA IL 62611

19-757-79750
CASS COUNTY TREASURER
346 MAIN ST # 206
PLATTSMOUTH NE 68098

19-757-617561
CASS COUNTY TREASURER
CASS CO GOVERNMENT BLDG
200 COURT PARK
LOGANSPORT IN 46947

19-757-31743
CASS COUNTY VOITURE 1218 40/8
416 S 7TH
PLATTSMOUTH NE 68048

19-757-617530
CASS, JIM
PO BOX 96
HEREFORD CO 80732

19-757-617611
CASS, RALPH D
2352 GIBBON AVE
FONTANELLE IA 50846-9744

19-757-617511
CASSEL, ALLEN
RURAL RTE 1
MANCHESTER IA 52057

19-757-40401
MADGE CASSELMAN
2605 RIVERCREST DR
ARLINGTON TX 76006

19-757-36473
EUGENE CASSELS
RR 2 BOX 210A
GROTON SD 57445

19-757-72819
CASSEM TIERNEY ADAMS GOTCH
& DOUGLAS
8805 INDIAN HILLS DR STE 300
OMAHA NE 68114

19-757-101160
CASSEM TIERNEY ADAMS GOTCH & DOUGLAS
8805 INDIAN HILLS DR
STE 300
OMAHA NE 68114

19-757-617551
CASSENS, JOHN E JR
RURAL RTE 1
SCHLESWIG IA 51461

19-757-98109
TRACY R CASSIDAY
1060 E 5TH AVE
MONMOUTH IL 61462-2443

19-757-98110
TRACY R CASSIDAY
1060 E 5TH AVE
MONOMOUTH IL 61462-2443

19-757-617475
CASSIDAY, AMY R
14622 GRANT ST
DOLTON IL 60419-2021

19-757-617421
CASSIDAY, JASON A
PO BOX 941
MONMOUTH IL 61462-0941

19-757-617420
CASSIDAY, JAY C
819 S MAIN ST
MONMOUTH IL 61462-2653

19-757-33122
LAURICE CASSIDY
5267 SW RAINTREE PKWY
LEES SUMMIT MO 64082

19-757-617477
CASSIDY, MARTHA
198 WASH POND RD
HAMPSTEAD NH 03841-2111

19-757-617485
CASSIDY, ROBERT D
45 SEWARD AVE
SPRINGFIELD OR 97477-1378

## Exhibit B

19-757-1993
HILLESTAD FARMS
21779 463 AVE
VOLGA SD 57071

19-757-98805
HILLESTAD FARMS
46250 218TH ST
VOLGA SD 57071

19-757-627561
HILLESTAD, RICK
46250 218 ST
VOLGA SD 57071

19-757-627560
HILLESTAD, ROBIN
21779 463 AVE
VOLGA SD 57071

19-757-627562
HILLESTAD, RON
21779 463 AVE
VOLGA SD 57071

19-757-99120
LEONARD R HILLGREN
DANIEL A FIX
333 S 9TH ST
FIX LAW OFFICE PC LLC
LINCOLN NE 68508

19-757-66699
HILLGREN, LEONARD R
729 E 5TH
CRETE NE 68333

19-757-610673
HANK HILLHOUSE
RURAL RTE 1
MANNING IA 51455

19-757-96577
KATHY C HILLIER
PO BOX 204
RR 1
GLADSTONE IL 61437-9752

19-757-102002
RYAN JAMES HILLIGAS
1909 N V RD
HAMPTON NE 68843-2917

19-757-627541
HILLIGAS, RYAN JAMES
1909 N V RD
HAMPTON NE 68843-2917

19-757-612090
KATHERINE M HILLMAN
PO BOX 526
CASTLETON IL 61426

19-757-627909
HILLMAN, GERALD E
RURAL RTE 2
SEWARD NE 68434

19-757-627928
HILLMAN, HARLAN
RURAL RTE 1
SYRACUSE NE 68446

19-757-627899
HILLMAN, KATHERINE M
PO BOX 526
CASTLETON IL 61426-0526

19-757-627915
HILLMAN, LOUIS
2329 210TH
WHEATLAND IA 52777

19-757-86588
HILLMAN, TERRY M
6100 NE GLADSTONE LN
GLADSTONE MO 64119-2166

19-757-89162
EUGENE F HILLOCK
3995 JEDDO RD
JEDDO MI 48032

19-757-91872
WILLIAM E HILLOCK
4653 S 9 MILE RD
BRECKENRIDGE MI 48615

19-757-88829
BURTON F HILLS
RFD 1
BANGOR MI 49013

19-757-86589
RONALD L HILLS
37 N HAVANA LAKE RD
HAVANA KS 67347

19-757-627533
HILLS FARM INC
7800 RR 52 S
DUBUQUE IA 52003

19-757-81997
HILLS PET NUTRITION INC
C/O COMMERCE BANK
PO BOX 805055
KANSAS CITY MO 64180-5055

19-757-627520
HILLS-BEAVER CREEK COOP FARM
PO BOX 516
HILLS MN 56138

19-757-74936
HILLSBORO ANIMAL CLINIC
1994 N HOLLY
HILLSBORO KS 67063-8371

19-757-92578
HILLSBORO FARMERS COOPERATIVE
PO BOX 429
HILLSBORO WI 54634

19-757-96415
HILLSBOROUGH COUNTY TAX COLLECTOR
ATTN DOUG BELDEN
601 E KENNEDY BLVD 14TH FL
TAMPA FL 33602

19-757-627565
HILLSDALE INC
24219 HWY 715
CARROLL IA 51401

19-757-627552
HILLSIDE FARMS
C/O JOAN HUMMER
PO BOX 196
OXFORD IA 52322-0196

19-757-627554
HILLSIDE FARMS INC
C/O EICKMAN MARITA
RT 3 PO BOX 180
COON RAPIDS IA 50058

# Exhibit B

19-757-95676-CC
RICHARD M NIELSEN MEMORIAL SCHOL
% WILLIAM R NIELSEN DIRECTOR
1425 C RD
MINDEN NE 68959

19-757-69716
RICHARD MAXWELL
11552 LARIAT RD
DODGE CITY KS 67801

19-757-83406
RICHARD MORFITT
690 1800 RD
DELTA CO 81416

19-757-77497
RICHARD R FRAZIER
1718 GREEN TREE LN
DUNCANVILLE TX 75137-3610

19-757-81638
RICHARD REIBER TRUCKING
PO BOX 85625
LINCOLN NE 68501-5625

19-757-33232
RICHARD SOLKO FAMILY TRUST
RR 1 BOX 50
HERNDON KS 67739

19-757-77501
RICHARD SUTHERLAND
JOE SUTHERLAND
1650 1600TH ST
IOLA KS 66749-3949

19-757-82089
RICHARD WELDING EQUIPMENT, INC
PO BOX 960
JENNINGS LA 70546

19-757-83198
RICHARD, ERVIN
1394 HWY 384
LAKE CHARLES LA 70605

19-757-644215
RICHARD, THOMAS J
493 HAYDENS LN
DUBUQUE IA 52001-6968

19-757-644221
RICHARD M NIELSEN MEMORIAL SCHOL
C/O WILLIAM R NIELSEN DIRECTOR
1425 C RD
MINDEN NE 68959

19-757-80812
RICHARD MCCURRIE TEAMING CO CORP
1443 W 41ST ST STE 2
CHICAGO IL 60609-2414

19-757-77495
RICHARD O PEARCE
NORMA KAY PEARCE
1835 LAWNDALE AVE
EL DORADO KS 67042-4042

19-757-77498
RICHARD R HARMAN
6057 GRIFFITH AVE SPC 29
MARYSVILLE CA 95901-9757

19-757-77499
RICHARD S DAVIES
2325 MANZANITA LN
RENO NV 89509-7022

19-757-32335
RICHARD SOLKO FARMING, INC
C/O JEAN SOLKO
1230 E 9TH ST
COLBY KS 67701

19-757-1353
RICHARD T HAMBLIN REV TRUST
31006 STATE RT O
DREXEL MO 64742

19-757-644158
RICHARD, BRAD
RURAL RTE 2
BENKELMAN NE 69021

19-757-610755
RICHARD, JOHN W
RURAL RTE 1
NAPONEE NE 68960

19-757-88615
ALTHA RICHARDS
1515 BERKSHIRE RD
SANDUSKY MI 48471

19-757-95676
RICHARD M NIELSEN MEMORIAL SCHOOL
C/O WILLIAM R NIELSEN DIRECTOR
1425 C RD
MINDEN NE 68959

19-757-101016
RICHARD MCCURRIE TEAMING CO CORP
1443 W 41ST ST
STE 2
CHICAGO IL 60609-2414

19-757-77496
RICHARD R CLEMENTS & SONS
2201 E WILLOW ST STE D
SIGNAL HILL CA 90806-2142

19-757-84269
RICHARD R RAWSON
HELEN RAWSON
885 S 700 E
PLEASANT GROVE UT 84062-2963

19-757-77500
RICHARD SCOTT GARVEY II
115 VISTA DEL MONTE
LOS GATOS CA 95030-6316

19-757-32335-CC
RICHARD SOLKO FARMING, INC.
C/O JEAN SOLKO
1230 E 9TH ST
COLBY KS 67701

19-757-83786
RICHARD WEBBSOUTH KANSAS & OKLAHOMA
RAILROAD
315 W 3RD ST
PITTSBURG KS 66762-4706

19-757-644206
RICHARD, CHARLES M
RT 2
PO BOX 33
MILTONVALE KS 67466

19-757-644217
RICHARD, MIKE
RURAL RTE 2
MILTONVALE KS 67466

19-757-88924
CHARLES RICHARDS
2903 WISSMILLER RD
MIKADA MI 48745

## Exhibit B

19-757-649382
SMITH, FRANCES
2014 S 1ST AVE
CHEYENNE WY 20070

19-757-649379
SMITH, FRANK
1319 LAKE VICTORIA DR
PALM SPRINGS FL 33461

19-757-649476
SMITH, GARY
2854 FOXGLOVE LN
REDDING CA 96001

19-757-649501
SMITH, GARY L
763 N MOUNT CARMEL ST
WICHITA KS 67203

19-757-649447
SMITH, GAYLEN
931 DOGWOOD RD
PORTSMOUTH IA 51565

19-757-649486
SMITH, GEORGE
RURAL RTE 2
PRINCEVILLE IL 61559

19-757-649482
SMITH, GEORGE E
2632 PINE NEEDLE DR
SEBRING FL 33875

19-757-649499
SMITH, GRADY A
2011 W 5TH ST
COFFEYVILLE KS 67337-2816

19-757-649481
SMITH, GREG
220 E 20
LARNED KS 67550

19-757-649484
SMITH, GREG
PO BOX 51150
KNOXVILLE TN 37950

19-757-649485
SMITH, GREG C
PO BOX 511
MAPLETON MN 56065

19-757-649483
SMITH, GREG J
D/B/A SMITH & SMITH
HC 69 BOX 7
MILBURN NE 68813

19-757-649496
SMITH, GREGORY E
3923 DIST 204 RD
TAMAROA IL 62888

19-757-649426
SMITH, GUADALUPE A
225 N 10TH
MONMOUTH IL 61462-1951

19-757-649735
SMITH, HAROLD A
RURAL RTE 3
LINCOLN NE 68505

19-757-649623
SMITH, HARRY
PO BOX 23
BLOOMFIELD NE 68718-0023

19-757-649512
SMITH, HEATHER
11364 S AVE
ACKLEY IA 50601

19-757-649715
SMITH, HOWARD C
PO BOX 1350
ELKART KS 67950

19-757-649431
SMITH, ISIDRO A
4221 HOLDREGE ST APT 4
LINCOLN NE 68503-1444

19-757-649392
SMITH, JACK
26113 TIVOLI LN
EPWORTH IA 52045

19-757-649393
SMITH, JACK
RR 1 BOX 1205
OTTERVILLE MO 65348

19-757-649462
SMITH, JAMES L
802 S MICHIGAN ST # 2
PRAIRIE DU CHIEN WI 53821-2228

19-757-649461
SMITH, JAMES S
RR# 1 BOX 48
FAIRFAX MO 64446

19-757-649454
SMITH, JAMIE
312 W DAYTON ST
CEDAR RAPIDS NE 68627

19-757-649467
SMITH, JANIS R
BOX 429
ELKHART KS 67950

19-757-649500
SMITH, JARED
C/O KEN SMITH
W LAWARY
PITTSFIELD IL 62363

19-757-649403
SMITH, JASON D
2477 N HONEYSUCKLE WAY
SPRINGFIELD MO 65802-9697

19-757-649404
SMITH, JASON LEE
4960 S SENECA ST LOT 22
WICHITA KS 67217-5152

19-757-649400
SMITH, JASON P
12004 NW 7TH ST
YUKON OK 73099

19-757-649388
SMITH, JEFF
C/O DOUBLETREE FARM
26743 N 2100 AVE
PRINCETON IL 61356

E-FILED
Wednesday, 31 May, 2006  04:48:10 PM
Clerk, U.S. District Court, ILCD

# GROUP
# EXHIBIT 7



STATE OF TEXAS  )
        )  ss:
CITY AND COUNTY OF DALLAS)

I, <u>Mike Henley</u>, being duly sworn, depose and say that I am the Advertising Clerk of the

Publisher of <u>THE WALL STREET JOURNAL</u> , a daily national newspaper  published

and of general circulation in the City and County of New York, New York, City of

Naperville, DuPage County, Illinois, and in the city and County of Dallas, Texas and that

the attached Notice has been regularly published in <u>THE WALL STREET JOURNAL</u> for

national distribution for <u>one</u> insertion(s) on the following date(s): <u>5/7/04</u> advertiser:

<u>Farmland Industries</u> and that the foregoing statements are true and correct to the best of

my knowledge, information, and belief.

Sworn to before me this
<u>7th</u> day of <u>May</u> 20<u>04</u>

Notary Public

# ◆ BANKRUPTCIES ◆

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re:<br>FARMLAND INDUSTRIES, INC.,<br>FARMLAND FOODS, INC.,<br>SFA, INC.,<br>FARMLAND TRANSPORTATION, INC.,<br>FARMLAND PIPE LINE COMPANY,<br><br>Debtors | In Proceedings under Chapter 11<br>Case No. 02-50557<br>Case No. 02-50561<br>Case No. 02-50562<br>Case No. 02-50564<br>Case No. 02-50565<br><br>Joint Administration |

### NOTICE OF EFFECTIVE DATE AND CERTAIN DEADLINES UNDER DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION, AS MODIFIED

**TO: ALL PARTIES IN INTEREST**

1. Please take notice that pursuant to § 9.3 of the Debtors' Second Amended Joint Plan of Reorganization, as Modified ("Plan"), notice is hereby given that the Effective Date of the Plan is May 1, 2004.

2. Please take further notice of the following deadlines under the Plan:

• § 11.1 – All final requests for compensation and reimbursement for Professionals pursuant to §§ 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date and Substantial Contribution Claims under § 503(b)(4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Liquidating Trustee and its counsel, Foley & Lardner, LLP at one of the following addresses ("Claim Delivery Address") no later than **June 15, 2004.**

**Claim Delivery Address**

| If sent by mail, send to: | If sent by messenger, send to: |
|---|---|
| FI Liquidating Trust<br>Attn: Claims<br>P.O. Box 55798<br>Jacksonville, FL 32241-6798 | FI Liquidating Trust<br>Attn: Claims<br>9475 Western Way, Suite 110<br>Jacksonville, FL 32256 |

• § 11.2 – Other than as set forth in § 11.1 of the Plan and except with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 case and payments payable in connection with post-petition severance obligations of the Debtors and the KERIT Plan (which claims shall be paid in the ordinary course of business according to the terms and conditions of the agreements relating thereto), all requests for payment of an Administrative Claim incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee at the Claim Delivery Address no later than **May 31, 2004.**

• § 8.2 – All proofs of claim for rejection of executory contracts or unexpired leases pursuant to § 6.1 of the Plan must be filed with the Bankruptcy Court and served on counsel for the Liquidating Trustee at the Claim Delivery Address by **May 31, 2004.**

3. Pursuant to and in accordance with § 7.6 of the Plan, as a condition to receiving a distribution on account of an Allowed Claim or interest, each holder of Industrial Revenue Bonds not reinstated on the Effective Date, Demand Certificates, Subordinated Certificates or Old Securities of Foods must tender the applicable certificates, instruments, securities or other documentation evidencing such Claim or Interest ("certificates") to the Liquidating Trustee at one of the following addresses ("Certificate Delivery Address"). These certificates must be tendered by **April 30, 2005** or your Claim or Interest will be discharged and you will be forever barred from asserting such Claim or Interest.

**Certificate Delivery Address**

| If sent by mail, send to: | If sent by messenger, send to: |
|---|---|
| FI Liquidating Trust<br>Attn: Certificates<br>P.O. Box 7469<br>North Kansas City, MO 64116-7469 | FI Liquidating Trust<br>Attn: Certificates<br>9475 Western Way, Suite 110<br>Jacksonville, FL 32256 |

**Delay in surrendering your certificate(s) will delay your distribution.**

A separate notice is being sent to known holders of Industries Preferred Shares. If you are such a holder and do not receive that notice, you should contact the Liquidating Trustee.

For further information, you may visit the website www.fiuquidatingtrust.com. If you do not have access to the Internet you may contact the Liquidating Trustee in writing at FI Liquidating Trustee, c/o J.P. Morgan Trust Company, National Association, P.O. Box 55798, Jacksonville, FL 32241-6798. Please note on the envelope that this is in reference to the Farmland bankruptcy. Please refer to the Plan for all other relevant deadlines. The Initial Distribution Date under the Plan is projected to occur by June 30, 2004.

Dated: May 1, 2004

BY ORDER OF THE COURT

All capitalized terms in this Notice shall have their respective meanings set forth in the Plan. You are directed to the Plan, the Disclosure Statement and the Confirmation Order for further detail on the matters addressed in this Notice.

Diamond Advertising
PO Box 6235
Bend, Oregon  97708
(541) 388-8288

# **AFFIDAVIT OF PUBLICATION**

I, Kathy Hollister, account representative for Diamond Advertising hereby certify that the attached legal notice advertisement was published in Feedstuffs on May 10, 2004.

Signed: _Kathy Hollister_

**Dated this** _26th_ **day of May, 2004**

**County of Deschutes**

**State of Oregon**

_Richard M. Ross_
**Notary Public**

OFFICIAL SEAL
**RICHARD D ROSS**
NOTARY PUBLIC-OREGON
COMMISSION NO. 370450
MY COMMISSION EXPIRES AUG. 11, 2007

(Figure 3). However, even among large producers, the dealer remained a dominant influencer.



UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI

In re:                                    In Proceedings
                                          Under Chapter 11
FARMLAND INDUSTRIES, INC.;                Case No. 02-50557
FARMLAND FOODS, INC.;                     Case No. 02-50558
SFA, INC.;                                Case No. 02-50562
FARMLAND TRANSPORTATION, INC.;            Case No. 02-50565
FARMLAND PIPE LINE COMPANY,               Case No. 02-50566
                    Debtors               Joint Administration

NOTICE OF EFFECTIVE DATE AND CERTAIN DEADLINES
UNDER DEBTORS' SECOND AMENDED JOINT PLAN OF
REORGANIZATION, AS MODIFIED

TO: ALL PARTIES IN INTEREST



## Lipids/ From p. 9

and relating to the business needs as well as the technical and personal needs of a primary decision maker will all be needed to remain successful. ∎

*in vivo* studies involving dietary supplements of fish oil indicate that much of the EPA and DHA is biohydrogenated, although to a lesser extent than typically observed for linoleic and linolenic acids.

Bauman concluded that, as analytical techniques improved, "we have gained an appreciation of the complexity of the biohydrogenation processes occurring in the rumen," suggesting that there must be many more pathways.

### Final thoughts

The increasing use of fats in dairy cattle diets and efforts to include lipid metabolism in nutrition models require an understanding of their fate. Bauman said, noting that the digestion and metabolism of dietary fats and fatty acids in ruminants is complex.

According to Bauman, recent research has established that some of the many intermediate fatty acids that are found in the rumen are signaling molecules that regulate metabolic processes in the cow and that others can have beneficial health effects when consumed in dairy products.

The rumen outflow of lipids are predominantly free fatty acids, and differences in the digestibility of individual fatty acids in the small intestine are negligible.

Thus, the composition of fatty acids absorbed in the small intestine is similar to the composition of fatty acids leaving the rumen.

He concluded that, "obviously, our knowledge of lipid digestion and metabolism is rapidly advancing and the opportunity and challenge is to effectively apply this knowledge in the feeding and management of today's high-producing dairy cows." ∎



**2. Use of independent, paid consultants by commercial producers.**

**3. Influence outside the farm on purchases of expendable items by size.**



Source for Figures: Center for
Food & Agricultural Business.

**4. Influence outside the farm on purchases of capital items by size.**

## AFFIDAVIT OF PUBLICATION

THE KANSAS CITY STAR COMPANY, publishers of
THE KANSAS CITY STAR, a newspaper published in
the City of Kansas City, County of Jackson, State of
Missouri, confirms that the notice and/or advertisement of

DIAMOND ADVERTISING

PO BOX 6235
BEND              OR 97708
23229376

4889360

a true copy of which is hereto attached,
was duly published in the above said newspaper

FOR THE PERIOD OF: 1  Day (s)

COMMENCING: May 7,2004

ENDING: May 7,2004

STAR EDITION (S):    5/ 7/

STAR PAPER (S):    233

VOLUME: #124

Subscribed and sworn to before me,
this Friday, 07 May, 2004 .
I certify that I was duly qualified
as a Notary Public for the State of
Missouri, commissioned in Jackson
County, Missouri. My commission
expires August 18, 2006.

Laura S. Keeling, Notary